**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **VICTIM RIGHTS LAW CENTER**<br>115 Broad Street, 3rd Floor<br>Boston, MA 02110,<br><br>**EQUAL RIGHTS ADVOCATES**<br>1170 Market Street, Suite 700<br>San Francisco, CA 94102,<br><br>**LEGAL VOICE**<br>907 Pine Street, Suite 500<br>Seattle, WA 98101,<br><br>**CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION**<br>307 N. Michigan Ave., Suite 1818<br>Chicago, IL 60601,<br><br>                    Plaintiffs,<br><br>   v.<br><br>**ELISABETH D. DEVOS**, in her official capacity as Secretary of Education,<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>**KENNETH L. MARCUS**, in his official capacity as Assistant Secretary for Civil Rights,<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>**U.S. DEPARTMENT OF EDUCATION**,<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>                    Defendants. | Case Number: _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1.     Plaintiffs Equal Rights Advocates, Victim Rights Law Center, Legal Voice, and Chicago Alliance Against Sexual Exploitation bring this action against Defendants U.S. Department of Education ("the Department" or "the Agency"), Secretary Elisabeth DeVos, and Assistant Secretary for Civil Rights Kenneth Marcus seeking vacatur of the Department's final regulations implementing Title IX of the Education Amendments of 1972 (the "Final Rule"), as published in the Federal Register on May 19, 2020.[1]

2.     The Final Rule will reverse decades of efforts by Congress, the Executive Branch, and state and local governments, to combat the effects of sex-based harassment[2] on equal access to education.  Without adequate justification or explanation, the Final Rule not only removes protections against sex-based harassment and imposes disproportionate burdens on survivors, but also reduces schools' responsibility to respond to sex-based harassment—in some cases requiring schools not to respond at all. Furthermore, these changes are motivated by discriminatory sex-based stereotypes, in direct violation of Title IX's mandate to prevent and remedy sex discrimination and the U.S. Constitution's Equal Protection guarantee.  The Final Rule should be declared invalid.

3.     Over 45 years ago, Congress enacted Title IX, 20 U.S.C. § 1681, *et seq.*, to prohibit discrimination on the basis of sex in education programs and activities receiving federal

---

[1] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020).

[2] Unless otherwise stated, this Complaint uses the term "sex-based harassment" to refer to sexual harassment as well as other forms of unwelcome sex-based conduct, such as dating violence, domestic violence, and stalking.  Per the Department's 2001 Guidance, "sexual harassment" is defined as "unwelcome conduct of a sexual nature," which includes, but is not limited to, unwelcome physical, verbal or nonverbal conduct of a sexual nature, including sexual advances, requests for sex, and other conduct of a sexual nature that targets someone because of their sex.  2001 Guidance at 2. See 66 Fed. Reg. 5512 (Jan. 19, 2001).

financial assistance ("educational institutions" or "recipients").  As the primary federal agency that administratively enforces Title IX, the Department is "directed to effectuate" Title IX "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives" of Title IX.[3]

4.   This landmark civil rights law has helped fight sex discrimination and promote equal access to educational benefits, opportunities, and resources for all students, and especially girls and women, from the classroom to the playing field. Title IX's protections against sex discrimination include protection against sex-based harassment.

5.   Many students harmed by sex-based harassment suffer a loss of educational opportunity, often because their schools fail to respond appropriately.  Although progress has been made by many institutions to address sex-based harassment, students are still victimized at high rates, reporting remains very low, and investigating lower still.  With low reporting, few investigations, and inadequate—and sometimes harmful—responses by schools, students who experience sex-based harassment are more likely to drop out of school because they do not feel safe.  Some are even punished for reporting the harassment or expelled for lower grades in the wake of their trauma.

6.   In 1997, with the understanding that Title IX's prohibition against sex discrimination is hollow if a student can be subjected to sex-based harassment with impunity, the Department issued its first guidance to educational institutions on the standards that govern their response to sex-based harassment.  The Department stated that a school will be liable under Title IX if student-on-student sexual harassment creates a hostile educational

---

[3] 20 U.S.C. § 1682.

environment, the school knows or should have known of the harassment, and the school fails to take immediate and appropriate corrective action.[4]

7.  In 1998 and 1999, the U.S. Supreme Court issued two decisions articulating stringent liability standards for private Title IX lawsuits seeking money damages regarding sex-based harassment.[5]   The Court, however, explained that even if a recipient's actions in response to sex-based harassment do not meet the stringent standards for *monetary liability* in private Title IX lawsuits, the Department can *administratively enforce* Title IX against a recipient for failing to adequately address sex-based harassment as part of its "authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate."[6]

8.  Subsequently, the Department carefully reviewed the Supreme Court's decisions—in particular whether to apply the Court's stringent standards to the Department's administrative enforcement of Title IX.  The Department underwent a notice and comment process before issuing revised guidance in 2001, ultimately deciding that "the administrative enforcement standards reflected in the 1997 guidance remain valid in [the Department's Office for Civil Rights ("OCR")] enforcement actions."[7]

9.  Through the 2001 Guidance and successive guidance materials, the Department has maintained these standards for its administrative enforcement of Title IX, reaffirming that Title IX prohibits sex-based harassment, which includes sexual harassment.  The

---

[4] 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("1997 Guidance").
[5] *See Davis v. Monroe Cty Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).
[6] *Gebser*, 524 U.S. at 292.
[7] *See* U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance; Harassment of Students by School Employees, Other Students, or Third Parties*, at iv (2001) ("2001 Guidance").

Department has consistently defined sexual harassment as "unwelcome conduct of a sexual nature" and has consistently stated that a school violates Title IX if it "knew, or in the exercise of reasonable care should have known" about *sex-based* harassment of a student by another student, an employee, or a third party but failed to take "prompt and effective action to end the harassment, prevent it from recurring, and remedy its effects."[8]

10.     These guidance materials recognize that students who experience sex-based harassment suffer not only physically and emotionally, but also in their ability to participate in and benefit from educational opportunities.  The Department's longstanding guidance led to greater and more meaningful action by recipients to address sex-based harassment and support victims, an increase in reporting by victims to their schools and the Department, more transparency in how recipients responded, and greater accountability when institutions failed to comply with Title IX.

11.     After extensive consultation with recipient schools across the country, the Department published a Dear Colleague Letter, a significant guidance document, in 2011, clarifying the obligations of schools to prevent and address sexual harassment and eliminate hostile environments that act as barriers to equal access to educational obligations.  The Department followed this Guidance with a series of Questions and Answers in 2014.

12.     The Department's reaffirmation of Title IX's protections continued until September 2017, when it formally rescinded sexual violence guidance documents issued in 2011 and 2014— purportedly because they were issued without notice and comment—and issued policies

---

[8] *See generally* 2001 Guidance.

and interim guidance to educational institutions that significantly weakened protections for victims of sex-based harassment.

13.     Going even further, on November 29, 2018, the Department issued a Notice of Proposed Rulemaking ("Proposed Rule") seeking to formally amend the rules implementing Title IX and departing from decades of Department guidance as to Title IX's requirements.[9]  The Proposed Rule allowed—and, in some cases, required—schools to dismiss many reports of sex-based harassment and use unfair and retraumatizing procedures in investigations of sex-based harassment that are not required in investigations of other types of staff or student misconduct.

14.     In just over two months, the Department received over 124,000 comments on the Proposed Rule—the overwhelming majority in opposition.  Numerous commenters reiterated that sex-based harassment in education remains highly prevalent yet continues to be vastly underreported and under-investigated, and underscored that many victims are ignored or punished by their schools instead of receiving the help they need to ensure equal educational access. Many commenters, including Plaintiffs, expressed deep concern that the Proposed Rule would exacerbate these existing inequities and encourage a climate where significant sex-based harassment goes unchecked.

15.     On May 19, 2020, in the midst of the emergency situation created by the COVID-19 pandemic, the Department released its Final Rule, which contains additional harmful provisions not included in the Proposed Rule and is accompanied by a preamble of over 2,000 pages containing confusing and unclear guidance.  The Final Rule requires schools

---

[9] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018).

to amend their policies and procedures as necessary to comply in less than 3 months, by August 14, 2020, at a time when schools and students are struggling to adapt to virtual teaching and learning.

16. The Final Rule will worsen the devastating effects of sex-based harassment in schools, and will further prevent and discourage victims from reporting sex-based harassment because, among other things, it narrows the definition of sexual harassment to which schools may respond; constricts the universe of those school officials whose knowledge of harassment obligates the school to respond; and in numerous respects unfairly tilts the grievance processes against students who report sex-based harassment ("complainants") and in favor of those who are reported harassers and assailants ("respondents"), which makes the process more intimidating and traumatizing for victims and puts in place new barriers to accurate fact-finding and adjudication of complaints.

17. For example, the Final Rule (i) requires schools to dismiss all reports of sexual harassment that fall short of an inappropriately narrow definition; (ii) allows schools to ignore sex-based harassment unless there is actual knowledge of an incident by a preK-12 employee or by a narrow—and unclear—category of high-ranking employees in institutions of higher education; (iii) requires schools to dismiss reports of sex-based harassment that occur outside of a school's narrowly-defined activity or program, even when perpetrated by a school employee or student; (iv) requires schools to dismiss complaints by victims who have transferred, graduated, or dropped out by the time they file a complaint, even if they were pushed out of school because of the harassment they faced; (v) allows schools to dismiss complaints at any time if the respondent is no longer a student or employee at the

school, even if an investigation is ongoing; and (vi) allows schools to unreasonably delay investigations.

18. The Final Rule also reduces the risk of liability for schools that fail to comply with Title IX. For example, contrary to longstanding Department policy, the Final Rule adopts for its *administrative enforcement* scheme the "deliberate indifference" standard, which has, until now, been used only in *private litigation for monetary damages*. Now, the Department will not consider a recipient to have violated Title IX unless its response to sex-based harassment, of which it has actual knowledge, is "clearly unreasonable in light of the known circumstances."[10] The Final Rule also prohibits schools from providing victims with supportive measures that might be considered "punitive" or "disciplinary" to the respondent, even if such measures are provided to victims of other types of student misconduct.

19. Although the Department has historically applied the same standard to harassment based on race, color, national origin, and disability,[11] the Final Rule often requires schools to use a uniquely burdensome and unfair set of procedures in investigations of sex-based harassment that are not required in investigations of other types of staff or student misconduct, such as harassment on the basis of race or disability.

20. Further, the Department essentially requires schools to conduct mini-trials when they receive sex-based harassment complaints, but it arbitrarily picks and chooses which

---

[10] 85 Fed. Reg. at 30, 574.
[11] Racial Incidents and Harassment Against Students at Educational Institutions, 59 Fed. Reg. 11,448, 11,450 (Mar. 10, 1994) ("1994 Racial Harassment Guidance"); U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Prohibited Disability Harassment* (July 25, 2000) ("2000 Disability Harassment Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html; *see also* U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) ("2010 Guidance"), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

elements of a trial a school may use. For example, the Final Rule (i) requires schools to presume that reported sex-based harassment did not occur, thereby favoring the respondent; (ii) removes all discretion from schools regarding whether to require parties and witnesses in higher education investigations to submit to direct cross-examination by the other party's "advisor of choice,"; (iii) requires exclusion of all oral and written statements of a witness or party if the individual refuses to (or is unable to) answer a single question during cross-examination, while refusing to provide basic procedural protections to ensure that cross-examination questions are clear, have a proper foundation, and are not harassing; (iv) imposes unprecedentedly broad exclusionary rules for evidence where a witness does not testify at the live hearing, excluding video evidence, text messages, blog posts, police reports, medical reports and other highly relevant and reliable materials; (v) forces schools in certain circumstances to use the higher "clear and convincing" standard in investigations of sex-based harassment rather than the equitable "preponderance of the evidence" standard used in all civil rights cases; and (vi) allows schools to unnecessarily delay their Title IX investigation if there is a parallel criminal investigation.

21.   Contrary to the unequivocal purpose of Title IX, to prevent and redress sex-based discrimination in education, the Department's Final Rule will significantly reduce the number of investigations of sex-based harassment that schools conduct.  Although the Department trumpets that the Final Rule will save schools about $179 million each year by drastically reducing the number of sex-based harassment investigations that schools conduct, it acknowledges that the Department "does not have evidence to support the claim that the final regulations will have an effect on the *underlying number* of incidents of sexual harassment."  Thus, the Department admits the Final Rule will leave many victims of sex-

based harassment without redress for the discrimination they face in their educational environment.[12]

22.     Although the Department claims the net cost of the Final Rule will be $48.6 million to $62.2 million over the next ten years, the actual net cost will be much higher, given that the Department entirely failed to account for the tremendous costs of the Final Rule to students who experience sex-based harassment but will no longer be able to report it, obtain fair investigations and outcomes, and/or receive necessary remedies.   This failure is particularly inexcusable given that the harms of sex discrimination are precisely those that Title IX seeks to prevent.

23.     In recent years, institutions from workplaces to schools have recognized the need to address sex-based harassment before it escalates and leads to more harm for the victim and liability for the institution.   Schools have invested in trainings and changed their policies to proactively prevent sex-based harassment and immediately take action to protect a student's safety and ability to learn.   The Final Rule turns this positive trend on its head, reversing decades of Title IX interpretation and progress made by schools.   Instead, the Final Rule encourages—and in some instances, requires—schools to bury their heads in the sand in the face of sexual harassment and prevents schools from taking affirmative steps to prevent and address sexual harm.

24.     For example, under the Final Rule, a teacher who observes an elementary school boy inappropriately touching a girl—as was the case in the Supreme Court's landmark Title IX decision, *Davis v. Monroe County Board of Education*[13]—will not be permitted to take any

---

[12] 85 Fed. Reg. at 30,539.
[13] 526 U.S. 629 (1999).

action that could be considered "disciplinary."  If the teacher wants to give the boy detention, or ask him to spend recess inside the classroom, the Final Rule will require a formal investigation lasting at least 20 days, and any questioning involved will require the students to either submit written follow-up questions to each other or participate in a live, trial-type adversarial hearing.  Further, it is not even clear that such inappropriate touching will be actionable under the Final Rule, because it will not meet the definition of "sexual assault" unless it was done for the purpose of sexual gratification rather than some other purpose (such as bullying), and the touching alone may not meet the standard of being severe, pervasive, and objectively offensive enough to interfere with the child's education.  Even if the school concludes that the conduct constitutes sex-based harassment, and investigates it under the Final Rule, the boy will be presumed not responsible.  And the girl, no matter her age, could be subject to live, direct cross-examination and will face procedural rules and standards that are more stringent, biased, and traumatizing than those her teacher would face if she were the one bringing a sex-based harassment complaint against another teacher.

25.     The standards set forth in the Final Rule do not apply to complaints or investigations of any other type of student or staff misconduct or any other type of discrimination.  The Department's decision to reverse decades of guidance and single out victims of sex-based harassment for uniquely burdensome and inequitable procedures relies on and reinforces the toxic sex stereotype and unfounded generalization that people who report sex-based harassment most often—women and girls—are uniquely less credible than people who report other types of wrongdoing.  In fact, the rates of false reporting of sex-based

harassment are no greater than the rates for any other crimes.[14]  The statements and actions of the Department's own leadership reveal this discriminatory viewpoint.

26.   The Final Rule disproportionately and inappropriately burdens potential complainants at every stage of the Title IX complaint and investigation process such that the cumulative impact of the Final Rule will be a chilling effect on future complaints of sex-based harassment, in an environment where such harassment is already dramatically underreported.

27.   The Final Rule violates the Administrative Procedure Act ("APA") and the Equal Protection guarantee of the Fifth Amendment.  First, the Final Rule is not in accordance with law because it eliminates protections for survivors of sex-based harassment and imposes procedural requirements that will chill reporting of harassment, contrary to Title IX's animating purpose.  Second, the Final Rule is arbitrary and capricious because the Department's stated rationale for the Rule is contrary to the evidence before it and the Department failed to provide an adequate justification for departing from decades of consistent Department policy and importing private law standards into an administrative enforcement scheme.  Third, the Final Rule exceeds the Department's statutory jurisdiction because the Final Rule requires schools to implement policies that frustrate Title IX's purpose, while the Department simultaneously attempts to abdicate its own enforcement responsibilities.  Fourth, the Department violated the APA's procedural requirements by including in the Final Rule provisions that were never submitted for public comment.

---

[14] David Lisak, et al., *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, Violence Against Women (2010) ("Cumulatively, these findings contradict the still widely promulgated stereotype that false rape allegations are a common occurrence."); *see* Emily Moon, *False Reports of Sexual Assault are Rare, But Why Is There So Little Reliable Data About Them?*, Pac. Standard (Oct. 5, 2018), https://psmag.com/news/false-reports-of-sexual-assault-are-rare-but-why-is-there-so-little-reliable-data-about-them.

Finally, the Final Rule's removal of long-standing protections against sexual harassment and active obstruction of schools' ability to address sex-based harassment are changes motivated by discriminatory sex-based stereotypes that violate the Equal Protection guarantee of the Fifth Amendment.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331.

29. Venue is proper under 28 U.S.C. § 1391 because Victim Rights Law Center, a plaintiff, resides in Boston, Massachusetts.

## PARTIES

30. **Plaintiff Victim Rights Law Center** ("VRLC") is a non-profit organization with locations in Oregon and Massachusetts dedicated solely to serving the legal needs of victims of rape and sexual violence. VRLC's mission is to provide legal representation to such victims to help rebuild their lives and to promote a national movement committed to seeking justice for every victim.

31. **Plaintiff Equal Rights Advocates** ("ERA") is a national non-profit civil rights organization based in San Francisco, California. Founded in 1974, ERA is dedicated to protecting and expanding economic educational access and opportunities for women and girls.

32. **Plaintiff Legal Voice** ("Legal Voice") is a Seattle-based non-profit public interest organization dedicated to protecting the rights of women, girls, and LGBTQ people. Legal Voice's work includes decades of advocacy to enact and enforce antidiscrimination laws and to eradicate sex-based discrimination in every area where it is present.

33. **Plaintiff Chicago Alliance Against Sexual Exploitation** ("CAASE") is a Chicago-based non-profit, public interest organization dedicated to addressing the culture, institutions, and individuals that perpetrate, profit from, or support sexual exploitation.

34. **Defendant U.S. Department of Education** (the "Department" or "Agency") is a federal agency headquartered in Washington, D.C.  The Department implements Title IX through issuing regulations and guidance documents and is tasked with administrative enforcement of Title IX, 20 U.S.C. § 1682.  As a federal agency, the Department is subject to the requirements of the Administrative Procedure Act and the United States Constitution.

35. **Defendant Elisabeth D. DeVos** is the United States Secretary of Education.  She is sued in her official capacity.

36. **Defendant Kenneth L. Marcus** is the Assistant Secretary for Civil Rights.  He is sued in his official capacity.

