# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**VICTIM RIGHTS LAW CENTER,** et al.

                    Plaintiffs,

   v.

**ELISABETH D. DEVOS**, et al.

                    Defendants.

Case No. 1:20-cv-11104

Judge William G. Young

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION OR SECTION 705 STAY

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTS AND BACKGROUND ............................................................................................. 4

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    I.      **Plaintiffs Have Shown A Likelihood of Success on the Merits** ....................... 8

          A.     The Final Rule Is Arbitrary, Capricious, and Not in Accordance with Law. ................................................................................................. 8

          B.     The Final Rule Exceeds the Department's Statutory Authority. ............. 20

          C.     The Department Failed to Follow APA Requirements ............................ 21

          D.     The Final Rule Violates the Equal Protection Guarantee of the Fifth Amendment .................................................................................. 23

    II.     **The Final Rule Will Result in Irreparable Harm to the Plaintiffs** ............... 25

          A.     Doe plaintiffs are suffering, and will continue to suffer, irreparable harm unless the Court grants preliminary injunctive relief or stays the Final Rule .......................................................................................... 25

          B.     Organizational plaintiffs are suffering, and will continue to suffer, irreparable harm unless the Court grants preliminary injunctive relief or stays the Final Rule .................................................................... 32

    III.    **The Balance of Equities and Public Interest Favors Granting the Requested Relief** ............................................................................................. 37

CONCLUSION .................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Ayala-Sepulveda v. Municipality of San German*,
  671 F.3d 24 (1st Cir. 2012) ................................................................24, 25

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
  443 F.3d 112 (1st Cir. 2006) .....................................................................37

*Buchanan v. Maine*,
  469 F.3d 158 (1st Cir. 2006) .....................................................................24

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979) ...............................................................................4, 11

*CBS, Inc. v. Davis*,
  510 U.S. 1315 (1994) .................................................................................28

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ...................................................................................21

*Cohen v. Brown Univ.*,
  101 F.3d 155 (1st Cir. 1996) .....................................................................24

*Cook Cty. Illinois v. McAleenan.*
  417 F. Supp. 3d 1008 (N.D. Ill. 2019) .....................................................38

*Cty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ......................................................36

*Daimler Trucks North America LLC, v. Envtl. Prot. Agency*,
  737 F.3d 95 (D.C. Cir. 2013) ....................................................................22

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ...............................................................................5, 10

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*,
  140 S. Ct. 1891 (2020) ...........................................................................9, 20

*District of Columbia v. U.S. Dep't of Agric.*,
  No. 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) .......38, 39

*Doe v. Rector & Visitors of George Mason Univ.*,
  179 F. Supp. 3d 583 (E.D. Va. 2016) ........................................................39

*Earth Island Inst. v. Ruthenbeck*,
  490 F.3d 687 (9th Cir. 2007) .....................................................................39

*Encino Motorcars, LLC v. Navarro*,
    136 S.Ct. 2117 (2016).............................................................................................8, 9

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ...................................................................................31

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)....................................................................................................9

*Franklin v. Gwinnett Cty. Pub. Schs.*,
    503 U.S. 60 (1992)......................................................................................................4

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)..............................................................................................5, 10

*Granite State Trade Sch., LLC v. The New Hampshire Sch. Of Mech. Trades. Inc.*,
    120 F. Supp. 3d 56 (D.N.H. 2015)..............................................................................8

*Haidak v. Univ. of Mass.-Amherst*,
    933 F.3d 56 (1st Cir. 2019).......................................................................................18

*Jones v. Nat'l Conf. of Bar Exam'rs*,
    801 F. Supp. 2d 270 (D. Vt. 2011)...........................................................................30

*Know Your IX v. DeVos*,
    1:20-cv-01224-RDB (D. Md. filed May 14, 2020).............................................28, 33

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................................36, 38

*Lipsett v. Univ. of P.R.*,
    864 F.2d 881 (1st Cir. 1988).....................................................................................24

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007)..................................................................................................22

*Lopera v. Town of Coventry*,
    640 F.3d 388 (1st Cir. 2011).....................................................................................24

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986)......................................................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)......................................................................................................8

*New Hampshire Hosp. Ass'n v. Burwell*,
    No. 15-CV-460-LM, 2016 WL 1048023 (D.N.H. Mar. 11, 2016)......................8, 37

*New York v. Dept. of Homeland Sec.*,
    408 F. Supp. 3d 334 (S.D.N.Y. 2019) ...................................................................38

*New York v. DeVos*,
    No. 1:20-cv-4260 (S.D.N.Y. filed June 4, 2020) ............................................28, 33

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................37

*Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*,
    470 F. Supp. 2d 30 (D.N.H. 2007) .........................................................................38

*Pennsylvania v. DeVos*,
    No. 1:20-cv-01468 (D.D.C. filed June 4, 2020) .............................................28, 33

*Petties v. District of Columbia*,
    881 F. Supp. 63 (D.D.C. 1995) ..............................................................................26

*Pollis v. New Sch. for Soc. Research*,
    829 F. Supp. 584 (S.D.N.Y. 1993) .........................................................................26

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010) ....................................................................................25

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005) ....................................................................................28

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir.1996) .....................................................................................25

*Ryan v. U.S. Immigration & Customs Enf't*,
    382 F. Supp. 3d 142 (D. Mass. 2019) ....................................................................28

*Savino v. Souza*,
    No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. May 12, 2020) .......................37

*Schlesinger v. Ballard*,
    419 U.S. 498 (1975) ..............................................................................................24

*SurvJustice Inc. v. DeVos*,
    No. 18-CV-00535-JSC, 2019 WL 5684522 (N.D. Cal. Nov. 1, 2019) ...................36

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ................................................................................................7

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ..................................................................................25

*Washington v. Indiana High Sch. Athletic Ass'n, Inc.*,
  181 F.3d 840 (7th Cir. 1999) ............................................................31

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ..........................................................36

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008).................................................................8, 25, 37

## Statutes and Regulations

5 U.S.C. § 553(b)(3) ............................................................................21

5 U.S.C. § 705...............................................................................4, 7

5 U.S.C. § 706..........................................................................8, 21, 39

20 U.S.C. § 1681(a) .........................................................................4, 14

20 U.S.C. § 1681, et seq. Title IX ..............................................................1

20 U.S.C. § 1682...............................................................................1

34 C.F.R. § 106.8 .............................................................................17

34 C.F.R. § 106.30 .............................................10, 12, 13, 16, 22, 23, 27, 29

34 C.F.R. § 106.44(a)...........................................................12, 14, 15, 28

34 C.F.R. § 106.45 ...............................................17, 18, 20, 23, 27, 29

34 C.F.R. § 106.71(b)(1).......................................................................29

40 Fed. Reg. 24, 128 (June 4, 1975) ............................................................4

62 Fed. Reg. 12,034, 12,040 (Mar. 13, 1997).....................................................4

83 Fed. Reg. 61,462 (Nov. 29, 2018)......................................................5, 7, 10

*Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) 1, 7, 11, 12, 13,
  14, 17, 18, 19, 21, 23, 27, 29

## Other Authorities

Am. Ass'n. of Univ. Women, *Crossing the Line: Sexual Harassment at School* 8
  (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-
  Sexual-Harassment-at-School.pdf ..........................................................15

Andrew Kreighbaum, *New Uncertainty on Title IX*, Inside Higher Education
(Nov. 20, 2018) ................................................................................................20

Inst. for Women's Policy Research, *Dreams Deferred: A Survey on the Impact of
Intimate Partner Violence on Survivors' Education, Careers, and Economic
Security* 8 (2018), https://iwpr.org/wp-content/uploads/2018/10/C474_IWPR-
Report-Dreams-Deferred.pdf ...........................................................................23

Julie Mack & Emily Lawler, *MSU doctor's alleged victims talked fir 20 years.
Was anyone listening?* MLIVE (Feb. 8, 2017),
https://www.mlive.com/news/index.ssf/page/msu_doctor_alleged_sexual_assa
ult.html ..............................................................................................................13

Letter from 20 Attorneys General to Betsy DeVos, Sec'y, Dep't of Educ. (July 19,
2017), https://www.attorneygeneral.gov/taking-action/press-releases/20-ags-
call-on-secretary-devos-to-maintain-protections-for-survivors-of-campus-
sexual-assault ....................................................................................................17

Letter from Former Students and Survivors of Sexual Abuse Perpetrated by Larry
Nassar at Michigan State University, George Tyndall at University of
Southern California, and Richard Strauss at Ohio State University to Secretary
DeVos and Assistant Secretary Marcus (Nov. 1, 2018),
https://www.publicjustice.net/wp-content/uploads/2018/11/November-1-
Survivor-Letter-to-ED.pdf ................................................................................13

Letter from Int'l Ass'n of Campus Law Enforcement Administrators to Betsy
DeVos, Sec'y, Dep't of Educ. (Jan. 28, 2019),
https://www.regulations.gov/document?D=ED-2018-OCR-0064-10515 .............15

Letter from National Education Association to Brittany Bull, Dep't of Educ. (Jan.
30, 2019),
http://www.nea.org/assets/docs/NEA%20Comment%20Letter%20RE%20ED-
2018-OCR-0064.pdf ..........................................................................................16

Letter from The School Superintendents Association to Betsy DeVos, Sec'y,
Dep't of Educ. (Jan. 22, 2019),
https://aasa.org/uploadedFiles/AASA_Blog(1)/AASA%20Title%20IX%20Co
mments%20Final.pdf ...................................................................................15, 16

RAINN, *Campus Sexual Violence: Statistics*,
https://www.rainn.org/statistics/campus-sexual-violence.....................................11

Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on
Children's Coached Reports*, 21 Psychology, Pub. Pol'y, & L. 10 (2015) ............19

Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?* N.Y.
Times (Aug. 5, 2016) .........................................................................................15

Saskia Righarts et al., *Young Children's Responses to Cross-Examination Style Questioning: The Effects of Delay and Subsequent Questioning*, 21(3) Psychology, Crime & L. 274 (2015)........................................................................19

U.S. Dep't of Educ., Office for Civil Rights, *Case Processing Manual* (Nov. 18, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf........................................6

U.S. Dep't of Educ., Office for Civil Rights*, Dear Colleague Letter* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ................6, 13

U.S. Dep't of Educ., Office for Civil Rights, Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College (Apr. 4, 1995), http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf ............................................................................................6

U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf............................6, 13

U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance; Harassment of Students by School Employees, Other Students, or Third Parties* (2001). ............................................................................5, 6, 10, 11, 12, 13, 14

U.S. Dep't of Justice, Bureau of Justice Statistics, *Rape and Sexual Assault Victimization Among College-Age Females* (Dec. 2014), https://perma.cc/8VZL-H6F5 ............................................................................14

U.S. Dep't of Educ., Office of Civil Rights, *Dear Colleague Letter* (Oct. 26, 2010),  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html ............................................................................................11, 14

U.S. Dep't of Educ., Office for Civil Rights, *Racial Incidents and Harassment Against Students* (Mar. 10, 1994), https://www2.ed.gov/about/offices/list/ocr/docs/race394.html ............................................11

United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study ................................................15

White House Counsil on Women and Girls*, Rape and Sexual Assault: A Renewed Call to Action* 15 (Jan. 2014), https://www.knowyourix.org/wp-content/uploads/2017/01/sexual_assault_report_1-21-14.pdf ................................................23

## INTRODUCTION

Over 45 years ago, Congress enacted Title IX, 20 U.S.C. § 1681, et seq., to prohibit sex discrimination in education programs and activities receiving federal financial assistance ("educational institutions" or "schools").  As a federal agency that funds educational programs and activities, the Department is "directed to effectuate" Title IX "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives" of Title IX.[1]  This landmark civil rights law was passed to fight sex discrimination and promote equal access to educational benefits, opportunities, and resources for all students, especially girls and women, from the classroom to the playing field.

