# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **VICTIM RIGHTS LAW CENTER**<br>115 Broad Street, 3rd Floor<br>Boston, MA 02110,<br><br>**EQUAL RIGHTS ADVOCATES**<br>1170 Market Street, Suite 700<br>San Francisco, CA 94102,<br><br>**LEGAL VOICE**<br>907 Pine Street, Suite 500<br>Seattle, WA 98101<br><br>**CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION**<br>307 N. Michigan Ave., Suite 1818<br>Chicago, IL 60601<br><br>**JANE DOE**, an individual by and through her mother and next friend, **MELISSA WHITE**<br><br>**ANNE DOE,** an individual<br><br>**SOBIA DOE,** an individual<br><br>**SUSAN DOE,** an individual<br><br>**JILL DOE,** an individual<br><br>**NANCY DOE,** an individual<br><br>**LISA DOE,** an individual<br><br>                   Plaintiffs,<br>    v.<br><br>**ELISABETH D. DEVOS**, in her official capacity as Secretary of Education,<br>400 Maryland Avenue SW<br>Washington, DC 20202, | Case Number: 1:20-cv-11104<br>Declaration of Nancy Chi Cantalupo |

1

**KENNETH L. MARCUS**, in his official
capacity as Assistant Secretary for Civil Rights,
400 Maryland Avenue SW
Washington, DC 20202,

**U.S. DEPARTMENT OF EDUCATION**,
400 Maryland Avenue SW
Washington, DC 20202,

                              Defendants.

## DECLARATION OF NANCY CHI CANTALUPO

I, Nancy Chi Cantalupo, declare as follows:

1. I submit this declaration in support the Motion for Preliminary Injunction filed by Equal Rights Advocates ("ERA"), Victims Rights Law Center ("VRLC"), Legal Voice, Chicago Alliance Against Sexual Exploitation ("CAASE"), Jane Doe, Anna Doe, Sobia Doe, Susan Doe, Jill Doe, Nancy Doe, and Lisa Doe, plaintiffs in the above-captioned case, which challenges as unlawful the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Final Rule").

2. I submit this declaration in my personal capacity as an expert in preventing sexual harassment and gender-based violence (collectively, "sexual harassment") in education, especially on college campuses. This declaration is based on my personal knowledge, my familiarity with Title IX of the Education Amendments of 1972 ("Title IX"), my review of the Rule, and the knowledge and expertise I have acquired from over 25 years of prevention work, including as a legal scholar and author of approximately 30 articles, book chapters, essays, amicus briefs, white papers, and policy documents on these subjects, as a nearly 15-year school administrator and institutional policymaker, as an attorney and advocate representing student

2

sexual harassment victims in school disciplinary proceedings, and as a student activist protesting my school's mishandling of sexual harassment. I informed the U.S. Department of Education of the research and opinions expressed in this Declaration in a comment filed in response to the Notice of Proposed Rulemaking that began the process of creating the Final Rule.[1]

**Background, Responsibilities, and Qualifications**

3.   To my knowledge, I am the only person in the country who has worked to prevent sexual harassment in education from as many and as diverse positions as I have.  As an attorney, law professor, policymaker, researcher, scholar, school administrator, student activist, and victim's advocate, I take a comprehensive, 360-degree view on the problem of sexual harassment in education and how to prevent it.

4.   My ability to take this 360-degree view has allowed me to serve in several unique roles relevant to the focus of this declaration.  Most recently, the American Bar Association's Commission on Domestic and Sexual Violence ("ABA-CDSV") asked me to lead a research and information gathering process and then to draft a set of *Recommendations for Improving Campus Student Conduct Processes for Gender-Based Violence* ("*ABA Recommendations*").[2]  Prior to taking on the *ABA Recommendations* project, I was recruited by NASPA: Student Affairs Administrators in Higher Education to serve as a subject matter expert on sexual harassment prevention and other civil rights issues to the association and its 14,000 members.  I also was nominated, selected, and served as a Primary Negotiator in a Negotiated Rulemaking, convened

---

[1] Comment from Nancy Chi Cantalupo Regarding Proposed Rule "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" to Office of Civil Rights, Dep't of Educ., (Jan. 30, 2019), https://beta.regulations.gov/document/ED-2018-OCR-0064-32141 (updated with additional signatures for a total of 94 law faculty at https://www.regulations.gov/document?D=ED-2018-OCR-0064-17567).
[2] Commission on Domestic and Sexual Violence, *Recommendations for Improving Campus Student Conduct Processes for Gender-Based Violence,* AMERICAN BAR ASSOCIATION https://www.americanbar.org/content/dam/aba/publications/domestic-violence/campus.pdf (last visited July 22, 2020).

by the U.S. Department of Education in 2014 to write new regulations implementing changes to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") made by the Violence Against Women Reauthorization Act of 2013.

5.   Throughout this time and since 2009, I have researched and published legal scholarship on the use of law, especially Title IX and other civil rights laws, to combat sexual harassment. While training for or serving as a law faculty member at Temple University, Georgetown University, Barry University and, currently, California Western School of Law, I published articles in the *Harvard Journal of Law & Gender*, *Wake Forest Law Review*, *California Law Review Online*, *Yale Law Journal Forum*, and the peer-reviewed social science journal, *Trauma, Violence & Abuse*, among other journals.  I have also been invited to write several book chapters, as well as op-eds for the *Washington Post*, *New York Times*, *USA Today*, and *Time* magazine.

6.   As a higher education administrator, I served for eight years as a campus women's resource center director and six years as an academic dean, adviser, and member of the Dean's staff for a top-15 law school (Georgetown Law).  During my time in these positions, I worked closely with students, faculty, and administrators on setting and implementing academic policies and assisted student victims of sexual harassment in a variety of ways, including representing them in internal school disciplinary proceedings and finding outside counsel to assist them in legal matters such as obtaining civil protection orders.  I also co-chaired an ongoing oversight and policy committee called the Sexual Assault Working Group for nearly half of my years as an administrator, leading a complete overhaul of the university's sexual violence prevention and response systems.

7.   My expertise has been repeatedly sought in public policy discussions and federal and state lawmaking activities related to peer sexual harassment in education.  I consulted

extensively with the Obama administration's White House Task Force to Protect Students from Sexual Assault and have discussed proposed legislation on campus sexual harassment with several U.S. Senators, as well as their and several Congresspersons' staffs.  In addition, I testified before the Maryland House of Delegates regarding a legislative proposal on which I was consulted by Delegate Jon Cardin in 2014, and I was asked by the office of the Attorney General of Virginia to testify before the Virginia legislature during the 2015 session.

8.   In my research on faculty sexual harassment, a co-author and I introduced a key analytical structure about this harassment that was utilized by the National Academies of Sciences, Engineering & Medicine in their 2018 comprehensive report on sexual harassment in science. As a result, I was asked to collaborate with a group of scientists who were convened at Cold Spring Harbor Laboratory by Nobel laureate, Dr. Carol Greider, and co-authored a piece in *Science* magazine regarding our deliberations and recommendations.  Finally, I have served for approximately a year as an independent consultant in a federal class action settlement with the University of Southern California resulting from university-employed gynecologist George Tyndall's decades of sexual abuse of his women patients at the university's student health center.

9.   Through these various positions, my public policy work, and my research activities, I have extensively researched or worked directly with victims and their advocates in hundreds of student sexual harassment cases.  In addition, I have discussed issues of sexual harassment with hundreds of other experts, school professionals (many of whom are "first responders" to crises involving sexual harassment), and both local and national policymakers. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

**The Final Rule Forces Schools to Adopt Investigatory Processes that are
Ineffective in Achieving Title IX's Goals**

10. Based on my 360-degree understanding of sexual harassment in education and how to prevent it, it is my expert opinion that the Final Rule, particularly the Final Rule's requirement that schools use live hearings and direct cross-examination in their sexual harassment investigations, will lead to more, not less, sexual harassment in the United States. My opinion is corroborated by the vast majority of the 225-plus school professionals who contributed to an ABA-CDSV project creating recommendations for practice in student conduct proceedings involving gender-based violence, recommendations that I drafted based on these professionals' extensive input and review. "Sexual harassment" as historically defined under Title IX and other civil rights laws includes gender-based violence and is considered a form of sex/gender discrimination. Because Title IX's central purpose is to prohibit and end such discrimination, the Final Rule, including its live hearing and direct cross-examination requirements, counteracts the entire reason why Title IX is a part of our law.

