# EXHIBIT 1

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

VICTIM RIGHTS LAW CENTER, *et al.*,

        *Plaintiffs*,

v.

ELISABETH DEVOS, *et al.*,

        *Defendants*.

</td><td>

Civil Action No. 1:20-cv-11104

Hon. William G. Young
U.S. District Judge

</td></tr>
</table>

## [PROPOSED] CORRECTED BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION OR SECTION 705 STAY

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

STATEMENT OF *AMICI CURIAE* ........................................................................... 1

I.     INTRODUCTION ................................................................................................ 3

II.    STATUTORY BACKGROUND ........................................................................ 5

III.   ARGUMENT....................................................................................................... 9

      A.     The Final Rule Contravenes the Text and Purpose of Title IX............................ 10

            1.     The Final Rule's Exclusion of Off-Campus and Online Sexual Harassment and Sexual Violence Inappropriately Narrows Schools' Obligations................................................................. 11

            2.     The Final Rule's Deliberate Indifference Standard for Enforcement Conflicts with Title IX and Is Out of Step with Related Civil Rights Laws. ....................................................... 12

            3.     The Final Rule's Anti-Victim Procedural Rules Also Conflict with Title IX.............................................................................. 14

            4.     The Final Rule's Preemption of Victim-Protective State Laws Is Inconsistent with Congressional Intent and Violates the APA's Procedural Requirements. ........................................ 15

      B.     The Final Rule Is Arbitrary and Capricious Because It Fails to Consider Important Aspects of the Problem and Relies on an Explanation That Runs Counter to the Evidence Before the Department. ................................................. 17

      C.     The Supreme Court's Decisions in *Gebser* and *Davis* Do Not Justify the Final Rule's Departure from Title IX's Victim-Focused Approach. .................... 21

      D.     Granting Plaintiffs' Motion Is in the Public Interest. ........................................... 23

IV.   CONCLUSION.................................................................................................. 24

APPENDIX A .......................................................................................................A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Fisheries of Me., Inc. v. Daley*,
  127 F.3d 104 (1st Cir. 1997) ................................................................................10

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................................................16

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ............................................................................................10

*Bryant v. Indep. Sch. Dist. No. I-38*,
  334 F.3d 928 (10th Cir. 2003) ...............................................................................6

*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998) ............................................................................................13

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979) ...............................................................................6, 7, 13, 14

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004) ..................................................................................9

*Cont'l Air Lines, Inc. v. Dep't of Transp.*,
  843 F.2d 1444 (D.C. Cir. 1988) ...........................................................................10

*Craker v. Drug Enf't Admin.*,
  714 F.3d 17 (1st Cir. 2013) ............................................................................10, 16

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ........................................................................................21, 22

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ............................................................................................16

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) ........................................................................................21, 22

*Goss v. Lopez*,
  419 U.S. 565 (1975) ............................................................................................14

*Grove City College v. Bell*,
  465 U.S. 555 (1984) ..............................................................................................7

*Haidak v. Univ. of Mass.-Amherst,*
     933 F.3d 56 (1st Cir. 2019) ........................................................................................14

*Iacaboni v. United States,*
     251 F. Supp. 2d 1015 (D. Mass. 2003) ......................................................................17

*League of Women Voters v. Newby,*
     838 F.3d 1 (D.C. Cir. 2016) .......................................................................................24

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
     140 S. Ct. 2367 (2020) ...............................................................................................17

*Lorillard v. Pons,*
     434 U.S. 575 (1978) ...................................................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
     463 U.S. 29 (1983) ...............................................................................................10, 20

*N. Haven Bd. of Ed. v. Bell,*
     456 U.S. 512 (1982) ...............................................................................................5, 6

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.,*
     116 F.3d 520 (D.C. Cir. 1997) ...................................................................................17

*R.I. Dep't of Envtl. Mgmt. v. United States,*
     304 F.3d 31 (1st Cir. 2002) ........................................................................................24

*Rice v. Santa Fe Elevator Corp.,*
     331 U.S. 218 (1947) ...................................................................................................16

*Rowan Cos., Inc. v. United States,*
     452 U.S. 247 (1981) ...................................................................................................13

*Shotz v. City of Plantation,*
     344 F.3d 1161 (11th Cir. 2003) ...................................................................................6

*W. Sea Fishing Co. v. Locke,*
     722 F. Supp. 2d 126 (D. Mass. 2010) ........................................................................10

*Winter v. Nat. Res. Def. Council,*
     555 U.S. 7 (2008) .........................................................................................................9

**Statutes**

5 U.S.C. § 706 ...........................................................................................................5, 9

20 U.S.C. § 1681 ..............................................................................................2, 5, 6, 11

20 U.S.C. § 1682 ............................................................................................2, 6, 10, 22

20 U.S.C. § 1683 ...........................................................................................................2

20 U.S.C. § 1684 ...........................................................................................................2

20 U.S.C. § 1685 ...........................................................................................................2

20 U.S.C. § 1686 ...........................................................................................................2

20 U.S.C. § 1687 ........................................................................................................2, 7

20 U.S.C. § 1688 ...........................................................................................................2

42 U.S.C. § 2000d-1 ......................................................................................................6

42 U.S.C. § 2000d ..........................................................................................................6

42 U.S.C. § 2000e-7 ......................................................................................................16

Civil Rights Restoration Act, Pub. L. No. 100-259, §§ 3–6, 102 Stat 28 ........................7

Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 304,
     127 Stat. 54 ..........................................................................................................2, 8, 9

**Other Authorities**

34 C.F.R. § 106 ..............................................................................................................1

34 C.F.R. § 106.30 ....................................................................................................19, 21

34 C.F.R. § 106.44 ....................................................................................................12, 21

34 C.F.R. § 106.45 ....................................................................................................15, 19

34 C.F.R. § 106.71 ..........................................................................................................6

118 Cong. Rec. (1972) ...........................................................................................5, 6, 7, 13

159 Cong. Rec. E179 (daily ed. Feb. 25, 2013) ..............................................................8

159 Cong. Rec. S44 (daily ed. Jan. 22, 2013) ................................................................8

85 Fed. Reg. 30,020 (May 19, 2020) ..................................................................... *passim*

Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual
     Assault and Misconduct* (Oct. 15, 2019), https://www.aau.edu/key-
     issues/campus-climate-and-safety/aau-campus-climate-survey-2019 .......................18

