# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

**VICTIM RIGHTS LAW CENTER,** et al.

                         Plaintiffs,

        v.

**ELISABETH D. DEVOS**, et al.

                         Defendants.

Case No. 1:20-cv-11104

Judge William G. Young

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION OR SECTION 705 STAY

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

    I.    **PLAINTIFFS HAVE SHOWN THEY HAVE STANDING AND WOULD SUFFER IRREPARABLE HARM** ...................................... 2

        A.    Defendants' Eleventh-Hour Policy Pronouncements Do Not Alleviate the Irreparable Harm to Plaintiffs and Fail to Undercut Plaintiffs' Standing ............................................................ 2

        B.    The Doe Plaintiffs Have Standing ............................................. 5

        C.    The Final Rule Is Causing and Will Continue to Cause Irreparable Harm to Organizational Plaintiffs ............................................ 8

        D.    The Organizational Plaintiffs Have Standing ......................... 11

    II.    **PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS** ....................................................................... 12

        A.  The Final Rule's Cumulative Effect Contravenes the Purpose of Title IX ............................................................................... 13

        B.    The Narrowed Definition of Sexual Harassment Is Arbitrary, Capricious, and Not in Accordance with the Law .................. 14

        C.    The Provisions Prohibiting Schools from Investigating Sexual Harassment Occurring Outside an Education Program or Activity and Requiring Complainants to be Enrolled or Attempting to Attend the School's Programs or Activities Are Arbitrary and Capricious. ............................................................................. 15

        D.    The Grievance Procedures Are Arbitrary and Capricious ...... 17

        E.    The Presumption of Non-Responsibility is Arbitrary and Capricious ............................................................................. 18

        F.    The Heightened Notice Requirement is Arbitrary and Capricious .......... 19

    III.    **THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR GRANTING THE REQUESTED RELIEF** .................................. 20

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*,
    468 U.S. 737 (1984), *abrogated on other grounds by*
    *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014)....................................................12

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
    659 F.3d 13 (D.C. Cir. 2011)....................................................12

*Antilles Cement Corp. v. Fortuno*,
    670 F.3d 310 (1st Cir. 2012)....................................................8

*Barnes-Wallace v. City of San Diego*,
    530 F.3d 776 (9th Cir. 2008) ....................................................6

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979)....................................................15

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
    840 F.2d 701 (9th Cir. 1988) ....................................................4

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004)....................................................2

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
    901 F.2d 107 (D.C. Cir. 1990)....................................................6

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999)....................................................15

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*,
    140 S. Ct. 1891 (2020)....................................................16

*Doe v. Dolton Elementary School Dist. No. 148*,
    694 F. Supp. 440 (N.D. Ill. 1988) ....................................................4

*E. Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) ....................................................9, 11

*El Rescate Legal Servs., Inc. v EOIR*,
    959 F.2d 742 (9th Cir. 1991) ....................................................9

*Equal Means Equal v. Dep't of Educ.*,
    No. CV 17-12043-PBS, 2020 WL 1284149 (D. Mass. Mar. 18, 2020) ............................11, 12

*Gebser v. Lago Vista Indep. Sch. Dist.*,

524 U.S. 274 (1998)........................................................................................................15

*Gidatex, S.r.L. v. Campaniello Imports*,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998).......................................................................2

*Gilder v. PGA Tour, Inc.*,
   936 F.2d 417, 423 (9th Cir. 1991) ...........................................................................2

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)................................................................................................12

*Jones v. Nat'l Conf. of Bar Exam'rs*,
   801 F. Supp. 2d 270 (D. Vt. 2011)............................................................................5

*King v. Innovation Books*,
   976 F.2d 824, 831 (2d Cir. 1992)..............................................................................2

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................................................9, 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...............................................................................................5, 6

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)................................................................................................12

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ...............................................................................12

*New York v. U.S. Dep't of Homeland Sec.*,
   No. 19-3591, 2020 WL 4457951 (2d Cir. Aug. 4, 2020) ...........................7, 10, 13

*Pennsylvania v. DeVos*,
   No. 1:20-cv-01468, ECF 22-3 (D.D.C. June 23, 2020) ............................................3

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) .............................................................................12

*Petties v. District of Columbia*,
   881 F. Supp. 63 (D.D.C. 1995) .................................................................................4

*Project Basic Tenants Union v. Rhode Island Hous. & Mortg. Fin. Corp.*,
   636 F. Supp. 1453 (D.R.I. 1986)............................................................................12

*Renee v. Duncan*,
   623 F.3d 787 (9th Cir. 2010) ....................................................................................6

*Saunders v. George Washington Univ.*,
   768 F. Supp. 843 (D.D.C. 1991) ...............................................................................4

*Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*,
   699 F.3d 1 (1st Cir. 2012) ...................................................................................13

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ..........................................................................................6

*SurvJustice Inc. v. DeVos*,
   No. 18-CV-00535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018), *order
   amended on reconsideration*, No. 18-CV-00535-JSC, 2019 WL 1434144
   (N.D. Cal. Mar. 29, 2019) ...............................................................................10, 12

*Texas v. United States*,
   523 U.S. 296 (1998) ...............................................................................................8

*Tozzi v. U.S. Dep't of Health & Human Servs.*,
   271 F.3d 301 (D.C. Cir. 2001) ...............................................................................6

*Union of Concerned Scientists v. Wheeler*,
   954 F.3d 11 (1st Cir. 2020) .....................................................................................8

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.*,
   181 F.3d 840 (7th Cir. 1999) ...................................................................................5

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
   418 F.3d 36 (1st Cir. 2005) .....................................................................................6

**Statutes and Regulations**

20 U.S.C. § 1681, et seq. ("Title IX") ........................................................... *passim*

20 U.S.C. § 1681(a) ...............................................................................................1

4 C.F.R. § 106.45(b)(6)(i) .......................................................................................5

34 C.F.R. § 106.30(a) .........................................................................................4, 19

34 C.F.R. § 106.44(a) ........................................................................................16, 19

34 C.F.R. § 106.45 ................................................................................................18

**Other Authorities**

*Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ............. *passim*

Revised Sexual Harassment Guidance: Harassment of Students by School
   Employees, Other Students, or Third Parties, 66 Fed. Reg. 5512 (Jan. 19,
   2001) ...............................................................................................................15