## BACKGROUND

### Sex-Based Harassment in Schools Is Prevalent, Underreported, Under-Investigated, and Impedes Equal Access to Education

37. Sex-based harassment, which includes sexual assault and other forms of sexual harassment, is widespread in schools across the country, including in institutions of higher education. Sex-based harassment affects all students, but disproportionately affects women, girls, LGBTQ students, and students with disabilities.  A 2019 study found that about one in four women, 1 in 4 transgender or gender-nonconforming students, and 1 in 15 men experience sexual assault while in college.[15]  In 2014, the White House Task Force to Protect Students

---

[15] Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*, at ix (Oct. 15, 2019), https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-2019.

from Sexual Assault concluded: "More than 1 in 4 transgender students and more than 1 in 3 of bisexual students experience sexual assault while in college."[16] Similarly, about 1 in 3 college women and 1 in 6 college men are survivors of dating violence or domestic violence,[17] and 1 in 6 women and 1 in 19 men have experienced stalking.[18]

38.   Although sex-based harassment on college campuses is more widely acknowledged, students of all ages are impacted.  A nationally representative survey of students in grades 7 through 12 concluded that 56 percent of girls and 40 percent of boys surveyed experienced some form of sexual harassment in the 2011 school year (including online harassment), and the majority said that the experience had a negative effect on them.[19] More than 1 in 5 girls ages 14 to 18 are kissed or touched without their consent.[20]   In addition, individuals who experience sexual violence are at heightened risk of repeat sexual violence—children who experience sexual violence are nearly 14 times more likely to experience rape or attempted rape in their first year of college, according to the National Center for Victims of Crime.[21]

---

[16] *Id.*

[17] Knowledge Networks, *2011 College Dating Violence and Abuse Poll* 15 (June 9, 2011), http://www.loveisrespect.org/pdf/College_Dating_And_Abuse_Final_Study.pdf.

[18] Nat'l Center for Victims of Crime, *Stalking Fact Sheet* (2015), https://victimsofcrime.org/docs/default-source/src/stalking-fact-sheet-2015_eng.pdf.

[19] Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* 2 (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf.

[20] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017) ("*Let Her Learn: Sexual Harassment and Violence*"), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[21] Nat'l Center for Victims of Crime, *Child Sexual Abuse Statistics* (2011), https://members.victimsofcrime.org/media/reporting-on-child-sexual-abuse/child-sexual-abuse-statistics.

39.   Despite its prevalence, sex-based harassment is vastly underreported. For example, only

about 12 percent of college survivors report sexual assault to their schools,[22] and 2 percent

of girls ages 14 to 18 who have been kissed or touched without their consent report the

incident to their schools.[23]

40.   Even when students do come forward, schools often choose not to investigate their reports

of sex-based harassment. For example, according to a 2014 Senate report, 21 percent of the

largest private institutions of higher education conducted fewer investigations of sexual

assault than reports received, with some of these schools receiving more than 7 times more

reports than investigations.[24]

41.   Even worse, schools often punish survivors when they come forward instead of helping

them. For example, students who report sex-based harassment have been disciplined for

allegedly "lying" about the incident or engaging in "consensual" sexual activity,[25] for

engaging in premarital sex,[26] for defending themselves against their harassers,[27] for missing

school in the aftermath of harassment, or for merely talking about their assault with other

---

[22] *Poll: One in 5 women say they have been sexually assaulted in college*, Wash. Post (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll.
[23] *Let Her Learn: Sexual Harassment and Violence* at 2.
[24] U.S. Senate Comm. On Homeland Sec. & Governmental Affairs, U.S. Senate Subcomm. On Fin. & Contracting Oversight, *Sexual Violence on Campus: How too many institutions of higher education are failing to protect students* 9 (July 9, 2014), https://www.hsdl.org/?view&did=755709.
[25] *See, e.g.*, Brian Entin, *Miami Gardens 9th-grader says she was raped by 3 boys in school bathroom*, WSVN-TV (Feb. 8, 2018), https://wsvn.com/news/local/miami-gardens-9th-grader-says-she-was-raped-by-3-boys-in-school-bathroom; Nora Caplan-Bricker, *"My School Punished Me"*, Slate (Sept. 19, 2016), https://slate.com/human-interest/2016/09/title-ix-sexual-assault-allegations-in-k-12-schools.html; Aviva Stahl, *'This Is an Epidemic': How NYC Public Schools Punish Girls for Being Raped*, Vice (June 8, 2016), https://broadly.vice.com/en_us/article/59mz3x/this-is-an-epidemic-how-nyc-public-schools-punish-girls-for-being-raped.
[26] Sarah Brown, *BYU Is Under Fire, Again, for Punishing Sex-Assault Victims*, Chronicle of Higher Educ. (Aug. 6, 2018), https://www.chronicle.com/article/BYU-Is-Under-Fire-Again-for/244164.
[27] NAACP Legal Defense and Educ. Fund, Inc. & Nat'l Women's Law Ctr., *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity* 25 (2014), https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf.

students in violation of a "gag order" or nondisclosure agreement imposed by their school.[28]  Students who report are also often pressured or forced to withdraw from school temporarily, transfer to another school, or enroll in an inferior or "alternative" education program that isolates them from their friends and from equal educational opportunities.

42.   Schools are more likely to ignore, blame, and punish women and girls of color, especially Black women and girls, who report sex-based harassment, due to harmful race and sex stereotypes that label them as "promiscuous"[29] and less deserving of protection and care.[30] Similarly, students who are pregnant or parenting are more likely to be blamed for sex-based harassment than their peers, due in part to the stereotype that they are more "promiscuous" because they have engaged in sexual intercourse in the past.  LGBTQ students are less likely to be believed and more likely to be blamed due to stereotypes that they are "hypersexual" or bring the "attention" upon themselves.[31]  And students with disabilities are less likely to be believed because of stereotypes about people with disabilities being less credible[32] and because they may have greater difficulty describing or

---

[28] *See, e.g.*, Tyler Kingkade, *When Colleges Threaten To Punish Students Who Report Sexual Violence*, Huffington Post (Sept. 9, 2015), https://www.huffingtonpost.com/entry/sexual-assault-victims-punishment_us_55ada33de4b0caf721b3b61c.

[29] *E.g.*, Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 Harv. J.L. & Gender 1, 16, 24-29 (Winter 2018).

[30] Georgetown Law Center on Poverty and Inequality, *Girlhood Interrupted: The Erasure of Black Girls' Childhood*, 1 (2018), https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2017/08/girlhood-interrupted.pdf.

[31] *See, e.g.*, Gillian R. Chadwick, *Reorienting the Rules of Evidence*, 39 Cardozo L. Rev. 2115, 2118 (2018), http://cardozolawreview.com/heterosexism-rules-evidence; Laura Dorwart, *The Hidden #MeToo Epidemic: Sexual Assault Against Bisexual Women*, Medium (Dec. 3, 2017), https://medium.com/@lauramdorwart/the-hidden-metoo-epidemic-sexual-assault-against-bisexual-women-95fe76c3330a.

[32] The Arc, *People with Intellectual Disabilities and Sexual Violence* 2 (Mar. 2011), https://www.thearc.org/document.doc?id=3657.

communicating the harassment they experienced, particularly if they have a cognitive or developmental disability.[33]

43. Sex-based harassment harms students physically, psychologically, and academically. Sexual assault survivors, for example, are three times more likely to suffer from depression, six times more likely to have Post Traumatic Stress Disorder, thirteen times more likely to abuse alcohol, twenty-six times more likely to abuse drugs, and four times more likely to contemplate suicide.[34]

44. Research shows that the effects of sex-based harassment in school have long-lasting consequences. For example, sexually victimized students are more likely to drop classes, change residences, and have lower GPAs, which negatively affects professional success and earning potential.[35] As a result, students who suffer sex-based harassment are deprived of equal access to an education.

### Statutory and Regulatory History

45. In recognition of the fact that "sex discrimination reaches into all facets of education," Congress passed Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which prohibits discrimination on the basis of sex under any federally funded education program or activity.[36] It is well-settled law that Title IX requires schools to address and remediate

---

[33] *See* Nat'l Inst. of Justice, *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (2016), https://www.nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-with-disabilities.aspx.

[34] Feminist Majority Foundation, *Fast facts - Sexual violence on campus* (2018), http://feministcampus.org/wp-content/uploads/2018/11/Fast-Facts.pdf.

[35] Cari Simon, *"On top of everything else, sexual assault hurts the survivors' grades"* https://www.washingtonpost.com/posteverything/wp/2014/08/06/after-a-sexual-assault-survivors-gpas-plummet-this-is-a-bigger-problem-than-you-think/

[36] 118 Cong. Rec. 5804 (1972) (remarks of Sen. Bayh).

sex-based harassment.[37]  When a recipient institution fails to comply with Title IX or take action to remedy its non-compliance, it can be subject to a range of enforcement actions by the Department, including the loss of federal funding.[38]

46.    In 1975, the Department's predecessor first promulgated regulations to effectuate Title IX.[39]  As amended, the 1975 Regulations remain in effect today.[40]  The regulations incorporate Title IX's nondiscrimination mandate, identify specific actions that constitute discrimination, and require assurances from recipients of federal financial assistance that their programs and activities comply with regulatory requirements.[41]  Educational institutions that have discriminated on the basis of sex must "take such remedial action as the Assistant Secretary [for Civil Rights] deems necessary to overcome the effects of such discrimination."[42]

47.    The 1975 Regulations require that educational institutions "adopt and publish grievance procedures providing for prompt and equitable resolution" of student and employee complaints of sex discrimination, including sex-based harassment.[43]  Such grievance procedures are designed to facilitate the reporting and resolution of sex discrimination complaints to prevent and remedy hostile educational environments.

48.    Further, each educational institution is required to "designate at least one employee"—commonly known as a Title IX coordinator—"to coordinate its efforts to comply with and

---

[37] *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).
[38] 20 U.S.C. § 1682.
[39] *See* 40 Fed. Reg. 24, 128 (June 4, 1975).
[40] *See* 34 C.F.R. pt. 106.
[41] See *id.* §§ 106.31(a), 106.31(b), 106.4(a).
[42] *Id.* § 106.3(a).
[43] *Id.* § 106.8(c).

carry out its responsibilities under [Title IX]," including any investigation of any complaint of sex discrimination, including sex-based harassment.[44]

49.   In addition to promulgating Title IX's implementing regulations, the Department has issued a series of guidance documents that explain educational institutions' obligations under Title IX.

50.   The first of such guidance documents about educational institutions' obligations to address sex-based harassment was published in 1997 after a public notice-and-comment period and "extensive consultation with interested parties, [including] students, teachers, school administrators, and researchers."[45]   The 1997 Guidance explains the standards used by OCR to investigate student complaints of schools' inadequate responses to sex-based harassment perpetuated by school employees, other students (peers), or third parties.

51.   The 1997 Guidance informed schools how to address sex-based harassment in educational settings, and advised schools of their responsibility to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints and also to disseminate a policy against sex discrimination.[46]

52.   The 1997 Guidance encouraged a school to take "interim measures" during the investigation of a complaint, such as placing the involved students in separate classrooms or employing alternative housing arrangements.   The 1997 Guidance instructed a school to put in place "responsive measures" after a finding of responsibility to "minimize, as much as possible, the burden" on the complainant.[47]   If the school determined that sex-based

---

[44] *Id.* § 106.8(a).
[45] 61 Fed. Reg. 42,728 (Aug. 16, 1996), 61 Fed. Reg. 52,172 (Oct. 4, 1996), and 62 Fed. Reg. 12,034, 12,035 (Mar. 13, 1997) ( "1997 Guidance").
[46] 62 Fed. Reg. at 12,040.
[47] *Id.* at 12,034.

harassment did occur, the 1997 Guidance explained that schools may be "required to provide . . . other services to the [complainant] if necessary to address the effects of the harassment on the student," such as grade changes, tutoring, tuition adjustments, and reimbursement for professional counseling.[48]

53. The Department issued revisions to the 1997 Guidance in 2001 after the Supreme Court issued two decisions articulating stringent liability standards for private Title IX sexual harassment cases seeking money damages. The 2001 Guidance explained that the liability standards articulated by the Supreme Court in those cases—that in order to recover money damages in a private Title IX lawsuit challenging sexual abuse by a teacher or student, a plaintiff must show that an appropriate official had actual notice of the abuse and that the school was deliberately indifferent to it—did not change the Department's administrative enforcement standards.[49]  Indeed, in setting the high standard for money damages, the Court highlighted the important difference between a private suit for damages and the Department's administrative regulatory scheme of achieving voluntary compliance by schools.

54. After careful review of the implications of those decisions, including undergoing a notice and comment process before finalizing the Guidance in 2001, the Department decided to maintain the 1997 Guidance standards requiring schools to take prompt and effective action calculated to end sexual harassment, prevent its recurrence, and remedy its effects.[50]  In the 2001 Guidance, the Department explained that the "liability standards established in those cases are limited to private actions for monetary damages" because the Supreme Court was

---

[48] *Id.*

[49] *See* 2001 Guidance at iii–vi.

[50] *Id.*

concerned about "the possibility of a money damages award against a school for harassment about which it had not known," which it contrasted against the administrative enforcement process that "requires enforcement agencies such as [the Department's Office for Civil Rights] to make schools aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination."[51]   In fact, individual and institutional commenters "uniformly agreed" with this distinction between administrative enforcement and private litigation.[52]

55.   The 2001 Guidance reaffirmed and reiterated many of the principles set forth in the 1997 Guidance, such as the requirement that educational institutions publish grievance procedures; disseminate a policy against sex discrimination; implement interim and responsive measures; and resolve complaints promptly and equitably.[53]

56.   The 2001 Guidance stated that schools had notice of sex-based harassment against a student and were therefore responsible for addressing it if "a responsible employee 'knew, or in the exercise of reasonable care should have known,' about the harassment." A "responsible employee" was broadly defined to "include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility."[54]

57.   The 2001 Guidance stated that schools were also responsible for addressing sex-based harassment against a student if an employee who is acting (or who reasonably appears to

---

[51] *Id.* at iii–iv.
[52] *Id.* at ii, iv.
[53] *Id.* at 14.
[54] *Id.* at 13.

be acting) "in the context of carrying out their day-to-day job responsibilities" to provide aid, benefits, and services to students engages in sex-based harassment, and the harassment "denies or limits a student's ability to participate in or benefit from a school program on the basis of sex."  The Department clarified that schools were liable for addressing this type of employee-on-student misconduct "whether or not the recipient ha[d] 'notice' of the harassment."[55]   The Department assured recipients that under its administrative enforcement procedures, "recipients always receive notice and the opportunity to take appropriate corrective action before any finding of violation of possible loss of federal funds."[56]

58.  The 2001 Guidance reiterated the 1997 Guidance's requirement that once on notice of harassment, a school was required to take immediate and appropriate steps to investigate, and then take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.

59.  Additionally, the 2001 Guidance noted that both employees and students of public schools and universities are entitled to certain constitutional due process protections, and that the rights established under Title IX must be interpreted consistently with any such due process protections.  The 2001 Guidance instructed, however, that recipients should ensure that "steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."[57]

---

[55] *Id.* at vi, 10.
[56] *Id.*
[57] *Id.* at 22.

60.     The standards for sex-based harassment set forth in the 2001 Guidance were consistent with the Department's 1994 guidance on harassment based on race, color, and national origin, and its 2000 guidance on disability harassment.[58]

61.     Both the 1997 Guidance and 2001 Guidance were reaffirmed, elaborated upon, and clarified through the Department's 2011 Dear Colleague Letter on Sexual Violence and a series of Questions and Answers issued in 2014.[59]  These documents provided additional details and examples to help schools comply with their Title IX obligations when responding to sexual violence, including clarifying that schools were required to respond to a hostile educational environment caused by off-campus incidents.  The 2011 and 2014 Guidances explained that schools must use a "preponderance of the evidence" standard— i.e., "more likely than not"—to decide whether sex-based harassment occurred.[60]  This clarification was consistent with the Department's policy of requiring schools to use the preponderance standard in Title IX investigations since as early as 1995 and throughout both Republican and Democratic administrations.[61]  The Department itself uses the

---

[58] *See generally* 1994 Racial Harassment Guidance; 2000 Disability Harassment Guidance.

[59] U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter* (Apr. 4, 2011) ("2011 Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014) ("2014 Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[60] 2014 Guidance at 13, 26; 2011 Guidance at 10-11.

[61] *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Letter from Howard Kallem, Chief Attorney, D.C. Enforcement Office, to Jane E. Genster, Vice President and General Counsel, Georgetown University (Oct. 16, 2003)  ("2003 OCR Letter to Georgetown University"), http://www.ncherm.org/documents/202-GeorgetownUniversity--110302017Genster.pdf ("in order for a recipient's sexual harassment grievance procedures to be consistent with Title IX standards, the recipient must … us[e] a preponderance of the evidence standard"); U.S. Dep't of Educ., Office for Civil Rights, Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College (Apr. 4, 1995) ("1995 OCR letter to Evergreen College"), http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf (explaining that Evergreen College's use of the clear and convincing standard "adhere[d] to a heavier burden of proof than that which is required under Title IX" and that the College was "not in compliance with Title IX.").

preponderance of the evidence standard in its own investigations of schools' responses to complaints of discrimination based on race, color, national origin, sex and disability.[62]

62. The 2014 Guidance also required institutions to take interim measures that minimized the burden on complainants while an investigation is pending in order "to ensure equal access to its education programs and activities and protect the complainant as necessary."[63]

63. Both the 1997 Guidance and 2001 Guidance were also reaffirmed through the Department's 2010 Guidance on bullying and harassment, which applied the same standards to harassment based on race, color, national origin, sex, and disability.[64]

64. Title IX is not the only law that governs sexual violence and other forms of sex-based harassment in schools.  In 2013, Congress passed the Campus Sexual Violence Elimination Act ("Campus SaVE") as an amendment to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), with implementing regulations that took effect on July 1, 2015.  Under Campus SaVE, Congress better aligned the Clery Act with Title IX by taking a survivor-centered approach to addressing sexual assault, domestic violence, dating violence, and stalking by mandating that investigations and conduct hearings are to "promote victim safety and increase accountability."[65]  The Clery Act encoded significant provisions of the 2011 Dear Colleague Letter.

---

[62] U.S. Dep't of Educ., Office for Civil Rights, *Case Processing Manual* (Nov. 18, 2018) at 17, https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.
[63] 2014 Guidance at 32–33; 2011 Guidance at 15–16.
[64] 2010 Guidance.
[65] Campus Sexual Violence, Domestic Violence, Dating Violence and Stalking Education and Prevention, Pub. L. No. 113-4 § 304, 127 Stat. 90 (2013).