On August 14, 2020, the U.S. Department of Education's final regulations implementing Title IX's protections against sexual harassment, titled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Final Rule") is scheduled to take effect.  The Final Rule will reverse decades of efforts by Congress, the Executive Branch, state and local governments, and educational institutions to combat the harmful effects of harassment on equal access to education.  Without adequate justification or explanation, the Final Rule not only removes protections against sexual harassment and imposes disproportionate burdens on survivors, but also narrows the definition of sexual harassment to which schools must respond, reducing schools' ability to respond to sexual harassment—in some cases *requiring* schools not to respond at all.  The Final Rule also arbitrarily mandates uniquely complainant-hostile procedures that are required for school investigations of sexual harassment, but not other types of student or staff misconduct or other forms of harassment and discrimination that the Department regulates, thus perpetuating the

---

[1] 20 U.S.C. § 1682.

1

discriminatory, toxic, and false message that allegations of sexual harassment are uniquely unreliable.

The Final Rule violates the Administrative Procedure Act ("APA") because it is arbitrary, capricious, contrary to law, in excess of the Department's statutory jurisdiction, and was enacted without observance of procedure required by law.  Additionally, the Final Rule violates the equal protection guarantee of the Fifth Amendment because it singles out complainants of sexual harassment for disparate treatment and because the challenged provisions are motivated by discriminatory sex-based stereotypes.

Plaintiffs are four victims-rights organizations and seven individuals, one as young as ten years old, who will suffer irreparable harm if the Final Rule is implemented.  Not only do some of these Doe plaintiffs risk their Title IX complaints being subject to mandatory dismissal for arbitrary reasons, but they will also all endure additional psychological, and emotional harm that will irrevocably interrupt their access to education.  Certain Doe plaintiffs' Title IX complaints involve sexual assault that occurred off-campus at a location that is not controlled by their school, and, therefore must be dismissed under the Final Rule, even though their assaults deny them the educational opportunities protected by law.  Others graduated before they could file their Title IX complaints, and their complaints must also be dismissed under the Final Rule, even where the respondent is still a student or employee at the school and may pose a danger to other students.

Each Doe plaintiff has already experienced some level of trauma, physically and/or emotionally, and the Final Rule will only intensify these traumas.  The Doe plaintiffs have expressed feelings of fear, anxiety, and depression, and for at least one, suicidality.  They have sought medical attention, including therapy and counseling, which has, for some, resulted in a significant financial burden.  All but one of the Doe plaintiffs who will be subject to a live hearing

with direct cross-examination will be forced to relive a traumatic experience without the formal legal protections available in a courtroom setting, and as a result have considered dropping their Title IX complaints completely to avoid that proceeding entirely.

Most critically, the Final Rule will impede the Doe plaintiffs' access to education. Many have already dropped classes, changed their fields of study, or transferred schools entirely, and almost all reported that their grades suffered. In the case of the minor Doe plaintiff, she has become withdrawn, expressing little desire to return to school when she used to look forward to it. She feels that she can no longer trust those adults responsible for protecting her, and her mother worries this will be a lasting effect of the repeated sexual harassment she endured. The Final Rule will only exacerbate and make permanent this harm.

The organizational plaintiffs have been forced to divert their limited resources to focus on the impact, uncertainty, and inconsistencies of the Final Rule, taking time and focus away from other equally important work such as legislative advocacy, collaborations with educational institutions, and the development of community programs. To this end, the organizational plaintiffs have had to spend significant time updating public-facing materials, increasing technical assistance to campus administrators and students, and helping preK-12 and post-secondary educational institutions understand their new obligations.

Further, as a direct result of the Final Rule, the missions of these organizational plaintiffs have been, and will continue to be, frustrated. The Final Rule will make it less likely that survivors engage in the Title IX process, and those who choose to proceed will be subject to a lengthy and time-consuming process that will require more assistance from these victims-rights organizations, reducing the numbers of cases the organizations can manage at one time.

Plaintiffs respectfully ask the Court to preliminarily enjoin implementation of the Final

Rule, without geographic limitation, or, in the alternative, to stay the impending August 14, 2020 effective date under Section 705 of the APA, until Plaintiffs' claims can be adjudicated on the merits.

## **FACTS AND BACKGROUND**

Title IX sets forth an unequivocal mandate: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"[2] In enacting Title IX, Congress intended both "to avoid the use of federal resources to support discriminatory practices . . . [and] to provide individual citizens effective protection against those practices."[3] Sexual harassment has long been understood to fall within Title IX's proscription.[4]

Since 1975, Title IX's implementing regulations have imposed affirmative obligations on schools to effectuate the statute's antidiscrimination mandate.[5] The Department's predecessor promulgated regulations requiring that educational institutions "adopt and publish grievance procedures providing for prompt and equitable resolution" of student and employee complaints of sex discrimination, including sexual harassment.[6] Guidance published in 1997 informed schools how to address sexual harassment in educational settings and advised schools of their responsibility to adopt and publish grievance procedures providing for "prompt and equitable" resolution of sex discrimination complaints.[7] The 1997 Guidance encouraged a school to take "interim measures" during the investigation of a complaint, and instructed a school to put in place "responsive measures" after a finding of responsibility to "minimize, as much as possible, the

---

[2] 20 U.S.C. § 1681(a).
[3] *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 & n.36 (1979).
[4] *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).
[5] *See* 40 Fed. Reg. 24, 128 (June 4, 1975).
[6] *Id.* § 106.8(c).
[7] 62 Fed. Reg. 12,034, 12,040 (Mar. 13, 1997) ("1997 Guidance").

burden" on the complainant.[8]

After the Supreme Court issued two decisions articulating narrow liability standards for private Title IX sexual harassment cases seeking money damages, the Department published revisions to the 1997 Guidance in 2001 ("the 2001 Guidance").[9]  The 2001 Guidance explained that the liability standards articulated by the Supreme Court in those cases—that in order to recover money damages in a private Title IX lawsuit challenging sexual abuse by a teacher or student, a plaintiff must show that an appropriate official had actual notice of the abuse and that the school was deliberately indifferent to it—did not change the Department's administrative enforcement standards.[10]  The Department therefore maintained the 1997 Guidance standards requiring schools to take prompt and effective action calculated to end sexual harassment, prevent its recurrence, and remedy its effects.[11]  The Department explained that the "liability standards established in those cases are limited to private actions for monetary damages" because the Supreme Court was concerned about "the possibility of a *money damages award* against a school for harassment about which it had not known."[12]

The 2001 Guidance reaffirmed and reiterated many of the principles set forth in the 1997 Guidance.[13]  The 2001 Guidance stated that schools had notice of sexual harassment against a student and were therefore responsible for addressing it if "a responsible employee 'knew, or in the exercise of reasonable care should have known,' about the harassment."  A "responsible employee" was broadly defined to include any employee who has, or who a student could

---

[8] *Id.* at 12,043.
[9] U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance; Harassment of Students by School Employees, Other Students, or Third Parties* (2001).  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).
[10] *See* 2001 Guidance at iii–vi.
[11] *Id.*
[12] *Id.* at iii–iv (emphasis added).
[13] *Id.* at 14.

reasonably believe has, the "authority to take action to redress" or "duty to report" the harassment.[14]

The 2001 Guidance stated that schools were also responsible for addressing employee-on-student sexual harassment if it occurs "in the context of carrying out" the employee's day-to-day responsibilities and the harassment "denies or limits a student's ability to participate in or benefit from a school program on the basis of sex." The Department clarified that schools were responsible for addressing this type of employee-on-student misconduct "whether or not the recipient ha[d] 'notice' of the harassment."[15]

Guidance documents in 2011 and 2014 clarified that schools were required to process complaints of sexual harassment regardless of where the harassment occurred and respond to a hostile educational environment caused by off-campus incidents.[16] The 2011 and 2014 Guidances explained that schools must use a "preponderance of the evidence" standard—i.e., "more likely than not"—to decide whether sexual harassment occurred.[17] This clarification was consistent with the Department's longstanding policy of requiring schools to use the preponderance standard in other Title IX investigations since as early as 1995.[18] The Department itself uses the preponderance of the evidence standard in its investigations of schools' responses to complaints of discrimination based on race, color, national origin, sex, and disability.[19]

---

[14] *Id.* at 13.

[15] *Id.* at vi, 10.

[16] U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter* (Apr. 4, 2011) ("2011 Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014) ("2014 Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[17] 2014 Guidance at 13, 26; 2011 Guidance at 10-11.

[18] *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College (Apr. 4, 1995), http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf.

[19] U.S. Dep't of Educ., Office for Civil Rights, *Case Processing Manual* (Nov. 18, 2018) at 17, https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

On November 29, 2018, the Department published a Notice of Proposed Rulemaking in the Federal Register ("Proposed Rule") seeking to amend Title IX regulations regarding sexual harassment, departing from decades of Department guidance.[20]   The Department received over 124,000 comments on the Proposed Rule, including comments from states, schools, public interest organizations, educators, and individuals.   The overwhelming majority of comments opposed the Proposed Rule.   However, the Final Rule includes additional harmful provisions that were not available for public comment in the Proposed Rule, will require schools to ignore more survivors and exclude broad swaths of relevant evidence from Title IX investigations.[21]

The Final Rule represents a complete and unjustified departure from the Department's prior regulatory positions and is contrary to Title IX's unequivocal purpose to prevent and redress sex discrimination in schools.   It does so by eliminating protections for victims of sexual harassment and imposing procedural requirements that will discourage victims from reporting their harassment and securing their right to equal educational opportunity.   The Final Rule represents an abdication of the Department of Education's responsibility to enforce Title IX.