**The American Bar Association Commission on Domestic and Sexual Violence
Rejected Live Hearings as the Least Effective and Most Damaging Investigation Method**

11. As the primary drafter of the *ABA Recommendations*, I played a central role in the nearly three years of research, drafting, peer-reviewing, and editing that were required to finalize and publish those guidelines. I can therefore confirm that the description of the process provided in the *ABA Recommendations* is accurate, including that our team conducted research and gathered information from dozens of institutions of higher education, as well as practitioners, researchers and other experts, from across the country. The process ultimately consulted over 225 campus professionals involved in conducting, training, constructing, researching, and/or policymaking related to student conduct processes, not only in its initial research and information-gathering

6

stages, but also in the extensive peer-review of the first draft of the recommendations.  These professionals included attorneys (civil, criminal defense, and prosecutors), Clery Act and Title IX compliance experts, Deans of Students, Directors of Student Conduct, in house and contracted investigators, gender-based violence experts, law professors, non-profit technical assistance providers, Title IX Coordinators, experts on Tribal Colleges and Universities, and university general counsels from private and public schools, commuter and residential campuses, community colleges, and minority-serving institutions across the country.

12. Based on the research conducted with the wide range of campus professionals listed above, the *ABA Recommendations* identified four investigation models that schools were using, had used, or were considering adopting for their student conduct proceedings involving gender-based violence: the "Investigative Model," the "Hearing Model," the "Investigation & Hearing Hybrid" ("IH Hybrid"), and the "Investigation & Deliberative Panel Hybrid" ("IDP Hybrid"). Because the Hearing Model and IH Hybrid were described by the campus professionals who provided input into the *ABA Recommendations* as having the characteristics of the live hearings required by the Final Rule, in the remainder of this declaration I will refer to these models as the "Final Rule Live Hearing" and the "Final Rule Hybrid."  Because the Investigative Model and IDP Hybrid models have been historically and/or are currently being used (unless or until the Final Rule goes into effect) specifically for civil rights-based complaints and proceedings, I will refer to these models as the "Civil Rights Investigative Model" and the "Civil Rights Hybrid." Neither the *ABA Recommendations* nor I refer to the Civil Rights Investigative Model or the Civil Rights Hybrid as a "Single Investigator" model because neither requires that investigations be conducted by a single person.  Indeed, according to my research and in my expert opinion,

best practices for these civil rights investigation models advise that they be done by a pair of investigators, especially if interviews with parties and witnesses are not audio-recorded.

13. Based on the information shared by the professionals who participated in the *ABA Recommendations* drafting process, the Civil Rights Investigative Model can be summarized as a process that uses professional investigators to gather evidence and interview the parties (i.e., the complainant and respondent) and any witnesses in separate, individual meetings, then to write a report where they synthesize the evidence and make factual findings. These investigators have professional expertise, knowledge, and skills in such areas as the dynamics of sexual harassment, trauma-informed interviewing and investigation techniques (including cultural competency and applicable linguistic skills), and methods for building trust with those involved in the investigation and in the integrity of the investigatory process itself. The Civil Rights Investigative Model has long been used and continues to be used by employers to address workplace sexual harassment under Title VII of the Civil Rights Act of 1964 and similar civil rights statutes.[3]

14. In my experience and as described by the campus professionals who provided input into the *ABA Recommendations*, a Final Rule Live Hearing is an adversarial proceeding that relies on the parties involved in the allegations to present evidence and witnesses, in support of their own factual account, while all parties are present, to a neutral panel of university community members who are not professional investigators. These panelists do not do their own investigation, but instead passively hear testimony and consider evidence presented by all parties and witnesses, then make factual findings based on that testimony and evidence.

---

[3] BETH K. WHITTENBURY, INVESTIGATING THE WORKPLACE HARASSMENT CLAIM (Am. Bar. Ass'n Book Publishing 2012).

15. The Final Rule Hybrid combines the models discussed above so that the investigators' report goes to the hearing panel and the panel reviews it along with hearing testimony from parties and witnesses, then makes factual findings based on the report and the testimony. Although Final Rule Live Hearings have historically been used in school disciplinary proceedings or have been adjusted slightly into the Final Rule Hybrid, for the last several decades, schools and student conduct experts have increasingly rejected these live hearing-based models.[4]  In my experience, even the most traditionally structured live hearings used *indirect* forms of cross-examination (where the parties give questions to the hearing panel, and the hearing panel asks the questions it approves as appropriate of the other party or witnesses).

16. Finally, the Civil Rights Hybrid uses professional investigators to make factual findings as in the Civil Rights Investigative Model, then adds a "Deliberative Panel" review of the investigation report. The Deliberative Panel is made up of campus community members, excluding students according to recognized best practices regarding student conduct matters that involve potential invasions of student privacy. The Civil Rights Hybrid gives the members of the Deliberative Panel copies of the investigation report and requires the investigators to appear before the panel to answer questions prior to the panel making a final decision about whether an school policy violation has occurred. The parties may also appear before the panel, at the party's option, to make statements, although the goal of the parties' statements is not to present new or additional evidence beyond the evidence in the investigators' report, but to give the parties an opportunity to speak directly to the school decisionmakers, without any kind of filter. Conceivably, the parties' statements might lead the Deliberative Panel to add to the questions

---

[4] W. Scott Lewis, Saundra K. Schuster, & Brett Sokolow, The NCHERM Group, Deliberately Indifferent: Crafting Equitable and Effective Remedial Processes to Address Campus Sexual Violence (2011), *available at* http://www.ncdsv.org/images/NCHERM_DeliberatelyIndifferent_2011.pdf.

that they ask the investigators, but those questions would still be directed at the investigators and be focused on such purposes as clarifying why a party's statement and the investigatory report present different accounts of the facts or determining why the investigators' report does not include evidence to which the party's statement points.

17. The *ABA Recommendations* advise schools to use either the Civil Rights Investigative Model or the Civil Rights Hybrid, with a preference for the Civil Rights Hybrid, for several reasons.  As an initial matter, the over 225 campus professionals who contributed information, experience, and expertise to the research and peer-review process overwhelmingly favored the civil rights-based investigation models. This remarkable level of agreement manifested despite the diversity of their institutions and their experiences with the different investigation models. As the *ABA Recommendations* note, those campus professionals who were most likely to approve of their institution's model for investigations (the majority of the professionals that contributed to the *ABA Recommendations*) were at institutions using some version of the civil rights investigation models, whereas those at institutions that used live hearing models expressed frustration with those models and interest in the civil rights-based models as better alternatives. In addition, the experiences and opinions of these professionals, who all played key roles in their schools' efforts to end sexual harassment, support a conclusion that the civil rights-based investigation models assist schools in preventing sexual harassment, whereas the live hearing-based models that would be mandated by the Final Rule do the opposite.  My own research and experience combatting sexual harassment in education supports this same conclusion.

### Investigating Student Sexual Harassment Complaints Using Live Hearings Counteracts Title IX's Mandate that Schools Prevent Sexual Harassment

18. Based on my 25 years of research and experience with sexual harassment prevention methods, I have concluded that the live hearings mandated by the Final Rule but rejected by the

*ABA Recommendations* and nearly all of 225-plus professionals who contributed to crafting them, undermine sexual harassment prevention.  The effects of live hearings particularly damage efforts to engage in *comprehensive prevention*, a public health-based prevention method that has been advanced by the Centers for Disease Control and Prevention as the best sexual harassment prevention method.

19. Comprehensive prevention categorizes all interventions and responses to sexual harassment, both before and after any formal complaint or complaints, as one or more of three forms of prevention: primary, secondary and tertiary. Primary prevention seeks to prevent harassment before it starts. Secondary prevention includes methods that respond to harassment immediately or very soon after it occurs, often focusing on interventions to address the trauma that sexual harassment victims experience, which affects their health, their relationships with others, and their ability to work and/or go to school. Tertiary prevention addresses the long-term consequences of harassment, not only on the immediate victims but also secondary victims, those responsible for harassing others, and the community as a whole.[5]

20. The systems schools put in place to investigate and resolve complaints of sexual harassment are key components to effective secondary and tertiary prevention and influence the effectiveness of a school's primary prevention programs, since students are less likely to take primary prevention educational messages seriously when the school's investigations do not indicate that the school itself takes harassment and its prevention seriously.  The live hearings mandated by the Final Rule undermine effective comprehensive prevention in at least two major ways: by increasing victim trauma, which interferes with both secondary and tertiary prevention efforts, and by significantly increasing the risks that schools will be unable to investigate and

---

[5] MARGARET BROME ET AL., CTRS. FOR DISEASE CONTROL & PREVENTION, SEXUAL VIOLENCE PREVENTION: BEGINNING THE DIALOGUE (2004), *available at* https://www.cdc.gov/violenceprevention/pdf/svprevention-a.pdf.

resolve sexual harassment complaints competently and accurately, which undermines a school's tertiary prevention efforts.