Caroline Cox, *Saving Title IX Values: The Campus Save Act as a Critical Tool for
     Survivors and Allies*, 41 Harv. J. L. & Gender 429 (2018) .........................................8

Catherine Hill & Holly Kearl, Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* (2011) https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf ..........................18

Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234 (2015), https://doi.org/10.1177/1521025115584750 ....................19

Cora Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52(6) Am. J. Prev. Med. 691 (2017), https://stacks.cdc.gov/view/cdc/45804/cdc_45804_DS1.pdf..........................................................................................20, 23

Hannah Brenner, *A Title IX Conundrum: Are Campus Visitors Protected from Sexual Assault?*, 104 Iowa L. Rev. 93 (2018)..............................................................5

J. Brad Reich, *A (Not So) Simple Question: Does Title IX Encompass "Gender"?*, 51 J. Marshall L. Rev. 225 (2018) .............................................................................7

Kavan Vartak, *Title IX Protections Against Bullying in Schools for Sex, Gender, and Orientation*, 27 Tul. J.L. & Sexuality 91 (2018) .................................................6

Lauren Van Driesen, *The Campus Sexual Violence Elimination Act: Is It Enough to Combat Sexual Assault on Campus?*, 68 Rutgers U.L. Rev. 1841 (2016) ...........................8

Letter from Ass'n of Am. Univs. (AAU) to Brittany Bull (Jan. 24, 2019), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Higher-Education-Regulation/AAU-Title-IX-Comments-1-24-19.pdf ................................................21

Letter from Jackie Speier, Rep. Cal. 14th Dist., U.S. House Reps., et al., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Apr. 2, 2020), https://speier.house.gov/?a=Files.Serve&File_id=252B3461-2471-4D71-BC89-F583693194E1 ...................................................................................................3

Letter from Jackie Speier, Rep. Cal. 14th Dist., U.S. House Reps., et al., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Nov. 29, 2018), https://frankel.house.gov/uploadedfiles/title_ix_letter_signatures_pdf.pdf..............................2

Letter from Lois Frankel, Rep. Fla. 21st Dist., U.S. House Reps., et al., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Oct. 15, 2018), https://frankel.house.gov/news/documentsingle.aspx?DocumentID=823................................1

Letter from Robert C. Scott, Rep. Va. 3rd Dist., U.S. House Reps., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Aug. 2, 2019), https://edlabor.house.gov/imo/media/doc/19.08.02%20RCS%20ltr%20to%20ED%20re%20ED%20Title%20IX%20rule.pdf..........................................................................2

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence .......................................................................18

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018) ....................17

Paul M. Anderson, *Title IX at Forty: An Introduction and Historical Review of Forty Legal Developments That Shaped Gender Equity Law*, 22 Marq. Sports L. Rev. 325 (2012) ................................................................................................................7

Press Release, Robert C. Scott, Rep. Va. 3rd Dist. U.S. House Reps., et al., *Scott, Nadler Statement on Education Department's Final Title IX Rule* (May 6, 2020), https://edlabor.house.gov/media/press-releases/scott-nadler-statement-on-education-departments-final-title-ix-rule ....................................................................3

Richard Fry, *U.S. Women Near Milestone in the College-Educated Labor Force*, Pew Research Center (June 20, 2019), https://www.pewresearch.org/fact-tank/2019/06/20/u-s-women-near-milestone-in-the-college-educated-labor-force/ ...............................................................................................................................4

Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. Times (Aug. 5, 2016) .............................................................................................11

Russlynn Ali, U.S. Dept. of Educ., Office for Civil Rights, *Dear Colleague Letter* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html ..............................................................................................................12

Sharon G. Smith, et al., Nat'l Ctr. for Injury Prevention & Control, Div. of Violence Prevention, *The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief - Updated Release* (2018), https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf ......................................1

U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance; Harassment of Students by School Employees, Other Students, or Third Parties* (2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ..........................................................................................................12, 22

U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, U.S. Senate Subcomm. on Fin. & Contracting Oversight, *Sexual Violence on Campus: How Too Many Institutions of Higher Education Are Failing to Protect Students* at 9 (July 9, 2014), https://www.mccaskill.senate.gov/SurveyReportwithAppendix.pdf ........................................................................18

United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study .................................................11

Women's Sports Foundation, *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women Fact Sheet* (2020), https://www.womenssportsfoundation.org/wp-content/uploads/2020/01/8_Chasing_Equity_Quick-Facts.pdf .................................................4

## STATEMENT OF *AMICI CURIAE*

*Amici* are members of Congress[1] who represent constituents who will be impacted by the Department of Education's Final Rule on Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (the "Final Rule").[2] *Amici*'s constituents include students at K-12 schools and universities, staff and faculty at educational institutions, victims of sexual harassment, including sexual assault, and their families.[3]

As members of Congress, *Amici* represent women and girls across the country. *Amici* advance legislative efforts to promote the safety of women and girls and to ensure equal educational opportunities for students who are most likely to experience discrimination based on their sex (including sexual orientation, gender identity, and pregnancy discrimination), race, ethnicity, or disability status. As gender-based violence in schools disproportionately affects women,[4] the *Amici* are particularly invested in ensuring that federal law adequately protects the interests of victims.

---

[1] A list of the members of Congress who join this brief is included in Appendix A. This corrected brief was originally filed July 31, 2020, but several *Amici* were omitted from the list contained in Appendix A of the original brief. The only change to this corrected brief is the addition of those *Amici* who were omitted from the original brief.

[2] 34 C.F.R. § 106 (2020).

[3] *See* Letter from Lois Frankel, Rep. Fla. 21st Dist., U.S. House Reps., et al., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Oct. 15, 2018), https://frankel.house.gov/news/document single.aspx?DocumentID=823.

[4] *See, e.g.*, Sharon G. Smith, et al., Nat'l Ctr. for Injury Prevention & Control, Div. of Violence Prevention, *The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief - Updated Release* at 2 (2018), https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf (noting that 43.6% of women experience some form of sexual violence in their lifetime, compared to 24.8% of men).