Monroe, Stephanie, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear
    Colleague Letter (Jan. 25, 2006),
       https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.....................................15

U.S. Dep't of Educ., Office for Civil Rights, *The Title IX Rule Is Effective on
    August 14, 2020, and Is Not Retroactive*, (Aug. 5, 2020),
       https://www2.ed.gov/about/offices/list/ocr/blog/20200805.html. ............................................3

## <u>INTRODUCTION</u>

Title IX's mandate is unequivocal: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[1]  The Department of Education's ("the Department") Final Rule contravenes this mandate and represents a derogation of the Department's duty to ensure educational equity.  By the Department's own account, the Final Rule will enable fewer victims to seek relief, reduce the number of investigations that schools will undertake, and increase the procedural burden on those victims who do file complaints, all while failing to lower the baseline level of sexual harassment in U.S. schools.  The Final Rule's cumulative effects will aggravate the very harms and risks that Congress in enacting Title IX sought to eliminate.

The Department's briefing in this case fails to acknowledge what is at stake for the Plaintiffs in this litigation and the real-world harm that will result from dismantling long established protections on which students depend.  As the survivors' brief points out, this is not a matter of whether "the pendulum in school sexual harassment cases had . . . swung too far 'in favor' of survivors as some respondent advocacy organizations claim. . . .  [T]he Final Rule is not a 'correction' of the 2011 and 2014 Department guidance.  Instead, the Final Rule breaks the pendulum by dismantling the purpose of Title IX. . . .  The Final Rule [] turns educators' responsibilities to students upside down, putting the onus on the students, not the schools to root out sexual violence."[2]

Nor does the Final Rule even advance the Department of Education's purported goal of

---

[1] 20 U.S.C. § 1681(a).

[2] Brief of Survivors of Sexual Violence as *Amici Curiae* in Support of Plaintiffs' Motion for a Preliminary Injunction or Section 705 Stay (No. 74-1) at 6-8 (hereinafter "Amicus Brief of Survivors").

providing federally-funded schools with greater clarity and certainty regarding their obligations under Title IX to prevent sexual harassment. The Department's desire to avoid defending the Final Rule as written on the merits is understandable. But having issued the Final Rule, the Department should not now be free to walk away from its serious implications.

Plaintiffs in this case are individual students who have experienced sexual assault and/or harassment by their fellow students or teachers whose Title IX proceedings will be impacted by the Final Rule, as well as organizations whose operations will be irreversibly disrupted by the Final Rule. Plaintiffs are already suffering, and will continue to suffer, irreparable harm as a result of the Final Rule's harmful effects. Because the Final Rule is arbitrary and capricious, contrary to law, in excess of the Department's statutory authority, and without observance of process required by law, Plaintiffs seek preliminary injunctive relief to prevent these irreparable harms while their case is adjudicated.[3]

## ARGUMENT

### I.   PLAINTIFFS HAVE SHOWN THEY HAVE STANDING AND WOULD SUFFER IRREPARABLE HARM

#### A. Defendants' Eleventh-Hour Policy Pronouncements Do Not Alleviate the Irreparable Harm to Plaintiffs and Fail to Undercut Plaintiffs' Standing

Defendants contend that the Doe plaintiffs cannot show irreparable harm because newly announced Department guidance—released within 10 days of the Final Rule's effective date— only requires schools to apply the new regulations to claims involving alleged misconduct that

---

[3] Defendants' argument that Plaintiffs waited too long to file the motion for preliminary injunctive relief is meritless. The cases cited by Defendants consider the time between *filing a complaint* and moving for a preliminary injunction, not the time between *the defendant's alleged unlawful conduct* and the motion for injunctive relief. *Gidatex, S.r.L. v. Campaniello Imports*, 13 F. Supp. 2d 417 (S.D.N.Y. 1998) (plaintiff waited three years to seek an injunction after filing lawsuit); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (plaintiff waited more than a year after filing the complaint to seek a preliminary injunction). Applying the right metric, Plaintiffs' motion, filed only three weeks after the amended complaint, is wholly appropriate. *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (eight month delay did not preclude preliminary injunctive relief); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (four month delay was not unreasonable).

occurs or after the August 14, 2020 effective date, regardless of when it is reported. But this supposed policy clarification, published in a blog post only hours before Defendants' opposition brief was filed, cannot carry the weight that Defendants would put on it.[4]

First, contrary to Defendants' assertions, the Final Rule itself contains no such retroactivity provision. Although the preamble to the Final Rule states that "the Department will not enforce these final regulations retroactively," this statement was a response to requests that the Final Rule permit schools to reopen *previously completed investigations* and readjudicate them under the new rules.[5] The Final Rule is silent about how schools should manage pending investigations (much less new investigations based on previously-occurring conduct), and indeed, the Final Rule gives every indication that schools should apply the new rules across the board.[6] Second, given the measures that school systems have already undertaken to meet the compliance deadline,[7] it strains credulity to suggest that schools will now reverse course and in nine days of the Final Rule's effective date decide to institute two parallel adjudicatory frameworks and two sets of conflicting approaches responding to sexual harassment allegations based on nothing more than an eleventh-hour blog post. Third, the Department's blog post will only exacerbate the emotional and psychological injuries to Doe plaintiffs by injecting yet more uncertainty into the administration

---

[4] U.S. Dep't of Educ., Office for Civil Rights, *The Title IX Rule Is Effective on August 14, 2020, and Is Not Retroactive*, (Aug. 5, 2020), https://www2.ed.gov/about/offices/list/ocr/blog/20200805.html.

[5] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026, 30,061 (May 19, 2020) ("Some of these commenters recommended that the Department make the proposed rules retroactive for students who were disciplined unfairly under the previous rules, including requiring schools to reopen and reexamine old cases and then apply these new rules, if requested to do so by a party involved in the old case. . . . However, the Department will not enforce these final regulations retroactively.").

[6] Grasping at straws, the Department quotes from the preamble: "some Title IX sexual harassment reports occurring within the same education program or activity within the same school year may be handled under the current Title IX regulations while others will be addressed under the requirements of the final regulations; this . . . occurs any time regulatory requirements are amended prospectively." 85 Fed. Reg. 30026, 30,534-35 (May 19, 2020). This statement only expresses the uncontroversial position that because some schools might begin operations before the effective date, those schools would have to apply two separate sets of rules within a single school year.