**The Trump Administration's Changes to Title IX**

65.   Following his inauguration, President Trump nominated Secretary DeVos to lead the Department of Education.

66.   To understand the confounding and unlawful provisions in the Final Rule, it is important context to note the longstanding stated views of the Trump Administration on the issue of sexual violence.  President Trump and other relevant Trump Administration officials have repeatedly discounted the societal costs of sexual violence, have demeaned and even threatened survivors who have come forward, and have argued that the current system for responding to sexual violence is unfair to those named as harassers and assailants.

67.   President Trump's actions and statements reveal his discriminatory and stereotyped views of women, and a pattern of discounting the veracity of allegations of women even in the face of strong evidentiary support. Then-candidate Trump dismissed the numerous women who reported being sexually harassed or assaulted by him as "phony accusers" who made such reports to get "some free fame." This discriminatory and stereotyped view of women and girls has become formal White House policy, as the White House Press Secretary has asserted in an official statement that at least 16 women who reported being sexually harassed by the President were lying.[66]

68.   In questioning the veracity of allegations of violence against women, President Trump purports to appeal to his own notions of "due process."  For example, following allegations supported by photographic evidence that a White House aide had engaged in domestic violence, he lashed out: "People's lives are being shattered and destroyed by a mere

---

[66] John Wagner, *All of the Women Who Have Accused Trump of Sexual Harassment Are Lying, the White House Says*, Wash. Post, Oct. 27, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/10/27/all-of-the-women-who-have-accused-trump-of-sexual-harassment-are-lying-the-white-house-says.

allegation. Some are true and some are false. Some are old and some are new. There is no recovery for someone falsely accused - life and career are gone. Is there no such thing any longer as Due Process?"[67]

69.    Secretary DeVos has repeatedly criticized the protections that Title IX affords to women and other survivors of sex-based harassment, at times appealing to equally misplaced notions of due process and unfairness.   Importantly, Secretary DeVos conflates the criminal justice system's due process protections with fair and equitable procedures afforded students in school sex-based harassment disciplinary proceedings. These procedures are required to be impartial and equitable under the Campus SaVE Act already as a matter of federal law.

70.    Secretary DeVos's criticism appears to be based on discriminatory stereotypes and unfounded generalizations about female college students in general and female victims of sexual violence in particular.

a.    For example, in September 2017, Secretary DeVos gave a speech on campus sex-based harassment at George Mason University.  In her remarks, she cited a number of misleading and/or untrue anecdotes to prop her unsupported claim that male respondents in sexual violence investigations are often treated unfairly by their schools.  Secretary DeVos also mischaracterized the 2011 and 2014 Guidances as being responsible for schools treating respondents unfairly, when in fact it was some schools' failure to follow the previous guidances that resulted in unfair treatment of respondents.

---

[67] Donald J. Trump (@realDonaldTrump), Twitter (Feb 10, 2018), https://twitter.com/realDonaldTrump/status/962348831789797381?s=20.

b.  Secretary DeVos's September 2017 speech presented as equally problematic the harm faced by sexual violence survivors and the harm faced by individuals who have been falsely accused, despite a lack of evidence that the latter is anything other than a rare occurrence, unlike the former.[68]  Rather than recognizing that false accusations are rare,[69] Secretary DeVos presented the problem of false accusations as rampant.

c.  Secretary DeVos also asserted that the loss of due process protections for respondents is a widespread problem on school campuses, claiming "the system established by the prior administration" was responsible for creating "victims of a lack of due process,"[70] despite the fact that the 2011 and 2014 Guidances expressly recognized that schools must protect due process rights.[71]

d.  Secretary DeVos expressed doubt about the seriousness of sexual harassment claims, saying, "[I]f everything is harassment, then nothing is."[72]  This statement, among other things, minimizes the full range of sex-based harassment and its impact on women and girls, including deprivation of their access to education.

71.  Other politically appointed Department of Education officials have expressed similar doubts about the veracity of sex-based harassment claims. For example, the Department's previous Acting Assistant Secretary for Civil Rights, Candice Jackson, publicly stated that

---

[68] *See* Elisabeth DeVos, Sec'y of the U.S. Dep't of Educ., Remarks on Title IX Enforcement at George Mason University (Sept. 7, 2017), https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement ("DeVos Remarks").

[69] David Lisak, et al., *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, VIOLENCE AGAINST WOMEN (2010) ("Cumulatively, these findings contradict the still widely promulgated stereotype that false rape allegations are a common occurrence.").

[70] *Id.*

[71] *Id.*; 2014 Guidance at 13; 2011 Guidance at 12.

[72] *Id*.

for most sexual assault investigations, there is "not even an accusation that these accused students overrode the will of a young woman."  She further stated that "the accusations— 90% of them fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she just decided that our last sleeping together was not quite right.'"[73]

72.     These comments reflect regressive and discriminatory sex stereotypes of women and girls who report sex-based harassment as vengeful or deceitful.

73.     In 2017, the Department, under DeVos's leadership, issued an updated Dear Colleague Letter rescinding the 2011 and 2014 Guidance and weakening protections for students who experience sex-based harassment.[74]

### THE FINAL RULE

74.     The Department published a Notice of Proposed Rulemaking in the Federal Register on November 29, 2018, seeking to formalize many of the changes in the 2017 Guidance and otherwise erode Title IX's protections.[75]

75.     The Department claimed that the Proposed Rule was intended to and would reduce the number of Title IX investigations conducted by schools and accordingly would save schools $99.2 million each year through that reduction.[76] Yet the Proposed Rule failed to explain why it was reasonable to seek to reduce the number of investigations of sex-based

---

[73] Erica L. Green and Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as The Accused Get DeVos' Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.
[74] U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ("2017 Guidance").
[75] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61,462 (Nov. 29, 2018) (the "Proposed Rule").
[76] *Id*. at 61,490.

harassment given that Title IX requires schools to address this form of sex discrimination and given that it is so prevalent, underreported, and under-investigated.

76. The Department also estimated that the Proposed Rule would result in total net savings to schools of $286.4 million to $367.7 million over the next 10 years.[77] But that net savings estimate failed to take any account whatsoever of the costs the Proposed Rule would impose on victims and survivors or on schools.

77. The Department received over 124,000 comments on the Proposed Rule, including comments from states, schools, public interest organizations, educators, and individual citizens. The overwhelming majority of all comments opposed the Proposed Rule.

78. In particular, stakeholders—including students, education associations and institutions, legal experts, trauma experts, civil rights advocates, and government officials—voiced their opposition to some or all of the Proposed Rule, including:

    a. Students, including: student survivors,[78] fraternity and sorority members,[79] and student body presidents at 76 colleges and universities in 32 states;[80]

---

[77] *Id.* at 61,463, 61,484.

[78] *See* Letter from Know Your IX to Kenneth Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., (Jan. 30, 2019), https://actionnetwork.org/user_files/user_files/000/029/219/original/Know_Your_IX_Comment_on_Proposed_Title _IX_Rule_(1).pdf; Letter from End Rape on Campus to Kenneth Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ. (Jan. 30, 2019), https://nwlc.org/wp-content/uploads/2019/02/NWLC-Title-IX-NPRM-Comment.pdf.

[79] Letter from Asa Jungreis, President, Alpha Epsilon Pi Fraternity, University of California, Davis to Dep't of Educ. (Jan. 28, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11081; Letter from A Sorority at the University of California Davis to Dep't of Educ. (Jan. 29, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11790.

[80] Letter from 76 College and University Student Body Presidents to Betsy DeVos, Sec'y, Dep't of Educ., at 1 (Jan. 30, 2019), https://assu.stanford.edu/sites/g/files/sbiybj6236/f/student_body_presidents_comment_on_title_ix_proposal_1.pdf.

b.  Education associations, including: the American Federation of Teachers;[81] American Council on Education;[82] Association for Student Conduct Administration;[83] Association of American Universities;[84] Association of Title IX Administrators;[85] International Association of Campus Law Enforcement Administrators;[86] National Association of Secondary School Principals;[87] National Education Association;[88] AASA (The School Superintendents Association);[89]

c.  Nineteen state attorneys general;[90]

d.  School systems and individual educational institutions, including: the Association of Independent Colleges and Universities in Massachusetts;[91] Berkeley Unified

---

[81] Letter from American Federation of Teachers to Brittany Bull, Dep't of Educ. (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-9123.

[82] Letter from American Council on Education on behalf of 61 Higher Education Associations to Betsy DeVos, Sec'y, Dept. of Educ., at 16 (Jan. 30, 2019), https://www.acenet.edu/Documents/Comments-to-Education-Department-on-Proposed-Rule-Amending-Title-IX-Regulations.pdf.

[83] Letter from Five Student Affairs Associations to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 7 (Jan. 29, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11689.

[84] Letter from Association of American Universities to Brittany Bull, Dep't of Educ. (Jan. 24, 2019), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Higher-Education-Regulation/AAU-Title-IX-Comments-1-24-19.pdf.

[85] Letter from Association of Title IX Administrators to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 28, 2019), https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18120231/ATIXA-NPRM-Comments-Final.pdf.

[86] Letter from Int'l Ass'n of Campus Law Enforcement Administrators to Betsy DeVos, Sec'y, Dep't of Educ., at 4 (Jan. 28, 2019) ("International Association of Campus Law Enforcement Administrators' Comment"), https://www.regulations.gov/document?D=ED-2018-OCR-0064-10515.

[87] Letter from The National Association of Secondary School Principals to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., (Jan. 17, 2019), https://www.nassp.org/wordpress/wp-content/uploads/2019/01/NASSP_Title_IX_Comments_-_1.17.19_V2.pdf.

[88] Letter from National Education Association to Brittany Bull, Dep't of Educ., at 9 (Jan. 30, 2019) ("Letter from Nat'l Educ. Ass'n"), http://www.nea.org/assets/docs/NEA%20Comment%20Letter%20RE%20ED-2018-OCR-0064.pdf.

[89] Letter from The School Superintendents Association to Betsy DeVos, Sec'y, Dep't of Educ., at 5 (Jan. 22, 2019) ("Letter from School Superintendents"), https://aasa.org/uploadedFiles/AASA_Blog(1)/AASA%20Title%20IX%20Comments%20Final.pdf.

[90] Letter from 20 Attorneys General to Betsy DeVos, Sec'y, Dep't of Educ., (July 19, 2017), https://www.attorneygeneral.gov/taking-action/press-releases/20-ags-call-on-secretary-devos-to-maintain-protections-for-survivors-of-campus-sexual-assault.

[91] Letter from Ass'n of Indep. Coll. and Univ. in Mass. to Betsy DeVos, Sec'y, Dep't of Educ., (Jan. 23, 2019),23, 2019) ("Letter from 55 Massachusetts Institutions of Higher Education"), http://aicum.org/wp-

Public Schools;[92] Boston University;[93] Georgetown University;[94] Howard University;[95] Northwestern University;[96] New York University;[97] Oregon University Presidents;[98] Oregon University Title IX Coordinators;[99] State University of New York (SUNY) system;[100] Trinity College;[101] University of California System, including Title IX Coordinators;[102] University of Colorado;[103]

content/uploads/2019/01/AICUM-public-comments-on-Notice-of-Proposed-Rulemaking-%E2%80%9CNPRM%E2%80%9D-amending-regulations-implementing-Title-IX-of-the-Education-Amendments-of-1972-Title-IX%E2%80%9D-Docket-ID-ED-2018-OCR-0064.pdf.

[92] Letter from Berkeley Unified Sch. Dist. Bd. of Educ. to U.S. Dep't of Educ. (Jan, 24, 2019), https://www.berkeleyschools.net/2019/01/school-board-writes-to-us-dept-of-education-proposed-title-ix-changes-could-undermine-student-safety.

[93] Letter from Bos. Univ. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 25, 2019), https://www.bu.edu/federal/2019/01/25/bu-urges-department-of-education-to-rethink-title-ix-changes.

[94] Letter from Georgetown Univ. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019), https://georgetown.app.box.com/s/fwk978e3oai8i5hpq0wqa70cq9iml2re.

[95] Letter from Howard Univ. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019), https://www2.howard.edu/sites/default/files/Title-IX-Comment-Letter-1-30-19.pdf.

[96] Letter from Northwestern Univ. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 29, 2019), http://dradis.ur.northwestern.edu/multimedia/pdf/comments.pdf.

[97] Letter from N.Y. Univ. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 29, 2019), https://www.nyu.edu/about/news-publications/news/2019/january/Title_IX_Concerns.html.

[98] Letter from the Presidents of the Seven Pub. Univ. in Or. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019), https://gcr.uoregon.edu/sites/gcr2.uoregon.edu/files/final_letter_from_presidents_re_title_ix_nprm.pdf.

[99] Letter from the Title IX Coordinators of the Or. Pub. Univ. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019), https://gcr.uoregon.edu/sites/gcr2.uoregon.edu/files/final_letter_from_title_ix_coordinators_re_title_ix_nprm.pdf.

[100] Letter from the State Univ. of N.Y. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 29, 2019), https://www.suny.edu/media/suny/content-assets/documents/chancellor/SUNY-Chancellor-Johnson-Comment-on-ED-Title-IX-Prop-Regs.pdf.

[101] Letter from Trinity Coll. to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ. (Jan. 30, 2019), https://www.trincoll.edu/president/wp-content/uploads/sites/10/2019/01/JBS.Title-IX-response.1.30.19.pdf.

[102] Letter from Univ. of Cal. to Brittany Bull, Dep't of Educ. (Jan. 28, 2019), https://sexualviolence.universityofcalifornia.edu/files/documents/uc-title-ix-letter.pdf.

[103] Letter from Univ. of Colo. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019), https://www.colorado.edu/today/letter-comment-proposed-rule-nondiscrimination-basis-sex-education-programs-or-activities-receiving.

University of Iowa;[104] University of Washington;[105] and twenty-four private, liberal

arts colleges and universities that filed a consolidated comment;[106]

e.  Legal experts, including seventy-three law professors in twenty-six states;[107]

f.  Experts in the effects of trauma caused by sex-based harassment also opposed the

Propose Rule, including the American Psychological Association[108] and over 900

mental health professionals.[109]

g.  Civil rights advocates, including: Consortium for Citizens with Disabilities,[110]

Human Rights Campaign,[111] Leadership Conference on Civil and Human Rights,[112]

MALDEF,[113] NAACP,[114] National Center for Transgender Equality,[115] National

---

[104] Letter from Univ. of Iowa to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019),
https://osmrc.uiowa.edu/university-iowa-submits-comments-new-proposed-title-ix-regulations-sexual-misconduct.
[105] Letter from Univ. of Wash. to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 28, 2019), https://s3-us-west-2.amazonaws.com/uw-s3-cdn/wp-content/uploads/sites/96/2019/01/28174314/UWTIXCommentsJan2019.pdf
[106] Letter from Pepper Hamilton, LLP, on behalf of Twenty-Four Liberal Arts Coll. and Univ. to Betsy DeVos,
Sec'y, Dep't of Educ., (Jan. 30, 2019) ("Letter from Twenty-Four Liberal Arts Institutions"),
https://www.pepperlaw.com/resource/35026/22G2.
[107] Letter from 73 Law Professors to Dep't of Educ. (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11900.
[108] Letter from the Am. Psychol. Ass'n to Brittany Bull, Dep't of Educ. (Jan. 30, 2019),
https://www.apa.org/advocacy/interpersonal-violence/titleix-comments.pdf.
[109] Letter from 902 Mental Health Professionals and Trauma Specialists to Kenneth L. Marcus, Ass't Sec'y for Civil
Rights, Dep't of Educ. (Jan. 30, 2019) ("Letter from 902 Mental Health Professionals and Trauma Specialists"),
https://www.regulations.gov/document?D=ED-2018-OCR-0064-104088.
[110] Letter from Consortium for Citizens with Disabilities to Dep't of Educ. (Jan. 30, 2019), https://nacdd.org/wp-content/uploads/2019/01/Final-CCD-Title-IX-comments-1.30.19.pdf.
[111] Letter from Human Rights Campaign to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ. (Jan.
30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11375.
[112] Letter from Leadership Conference on Civil and Human Rights to Kenneth L. Marcus, Ass't Sec'y for Civil
Rights, Dep't of Educ., at 7 (Jan. 30, 2019) ("Letter from Leadership Conference on Civil and Human Rights"),
http://civilrightsdocs.info/pdf/policy/letters/2019/Joint-Comment-Title-IX-NPRM-01302019-Final.pdf.
[113] Letter from MALDEF to Brittany Bull, Dep't of Educ. (Jan. 30, 2019), https://www.maldef.org/wp-content/uploads/2019/01/MALDEF-Title-IX-Comment.pdf.
[114] Letter from Leadership Conference on Civil and Human Rights at 11.
[115] Letter from National Center for Transgender Equality to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't
of Educ. (Jan. 29, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11557.

Employment Lawyers Association,[116] Southeast Asia Resource Action Center,[117] and Southern Poverty Law Center;[118]

h. Government officials, including: 145 state legislators from forty-one states;[119] and 36 United States senators.[120]

79. Over seventeen months later—in the midst of a global pandemic causing schools to nearly universally shut down—the Department published the Final Rule in the Federal Register.[121] Despite receiving an overwhelming number of comments opposing the Proposed Rule and emphasizing the vast prevalence, under-reporting, and under-investigation of sex-based harassment, the Department chose to add *additional* harmful provisions to the Final Rule that require schools to dismiss many more survivors and to exclude broad swaths of relevant evidence from Title IX investigations.

80. In the weeks following its publication, in addition to Plaintiffs bringing the instant complaint, the Final Rule has been challenged by a coalition of 18 states,[122] the state of New York,[123] and multiple organizations whose missions are educating, supporting, advocating for, and providing services to students who have experienced sex-based harassment,[124] all of which argue that the Final Rule significantly weakens federal

---

[116] Letter from National Employment Lawyers Association to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 30, 2019), https://www.nela.org/index.cfm?pg=83FedReg61483.

[117] Letter from Leadership Conference on Civil and Human Rights at 11.

[118] *Id.*

[119] Letter from 145 State Legislators in 41 States to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ. (Jan. 25, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-8535.

[120] Letter from 36 U.S. Senators to Betsy DeVos, Sec'y, Dep't of Educ., at 6-7 (Jan. 30, 2019), https://www.help.senate.gov/imo/media/doc/013019%20Proposed%20Title%20IX%20reg%20caucus%20letter.pdf.

[121] 85 Fed. Reg. 30,026 (May 19, 2020).

[122] *Pennsylvania v. DeVos*, No. 1:20-cv-01468 (D.D.C. filed June 4, 2020).

[123] *New York v. DeVos*, No. 1:20-cv-4260 (S.D.N.Y. filed June 4, 2020).