## **LEGAL STANDARD**

A preliminary injunction serves to "preserve the relative positions of the parties" pending judicial review on the merits.[22]   The APA also authorizes courts to "postpone the effective date of an agency action" pending judicial review to "preserve status" and "prevent irreparable injury."[23]  Parties seeking a preliminary injunction or a stay under 5 U.S.C. § 705 must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the

---

[20] 83 Fed. Reg. 61,462 (Nov. 29, 2018).
[21] 85 Fed. Reg. 30,026 (May 19, 2020).
[22] *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).
[23] 5 U.S.C. § 705.

public interest.[24]  Courts will "assess each of these four elements in turn, mindful that the burden of satisfying them rests and remains with [movant]."[25]  The plaintiffs in this action have established each of these elements.

## ARGUMENT

## I.   PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs are likely to succeed on the merits of their claims because the Final Rule is arbitrary and capricious and not in accordance with law, it exceeds the Department's statutory jurisdiction, and because the Department failed to follow APA procedures in issuing the Final Rule.  The Final Rule also violates the Fifth Amendment's equal protection guarantee by imposing unique burdens on victims of sexual harassment compared to victims of other forms of harassment.

### A.   The Final Rule Is Arbitrary, Capricious, and Not in Accordance with Law.

Under the APA, a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[26]  An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, [made a decision] that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," or failed to "give adequate reasons for its decisions."[27]  While "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," an "agency must at least 'display awareness that it is changing position' and 'show

---

[24] *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Courts apply the same four-part analysis to motions for stays of administrative action and motions for preliminary injunctions.  *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-CV-460-LM, 2016 WL 1048023, at *5 n. 6 (D.N.H. Mar. 11, 2016) ("[c]ourts use the same standard to decide applications for stays of administrative action as for preliminary injunction determinations").

[25] *Granite State Trade Sch., LLC v. The New Hampshire Sch. Of Mech. Trades. Inc.*, 120 F. Supp. 3d 56, 61 (D.N.H. 2015).

[26] 5 U.S.C. § 706(2)(A).

[27] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016).

that there are good reasons for the new policy.'"[28]   If an agency "changes course" from longstanding policy that "may have engendered serious reliance interests," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."[29]

The Final Rule is arbitrary, capricious, and contrary to law because, *inter alia*, it (1) requires schools to dismiss reports of sexual harassment that do not fall within its new, inappropriately narrow definition; (2) imposes a heightened notice requirement that will relieve schools of their obligations to address and prevent sexual harassment; (3) prohibits schools from investigating much sexual harassment that occurs off campus, including online harassment; (4) adopts a lax deliberate indifference standard for a school's response to known sexual harassment; (5) prohibits many supportive measures for victims of sexual harassment; (6) establishes an unfair presumption of non-responsibility that favors respondents; and (7) imposes restrictive evidentiary rules that will re-traumatize victims of sexual harassment and require the exclusion of relevant evidence from Title IX adjudications. These changes are contrary to longstanding agency practice, frustrate Title IX's antidiscrimination mandate, run counter to the evidence for the agency, and fail to take into account the reliance interests engendered by the Department's previous positions.   For these reasons and many others, the Final Rule is arbitrary and capricious and cannot stand.

1.      *The Final Rule Impermissibly Narrows What Constitutes "Sexual Harassment."*

The Final Rule adopts a novel and narrow definition of "sexual harassment" that is inconsistent with Title IX's purpose and precedents and requires schools to dismiss any sexual harassment complaint that does not meet this new definition, thereby prohibiting schools from

---

[28] *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).
[29] *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1915 (2020) (internal quotations and citations omitted).

responding to many forms of sexual harassment.  Other than quid pro quo harassment committed by a school employee and certain criminal offenses defined by the Clery Act, section 106.30 of the Final Rule redefines "sexual harassment" to include only "unwelcome conduct" that is "so severe, pervasive, *and* objectively offensive that it *effectively denies* a person equal access to the recipient's education program or activity."[30]  This definition represents a dramatic departure from the standard that schools have been successfully applying for nearly two decades: that sexual harassment is any "unwelcome conduct of a sexual nature."[31]  Under this narrowed definition ("severe, pervasive *and* objectively offensive" and "effectively denies"), students will now be forced to endure repeated and escalating levels of abuse before their schools are permitted take steps to investigate and stop the harassment.  Perversely, schools that assist victims before the sexual harassment meets the new definition will be considered in violation of Title IX.

The Department attempts to justify its new definition of hostile environment sexual harassment primarily by stating a desire to align administrative enforcement with the heightened liability standard for obtaining monetary damages, citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).[32]  But the Department ignores the fact that the Supreme Court drew a distinction between "defin[ing] the scope of behavior that Title IX proscribes" and identifying the narrower circumstances in which a school's failure to respond to harassment supports a claim for monetary damages.[33]  Indeed, the Department has acknowledged that the heightened private litigation standard is inapplicable to its administrative enforcement of Title IX, through which the Department seeks schools' voluntary

---

[30] § 106.30 (emphasis added).
[31] *See* 2001 Guidance.
[32] 83 Fed. Reg. at 61,466-67.
[33] *Davis*, 526 U.S. at 639.

compliance.[34]

The Department also ignores that this change will undermine the protections afforded to victims of sexual harassment.  First, the definition will chill reporting of sexual harassment in both preK-12 schools and higher education.  Evidence shows that, even before the Final Rule, only a fraction of sexual harassment is reported to school authorities, often because students think no one would do anything to help.[35]  The Final Rule's narrowed definition of "sexual harassment" will undoubtedly reduce reporting even further as students reasonably fear that schools will not provide any meaningful response if they report or file a formal report.[36]

Second, the new definition of "sexual harassment" will create inconsistent requirements for schools' response to sexual harassment relative to other categories of student or staff misconduct.  For decades, the Department required schools to address sexual harassment according to the same standard it applies to harassment based on race, ethnicity, national origin, or disability—conduct that is "severe, pervasive, *or* persistent so as to *interfere with or limit* a student's ability to participate in or benefit from the services."[37]  By creating a heightened standard that applies only to sexual harassment ("so severe, pervasive, *and* objectively offensive that it *effectively denies* a person equal access to the recipient's education program or activity), the Department contravenes clear congressional intent and subjects sexual harassment complaints to a uniquely burdensome standard.[38]

> 2. *The Final Rule Requires School Action Only When the School Has "Actual Knowledge" of Sexual Harassment.*

---

[34] 85 Fed. Reg. at 30,043, 30,091, 30,185 (acknowledging "the Department is not required to adopt the deliberate indifference standard articulated by the Supreme Court").

[35] *See* RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[36] *See* Ex. I, Decl. of Noreen Farrell for plaintiff Equal Rights Advocates ¶ 31 ("ERA").

[37] U.S. Dept. of Educ., Office of Civil Rights, *Dear Colleague Letter* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html ("2010 Guidance") at 2 (emphasis added); *see also* 2001 Disability Harassment Guidance, U.S. Dept. of Educ., Office for Civil Rights, *Racial Incidents and Harassment Against Students*, (Mar. 10, 1994), https://www2.ed.gov/about/offices/list/ocr/docs/race394.html.

[38] *Cannon*, 441 U.S. at 704.

Sections 106.30 and 106.44(a) of the Final Rule provide that schools are only responsible for addressing sexual harassment when a preK-12 employee or one of a narrow set of higher education employees has "actual knowledge" of the harassment.[39]   These sections reverse the Department's previous position, which held schools responsible for sexual harassment of students if almost any school employee "knew or should have reasonably known" about it, and in some employee-on-student incidents, even if no employee knew or should have known about it.[40]

The Final Rule also limits the range of employees whose actual knowledge of the sexual harassment triggers the school's Title IX obligations.   Under the Final Rule, a post-secondary school need only act when a Title IX coordinator or a high-ranking official who has "the authority to institute corrective measures" has actual knowledge of the sexual harassment.[41]   Again, this reverses the Department's prior position, which required schools to respond to sexual harassment of students if the employee who had actual or constructive notice of the incident was a "responsible employee."[42]

These provisions will undercut schools' obligations to address and will suppress reporting of sexual harassment.   For example, under the Final Rule, if a college student tells a professor, residential advisor, or teaching assistant that they were raped by another student or school employee, the college will have no obligation to help.   As survivors from Michigan State University pointed out, in a case like Larry Nassar's, where victims reported their experiences to at least fourteen school employees over a twenty-year period, including athletic trainers, coaches,

---

[39] 85 Fed. Reg. at 30,574.
[40] 2001 Guidance at iv, 10-14.
[41] § 106.30 (defining "actual knowledge").
[42] 2001 Guidance at 13 (("A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility").

counselors, and therapists,[43] the university would have no responsibility to investigate the abuse under the Final Rule merely because those employees were not school officials with the "authority to institute corrective measures."[44]

The Department's justifications for these changes do not withstand the slightest scrutiny. The Department claims that the "authority to institute corrective measures" limitation will give victims in higher education more "autonomy" and "privacy" by allowing them to request help from certain school employees without automatically triggering a formal investigation.[45]   But earlier Title IX guidances *already* instructed schools to consider the victim's request for confidentiality and to designate certain school employees as confidential reports.[46]   Moreover, section 106.30 of the Final Rule allows schools to override students' request not to initiate an investigation and thus will require an unwilling complainant's identity be revealed to the respondent.[47]   The Department's expressed concern for victim autonomy rings hollow.

The Department's change from a constructive notice standard ("knew or reasonably should have known") to an actual notice standard ("actual knowledge") will also undercut schools' obligations to respond to sexual harassment.   Under the Final Rule, school employees will be incentivized to avoid receiving "actual knowledge" of sexual harassment so that they are not required to address it—even if they have a reasonable suspicion that a student is being victimized.

Again, the Department's justifications of this change cannot withstand any scrutiny.   The Department claims that "when sexual harassment is 'so pervasive' that some employees 'should

---

[43] Julie Mack & Emily Lawler, *MSU doctor's alleged victims talked for 20 years.   Was anyone listening?*, MLIVE (Feb. 8, 2017), https://www.mlive.com/news/index.ssf/page/msu_doctor_alleged_sexual_assault.html.
[44] Letter from Former Students and Survivors of Sexual Abuse Perpetrated by Larry Nassar at Michigan State University, George Tyndall at University of Southern California, and Richard Strauss at Ohio State University to Secretary DeVos and Assistant Secretary Marcus (Nov. 1, 2018), https://www.publicjustice.net/wp-content/uploads/2018/11/November-1-Survivor-Letter-to-ED.pdf.
[45] 85 Fed. Reg. at 30,040.
[46] 2014 Guidance at 18-24; 2011 Guidance at 5; 2001 Guidance at 17, 18.
[47] § 106.30(a) (defining "formal complaint").   *See also* 85 Fed. Reg. at 30,122 n.547.

have known' it is *highly likely* that at least one employee did know about it," and therefore "[t]here is no reason to retain a separate 'should have known' standard."[48]  Such speculation cannot change the fact that in too many cases, no covered employee will have *actual knowledge*, even if some reasonably suspect harassment.