**Live Hearings are Ineffective and Damaging to Sexual Harassment Prevention Because They Increase Victim Trauma, which Discourages Victims from Reporting, Decreases the Accuracy of Fact-finding, and Increases Discriminatory Stereotyping**

21. My research and experiences with school sexual harassment investigations emphasize the necessity for such investigations to be trauma-informed so they will act as effective secondary prevention, which aims to minimize the harm to victims, and tertiary prevention, because trauma-informed investigations increase fact-finding accuracy in sexual harassment cases. Secondary prevention efforts seek to minimize harm to victims because they recognize that, if schools are going to prevent harassment, victims must notify their school that harassment is happening, yet victims are unlikely to give such notice if they will get no remedies or assistance as a result. In addition, trauma-informed investigations help to avoid or minimize the damaging neurobiological effects of trauma and increase victims' abilities to organize their memories of the traumatic events so as to explain those memories coherently to investigators, thus increasing the accuracy of the fact-finding in the case.

22. Research and training materials developed by experts in trauma-informed investigations recognize, first, that some student victims initiate an investigation for trauma-related reasons, such as protecting themselves from all contact with the named harasser and, second, that poorly-designed investigations can *re*-traumatize victims in a manner that is not only more damaging to the victim's health and well-being than the original traumatic event but also damaging to the accuracy of the investigation itself.

23. One way in which trauma-informed investigations minimize the chances of re-traumatizing victims is by reducing as much as possible the number of times a victim must

recount the violence. For instance, best practices for law enforcement often suggest methods by which police, prosecutors, and others such as Sexual Assault Nurse Examiners (SANEs) can work together to minimize the number of times sexual assault survivors must recount the violence they have experienced. Because victims must re-experience to a significant extent the trauma of the harassment each time they tell someone about the harassment, experts such as Dr. Kim Lonsway and Sergeant (Retired) Joanne Archambault, who between them have about 5 decades of research on and practical experience with sexual assault investigations, advise law enforcement to develop methods for reducing the number of times victims are interviewed or have to recount their victimizations to law enforcement.  Such methods include having police and SANEs conduct preliminary or comprehensive interviews together and not passing a survivor between law enforcement officers for trivial and avoidable reasons like a shift change.[6]

24. Instead of minimizing such recounting, Final Rule live hearings *increase* the retelling— and reliving—victims must endure during the investigation, potentially twice as many times as in civil rights-based investigations.  Moreover, Final Rule live hearings provide fewer privacy protections—and therefore greater risk for re-traumatization—than those provided by courts of law.  Such hearings require complainants to recount their trauma to panels that will almost surely include faculty and/or other campus community members, perhaps even a fellow studencontrary to best practices, the school still puts students on such panels), any one of whom the victim may have to interact with later and repeatedly, especially if the school and/or campus are small.  For example, in a public account of the trauma resulting from such a privacy invasion, one that is consistent with many accounts that I have heard from student sexual harassment victims over my

---

[6] JOANNE ARCHAMBAULT & KIM LONSWAY, END VIOLENCE AGAINST WOMEN INT'L, CLEARANCE METHODS FOR SEXUAL ASSAULT CASES (March 2020), *available at* https://www.evawintl.org/Library/DocumentLibraryHandler.ashx?id=34.

25 years of work in this field, a student described being forced by her school's live hearing process to "sit in a room full of Harvard professors as they look[ed] at a magnified photo of my backside covered in bruises and broken blood vessels."[7]  Whereas standard court rules would guard against such privacy invasions by prohibiting a judge or jury member who lived in a small community with either victim or named harasser from presiding over their trial, the Final Rule not only *allows* such privacy invasions, it actually *requires* them.

25. Moreover, because the Final Rule live hearings require direct cross-examination, they force complainants not only to recount and relive their trauma while being watched by the person(s) they have named as *causing* that trauma but also to submit to hostile questioning by that person's representative.  In the case of the Harvard student mentioned above, like many other student victims with whom I have worked, the Final Rule would require her to answer questions, asked directly by, say, the respondent's fraternity brother or angry parent, with no filter for misleading or prejudicial questions, about the magnified injuries to her private body parts, all in front of an audience of people who could teach a future class of hers or coach the competitive debate team that she intends to join or advise the student newspaper for which she wishes to write.

26. In light of the context already outlined, I am deeply skeptical that any student victim would choose to initiate and/or complete any investigation that is structured as the Final Rule requires.  As a result, most victims will not report the harassment at all, will not name the harassers, or will not seek or cooperate with any investigation, all of which will hinder schools' efforts to prevent sexual harassment, both generally and with regard to specific harassers.

---

[7] The Obama White House, *Vice President Biden Speaks on Preventing Campus Sexual Assault*, YOUTUBE (Apr. 30, 2014), https://www.youtube.com/watch?v=m6-Fz_VO_Ss.

27. Even if a victim does proceed with an investigation and decides to participate in a Final Rule live hearing, because the Final Rule's requirements are so likely to re-traumatize victims, the accuracy of the investigation is likely to be compromised.  Research on the neurobiological effects of sexual trauma shows that trauma causes human brains to release hormones that interfere with the brain's ability to organize memories in the usual, linear, "who, what, where, when and how" manner.[8] When, for all of the reasons I have already articulated, a live hearing causes a traumatic response, the neurobiological effects may interfere with complainants' abilities to give an organized, understandable description of what they experienced, which will interfere with the accuracy of the fact-finding process.

28. Disorganized victim testimony caused by normal human brain reactions to trauma that have been triggered by Final Rule-mandated live hearing procedures such as direct cross-examination could appear to contradict or be inconsistent with the victim's previous statements about the traumatic event.  When fact-finders such as hearing panel members do not know about or consider the neurobiological effects of trauma, such inconsistencies could lead to the mistaken impression that the victim is not credible.  This mistaken impression could then cause a fact-finder to draw incorrect conclusions about the accuracy of a victim's account, believing that the account was fabricated—even though in actuality a traumatic reaction has merely caused a temporary disorganization of the victim's memories that will dissipate once the victim feels safe and is no longer in a traumatized state.

29. Direct cross-examination is a particular challenge that adds significantly to these detrimental effects on fact-finding accuracy.  Based on my research and experience working with

---

[8] Rebecca Campbell, Rachael Goodman-Williams, & McKenzie Javorka, *A Trauma-Informed Approach to Sexual Violence Research Ethics and Open Science*, 34 J. OF INTERPERSONAL VIOLENCE 4765, 4771 (2019) https://journals.sagepub.com/doi/pdf/10.1177/0886260519871530.

sexual harassment victims, including preparing them for, sitting with them during, and debriefing with them after cross-examination-like questioning, I know that direct cross-examination is extremely likely to trigger a traumatic reaction from a victim.  Indeed, even indirect cross-examination, the questioning method overwhelming chosen even by schools that were still doing hearings before the Final Rule, is highly stressful.  Such questioning almost inevitably causes witnesses, especially sexual harassment complainants, to feel attacked and highly *un*safe, precisely the reaction likely to cause trauma-based neurobiological reactions, to interfere with organized memories and testimony, and ultimately to undermine accurate fact-finding.

30. The mistaken disbelief of victim testimony and resulting fact-finding inaccuracy that traumatic reactions triggered by live hearings can cause also feed into stereotypes that sexual harassment victims lie about being harassed.  My and others' research (most notably research by the President of Brooklyn College, Michelle Anderson)[9] has documented how ancient legal rules that treated the allegations of criminal rape victims with special suspicion have been retained in modern culture as gender stereotypes.  That is, although these doctrines have been reformed out of the black letter law, they continue to affect the enforcement of criminal and other laws dealing with sexual harassment and/or violence through stereotypes regarding victims' lack of credibility.  Under these old doctrines, women who reported being raped were viewed as not credible if they were "unchaste," married to their assailant, or could not provide corroborating evidence of being raped. Accordingly, juries were given "cautionary instructions" advising them to regard the truthfulness of these women's testimony with particular skepticism and suspicion.