*Amici* have an interest in ensuring the Department's actions are consistent with federal law, including the broad, remedial measures enacted by Congress to address gender-based discrimination in federally funded programs. The enforcement of Title IX of the Education Amendments of 1972, which prohibits schools from discriminating against students on the basis of sex, is a priority for *Amici*.[5] Many of the *Amici* were instrumental in enacting the Campus Sexual Violence Elimination Act ("SaVE Act"), which requires educational institutions to adopt policies to prevent gender-based harassment.[6] *Amici* have also led or supported efforts to bolster other civil rights legislation and to protect students from discrimination that interferes with their access to education.

*Amici* have consistently opposed the Department's efforts through this rulemaking process to roll back protections for victims of gender-based harassment, including sexual violence.[7] When the Department published its proposed rule, members of Congress wrote to Secretary DeVos raising concerns about the impact of the changes on victims' ability to seek justice and urging the Department to abandon the proposal.[8] And in April, members of Congress urged Secretary DeVos to suspend the rulemaking process due to the ongoing COVID-19 crisis, contending that implementing new regulations during the pandemic would significantly burden

---

[5] 20 U.S.C. §§ 1681–1688.

[6] Campus Sexual Violence Elimination Act, Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 304, 127 Stat. 54.

[7] *See* Letter from Jackie Speier, Rep. Cal. 14th Dist., U.S. House Reps., et al., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Nov. 29, 2018), https://frankel.house.gov/uploadedfiles/title_ix_letter_signatures_pdf.pdf.

[8] *See id.*; Letter from Robert C. Scott, Rep. Va. 3rd Dist., U.S. House Reps., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Aug. 2, 2019), https://edlabor.house.gov/imo/media/doc/19.08.02%20RCS%20ltr%20to%20ED%20re%20ED%20Title%20IX%20rule.pdf.

constituent schools, students, and communities.[9] Following the Final Rule's publication, *Amici* again wrote to the Secretary, explaining the harmful consequences that the Final Rule would have for students and schools.[10]

The Department published its Final Rule without addressing these issues. *Amici* thus are submitting this brief to offer to the Court their unique insight as members of Congress on how the Final Rule conflicts with the text and purpose of Title IX.

## I.    INTRODUCTION

Not long ago, women and girls were shut out entirely from educational opportunities in this country. Even when allowed to partake of these opportunities, they faced an unfair playing field because they were forced to bear the burden of sex-based discrimination. By enacting Title IX, Congress sought to alleviate this burden by establishing a comprehensive remedial structure that protected the rights of victims of sex-based discrimination and encouraged schools to stamp out such discrimination in the educational context. Since its enactment, Title IX has played a critical role in allowing women and girls to access educational opportunities free from discrimination, harassment, and violence. Under the protections that Title IX affords, women and girls have had more access to sports, professional and graduate programs, and fields traditionally occupied by men. In 1971, fewer than 500,000 girls played high school sports; today, that

---

[9] *Id.*

[10] Letter from Jackie Speier, Rep. Cal. 14th Dist., U.S. House Reps., et al., to Elisabeth DeVos, Sec. Educ., Dep't Educ. (Apr. 2, 2020), https://speier.house.gov/?a=Files.Serve&File_id= 252B3461-2471-4D71-BC89-F583693194E1; *see also* Press Release, Robert C. Scott, Rep. Va. 3rd Dist. U.S. House Reps., et al., *Scott, Nadler Statement on Education Department's Final Title IX Rule* (May 6, 2020), https://edlabor.house.gov/media/press-releases/scott-nadler-statement-on-education-departments-final-title-ix-rule.

number is nearly 3.5 million.[11] In 2019, women reached "a milestone in gender parity" as they surpassed men in the college educated workforce for the first time, even though women have received more than half of all bachelor's degrees since 1982.[12] Title IX has not only created access to these opportunities, but provides women with avenues for addressing sex discrimination and harassment that may still occur.

But rather than continuing this progress, the Department's Final Rule attempts to turn back the clock and undo that important work. The Final Rule would require schools to ignore many incidents of gender-based discrimination on and off campus. It would gut agency enforcement by establishing the high bar of "deliberate indifference" prior to agency action. It would impose uniquely misguided, anti-victim procedural requirements that would apply only to sexual harassment but not to other types of staff or student misconduct. And it would bring the rules governing gender-based discrimination in federally funded programs out of step with other federal civil rights statutes enforced by the Department of Education.

Under Title IX, the Department may promulgate implementing rules only if they are consistent with the statute's broad remedial purpose. The Final Rule fails this test. The Department's approach turns Title IX's victim-protective approach on its head, substantially narrowing the obligation of federally funded programs to prevent and investigate gender-based discrimination. As such, the Rule is deficient under the Administrative Procedure Act ("APA"):

---

[11] Women's Sports Foundation, *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women Fact Sheet* at 1 (2020), https://www.womenssportsfoundation.org /wp-content/uploads/2020/01/8_Chasing_Equity_Quick-Facts.pdf.

[12] Richard Fry, *U.S. Women Near Milestone in the College-Educated Labor Force*, Pew Research Center (June 20, 2019), https://www.pewresearch.org/fact-tank/2019/06/20/u-s-women-near-milestone-in-the-college-educated-labor-force/.

arbitrary and capricious, in excess of the agency's statutory authority, and contrary to Congress's purposes in enacting Title IX and other victim-protective civil rights legislation.[13] Plaintiffs have shown that they are likely to succeed on the merits, and the requested preliminary injunction would be in the public interest.[14]

## II.      STATUTORY BACKGROUND

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Its purpose as articulated by its sponsor, Senator Birch Bayh,[15] was "to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure jobs of their choice with equal pay for equal work." 118 Cong. Rec. 5,808 (1972). Title IX is "a strong and comprehensive measure," designed from its enactment to create sweeping mandates for institutions to eliminate gender-based discrimination in federally funded programs. *See* Hannah Brenner, *A Title IX Conundrum: Are Campus Visitors Protected from Sexual Assault?*, 104 Iowa L. Rev. 93, 100 (2018) (quoting 118 Cong. Rec. 5,806–5,807).

---

[13] *See* 5 U.S.C. § 706(2).

[14] Plaintiffs further argue that the Final Rule violates the Equal Protection Guarantee of the Fifth Amendment to the U.S. Constitution. Although *Amici* support this argument, the focus of this brief is on Plaintiffs' arguments under the Administrative Procedure Act.

[15] As the Supreme Court has noted, "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526–27 (1982).