[7] *See Pennsylvania v. DeVos*, 1:20-cv-01468 ECF 22-3 (D.D.C. June 23, 2020), Ex. 39 at 10.

of their claims.[8]

Without the blog post to rely upon, Defendants can only attempt to discount the irreparable harm caused by the Final Rule as a mere "state of speculation."[9]  In doing so, they fail to recognize that courts around the country have found irreparable injury in the "emotional stress, depression and reduced sense of well-being, which constituted 'psychological and physiological distress . . . the very type of injury Congress sought to avert."[10]  Doe plaintiffs have suffered, and in the absence of injunctive relief, will continue to suffer, precisely these harms.

As recent graduates, Sobia Doe will have her complaint dismissed under section 106.30 of the Final Rule, even though the respondent remains enrolled and/or employed by her school.[11]  Susan Doe, Nancy Doe, and Lisa Doe all suffered sexual assault or sexual harassment in private off-campus locations that appear to be outside the school's educational program or facility, and therefore their complaints must be dismissed under section 106.45(b)(3)(i) of the Final Rule.[12]  The Doe plaintiffs have already had to drop courses, change their field of study, even transfer schools as a result of the discrimination they suffered.[13]  Several have experienced anxiety,

---

[8] *See Pennsylvania v. DeVos*, 1:20-cv-01468, ECF 22-3 (D.D.C. June 23, 2020), Ex. 43 at 22, Decl. of Elizabeth Collins ("a two-tiered approach in which some incidents require Title IX investigation and grievance procedures and other incidents do not, will inevitably cause confusion for school administrators, students, and parents").

[9] Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction or Section 705 Stay (hereinafter "Def. Opp.") at 14.

[10] *See Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988) (quoting *Equal Emp. Opp. Comm'n v. Chrysler Corp*, 546 F. Supp. 54 (E.D. Mich. 1982)); *Petties v. District of Columbia*, 881 F. Supp. 63, 68 (D.D.C. 1995) (stress, anxiety, and deteriorating scholastic performance caused by uncertainty about government's action constitutes irreparable harm); *Saunders v. George Washington Univ.*, 768 F. Supp. 843, 845 (D.D.C. 1991) (fired professor showed irreparable harm by losing the "tremendous personal satisfaction and joy" that she derived from teaching).

[11] Ex. D, Decl. of Sobia Doe ¶¶ 31-32, 73 ("Sobia Doe"); 34 C.F.R. § 106.30(a) ("[a]t the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed").

[12] Ex. E, Decl. of Susan Doe ¶ 4 ("Susan Doe"); Ex. F, Decl. of Nancy Doe ¶ 9 ("Nancy Doe"); Ex. A, Decl. of Lisa Doe ¶¶ 2-4 ("Lisa Doe").

[13] Sobia Doe ¶ 39; Susan Doe ¶¶ 34-36; Ex. B, Decl. of Jill Doe ¶¶ 5-9 ("Jill Doe"); Nancy Doe ¶¶ 24-30; Lisa Doe ¶¶ 19-21.

depression, and suicidality, and some have sought medical attention, therapy, and counseling.[14] By requiring the dismissal of their complaints, the Final Rule ensures that these victims will not have their rights vindicated and condemns them to continue to suffer unequal access to education.[15]

Furthermore, even if their Title IX complaints are permitted to proceed, all but one of the Doe plaintiffs will suffer irreparable harm by being forced to participate in a live hearing that requires direct cross-examination, a key component of the Final Rule's grievance process that the Final Rule incentivizes postsecondary schools to implement, even if the underlying incident occurred before August 14, 2020.[16] Sobia Doe, Susan Doe, Nancy Doe, Anne Doe, Lisa Doe, and Jill Doe dread the prospect of direct cross-examination, and have suffered psychological harms related to their reasonable fears.[17] These harms will impede Doe plaintiffs' access to educational opportunities, causing irreparable harm.[18]

### B. The Doe Plaintiffs Have Standing

Defendants' contention that the Doe plaintiffs lack standing is without merit.

First, plaintiffs have alleged a cognizable injury in fact. To establish standing, a plaintiff must show that they suffered an injury that is "concrete" and "particularized."[19] To be

---

[14] Ex. C, Decl. of Anne Doe ¶ 6 ("Anne Doe"); Sobia Doe ¶¶ 40-54; Susan Doe ¶¶ 30-33, 51-52; Jill Doe ¶¶ 6-9; Nancy Doe ¶¶ 31-34; Ex. L, Decl. of Judith L. Herman ¶ 9 ("Herman") ("These negative effects include anxiety, increased isolation, increased risk of self-harm, distress, depression, and suicidal ideation.").

[15] *Doe v. Dolton Elementary School Dist. No. 148*, 694 F. Supp. 440, 447-48 (N.D. Ill. 1988) (student diagnosed with AIDS showed irreparable harm in the "emotional and psychological" injury of being denied the ability to attend school").

[16] 34 C.F.R. § 106.45(b)(6)(i) will remove all discretion from colleges and graduate schools about whether to conduct a live hearing for sexual harassment investigations, and will require parties and witnesses to submit to cross-examination by the other party's "advisor of choice." *See also* 85 Fed. Reg. 30,026, 30,345, 30,346, 30,347, 30,349, 30,356 (May 19, 2020).

[17] Susan Doe ¶¶ 43-45; Sobia Doe ¶¶ 75-76; Nancy Doe ¶¶ 48-49; Lisa Doe ¶ 33; Anne Doe ¶¶ 25, 30; Jill Doe ¶ 15; *See* Declaration of Nancy Cantapulo, ¶¶ 21-32.

[18] *See Jones v. Nat'l Conf. of Bar Exam'rs*, 801 F. Supp. 2d 270, 286-87 (D. Vt. 2011) (concrete "loss of the chance to engage in normal life activity" is irreparable harm) (quoting *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011)); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 853 (7th Cir. 1999) ("diminished academic motivation" found sufficient to constitute irreparable harm).