[124] *Know Your IX v. DeVos*, 1:20-cv-01224-RDB (D. Md. filed May 14, 2020).

protections for students from sex-based harassment in education.  Additionally, multiple stakeholders who opposed the Proposed Rule also expressed their opposition to the Final Rule and the harm it would cause to students who suffer sex-based harassment: for example, the American Federation of Teachers,[125] American Council on Education[126] (the umbrella membership group for 1,700 college and university leaders), The School Superintendents Association,[127] and the American Psychological Association.[128]

81.   The Final Rule will significantly weaken Title IX's protection against sex discrimination, narrowing the definition of sexual harassment such that schools may only address harassment when it has done its damage to students' educational opportunities and limiting the ability of educational institutions to craft policies that ensure equal access to educational opportunities.  It also arbitrarily mandates uniquely complainant-hostile procedures that are only required for investigating complaints of sex-based harassment, but not other types of student or staff misconduct or other forms of harassment and discrimination which the Department regulates, thus perpetuating the discriminatory, toxic, and false message that allegations of sex-based harassment are uniquely unreliable.

---

[125] Press Release, American Federation of Teachers, AFT's Randi Weingarten on Department of Education's Title IX Rule Changes (May 6, 2020), https://www.aft.org/press-release/afts-randi-weingarten-department-educations-title-ix-rule-changes.
[126] Press Release, American Council on Education, Statement by ACE President Ted Mitchell on Final Title IX Regulations (May 6, 2020), https://www.acenet.edu/News-Room/Pages/Statement-by-ACE-President-Ted-Mitchell-on-Final-Title-IX-Regulations.aspx.
[127] The School Superintendent Association, *AASA Analysis Of Title IX Regulation* (May 7, 2020), https://aasa.org/policy-blogs.aspx?id=44694&blogid=84002.
[128] Press Release, Am. Psychological Ass'n, More Difficult to File Claims of Campus Sexual Assault Under New Education Dept. Title IX Rule (May 6, 2020),  https://www.apa.org/news/press/releases/2020/05/campus-sexual-assault?utm_source=facebook&utm_medium=social&utm_campaign=apa-press-release&utm_content=title-ix-statement-may6.

82.   The Department now claims that the Final Rule will even further reduce the number of investigations of sex-based harassment conducted by schools, amounting to $178.8 million in savings to schools each year,[129] nearly double the estimated $99.2 million in annual savings that were attributed to reduced investigations in the Proposed Rule.[130] Despite acknowledging comments that it "should be working to combat the problems of underreporting and under-investigation instead of trying to reduce the number of investigations," the Department continues to provide no reasoned justifications for its opposite stance.[131]

83.   Like the Proposed Rule, the Final Rule continues to exclude all costs to victims and survivors of sex-based harassment imposed by the Rule from its regulatory impact analysis. Numerous studies show that a single rape can cost a survivor more than $240,000,[132] that the average lifetime cost of dating and domestic violence can exceed $100,000 for women and $23,000 for men,[133] and that the average lifetime cost of rape results in an annual national economic burden of $263 billion and a population economic burden of nearly $3.1 trillion over survivors' lifetimes.[134]   The cost to survivors is beyond financial.   Survivors are three times more likely to suffer from depression, six times more likely to have post-

---

[129] *Id.* at 30,507.
[130] 83 Fed. Reg. at 61,490.
[131] 85 Fed. Reg. at 30,549-30,550.
[132] White House Council on Women and Girls, *Rape and Sexual Assault: A Renewed Call to Action* 15 (Jan. 2014), https://www.knowyourix.org/wp-content/uploads/2017/01/sexual_assault_report_1-21-14.pdf.
[133] Inst. for Women's Policy Research, *Dreams Deferred: A Survey on the Impact of Intimate Partner Violence on Survivors' Education, Careers, and Economic Security* 8 (2018), https://iwpr.org/wp-content/uploads/2018/10/C474_IWPR-Report-Dreams-Deferred.pdf.
[134] Cora Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52(6) AM. J. PREV. MED. 691, 698, (2017), *available at* https://stacks.cdc.gov/view/cdc/45804/cdc_45804_DS1.pdf.

traumatic stress disorder, 13 times more likely to abuse alcohol, 26 times more likely to abuse drugs, and four times more likely to contemplate suicide.[135]

84.   Students also face specific costs when they suffer sex-based harassment. Despite acknowledging that 8 percent of sexual assault survivors drop a class, 11 percent move residences, 22 percent seek psychological counseling,[136] and 34 percent drop out of college altogether,[137] the Department continues to exclude these costs in its Final Rule's regulatory impact analysis. The Final Rule also fails to account for medical costs for physical and mental injuries; lost tuition and lower educational completion and attainment for victims who are forced to change majors or drop out of school; lost scholarships for victims who receive lower grades as a result of the harassment or violence; and defaults on student loans as a result of losing tuition or scholarships.

85.   Furthermore, the Clery Act requires that schools have an investigation and hearing process that "protects the safety of victims and promotes accountability."[138] The Final Rule fails to mention victim safety at all, and in fact requires colleges and universities to implement procedures that are hostile to complainants and will chill reporting.  Nor does it mention accountability, the logical corollary to victim safety, not only for the particular victim, but for all students. Instead, by claiming that the Final Rule will save schools money by reducing the number of investigations they are required to conduct, the Department

---

[135] Feminist Majority Foundation, *Fast facts - Sexual violence on campus* (2018), http://feministcampus.org/wp-content/uploads/2018/11/Fast-Facts.pdf.
[136] 83 Fed. Reg. at 61,487.
[137] *Id.*
[138] Campus Sexual Violence, Domestic Violence, Dating Violence and Stalking Education and Prevention, Pub. L. No. 113-4 § 304, 127 Stat. 90 (2013).

acknowledges that the Final Rule will not serve to increase accountability by respondents or recipients for sex-based harassment.

**The Final Rule Impermissibly Narrows the Definition of "Sexual Harassment"**

86.  The Final Rule adopts a novel and narrow definition of "sexual harassment" that is inconsistent with Title IX's purpose and precedents, and requires schools to dismiss any sexual harassment complaint that does not meet this new definition, thereby excluding various forms of sexual harassment that interferes with equal access to educational opportunities.[139] The Final Rule, through this narrow definition coupled with multiple barriers for complainants, also discourages the reporting of sexual harassment.[140]

87.  Section 106.30 of the Final Rule redefines "sexual harassment" to mean the following when it occurs "on the basis of sex":

(1) An employee of the recipient condition[s] the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

---

[139] § 106.30(a).

[140] Although the Department has "clarified" that "dismissal of a formal complaint because the allegations do not meet the Title IX definition of sexual harassment, does not preclude a recipient from addressing the alleged misconduct under other provisions of the recipient's own code of conduct," this so-called clarification creates even more confusion.  *See* 85 Fed. Reg. at 30,037-38.  Permitting the use of other grievance procedures under a school's code of conduct creates uncertainty for complainants and respondents alike, as well as potential liability for schools if their classification of conduct as outside of the definition of sexual harassment is challenged.

(3) "Sexual assault" as defined in 20 U.S.C. § 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. § 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in U.S.C. § 12291(a)(30).[141]

88. This definition represents a dramatic departure from the standard for sexual harassment that schools have been successfully applying for nearly two decades—that sexual harassment is "unwelcome conduct of a sexual nature." [142]

89. Under the Final Rule's narrowed definition—that the conduct be so "severe, pervasive, *and* objectively offensive" that it denies a person equal access—students will be forced to endure repeated and escalating levels of abuse before their schools may take steps to investigate and stop the sexual harassment.  That is, in the absence of *quid pro quo* harassment or sexual assault, domestic violence, dating violence, or stalking, a school is *required to dismiss* a student's Title IX complaint if the sexual harassment has not yet advanced to a point where it is actively interfering with a student's education.[143]

90. This definition will chill reporting of sexual harassment in both preK-12 schools and higher education.  Evidence shows that, even before the Final Rule created this narrowed definition of sexual harassment, only a fraction of sexual harassment of students is reported to school authorities.  Students often choose not to report because they think the harassment is not serious enough or that no one would do anything to help.[144]  The Final Rule's narrowed definition of "sexual harassment" will undoubtedly reduce reporting even further

---

[141] § 106.30(a).
[142] *See* 2001 Guidance.
[143] §§ 106.30(a), 106.45(b)(3)(i).
[144] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

as students reasonably fear that schools will not provide any meaningful response if they file a report.

91.     The revised sexual harassment definition will also create inconsistent requirements for sexual harassment relative to other categories of student or staff misconduct.  For example, the Department still requires schools to respond to harassment of students based on race, ethnicity, national origin, or disability under the more inclusive standard for creating a hostile educational environment, which is conduct that is "severe, pervasive, *or* persistent so as to *interfere with or limit* a student's ability to participate in or benefit from the services."[145]  Further, sexual harassment of people protected under both Title IX and Title VII, including students who are employed by their schools and school employees in both prepreK-12 and higher education—will be subject to two conflicting standards given that employees, under Title VII standards, must only show that sexual harassment is severe *or* pervasive – not both as required by the Final Rule.[146]

**The Final Rule Requires School Action Only When the School Has "Actual Knowledge" of Sex-Based Harassment**

92.     Sections 106.30 and 106.44(a) of the Final Rule provide that schools will only be responsible for addressing sex-based harassment when a preK-12 employee or one of a narrow set of higher education employees has "actual knowledge" of the harassment.[147]  These sections reverse the Department's previous positions, which required schools to address sex-based harassment if:  (i) almost any school employee either "knew or should

---

[145] 2010 Guidance at 2 (emphasis added); *see also* 2000 Disability Harassment Guidance; 1994 Racial Harassment Guidance.

[146] U.S. Equal Emp't Opportunity Comm'n, *Harassment*, https://www.eeoc.gov/harassment. *See also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (requiring "severe or pervasive" even in private litigation for money damages).

[147] 85 Fed. Reg. at 30,574.

reasonably have known" about (a) a student-on-student incident or (b) an employee-on-student incident that occurred *outside* the context of the employee's provision of aid, benefits, and services to students; or (ii) an employee-on-student incident occurred *within* the context of the employee's provision of aid, benefits, and services to students, "whether or not [the school] knew or should have known about it."[148]

93. The "actual knowledge" requirement will undermine Title IX's discrimination protections by reducing schools' obligations to respond to sex discrimination in the form of sex-based harassment and making it harder to report sex-based harassment, including sexual assault.

94. The Final Rule also limits the range of employees whose actual knowledge of the sex-based harassment triggers the school's Title IX obligations.  Under the Final Rule, a post-secondary school need only act when a Title IX coordinator or an official who has "the authority to institute corrective measures" has actual knowledge of the sex-based harassment.[149]  And, under the Final Rule, "the mere ability or obligation to report sexual harassment or to inform a student about how to report sexual harassment, or having been trained to do so, does not qualify an individual as one who has authority to institute corrective measures on behalf of the recipient."[150]

95. This reverses the Department's previous position, which considered schools to have an obligation to respond to student-on-student sex-based harassment or to employee-on-student sex-based harassment outside the context of the employee's provision of aid, benefits, or services to student– if a "responsible employee" had or should have had notice

---

[148] 2001 Guidance at iv, 10–14.
[149] § 106.30(a) (defining "actual knowledge").
[150] *Id.*

of the incident.[151]  The term "responsible employee" broadly included "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sex-based harassment or any other misconduct by students or an individual who a student could reasonably believe has this authority or responsibility."[152]

96.   The Final Rule also reverses the Department's previous position that schools are responsible for addressing employee-on-student sex-based harassment that occurs within the context of the employee's provision of aid, benefits, and services to students, regardless of whether the school had notice.

97.   Under the Final Rule, if a college or graduate student tells a professor, residential advisor, or teaching assistant that they were raped by another student, a professor, or other university employee, the college or university will have no obligation to help the student.

98.   Because the Department has not defined which school officials have "the authority to institute corrective measures," higher education students who want assistance or an investigation into their complaint will likely have to report sex-based harassment to the Title IX coordinator or an official with whom students often do not interact individually or have a relationship to comfortably approach about harassment, such as a College Dean or University Provost.

99.   If the Final Rule had been in place earlier, institutions of higher education like Michigan State University would have had no responsibility to stop Larry Nassar —even though his

---

[151] 2001 Guidance at 13.
[152] *Id*. (emphasis added).

victims reported their experiences to at least fourteen school employees over a twenty-year period—including athletic trainers, coaches, counselors, and therapists[153]—merely because those employees were not school officials with the "authority to institute corrective measures."  In fact, upon reports that the Department would heighten the notice provision before the Proposed Rule was published, 82 survivors from Ohio State University, Michigan State University, and the University of Southern California pleaded with Secretary DeVos to not make this change, claiming that their "schools could claim they had no responsibility to investigate Nassar, Tyndall, or Strauss, simply because [they] did not report our assaults to the "right" individuals, despite so many school employees knowing about the abuse."[154]

100. School officials in higher education strongly opposed the requirement of "actual knowledge" by a narrow set of school employees when it was first described in the Proposed Rule. For example, a consortium of five student affairs and student conduct professionals—representing ACPA – College Student Educators International, Association for Student Conduct Administration, Association of College and University Housing Officers – International, NASPA – Student Affairs Administrators in Higher Education, and NIRSA: Leaders in Collegiate Recreation—warned the Department in a joint comment that the heightened notice provision could result in "fewer students reporting sexual

---

[153] Julie Mack & Emily Lawler, *MSU doctor's alleged victims talked for 20 years. Was anyone listening?*, MLIVE (Feb. 8, 2017), https://www.mlive.com/news/index.ssf/page/msu_doctor_alleged_sexual_assault.html.
[154] Letter from Former Students and Survivors of Sexual Abuse Perpetrated by Larry Nassar at Michigan State University, George Tyndall at University of Southern California, and Richard Strauss at Ohio State University to Secretary DeVos and Assistant Secretary Marcus (Nov. 1, 2018), https://www.publicjustice.net/wp-content/uploads/2018/11/November-1-Survivor-Letter-to-ED.pdf.

assaults or harassment" and pointed specifically to the "terrible consequences of not reporting in cases like the Larry Nassar case."[155]

101. Although the Department claims that the "authority to institute corrective measures" limitation will give victims in higher education more "autonomy" and "privacy" by allowing them to request help from certain school employees without automatically triggering a formal investigation, earlier Title IX guidances already instructed schools not to initiate an investigation without the victim's consent and to honor their requests for confidentiality. For example, the earlier Guidances instructed schools to provide supportive measures without initiating an investigation if the victim requested, and to designate certain employees as confidential employees to whom students could disclose sex-based harassment without giving their school "notice" of the incident.[156] Moreover, despite claiming to protect survivors' autonomy around whether to initiate an investigation, Section 106.30 of the Final Rule in fact allows schools to override students' request not to initiate an investigation, and in doing so, will require an unwilling complainant's identity be revealed to the respondent.[157]  As a result, the Final Rule fails to protect confidentiality for victims who wish to report sex-based harassment. The Department therefore fails to provide a reasonable justification for narrowing the set of employees who can receive notice of sex-based harassment before a school is obligated to respond, which undercuts the purpose of Title IX.

---

[155] Letter from Five Student Affairs Associations to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 7 (Jan. 29, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11689.
[156] 2014 Guidance at 18-24; 2011 Guidance at 5; 2001 Guidance at 17, 18.
[157] § 106.30(a) (defining "formal complaint"). *See also* 85 Fed. Reg. at 30,122 n.547.

**The Final Rule Prohibits Schools from Investigating Sex-Based Harassment Occurring Outside Their Narrowly-Defined Programs or Activities Even When It Creates a Hostile Educational Environment**

102. Section 106.45(b)(3)(i) of the Final Rule require schools to dismiss reports of sex-based harassment that occur outside of the school's program or activity, even when such reported incidents create a hostile educational environment within an educational program or activity.

103. The Final Rule narrowly defines "education program or activity" as including "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sex-based harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution."[158] This definition ignores many incidents of sex-based harassment that occur in off-campus housing, in study abroad programs, online, or in other public and private spaces, even when such incidents result in a student being unable to fully participate in or benefit from a school's education program.

104. This provision conflicts with the plain language of Title IX, which depends not on where the underlying conduct occurred, but whether the person is "denied the benefits of, or [is] subjected to discrimination under any education program or activity."[159] Nor can the statute be reasonably read to *prohibit* schools from addressing any form of sex-based harassment, even if occurs in a study abroad program.

105. For almost two decades, the Department's Guidances have agreed that schools are responsible for addressing sex-based harassment if it is "sufficiently serious to deny or

---

[158] § 106.44(a).
[159] 20 U.S.C. § 1681(a).

limit a student's ability to participate in or benefit from the education program," regardless of where the incident occurs.[160]  The Department's previous Guidance was consistent with the fact that many students experience sex-based harassment in off-campus locations.  For example, according to a 2014 U.S. Department of Justice report, 95 percent of sexual assaults of female students ages 18-24 occur outside of a school program or activity.[161]  Yet this change in the Final Rule means that a student or teacher who sexually assaults a student after school and in a private location is almost certainly beyond the reach of institutional response, including a disciplinary response.

106.  Representatives of preK-12 school leaders like AASA, The School Superintendents Association and the National Association of Secondary School Principals oppose mandatory dismissal of complaints alleging out-of-school harassment because these groups recognize that out-of-school conduct "often spill[s] over into the school day and school environment."  Campus professionals such as the Campus Advocacy and Prevention Professional Association (CAPPA) and Student Affairs Administrators in Higher Education (NASPA) have also raised concern about this change.  CAPPA noted:

> "[This change] highlights the Department's fundamental misunderstanding of the interactions between students and their educational programs and activities. It is the year 2019, and with the proliferation of both mobile technology and social media, neither students nor employees are every fully separate from or outside of the programs or activities of their educational environment or workplace."[162]

---

[160] 2010 Guidance at 7.

[161] U.S. Dep't of Justice, Bureau of Justice Statistics, *Rape and Sexual Assault Victimization Among College-Age Females*, 1995-2013 at 6 (Dec. 2014), https://perma.cc/8VZL-H6F5.

[162] Letter from Campus Advocacy and Prevention Professional Association to Betsy DeVos, Sec'y, Dep't of Educ. (Jan. 28, 2019), http://www.nationalcappa.org/cappa-letter-to-department-of-education-january-28-2019.

In addition, these provisions will limit a recipient's ability to address sex-based harassment occurring on social media or outside of school, even if the conduct results in the victim becoming too afraid to attend class and face the victim's harasser, who could be another student or the instructor teaching the victim's class. This will have drastic consequences as nearly 9 in 10 college students live off campus,[163] including all community and junior college students, and 41 percent of college sexual assaults involve off-campus parties.[164] Moreover, nearly all teenagers are online and of individuals ages 12-17, about 20 to 40 percent have been cyber-bullied, which often includes sex-based harassment.[165]   As the Association of Independent Colleges and Universities (AICUM) noted:

> "Massachusetts has several areas where colleges/universities are clustered, particularly the high concentration of institutions in the small geographical area of Boston and its surrounding communities, as well as in Worcester, the greater Amherst area, and in Springfield. This geographic proximity means that students frequently come in contact with students from other campuses. Institutions should not be precluded from investigating and addressing the conduct of students and employees which may occur off-campus."[166]

107. This change will also create inconsistent policies for sex-based harassment relative to other student misconduct, prohibiting schools from addressing off-campus sex-based harassment even as they address other forms of off-campus behavior that threatens to harm the educational environment, such as drug use or physical assault.   Under the Final Rule, schools can continue to respond to underage alcohol consumption at an off-campus party, but will be prohibited from responding to a complaint of sex-based harassment that occurs

---

[163] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. Times (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html (87 percent).
[164] United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study.
[165] Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* 8 (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf.
[166] Letter from 55 Massachusetts Institutions of Higher Education, *supra* note 91, at 12.