   3.   *The Final Rule Prohibits Schools from Investigating Sexual Harassment Occurring Outside Their Narrowly-Defined Programs or Activities Even When It Creates a Hostile Educational Environment.*

Title IX's language is broad, prohibiting sex discrimination under any education program or activity.[49]  Nonetheless, the Final Rule's prohibition on sexual harassment is limited to conduct that takes place "in" an "education program or activity," which the Department defines as "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs."[50]  This provision is contrary to the text of Title IX and is not justified by a reasoned explanation.

For almost two decades, the Department has required schools to address harassment, including sexual harassment, that is "sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program," regardless of where it occurs.[51]  The Department's longstanding position was consistent with the fact that many students experience sexual harassment in off-campus locations.  For example, according to a 2014 U.S. Department of Justice report, 95 percent of sexual assaults of female students ages 18-24 occur outside of a school program or activity.[52]  Yet this change in the Final Rule means that such incidents are almost certainly beyond the reach of an institutional response, even if, for example, the student must take

---

[48] 85 Fed. Reg. at 30,041.
[49] 20 U.S.C. §1681(a).
[50] § 106.44(a).
[51] 2010 Guidance at 1; 2001 Guidance at 5.
[52] U.S. Dep't of Justice, Bureau of Justice Statistics, *Rape and Sexual Assault Victimization Among College-Age Females*, 1995-2013 at 6 (Dec. 2014), https://perma.cc/8VZL-H6F5.

a class taught by her assailant.

These provisions also limit a recipient's ability to address sexual harassment occurring on social media or outside of school, even if the conduct results in the victim becoming too afraid to attend class and face their harasser.  This will have drastic consequences, as nearly 90% of college students live off-campus,[53] 41% of college sexual assaults involve off-campus parties,[54] nearly all teenagers are online, and 20-40% of all children ages 12-17 have been cyber-bullied, which often includes sexual harassment.[55]  Further, it will arbitrarily prohibit schools from addressing off-campus sexual harassment, even though schools already discipline students for other types of serious off-campus conduct, such as drug use, physical assault, and murder.[56]

4.     *The Final Rule Adopts an Unreasonably Lax Deliberate Indifference Standard for a School's Response to Known Sexual Harassment.*

Title IX imposes an obligation on funding recipients not to discriminate, which means that they must prevent discrimination, address discrimination when it occurs, and remedy its effects. That obligation is not met when institutions are held accountable only when they engage in egregious institutional misconduct.  Nonetheless, the Final Rule provides that a school's response to known sexual harassment will escape scrutiny from the Department as long as it is not "deliberately indifferent."[57]

The Department has failed to justify its decision to adopt this deliberate indifference

---

[53] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*  N.Y. Times (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html.
[54] United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study.
[55] Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* 8 (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf.
[56] Letter from Int'l Ass'n of Campus Law Enforcement Administrators to Betsy DeVos, Sec'y, Dep't of Educ., at 4 (Jan. 28, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-10515; Letter from The School Superintendents Association to Betsy DeVos, Sec'y, Dep't of Educ., at 5 (Jan. 22, 2019), https://aasa.org/uploadedFiles/AASA_Blog(1)/AASA%20Title%20IX%20Comments%20Final.pdf.
[57] § 106.44(a).

standard given the contrary evidence in the record.   While the Department argues that the deliberate-indifference standard "leave[s] recipients legitimate and necessary flexibility" to address sexual harassment,[58] no data supports the underlying assumption that schools have been stymied because the previous standard failed to offer sufficient "flexibility."   Indeed, ample evidence shows that educators in preK-12 and higher education strongly oppose the deliberate-indifference standard, including because it will require them to provide less protection for students, including minors, from sexual harassment than for adult employees in the workplace.[59]

   5.   *The Final Rule Bans Many Supportive Measures for Victims of Sexual Harassment.*

   Under the Final Rule, complainants will not be entitled to the full range of "supportive measures" necessary to ensure equal access to educational opportunities guaranteed by Title IX. Specifically, the Final Rule will prohibit many supportive measures on the grounds that they are "disciplinary," "punitive," or "unreasonably burden[] the other party."[60]   For example, a school may reject a complainant's request to change her harasser's classes or housing or work assignments because such changes may be considered punitive or unreasonably burdensome toward the respondent, thereby forcing the complainant to change her own classes, housing, or work assignments in order to avoid interacting with her harasser.   This is a sharp departure from the policy spanning the entire history of Title IX regulation: that schools were required to provide measures to help a complainant retain access to educational opportunities.

   6.   *The Final Rule Establishes an Unfair Presumption of Non-Responsibility in Favor of Respondents.*

---

[58] *Id.* at 30,044.
[59] Letter from The School Superintendents Association to Betsy DeVos, Sec'y, Dep't of Educ., at 5 (Jan. 22, 2019), https://aasa.org/uploadedFiles/AASA_Blog(1)/AASA%20Title%20IX%20Comments%20Final.pdf; Letter from National Education Association to Brittany Bull, Dep't of Educ., at 9 (Jan. 30, 2019), http://www.nea.org/assets/docs/NEA%20Comment%20Letter%20RE%20ED-2018-OCR-0064.pdf.
[60] § 106.30(a).

Section 106.45(b)(1)(iv) will require schools to establish a presumption of non-responsibility for all complaints of sexual harassment. That is, schools will be required to presume that the reported incident did not occur.

This presumption conflicts with the requirement of "equitable" resolution of complaints in both the 1975 Regulations and the Final Rule,[61] as a presumption in favor of one party against the other is plainly inequitable. Further, the presumption conflicts with the Final Rule's own new requirement that "credibility determinations may not be based on a person's status as a complainant, respondent, or witness."[62] The Department claims that the presumption of non-responsibility "reinforces that the burden of proof remains on recipients (not on the respondent or the complainant) and reinforces correct application of the standard of evidence."[63] But the Department fails entirely to explain how a presumption that favors the respondent is necessary to support any standard of evidence. Further, the Department fails to articulate a reasoned justification for importing a criminal-law standard into non-criminal school disciplinary proceedings—particularly when no such presumption of non-responsibility is required for any other form of student or employee misconduct at schools.[64]

7. *The Final Rule Removes Postsecondary Schools' Discretion over Hearings and Imposes Sweeping Exclusionary Rules of Relevant Evidence and Testimony.*

Although purporting to provide schools with flexibility in resolving Title IX cases, the Department has arbitrarily chosen to impose elements of a full civil or criminal trial on postsecondary schools—requirements that will re-traumatize victims, chill reporting, and

---

[61] § 106.8(c) (Final Rule); § 106.8(b) (1975 Regulations).

[62] § 106.45(b)(1)(ii).

[63] 85 Fed. Reg. at 30,103.

[64] Contrary to the Department's claims that the presumption "reinforces correct application of the standard of evidence," a coalition of attorneys general warned in their comment that, in fact, the opposite was true. Letter from 20 Attorneys General to Betsy DeVos, Sec'y, Dep't of Educ., (July 19, 2017), https://www.attorneygeneral.gov/taking-action/press-releases/20-ags-call-on-secretary-devos-to-maintain-protections-for-survivors-of-campus-sexual-assault.

undermine Title IX's antidiscrimination mandate.[65]   Because there is no rational basis for these provisions, the Final Rule is arbitrary and capricious.

Section 106.45(b)(6)(i) will remove all discretion from colleges and graduate schools about whether to conduct a live hearing for sexual harassment investigations, and will require parties and witnesses to submit to cross-examination by the other party's "advisor of choice," who may be an attorney, angry parent, close friend, coach, or any other adult in a position of authority over the complainant or a witness.   The Department asserts that direct cross-examination by the parties' representative at a live hearing is necessary to defend the due process rights of respondents and to ensure accurate fact-finding[66]   But, as with the presumption of non-responsibility, in conflating a criminal trial with a school adjudication, the Department makes a false comparison between being found responsible for a civil rights violation at school and being found guilty of a crime for which one might face incarceration.[67]

Further, the live-cross examination will actually *reduce* the accuracy of Title IX proceedings.   The Final Rule requires schools to disregard as evidence all oral and written statements of any party or witness who declines or is unable to testify at a live hearing or who declines to answer every cross-examination question.[68]   This provision, which permits no exceptions, represents a sweeping exclusion of relevant evidence, far above and beyond the Federal Rules of Evidence hearsay rules, and is particularly egregious given that schools have no subpoena power to compel witness testimony.   Such mandatory evidentiary exclusions bear no relationship to, and in fact directly undermine, the due process and truth-seeking goals that purport

---

[65] Ex. N., Decl. of Nancy C. Cantalupo ¶¶ 10, 26 ("Cantalupo").
[66] 85 Fed. Reg. at 30,313–30,314.
[67] As the First Circuit has noted, "We . . . take seriously the admonition that student disciplinary proceedings need not mirror common law trials."  *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019) (rejecting argument that constitutional due process required direct cross-examination in Title IX proceedings).
[68] § 106.45(b)(6)(i).

to animate them.  In addition, the Final Rule arbitrarily forbids schools from adopting well-established evidentiary rules that make in-school proceedings workable, reliable, and equitable. For example, schools will be *prohibited* from excluding evidence or cross-examination questions that are unduly prejudicial, misleading, or assume facts not in evidence.[69]

Although the Final Rule does not require live cross-examination in preK-12 investigations, the Final Rule will require live cross-examination of minor children who suffer sexual harassment in programs operated by post-secondary institutions.  Thus, minor children attending college-run summer programs, high school children taking classes at community colleges, and even toddlers in university-run childcare programs will be forced to submit to live cross-examination if they complain of sexual abuse by an adult.  There is no rational reason why the requirement of direct, live cross-examination should turn on the location of the harassment or assault, rather than the age of the complainant.  The Department declined to include any exception to live cross-examination, even for minor children, despite data showing that hostile, leading questions are not effective methods of eliciting accurate testimony from children.[70]

Contrary to the Department's claims, the harm from this live, direct cross-examination requirement is not mitigated by the Final Rule's limited accommodations.  According to the president of the Association of Title IX Administrators, requiring live cross-examination by a respondent's advisor of choice, "even with accommodations like questioning from a separate

---

[69] *Id.* at 30,248, 30,361.  Moreover, research shows that cross-examination in this context produces less accurate outcomes due to the neurobiological effects of trauma.  *See* Cantalupo ¶ 27.