31. When the neurobiological effects of sexual trauma lead victims to recount their memories of sexual harassment in a disorganized fashion, thus creating the inaccurate impression that

---

[9] Michelle J. Anderson, *Diminishing the Legal Impact of Negative Social Attitudes Toward Acquaintance Rape Victim*s, 13 NEW CRIM. L. REV. 644, 645 (2010).

victims are lying, they can seem to confirm such stereotypes as true rather than based in bias.  By causing and/or exacerbating a traumatic reaction that inaccurately appears to confirm such stereotypes, the Final Rule live hearing requirement perpetuates stereotyping and gender discrimination.

32. Perpetuating such discriminatory and inaccurate stereotypes erects yet another barrier to effective prevention of sexual harassment by tapping into deeply ingrained biases that lead to the misinterpretation and wrongful dismissal of true and accurate sexual harassment reports as false. Enabling such wrongful dismissals allows sexual harassment that is actually occurring to continue unchecked.

### Live Hearings are Ineffective and Damaging to Sexual Harassment Prevention because They are Harder for Schools to Implement Competently and Accurately, Thus Harming Both Complainants and Respondents

33. In addition to the reasons already articulated, the over 225 campus professionals who contributed to the *ABA Recommendations* rejected the investigation models that the Final Rule would mandate because of a host of practical considerations that would make live hearings difficult if not impossible for schools to conduct competently and accurately.  These professionals recognized and my own research and experience confirms that incompetently conducted investigations harm all of the students involved and ultimately lead to incorrect determinations as to whether sexual harassment occurred and who was responsible for it.  In the short-term, such incorrect determinations likely would allow harassment actually occurring to continue unchecked.  In the long-term, incompetent investigations would destroy students' and other campus community members' trust in their school's process and lead them to ignore, bypass, or challenge it via lawsuits that are likely to be very costly—perhaps destructively so— to schools.

34. My research and experience has repeatedly confirmed that conducting sexual harassment investigations competently and accurately requires a lot of training, including in the dynamics and scope of the harassment, in trauma-informed practices, in general investigation techniques, in the school's policies and procedures, and in relevant legal requirements. Under the civil rights-based investigation models, a school can contract with professionals who already have such expertise and/or train a limited number of existing employees to be responsible for multiple investigations (including ones not involving sexual harassment). Such concentrated use of training resources, as well as the repeated use and practice of the necessary investigation skills, will allow even initially inexperienced investigators to develop expertise and improve the quality of their investigations relatively quickly. Moreover, even though hiring professional investigators is a substantial initial investment, schools benefit substantially from that investment.

35. In addition, my research and experiences indicate that the Final Rule live hearing requirement, combined with the structural realities of how schools are organized and operate, will force schools to staff hearing panels in a manner that will likely reduce the competence and accuracy of their determinations. I know of no school—not even the richest private institution— that has or would hire multiple employees to serve exclusively as hearing panel members. Instead, schools assign service on hearing panels to existing employees, the vast majority of whom the school hired to do jobs completely unrelated to sexual harassment (e.g. teach and conduct research in biochemistry or manage the school's course registration process). As with most extra responsibilities assigned to school employees on top of their regular jobs, the school will feel obliged to limit the time the employee must serve in such a capacity. Indeed, most schools assign all extra "service" of this kind on an annual, rotating basis, and would see no reason to treat sexual harassment hearing panels differently. In such a context, Final Rule live

hearings would require schools to train a new group of employees in the long list of topics noted above *every* year.

36. Moreover, because of these employees' almost complete lack of knowledge in the topics listed above, even basic training will require significant resources. Despite this expense, at the end of panel members' rotation, they will be replaced by other untrained faculty and staff, and the school will have to start the training process anew, expending more resources, with new panel members.

37. Under such circumstances, schools will get little to no return on their investment in training. If sexual harassment complaints are rare during employees' short time on a panel, they will not have sufficient opportunity to develop competence in the training topics, nevermind develop expertise. Even if there are multiple harassment complaints in a year, in order to maintain staff morale the school will likely avoid saddling a single employee with multiple sexual harassment hearings. Any school that has conducted such hearings understands that they are at least unusually exhausting for panel members and at worst can subject panel members to secondary trauma, burdens that are likely to be exacerbated for employees who are assumed to have or actually have needed cultural and/or linguistic skills (due, for instance, to their gender, race, national origin, or sexual orientation).

38. Under such circumstances, the risks of panel members committing errors that could cause harm to either or both complainants and respondents increase significantly.  Such errors are not uncommon, as the many lawsuits filed by both student victims and named harassers in recent years demonstrate.  Indeed, based on my review of the descriptions of allegedly mishandled sexual harassment investigations, provided by allies of students disciplined for harassment, in support of the Final Rule, I predict that the Final Rule will lead to more of the type of alleged

mishandling complained of by these allies. I make such a prediction because these accounts do not describe investigations that led to wrongful results because of *structural* unfairness to respondents in the investigation process.  At most, these accounts point to incompetent investigations and errors in applying rules and policies that would be fair if properly applied. For instance, an allegation that a school failed to give notice of an investigation to a named harasser alleges that the school made an error that violated already existing laws such as the Clery Act, not that those laws are structured unfairly.

39. My review of such allegations as well as my research and experience working with hundreds of campus professionals convinces me that forcing highly legalistic changes to established rules and policies, as the Final Rule does, will only create more risk of errors and mishandling by employees who lack even rudimentary legal training and who are already struggling, under much more simple and less legalistic rules, to conduct such investigations competently.  Indeed, instead of providing procedures that can be easily understood and correctly applied by non-lawyers, the Final Rule requires procedures that are more complex, legalistic, and confusing even than many *court* rules. A comment filed by ninety-three law professors, including myself, in response to the proposed rule, raised no fewer than eighty legal ambiguities and questions created by the proposed rule,[10] including parts of the proposed rule that are virtually unchanged in the Final Rule. If even lawyers and those responsible for educating and training future lawyers view the Final Rule's mandated procedures as so excessively confusing, how can those with no legal training be expected to competently comply with them and conduct accurate investigations? In these circumstances, the Final Rule is virtually guaranteed to lead to

---

[10] Comment from 73 Law Professors Regarding Proposed Rule "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" to Office of Civil Rights, Dep't of Educ., (Feb. 19, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11900 (updated with additional signatures for a total of 94 law faculty at https://www.regulations.gov/document?D=ED-2018-OCR-0064-17567).

more errors and mishandling of the kind that respondents and their allies allege is already

occurring.

40. The highly legalistic nature of the Final Rule live hearing requirement will also likely

harm complainants and respondents in sexual harassment investigations who do not have the

resources to hire lawyers to advise them and help them navigate the process.  Students without

the resources to hire lawyers to advise them can be both complainants and respondents, so this

inequality can exist not only between complainants and respondents in a particular case but also

between respondents and between complainants over a range of cases. I know from my service

on the 2014 Clery Act Negotiated Rulemaking Committee that many schools adopted rules

restricting advisers who accompany students through disciplinary processes from talking in

hearings and meetings in order to minimize such inequalities between students.  Final Rule live

hearings would strip away such equalizing policies and instead exacerbate income disparities and

inequalities between students, leaving students who cannot afford an attorney to navigate a

legalistic process without the knowledge or training required. Furthermore, recall that the hearing

panel in the Final Rule Live Hearing investigation model plays a passive role with regard to fact-

finding: panel members simply consider evidence presented to them by the parties; they do not

do their own investigation like fact-finders do in the civil rights-based models.  With so much

riding on their ability to present evidence that proves their account of the facts, complainants and

respondents who cannot afford attorneys will almost certainly have their ability to effectively

argue their case compromised.

41. Resource disparities between *schools* will also be exacerbated by the Final Rule live

hearing requirement. Schools will rightly see a need to hire lawyers to run their hearings so that

their employees are not placed in the difficult position of acting as judges without legal training

and managing attorneys who have more legal or judicial training, experience, or skills than they do. However, many schools, including many minority-serving and commuter/community colleges, cannot afford in-house lawyers. The Final Rule puts such schools in a difficult if not impossible position.  In contrast, the civil rights-based investigation models are more likely to protect all students and be manageable for all schools, regardless of income level, because these models can be—and, in many workplaces, they *are*—competently navigated by non-lawyers.