Title IX was thus designed to fill the gaps with respect to sex left unaddressed by Title VI of the Civil Rights Act of 1964 ("Title VI"). Kavan Vartak, *Title IX Protections Against Bullying in Schools for Sex, Gender, and Orientation*, 27 Tul. J.L. & Sexuality 91, 97 (2018). Title VI, enacted nearly a decade earlier, obligated institutions to prevent and respond to discrimination on the basis of race, color, or national origin in programs and activities that receive federal funding. Title IX "close[d] loopholes in existing legislation relating to general education," 118 Cong. Rec. 5,803 (statement of Sen. Bayh), by prohibiting "gender discrimination in federally funded education programs" and threatening the "termination of federal assistance for noncompliance." *N. Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 524 (1982).

The similarity of the text of Titles VI and IX demonstrate that Congress intended the two statutes to be interpreted consistently. *See, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694 (1979) ("Title IX was patterned after Title VI."); *Bryant v. Indep. Sch. Dist. No. I-38,* 334 F.3d 928, 934 (10th Cir. 2003); *Shotz v. City of Plantation*, 344 F.3d 1161, 1170 n.12 (11th Cir. 2003). Other than the substitution of the words "basis of sex" for the words "ground of race, color, or national origin," the language of these civil rights statutes is nearly identical. *Cannon*, 441 U.S. at 694-95; *see also* 20 U.S.C. § 1681(a) (Title IX); 42 U.S.C. § 2000d (Title VI). And both statutes condition an offer of federal funding on a promise by the recipient not to discriminate. 20 U.S.C. § 1682 (Title IX); 42 U.S.C. § 2000d-1 (Title VI); *see also* 34 C.F.R. § 106.71 ("The procedural provisions applicable to title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). As the Supreme Court recognized in *Cannon*, "[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been." 441 U.S. at 696.

Beyond the similarities in their text, Title VI and Title IX share a common core purpose, as reflected in the legislative history and reaffirmed by the Supreme Court: "to ensure that public funds derived from all the people are not utilized in ways that encourage, subsidize, permit, or result in prohibited discrimination against some of the people." 118 Cong. Rec. 5,803. That core purpose has two elements: (1) "to avoid the use of federal resources to support discriminatory practices"; and (2) "to provide individual citizens effective protection against those practices." *Cannon*, 441 U.S. at 704.

Since the passage of Title IX, Congress has repeatedly taken steps in line with this core purpose to affirm or broaden Title IX's remedial scheme. Following the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555 (1984), which narrowly interpreted the phrase "educational program or activity," Congress passed the Civil Rights Restoration Act ("CRRA") to "restore the broad scope of coverage and to clarify the application of Title IX." Paul M. Anderson, *Title IX at Forty: An Introduction and Historical Review of Forty Legal Developments That Shaped Gender Equity Law*, 22 Marq. Sports L. Rev. 325, 343 (2012). As amended by the CRRA, Title IX now provides that the statutory term "program or activity" includes "all of the operations of … a college, university, or other postsecondary institution, or a public system of higher education." 20 U.S.C. § 1687. The CRRA explicitly encompassed "local education agenc[ies]" in the definition of "program or activity," *id.*, including elementary and secondary education institutions. J. Brad Reich, *A (Not So) Simple Question: Does Title IX Encompass "Gender"?*, 51 J. Marshall L. Rev. 225, 239–40 (2018). And the CRRA applied this broad definition of "program or activity" to four different civil rights provisions (including Title VI), further demonstrating Congress's intent that these laws would be applied consistently. *See* Civil Rights Restoration Act, Pub. L. No. 100-259, §§ 3–6, 102 Stat 28.

In 2013, Congress passed "a sister statute to Title IX," the Campus Sexual Violence

Elimination Act ("SaVE Act"), designed to combat the continuing prevalence of sexual violence

on college campuses and the "lackluster response" of institutions to address the issue. 159 Cong.

Rec. E179 (daily ed. Feb. 25, 2013) (statement of Rep. Maloney); Lauren Van Driesen, *The*

*Campus Sexual Violence Elimination Act: Is It Enough to Combat Sexual Assault on Campus?*,

68 Rutgers U.L. Rev. 1841, 1844 (2016); *see also* Violence Against Women Reauthorization Act

of 2013, Pub. L. No. 113-4, § 304, 127 Stat. 54. The SaVE Act was designed to "renew the

commitment of the United States to providing the resources necessary to combat all forms of

domestic violence, sexual assault, dating violence, and stalking. . . and make women on college

campuses safer from domestic and sexual violence." 159 Cong. Rec. S44 (daily ed. Jan. 22,

2013).

Like Title IX, the SaVE Act imposes obligations on federal funding recipients. First, it

requires institutions covered by Title IX to engage in annual reporting of a broad array of gender-

based violence offences; second, it mandates that those institutions implement prevention

programming; and third, it sets out "minimum procedural standards in their adjudicatory

proceedings for such crimes." Caroline Cox, *Saving Title IX Values: The Campus Save Act as a*

*Critical Tool for Survivors and Allies*, 41 Harv. J. L. & Gender 429, 436 (2018); *see also* Pub. L.

No. 113-4, § 304, 127 Stat. 54.

In specifying these "minimum procedural standards," the SaVE Act codified victim-

protective requirements for the handling of allegations of gender-based violence, including those

recommended in a 2011 Dear Colleague Letter issued by the Office for Civil Rights of the

Department of Education. *See id.*; *see generally* Pub. L. No. 113-4, § 304, 127 Stat. 54.

Specifically, the SaVE Act requires that educational institutions publish procedures for

institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual

assault, or stalking, that such proceedings "provide a prompt, fair, and impartial investigation

and resolution," and that they be conducted by officials who are trained on "how to conduct an

investigation and hearing process that protects the safety of victims and promotes

accountability." Pub. L. 113-4, § 304, 127 Stat. 54. Title IX and the SaVE Act thus work hand-

in-hand to establish a comprehensive remedial program where schools are required to protect

students from gender-based harassment, including sexual violence, and to promptly investigate

any incidents that may occur.

## III.   ARGUMENT

Plaintiffs seek an order preliminarily enjoining implementation of the Final Rule or, in

the alternative, staying the effective date pending judicial review. This Court may issue a

preliminary injunction if Plaintiffs demonstrate that (1) they are likely to succeed on the merits,

(2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance

of equities tips in their favor, and (4) an injunction is in the public interest. *See Winter v. Nat.*

*Res. Def. Council*, 555 U.S. 7, 20 (2008); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370

F.3d 151, 162 (1st Cir. 2004).