[19] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

particularized, the injury must "affect the plaintiff in a personal and individual way."[20]   As explained above, the imminent application of the Final Rule is causing the Doe plaintiffs specific emotional and psychological harms.[21]   These are not "generalized grievance[s]" against allegedly illegal government conduct;[22] rather, the Final Rule "affect[s] the plaintiff[s] in a personal and individual way."[23]   Moreover, Plaintiffs are being denied the equal access to education guaranteed by Title IX.   Such an injury is independently sufficient to meet the injury-in-fact requirement.[24]

Second, Defendants' contention that the Doe plaintiffs' injuries are caused by their school's independent decision-making is equally unavailing.   Defendants cannot plausibly argue that the Final Rule is not "at least a substantial factor motivating the [schools'] actions."[25]   Schools are not independent actors with respect to Title IX enforcement and the Final Rule threatens administrative enforcement by the Department, including the termination of federal funding.[26]   Plaintiffs "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test.   This is true even in cases where the injury hinges on the reactions of third parties . . . to the agency's conduct."[27]   Following the publication of the Final Rule, schools across the country—including the Doe plaintiffs' schools—have rushed to hire additional staff, revise internal guidelines, and develop processes that meet the Final Rule's complex requirements,

---

[20] *Id*. at 560 n.1.
[21] *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 785-86 (9th Cir. 2008) (finding the psychological injury of being excluded from a public pool sufficient to confer standing).
[22] *Lujan*, 504 U.S. at 575.
[23] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).
[24] *See Renee v. Duncan*, 623 F.3d 787, 797 (9th Cir. 2010) ("We are bound to accept Congress' determination that students taught by a disproportionate number of teachers without 'full State certification' have been injured in fact.").
[25] *Tozzi v. U.S. Dep't of Health & Human Servs*., 271 F.3d 301, 308 (D.C. Cir. 2001) (quotation omitted); *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45 (1st Cir. 2005) ("The fact that the deleterious effect of a [government action] is indirect will not by itself defeat standing.").
[26] 85 Fed. Reg. 30,036, 30,288 (May 19, 2020).
[27] *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin*., 901 F.2d 107, 113-14 (D.C. Cir. 1990) (finding evidence in the record to support a conclusion that third parties' decisions were not substantially independent of the challenged government action and that those third parties were likely to alter their behavior in response to favorable judicial action).

processes that are even more difficult in light of the global pandemic.[28]

Defendants evidently hope that their last-minute blog post will enable them to escape accountability for the immediate impacts of the Final Rule on the Doe plaintiffs on the grounds that *schools*, not *the Department*, will have final say over the rules applicable to the Doe plaintiffs. But nothing in Article III standing doctrine requires such an unfair and impractical result. Rather, "when an agency action has a 'predictable effect ... on the decisions of third parties,' the consequences of those third party decisions may suffice to establish standing, even when the decisions are illogical or unnecessary.[29] In the event that the Doe plaintiffs' schools apply the Final Rule's mandates for all future Title IX investigations regardless of when the alleged misconduct took place—that is, if schools reasonably decline to rewire their administrative processes based on a four-paragraph blog post—such a decision can be "traced back through the actions of the intermediary parties to the challenged government decision."[30]

Third, Doe plaintiffs' injuries are redressable by the relief sought in this litigation. Contrary to Defendants' arguments, Doe plaintiffs need not show that an injunction will "prevent respondents from lobbying schools to change their procedures" or "prevent schools from voluntarily providing additional procedures."[31] Doe plaintiffs "need only show that a favorable ruling could potentially lessen [their] injury; [they] need not definitively demonstrate that a victory would completely remedy the harm."[32] Enjoining the Final Rule would allow Doe plaintiffs' claims to continue under the status quo ante, "lessen[ing]" the harm caused by the Final Rule.

---

[28] *See* Brief of the American Council on Education and 24 Other Higher Education Organizations as *Amici Curiae* in Support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay (No. 68-1) at 13 (The Final Rule will cause schools "extraordinary hardship and confusion"); Brief *Amicus Curiae* of AASA et al., in Support of Plaintiffs' Motion for Preliminary Injunction or Section 705 Stay (No. 55-1) at 5-6.

[29] *New York v. U.S. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *9 (2d Cir. Aug. 4, 2020) (citing *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)).

[30] *Id*. at 114.

[31] Def. Opp. at 12.

[32] *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012).

Finally, Doe plaintiffs' claims are ripe.  As explained above, the Department's blog post is unlikely to change schools' plans to implement the Final Rule, and thus Doe plaintiffs' claims are fit for adjudication.  Defendants' last-minute smoke screen does not mean that "we have no idea whether or when" the Doe plaintiffs will be harmed by the Final Rule.[33]  Indeed, those harms are already occurring.[34]

### C.  The Final Rule Is Causing and Will Continue to Cause Irreparable Harm to Organizational Plaintiffs

Plaintiffs have demonstrated frustration of mission and diversion of resources caused by the Department's Final Rule and this harm is irreparable.  Contrary to Defendants' assertions, the Final Rule imposes obstacles to organizational plaintiffs' actions to further their missions by making it less likely survivors will report sexual harassment due to the narrowed definition of "sexual harassment," the requirement of live hearings and direct cross-examination, and an unequal standard of evidence that unfairly burdens survivors.  This chilling effect is not speculative—at the time Plaintiffs' preliminary injunction was filed, at least two organizational plaintiffs, ERA and VRLC, had *already observed* survivors' unwillingness to bring complaints because of their concerns regarding the Title IX process under the Final Rule.[35]  Additionally, Legal Voice and CAASE have also asserted that the Final Rule's provisions will create a chilling effect on reporting sexual harassment.[36]  Because organizational plaintiffs aim to protect and assist

---

[33] *Texas v. United States*, 523 U.S. 296, 300 (1998).

[34] *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020) (finding claims against EPA directive ripe even though not all alleged harms had occurred).

[35] Ex. I, Decl. of Noreen Farrell for plaintiff Equal Rights Advocates ¶ 31 ("ERA") ("ERA has been unable to proceed with complaints of students concerned about coverage of off-campus assault"); Ex. H, Decl. of Stacy Malone for plaintiff Victim Rights Law Center ¶ 13 ("VRLC") ("VRLC has seen that survivors are considering a "now or never" approach to bringing a complaint, exacerbated by either not being close to on-campus counseling or by hiding information from family members who do not know about their experience of sexual violence.").