*at the same party*.  As noted by AASA, which stated it was "shocked" by this provision in the Proposed Rule:

> It is common practice for district administrators to discipline students for off-campus conduct whether it's the use of drugs or alcohol at a house party, cyberbullying, hazing, physical assault, etc. . . . [The Proposed Rule] would unduly tie the hands of school leaders who believe every child deserves a safe and healthy learning environment.[167]

Similarly, the International Association of Campus Law Enforcement Administrators noted in their comment on the Proposed Rule:

> [This provision] [u]nfairly and arbitrarily restricts schools' response to sexual harassment in a manner inconsistent with all other disciplinary actions. Sexual assault would be the only crime response restricted in this manner by the federal government. If a student robbed someone, committed a hate crime, stole a car, sold drugs off-campus, or even committed murder, those actions would be covered under the institution's disciplinary processes even though they happened outside the scope of the school's programs or activities . . . No other criminal acts are protected from institutional response in such a manner.[168]

**The Final Rule Prohibits Schools from Investigating Many Complaints When the Victim Has Transferred, Graduated, or Dropped Out, and the Proposed Rule Failed to Give Notice That This Harmful Provision Was Being Considered.**

108.  The Final Rule restricts who can file a formal sex-based harassment complaint with an educational institution.  Section 106.30 provides, "[a]t the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed."[169]  The Department's justification for this restriction is to "ensure that a recipient is not required to expend resources investigating allegations in circumstances where the complainant has no

---

[167] *See* Letter from School Superintendents, *supra* note 89, at 5.
[168] Int'l Ass'n of Campus Law Enforcement Administrators' Comment, *supra* note 86, at 4.
[169] 85 Fed. Reg. at 30,574.

affiliation with the recipient, yet refrains from imposing a time limit on a complainant's decision to file a formal complaint."[170]

109.  By limiting who can bring sex-based harassment complaints in this way, the Department will leave many victims without recourse, including students who have transferred to avoid their harassers, students who have dropped out due to the trauma of the harassment they suffered, students who have graduated, and high school students who are assaulted during a college admit weekend and decide to enroll at another institution.  As a result, schools will not be permitted to address sex-based harassment even if the harasser's ongoing presence continues to threaten members of the school community.  For example, Section 106.30 would produce the absurd result that former students abused by a teacher *still employed by the school* would be unable to file a formal sex-based harassment complaint asking the school to take action to prevent and redress harassment by the teacher.

110.  This change disregards how frequently one perpetrator abuses multiple victims, with the result that not pursuing an investigation on the basis that a victim has left the school could lead to additional sex-based harassment against other students and leave the educational entity open to greater liability.

111.  Further, Section 106.30 ignores the unequal power dynamic between students, on the one hand, and teachers, coaches, and administrators on the other.  A student suffering from sexual harassment at the hands of a coach, for example, may be reluctant to file a formal complaint while the student remains a participant in the program led by the coach.

---

[170] *Id*. at 30,127.

112. Section 106.30 also prohibits third parties from filing formal sex-based harassment complaints.  The Department justifies this restriction on the ground that it protects the autonomy of post-secondary students who may not wish to file a formal complaint.  The restriction is not limited to post-secondary students, however, and the blanket application to all students, including preK-12 students, will result in unreported sex-based harassment. For example, teachers, other students, or school employees will not be permitted to file a formal complaint seeking a school response to sex-based harassment, even if they personally observe sex-based harassment in the classroom, in school hallways, or on the playground.

113. Because this provision was not included in the Proposed Rule, stakeholders were unable to comment on the dangers of this change.

**The Final Rule Allows Schools to Dismiss Complaints If the Respondent Has Graduated, Transferred, or Retired, and the Proposed Rule Failed to Give Notice That This Harmful Provision Was Being Considered.**

114. The Final Rule, section 106.45(b)(3)(ii), allows schools to dismiss complaints—even during a pending investigation or hearing—because the respondent is no longer enrolled in or employed by their school.[171]

115. This means if a student graduates or transfers to another school after sexually assaulting another student, the school will no longer have to investigate or redress any resulting hostile educational environment. Similarly, if a teacher retires or resigns after sexually abusing many students over several years, the school will no longer have to investigate to determine the scope of the abuse, the impact of the abuse on students, whether other employees knew

---

[171] § 106.45(b)(3)(ii).

about the abuse but ignored it, or whether school policies or practices facilitated the abuse. Without such an investigation, the school will no longer be required to remedy the hostile educational environment faced by the survivors and possibly the broader school community, such as by taking systemic action to prevent such abuse from happening again.

116.   Because this provision was not included in the Proposed Rule, stakeholders were unable to comment on the dangers of this change.

### The Final Rule Adopts a Restrictive Deliberate Indifference Standard for a School's Response to Known Sex-Based Harassment

117.   Under the Final Rule, a school's response to a sex-based harassment complaint will escape scrutiny from the Department so long as it is not "deliberately indifferent."[172]

118.   A school's response will be deliberately indifferent only if the "response to sexual harassment is *clearly unreasonable* in light of the known circumstances."[173]  This standard, established by the Supreme Court in the context of a private right of action against a school for monetary damages, is significantly more relaxed for institutions than the Department's previous standard requiring a "reasonable response" and will substantially undercut schools' responsibility to adhere to Title IX's requirements.[174]

119.   Title IX, like other anti-discrimination laws, imposes an obligation on funding recipients not to discriminate, which means that they must prevent discrimination, address discrimination when it occurs, and remedy its effects.  That obligation is not met when institutions are held accountable only when they engage in egregious institutional misconduct.

---

[172] § 106.44(a).
[173] *Id*.; 85 Fed. Reg. at 30,574 (emphasis added).
[174] 2001 Guidance at 15–16.

120. The Department has failed to explain adequately its change in position given the contrary evidence in the record.

121. The Department justifies changes to the definition of sexual harassment and notice standards, and requiring a recipient's deliberate indifference, on the ground that it believes that "the administrative standards governing recipients' responses to sexual harassment [should be] aligned with the standards developed by the Supreme Court" in cases assessing liability under Title IX for money damages in private litigation.[175] The Department also claims that the deliberate indifference standard "leave[s] recipients legitimate and necessary flexibility to make decisions regarding the supportive measures, remedies, and discipline that best address each sexual harassment incident."[176]

122. Yet no data supports the Department's underlying assumption that schools have been stymied by the Department's previous longstanding standard (i.e., schools must take prompt and immediate corrective action when they know or reasonably should have known about sex-based harassment) because it failed to offer enough flexibility.

123. Moreover, the Department itself has admitted that it is "not required to adopt the liability standards applied by the Supreme Court in private suits for money damages," acknowledging that as an administrative agency, it is authorized to "'promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate, 20 U.S.C. §

---

[175] 85 Fed. Reg. at 30,210.
[176] *Id.* at 30,044.

1682, even if those requirements do not purport to represent a definition of discrimination under the statute.'"[177]

124. The liability standard for private damages is restrictive so as not to expose schools to financial consequences except in cases that meet this notoriously high legal requirement.[178] However, the Department of Education's administrative mandate is not to hold schools financially liable, but rather to work with its recipient schools to achieve voluntary compliance with Title IX's anti-sex discrimination protections. The adoption of a standard that schools should be non-deliberately indifferent—suggesting that being indifferent is fine as long as it is not deliberate—is inappropriately restrictive in the administrative enforcement context.   The Department has not explained why it has now reversed its decades-long policy, which is also consistent with the Supreme Court opinions, by importing a liability standard for money damages into its administrative enforcement scheme.

125. When the Department first proposed importing the damages liability standard into the Proposed Rule, educators in preK-12 and higher education alike strongly opposed it. For example, AASA expressed concern that these provisions would "perversely" affect students, since "schools would be held to a far lesser standard in addressing the harassment of students—including minors—under its care than addressing harassment of adult employees."[179] The National Education Association agreed, noting that this provision

---

[177] Proposed Rule at 61,468, 61,469 (citing *Gebser*, 524 U.S. at 292); *see also Davis*, 526 U.S. at 639 (distinguishing "the scope of the behavior that Title IX proscribes" from behavior that "can support a private suit for money damage").

[178] See Catharine A. MacKinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education*, 125 Yale L. J. 125, 2038 (May 2016).

[179] Letter from School Superintendents, *supra* note 89, at 4-5.

would "provide young students with less protection from harassment in schools than adults receive in their workplaces" and that they would create "confusion and absurdity" for student-employees, who "may be subject to differing levels of protection depending on whether they are classified as students or as employees."[180]

**The Final Rule Prohibits Many Supportive Measures for Victims of Sex-Based Harassment**

126. The Final Rule, § 106.30, defines "supportive measures" as "non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge, to the claimant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed."[181]   Supportive measures are "designed to restore or preserve equal access to the recipient's education program and activity, without unreasonably burdening the other party, including measures designed to protect the safety of all parties and the recipient's educational environment, or deter sexual harassment."[182]

127. Under the Final Rule, complainants will not be entitled to the full range of "supportive measures" necessary to ensure equal access to educational opportunities.  The Final Rule will prohibit such measures on the grounds that the requested measures are "disciplinary," "punitive," or "unreasonably burden[] the other party."   For example, schools are likely to feel constrained from changing any of a respondent's classes or housing and work assignments because such changes may be considered punitive or unreasonably burdensome toward the respondent, thereby forcing the complainant to change their own classes and housing and work assignments in order to avoid the respondent.  This is a sharp

---

[180] Letter from Nat'l Educ. Ass'n, *supra* note 88, at 9.
[181] § 106.30(a).
[182] *Id.* (emphasis added).

departure from the policy spanning the entire history of Title IX regulation:  that schools were required to provide such measures that would enable a complainant to retain access to educational opportunities, not to prevent the respondent from being inconvenienced.

128.  The Final Rule allows schools to provide supportive measures that harm rather than help a complainant. For example, schools are likely to refrain from issuing *one-way* no-contact orders against respondents and instead require complainants to agree to *mutual* no-contact orders because they believe one-way orders are punitive or unreasonably burdensome toward the respondent. However, decades of expert consensus establish that *mutual* no-contact orders are harmful to victims, because abusers often manipulate their victims into violating the mutual order, and will turn a measure that is intended to protect victims of sex-based harassment into a measure that punishes victims instead.[183] This rule is also a departure from longstanding practice under the 2001 Guidance, which instructed schools to "direct[] the harasser to have no further contact with the harassed student" but not vice-versa.[184]

129.  Under the Final Rule, many victims will not be entitled to receive supportive measures. Schools will only be required to provide supportive measures to those students whose complaints meet the narrow definition of sexual harassment and survive dismissal under the many dismissal provisions of the Final Rule (schools are allowed, but not required, to provide supportive measures to those students whose claims have been dismissed).  This means a student whose complaint is dismissed because the incident occurred outside of a narrowly-defined "school program or activity," because the complainant is no longer

---

[183] *See* Joan Zorza, *What Is Wrong with Mutual Orders of Protection?* 4(5) Domestic Violence Rep. 67 (1999).
[184] 2001 Guidance at 16.

participating or attempting to participate in the school's program or activity when they file a complaint, or because the respondent is no longer enrolled at or employed by the school at any time during an investigation, will not be entitled to supportive measures.

### The Final Rule Establishes an Unfair Presumption of Non-Responsibility by the Respondent

130. Section 106.45(b)(1)(iv) will require schools to establish a presumption of non-responsibility for all complaints of sex-based harassment. That is, schools will be required to presume that the reported incident did not occur. The presumption of non-responsibility is based in sex discrimination and exacerbates the myth that women and girls often lie about sexual assault. This is one of the myths perpetuated by the Department's previous Acting Assistant Secretary for Civil Rights, Candice Jackson, who, as noted previously, publicly stated that for most sexual assault investigations, there is "not even an accusation that these accused students overrode the will of a young woman." She further stated that "the accusations—90% of them fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she just decided that our last sleeping together was not quite right.'"[185]

131. This presumption also conflicts with current Title IX regulations requiring "equitable" resolution of complaints;[186] a presumption in favor of one party against the other is plainly inequitable. Moreover, it conflicts with the Final Rule's own requirement that "credibility

---

[185] Erica L. Green and Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as The Accused Get DeVos' Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.
[186] § 106.8(c).

determinations may not be based on a person's status as a complainant, respondent, or witness."[187]

132.  The presumption of innocence is a criminal law principle and inappropriately imported into this context.  There is no such principle in civil or civil rights proceedings, such as Title IX proceedings.    As the International Association of Campus Law Enforcement Administrators explained in its comment to the Proposed Rule:

> "'Presumption of innocence' conflates criminal proceedings and criminal standards with a school disciplinary process. Disciplinary processes do not make a determination as to whether a person is 'innocent' or 'guilty,' they determine whether or not someone is responsible for a code violation."[188]

Similarly, nineteen state attorneys general included in their comment a section titled "The Presumption of Non-Responsibility Improperly Tilts the Process in Favor of the Respondent":

> "[T]he grievance procedures are non-criminal in nature, so a criminal presumption by another name is not appropriate. Relatedly, but more fundamentally, the presumption contradicts the regulation's stated goal of promoting impartiality by *inherently favoring the respondent's denial* over the complainant's allegation. Instead the allegation and the denial must be treated neutrally, as competing assertions of fact whose truth can only be determined after an investigation."[189]

133.  The Department also fails to adequately explain the factual basis for this provision.  The Department claims that the presumption of non-responsibility "reinforces that the burden of proof remains on recipients (not on the respondent or the complainant) and reinforces correct application of the standard of evidence."[190]  But the Department fails entirely to explain how a presumption that favors the respondent is necessary to support either the

---

[187] § 106.45(b)(1)(ii).
[188] Int'l Ass'n of Campus Law Enforcement Administrators' Comment, *supra* note 86, at 6.
[189] Letter from 19 Attorneys General, *supra* note 90, at 35 (emphasis added).
[190] 85 Fed. Reg. at 30,103.

"clear and convincing evidence" standard or the "preponderance of the evidence" standard—or indeed, any standard of evidence.

134. Contrary to the Department's claims that the presumption "reinforces correct application of the standard of evidence," the attorneys general warned in their comment that, in fact, the opposite was true:

> The problem [with the presumption requirement] would be even starker if any final regulation were to retain recipients' ability to choose a "clear and convincing" evidence standard (which we contend is not appropriate). The presumption of non-responsibility and the "clear and convincing" standard of evidence likely would, in practice, compound one another and raise an exceedingly high bar to any finding of responsibility for sexual harassment.[191]

**The Final Rule Permits Schools to Unreasonably Delay Investigations**

135. Section 106.45(b)(1)(v) will require schools to conduct investigations within a "reasonably prompt timeframe," but the only guidance the Department provides for what that phrase means is that an investigation must take at least 20 days (two 10-day timelines) per § 106.45(b)(5)(vi)-(vii).   Moreover, the Final Rule will allow schools to create a "temporary delay" or "limited extension" of timeframes for "good cause," where "good cause" may be "concurrent law enforcement activity."   In contrast, the 2011 and 2014 Guidance recommended that schools complete investigations within 60 days, and the 2001 Guidance prohibited schools from delaying a Title IX investigation merely because of a concurrent law enforcement investigation.

136. Title IX's regulatory scheme has always recognized schools' obligation and ability to respond promptly and equitably to instances of sexual harassment, which makes sense given shorter academic calendars and the need to ensure that students can continue to learn

---

[191] *Id.*

free from sex discrimination. Even when there is a concurrent police investigation, a school should not be hampered in its response nor allowed to use a criminal investigation as an excuse for delaying its own investigation.  The two investigations are completely separate proceedings that apply different standards of proof and serve different purposes.  For example, only the school can implement measures to enable a student to maintain equal access to education such as schedule changes, housing and dining arrangements, and other academic adjustments.

137.  Yet many schools may wrongly interpret § 106.45(b)(1)(v) to allow them to delay or suspend Title IX investigations indefinitely if there is any concurrent law enforcement activity. This is especially concerning for students in elementary and secondary schools, as well as adult students with developmental disabilities, whose reports of sexual abuse may automatically trigger a law enforcement investigation under state mandatory reporting laws. As a result, these students will have no way to secure a timely school investigation and resolution, as the mere act of reporting sexual assault can trigger an automatic delay.

138.  These types of delays and suspensions create a safety risk not only to the victim who reported the initial incident but also to other students who may be victimized by the same respondent during the delay.[192]  The Final Rule's provision allowing unlimited delay also creates a moral hazard in that if a school delays an investigation long enough for the complainant to graduate or drop out, the school would be required to dismiss the complaint.

---

[192] ATIXA, *ATIXA Position Statement on the Proposed Legislation Entitled: Promoting Real Opportunity, Success, And Prosperity Through Education Reform (PROSPER) Act (Higher Education Act Reauthorization)* (Jan. 18, 2018), https://atixa.org/wordpress/wp-content/uploads/2015/03/ATIXA-POSITION-STATEMENT-ON-PROSPER-ACT-Final.pdf.

139. The provision allowing many types of delays was strongly opposed when it was first published in the Proposed Rule. Student survivors noted in their comments that many Title IX investigations are already exceedingly delayed, with some taking more than 180 days or even up to 519 days to resolve.[193] State attorneys general also pointed out that creating additional grounds for delay will only further "re-victimize" survivors "as the process drags on without resolution or relief."[194]

**The Final Rule Removes Schools' Discretion over Hearings and Imposes Sweeping Exclusionary Rules of Relevant Evidence and Testimony That Were Not Subject to Notice and Comment**

140. Although purporting to provide schools with flexibility in resolving Title IX cases, the Department has arbitrarily chosen elements of a full civil or criminal trial and imposed these strict requirements on schools. Section 106.45(b)(6)(i) will remove all discretion from colleges and graduate schools about whether to conduct a live hearing for sex-based harassment investigations, and will require parties and witnesses to submit to cross-examination by the other party's "advisor of choice," who may be an attorney, angry parent, close friend, teacher, coach, bitter ex-boyfriend of the complainant, or any other adult in a position of authority over the complainant or a witness. The Department asserts that cross-examination at a live hearing, in all circumstances involving sexual harassment at colleges at graduate schools, is necessary to defend the due process rights of respondents and serves each school's duty to reach factually accurate determinations.[195] In conflating

---

[193] *See* Letter from Know Your IX to Kenneth Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., (Jan. 30, 2019), https://actionnetwork.org/user_files/user_files/000/029/219/original/Know_Your_IX_Comment_on_Proposed_Title_IX_Rule_(1).pdf

[194] Letter from 20 Attorneys General to Betsy DeVos, Sec'y, Dep't of Educ., (July 19, 2017), https://www.attorneygeneral.gov/taking-action/press-releases/20-ags-call-on-secretary-devos-to-maintain-protections-for-survivors-of-campus-sexual-assault.