[70] *See, e.g.*, Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Coached Reports*, 21 Psychology, Pub. Pol'y, & L. 10 (2015) (cross-examination led children to recant their initial true allegations of witnessing transgressive behavior and significantly reduced children's testimonial accuracy for neutral events); Saskia Righarts et al., *Young Children's Responses to Cross-Examination Style Questioning: The Effects of Delay and Subsequent Questioning*, 21(3) Psychology, Crime & L. 274 (2015) (cross-examination resulted in a "robust negative effect on children's accuracy"; only 7% of children's answers improved in accuracy).

room[,] would lead to a 50 percent drop in the reporting of misconduct."[71]

By requiring an extremely prescriptive and inflexible grievance process under § 106.45 for sexual harassment complaints specifically, yet at the same time asserting that institutions need "flexibility" in responding to sexual harassment to justify adopting the stringent deliberate indifference standard used in private litigation for money damages, the Department has selectively applied its purported principles and therefore acted arbitrarily and capriciously.

Lastly, in forcing schools to adopt these grievance procedures by August 14, 2020, the Department failed to consider individuals' reliance interests on the decades-old Title IX framework. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters."[72]  Doe plaintiffs in this case initiated Title IX investigations with certain justified expectations regarding their schools' Title IX processes and the protections afforded to them during the grievance process, which are weakened by the Final Rule.  For example, Lisa Doe dreads the prospect of participating in live cross-examination by her assailant's advisor of choice, and is considering dropping her complaint as a result of the Final Rule.[73]  Jill Doe believes cross-examination would be "terrifying" and may abandon her complaint if she is required to participate in direct cross-examination.[74]  Because the Final Rule ignores that individuals have relied on the Department's prior policy, it is arbitrary and capricious.

**B.     The Final Rule Exceeds the Department's Statutory Authority.**

The Final Rule also violates the APA because it is "in excess of statutory jurisdiction,

---

[71] Andrew Kreighbaum, *New Uncertainty on Title IX*, Inside Higher Education (Nov. 20, 2018); *see* Ex. L, Declaration of Judith L. Herman, M.D. ¶¶ 21-22 ("Herman") ("Adversarial live hearings have greater potential to discourage victims from coming forward.").

[72] *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1920 (2020).

[73] Ex. A, Decl. of Lisa Doe, ¶¶ 33-34 ("Lisa Doe").

[74] Ex. B, Decl. of Jill Doe, ¶¶ 15-17 ("Jill Doe").

authority, or limitations, or short of statutory right."[75]   Courts and federal agencies have long recognized that sexual harassment is sex discrimination, thereby requiring recipients to take steps to ensure that victims are not excluded from participating in in educational programs or activities because of harassment.   It therefore exceeds Title IX's nondiscrimination mandate for the Department to issue regulations that require schools *not* to protect students from discrimination.

Yet this is precisely what the Final Rule does.   By requiring schools to dismiss many complaints of sexual harassment, by severely curtailing protections for victims of sexual harassment and requiring hostile procedures that will chill reporting, and by adopting heightened notice requirements and the deliberate indifference standard, the Department has issued a rule that runs counter to both the letter and spirit of Title IX.   Indeed, the Department admits that the Final Rule will result in a "reduction in the number of *investigations*" of sexual harassment despite claiming that it will have no discernable effect on the "*underlying number* of incidents of sexual harassment."[76]   In short, Final Rule will leave many victims without redress.   The Department's rulemaking has "gone beyond what Congress has permitted it to do,"[77] and the Final Rule must be vacated.

## C.   The Department Failed to Follow APA Requirements

The APA requires agencies to observe procedures that are required by law.[78]   One such requirement is that a notice of proposed rulemaking must contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved."[79]   Courts "have generally interpreted this to mean that the final rule [an] agency adopts must be a logical outgrowth of the

---

[75] 5 U.S.C. § 706(2)(C).
[76] 85 Fed. Reg. at 30,539; Ex. M, Decl. of Michael Madowitz, ¶ 18 ("Madowitz") ("Given that fewer incidents of sexual harassment will be investigated under the Final Rule, the likelihood of this harassment being detected and punished will also be reduced, which in turn will reduce the system's general deterrent effect.").
[77] *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).
[78] 5 U.S.C. § 706(2)(D).
[79] 5 U.S.C. § 553(b)(3).

rule proposed."[80]  "A final rule is a logical outgrowth of the proposed rule only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."[81]

The Final Rule contains several provisions that were not identified, described, or otherwise included in the Proposed Rule, including provisions that impose sweeping exclusionary rules of relevant evidence, invite retaliation against complainants, and purport to preempt state and local laws that provide greater protections against sexual harassment—an unprecedented interpretation in the civil rights context.

Critically for many of the Doe plaintiffs, the Final Rule requires schools to dismiss complaints by victims who have transferred, graduated, or dropped out before they file a complaint, even if they were pushed out of school because of the harassment they faced, and allows schools to dismiss complaints *at any time* if the respondent is no longer a student or employee at the school, even if an investigation is ongoing.[82]  These provisions produce the absurd result that former students abused by a student or employee who still attends or is employed by the school will be unable to file a formal sexual harassment complaint asking the school to take action, as is the case with plaintiffs Anne Doe and Sobia Doe.[83]  Similarly, if a student transfers to another school or graduates after sexually harassing a fellow student, then the school will no longer be required to investigate, even if the victim is still a student at the school.  Further, if a teacher retires or resigns after sexually abusing many students over several years, the school will no longer have to investigate to determine the scope of the abuse, the impact of the abuse on students, and whether other school employees knew about the abuse but ignored it.

---

[80] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) (internal citations omitted).
[81] *Daimler Trucks North America LLC, v. Envtl. Prot. Agency*, 737 F.3d 95, 100 (D.C. Cir. 2013) (citations omitted).
[82] §§ 106.30(a)(defining "formal complaint"); 106.45(b)(3)(ii).
[83] *See* Ex. C, Decl. of Anne Doe ("Anne Doe"); Ex. D, Decl. of Sobia Doe ("Sobia Doe").

The Department "did not propose, and offered no indication that it was contemplating" these provisions.[84]  Based on the Proposed Rule, the public could not have anticipated the need to comment on these topics.  The Department therefore failed to provide adequate notice and opportunity to comment on the proposed rulemaking, in violation of the APA.

Additionally, the Final Rule's regulatory impact analysis did not sufficiently justify the costs and benefits of the rulemaking, thus evading the APA's critical procedural protections that ensure agency regulations are warranted and evidence-based.[85]  The regulatory impact analysis should have considered all costs to society, but instead it entirely excludes costs to victims and survivors of sexual harassment imposed by the Final Rule.[86]  Sexual harassment imposes heavy costs on victims, both financial and emotional,[87] but the Final Rule refused to quantify the costs of unaddressed sexual harassment on students and schools or to consider the financial and educational costs associated with reduced reporting.[88]  The Final Rule also fails to account for medical costs, lost tuition and lower educational completion, lost scholarships, and defaults on student loans that result from losing tuition or scholarships.

### D.  The Final Rule Violates the Equal Protection Guarantee of the Fifth Amendment

The Fifth Amendment to the U.S. Constitution forbids the federal government from denying equal protection of the laws, including by discriminating on the basis of sex.  The Final Rule violates this equal-protection guarantee by singling out victims of sexual harassment for

---

[84] §§ 106.30; 106.45(b)(3)(ii).

[85] Madowitz ¶¶ 5, 21-23.

[86] *Id.* at 18.

[87] Numerous studies show that a single rape can cost a survivor more than $240,000, that the average lifetime cost of dating and domestic violence can exceed $100,000 for women and $23,000 for men.  *See, e.g.*, White House Council on Women and Girls, *Rape and Sexual Assault: A Renewed Call to Action* 15 (Jan. 2014), https://www.knowyourix.org/wp-content/uploads/2017/01/sexual_assault_report_1-21-14.pdf; Inst. for Women's Policy Research, *Dreams Deferred: A Survey on the Impact of Intimate Partner Violence on Survivors' Education, Careers, and Economic Security* 8 (2018), https://iwpr.org/wp-content/uploads/2018/10/C474_IWPR-Report-Dreams-Deferred.pdf; *see* Madowitz ¶ 19; Herman ¶¶ 10-12.

[88] 85 Fed. Reg. at 30,539, 30,547, 30,551; *see* Madowitz ¶ 17.

disparate treatment relative to other victims of discrimination or misconduct, and because the Defendants were motivated, at least in part, by the discriminatory and baseless gender stereotype that many women and girls lack credibility with regard to sexual harassment.[89]  This stereotype includes the perception that women and girls who report sexual harassment misunderstood a harmless romantic advance and that those who report sexual violence often are either lying, exaggerating, or have regret about a consensual encounter.  Such discrimination is prohibited by the Constitution; as the First Circuit noted over twenty years ago, "the Supreme Court has repeatedly condemned gender-based discrimination based upon 'archaic and overbroad generalizations' about women."[90]

Sex-based discrimination violates the Constitution's equal-protection guarantee if it "does not serve important governmental objectives and is not substantially related to achievement of those objectives."[91]  In evaluating an equal protection claim, "the court considers (1) whether the [plaintiff] was treated differently than others similarly situated, and (2) whether such difference was based on an impermissible consideration."[92]  "Plaintiffs claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently."[93]  Plaintiffs have made that showing here.

The Final Rule singles out sexual harassment for uniquely burdensome and inequitable procedures, evincing Defendants' intent to discriminate based on sex.  Specifically, the Final Rule mandates dismissal of sexual harassment complaints under certain circumstances that other forms of harassment are not subjected to, and it mandates burdensome and unfair procedures for sexual

---

[89] *See* Cantalupo ¶ 30.
[90] *Cohen v. Brown Univ.*, 101 F.3d 155 (1st Cir. 1996) (citing *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975)).
[91] *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988).
[92] *Ayala-Sepulveda v. Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012) (quoting *Lopera v. Town of Coventry*, 640 F.3d 388, 402 (1st Cir. 2011)).
[93] *Id.* (quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)).

harassment complaints where no such requirements exist for any other type of employee or student harassment or misconduct.