42. Every additional expense, inefficiency, and practical difficulty a school faces in investigating sexual harassment complaints reduces the likelihood that it will conduct the investigation competently and come to an accurate determination as to whether harassment occurred and who was responsible for it.  For the reasons already explained, incompetent investigations and inaccurate determinations of responsibility reduce schools' abilities to prevent sexual harassment.  Because Final Rule live hearings pile many expenses, inefficiencies, and practical difficulties on top of the already difficult challenges schools face in investigating sexual harassment complaints, they counteract Title IX's goal of preventing sexual harassment.

### Conclusion

43.  In sum, my research and over 25 years of experience working to prevent sexual harassment in education confirms that the live hearings required by the Final Rule will make schools less able to prevent sexual harassment, thus leading them to perpetuate gender discrimination in education in violation of Title IX.  The *ABA Recommendations* and the hundreds of campus professionals and sexual harassment prevention experts were right to reject the Final Rule live hearings in favor of the Civil Rights Investigative Model and the Civil Rights Hybrid.  I submit this declaration in support of the litigation challenging the Final Rule because,

in my expert opinion, the Final Rule will lead to more sexual harassment and therefore more gender discrimination in our nation's schools, a result exactly contrary to the purpose of Title IX.

44. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 23, 2020

_____
Nancy Chi Cantalupo

# Nancy Chi Cantalupo 甘念齊

nancy.chi.cantalupo@gmail.com ♦ (703) 244-0390
scholarship available at: http://ssrn.com/author=884485; http://bit.ly/dashboard-cantalupo

**Associate Professor of Law** 2018-present
**Assistant Professor of Law** 2015-2018
*Barry University Dwayne O. Andreas School of Law;* Orlando, FL
- Courses: Criminal Law, Criminal Procedure, Property I & II, International Law, Sexual Violence & the Law, and the Title IX Practicum.
- Chair of Mission-Effectiveness Committee, charged with diversity and cultural competency projects (2016-2019); and the Academic Programs Committee, charged with curriculum (2019-2020).
- Received faculty vote for promotion to Associate Professor, an interim step to tenure, in January 2018.

**Adjunct Professor of Law** Summer 2019
*Seattle University School of Law;* Seattle, WA
- Course: Administrative Law Practicum: Title IX Rulemaking

## EDUCATION

Georgetown University Law Center; Washington, DC 2003
Juris Doctor, *cum laude*
- International Women's Human Rights Clinic (human rights report on domestic violence in Ghana published 2006)

Temple University Beasley School of Law; Philadelphia, PA 2013
Master of Laws

Georgetown University; Washington, DC 1995
Bachelor of Science in Foreign Service, *magna cum laude*
- Recipient, Jesse A. Mann Medal for Excellence in the Humanities in International Affairs
- Beijing University (semester study abroad)

## TEACHING & RESEARCH INTERESTS

| | | |
|---|---|---|
| Criminal Law & Procedure | Administrative Law | Title IX Practicum |
| Property | Legislation | Sexual Violence & the Law |
| Torts | Civil Rights Law | International & Human Rights Law |

## PUBLICATIONS

**ARTICLES, ESSAYS & BOOK CHAPTERS**
*The Title IX Movement Against Campus Sexual Violence: How a Civil Rights Law Inspired a Feminist Movement & Vice Versa*, invited book chapter for Deborah L. Brake, Martha Chamallas, & Verna L. Williams, OXFORD HANDBOOK ON FEMINIST LEGAL THEORY (forthcoming 2020).

*Title IX Symposium Keynote Speech: Title IX & the Civil Rights Approach to Sexual Harassment in Education*, __ ROGER WILLIAMS UNIVERSITY LAW REVIEW __ (forthcoming 2020).

*Dog Whistles & Beachheads: The Trump Administration, Sexual Violence & Student Discipline,* 54 WAKE FOREST LAW REV. 303 (2019).

*And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARV. J.L. & GENDER 1 (2019).

*Systematic Prevention of a Serial Problem: Sexual Harassment and Bridging Core Concepts of Bakke in the #MeToo Era,* DAVIS LAW REVIEW (2019) (with William Kidder).

*Widely Welcomed and Supported by the Public: A Report on the Title IX-Related Comments in the U.S. Department of Education's Executive Order 13777 Comment Call*, CALIFORNIA LAW REVIEW ONLINE (2019) (with Tiffany Buffkin, Mariko Cool, & Amanda Orlando).

*Civil Rights Investigations & Comprehensive Prevention of Sexual Misconduct*, in CLAIRE RENZETTI & DIANE R. FOLLINGSTAD, ADJUDICATING CAMPUS SEXUAL MISCONDUCT:  CONTROVERSIES AND CHALLENGES (2019).

*A Systematic Look at a Serial Problem: Sexual Harassment of Students by University Faculty,* 2018 UTAH L. REV. 671 (2018) (with William Kidder).

*Mapping the Title IX Iceberg: Sexual Harassment of (Mostly) Graduate and Professional School Students by College Faculty, 66* J. LEGAL. EDUC. 850 (2017) (with William Kidder).

*For the Title IX Civil Rights Movement: Congratulations & Cautions*, 125 YALE L.J. F. 281 (2016), *reprinted at* WOMEN AND THE LAW 551 (Tracey A. Thomas ed., 2016) & WOMEN AND THE LAW (Tracey A. Thomas ed., 2017).

*Address: The Civil Rights Approach to Campus Sexual Violence*, 28 REGENT U. L. REV. 185 (2016).

*Title IX's Civil Rights Approach & The Criminal Justice System: Enabling Separate but Coordinated Parallel Proceedings*, *in* THE CRISIS OF CAMPUS SEXUAL VIOLENCE: CRITICAL PERSPECTIVES ON PREVENTION AND RESPONSE (Sara Carrigan Wooten & Roland W. Mitchell, eds. 2015).

*Masculinity & Title IX: Bullying & Sexual Harassment of Boys in the American Liberal State*, 73 MD. L. REV. 887 (2014).  Presented at the AALS Annual Meeting, January 2012.

*Institution-Specific Victimization Surveys: Addressing Legal & Practical Disincentives to Gender-Based Violence Reporting on College Campuses*, 15 TRAUMA, VIOLENCE & ABUSE 227 (2014).

Lenahan (Gonzales) v. USA & *Collective Entity Responsibility for Gender-Based Violence*, 21 AM. U.J. GENDER SOC. POL'Y & L. 231 (2013).  Presented at "Domesticating *Lenahan*" Symposium, April 2012.

*"Decriminalizing" Institutional Responses to Peer Sexual Violence, in* CAMPUS CRIME: LEGAL, SOCIAL, AND POLICY PERSPECTIVES (John J. Sloan, III & Bonnie Fisher eds., 3d ed. 2013).

*Comparing Single-Sex & Reformed Co-Education: A Constitutional Analysis*, 49 SAN DIEGO L. REV. 725 (2012).

*"Decriminalizing" Campus Institutional Responses to Peer Sexual Violence*, 38 J.C. & U.L. 483 (2012). Invited contribution to peer-reviewed journal.

*Burying Our Heads in the Sand: Lack of Knowledge, Knowledge Avoidance, and the Persistent Problem of Campus Peer Sexual Violence*, 43 LOY. U. CHI. L.J. 205 (2011), *reprinted at* WOMEN AND THE LAW 551 (Tracey A. Thomas ed., 2012).

*Using Law and Education to Make Human Rights Real in Women's Real Lives*, *in* CONFRONTING GLOBAL GENDER JUSTICE:  WOMEN'S LIVES, HUMAN RIGHTS (Debra Bergoffen, Paula Ruth Gilbert, Tamara Harvey, & Connie L. McNeely eds., 2011).

*How Should Colleges and Universities Respond to Peer Sexual Violence on Campus?: What the Current Legal Environment Tells Us,* 3 NASPA JOURNAL ABOUT WOMEN IN HIGHER EDUCATION 1 (2010).

*Campus Violence: Understanding the Extraordinary through the Ordinary,* 35 J.C. & U.L. 613 (2009). Selected from a Call for Papers for peer-reviewed journal.

*Domestic Violence in Ghana: The Open Secret*, 7 GEO. J. GENDER & L. 531 (2006) (with Lisa Vollendorf Martin, Kay Pak and Sue Shin).