Plaintiffs have met the burden of showing they are likely to succeed on the merits. Under

the APA, Courts must set aside agency action that is "arbitrary and capricious, an abuse of

discretion, or otherwise not in accordance of law," as well as actions that are in excess of

statutory authority or without observance of required procedures. *See* 5 U.S.C. § 706(2)(A), (C),

(D). "A decision is arbitrary and capricious 'if the agency has relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency, or is

so implausible that it could not be ascribed to a difference in view or the product of agency

expertise.'" *Craker v. Drug Enf't Admin.*, 714 F.3d 17, 26 (1st Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In applying this standard, courts "must determine if the Secretary's action 'was consonant with [the agency's] statutory powers, reasoned, and supported by substantial evidence in the record.'" *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 135 (D. Mass. 2010) (Young, J.) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "[A]n agency interpretation [does] not merit judicial approbation if it actually frustrate[s] the policies that Congress was seeking to effectuate." *Cont'l Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1453 (D.C. Cir. 1988). Because the Department's action fails to meet this standard, the Court should set aside the Final Rule.

### A.     The Final Rule Contravenes the Text and Purpose of Title IX.

By statute, the Department is "directed to effectuate" Title IX "by issuing rules, regulations, or other orders of general applicability which shall be consistent with achievement of [its] objectives." 20 U.S.C. § 1682. Although the Department claims the Final Rule merely "clarif[ies]" Title IX standards, *see, e.g.*, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,020, 30,537 (May 19, 2020), it instead conflicts with the text of Title IX and its purpose to prohibit discrimination on the basis of sex in education and providing redress for victims. The Final Rule contradicts Title IX's victim-protective approach in several respects.

1.     **The Final Rule's Exclusion of Off-Campus and Online Sexual Harassment and Sexual Violence Inappropriately Narrows Schools' Obligations.**

Under § 106.45(b)(3)(i) of the Final Rule, schools must dismiss reports of sexual harassment that occur outside of the school's "education program or activity." This could exclude from schools' obligations reports of gender-based harassment that occur off-campus, including in off-campus housing, in buildings owned or leased by unaffiliated student organizations like fraternities or sororities, or even online. This exclusion applies regardless of the impact that such conduct may have on victims' ability to access an education.

Narrowing schools' obligations based on the location where conduct occurred is contrary to the text and purpose of Title IX. The statute provides that no person should, on the basis of their sex, "be excluded from participation in" or "denied the benefits of … any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). But adopting this narrower standard ignores the realities of life on college campuses. Nearly 9 in 10 college students live off campus, and roughly 41 percent of college sexual assaults involve off-campus parties. *See* Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. Times (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html; United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study. If a student is the target of sexual harassment or sexual violence, the injuries they may suffer are no less traumatic because the incident occurs off-campus or online, and they are no less denied the benefits of an educational program or activity.

By carving out sexual misconduct that occurs off campus or online, the Final Rule also departs from authoritative Department Guidance indicating that schools must address harassment

based on race, color, national origin, sex, or disability if it is "sufficiently serious that it creates a hostile environment," regardless of where the incident occurs. Russlynn Ali, U.S. Dept. of Educ., Office for Civil Rights, *Dear Colleague Letter* at 1 (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html. Congress is well aware of this guidance and has not seen fit to overturn it, including when it enacted the SaVE Act in 2013. *Cf. Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change"). Adopting a rule that would leave unaddressed such a large percentage of education-related sexual violence incidents unaddressed cannot be squared with the text and purpose of Title IX.

> **2.      The Final Rule's Deliberate Indifference Standard for Enforcement Conflicts with Title IX and Is Out of Step with Related Civil Rights Laws.**

The Final Rule likewise conflicts with the text and purpose of Title IX by adopting a deliberate indifference standard for enforcement. 34 C.F.R. § 106.44(a). Whereas previous Department Guidance stated that a school violates Title IX if it should have known about sex-based harassment and failed to take "prompt and effective action to end the harassment, prevent it from recurring, and remedy [its] effects," *see* U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance; Harassment of Students by School Employees, Other Students, or Third Parties* at 11 (2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf, under the new regulations a school would face an enforcement proceeding only if its response is "clearly unreasonable in light of the known circumstances." 34 C.F.R. § 106.44(a). This is contrary to Title IX and the SaVE Act, which impose an affirmative duty on schools to prevent and adequately investigate incidents of discrimination. *See supra*, at 8.

The deliberate indifference standard renders Title IX's enforcement scheme significantly out of step with other civil rights statutes that apply to students and employees at schools, contrary to congressional intent. Under Title VII, for example, school districts may be held liable if an incident of sexual harassment results in an employee suffering a negative employment action—whether or not the school district is deliberately indifferent to the harassment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). The Final Rule would likewise treat sexual harassment and sexual violence differently than other forms of discrimination prohibited by Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990. This disharmony is not what Congress intended when it enacted Title IX against the backdrop of other civil rights laws using language drawn from these other statutes.

The Department, for its part, asserts that it has no legal obligation under the Administrative Procedure Act to devise "identical or even similar rules to eliminate discrimination on the bases of sex, race, or disability." 85 Fed. Reg. at 30,528. But this argument disregards that Congress "patterned" Title IX after Title VI and intended it to be interpreted and enforced in the same way. *Cannon*, 441 U.S. at 678; *see also* 118 Cong. Rec. 5,803 (statement of Sen. Bayh). When Congress includes language in a statute borrowed from an earlier enacted statute, it generally intends the two statutes to be interpreted consistently. *See Cannon*, 441 U.S. at 697–98 ("[B]ecause of their repeated references to Title VI and its modes of enforcement, we are especially justified in presuming both that those representatives were aware of the prior interpretation of Title VI and that that interpretation reflects their intent with respect to Title IX."); *accord Rowan Cos., Inc. v. United States*, 452 U.S. 247, 255 (1981) (similar language appearing in various tax statutes was "strong evidence that Congress intended" the statutes to be

interpreted consistently). In modeling Title IX on Title VI, Congress sought to "provide individual citizens effective protection against [discriminatory] practices." *Cannon*, 441 U.S. at 704. By failing to provide the same protection to victims of gender-based discrimination that it does to victims of race-based discrimination, the Final Rule is not in accordance with Title IX.