[36] Ex. K, Decl. of Lisa M. Stone for plaintiff Legal Voice ¶¶ 14-15 ("Legal Voice"); Ex. J, Decl. of Kaethe Morris Hoffer for plaintiff Chicago Alliance Against Sexual Exploitation ¶¶ 20-21, 28 ("CAASE").  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (A preliminary injunction requires "only a likelihood of such irreparable injury, Damocles's sword does not have to actually fall on all [plaintiffs] before the court will issue an injunction.").

survivors of sexual assault and harassment by advocating on their behalf, this chilling effect on the filing of complaints makes it increasingly difficult for them to fulfill their missions.[37]

Furthermore, ERA and VRLC have also alleged that in cases where a student files a formal complaint with their school, the Final Rule makes it more difficult for them to accomplish their missions of obtaining justice for survivors of sexual harassment because it makes accurate outcomes less likely and even where those outcomes remain available, success will take more time and effort given the barriers to the prompt and fair adjudication of complaints.[38]  This additional time and effort for each investigation and hearing will make it impossible for these organizations to help the same number of survivors under the Final Rule that they were able to help under the Department's previous policy.  The Department does not dispute that reduced likelihood of beneficial outcomes can establish frustration of mission as a matter of law—nor could it.[39]

Defendants' argument that organizational plaintiffs' expenditures cannot be considered a diversion of resources when the purpose of the organizations is to provide education concerning Title IX views the nature of organizational plaintiffs' expenditures too narrowly.[40]  The Final Rule harms organizational plaintiffs because it impairs their efforts to advocate for survivors—the "expenditures are merely a symptom of that programmatic injury."[41]  Not only have organizational plaintiffs expended significant resources to educate survivors about the sweeping changes of the

---

[37] *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2018 WL 4770741, at *8 (N.D. Cal. Oct. 1, 2018), *order amended on reconsideration*, No. 18-CV-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019) (finding frustration of mission based on observed "chilling effect" and denying motion to dismiss plaintiffs' APA and *ultra vires* claims for lack of standing), *appeal pending*, No 19-1755 (9th Cir.).

[38] VRLC ¶¶ 12, 14; ERA ¶¶ 20-21; CAASE and VRLC also allege that the Final Rule "puts in place new barriers to accurate fact-finding and adjudication of complaints."  CAASE ¶ 20; VRLC ¶ 14.

[39] *See El Rescate Legal Servs., Inc. v EOIR*, 959 F.2d 742, 748 (9th Cir. 1991) (allegation of practice of using incompetent translators frustrated plaintiffs' immigration efforts on behalf of non-English-speaking clients and was sufficient to establish standing).

[40] Even assuming organizational plaintiffs suffered purely economic injury, "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable."  *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020).

[41] *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Final Rule, but they have also diverted resources directly to combat the harmful effects of the Final Rule. For example, ERA's legislative efforts have historically focused on employment-related bills, but it has diverted staff resources toward its work related to Senate Bill 493 in California, which would impose additional requirements on post-secondary schools' handling investigation of sexual misconduct.[42] CAASE's Policy Department has diverted time from their regular work to complete an analysis of the Final Rule and draft recommendations of policies to protect student survivors after the Final Rule goes into effect.[43] VRLC has diverted resources to create materials that will aid preK-12 student survivors and parents, school districts, and education attorneys in maintaining trauma-informed practices under the Final Rule.[44] Legal Voice has diverted resources to research potential legislative proposals to provide protections for survivors despite the Final Rule, and it expects to divert additional resources toward advocating for legislative Title IX protections at the state level.[45]

These harms are irreparable and magnified in light of the approaching August 14, 2020 effective date. These harms are not merely economic, but instead go to the heart of organizational plaintiffs' programmatic goals. Similar harms to organizations have been found to be irreparable.[46]

In the absence of an injunction or a stay of the effective date, organizational plaintiffs will

---

[42] ERA ¶ 28.

[43] CAASE ¶ 19.

[44] VRLC ¶ 10.

[45] Legal Voice ¶ 11.

[46] *League of Women Voters of United States*, 838 F.3d at 9 (finding irreparable harm to voter registration organizations' mission of registering voters and imposing injunction against use of voter registration form instructions requiring proof of United States citizenship); *New York v. U.S. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *30 (2d Cir. Aug. 4, 2020) (affirming injunction and finding of irreparable harm based on expenditures to "mitigate the harm" to communities organizations served, and noting that the agency "predicted that the Rule would have economic harms, and the Rule has already had a chilling effect on non-citizen use of public benefits. These injuries claimed by the States and the Organizations are actual and imminent."); *E. Bay Sanctuary*, 950 F.3d at 1280 (affirming nationwide preliminary injunction against rule and finding that legal services organizations would suffer irreparable where there would be significant changes in their programmatic mission of assisting asylum seekers, because policy discouraged asylum seekers, and the organizations suffered loss of funding they could not recover).

continue to see their missions frustrated and resources diverted. Organizational plaintiffs cannot

be compensated by a damages remedy or a later-issued injunction: They cannot advocate for

survivors whose reports of sexual harassment were chilled due to the Final Rule (in many cases

they may never know who these survivors are), they cannot unilaterally reverse a Title IX

investigation outcome that was unfavorable to a survivor due to the arbitrary and capricious nature

of the Final Rule's procedures, and they cannot recover time and effort diverted to addressing the

harmful effects of the Final Rule in legislative or education arenas.[47] A preliminary injunction

would allow organizational plaintiffs to re-allocate resources to the *status quo ante* and pursue

their missions, until the legality of the Final Rule is decided.

### D.  The Organizational Plaintiffs Have Standing

Regardless of the Court's determination of the irreparability of these harms, organizational

plaintiffs have still established the more basic requirements of Article III standing by

demonstrating injury-in-fact based on those harms, as well as causation, and redressability. "[A]n

advocacy organization may achieve standing if its mission has been 'frustrated' by the challenged

conduct and it has expended resources to combat it."[48] A "diversion-of-resources injury is

sufficient to establish organizational standing at the pleading stage, even when it is 'broadly

alleged.'"[49] An organization has standing where it "undertook the expenditures in response to,

and to counteract, the effects of the defendants' alleged" unlawful acts.[50]

---

[47] *See* VRLC ¶ 12 ("If the Final Rule goes into effect and is later vacated, VRLC will not be able to recover this time or later serve these survivors' time-sensitive complaints, thereby frustrating the organization's mission.").