[195] 85 Fed. Reg. at 30,313–30,314

a criminal trial with a school adjudication, the Department makes a false equivalence between being found responsible for a civil rights violation at school and being found guilty of a crime for which one might face incarceration.

141.  However the Final Rule goes well beyond requiring cross-examination and creates broad exclusionary rules and forbids basic procedural protections through new and bizarre provisions that were not subject to notice and comment.  The evidentiary and procedural burdens imposed by the Final Rule will only serve to reduce the quantum of evidence that a school can consider under Title IX, discourage witnesses from participating in the Title IX process, impose complainant-hostile procedures that are not required in other student or employee misconduct investigations, and retraumatize victims.

142.   Although the Final Rule does not require live cross-examination for children in preK-12 institutions, in part based on an acknowledgment that cross-examination is traumatizing and may not yield reliable results when minor children are involved, the Final Rule continues to require live cross-examination of minor children who are subject to sex-based harassment, if that misconduct occurs in the context of a post-secondary institution.  Thus, for example, the Final Rule will require that minor children attending summer programs or athletic or academic programs at post-secondary institutions, high school children taking classes at higher educational facilities, and even toddlers in daycares at higher educational institutions, be forced to submit to live cross-examination if they complain of sexual abuse by an adult classmate, professor, or daycare provider.  There is no rational reason why the location of the harassment or assault, rather than the age of the complainant, should mandate that direct, live cross-examination is required. The Department declined to include any exception to live cross-examination, even for minor children, though data shows that

hostile, leading questions are not effective methods of eliciting accurate testimony from children.[196]

143. The Final Rule also requires schools to disregard as evidence all oral and written statements of any party or witness who declines to testify at a live hearing or who declines to answer every single question they receive during cross-examination.[197] This provision, which permits no exceptions, represents a sweeping exclusion of relevant evidence, far above and beyond the Federal Rules of Evidence hearsay rules.  Such mandatory evidentiary exclusions bear no relationship to the due process and truth-seeking goals that purport to animate them.

144. Moreover, this exclusionary rule appears for the first time in the Preamble to the Final Rule, and was not included in the Proposed Rule, which only stated that "statements" by witnesses who were not subject to cross-examination would not be considered.  The Proposed Rule did not make clear that "statements" would include a broad swath of documents and evidence such as police reports, medical records, video tapes, public blog posts, social media posts, emails, text message and other relevant evidence, or that the Final

---

[196]  Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Coached Reports*, 21 Psychology, Pub. Policy, & L. 10 (2015) (cross-examination led children to recant their initial true allegations of witnessing transgressive behavior and significantly reduced children's testimonial accuracy for neutral events); Saskia Righarts et al., *Young Children's Responses to Cross-Examination Style Questioning: The Effects of Delay and Subsequent Questioning*, 21(3) Psychology, Crime & L. 274 (2015) (cross-examination resulted in a "robust negative effect on children's accuracy"; only 7% of children's answers improved in accuracy); Fiona Jack and Rachel Zajac, *The Effect of Age and Reminders on Witnesses' Responses to Cross-Examination-Style Questioning*, 3 J. of Applied Research in Memory and Cognition 1 (2014) ("adolescents' accuracy was also significantly affected" by cross-examination-style questioning); Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Reports of Neutral and Transgressive Events,* 19 Legal & Crim. Psychology 296 (2014) (cross-examination led children to provide significantly less accurate reports for neutral events and actually reduced the number of older children who provided truthful disclosures for transgressive events); Joyce Plotnikoff & Richard Woolfson, *'Kicking and Screaming': The Slow Road to Best Evidence*, in *Children and Cross-Examination: Time to Change the Rules?* 21, at 27 (John Spencer & Michael Lamb eds. 2012) (a hostile accusation that a child is lying "can cause a child to give inaccurate answers or to agree with the suggestion that they are lying simply to bring questioning to an end").
[197] § 106.45(b)(6)(i).

Rule would require the consideration of this relevant evidence if the doctor, police officer, or other person who wrote down the information was unable or unwilling to testify at the live hearing.  It could not have been plausible that the Department intended for such a broad exclusion of evidence, well beyond the Federal Rules of Evidence, when it put forth its Proposed Rule.

145.  For example, under the sweeping exclusionary provisions of the Final Rule:

- If a complainant fails to answer a single question as part of lengthy cross-examination sessions, the school will be required to disregard all of the complainant's statements in the formal complaint, at the live hearing, and in all other written or oral evidence—even statements in a video or audio recording of the incident clearly indicating that the complainant said "no."[198]

- If a police officer, nurse, or witness is unavailable for cross-examination, even if for a very justifiable reason that has no bearing on the truth of her or his testimony, the Final Rule will require that then none of that individual's previous written or oral statements can be considered as evidence by the school, even if recorded in a police report, medical record, or text or email message.[199]

- Even if a respondent admits to sex-based harassment in a guilty plea before a judge, the school will nonetheless be required to ignore that confession if the respondent refuses to be cross-examined at the school's live hearing.[200]

---

[198] 85 Fed. Reg. at 30,346, 30,347, 30,349.
[199] *Id.* at 30,349.
[200] *Id.* at 30,344, 30,345.

- Even a blog post written by the respondent admitting to a sexual assault could not be considered as evidence if the respondent fails to testify, as the Department expressly declined to provide a hearsay exception for statements by a party that are against that party's interest.[201]

146. The Final Rule acknowledges that schools lack subpoena power, and further acknowledges that "witnesses also are not required to testify and may simply choose not to testify because the determination of responsibility usually does not directly impact, implicate or affect them."[202] As a result, schools will frequently be forbidden from relying on relevant, probative evidence in sex-based harassment investigations as a result of the fact that witnesses choose not to testify.   Thus, for example, if there is a video tape with a group of people admitting to a sexual assault, the Final Rule will permit a respondent to ask the other participants in the video to refuse to appear and fail to testify, thereby securing exclusion of the videotape.  There is no provision in the Final Rules to prevent this type of deliberate conduct to exclude relevant evidence.

147. This prohibition on consideration of relevant, probative evidence is based in stereotypes of women and girls as not being credible on issues of sex-based harassment.[203]

148. The Final Rule also arbitrarily forbids schools from adopting well-established evidentiary rules that make in-school judicial proceedings workable, reliable, and equitable. For example, schools will be *prohibited* from excluding evidence or cross-examination

---

[201] *Id.*

[202] *Id.* at 30,356.

[203] *Id*. at 30,348 ("Because party and witness statements so often raise credibility questions in the context of sexual harassment allegations, the decision-maker must consider only those statements that have benefited from the truth-seeking function of cross-examination").

questions that are unduly prejudicial, misleading, or assume facts not in evidence.[204]  This lack of procedural protections is particularly harmful because the Final Rule would exclude all testimony of a party or witness who failed to answer even a single question under cross-examination.[205]  Importantly, the Final Rule permits cross-examination by people who are not lawyers and who may not be skilled in the art of asking clear questions. If a witness or party is unable to answer a single question, the entirety of their testimony will be excluded. This is a sweeping rule that has no rational basis.

149.  Similarly, the Final Rule will require schools to apply an unusually narrow and confusing exclusion for prior sexual history evidence, which *prohibits* schools from excluding evidence or cross-examination questions that relate to a complainant's "dating or romantic" history with other people who are not the respondent—as long as it does not explicitly refer to the complainant's "sexual" history with other people.[206]  The Final Rule therefore allows respondents to use sex stereotypes that shame and blame survivors for perceived promiscuity.

150.  The Final Rule also allows for questioning of a complainant's past "if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent."[207]  This means that a respondent can question the complainant about all past sexual encounters with the respondent in an attempt to discredit the complainant's claim.   Not only does this contradict directly all sexual

---

[204] *Id.* at 30,248, 30,361.
[205] *Id.* at 30,349.
[206] *Id.* at 30,351; *see also id.* at 30,248 (explaining that schools may adopt additional evidentiary rules only if they fall "within these evidentiary parameters").
[207] § 106.45(i)-(ii).

assault trainings teaching students that previous consent does not mean the person consented in any other situations, but it also contravenes protections afforded under federal and state rape shield laws.[208] These laws were passed to counteract precisely the presumption that once someone consents to sexual activity, they then are deemed to consent to any and all further activity.  Victims and survivors of dating violence will be even less likely to seek justice because of this provision.

151. The Final Rule also ignores the potential harm to complainants who have to be subjected to hearing questions asked by the respondent's advisor *before* the decision-maker determines whether to exclude them.  Having to listen to the respondent's advisor ask irrelevant questions that are aggressive, misleading, and/or based on rape myths and sex stereotypes, possibly over and over again before being excluded each time by the decision-maker, could be traumatic and triggering for the complainant.

152. Section 106.45(b)(6)(ii) permits elementary and secondary schools to use this direct, live cross-examination process, even though children and young adults are easily intimidated under hostile questioning by an adult.[209]  In fact, data shows that children subject to cross-examination-style questioning are more likely to repudiate accurate statements and to reaffirm inaccurate ones.[210]

---

[208] *See e.g.*, Fed. R. Evid. 412 (prohibiting "evidence offered to prove that a victim engaged in other sexual behavior" or "evidence offered to prove a victim's sexual disposition"); Mass. R. Evid. 412 (prohibiting evidence "offered to prove that a victim engaged in other sexual behavior" or "evidence offered to prove a victim's sexual reputation").

[209] *See, e.g.*, Gail S. Goodman et al., *Testifying in Criminal Court: Emotional Effects on Child Sexual Assault Victims,* Monographs of the Society for Research in Child Development, Serial no. 229, Vol. 57, No. 5, at 85 (1992).

[210] Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Coached Reports*, 21 Psych., Pub. Policy & L. 10 (2015).

153. The Final Rule forbids college and graduate schools from designing procedures for hearings that take into account the fact that the adversarial and contentious nature of cross-examination will further traumatize those who seek help through Title IX to address sex-based harassment and will discourage many students—both parties and witnesses—from participating in the Title IX grievance process.  Over 900 mental health experts who specialize in trauma told the Department that subjecting a student survivor of sexual assault to cross-examination by their respondent's advisor of choice was "almost guaranteed to aggravate their symptoms of post-traumatic stress," and was "likely to cause serious to harm victims who complain and to deter even more victims from coming forward."[211]

154. Contrary to the Department's claims, the harm from this live, direct cross-examination requirement is not mitigated by the limited accommodations provided by the Final Rule. According to the president of the Association of Title IX Administrators, the requirement of live cross-examination by a respondent's advisor of choice, "even with accommodations like questioning from a separate room[,] would lead to a 50 percent drop in the reporting of misconduct."[212]   After the Final Rule was published, the American Psychological Association expressed disappointment in the Final Rule, stating that it was "concerned that provisions in the final rule could lead to underreporting of sexual misconduct, revictimization and/or traumatization of all parties involved,"  specifying that those provisions included those "creating an adversarial system of resolving complaints similar to legal proceedings."[213]   The APA added that the Final Rule "lacks the foundation of

---

[211] Letter from 902 Mental Health Professionals and Trauma Specialists, *supra* note 109, at 4-5.

[212] Andrew Kreighbaum, *New Uncertainty on Title IX*, Inside Higher Education (Nov. 20, 2018).

[213] Press Release, Am. Psychological Ass'n, More Difficult to File Claims of Campus Sexual Assault Under New Education Dept. Title IX Rule (May 6, 2020),  https://www.apa.org/news/press/releases/2020/05/campus-sexual-

psychological research and science needed to address acts of sexual misconduct on college campuses."[214]

155.   The Final Rule's flat prohibition of reliance on testimony by parties and witnesses who do not submit to live, direct cross-examination will require schools to disregard relevant evidence, even when such evidence bears other indicia of reliability.[215]

156.   As Liberty University noted, this prohibition will force survivors to submit to a "Hobson's choice" between being revictimized by their harasser or assailant's advisor or having their testimony completely disregarded, and will prohibit schools from simply "factoring in the victim's level of participation in [its] assessment of witness credibility."[216]

157.   In requiring institutions of higher education to conduct live, quasi-criminal trials with direct cross-examination to address formal complaints of sex-based harassment, when no such requirement exists for addressing any other form of student or employee misconduct at schools, including misconduct investigations over which the Department's Office for Civil Rights has jurisdiction, the Final Rule reinforces the sex stereotype that students who report sexual assault and other forms of sex-based harassment—who are mostly women and girls—are more likely to lie than students who report physical assault or other types of harassment.

158.   Neither the Constitution nor federal law requires cross-examination in public school proceedings and the majority of courts that have reached the issue have agreed that live

---

assault?utm_source=facebook&utm_medium=social&utm_campaign=apa-press-release&utm_content=title-ix-statement-may6.

[214] *Id*.

[215] § 106.45(b)(6)(i).

[216] Letter from Liberty Univ. to Sec'y Elisabeth DeVos at 2 (Jan. 24, 2019),
http://www.liberty.edu/media/1617/2019/jan/Title-IX-Public-Comments.pdf.

cross-examination is not required in public school disciplinary proceedings, as long as there is a meaningful opportunity to have questions posed by a hearing examiner or some other neutral third party. Indeed, the Department "acknowledges that constitutional due process does not require the specific procedures included in the § 106.45 grievance process."[217] Requiring live cross-examination under its Title IX regulations is contrary to, and exceeds, Title IX's mandate to prohibit sex discrimination in schools, including sex-based harassment.

159. Unsurprisingly, educational associations overwhelmingly opposed the live cross-examination provision when it was first announced in the Proposed Rule. For example, the Association of Independent Colleges and Universities (AICUM) noted that these requirements conflicted with well-settled Massachusetts and First Circuit law:

> "Courts long have held that a fair process for students accused of violating institutional rules does not require such legalistic hearings, even at public institutions and even where sanctions can include expulsion. Requiring such hearings for private institutions would contravene a well-settled body of First Circuit and Massachusetts law that governs AICUM's member institutions."[218]

In addition, AICUM noted the Final Rule would be all but impossible for school officials to implement:

> "[Requiring live cross-examination] will place institutional decision-makers in the difficult position of controlling overly zealous cross-examiners, making – and stating the basis for – evidentiary rulings in the moment (*a task not even required of judges*), and otherwise assuming a role akin to that of a federal or state court judge."[219]

Furthermore, AICUM observed that well-established alternatives already exist both within and outside of the education context:

---

[217] 85 Fed. Reg. at 30,053.

[218] Letter from 55 Massachusetts Institutions of Higher Education, *supra* note 91, at 4 (emphasis added).

[219] *Id.* at 9.

> "Many private educational institutions, like most employers both public and private, have a long and successful history of using investigative models – without live hearings and cross-examination – to determine whether discrimination or harassment on the basis of race, national origin, age, disability, and other protected classifications has occurred. Such cases, like those involving discrimination or harassment on the basis of sex, frequently turn on the credibility of complainants, respondents, and other witnesses, and involve high stakes for all involved, including the termination of employment. *There is nothing inherently different about alleged discrimination or harassment on the basis of sex which requires a live hearing with cross-examination.*"[220]

160. Similarly, twenty-four private liberal arts institutions, many of which are in the First Circuit, commented that the live cross-examination provision "w[ould] most certainly turn classrooms into courtrooms" and force some schools to "hire judges or lawyers to oversee such proceedings."[221]

161. The American Council on Education, on behalf of 61 associations representing thousands of public and private, two-and four-year institutions of higher education, also observed:

> "It … requires decision makers to provide an on-the-spot explanation for any decision to exclude a question or evidence—*something not even judges are required to do in a court of law*. To hold college administrators in student conduct proceedings to a standard that is higher than that required of judges in courts of law is *nonsensical*."[222]

162. When the Final Rule was announced with further limitations on live cross-examination, the American Council on Education issued a follow-up statement that noted its dismay that the Final Rule "turns student disciplinary proceedings into legal tribunals that will tip the scales in favor of those who can afford to pay for high-priced legal pit bulls."[223]

---

[220] *Id.* at 5.
[221] Letter from Twenty-Four Liberal Arts Institutions, *supra* note 106, at 13-14.
[222] Letter from American Council on Education on behalf of 61 Higher Education Associations to Betsy DeVos, Sec'y, Dept. of Educ., at 16 (Jan. 30, 2019), https://www.acenet.edu/Documents/Comments-to-Education-Department-on-Proposed-Rule-Amending-Title-IX-Regulations.pdf (emphasis added).
[223] Press Release, American Council on Education, Statement by ACE President Ted Mitchell on Final Title IX Regulations (May 6, 2020), https://www.acenet.edu/News-Room/Pages/Statement-by-ACE-President-Ted-Mitchell-on-Final-Title-IX-Regulations.aspx.

163. By requiring an extremely prescriptive and inflexible grievance process under § 106.45 for sex-based harassment complaints specifically, yet at the same time asserting that institutions need "flexibility" in responding to sex-based harassment to justify adopting the stringent deliberate indifference standard used in private litigation for money damages, the Department has acted arbitrarily and capriciously.

164. Sex-based harassment is already dramatically underreported. This underreporting, which significantly harms schools' ability to create safe and inclusive learning environments, will only be exacerbated if any such reporting forces complainants into traumatic, burdensome, and unnecessary procedures. This selective requirement of live, direct cross-examination harms complainants and educational institutions and is contrary to the letter and purpose of Title IX to end discrimination in schools based on sex, including sex-based harassment.

**The Final Rule's Standard of Proof Disparately Affects Victims of Sex-Based Harassment**

165. Section § 106.45(b)(1)(vii) permits "each recipient to select between one of two standards of evidence to use in resolving formal complaints" of sex-based harassment.  Although the provision purports to give schools flexibility, in many cases it will require schools to use the more demanding "clear and convincing evidence" standard to resolve complaints of sex-based harassment, even if they use the equitable "preponderance of the evidence" standard for all other types of student misconduct.  This is because the Final Rule requires schools to use the same standard of evidence for sex-based harassment complaints against students as for formal complaints against employees.

166. The Final Rule is a departure from at least twenty-five years of Department policy in both Republican and Democratic administrations requiring schools to use the preponderance

standard to determine whether sex-based harassment occurred.[224]   It is also a departure from the use of the preponderance standard in campus sexual assault proceedings by the vast majority of educational institutions over the past two decades.[225]

167.   The "clear and convincing evidence" standard, by definition, will tilt schools' investigations of sex-based harassment in favor of respondents and against complainants, even though both parties have an equal interest and stake in obtaining an education.