Because victims of sexual harassment are "treated differently than others similarly situated . . . based on an impermissible consideration," the Final Rule violates the equal-protection guarantee of the Fifth Amendment.[94]

## II.     THE FINAL RULE WILL RESULT IN IRREPARABLE HARM TO THE PLAINTIFFS

District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.[95]  The measure of irreparable harm "is not a rigid one" and functions as a "sliding scale, in conjunction with the measure of the moving party's likelihood of success on the merits.[96]  Harm must be more than speculative, but it need not be proven—rather, the party seeking the injunction or stay must show that irreparable harm is "likely" in the absence of an injunction or stay.[97]

### A.     Doe plaintiffs are suffering, and will continue to suffer, irreparable harm unless the Court grants preliminary injunctive relief or stays the Final Rule

First, the Final Rule is already inflicting continuing emotional and psychological harm on Doe plaintiffs, who are current or former students of the institutions at which they experienced sexual assault or other sexual harassment.  To date, the Department does not appear to have issued any guidance regarding how the Final Rule will affect the investigation or adjudication of complaints filed prior to the August 14, 2020 effective date.  Doe plaintiffs who have filed

---

[94] *Ayala-Sepulveda*, 671 F.3d at 32.
[95] *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (citations omitted).
[96] *Id.* (citing *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir.1996) ("[A]n attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem.").
[97] *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

complaints do not anticipate resolution by the Final Rule's August 14, 2020 effective date.[98]  Given

the arbitrary and capricious nature of the Final Rule's sweeping changes to Title IX process, Doe

plaintiffs are suffering severe distress due to the uncertainty of how a Title IX investigation of their

already-filed or potential complaints would proceed—and potentially further traumatize them—

under the Final Rule.

For example, Sobia Doe has been told that if her case is not fully resolved by August 13,

2020, her case will be subject to the Final Rule.[99]  Sobia Doe fears that if the Final Rule further

prolongs investigation and adjudication of her complaint, she will continue to experience

depression and fears the return of suicidal thoughts.[100]  In contrast, Susan Doe understands that her

case is to proceed under the current Title IX rules; however, she does not know how her complaint

would be handled if her respondent advocates for the investigation to proceed under the Final Rule,

as she strongly suspects he will.[101]  Susan Doe fears her grades would suffer and that her education

would be delayed further if her complaint proceeds under the Final Rule.[102]  Anne Doe, a recent

graduate contemplating filing a complaint against a current student, states that the uncertainty

surrounding the Final Rule has precluded her from making an informed decision on filing and fears

being further hurt and traumatized if she does so.[103]  These harms are irreparable.[104]

Second, unless enjoined or stayed, the Final Rule will cause irreparable harm to Doe

plaintiffs, because (1) if their complaints or investigations are dismissed under the Final Rule prior

---

[98] *See, e.g.*, Sobia Doe ¶ 62; Ex. E, Decl. of Susan Doe ¶ 24 ("Susan Doe").

[99] Sobia Doe ¶ 68.

[100] Sobia Doe ¶¶ 51-53.

[101] Susan Doe ¶¶ 24-26.

[102] Susan Doe ¶ 51.

[103] Anne Doe ¶ 35 ("How could I make an informed decision and not risk getting even more hurt and traumatized when my school cannot even talk to its students about what to expect?"); *see also* Herman ¶¶ 9-12.

[104] *See Petties v. District of Columbia*, 881 F. Supp. 63, 68 (D.D.C. 1995) (stress, anxiety, and deteriorating scholastic performance caused by uncertainty about government's action constitutes irreparable harm); *Pollis v. New Sch. for Soc. Research*, 829 F. Supp. 584, 598-99 (S.D.N.Y. 1993) (rejecting notion that "claims such as emotional or psychological damage can never, as a matter of law, demonstrate irreparable harm").

to resolution, Doe plaintiffs will be left with no recourse to vindicate their civil rights to equal access to education; (2) if their complaints are investigated, the Final Rule's procedures will unnecessarily further traumatize Doe plaintiffs, causing them to spend additional time and money seeking psychological and medical treatment, and severely interrupt or harm their access to education; and (3) no matter how their complaints proceed, their schools will be limited when providing them with supportive measures necessary to preserve or restore their equal access to education and their schools will be allowed to act unreasonably with impunity.

> 1. *Doe plaintiffs will suffer irreparable harm if their complaints are dismissed because they have graduated or because the harassment they suffered occurred off-campus.*

Jill Doe and Nancy Doe are recent graduates who have pending complaints with their educational institutions that began when they were still students, Sobia Doe is a recent graduate with a pending complaint that was filed after she graduated, and Anne Doe is a recent graduate considering filing a complaint.[105]   Section 106.30 of the Final Rule requires schools to not investigate complaints if at the time of the filing of the complaint, the victim is not participating or attempting to participate in the education program or activity at the institution where the complaint is filed.[106]   Under the Final Rule, Sobia Doe and Anne Doe's complaints will have to be dismissed, and Jill Doe and Nancy Doe fear their schools will choose to dismiss their complaints. Sobia Doe and Nancy Doe are especially concerned that their complaints will be dismissed even though their respondents remain enrolled or employed by their schools and could be sexually harassing or assaulting others.

Anne Doe, Susan Doe, Nancy Doe, and Lisa Doe all suffered sexual assault or sexual harassment in off-campus locations.[107]   Section 106.45(b)(3)(i) of the Final Rule *requires* schools

---

[105] Sobia Doe ¶¶ 31-32, 73; Jill Doe ¶¶ 1, 10-13; Ex. F, Decl. of Nancy Doe ¶ 38 ("Nancy Doe"); Anne Doe ¶ 31.
[106] 85 Fed. Reg. at 30,574.
[107] Anne Doe ¶ 3; Susan Doe ¶ 4; Nancy Doe ¶ 9; Lisa Doe ¶¶ 2-4.

to dismiss reports of sexual harassment that occur outside of the school's "education program or activity," which is narrowly-defined under the Final Rule, even when such reported incidents create a hostile educational environment within an educational program or activity.[108]  These Doe plaintiffs fear their school will be required to dismiss their complaint simply because of the location of the assault, despite the fact that the assault and exposure to the respondent creates a hostile educational environment that interferes with their equal access to education.

If the Final Rule takes effect, it is likely that Doe plaintiffs' complaints or cases will be dismissed, and Doe plaintiffs will be left without recourse to vindicate their right to equal access to education, during which time, several legal challenges to the Final Rule will be pending.[109]  A preliminary injunction or a stay is necessary because even if the Final Rule is later vacated (a process which can take months or years), re-filing their complaints will be more burdensome. Furthermore, Doe plaintiffs will suffer unquantifiable emotional and psychological harm from the delay in resolving their complaints—if they are ever resolved.[110]  This harm is irreparable.[111]

2.   *Plaintiffs will suffer irreparable harm if their complaints are investigated under the Final Rule because it will cause them unnecessary trauma and severely interrupt their access to education.*

Doe plaintiffs have suffered significant physical and psychological trauma, including fear, anxiety, depression, and suicidality, which has caused some to seek medical attention, including

---

[108]  § 106.44(a) (defining "education program or activity" as "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution").

[109]  *Pennsylvania v. DeVos*, No. 1:20-cv-01468 (D.D.C. filed June 4, 2020); *New York v. DeVos*, No. 1:20-cv-4260 (S.D.N.Y. filed June 4, 2020); *Know Your IX v. DeVos*, 1:20-cv-01224-RDB (D. Md. filed May 14, 2020).

[110]  *See, e.g.*, Susan Doe ¶ 41.

[111]  Indefinite delay can rise to the level of irreparable harm. *See, e.g., CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (Blackmun, J., in chambers) (granting emergency stay from preliminary injunction because the "indefinite delay" of a broadcast would cause "irreparable harm to the news media"); "Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 159 (D. Mass. 2019) (citing *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005)).

therapy, counseling, and emergency room visits, further resulting in a financial burden.[112]   This

trauma has also already affected their equal access to education—Doe plaintiffs have had to drop

courses, change their field of study, transfer schools, and their grades have suffered.[113]

These effects will only be exacerbated if the Final Rule goes into effect and their

complaints are investigated under the new procedures. [114]   Doe plaintiffs will have no guarantee

that their names or details of their experiences will remain confidential during their

investigations.[115]   The Final Rule will also likely *prohibit* schools from implementing many

supportive measures for victims during this process,[116] such as removing a respondent from a

shared school club or extracurricular activity, thereby increasing the likelihood of emotional and

psychological harm under the Final Rule.[117]

Furthermore, all but one of the Doe plaintiffs will suffer irreparable harm from being forced

to participate in a live hearing that includes direct cross-examination.[118]   For example, Susan Doe

is still emotionally and psychologically affected from being cross-examined by her respondent

when she obtained a civil restraining order and cannot fathom having to re-live this experience in

a Title IX proceeding with her respondent's advisor, but without the formal legal protections she

---

[112] Anne Doe ¶ 6; Sobia Doe ¶¶ 40-54; Susan Doe ¶¶ 30-33, 51-52 (describing her PTSD diagnosis and suicide attempt in addition to the financial burden of seeking healthcare); Jill Doe ¶¶ 6-9; Nancy Doe ¶¶ 31-34; Herman ¶ 9 ("These negative effects include anxiety, increased isolation, increased risk of self-harm, distress, depression, and suicidal ideation.").

[113] Anne Doe ¶¶ 22-25; Sobia Doe ¶ 39; Susan Doe ¶¶ 34-36; Jill Doe ¶¶ 5-9; Nancy Doe ¶¶ 24-30; Lisa Doe ¶¶ 19-21; and Herman ¶¶ 9-12.

[114] *See* Cantalupo ¶¶ 24-25.

[115] Section 106.71(b)(1) of the Final Rule effectively allows a respondent to publicly discuss the pending complaint—including disclosing the complainant's name—because the Department has only qualified and limited retaliation protections for complainants, stating that "the exercise of rights protected under the First Amendment does not constitute retaliation prohibited under paragraph (a) of this section."

[116] § 106.30(a) (prohibiting supportive measures that are "disciplinary," "punitive," or "unreasonably burden[] the other party."); 85 Fed. Reg. at 30,182.

[117] Herman ¶¶ 14-16.