## OP-EDS (INVITED) & BLOGS (INVITED & ACCEPTED)

*Reclaiming Notice & Comment*, LAW & POLITICAL ECONOMY BLOG (August 2, 2019) (with Matthew Cortland & Karen Tani, Berkeley Law), https://lpeblog.org/2019/08/02/reclaiming-notice-and-comment-part-ii/.

*Don't Backslide on Title IX* (part of a collection on *"The One Best Idea for Ending Sexual Harassment"*) WASHINGTON POST (December 8, 2017), https://www.washingtonpost.com/blogs/post-partisan/wp/2017/12/08/the-one-best-idea-for-ending-sexual-harassment/?utm_term=.0d4b9c22d9d2#idea12.

*'Preponderance of the Evidence' is the Correct Standard for College Sexual Violence Cases,* NEW YORK TIMES (Jan. 4, 2017), http://www.nytimes.com/roomfordebate/2017/01/04/is-a-higher-standard-needed-for-campus-sexual-assault-cases.

*Combatting "Deeply Intertwined" Discriminatory Harassment in Our Schools Post-2016 Election*, RACE & LAW PROF BLOG (Nov. 2016), http://lawprofessors.typepad.com/racelawprof/2016/12/combatting-deeply-intertwined-discriminatory-harassment-in-our-schools-post-2016-elections-professor.html.

*Accurate Reporting Without Shame,* NEW YORK TIMES ROOM FOR DEBATE (Aug. 12, 2014), http://www.nytimes.com/roomfordebate/2014/08/12/doing-enough-to-prevent-rape-on-campus/accurate-reporting-of-sexual-assault-on-campus-without-shame.

*At Issue: Should colleges hand off all sexual assault cases to the police?,* CQ RESEARCHER (Oct. 31, 2014), http://photo.pds.org:5012/cqresearcher/document.php?id=cqresrre2014103106.

*Violating Student Victims' Rights is Expensive*, TIME (May 15, 2014), http://time.com/99697/campus-sexual-assault-nancy-chi-cantalupo/.

*Rape victims need Title IX: Opposing view*, USA TODAY (May 7, 2014), http://www.usatoday.com/story/opinion/2014/05/06/sexual-assault-colleges-universities-title-ix-editorials-debates/8786319/.

## SCHOLARLY WORKS-IN-PROGRESS

"1/100ᵗʰ of a Person?: Title IX, Notice & Comment Rulemaking & Democracy"
"Property & Bodies: A Civil Rights View of the Cathedral"
"Multiracial Women, Sexual Harassment & Gender-Based Violence"
"Σexual Assault Expected: Developing Theories of 'Collective Entity Responsibility' in Tort"

# OTHER TEACHING EXPERIENCE

**Researcher; Adjunct Professor of Law**
***Georgetown University Law Center****; Washington, DC*                                      2014-2015; 2009-2012,
***Georgetown University Women's & Gender Studies Program****; Washington, DC*                      2007, 2005
*Courses*: Property (co-taught w/ David Super); Rule of Law & Civil Society in China Practicum (supervised human rights fact-finding trips to Beijing, China to investigate gender-based violence and elder care in China); Gender & Global Laws

**Abraham L. Freedman Fellow**
***Temple University Beasley School of Law****; Philadelphia, PA*                                      2011-2013
*Courses*: Legislation & Regulation; Legal Research &Writing; *Collaboratively-taught courses*: Torts; Criminal Procedure II

**Adjunct Professor**                                                                              2010, 2007-2008
***George Washington University Law School;*** Washington, DC
*Courses:* International Human Rights of Women

## SELECTED PRESENTATIONS

*Current and Future Academic Years:*
Invited Plenary Speaker; American Sociological Association Annual Conference; San Francisco (August 2020).

Invited Presenter; The Ohio State University Presidential Task Force on Sexual Abuse; Columbus (April 2020).

Presenter, selected from a Call for Papers for Rutgers University's "Feeling Democracy: A Conference on Politics and Emotions"; New Brunswick (April 2020).

Invited Panelist, "Recent Developments: How Easily Can Agencies Change Regulatory Policy in Immigration & Civil Rights?," *Hot Topic Program*, Association of American Law Schools Annual Conference (January 2020).

Panelist, "Teaching in a #MeToo World" Panel selected proposal, Association of American Law Schools Annual Conference (January 2020).

Invited Panelist; National Academies of Science, Engineering and Medicine; Meeting to Prevent Sexual Harassment in Higher Education; Seattle (November 2019).

Invited Panelist; National Women's Law Center; Intertwining Identities & Workplace Harassment Working Group meeting; Washington, DC (November 2019).

Invited Keynote Speaker; *Roger Williams University Law Review* Symposium; Bristol, RI (November 2019).

Presenter; "Disrupting Hierarchies in Legal Education: Commemorating the Impact of the Freedman Fellow Program"; *Temple Law Review* Symposium (October 2019).

Organizing Committee Member & Presenter; LatCrit/SALT Faculty Development Workshop; Introducing Critical Theory & Social Justice in the Classroom; Georgia State Law, Atlanta (October 2019).

*Past Academic Years:*
Invited Panelist, "What Does Progress Look Like?" Concluding Plenary; Invitation-Only Faculty Sexual Harassment Conference, University of Wisconsin-Madison (July 2019).

Invited Debater, "Education Policy Debate: The Right Direction on Title IX Sexual Harassment Regulations?"; American Enterprise Institute; Washington, DC (June 2019), video at https://www.aei.org/events/education-policy-debate-the-right-direction-on-title-ix-sexual-harassment-regulations/.

Invited Participant, Invitation-Only Critical-Interdisciplinary Sexual Violence Research Summit; Park City, UT (June 2019).

Invited Panelist, "The Effectiveness of Law" Panel, *Women's Rights Law Reporter* Symposium on Ending Campus Sexual Assault, Rutgers Law School-Newark (April 2019).

Panel Organizer & Presenter, "Democracy & Activism through Scholarship, Teaching & Service," National People of Color Conference (March 2019).

Presenter, "Property & Bodies: A Civil Rights View of the Cathedral," *Property Law: Works-in-Progress* selected paper, Association of American Law Schools Annual Conference (January 2019).

Invited Panelist, "Sexual Harassment & Violence Narratives: #MeToo, the Kavanaugh Allegations & Title IX Guidance," *Hot Topic Program*, Association of American Law Schools Annual Conference (January 2019).

Invited Presenter, "Increasing Gender Diversity in the Biosciences" Invitation-Only Meeting at The Banbury Center of Cold Springs Harbor Laboratory (December 2018).

Invited Roundtable Participant, *Taking Back the Campus: Imagining an End to Gender-Based Violence in Higher Education and Beyond*, National Women's Studies Association Conference (November 2018).

Invited Co-Panelist, *U.C. Davis Law Review* Symposium: Bakke at 40: Diversity, Difference & Doctrine (October 2018).

Invited Presenter, Social Justice Mondays Series, Seattle University School of Law (October 2018).

Panel Organizer & Moderator, "Intersectional Perspectives on Sexual Harassment," Western Law Professors of Color/Conference of Asian Pacific American Law Faculty Joint Conference (October 2018).

Panel Organizer & Presenter, "Activism," Western Law Professors of Color/Conference of Asian Pacific American Law Faculty Joint Conference (October 2018).

Invited *Constitution Day* Speaker, University of South Dakota School of Law (September 2018).

Invited Lecture, "#MeToo & the Civil Rights Approach to Gender-Based Violence," (University of Maryland Department of Women's Studies; April 2018).

Invited Panelist, Hot Topic Program: "Rethinking the Campus Response to Sexual Violence: Betsy DeVos, Title IX, and the Continuing Search for Access to Justice," Association of American Law Schools Annual Conference (San Diego; January 2018).

Presenter, Legal Scholarship Workshop (University of Chicago Law; December 2017).

Presenter, Faculty Scholarship Workshop (John Marshall Law School; December 2017).

Invited Panelist, Symposium on "Gender Equality: Progress & Possibilities" (*Toledo Law Review*; October 2017).

Invited Panelist, "Campus Sexual Assaults & Title IX: A Navigation Guide" (National Asian Pacific American Bar Association Annual Convention; November 2017).

Invited Panelist, Teach-In: Sexual Assault on College Campuses (American Studies Association Annual Conference; November 2017).

Invited Presenter, "Campus Responses to Sexual Misconduct: Pausing to Consider the Implications" Conference, University of Kentucky Center on Research on Violence Against Women (September 2017).