### 3. The Final Rule's Anti-Victim Procedural Rules Also Conflict with Title IX.

The Final Rule also adopts misguided, anti-victim procedural rules that could discourage individuals from coming forward with information about sexual harassment, including incidents of sexual violence. Section 106.45(b)(6)(i) requires parties to submit to cross-examination by the other party's "advisor of choice," forcing victims to potentially relive their trauma in the face of hostile questioning. This requirement would apply to non-party witnesses as well. Victims therefore must not only personally submit to cross-examination, they must also convince friends, roommates, classmates, and even physicians and police officers to do the same. If for whatever reason a witness fails to appear, then none of that witness's previous written or oral statements can be considered as evidence.

The Department claims direct cross-examination is required to protect the due process rights of respondents. 85 Fed. Reg. at 30,313–30,314. But "student disciplinary proceedings need not mirror common law trials." *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019). The Supreme Court has held that students facing short-term suspensions from public schools require only "some kind of" "oral or written notice" and "some kind of hearing," and do not require "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call [their] own witnesses to verify [their] version of the incident." *Goss v. Lopez*, 419 U.S. 565, 566, 579 (1975). And far from creating a level playing field for victims and respondents, the cross-examination requirement effectively stacks the deck against

the victim. The Final Rule requires schools to exclude any oral or written statements of any party

or witness who declines to make themselves available for live cross-examination. 85 Fed. Reg. at

30,313–30,314. So even if a respondent *confesses* to misconduct, that statement may be ignored

under the Final Rule if the respondent refuses to be cross-examined. And, because the Final Rule

creates a presumption of non-responsibility for all complaints of sexual harassment, 34 C.F.R.

§ 106.45(b)(1)(iv), it is more likely that the victim, rather than the respondent, will be forced to

submit to a live hearing, as that may be the only way to hold the alleged harasser accountable.

The respondent, by contrast, can potentially escape responsibility without ever being cross-

examined, resting instead on the presumption of non-responsibility.

These anti-victim evidentiary rules are divorced from the text and purpose of Title IX,

and they are out-of-step with how other anti-discrimination laws are implemented by the

Department—even though Congress intended them to be implemented similarly. The

Department fails to explain why sexual harassment should be treated differently from any of

these other forms of discrimination. By adopting a more rigorous standard here, the Department

only reinforces the false stereotype that victims, particularly women and girls, tend to lie about

sexual assault.

> **4.      The Final Rule's Preemption of Victim-Protective State Laws Is
>          Inconsistent with Congressional Intent and Violates the APA's
>          Procedural Requirements.**

The Rule also expressly preempts state laws to the extent there is any "conflict between

State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45." 85 Fed. Reg.

at 30,573. States that have policies or laws that are fairer to victims than the Final Rule could

potentially find those rules preempted if they contradict the new standards the Department has

now adopted. But in its rush to promulgate the Final Rule in the midst of a global pandemic, the

Department did not adequately consider whether the Final Rule would conflict with state laws.

The Department's failure to account for this "important aspect of the problem," renders the Final Rule arbitrary and capricious. *See Craker*, 714 F.3d at 26.

Congress did not sanction the Department's attempt to displace more victim-protective state laws—an attempt that is at odds with the approach taken in other civil rights statutes. Generally, federal civil rights statutes establish a floor of protection that can be expanded upon by state and local rules. Title VII, for example, expressly reserves to states the flexibility to adopt their own employee-protective rules, provided they do not "purport[] to require or permit the doing of any act which would be an unlawful employment practice." 42 U.S.C. § 2000e-7. Nothing in the text or history of Title IX suggests that Congress intended something different in this context.

Were there ambiguity about Congress's intent, the background presumption disfavors preemption, *see Bond v. United States*, 572 U.S. 844, 858 (2014) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), and clearer evidence of congressional intent to preempt state law would be needed to support such agency action, *see, e.g.*, *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 161 (1982) (relying on the text and history of the Home Owners' Loan Act of 1933 to conclude that "Congress plainly envisioned that federal savings and loans would be governed by what the [Federal Home Loan Bank] Board—not any particular State—deemed to be the 'best practices.'"). No such clear guidance exists in Title IX.

The Final Rule's preemption provision also flouts the APA's procedural requirements. The Department's proposed rule did not include the provision, denying *Amici* and their constituents the opportunity to provide meaningful comment. In fact, the Department's notice of proposed rulemaking indicated that the rule would preserve recipients' flexibility to adopt "grievance procedures" that work better "for the recipient's educational environment." *See*

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462, 61,472 (Nov. 29, 2018). That representation is at odds with the preemption provision that ultimately appeared in the Final Rule. "The APA requires that the notice of proposed rulemaking contain … either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020) (cleaned up); *see Iacaboni v. United States*, 251 F. Supp. 2d 1015, 1039 (D. Mass. 2003) ("It is well established that failure to comply with the APA's notice requirement renders a rule subject to the APA invalid."). Under the APA, notice is "inadequate when the interested parties could not reasonably have anticipated the final rulemaking from the draft rule." *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997). The Final Rule can be set aside for this reason alone.

**B.     The Final Rule Is Arbitrary and Capricious Because It Fails to Consider Important Aspects of the Problem and Relies on an Explanation That Runs Counter to the Evidence Before the Department.**

The Final Rule is also arbitrary and capricious because it fails to account for the full cost borne by victims, schools, and the public when incidents of gender-based harassment, including sexual assault, are not prevented or adequately investigated. In justifying the Final Rule, the Department highlighted the money schools may save by conducting fewer Title IX investigations. 85 Fed. Reg. at 30,549. But the Department's estimates of savings and costs grossly miscalculate the actual economic damage that the Final Rule will inflict on victims, schools, and the public.

Despite the progress our country has made in expanding women's access to educational opportunities, sexual harassment continues to be a pervasive threat to American students. As the #MeToo movement reflects, these threats exist across society, but they are particularly acute in

schools and educational programs. In one study, approximately half of students surveyed between grades seven and twelve experienced sexual harassment in school in a single year alone. *See* Catherine Hill & Holly Kearl, Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* (2011) at 2, https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf. Of those students, 87 percent said that the experience had a negative effect on them. *See id.* More than one in five girls aged 14-18 are kissed or touched without their consent. *See* Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence. This pattern of harm continues in the college environment. A study found that one in four women, one in four transgender or gender non-conforming students, and one in fifteen men experienced sexual assault while in college. *See* Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct* at ix (Oct. 15, 2019), https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-2019.