[48] *Equal Means Equal v. Dep't of Educ.*, No. CV 17-12043-PBS, 2020 WL 1284149, at *5 (D. Mass. Mar. 18, 2020), *appeal pending*, 20-1429 (1st Cir.) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

[49] *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (quoting *Havens*, 455 U.S. at 379); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1096–97 (D.C. Cir. 2015).

[50] *People for the Ethical Treatment of Animals*, 797 F.3d at 1098; *New York v. U.S. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *10 (2d Cir. Aug. 4, 2020) (The organizations dedicated to providing legal and social services "have expended significant resources to mitigate the Rule's impact on those they serve. In so doing, they have diverted resources that would otherwise have been available for other programming, a 'perceptible opportunity cost' that suffices to confer standing.")

Organizational plaintiffs' alleged frustration of mission and diversion of resources to combat the harmful effects of the Final Rule is the type of "concrete, particularized, and actual or imminent"[51] injury to the organization's activities, along with "the consequent drain on the organization's resources," that the Supreme Court has found to be "concrete and demonstrable" and "far more than simply a setback to the organization's abstract social interests."[52]  Indeed, the district court in *SurvJustice* previously found *Havens* standing for organizational plaintiffs ERA and VRLC based on similar observed injuries as described above, with the same degree of specificity.[53]  The Supreme Court has stated that "in many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases."[54]  Within the limits described above, courts have applied *Havens* to find organizational standing in a "wide range of circumstances."[55]

## II.   PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS[56]

The briefing on this motion establishes that Plaintiffs have shown that there is "'more than

---

[51] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

[52] *Havens*, 455 U.S. at 379.

[53] *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2018 WL 4770741, at *8 (N.D. Cal. Oct. 1, 2018), *order amended on reconsideration*, No. 18-CV-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019) (finding that plaintiffs had satisfied the injury-in-fact prong of standing as to their APA and *ultra vires* claims and denying a motion to dismiss those claims); *see Equal Means Equal*, 2020 WL 1284149, at *6 (contrasting specificity of organizational plaintiffs' alleged harms with those in *SurvJustice* and allowing one organizational plaintiff to amend the complaint to allege factual bases to support standing).

[54] *See Allen v. Wright*, 468 U.S. 737, 751–52 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).

[55] *Project Basic Tenants Union v. Rhode Island Hous. & Mortg. Fin. Corp.*, 636 F. Supp. 1453, 1459-60 (D.R.I. 1986) (finding "distinct and palpable" organizational injury where plaintiff alleged harm to its efforts to "advocat[e] for more affordable housing and more open housing opportunities throughout the City" and "interfer[e] with its encouragement of others in the enjoyment" of open housing"); *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 27 (D.C. Cir. 2011) (stating that "many" cases finding *Havens* standing involve alleged injury to "activities that could just as easily be characterized as advocacy—and, indeed, sometimes are.").

[56] In the interest of clarity for the Court, Plaintiffs focus this Reply on issues most pertinent to the preliminary injunction; however Plaintiffs do not concede points not discussed herein and reserve the right to address them at a later time.

a mere possibility' of success" on the merits.[57]

### A.  The Final Rule's Cumulative Effect Contravenes the Purpose of Title IX

While the Department selectively tries to justify specific provisions of the Final Rule, the cumulative effect of the Rule undeniably contravenes the purposes of Title IX.  To justify the Final Rule, Defendants assume the number of incidents of sexual harassment and assault will remain constant after the Final Rule is implemented.[58]  Yet the Department predicts "the proposed regulations would decrease the number of investigations conducted per year"[59]:  a 50% reduction in investigations in the K-12 context and a 33% reduction in the post-secondary context.[60]  In short, Defendants' own predictions of the impact of the Final Rule align with Plaintiffs' declarations documenting the "chilling effect" that the Final Rule will lead to more unreported and/or uninvestigated instances of sexual assault and harassment, and consequently fewer instances of survivors even attempting to vindicate their right to access education free from discrimination through the Title IX process.[61]  Where an agency itself forecasts the injuries claimed by Plaintiffs, it is "disingenuous" for Defendants to claim that injury is not "sufficiently imminent."[62]

The Final Rule reduces dramatically the prospect of school liability for non-compliance with Title IX and strengthens respondents' rights to quash legitimate Title IX complaints through aggressive and intimidating tactics.  Too often, the Final Rule reads as if the Department believed that Title IX's statutory goal was to ensure equal access to education for alleged perpetrators of

---

[57] *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

[58] 85 Fed. Reg. at 30,539 (May 19, 2020) (admitting "this is a major assumption and limitation of our analysis").

[59] *Id.* at 30,503.

[60] *Id.* at 30,566.

[61] ERA ¶ 31; VRLC ¶ 13; Legal Voice ¶¶ 14-15; CAASE ¶¶ 20-21, 28; Ex. M, Decl. of Michael Madowitz ¶¶ 17-18 ("Madowitz").

[62] *New York v. U.S. Dep't of Homeland Sec.*, 2020 WL 4457951 at *9 (noting that DHS acknowledged in the costs and benefits of adopting the Rule that expected disenrollment will result in decreased federal funding to states, decreased revenue for healthcare providers, and an increase in uncompensated care).

sexual harassment.  But Congress legislated no such mandate, and as the outpouring of Amici support for Plaintiffs underscores, the Final Rule does little if anything to protect the statutory class of persons whose rights Title IX was enacted to protect—victims of sex-based discrimination, which includes sexual harassment.  Indeed, the Department's cost-benefit analysis glaringly fails to even consider the cost of sexual harassment on survivors.  The Final Rule contravenes Title IX's unequivocal purpose to prevent and redress sex discrimination in schools and weakens its ability to protect as Congress intended.[63]

### B.  The Narrowed Definition of Sexual Harassment Is Arbitrary, Capricious, and Not in Accordance with the Law

The Final Rule's definition of "sexual harassment" upsets decades of Department policy and guidance without adequate justification and subverts Title IX's clear mandate.