168.   In contrast, schools should be free to determine that the preponderance standard is the only standard consistent with Title IX's "equitable" requirement because it places an equal burden on both parties, creates an equal risk of an erroneous decision, and "treat[s] all students with respect and fundamental fairness."[226]   As the Association for Title IX Administrators (ATIXA) put it:

> "[A]ny standard higher than preponderance advantages those accused of sexual violence (mostly men) over those alleging sexual violence (mostly women). It makes it harder for women to prove they have been harmed by men. The whole point of Title IX is to create a level playing field for men and women in education, and the preponderance standard does exactly that. *No other evidentiary standard is equitable.*"[227]

169.   Similarly, the Leadership Conference on Civil and Human Rights, which represents more than 200 national civil and human rights organizations, stated in its comment opposing the

---

[224] *See, e.g.*, 2003 OCR Letter to Georgetown University, at 1; 1995 OCR letter to Evergreen College, at 8.
[225] Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* 120 (2002).
[226] 34 C.F.R. § 106.8(c). Chris Loschiavo & Jennifer L. Waller, Association for Student Conduct Administration, *The Preponderance of Evidence Standard: Use In Higher Education Campus Conduct Processes*, https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.
[227] ATIXA, *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 4 (Feb. 17, 2017) (emphasis added).

Proposed Rule:  "[T]he preponderance of the evidence standard is the only evidentiary standard that treats all students fairly and equally."[228]

170. Moreover, the preponderance standard is the standard used by courts in civil rights litigation, including in Title IX litigation brought by *respondents* claiming they were wrongly suspended or expelled for sexual assault, and lawsuits alleging workplace discrimination in violation of Title VII of the 1964 Civil Rights Act.[229]  The preponderance standard is also used in nearly all civil litigation, including in judicial proceedings to determine consequences far more serious than student discipline, such as enhancement of prison sentences and civil commitment of defendants acquitted by the insanity defense.[230] The Supreme Court has only required a standard of proof more burdensome than the preponderance standard in a narrow handful of civil cases with consequences far more severe than suspension or expulsion from school—such as deportation, civil commitment for mental illness, and juvenile delinquency with the possibility of institutional confinement.[231]

171. Yet, because collective bargaining agreements with employees of schools often require a school to use the clear and convincing standard in disciplining employees, some schools will be required to apply this standard of evidence to all complaints of sex-based harassment against both students and employees.

---

[228] Letter from Leadership Conference on Civil and Human Rights at 7.
[229] Amy Chmielewski, *Defending the Preponderance of the Evidence Standard in College Adjudications of Sexual Assault*, 2013 BYU Educ. & L. J. 143 (2013).
[230] *McMillan v. Pennsylvania*, 477 U.S. 79, 91-92 (1986); *Jones v. United States*, 463 U.S. 354, 368 (1983).
[231] *Addington v. Texas*, 441 U.S. 418, 432 (1979); *In re Winship*, 397 U.S. 358, 367-68 (1970); *Woodby v. INS*, 385 U.S. 276, 286 (1966).

172. By allowing—and in some cases, requiring—schools to impose higher evidentiary standards in Title IX proceedings than in other student or staff misconduct proceedings, the Department targets those who have experienced sex-based harassment for disparate treatment.

173. This double standard relies on and reinforces the sex stereotype that students who report sexual assault and other forms of sex-based harassment—who are mostly women and girls—are more likely to lie than students who report physical assault or other types of harassment.

**The Final Rule Includes a Provision Inviting Retaliation Against Complainants, and the Proposed Rule Gave No Notice This Harmful Provision Was Being Considered.**

174. The Final Rule includes provisions governing retaliation, for the first time in the Department's multi-year rulemaking.  These provisions are inconsistent with earlier Department guidance and Supreme Court precedent, are likely to cause confusion for schools, and may ultimately undermine retaliation protections for survivors exercising their rights under Title IX.[232]

175. In 2005, the Supreme Court held that retaliation falls within Title IX's prohibition of intentional discrimination on the basis of sex.[233]  The Court stated that "[r]eporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel."[234]

---

[232] § 106.71.
[233] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).
[234] *Id.* at 180.

176. Current and rescinded Department guidance addressed retaliation under Title IX, also focusing on protections for individuals reporting, speaking out against, or opposing sex discrimination.  Those guidances recognized that complainants and witnesses often do not come forward because they are scared about their safety, public shaming, or counter-complaints or defamation lawsuits.  Thus, the 2001 Guidance states that "a school should take steps to prevent any further harassment and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses."[235]   The 2011 and 2014 Guidances similarly emphasized protections for retaliation against the complainant or witnesses by the respondent or their associates.[236]

177. However, under Section 106.71(b)(1) of the Final Rule, the Department qualifies—and limits—retaliation protections for complainants, stating that "the exercise of rights protected under the First Amendment does not constitute retaliation prohibited under paragraph (a) of this section."

178. The Department claims it added this section to the Final Rule to quell "concerns of commenters who feared that speech protected under the First Amendment may be affected, if a recipient applies an anti-retaliation provision in an erroneous manner. . . [by] clarify[ing] that *the Department may not require a recipient to restrict rights protected under the First Amendment to prohibit retaliation*."[237]

179. This section is inextricably tied to Section 106.45(b)(5)(iii), which provides that "[w]hen investigating a formal complaint and throughout the grievance process, a recipient must . . .

---

[235] 2001 Guidance at 17.
[236] 2014 Guidance at 43; 2011 Guidance at 16.
[237] 85 Fed. Reg. at 30,537.

[n]ot restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence."

180. By limiting the ability of institutions to place reasonable parameters around what complainants and respondents can and cannot say regarding ongoing proceedings, the Department compromises the integrity of the investigation and creates a clear disincentive to students considering raising formal complaints.

181. Although there are situations in which a student has a reasonable need to share allegations, such as obtaining legal advice, seeking counseling or emotional support, conducting an investigation, or identifying others harmed by a harassing behavior, the Department's prohibition on any restriction on discussion of the allegations goes far beyond such situations.

182. Students will undoubtedly be swayed from filing formal complaints knowing respondents are effectively free to speak and write about anything and everything related to an investigation with impunity. The Final Rule thus provides harassers with clear incentives to undertake intimidation campaigns given that in the absence of a formal complaint, the Final Rule also prohibits schools from disciplining a harasser in any way.

183. Although the Department claims that "that the retaliation provision in these final regulations provides clearer, more robust protections than the recommendations in any of the Department's past guidance documents,"[238] it instead does the opposite. This provision creates confusion because it is inconsistent with Supreme Court precedent in addressing retaliation and limits when schools can address retaliation against complainants and

---

[238] *Id.*

witnesses.  Given the totality of the Department's changes to Title IX enforcement, which provide greater protections for respondents over complainants, schools will be less likely to address retaliatory intimidation or harassment campaigns from respondents and their friends out of fear of violating their First Amendment rights.

184.   In addition, § 106.71(b)(2) allows schools to discipline survivors for making a "materially false statement in bad faith" without it being considered retaliation under Title IX, as long as the decision to discipline is not based solely on the outcome of an investigation.

185.   The threat of discipline if a school determines an accusation is "false" will deter many survivors from coming forward to ask for help or initiate an investigation. This provision will especially harm women and girls of color (particularly Black girls who already face discriminatory discipline[239]), pregnant and parenting students, LGBTQ students, and students with disabilities, who are already more likely to be disbelieved and blamed due to rape myths and stereotypes that label them as more promiscuous, aggressive, and/or less credible.

186.   The Department provided no indication in the Proposed Rule that it would create new Title IX provisions on retaliation and did not give the public adequate notice and opportunity to comment.

**The Final Rule Purports to Preempt State and Local Laws That Provide Greater Protections Against Sex-Based Harassment, and the Proposed Rule Gave No Notice That This Harmful Provision Was Being Considered.**

187.   The Final Rule also includes for the first time a provision on preemption.[240]

---

[239] U.S. Dep't of Educ., Office for Civil Rights, 2015-16 Civil Rights Data Collection: School Climate and Safety Report (2018), https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.
[240] § 106.6(h).

188.   Under Section 106.6(h), the Final Rule preempts any state or local law to the extent that there is a conflict. This means that even if schools are required by state or local law to provide stronger protections for victims of sex-based harassment, they will be prohibited from doing so to the extent that such protections conflict with the Final Rule.

189.   For example, state and local laws that require schools to investigate complaints of sex-based harassment that: (i) fall short of the Final Rule's narrow definition of harassment, (ii) occur outside of a school program or activity or in a school program or activity outside of the United States, or (iii) are filed by a complainant who is no longer participating in the school's program or activity are purportedly preempted by the Final Rule.

190.   Even if a complainant is able to survive the Final Rule's stringent dismissal rules and is able to initiate a Title IX investigation, their school will be prohibited from following state or local laws providing certain types of protections in investigation procedures. For example, schools will be prohibited from: (i) making no presumptions about the respondent's responsibility, (ii) allowing parties in higher education to ask questions of each other through a neutral third party, (iii) allowing parties and witnesses in postsecondary proceedings to submit written or oral evidence without being subjected to cross-examination at a live hearing, (iv) excluding cross-examination questions that are misleading or unduly prejudicial or that relate to a complainant's "dating or romantic" history, or (v) applying a preponderance of the evidence standard in student investigations where staff investigations are required by a collective bargaining agreement to use a more burdensome standard.

191.   By creating a ceiling instead of a floor on what Title IX protections are available to students and employees against sex-based harassment, the Final Rule radically departs from the

longstanding interpretations of Title IX and other federal civil rights laws, as providing merely a floor upon which states and local governments are able to create additional protections.

192. The Department provided no indication that it would create a new Title IX provision on preemption and did not give the public, including schools, states, and local governments, adequate notice and opportunity to comment.

## THE CHALLENGED PROVISIONS WILL FRUSTRATE PLAINTIFFS' MISSIONS AND FORCE THE DIVERSION OF THEIR RESOURCES

193. **VRLC** provides legal services to help restore victims' lives after experiencing sex-based violence, including sexual assault survivors who have experienced domestic violence, dating violence, and stalking.  VRLC's services ensure that survivors can stay in school; protect their privileged and confidential mental health, medical and education records; preserve their employment; maintain their safe housing; secure their immigration status; and swiftly access victim compensation and other benefits.  As part of its work, VRLC provides legal services and/or facilitates the provision of legal services to students who have experienced sexual violence. With almost 50% of VRLC's clients under the age of 24, a substantial portion of its practice is providing education-related legal consultation and representation.  VRLC attorneys represent victims to communicate effectively with school administrators, acquire interim measures to secure their education while investigations are pending, prepare for and attend disciplinary hearings, file appeals, and if necessary, file complaints with OCR.

194. VRLC brings this action on its own behalf because, as detailed below, the Final Rule concretely frustrates its mission and purpose by (among other things) (i) requiring

resource-intensive efforts that impede its daily operations, (ii) impairing its mission of providing legal assistance to survivors of sex-based harassment, (iii) limiting the efficacy of available avenues of redress for the population it seeks to serve, and (iv) otherwise directly conflicting with, impairing, and frustrating VRLC's organizational mission and priorities.

195.  The Final Rule also requires VRLC to divert its resources to combat the harmful effects of the Rule.  For example, VRLC's staff attorneys have spent additional time advising survivors who anticipate their case will be dismissed if they wait to return to campus after the implementation of the Final Rule, and VRLC's staff attorneys have had to attend additional trainings provided by other organizations to understand the applicability of the rules.  VRLC has also had to divert staff resources to update its public-facing materials, including training curricula and online guides.  In addition, VRLC has specifically created materials to aid preK-12 student survivors and parents, school districts and education attorneys in maintaining as many trauma-informed practices as possible under the Final Rule.

196.  VRLC has also had to increase the technical assistance it provides to campus administrators and education attorneys, including increasing the number of trainings to Massachusetts law enforcement, SARTs, SANE, and advocates on the Final Rule about the impact on campus sexual assault victims, and spending more time advising attorneys regarding the impact of the Final Rule on their cases.  VRLC has also diverted staff resources on existing collaborations with higher education institutions to help them modify existing policies to comply with the Final Rule (this is in addition to VRLC staff time spent on the initial review of policies).

197. As a result of the Final Rule, VRLC anticipates it will take double the amount of preparation time for staff attorneys to prepare for an investigation that includes a lengthy live hearing and cross-examination, thus reducing the overall number of survivors VRLC can represent.

198. After the Department's issued interim guidance revising Title IX's sex-based harassment policy in 2017, VRLC saw immediate and detrimental impacts to its mission and operational activities.  VRLC is confident it will experience the same, if not more drastic, consequences from the Department's haphazard changes.  For example, as a result of the 2017 Guidance, victims of sexual assault and other sex-based harassment were less willing to report their experiences to school authorities, impairing VRLC's ability to achieve its mission.  VRLC saw an immediate chilling effect evidenced by a decline in the number of victims willing to pursue their school's Title IX complaint resolution process.  The Final Rule will likewise make it less likely for VRLC clients to engage in the campus process due to, among other particulars, the inappropriately narrow definition of "sexual harassment," the requirement of live hearings and direct cross-examination of victims, and an inappropriate and unequal standard of evidence that unfairly burdens survivors and makes findings of responsibility for sexual assault and other sex-based harassment more onerous.  VRLC has seen that survivors are considering a "now or never" approach to bringing a complaint, exacerbated by either not being close to on-campus counseling or by hiding information from family members who do not know about their experience of sexual violence.  Accordingly, there will inevitably be a decline in the number of victims willing to file complaints with the Department of Education alleging violations of Title IX by their schools and/or cooperate with the Department of Justice on pending investigations.  Such

declines in reporting and hesitance to participate in the grievance process either through educational institutions or at the Department of Education directly threaten and frustrate VRLC's mission and purpose.

199.   In addition to chilling and discouraging victims of sex-based harassment from seeking justice under Title IX, whether through their school or the Department of Education, the Final Rule will make it difficult for VRLC to provide appropriate legal counsel to its clients, leading to further reductions in reporting.

200.   In cases where an individual proceeds with a complaint to their school, VRLC's mission is frustrated given the nature of the Final Rule.  In particular, the Final Rule makes it more difficult for VRLC to accomplish its mission of obtaining justice for survivors of sex-based harassment because it makes beneficial outcomes less likely and because even where those outcomes remain available, success will take more time and effort.  In addition, because the Final Rule allows schools to resolve reports of sex-based harassment without any clear timeframe and even delay investigations for an unspecified period when there is an ongoing parallel criminal investigation, educational institutions are unlikely to respond promptly to VRLC's clients' complaints.  This trend requires VRLC to spend additional staff time and resources that it has not had in the past in attempting to reach school officials concerning its clients' complaints.

201.   VRLC has also had to devote staff time to reviewing and understanding the Final Rule in order to advise clients in ongoing campus investigations and advocate effectively on their behalf.  This use of time has decreased the amount of time available to provide legal services, including work on ongoing litigation.

202. **ERA** furthers its mission through engaging in public education efforts as well as policy reform and legislative advocacy; providing free legal information and counseling; and litigating cases involving issues of gender discrimination in employment and education at all stages, from the administrative process to the United States Supreme Court. ERA has a long history of pursuing gender justice and equal opportunity for women and girls in education and has litigated a number of important precedent-setting cases, including *Doe v. Petaluma City School District*, 54 F.3d 1447 (9th Cir. 1995), which established that a school can be sued for sex discrimination under Title IX when it fails to address student-on-student sex-based harassment, and *Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957 (2010), which established a university violated Title IX by reducing collegiate athletic opportunities for all women. ERA has participated as *amicus curiae* in scores of state and federal cases involving the interpretation and application of procedural rules and civil rights laws that have an impact on access to justice and economic opportunity for women and girls. Through its Advice and Counseling program, ERA also provides free information and assists individuals on matters relating to sex discrimination at work and in school. As part of its mission, ERA counsels and represents individuals who have been victims of sexual assault and other sex-based harassment in matters pursuant to Title IX.

203. ERA brings this action on its own behalf because the Final Rule (i) requires resource-intensive efforts that divert resources from its daily operations; (ii) limits the efficacy of available avenues of redress to ERA's clients and others it serves; (iii) increases the costs ERA bears in its work on behalf of student victims of sex-based harassment; and (iv) otherwise directly conflicts with, impairs, and frustrates ERA's organizational mission and programmatic priorities.

204.  Since the issuance of this Final Rule, ERA has diverted significant staff resources to reading, learning, analyzing, and understanding the changes to the Title IX regulations.

205.  ERA has begun updating both internal and public-facing resources to reflect the changes from the Final Rule.  These resources include training materials, advocacy guides, and know-your-rights guidance.  ERA has also had to prepare and modify legislative trainings in California to include education regarding the effects of the Final Rule, thereby diverting resources away from other educational efforts and frustrating ERA's mission.

206.  ERA has had to expand its Pro Bono Attorney Network to recruit more attorneys to address and mitigate the harms of the Final Rule to victims of sex-based harassment.  As a result, ERA has been forced to overhaul its training program to educate new Pro Bono attorneys and retrain existing attorneys on the impact of the Final Rule.  ERA also anticipates that it will be more difficult to recruit pro bono attorneys to represent complainant students in Title IX proceedings with their schools, because—regardless of whether the complainants are eligible for monetary compensation—there will be a long and difficult road for students to vindicate their civil rights.

207.  In addition to training its own staff attorneys, ERA has also had to increase and modify the technical assistance it provides to educational institutions, student organizations, and attorneys.  Prior to the Final Rule, ERA provided consulting services and could take on new work.  Now, ERA is fielding requests to educate and inform on the impact of the Final Rule, rather than advocate for its clients.

208.  ERA has diverted staff resources from existing collaborations with preK-12 and postsecondary institutions to help modify schools' existing policies to comply with the Final Rule.  ERA is currently engaged in two large-scale, multi-year programmatic

collaborations, one with the Sacramento Unified School District that serves over 40,000 preK-12 students, and another with a post-graduate research institution with locations in two states.  In each collaboration, ERA works with the institution to design and implement improved Title IX policies and trainings and to conduct climate surveys to assess improvements.  ERA recently added COVID-19 guidance to this portfolio.  The goal of this programmatic work is to improve protections for students against sex-based harassment.  For one of these initiatives, ERA had completed its intensive policy and training work and was ready to hand off the implementation to the educators and administrators at the institution, while remaining available in an advisory capacity.  Due to the Final Rule, however, ERA has been forced to abandon the current drafts of Title IX policies and training materials.  Senior ERA staff will have to redo work that was near completion to account for the numerous Final Rule changes, setting the programmatic work back by nearly eighteen months in the case of the collaboration with the research institute.  Not only has the Final Rule required ERA to divert resources away from other aspects of its programmatic work with these institutions, it has frustrated the mission of these collaborative partnerships by prohibiting ERA from engaging in the additional aspects of the programmatic collaboration that directly benefit students, including promoting women in the academic sciences environment, changing reward incentives and disciplinary structures, incorporating student involvement, and analyzing results of climate surveys and advising these institutions on how to respond.