[118] Section 106.45(b)(6)(i) will remove all discretion from colleges and graduate schools about whether to conduct a live hearing for sexual harassment investigations, and will require parties and witnesses to submit to cross-examination by the other party's "advisor of choice," who may be an attorney, angry parent, close friend, teacher, coach, bitter ex-boyfriend of the complainant, or any other adult in a position of authority over the complainant or a witness; *see also* 85 Fed. Reg. at 30,345, 30,346, 30,347, 30,349, 30,356.

had in the court proceeding (such as protections against irrelevant or harassing questions).[119] Sobia Doe fears suffering further panic attacks and triggering her diagnosed post-traumatic stress disorder if she is required to re-do any investigation or adjudication of her Title IX complaint, particularly if she has to undergo live, direct cross-examination by her faculty respondent's advisor.[120]   Nancy Doe and Lisa Doe are particularly worried about cross-examination if their respective respondent is able to hire an attorney.[121]   Anne Doe "cannot imagine being able or willing" to put herself through live cross-examination by her respondent and already experiences feelings of "danger, panic, and intense fear" whenever she sees her respondent or reminders of him, such as his sport insignia.[122]   Jill Doe states that the prospect of being cross-examined by her respondent's advisor is "terrifying."[123]

Despite wishing to vindicate their rights through the formal Title IX process, Doe plaintiffs are seriously considering withdrawing their complaints in order to avoid the likely emotional and psychological trauma the Final Rule will inflict on them, or choosing not to file a complaint.[124] But if a preliminary injunction or stay is granted and/or the Final Rule is ultimately vacated, then Sobia Doe, Susan Doe, Jill Doe, Nancy Doe, and Lisa Doe intend to proceed with their Title IX complaints,[125] and Anne Doe intends to file a complaint.[126]

The Final Rule will impose significant emotional and psychological harms on the Doe plaintiffs and interfere with their education and daily activities.  This harm is irreparable.[127]

---

[119] Susan Doe ¶¶ 43-45.
[120] Sobia Doe ¶¶ 75-76.
[121] Nancy Doe ¶¶ 48-49; Lisa Doe ¶ 33.
[122] Anne Doe ¶¶ 25, 30.
[123] Jill Doe ¶ 15.
[124] Anne Doe ¶ 36; Sobia Doe ¶¶ 74-76, 79; Susan Doe ¶ 53; Jill Doe ¶¶ 17-18; Nancy Doe ¶ 44; and Lisa Doe ¶¶ 27-29, 34.
[125] Sobia Doe ¶ 80; Susan Doe ¶ 56; Jill Doe ¶¶ 20-21; Nancy Doe ¶ 52; and Lisa Doe ¶ 30.
[126] Anne Doe ¶ 38.
[127] Concrete "loss of the chance to engage in normal life activity," such as by pursuing educational opportunities or a "chosen profession," constitutes irreparable harm.  *Jones v. Nat'l Conf. of Bar Exam'rs*, 801 F. Supp. 2d 270, 286-87

3.    *Jane Doe will suffer irreparable harm if the Final Rule goes into effect because it will limit her school from providing her with supportive measures necessary for her to have equal access to educational opportunities and allow the school to provide an inadequate response.*

Under the Final Rule, the school will be encouraged to refuse further action to address effectively the sexual harassment against Jane Doe, a ten-year old elementary school student. The Final Rule impedes the school's ability to provide the supportive measures necessary to ensure Jane Doe can learn in a safe educational environment if such measures are considered "punitive," "disciplinary," or "unreasonably burdensome" to her respondent.[128]

Jane Doe and her mother, Melissa White, reported four incidents of sexual assault and harassment to the school, but when Jane Doe reported the fourth incident to her teacher, the teacher told her that she could not call her mother for help because it was not "important enough."[129] Furthermore, although the school changed some of Jane Doe's assailant's classes and his lunch period, Jane Doe continued to see him in various places, even in places where she was told she would not have to encounter him, such as recess.[130] When she reported this, teachers refused to take action.[131] Another time, during a field trip, he was allowed to sit directly behind Jane Doe even though the school had promised Melissa White that he would be kept away from her.[132] Jane Doe—already suffering emotional trauma from the assault necessitating weekly counseling—has become withdrawn and no longer wants to attend school because she feels alienated.[133] Melissa

---

(D. Vt. 2011) (quoting *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011)); *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 853 (7th Cir. 1999) ("diminished academic motivation" found sufficient to constitute irreparable harm).

[128] Ex. G, Jane Doe Decl. ¶¶ 18, 26; Ex. O, Elizabeth Collins Decl. ¶¶ 21,23 ("Though the Rule may allow schools to act on incidents that fall outside of the Rule's limited definition of sexual harassment . . . schools are unlikely to conduct investigations when not required by the Rule. Most schools are often strapped for funding and, thus, schools will likely use their limited resources to investigate only those incidents where the Rule specifically requires investigation.").

[129] *Id.* ¶ 4.

[130] *Id.* ¶ 10.

[131] *Id.* ¶ 4.

[132] *Id.* ¶ 11.

[133] *Id.* ¶¶ 19, 22, 27.

White has considered removing her daughter from the school to ameliorate the harm to her daughter, but they live in a rural area where other schools are not a realistic option.[134]

To date, however, the school has not indicated that they are conducting a Title IX investigation in response to Jane Doe's and Melissa White's reports, and the school has not offered sufficient supportive measures to allow Jane Doe access to her education.[135]  Melissa White and Jane Doe are considering filing a complaint with the Department of Education's Office for Civil Rights, but fear that under the Final Rule, the Department would conclude that the school's response was sufficient despite the repeated sexual harassment and assault Jane Doe suffered. [136]

**B.       Organizational plaintiffs are suffering, and will continue to suffer, irreparable harm unless the Court grants preliminary injunctive relief or stays the Final Rule**

Organizational plaintiffs are familiar with adapting to changing legal landscapes, but the changes introduced by the Final Rule were unprecedented—indeed, some changes were not even subject to the notice and comment process—and have caused ongoing, irreparable harm.[137] Among other services, organizational plaintiffs directly represent survivors of sexual assault, including by advising survivors undergoing a school's Title IX process.[138]  Given the arbitrary and capricious nature of the Final Rule's sweeping changes to Title IX process and the Final Rule's lack of clarity and internal inconsistency, organizational plaintiffs have already observed significant limitations on their ability to advise survivor clients with pending Title IX

---

[134] *Id.* ¶ 23.
[135] *Id.* ¶¶ 10, 18.
[136] *Id.* ¶ 28.
[137] Ex. H, Decl. of Stacy Malone for plaintiff Victim Rights Law Center ¶ 19 ("VRLC"); ERA ¶ 6, 33; Ex. J, Decl. of Kaethe Morris Hoffer for plaintiff Chicago Alliance Against Sexual Exploitation ¶¶ 2, 34 ("CAASE"); Ex. K, Decl. of Lisa M. Stone for plaintiff Legal Voice ¶¶ 3, 16 ("Legal Voice").
[138] VRLC ¶¶ 4-6; ERA ¶¶ 4-6; Legal Voice ¶¶ 4-7; CAASE ¶¶ 4-7.

investigations.[139]   Additionally, the legality of the Final Rule has been challenged by four other

organizations, a coalition of states and the District of Columbia, and the state of New York.[140]

Injunctive relief will allow this case, and other legal challenges, to proceed and allow the validity

of the Final Rule to be decided on the merits, thereby preventing irreparable harm to organizational

plaintiffs.   Furthermore, organizational plaintiffs are suffering—and will continue to suffer—

irreparable harm because the Final Rule (1) diverts their resources and frustrates their missions,

and (2) harms organizational plaintiffs' survivor clients.

1.   *The Final Rule causes irreparable harm to organizational plaintiffs because it diverts the organizations' resources and frustrates their missions.*

Organizational plaintiffs were forced to make difficult choices in allocating their already

scarce resources following publication of the Final Rule, particularly given the effective date just

months away.   Organizational plaintiffs, like many non-profit organizations, have a limited staff

with a wide range of responsibilities, including but not limited to providing direct legal services,

providing legal information and education, collaborating with educational institutions, and

legislative advocacy.[141]   Therefore, organizational plaintiffs have been triaging among Title IX

clients and other priorities.   For example, as a result of the Final Rule, ERA had no choice but to

shut down its employment advice and counseling program reserved for Title VII complaints in

order to field inquiries regarding the Final Rule and Title IX inquiries.[142]   Additionally, CAASE

is delaying the development of a Restorative Justice program and a gender justice and criminal

justice reform project because the necessary resources are currently tied up in efforts to fully

---

[139] *E.g.* VRLC ¶ 10 (attorneys have had to attend additional trainings themselves and spend additional time with clients); CAASE ¶ 10 (CAASE had to take fewer clients in order to devote resources to fully assess the impact of the rule on survivors).
[140] *Pennsylvania v. DeVos*, No. 1:20-cv-01468 (D.D.C. filed June 4, 2020); *New York v. DeVos*, No. 1:20-cv-4260 (S.D.N.Y. filed June 4, 2020); *Know Your IX v. DeVos*, 1:20-cv-01224-RDB (D. Md. filed May 14, 2020).
[141] VRLC ¶¶ 4-6; ERA ¶¶ 5-6, 25; Legal Voice ¶¶ 4-7; CAASE ¶¶ 4-7.
[142] ERA ¶ 18; Legal Voice ¶ 12.

understand and provide for expert assistance regarding the Title IX regulations.[143]

Organizational plaintiffs have also had to divert staff resources in order to:  (1) update public-facing training guides and curricula[144]; (2) increase technical assistance and outreach to campus administrators, attorneys, and students[145]; and (3) assist on existing collaborations with preK-12 and post-secondary education institutions.[146]  For example, ERA is currently engaged in two large-scale, multi-year programmatic collaborations with a school district and a post-graduate research institution to design and implement improved Title IX policies and trainings and to conduct climate surveys to assess improvements, and recently, to design and implement COVID-19 guidance.[147]  However, due to the Final Rule, ERA is being forced to abandon the current drafts of Title IX policies and training materials and senior ERA staff will have to redo months of work, including work that was near completion, to account for the numerous Final Rule changes.[148]  The August 14, 2020 effective date exacerbates this harm.  For example, Legal Voice, given its limited staff and capacity, is not likely to finish updating its public-facing guidance and training materials by the effective date.[149]

At least one organizational plaintiff, CAASE, has also seen its Policy Department spend significant time and resources assessing potential and confirmed conflicts with state law, trying to determine what schools will do in response to the new regulations, and updating documents and written collateral.[150]  Because these preemption issues were not explained in the Proposed Rule, CAASE has been forced to assess these Illinois state law issues on short notice after the publication

---

[143] CAASE ¶ 11-12.
[144] VRLC ¶ 10; ERA ¶ 18; Legal Voice ¶ 10; CAASE ¶ 10.
[145] VRLC ¶ 11; ERA ¶¶ 9, 22, 15; Legal Voice ¶ 11; CAASE ¶¶ 15, 19.
[146] VRLC ¶ 11; ERA ¶¶ 22-24; CAASE ¶ 13.
[147] ERA ¶ 22-24.
[148] ERA ¶ 23-24.
[149] Legal Voice ¶ 12-13.  Other organizational plaintiffs face similar harm, *e.g.*, ERA ¶ 18.
[150] CAASE ¶ 14.