Presenter, "'Singing a New America': What Pauli Murray Teaches Us about Justice and Equality" selected paper (Howard Law; September 2017), https://www.youtube.com/watch?v=P0CFI75lXjg.

Invited Panelist, ABA CLE Showcase Program: "Issues of Sexual Violence on College Campuses and Beyond: Balancing Privacy, Constitutional and Civil Rights," American Bar Association Annual Meeting (Aug. 12, 2017), C-SPAN broadcast at https://www.c-span.org/video/?431967-2/sexual-assault-campus.

"Faculty Sexual Harassment of Students: Intersectional Perspectives," Conference of Asian Pacific American Law Faculty & Northeastern People of Color (Combined) Conference selected paper (Brooklyn Law, June 2017).

Invited Panelist, To POE or Not to POE: A Debate between Nancy Chi Cantalupo, Katharine Baker, Daniel Hemel & Richard Epstein (University of Chicago Law; April 2017).

"Σexual Assault Expected: Developing Theories of 'Collective Entity Responsibility' in Tort," Workshop on Sex, Violence & Vulnerability selected paper (Emory Law; November 2016).

Invited Panelist, Journal of Legal Education Symposium on Campus Sexual Assault & Academic Freedom (Georgetown Law; October 2016).

Invited Panelist, Symposium on "Creating Compliance: Institutional Concerns for a Maturing Industry" (*Toledo Law Review*; October 2016).

Invited Panelist, "Symposium on Sports, Violence and Equality: Current Issues in Title IX Compliance" (Villanova Law; January 2016)

Invited Panelist, Campus Sexual Assault: A Civil Rights Perspective (January 2016; ABA Teleconference).

Invited Panelist, U.S. Congressional Briefing on "Campus Sexual Assault & the Problems with Mandatory Police Reporting," sponsored by the National Women's Law Center and Know Your IX (December 2015).

Panelist, American Society of Criminology Annual Conference (Washington, DC; November 2015).

Guest-lecture, Professor Gabriel Chin's U.C. Davis School of Law course (via Skype, October 2015).
Invited Panelist, 2015 *Regent University Law Review* Symposium (Virginia Beach, VA; October 2015).

Invited Speaker, American Constitution Society Faculty Forum (Orlando, FL; October 2015).

Invited Commentator, *Yale Law Journal*'s Conversation on Title IX (New Haven, CT; September 2015).

Guest-lecture, Professor Michele Dauber's Stanford University course (Washington, DC; September 2015)

"Proceduralism & Inequality: The Case of Campus Sexual Violence," Law & Society Association Annual Conference Feminist Legal Theory Collaborative Research Network selected paper (Seattle, WA; May 2015).

Invited Speaker, Panel on "Strengthening Title IX: Campus Safety, Accountability, and Transparency," University of Chicago Institute of Politics (Chicago, IL; March 2015).

"Proceduralism & Inequality: the Case of Campus Sexual Violence," Committee of Asian Pacific American Law Faculty (CAPALF) Annual Conference Works-in-Progress Presentation (Boston, MA; March 2015).

Keynote Lecture, Symposium on Campus Sexual Assault & Title IX, University of Baltimore School of Law (Baltimore, MD; February 2015).

"Proceduralism & Inequality: the Case of Campus Sexual Violence," Mid-Atlantic People of Color Legal Scholarship Conference Works-in-Progress Presentation (Morgantown, WV; January 2015).

Invited Speaker, Conference on Student Life, Relationships & the Law: Confronting Domestic Violence in Higher Education, Pepperdine University School of Law (Los Angeles, CA; October 2014).

Keynote Address, NASPA Student Affairs Law & Policy Conference (Denver, CO; October 2014).

Invited Speaker, Law School Lecture Series, University of Oregon School of Law (Eugene, OR; June 2014).

Invited Speaker, Symposium in Celebration of the 20th Anniversary of the Violence Against Women Act, Duquesne University School of Law (Pittsburgh, PA; March 2014).

"Masculinity & Title IX: Bullying and Sexual Harassment of Boys in the American Liberal State," Lavender Law Conference Junior Scholars Forum (San Francisco, CA; August 2013).

"Masculinity & Title IX: Bullying and Sexual Harassment of Boys in the American Liberal State," Georgetown Law Summer Workshop (Washington, DC; June 2013).

*Cantalupo CV*

Keynote Lecture, National Scientific Meeting on Improving the Safety of Women on College Campuses: State of the Scientific Literature on the Problem and the Response, Center for Research on Violence Against Women, University of Kentucky (Lexington, KY; June 2013).

"Commentary on Bullying in Higher Education," Bullying: Redefining Boundaries, Responsibility, and Harm Symposium, Temple University Beasley School of Law (Philadelphia, PA; February 2013).

"Masculinity & Title IX: Addressing the Real Sex Discrimination Confronting Boys in School," Mid-Atlantic People of Color Legal Scholarship Conference Works-in-Progress Presentation (Philadelphia, PA; January 2013).

"*Lenahan (Gonzales) v. USA* & Collective Entity Responsibility for Gender-Based Violence," American University *Journal of Gender, Social Policy & the Law* 20th Anniversary Symposium: *Lenahan (Gonzales) v. USA: Domesticating International Law* (Washington, DC; April 2012).

"Masculinity and Title IX," The Association of American Law Schools, Section on Education Law, Title IX and Bullying/Harassment in Schools Panel (Washington, DC; January 2012).

"'Ordinary' and 'Extraordinary' Violence, Hate Crimes and Hate Crime Prevention," Department of Justice Community Relations Service Training (Washington, DC, February 2010).

"Campus Violence: Understanding the Extraordinary through the Ordinary," The Association of American Law Schools, Section on Education Law, Panel on Campus Violence: Prevention, Response and Liability (San Diego, CA; January 2009).

"The Opportunities and Limits of the Law to En*Gender* Liberation," Center for Gender and Law Studies of the China Academy of Social Sciences (Beijing, China; November 2007).

## <u>SELECTED MEDIA APPEARANCES</u>

Colleen Flaherty, *The Case for Disciplining Faculty Harassers*, INSIDE HIGHER EDUCATION (March 12, 2019), https://www.insidehighered.com/news/2019/03/12/new-paper-says-slapping-faculty-harassers-wrists-compromises-comprehensive.

Madison Pauly, *There's a Quiet #MeToo Movement Unfolding in the Government's Comments Section*, MOTHER JONES (January 15, 2019), https://www.motherjones.com/politics/2019/01/betsy-devos-title-ix-sexual-assault-harassment-metoo/ (linking to forthcoming *California Law Review Online* study).

Irene Hsu & Rachel Stone, *"A Professor is Kind of Like a Priest,"* NEW REPUBLIC (Nov. 30, 2017), https://newrepublic.com/article/146049/a-professor-kind-like-priest (linking to *Utah Law Review* study).

Katherine Mangan, *Here's What Sexual Harassment Looks Like in Higher Education*, CHRONICLE OF HIGHER EDUCATION (Nov. 16, 2017), https://www.chronicle.com/article/Here-s-What-Sexual/241807?cid=at&elq=0c04f281cef34aca93b442e65b526af4&elqCampaignId=7247&elqTrackId=8a6f7ceffedb4f6c889d4837d3925fbf&elqaid=16768&elqat=1&utm_medium=en&utm_source=at.

Colleen Flaherty, *Worse Than It Seems*, INSIDE HIGHER EDUCATION (July 18, 2017), https://www.insidehighered.com/news/2017/07/18/study-finds-large-share-cases-involving-faculty-harassment-graduate-students-are (discussing forthcoming *Utah Law Review* study).

Sophia Tulp, *Civil rights office to visit Cornell, which now has the highest number of active Title IX investigations*, USA TODAY (Feb. 21, 2017), http://college.usatoday.com/2017/02/21/civil-rights-office-to-visit-cornell-which-now-has-the-highest-number-of-active-title-ix-investigations/.

Tyler Kingkade, *Law Professors Defend Use of Preponderance Standard in Campus Rape Cases*, HUFFINGTON POST (August 7, 2016), http://www.huffingtonpost.com/entry/preponderance-of-evidence-college-sexual-assault_us_57a4a6a4e4b056bad215390a.

Dateline-NBC: *Crisis on Campus* (June 21, 2015).

Max Ehrenfreund**,** *Virginia wants to force universities to report every rape to the police. That won't address U-Va.'s real problem,* WASHINGTON POST (Dec. 3, 2014), http://www.washingtonpost.com/blogs/wonkblog/wp/2014/12/03/virginia-wants-to-force-universities-to-report-every-rape-to-the-police-that-wont-address-uvas-real-problem/.