Yet despite the prevalence of sexual harassment, it remains severely underreported. *See, e.g.*, *id.* at xv (noting that only about one in ten college victims report sexual assault to their schools or local police); Hill & Kearl, *supra*, at 2 (reporting that only 9 percent of students surveyed reported the incident to an adult at school and half of students told no one at all). And even when incidents are reported, they are often under-investigated. *See* U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, U.S. Senate Subcomm. on Fin. & Contracting Oversight, *Sexual Violence on Campus: How Too Many Institutions of Higher Education Are Failing to Protect Students* at 9 (July 9, 2014), https://www.mccaskill.senate.gov/SurveyReportwithAppendix.pdf (noting schools often investigate far fewer incidents of sexual

18

harassment than are reported). Despite the pervasiveness of sexual harassment and sexual assault in the educational setting, the Final Rule focuses only on the purported benefit of schools carrying out *fewer* investigations and fails adequately to account for the significant cost to victims.

Whether reported or not, sexual harassment and sexual assault take an immense toll both on individual victims and on American society as a whole. During the notice and comment process, commenters told the Department about "the severe impact of sexual harassment or assault on their educational experience, including the ability to learn and balance pressures of life." 85 Fed. Reg. at 30,056. Victims are three times more likely to suffer from depression, six times more likely to have post-traumatic stress disorder, thirteen times more likely to abuse alcohol, and four times more likely to contemplate suicide. *See* Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), https://doi.org/10.1177/ 1521025115584750. Indeed, approximately 34 percent of college students who experience sexual assault drop out of college completely. *See id*. And yet under the Final Rule, schools are not permitted to investigate a report of gender-based harassment if the victim dropped out of the educational program before filing the complaint. 34 C.F.R. §§ 106.30(a), 106.45(b)(3)(ii). Commenters also provided the Department with "data showing that rape and sexual assault victims often incur significant financial costs such as medical and psychological treatment, lost time at work, and leaves of absence from school." 85 Fed. Reg. 30,081.

Although the full cost of this trauma is difficult to quantify, estimates show that the monetary costs associated with sexual violence are significant. The U.S. Government itself— through the Centers for Disease Control and Prevention—estimates that the lifetime cost of rape

is $122,461 per victim, resulting in an aggregate economic burden of nearly $3.1 trillion over victims' lifetimes. *See* Cora Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52(6) Am. J. Prev. Med. 691, 698, (2017), https://stacks.cdc.gov/view/cdc/45804/cdc_45804_DS1.pdf. Of the $3.1 trillion economic burden over rape victims' lifetimes, $1 trillion (roughly 32 percent) of those costs is incurred by government sources. *See id.* And these statistics encompass only the estimated cost of rape; they do not account for the costs associated with other forms of sexual violence and sexual harassment. Nevertheless, these statistics reflect that the costs of gender-based harassment are borne by individual victims and by American society as a whole.

Because the Final Rule fails to adequately account for these costs, it should be set aside as arbitrary and capricious. An agency rule is arbitrary and capricious "if the agency … entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency"—defects that are both present here. *State Farm*, 463 U.S. at 43. Despite acknowledging the significant financial costs suffered by victims, the Department made no changes in the Final Rule in response to these concerns. 85 Fed. Reg. 30,081. The Department claims there are resources to "help complainants avoid the costs that flow from loss of educational opportunities," but the Department cited only the "supportive measures" provided to complainants and the "remedies" provided *after* "a fair grievance process has determined that a respondent is responsible." *Id.* Yet as the Department recognizes, the Final Rule will result in fewer investigations, thus *decreasing* the availability of these remedies. The Final Rule does nothing to address the underreporting of sexual harassment and sexual violence, which means these remedies inherently fail to address the significant costs that victims and American society are forced to bear.

In addition to the cost to victims, the Final Rule also fails to account for the costs incurred by schools, despite numerous comments from school leaders advising of this significant flaw in the Department's rulemaking process. For example, the Association of American Universities advised that the Rule "imposes unrealistic requirements on universities and sets them up to be potentially legally liable for implementation of these requirements without benefitting students or making the process more equitable." *See* Letter from Ass'n of Am. Univs. (AAU) to Brittany Bull at 4 (Jan. 24, 2019), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Higher-Education-Regulation/AAU-Title-IX-Comments-1-24-19.pdf (discussing "higher costs associated with the regulation's prescribed quasi-court models"). Universities may lack sufficient funding to afford the "regulation's prescribed quasi-court models," and by barring the use of alternative investigation and adjudication models, the Final Rule risks inflicting additional, unnecessary (and costly) trauma on victims. *See id.* The rich learning environment that schools work to cultivate ultimately suffers when students, particularly women, cannot fully participate in campus life because they are not adequately protected from gender-based harassment and sexual violence.

### C. The Supreme Court's Decisions in *Gebser* and *Davis* Do Not Justify the Final Rule's Departure from Title IX's Victim-Focused Approach.

The Department claims the Final Rule's departure from its prior victim-protective approach is required by the Supreme Court's decisions in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), and *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). *See* 34 C.F.R. §§ 106.30, 106.44(a); 85 Fed. Reg. at 30,032. In reality, neither case justifies the Department's approach. *Gebser* established an "exceedingly high standard" for when a school may be held liable under Title IX in a civil suit for damages, *Gebser*, 524 U.S. at 304 (Stevens, J., dissenting). The Final Rule mirrors this exceedingly high standard in several respects,

including by establishing a stricter definition of sexual harassment. *See* Pls.' Mem. in Support of

Mot. for Preliminary Injunction, ECF No. 32, at 10 (arguing Final Rule is arbitrary and

capricious because it adopts a modified definition of sexual harassment).

      The Department adopted this stricter standard to avoid what it claims would be

inconsistencies between how sexual harassment is handled in the context of civil litigation and

administration enforcement. 85 Fed. Reg. at 30,036. But there is good reason to treat these issues

differently in the administrative context. "Agencies generally have authority to promulgate and

enforce requirements that effectuate [a] statute's nondiscrimination mandate even if those

requirements do not purport to represent a definition of discrimination under the statute."