By redefining sexual harassment as quid-pro-quo harassment, Clery Act offenses, and unwelcome conduct that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access," the Rule requires schools to ignore many types of sexual misconduct that are severe but not pervasive—such as a single instance of a teacher exposing himself to a minor student, or one student recording another student without their knowledge during sexual encounter—or that are pervasive but not independently severe—such as a repeated, unwelcome requests to send nude photos or persistent vulgar comments.  The new definition thus excludes conduct that produces the very effects that Title IX proscribes.  Further, by limiting Title IX's reach to sexual harassment that "effectively denies a person equal access," the Final Rule contravenes Title IX's text, which charges the Department with ensuring that no person shall be

---

[63] *See* [Proposed] Brief of Members of Congress as *Amici Curiae* in Support of Plaintiffs' Motion for a Preliminary Injunction or Section 705 Stay (No. 85-1) at 4 ("Under Title IX, the Department may promulgate implementing rules only if they are consistent with the statute's broad remedial purpose. The Final Rule fails this test. The Department's approach turns Title IX's victim-protective approach on its head").

"excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity."[64]

The Department's justification for this definition does not withstand scrutiny.  The Final Rule seeks to align schools' disciplinary standards with the framework in *Gebser* and *Davis*, but the Department's reliance on these cases underscores the dramatic changes that the Final Rule is making to the current state of the law.  *Gebser* and *Davis* each involved the applicable standard for an implied private right of action in federal courts for money damages, not the standard for administrative enforcement of Title IX.  The Court established a heightened standard for monetary liability in *Gebser* precisely because the motivating rationale for that standard does not apply in the administrative enforcement context.  *Gebser* highlighted that Congress had not expressly created a private right of action to enforce the statute; rather, the Court itself created that right[65] and set a high liability standard to guard against "unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs."[66]  But the potential notice problems to covered schools motivating the *Gebser* standard are not present in the administrative enforcement context.  For decades, the Department has acknowledged as much,[67] and it has failed to justify or explain such a dramatic shift from this longstanding understanding.[68]

### C.  The Provisions Prohibiting Schools from Investigating Sexual Harassment Occurring Outside an Education Program or Activity and Requiring Complainants to be Enrolled or Attempting to Attend the School's Programs or Activities Are Arbitrary and Capricious.

---

[64] 20 U.S.C. § 1681(a).

[65] *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979).

[66] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998).

[67] *See* Amicus Curiae Brief of Law Professors (No. 72-2) at 18-20 (listing sources); *see also* Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 66 Fed. Reg. 5512 (Jan. 19, 2001); Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter (Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[68] Further, the fact that the Department's previous policy was not promulgated through notice-and-comment rulemaking does not preclude the development of serious reliance interests on that policy.  *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1913-15 (2020) (internal quotations and citations omitted).

The Final Rule unreasonably restricts schools from investigating sexual harassment that occurs outside of an "education program or activity."[69]  Defendants inexplicably contend that the Final Rule does not "draw a distinction between on-campus misconduct and off-campus misconduct," yet admit that the Final Rule ***does*** exclude off-campus conduct if the conduct did not occur "in the recipient's education program or activity."[70]  Indeed, the Final Rule requires schools to dismiss complaints where a professor sexually harasses a student during the student's shift at an off-campus coffee shop or where a student sexually assaults another student at an off-campus apartment stripping a school of authority to address these and many other similar actions that manifestly contribute to a hostile environment on campus and jeopardizes students' ability to access their education.  Although the Department now asserts that, under the Final Rule, an educational institution is not precluded from using a "non-Title IX" code to address off-campus conduct, this concession in no way justifies the Department's decision to restrict the coverage of Title IX and will leave victims unprotected as schools grapple with newly created uncertainty.

Likewise, the requirement that a complainant must attend or be attempting to attend the school's program or activity is arbitrary.  Students harassed and assaulted by faculty are often afraid to come forward while they remain under the influence of their abusers.[71]  It was only after transferring from her field of study and attending a different school that Sobia Doe was able to come forward to report the abuse she suffered by her professor.  There is no justifiable reason to forbid a school from conducting a Title IX investigation into a current employee who poses a threat to current students merely because the complainant left the school before reporting the harassment.  Nor is there any rational basis for forcing a survivor who has graduated to continue participating

---

[69] 34 C.F.R. § 106.44(a).
[70] Def. Opp. at 26-27.
[71] *See generally* Decl. of Sobia Doe.

in alumni events simply so they can file a Title IX complaint.[72]

### D.  The Grievance Procedures Are Arbitrary and Capricious

The Final Rule imposes a number of requirements related to schools' grievance procedures that fly in the face of Title IX's purpose and the agency's longstanding position.  The Final Rule has created a trial-like atmosphere in which complainants are required to submit to re-traumatizing direct, live cross-examination by an advisor of their respondent's choice but are not afforded the procedural safeguards of an actual civil or criminal trial.  The grievance procedures are biased toward respondents and hostile toward complainants, contributing to a less fair process that will ultimately chill sexual harassment reporting.

Perhaps most egregious is the Final Rule's sweeping new mandate compelling schools to enable direct, live cross examination even in cases where it is harmful and unnecessary. Defendants cite to the "numerous safeguards" the Final Rule includes; however, each is unlikely to prevent the re-traumatization and harm of the cross-examination itself.  For example, although Defendants point to the school's ability to limit examination to the "relevant" issues, the Final Rule actually requires the exclusion of huge swaths of relevant evidence.[73]  Most notably, the Final Rule excludes all relevant oral and written statements from a party or witness who declines or is unable to testify at a live hearing or who declines to answer even a single cross-examination question during a live hearing.[74]  Defendants acknowledge that this sweeping rule regarding hearsay is "a broader exclusionary rule than found in the Federal Rules of Evidence," but maintain it is somehow justified because "recipients are educational institutions that should not be converted into de facto courtrooms."[75]  But by inequitably cherry picking certain elements of civil and

---

[72] Def. Opp. at 36.
[73] *Id.* at 30.
[74] 85 Fed. Reg. 30,016, 30,313-14 (May 19, 2020).
[75] Def. Opp. at 31.

criminal trials to enforce, the Department has made the rules for these proceedings in many respects more formalistic and impractical than what one encounters in a courtroom.