209.   ERA will undoubtedly expend additional resources over and above what it otherwise would to counteract the effects of the Final Rule.  For example, ERA will have no choice but to continue diverting staff time and resources away from core programmatic activities, such

as litigating employment-related civil rights enforcement cases and cases involving Title IX enforcement that do not relate to sex-based harassment in schools, to step up its efforts to assist student victims of sex-based harassment in obtaining redress.  Specifically, since the issuance of the Final Rule, when faced with questions about resource allocation and staffing, ERA has been forced to prioritize Title IX services.  ERA has been forced to completely shut down its employment advice and counseling program reserved for Title VII complaints in order to field inquiries regarding the Final Rule.  ERA has had to limit the program to Title IX matters.  Where ERA formerly pursued five or six employment-discrimination cases each year, it now may only have the resources to pursue two. Additionally, of ERA's six attorneys, three now do Title IX work full time, a significant increase over the past two years, and ERA has recently added a fellow to focus solely on Title IX matters for LGBTQ students.

210.   **Legal Voice** furthers its mission by participating in pro bono litigation services, legislative advocacy, and the provision of legal information and education.  Legal Voice focuses on impact litigation and in particular works to support the communities most impacted by sex-based discrimination:  women of color, LGBTQ and gender-nonconforming individuals, and immigrants.  Legal Voice has served nearly 300 clients since 1978 through both direct representation and amicus support.

211.   Legal Voice has provided pro bono representation in eight cases specifically related to Title IX in preK-12 schools and higher education. Two of those cases involved direct representation of sexual assault survivors.

212.   As legislative advocates, Legal Voice has worked with Washington state legislators to codify additional protections for student survivors of sexual assault.  For example, in the

2019 legislative session, Legal Voice successfully lobbied to ease the requirements to obtain a sexual assault protection order.  In addition, Legal Voice crafted a bill that would have created a joint legislative task force on sexual violence in higher education, including Title IX protections and compliance.  In the 2020 legislative session, Legal Voice successfully led efforts on a bill that imposes additional requirements on postsecondary educational institutions in their investigations of sexual misconduct.  For each of these initiatives, Legal Voice provided testimony, drafted legislative language, and organized stakeholders.

213. Legal Voice brings this action on its own behalf because the Final Rule (i) requires resource-intensive efforts that divert resources from its daily operations; (ii) limits the efficacy of available avenues of redress to Legal Voice's clients and others it serves; (iii) increases the costs Legal Voice bears in its work on behalf of student victims of sex-based harassment; and (iv) otherwise directly conflicts with, impairs, and frustrates Legal Voice's organizational mission and programmatic priorities.

214. Legal Voice has had to divert time and resources to reviewing the Final Rule and updating its Know Your Rights materials for Washington, Idaho and Alaska.  As a result, Legal Voice has been hindered in its ability to provide legal advice, technical assistance, and representation to student victims of sex-based harassment.  This time would have otherwise been spent working on existing matters and ongoing litigation.

215. Legal Voice also expects to divert resources to providing increased technical assistance and education to students and educational institutions regarding the applicability of the Final Rule to pending and future Title IX cases, given the uncertainty in this area.  Legal Voice also expects to divert additional resources to legislative advocacy to codifying

protections under Title IX at the state level, because in the previous year, changes were contemplated but stakeholders decided to wait until the Final Rule was issued.  As a result, Legal Voice will have fewer resources to devote to litigation because of its staffing capacity.

216. **CAASE** furthers its mission by creating and facilitating educational curricula to empower high-school students to end sex-based harassment in the Chicagoland area, as well as Illinois-wide and nation-wide.

217. CAASE furthers its mission by advocating for systemic reforms that provide support for and expand options for survivors of sexual harm and that provide for appropriate accountability for offenders -- both individual and institutional. CAASE does this via legislative actions, community engagement and education, coalition-building, and participating in strategic criminal legal system convenings.

218. CAASE furthers its mission by providing legal representation for survivors of sex-based harassment in civil litigation, as victims' rights representatives in the criminal justice system, and as advocates for public policies that increase the efficacy of criminal and civil laws pertaining to sex-based harassment.  Among its cases, CAASE represents students over the age of 13 who have survived sex-based harassment and need support to continue their education, including navigating the Title IX complaint process.

219. CAASE furthers its mission through community engagement by centering communities most impacted by sexual harm. CAASE provides platforms for survivors to share their experiences and expertise which shapes our work, educates the public, and raises awareness.

220. CAASE brings this action because the final rule (i) requires resource-intensive efforts that divert resources from CAASE's daily operations; (ii) limits the efficacy of available avenues of redress to CAASE's student clients; (iii) otherwise directly conflicts with, impairs, and frustrates CAASE's organizational mission and programmatic priorities; and (iv) likely conflicts with case law and impairs CAASE's ability to advise its clients.

221. Since the issuance of the Final Rule, members of CAASE's Legal Department have had to shift much of their focus away from directly representing clients, because they are required to assess the potential impact of the Final Rule on existing and potential future cases.  They have also been forced to forgo important projects to devote time to preparing and giving Know Your Rights presentations and drafting collateral materials to spread awareness of these issues. The members of the Legal Department have had to dedicate time to plan for how best to support and represent their clients in their cases once schools have modified their policies, and they will need to continue to spend significant time doing research and communicating with schools in order to stay up to date on when and in what ways they are making changes in order to be in accordance with the Final Rule.

222. CAASE's Legal, Community Engagement, and Policy departments have also had to delay the development of a Restorative Justice program because the necessary resources are currently tied up in these efforts to fully understand and be prepared to provide expert assistance regarding the Title IX regulations.

223. CAASE's Community Engagement and Policy departments have also had to delay the development of a project designed to bring gender justice advocates and criminal justice reform advocates together to discuss shared goals and to build solidarity and community.

224.  Since the issuance of the final rule, CAASE's Community Engagement Department has had to shift focus away from building a survivor advisory board and building connections with individuals who have experienced sexual violence on the southside of Chicago, to building relationships and connections with student survivors. The members of the Community Engagement Department have had to plan and develop new outreach and collateral as a result of the new regulations, shifting time away from other opportunities and projects.  They have had to spend time arranging and attending meetings with school employees and students in order to discuss what the new regulations mean and how both students and staff can respond.

225.  CAASE's Policy Department has spent a substantial amount of time analyzing the new rule and comparing it to previous guidance, current laws in Illinois, and current bills in formation in Illinois. The members of this department have dedicated significant time and resources to sorting out potential and confirmed conflicts of law, trying to determine what schools will do in response to the new regulations, and updating documents and written collateral. They have had to shift focus from passing other bills related to crime victims' rights, rape kit expansion, workplace harassment and violence, and the sex offender registry in order to work on state-specific legislation to ensure the new regulations do not undermine the ability of student victims of sex-based harassment to maintain or achieve access to education. The Policy Department has also pulled back from nearly all workplace advocacy efforts, among other projects, in order to focus on and address this issue.  Because these preemption issues were not explained in the Proposed Rule, CAASE has been forced to assess these issues on short notice after the publication of the Final Rule.

226. The members of CAASE's Prevention Department have spent an enormous amount of time reading and analyzing the regulations and associated literature. In order to do that, they have had to divert time from supporting and responding to the abrupt shift towards digital e-learning resulting from the global pandemic. They have also spent time fielding questions from faculty from higher education institutions about the regulations and how to put pressure on their school administrators to respond appropriately.

227. CAASE's Communications Department has had to divert time away from its normal operations in order to take meetings with other departments, develop messaging around this issue, and ensure reporters are educated about the distinctions between the national impact and the local, Illinois-specific impact of these regulations. This includes: spending time writing content, keeping media contacts informed about issues and preparing relevant CAASE staff for story-specific interviews, and developing/implementing a social media campaign about the changes focused on target populations. The regulations have also delayed the executions of other planned projects, including the re-launch of CAASE.org.

228. All departments at CAASE will undoubtedly have no choice but to continue to expend substantial resources in order to counteract the effects of the new regulations at the expense of their other projects, activities, and responsibilities.

229. In addition to diverting Plaintiffs' resources and frustrating Plaintiffs' missions, the Department's discriminatory motivation underlying the Final Rule also harms women and girls—including Plaintiffs' clients—who are hindered in bringing their own claims to challenge the Final Rule.

## CLAIMS FOR RELIEF

## COUNT ONE

*Administrative Procedure Act – Not in Accordance with Law*

230.  Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

231.  Under the APA, a court must "set aside agency action" that is "not in accordance with law."[241]

232.  Congress crafted Title IX's prohibition on sex discrimination in education programs and activities receiving federal financial assistance to promote equal educational access for girls and women.  Sexual harassment is recognized as a barrier to such access, and sexual assault is the most extreme form of sexual harassment. The Department of Education—the administrative agency tasked with enforcement of Title IX's civil rights provisions—is responsible for ensuring that schools that receive federal funding are acting to prevent and address sexual harassment through prompt and effective remedial measures.

233.  Until 2017, the Department of Education recognized that sex-based harassment can limit or deny students' ability to participate in or benefit from educational opportunities, and the Department's Title IX regulations and guidance documents represented good-faith attempts to reduce sex-based harassment in educational institutions.  The Final Rule represents a complete departure from established practice and procedure regulating educational institutions. It will undermine Title IX's unequivocal and long-standing purpose to prevent and redress sex discrimination in schools, by eliminating protections for victims of sex-based harassment, imposing procedural requirements that will

---

[241] 5 U.S.C. § 706(2)(A).

discourage victims from reporting, and permitting schools to respond in ways that will re-traumatize victims and make justice more elusive.  The Final Rule is contrary to the text and purpose of Title IX, the Department's own regulations, and Supreme Court precedent.

234. Sections 106.30, 106.44(a), 106.45(b)(1)(iv), 106.45(b)(1)(v), 106.45(b)(1)(vii), 106.45(b)(3)(i), 106.45(b)(3)(ii), 106.45(b)(5)(iii), 106.45(b)(6)(i), 106.45(b)(6)(ii), 106.6(h), 106.71(b)(1), and 106.71(b)(2) of the Final Rule are therefore "not in accordance with law" under the APA and should be vacated.

## COUNT TWO

### *Administrative Procedure Act – Arbitrary and Capricious*

235. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

236. The APA provides that a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."[242]  Under *State Farm*, the touchstone of "arbitrary and capricious" review under the APA is "reasoned decisionmaking."[243]

237. The Department's justifications for its decision runs counter to the evidence before the agency, relies on factors Congress did not intend for the agency to consider, is inconsistent with federal law and Supreme Court precedent, and disregards material facts and evidence.

238. The Department's release of the Final Rule of over 2000 pages in the midst of the COVID-19 pandemic in May, 2020, with a compliance requirement for educational institutions set for August 14, 2020, is contrary to established practice and clearly unreasonable.[244]  There

---

[242] 5 U.S.C. § 706(2)(A).
[243] *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 43 (1983).
[244] By contrast, when the Campus SaVE Act was signed into law in March 2013, it provided one year for its effective date, and the implementing regulations were effective on July 1, 2015.  This was a reasonable timeframe for recipient schools to create and implement their own policies in the most effective manner.

is no emergency requiring schools to suddenly depart from protecting students from sexual assault.

239. The Department has therefore failed to provide a reasoned explanation for its decisions and Sections 106.30, 106.44(a), 106.45(b)(1)(iv), 106.45(b)(1)(v), 106.45(b)(1)(vii), 106.45(b)(3)(i), 106.45(b)(3)(ii), 106.45(b)(5)(iii), 106.45(b)(6)(i), 106.45(b)(6)(ii), 106.6(h), 106.71(b)(1), and 106.71(b)(2) of the Final Rule are therefore arbitrary and capricious.[245]

## COUNT THREE

*Administrative Procedure Act – Excess of Statutory Jurisdiction*

240. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

241. The APA provides that a reviewing court shall set aside any agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[246]

242. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[247]  Courts and federal agencies have long recognized that sexual harassment and other sex-based harassment is sex discrimination, thereby requiring recipients to take steps to ensure that victims are not excluded from participating in, be denied benefits of, or subjected to discrimination in educational programs or activities because of experiencing such harassment. The Department "is authorized and directed to effectuate the provisions of

---

[245] *State Farm*, 463 U.S. at 43.
[246] 5 U.S.C. § 706(2)(C).
[247] 20 U.S.C. § 1681(a).

section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute."[248]

243. It exceeds Title IX's nondiscrimination mandate for the Department to issue regulations that require schools *not* to protect students against sex discrimination. Yet the Final Rule requires schools to dismiss certain types of complaints of sex discrimination, thereby requiring schools to violate students' and employees' rights under Title IX.  It further exceeds Title IX's nondiscrimination mandate to include respondents in the prohibition of sex discrimination in a statute designed to protect the civil rights of complainants.

244. Nor is the Department authorized under Title IX to issue regulations that provide special protections to respondents in sex-based harassment investigations that are inequitable and unfair to victims of such misconduct.  This will discourage victims of sex-based harassment from coming forward, thereby harming schools' ability to create safe and inclusive learning environments and protect students from sex discrimination. The selective protections for respondents and burdensome procedures for victims is contrary to the letter and purpose of Title IX.

245. Furthermore, the Clery Act supersedes the Department's Final Rule on key provisions concerning victims' rights and conduct proceedings. Because Congress has spoken on these statutory interpretations, to the extent the Final Rule is inconsistent with the Clery Act, the Final Rule must be vacated.

---

[248] 20 U.S.C. § 1682.

246. Therefore, the Department has failed to effectuate Title IX's anti-discrimination mandate and has "gone beyond what Congress has permitted it to do."[249]  Thus, sections 106.30, 106.45(b)(1)(iv), 106.45(b)(3), 106.45(b)(6)(i), 106.71(b)(1), and 106.71(b)(2) of the Final Rule are in excess of statutory authority and must be vacated.

## COUNT FOUR

*Administrative Procedure Act – Without Observance of Procedure Required by Law*

247. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

248. The APA requires that a notice of proposed rulemaking contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved."[250] Courts "have generally interpreted this to mean that the final rule [an] agency adopts must be a logical outgrowth of the rule proposed."[251]  "A final rule is a logical outgrowth of the proposed rule only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."[252]

249. The Final Rule contains several provisions that were not identified, described, or otherwise included in the Proposed Rule, including the following: (i) the requirement that recipients dismiss complaints if the victim graduated, transferred, or dropped out; (ii) the provision allowing schools to dismiss complaints if the respondent graduated, transferred, or retired;

---

[249] *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).
[250] 5 U.S.C. § 553(b)(3).
[251] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) (internal citations omitted).
[252] *Daimler Trucks North America LLC, v. Envtl. Prot. Agency*, 737 F.3d 95, 100 (D.C. Cir. 2013) (citations omitted).

(iii) the sweeping exclusion of relevant evidence and testimony; (iv) the retaliation provision and; (v) the preemption provision.  The Department "did not propose, and offered no indicating that it was contemplating" these provisions.[253]  Based on the Proposed Rule, the public could not have anticipated the need to comment on these topics.  The Department therefore failed to provide adequate notice and opportunity to comment on the proposed rulemaking, in violation of the APA, 5 U.S.C. § 706(2)(D).  The Final Rule must be vacated.

250. Additionally, the Final Rule's regulatory impact analysis did not sufficiently justify the costs and benefits of the rulemaking, thus evading the APA's critical procedural protections that ensure agency regulations are warranted and evidence-based.

251. Sections 106.30, 106.45(b)(3)(ii), 106.45(b)(6)(i), 106.6(h), and 106.71(b)(1) of the Final Rule therefore violate the APA because they were promulgated without observance of procedure required by law.

## COUNT FIVE

*Violation of the Equal Protection Guarantee of the Fifth Amendment*

252. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

253. The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the federal government from denying equal protection of the laws, including by discriminating on the basis of sex.

---

[253] *Id.* at 100.

254. In issuing the Final Rule, Defendants were motivated, at least in part, by their discriminatory—and baseless—gender stereotype that many women and girls lack credibility with regard to sex-based harassment. This stereotype includes the perception that women and girls who report sexual harassment misunderstood a harmless romantic advance and that those who report sexual violence often are either lying or have regret about a consensual sexual encounter. The Department's decision to single out sex-based harassment for uniquely burdensome and inequitable procedures is evidence of their intent to discriminate based on sex.

255. The statements and actions of Secretary DeVos and others in the administration, as well as the circumstances under which the Final Rule was issued, further demonstrate that Defendants issued the Final Rule knowing it would have a disparate impact on women, who constitute the overwhelming majority of sex-based harassment survivors, by reducing federal protections for victims of sex-based harassment. They took this action not despite this impact on women and girls, but because of it.

256. Sections 106.30, 106.44(a), 106.45(b)(1)(iv), 106.45(b)(1)(v), 106.45(b)(1)(vii), 106.45(b)(3)(i), 106.45(b)(3)(ii), 106.45(b)(5)(iii), 106.45(b)(6)(i), 106.45(b)(6)(ii), 106.6(h), 106.71(b)(1), and 106.71(b)(2) of the Final Rule therefore violate the Equal Protection guarantee of the Fifth Amendment to the U.S. Constitution.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1. Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law within the meaning

of 5 U.S.C. § 706(2)(A), (C), and (D); and in violation of the Fifth Amendment's equal

protection guarantee;

2.   Vacate and set aside the Final Rule;

3.   Stay the effective date of the Final Rule pursuant to 5 U.S.C. § 705;

4.   Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees,

pursuant to 28 U.S.C. § 2412; and

5.   Grant other such relief as this Court may deem proper.

Dated:          June 10, 2020                    Respectfully submitted,

By:_____

       Julie O'Neill
       Natalie A. Fleming Nolen*
       David A. Newman*
       Vanshika Vij*
       Caitlin A. Crujido*
       Robin A. Smith*
       Morrison & Foerster LLP
       2000 Pennsylvania Ave., NW, Suite 6000
       Washington, DC  20006-1888
       Telephone: 202.887.1500

       Emily Martin*
       Neena Chaudhry*
       Sunu Chandy*
       Shiwali G. Patel*
       Elizabeth Tang*
       National Women's Law Center
       11 Dupont Circle, NW, Suite 800
       Washington, DC 20036
       Telephone: 202.588.5180

Diane L. Rosenfeld**
Attorney at Law
Mass. Bar Number 668275
Cambridge, MA 02138

*Attorneys for Plaintiffs*
*Victim Rights Law Center*
*Equal Rights Advocates*
*Legal Voice*
*Chicago Alliance Against Sexual*
*Exploitation*

*\* motion for admission pro hac vice*
*forthcoming*
*\*\*motion for admission to U.S. District*
*Court for District of Massachusetts*
*forthcoming*