of the Final Rule.[151]  As a result, CAASE has had to divert resources from advocating for other bills related to crime victims' rights, rape kit expansion, workplace harassment and violence, and the sex offender registry, in order to work on state-specific legislation to ensure that student victims of sexual harassment have access to education under the Final Rule.[152]

Legal Voice expects to divert additional resources to legislative advocacy to codifying protections under Title IX at the state level, because in the previous year, changes were contemplated but stakeholders decided to wait until the Final Rule was issued.[153]  As a result, Legal Voice will also have fewer resources to devote to litigation because of its staffing capacity.[154] VRLC anticipates it will take double the amount of preparation time for staff attorneys to prepare for an investigation that includes a lengthy live hearing and cross-examination, thus reducing the overall number of survivors VRLC can represent.[155]

Organizational plaintiffs are also seeing their missions frustrated.  The Final Rule will make it less likely for survivors to report sexual harassment due to, among other particulars, the restrictive definition of "sexual harassment," the requirement of live hearings and direct cross-examination of survivors, and an unequal standard of evidence that unfairly burdens survivors. And in cases where a student does file a formal complaint with their school, the Final Rule makes it more difficult for VRLC to accomplish its mission of obtaining justice for survivors of sexual harassment because it makes accurate outcomes less likely and even where those outcomes remain available, success will take more time and effort.[156]

These harms to organizational plaintiffs are irreparable because they cannot adequately be

---

[151] CAASE ¶ 14.
[152] CAASE ¶ 14.
[153] Legal Voice ¶ 11.
[154] Legal Voice ¶ 11.
[155] VRLC ¶ 12.
[156] VRLC ¶ 14; Cantalupo ¶ 42.

compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.[157]   Uncertainty due to federal action that interferes with the ability to budget, plan for the future, and properly serve constituents can rise to irreparable harm.[158]   Organizational plaintiffs are not only expending financial resources to address the Final Rule—they are diverting their time and effort, at the expense of other activities, and will never recover these efforts, even if the Final Rule is later invalidated.   A preliminary injunction would restore the status quo prior to the publication of the Final Rule, allowing organizational plaintiffs to re-allocate resources to the status quo ante and pursue their mission unhindered, until the legality of the Final Rule is decided.

>    2.   *The Final Rule is irreparably harming—and will continue to harm—organizational plaintiffs' survivor clients*

As set forth above, Doe plaintiffs will suffer irreparable harm under the Final Rule. Organizational plaintiffs serve many other clients who will suffer the same irreparable harm.

If allowed to take effect, the Final Rule will result in a "chilling" effect on survivors, who will report their sexual harassment in fewer numbers to organizational plaintiffs.   This harm is irreparable and it is not speculative.[159]   VRLC and ERA have already observed that survivors are considering a "now or never" approach to bringing a complaint before the August 14, 2020 effective date, which is exacerbated by the COVID-19 crisis, as many survivors who now live at

---

[157] *See Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017) (federal Executive Order caused injury to students and faculty subject to restrictions but also caused budgetary uncertainty and harm to plaintiff universities' mission); *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

[158] *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *reh'g denied, Cty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1205 (N.D. Cal. 2017) (Executive Order and uncertainty arising from it created irreparable harm to counties due to inability to "budget, plan for the future, and properly serve their residents.").

[159] After the Department's issued interim guidance revising Title IX's sexual harassment policy in 2017, organizational plaintiffs saw detrimental impacts to their missions and operational activities.   For example, after the 2017 guidance, VRLC observed that victims of sexual assault and other sexual harassment were less willing to report their experiences to school authorities, impairing VRLC's ability to achieve its mission.   VRLC ¶ 13.   VRLC, ERA, and other organizations challenged the 2017 guidance, but the court dismissed the motion for summary judgment on the basis that agency action was "final" for purposes of judicial review.   *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2019 WL 5684522, at *1 (N.D. Cal. Nov. 1, 2019).

home are unable to access on-campus counseling and/or are not ready to disclose their sexual assault information to their family members.[160]  Accordingly, there will inevitably be a decline in the number of victims willing to file complaints their schools, to file complaints with the Department of Education alleging violations of Title IX by their schools, and/or to cooperate with the Department of Justice on pending investigations.[161]

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORS GRANTING THE REQUESTED RELIEF

Preliminary relief is granted when Plaintiffs also show that the balance of equities tips in their favor and that an injunction or stay is in the public interest.[162]  These two factors typically merge when the federal government is the opposing party.[163]  To balance the equities, the court reviews "the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue."[164]

The balance of equities tips significantly in the Plaintiffs' favor, given the irreparable harms they will suffer if the Final Rule is implemented.  The organizational plaintiffs will be forced to continue diverting resources toward educating and informing the public about the implications and obligations created by the Final Rule rather than providing direct legal services or advocating on behalf of important legislation.  They will also be forced to exert significant efforts assisting

---

[160] VRLC ¶ 13; ERA ¶ 32.

[161] VRLC ¶ 13. Furthermore, organizational plaintiffs anticipate increased difficulty in serving survivors who do wish to pursue a Title IX complaint under the Final Rule, thus causing them irreparable harm.  For example, ERA has had to expand its Pro Bono Attorney Network to recruit more attorneys to address and mitigate the harms of the Final Rule to victims of sexual harassment.  As a result, ERA has been forced to overhaul its training program to educate new Pro Bono attorneys and retrain existing attorneys on the impact of the Final Rule.  At the same time, ERA anticipates that it will be more difficult to recruit pro bono attorneys to represent complainant students in Title IX proceedings with their schools, because—regardless of whether the complainants are eligible for monetary compensation—there will be a long and difficult road for students to vindicate their civil rights. *See* ERA ¶ 20-21.

[162] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[163] *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Savino v. Souza*, No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. May 12, 2020).

[164] *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460-LM, 2016 WL 1048023 (D.N.H. March 28, 2016) (citing *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006)).

survivors throughout lengthy and traumatizing Title IX proceedings, will obtain fewer accurate outcomes, and will be hampered in their abilities to take on new clients.

Doe plaintiffs will bear the brunt of the effects of the Final Rule. The Final Rule will force them to endure the psychological and emotional pain of participating in a live, direct cross-examination without the formal legal protections of a traditional civil or criminal proceeding. The Final Rule will require their schools to invalidate their experiences by dismissing their complaints because their assault happened off-campus or because they have graduated, and will create a lax deliberate indifference standard for institutions to respond to the harms they are suffering. The Final Rule does nothing more than perpetuate and exacerbate an already traumatic experience irreparably harming Doe plaintiffs. By contrast, Defendants will not be harmed by adhering to the Department of Education's existing Title IX policies, much of which the Department has been enforcing for decades.[165] Maintaining the status quo harms no one.

A preliminary injunction or stay in this matter is also in the public interest. The public interest factor asks the court to consider "whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief.[166] Courts have historically held that "[t]here is generally no public interest in the perpetuation of unlawful agency action."[167] To the contrary, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"[168] Furthermore, limiting an educational institution's ability to address Title IX claims would

---

[165] *See District of Columbia v. U.S. Dep't of Agric.*, No. 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) (finding "[t]he equities weigh sharply in favor of preliminary relief" when an agency's "only harm is that it will be required to keep in place the existing regulation – which [it] has used for 19 years – while judicial review of its new regulation runs its course").

[166] *Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 66, (D.N.H. 2007).

[167] *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12-15 (D.C. Cir. 2016); *see Cook Cty. Illinois v. McAleenan.* 417 F. Supp. 3d 1008, 1029 (N.D. Ill. 2019) *aff'd on other grounds sub nom Cook Cty., Illinois v. Wolf*, 962 F.3d 208 (7th Cir.); *New York v. Dept. of Homeland Sec.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019).

[168] *Newby*, 838 F.3d at 12-15.

"disserve … the public interest by potentially leaving credible sexual misconduct allocations without redress."[169]  Because Plaintiffs are likely to succeed on the merits, Defendants' harms are limited merely to preserving the status quo during the judicial review.  This "pales in comparison" to the Plaintiffs' irreparable harm associated with "implementing a sea of change."[170]

Moreover, a nationwide injunction or stay is necessary. The text of the APA's § 706 "compel[s] nationwide injunctions of invalid rules."[171]  Courts have also recognized that nationwide relief at the preliminary stage ensures that complete relief remains available to the plaintiffs after the final adjudication, especially when an agency action has "nationwide impact" and would cause injuries of "sufficient similarity" to other individuals throughout the country.[172] After all, if a rule is allowed to be implemented in some states but not others pending adjudication, then the "egg has been scrambled," and "restoring the status quo ante will be considerably more disruptive" and will weigh in favor of remand without vacatur after an adjudication of the merits.[173]

Here, Plaintiffs are likely to succeed on the merits, and if they do, they should be entitled to full relief, including vacatur.  Accordingly, a nationwide preliminary injunction or stay is proper so as to avoid the risk that the Final Rule will become too difficult to unscramble after a final adjudication has been implemented in educational institutions across the country.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin implementation of the Final Rule nationwide, or, in the alternative, stay the effective date pending

---

[169] *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 590 (E.D. Va. 2016).
[170] *See District of Columbia,* 2020 WL 1236657, at *31 (D.D.C. Mar. 13, 2020).
[171] *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007),  *aff'd in part & rev'd in part on other grounds by Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (emphasis added); *District of Columbia,* 2020 WL 1236657, at *33.
[172] *Id*. at *35.
[173] *Id.*

judicial review.

Dated:        July 24, 2020                    Respectfully submitted,


By: /s/ Julie O'Neill
        Julie O'Neill
        Natalie A. Fleming Nolen
        David A. Newman
        Vanshika Vij
        Caitlin A. Crujido
        Robin A. Smith
        Evan Harris
        Morrison & Foerster LLP
        2000 Pennsylvania Ave., NW, Suite 6000
        Washington, DC  20006-1888
        Telephone: 202.887.1500

        Emily Martin*
        Neena Chaudhry*
        Sunu Chandy*
        Shiwali G. Patel*
        Elizabeth Tang*
        National Women's Law Center
        11 Dupont Circle, NW, Suite 800
        Washington, DC 20036
        Telephone: 202.588.5180

        Diane L. Rosenfeld**
        Attorney at Law
        Mass. Bar Number 668275
        Cambridge, MA 02138

        *Attorneys for Plaintiffs*

        *\* motion for admission pro hac vice*
        *forthcoming*
        *\*\*motion for admission to U.S. District*
        *Court for District of Massachusetts*
        *forthcoming*