Catherine Rampell, *Stop the Campus Rape Numbers Game*, WASHINGTON POST (Aug. 4, 2014), http://www.washingtonpost.com/opinions/catherine-rampell-stop-the-campus-rape-numbers-game/2014/08/04/da82dcfc-1c0d-11e4-ae54-0cfe1f974f8a_story.html.

Anna Bahr, *Campus Sexual Assault Bill Relies on Public Shaming of Colleges*, NEW YORK TIMES (Aug. 1, 2014), http://www.nytimes.com/2014/08/02/upshot/campus-sexual-assault-bill-relies-on-public-shaming.html?_r=0.

Monica Vendituoli, *Is Reporting Campus Sex Assaults to the Police Discouraged? a Senator Asks*, CHRONICLE OF HIGHER EDUCATION (June 24, 2014), http://chronicle.com/article/Is-Reporting-Campus-Sex/147327/?cid=at&utm_source=at&utm_medium=en.

Taylor Harvey, *To Curb Sexual Assault on Campuses, Surveys Become a Priority*, CHRONICLE OF HIGHER EDUCATION (May 12, 2014), http://chronicle.com/article/To-Curb-Sexual-Assault-on/146475/.

Richard Pérez-Peña and Kate Taylor, *Fight Against Sex Assaults Holds Colleges to Account*, NEW YORK TIMES (May 3, 2014), http://www.nytimes.com/2014/05/04/us/fight-against-sex-crimes-holds-colleges-to-account.html?_r=0.

John Lauerman, *White House Report Calls for Campus Violence Surveys*, BLOOMBERG NEWS (Apr. 29, 2014), http://www.businessweek.com/news/2014-04-28/white-house-report-calls-for-campus-violence-surveys-by-2016.

Tyler Kingkade, *Proposal To Require Campus Climate Surveys On Sexual Assault Faces Quick Opposition,* HUFFINGTON POST (Apr. 29, 2014), http://www.huffingtonpost.com/2014/04/29/campus-climate-surveys-sexual-assault_n_5235457.html.

John Lauerman, *Campus Sexual Assault Hearings Planned by Senator McCaskill,* BLOOMBERG NEWS (Apr. 22, 2014), http://www.bloomberg.com/news/2014-04-22/campus-sexual-assault-hearings-planned-by-senator-mccaskill.html.

Jacob deNobel, *Bill Aims to Increase Reports of Campus Sexual Violence*, COMMUNITY TIMES (Feb. 5, 2014), http://www.carrollcountytimes.com/community_times/news/bill-aims-to-increase-reports-of-campus-sexual-violence/article_834ad2c6-9ca8-597c-9563-10f6ef1a6afc.html.

Tyler Kingkade, *College Sexual Assaults Often Go Unreported, This Idea Could Change That*, HUFFINGTON POST (Sept. 23, 2013), http://www.huffingtonpost.com/2013/09/23/campus-sexual-assault-surveys_n_3968725.html.

Caitlin Peterkin, *Colleges Need to Support Male Victims of Sexual Violence, Speaker Says*, CHRONICLE OF HIGHER EDUCATION (Oct. 7, 2012), http://chronicle.com/article/Colleges-Need-%20Penn%20State%20scandal,%20too.)%20to-Support-Male/134906/.

Victim Rights Law, *#clery25, Nancy Chi Cantalupo's "Burying our heads in the sand" presentation is phenomenal! Thank you for your work Nancy! Read her articles!*, TWITTER (Oct. 5, 2012), https://twitter.com/VictimRightsLaw/status/254239786854916096.

Donna Bickford, Brenda Bethman, Michelle Issadore & Michelle Kroner, *Open Letter to Anonymous*, INSIDE HIGHER ED (Nov. 8, 2011), http://www.insidehighered.com/views/2011/11/08/essay-defending-ocr-letter-colleges-and-sexual-assault.

Peter Katel, *Crime on Campus: Are Colleges Doing Enough to Keep Campuses Safe?*, CQ Researcher (Feb. 4, 2011), http://photo.pds.org:5012/cqresearcher/getpdf.php?file=cqr20110204C.pdf.

## SELECTED BRIEFS, LEGISLATIVE TESTIMONY, AND POLICY DOCUMENTS

Brief for 19 Law Professors as *Amicus Curiae*, *Doe v. University of the Sciences*, before the U.S. Court of Appeals for the Third Circuit (filed December 13, 2019).

*Recommendations for Practice: Improving Campus Student Conduct Processes for Domestic, Dating, Sexual & Stalking Violence*, American Bar Association Commission on Domestic & Sexual Violence (2019).

Written Comments Filed, Notice of Proposed Rulemaking on Department of Education Proposed Rule: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (January – February 2019).

Expert Sworn Statement (with Johanna Bond and Lisa Martin) for Ghanaian political asylum applicant fleeing domestic violence (based on co-authored report, published at *Domestic Violence in Ghana: The Open Secret*, 7 GEO. J. GENDER & L. 531 (2006)) (2017).

*White Paper on Title IX & the Preponderance of the Evidence* (co-authored with Katharine K. Baker and Deborah L. Brake and signed by 115 law professors from law schools across the country), http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-1.pdf (August 2016).

Memorandum regarding the legality under the Family Educational Rights and Privacy Act (FERPA) of Project Callisto (with Ian Ayres, Yale Law) (October 2015).

Oral Testimony before Virginia House of Delegates Courts & Education Committees (February 2015).

Open Letter to 50 State Legislatures, on behalf of 19 higher education associations and victim advocacy organizations, https://www.naspa.org/images/uploads/main/Joint_omnibus_bill_statement_letterhead.pdf (February 2015).

Brief for NASPA and the Victim Rights Law Center as *Amicus Curiae*, *Palo v. Iowa Board of Regents*, before the Iowa Supreme Court (filed December 30, 2014).

Written & Oral Testimony on Senate roundtable convened by Senator Claire McCaskill regarding "Campus Sexual Assault: The Administrative Process and the Criminal Justice System" (June 2014), broadcast at http://www.c-span.org/video/?320111-1/sexual-assault-college-campuses.

Consultation (by invitation) & Written Comments Filed, White House Task Force to Protect Students from Sexual Assault (January 2014 – 2016).

Oral & Written Regulatory Negotiation as Primary Negotiator for Advocacy Organizations on Negotiated Rulemaking Committee convened by the Department of Education to draft new regulations under the Clery Act, amended by the 2013 Violence Against Women Act (January – April 2014).

Oral Testimony before Maryland House of Delegates Ways & Means Committee (January 2014).

## OTHER EXPERIENCE

**Expert Consultant & Witness**                                                                                   2014-present

**Associate Vice President of Equity, Inclusion & Violence Prevention**                     2014-2015
*NASPA-Student Affairs Administrators in Higher Education;* Washington, DC

**Research Fellow**                                                                                                        2013-2014
*Victim Rights Law Center;* Boston, MA & Washington, DC

**Assistant Dean for Clinical Programs**                                                                        2005-2011
*Georgetown University Law Center;* Washington, DC

**Associate Director, International Legal Studies Program**                                            2005
*American University's Washington College of Law;* Washington, DC

**Attorney**                                                                                                               2003-2005;
*Drinker Biddle & Reath, L.L.P.;* Washington, DC                                            Summer 2002

**Director**                                                                                                             1995 - 2003
*Georgetown University Women's Center;* Washington, DC

## SELECTED *PRO BONO* ACTIVITIES

**Board Member**, Conference of Asian Pacific American Law Faculty                       2017-present

**Planning Committee Member**, Faculty Development Workshop; LatCrit 2019        2019-present

**Co-Chair**, Advocacy Subcommittee, Feminist Legal Theory Collaborative Research Network     2019-present
Action Committee, Law & Society Association

**Invited Guest**, American Law Institute                                                                   2015-present

**Board Chair**, DC Law Students in Court (tenant's rights consortium legal clinic)        2007-2010

**Board Adviser**, Asian/Pacific Islander Domestic Violence Resource Project              2009-2010
**Board Member**, Asian/Pacific Islander Domestic Violence Resource Project              2007-2009

**Pro Bono Attorney**, Election Protection                                                        2004, 2006 & 2008

## SKILLS

Conversant in Mandarin Chinese.