*Gebser*, 524 U.S. at 292. And, as the Court observed, the Department provides notice to schools

before engaging in an enforcement action. 20 U.S.C. § 1682. Terminating funding may be the

ultimate enforcement tool that the Department has at its disposal, *see Gebser*, 524 U.S. at 280–

81, but it is not the Department's first or most likely response to a Title IX violation. The

Department may effectuate Title IX's antidiscrimination mandate by "any other means

authorized by law," *see* 20 U.S.C. § 1682, and is not required to enforce Title IX solely through

the suspension of federal funds.

      As the Department has long recognized, "the liability standards in [*Gebser* and *Davis*] are

limited to private actions for monetary damages." U.S. Dep't of Educ., Office for Civil Rights,

*Revised Sexual Harassment Guidance; Harassment of Students by School Employees, Other*

*Students, or Third Parties* at ii (2001). The Supreme Court adopted these stricter standards

precisely because *Gebser* and *Davis* involved suits for money damages arising from an implied

right of action under Title IX, *see Davis*, 526 U.S. at 633; *Gebser*, 524 U.S. at 277, explicitly

recognizing the absence in that context for notice and an opportunity to come into compliance,

*see Gebser*, 524 U.S. at 289 (it "would be unsound … for a statute's express system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially implied system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." (emphasis omitted)). Thus, far from mandating a similarly restrictive approach to administrative enforcement, the Court's decisions took account of the supposed inconsistency the Department points to in justifying the Final Rule, and the Department does not adequately explain why its reading of these cases has now changed.

### D.       Granting Plaintiffs' Motion Is in the Public Interest.

As indicated by the costs to victims, schools, and the public for which the Department's Final Rule fails to account, *see* Part III.B, *supra*, Plaintiffs' request for an injunction is in the public interest. If the Final Rule is allowed to remain in place, a multitude of harms will follow: universities and schools will have to expend resources to implement the new rule amid a national emergency, *see* Letter from Ass'n of Am. Univs. (AAU) to Brittany Bull at 4; victims of gender-based harassment will go without effective redress; and society at large will suffer the collateral consequences that come from barring girls and women from an education free from sexual harassment and assault. *See, e.g.*, Peterson et al., *supra*. The very nature of these collateral harms means that they will extend well beyond the litigants in this case, affecting school staff, the employers and family members of victims, and many others, through the seeping economic costs of lost wages, missed schooling, and psychological trauma.

Any countervailing interest proffered by the Department does not justify the imposition of these damaging societal costs. The Department has been operating under the status quo for years, and continuing that status quo for the pendency of this litigation will cause minimal burden to Defendants, federally funded programs, or the students, faculty, and staff covered by

Title IX. In any event, as explained above, the Final Rule contradicts both the text and purpose of Title IX, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Consequently, not only do Plaintiffs demonstrate a likelihood of success on the merits, but granting their request also serves the public interest. *See R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 54 (1st Cir. 2002).

## IV.    CONCLUSION

Because the Department's approach is arbitrary and capricious and contrary to the text and purpose of Title IX, the Plaintiffs' motion for a preliminary injunction or stay should be granted.

Date:  July 31, 2020                            Respectfully submitted,

                                               *s/ Matthew S. Shapanka*
                                               Matthew S. Shapanka (BBO# 690394)
                                                     *Counsel of Record*
                                               Trisha B. Anderson (*pro hac vice* motion forthcoming)
                                               Carlton Forbes (*pro hac vice* motion forthcoming)
                                               Tyler Starr (*pro hac vice* motion forthcoming)
                                               Emily Fox (*pro hac vice* motion forthcoming)
                                               Nicole Antoine (*pro hac vice* motion forthcoming)
                                               Covington & Burling LLP
                                               One CityCenter
                                               850 Tenth Street, NW
                                               Washington, DC 20001-4956
                                               (202) 662-6000
                                               mshapanka@cov.com
                                               tanderson@cov.com
                                               cforbes@cov.com
                                               tstarr@cov.com
                                               efox@cov.com
                                               nantoine@cov.com

                                               Counsel for *Amici Curiae* Members of Congress

**APPENDIX A**

The following is a list of *Amici* who have joined this brief:

- Jackie Speier

- Lois Frankel

- Brenda L. Lawrence

- Deb Haaland

- Veronica Escobar

- Jerrold Nadler

- Zoe Lofgren

- Carolyn B. Maloney

- Adam Smith

- John Yarmuth

- Eliot L. Engel

- Ann McLane Kuster

- Ayanna Pressley

- Gwen Moore

- Susan A. Davis

- Elissa Slotkin

- Rosa DeLauro

- Katherine Clark

- Debbie Dingell

- Pramila Jayapal

- Theodore E. Deutch

- Jamie Raskin

- Lucille Roybal-Allard

- Mark Pocan

- Barbara Lee

- Bonnie Watson Coleman

- Katie Porter

- Jan Schakowsky

- Eleanor Holmes Norton

- Nydia M. Velázquez

- Suzanne Bonamici

- Alcee L. Hastings

- Chellie Pingree

- Alma S. Adams, Ph.D.

- Jerry McNerney

- Peter Welch

- Earl Blumenauer

- Gerald E. Connolly

- Norma J. Torres

- Derek Kilmer

- Val B. Demings

- Julia Brownley

- Joseph P. Kennedy, III

- Steve Cohen

- Dina Titus

- Diana DeGette

- Bill Foster

- Mark DeSaulnier

- Jim Cooper

- Jennifer Wexton

- Betty McCollum

- A. Donald McEachin

- Darren Soto

- Kathy Castor

- Danny K. Davis

- Suzan K. DelBene

- Adriano Espaillat

- Frederica S. Wilson

- Judy Chu

- Stephen F. Lynch

- Ro Khanna

- Sharice L. Davids

- Jahana Hayes

- Andy Levin

- Joyce Beatty

- Susan Wild

- David Price

- Debbie Mucarsel-Powell

- Jason Crow

- Sean Casten

- Debbie Wasserman Schultz

- Mike Quigley

- Gilbert R. Cisneros, Jr.

- Lori Trahan

- José E. Serrano

- Tony Cárdenas

- Grace Meng

- Anna G. Eshoo

- Linda T. Sánchez

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of July 2020, I electronically filed the foregoing

Brief for Members of Congress as *Amici Curiae* in support of Plaintiffs' Motion for a

Preliminary Injunction or Section 705 Stay with the Clerk of the Court using the CM/ECF

system, which will send notification to all counsel of record.

*s/ Matthew S. Shapanka*
Matthew S. Shapanka