The Final Rule will also unnecessarily traumatize survivors.  Although Defendants highlight the Final Rule's prohibition on parties personally conducting cross-examination,[76] this "safeguard" is insufficient to overcome the fact that the Final Rule requires the party's "advisor of choice" to conduct the questioning[77] rather than a neutral hearing officer.  The advisor of choice could be anyone from a high-powered, aggressive attorney to an enraged parent to a loyal fraternity brother.  Although the Defendants argue these advisors would be subject to the "same rules of order and decorum as any other advisor," Defendants fail to consider, for example, the practical challenges of a school official maintaining such order and the power dynamics of such a scenario. Consider the inherent intimidation of a young student being interrogated about a sexual assault by an aggressive parent of the alleged assailant, the fear of retaliation associated with being questioned by a well-connected student athlete or fraternity member, or the inequities resulting from one party having an attorney and the other having a non-attorney advisor.[78]

### E.  The Presumption of Non-Responsibility is Arbitrary and Capricious

Rather than protecting individuals from discrimination on the basis of sex, as Title IX requires, the Final Rule seeks to protect the respondent from "feel[ing] like the burden was on the respondent to prove non-responsibility."[79]  This inevitably alters the purpose of a Title IX investigation from one seeking the truth in order to ensure equal access to education, to a judicial proceeding.  Defendants fail to articulate why a Title IX hearing—which serves as a distinct remedy from what can be achieved through the criminal legal system—must incorporate such a

---

[76] Def. Opp. at 30.
[77] 34 C.F.R. § 106.45(b)(6)(i).
[78] Def. Opp. at 32.
[79] 85 Fed. Reg. 30,016, 30,258 (May 19, 2020).

presumption to fulfil the purpose of Title IX.  The Department of Education does not require such a presumption of non-responsibility for any other form of student or employee misconduct.

### F.  The Heightened Notice Requirement is Arbitrary and Capricious

The Final Rule's requirement that an unreasonably narrow subset of school employees must have "actual knowledge" of the sexual harassment before the school is required to address the conduct is yet another example of the Department's improper abdication of educational institutions' responsibilities.[80]  This heightened notice standard will allow certain instances of sexual harassment to go unchecked by fostering a culture of silence that enables serial predators like Larry Nassar, George Tyndall, James Heaps, and Richard Strauss.[81]

Prior to the Final Rule, the Department required schools to respond to sexual harassment so long as the employee who had actual or constructive notice was a "responsible employee."[82] The Final Rule represents a vast departure from this guidance, especially at the post-secondary level.  The Final Rule only requires a Title IX response when the Title IX coordinator or a high-ranking official with the "authority to institute corrective measures" has actual knowledge of the sexual harassment.[83]  This unnecessarily limited pool of individuals tasked with taking action in response to reports of sexual harassment excludes individuals students may be more likely to confide in, such as coaches or residential advisors.[84]  Defendants fail to address this significant shift and the fact that it will lead to fewer addressed reports of sexual harassment simply because certain individuals are no longer required to act.  It also will not protect the autonomy of

---

[80] 34 C.F.R. §§ 106.30, 106.44; 85 Fed. Reg. 30,016, 30,574.
[81] *See* Amicus Brief of Survivors at 2-3.
[82] 2001 Guidance at 13.
[83] 34 C.F.R. § 106.30.
[84] *See* Amicus Brief of Survivors at 3 ("As prime examples, survivors from MSU, the University of Southern California, and Ohio State University reported their horrifying experiences of sexual violence to numerous school employees, including athletic trainers, coaches, and professors, and under the Final Rule, none of them would have had the responsibility to address the abuse because the schools could argue that none of these employees either had "actual knowledge" or had the "authority to institute corrective measures.").

complainants, contrary to the Defendants' assertions.[85]

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR GRANTING THE REQUESTED RELIEF

The balance of the equities and public interest weigh in Plaintiffs favor.  Defendants put forward two reasons why they disagree: (1) the notion that it is generally good to allow regulations, and (2) Defendants' belief that there were weaknesses with the prior guidance.[86]  But whatever one's view of the value of formal rulemaking, the Department has no good explanation for why schools, the public at large, or students—much less victims of sex-based discrimination—would benefit from a Final Rule that is poised to exacerbate the very harm Title IX was enacted to address.

In contrast, Plaintiffs, other victims, and those who could become victims of sex-based discrimination are harmed whether or not their complaints are investigated under the Final Rule in that the Final Rule relies on stereotypes that sexual harassment complainants are uniquely less trustworthy and accordingly invalidates their experiences, prolongs and intensifies the psychological and emotional pain of the sexual harassment, disincentivizes reporting, and exacerbates the challenges victims of sexual assault and sexual harassment face in trying to access their education.  Congress enacted Title IX because it recognized that the public interest is best served by instituting policies that seek to prevent sex discrimination in schools.

## <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court preliminarily enjoin implementation of the Final Rule nationwide, or, in the alternative, stay the effective date pending judicial review.

---

[85] Def. Opp. at 33.
[86] *Id*. at 40.

Dated:        August 10, 2020              Respectfully submitted,


By: /s/ David Newman
Julie O'Neill
Natalie A. Fleming Nolen
David A. Newman
Vanshika Vij
Caitlin A. Crujido
Robin A. Smith
Evan M. Harris
Morrison & Foerster LLP
2000 Pennsylvania Ave., NW, Suite 6000
Washington, DC  20006-1888
Telephone: 202.887.1500

Emily Martin*
Neena Chaudhry
Sunu Chandy*
Shiwali G. Patel
Elizabeth Tang
National Women's Law Center
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Telephone: 202.588.5180

Diane L. Rosenfeld**
Attorney at Law
Mass. Bar Number 668275
Cambridge, MA 02138

*Attorneys for Plaintiffs*

* *motion for admission pro hac vice
forthcoming*
***motion for admission to U.S. District
Court for District of Massachusetts granted;
formal admission scheduled August 11, 2020*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of this **<u>REPLY BRIEF IN SUPPORT OF PLAINTIFFS'</u>**

**<u>MOTION FOR PRELIMINARY INJUNCTION OR 5 U.S.C. § 705 STAY PENDING</u>**

**<u>JUDICIAL REVIEW</u>**, was served this day on all parties via the Court's electronic case filing

system.


Date:  August 10, 2020                                        <u>/s/ David Newman</u>