**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| VICTIM RIGHTS LAW CENTER, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-11104-WGY |
| | ) |
| ELISABETH D. DEVOS, *et al.*, | ) Leave to file granted |
| | ) August 18, 2020 |
| *Defendants*. | ) |
| | ) |

**BRIEF OF THE AMERICAN COUNCIL ON EDUCATION AND 24 OTHER HIGHER**
**EDUCATION ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION OR 5 U.S.C. § 705 STAY**

Gregory F. Noonan (BBO# 651035)
HOGAN LOVELLS US LLP
125 High Street, Ste. 2010
Boston, MA 02110
(617) 371-1029
gregory.noonan@hoganlovells.com

Stephanie J. Gold
Susan M. Cook
Kyle M. Druding
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5496
stephanie.gold@hoganlovells.com

*Counsel for Amici Curiae*

Dated:  August 18, 2020

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF INTEREST ................................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................................ 3

ARGUMENT ............................................................................................................................ 4

      I.      The Department's Final Rule Directs A Sea Change For Title IX
              Administration In Higher Education. ...................................................................... 4

      II.     The Abbreviated Compliance Deadline Set Forth In The Final Rule Will
              Be Difficult—If Not Impossible—For Institutions To Meet. .............................. 8

CONCLUSION ....................................................................................................................... 16

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979) ...............................................................................................4

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ...............................................................................................4

*Franklin v. Gwinnett Cty. Pub. Sch.*,
  503 U.S. 60 (1992) .................................................................................................4

STATUTES:

Department of Education Organization Act,
  Pub. L. No. 96–88, 93 Stat. 669 (1979).................................................................4

20 U.S.C. § 1681(a) ....................................................................................................4

REGULATIONS:

Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance,
  85 Fed. Reg. 30,026 (May 19, 2020)............................................................ 3, 6, 15

Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance,
  83 Fed. Reg. 61,462 (Nov. 29, 2018) ..................................................................5, 6

Sexual Harassment Guidance: Harassment of Students by School Employees,
  Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997)
  *revised* (Jan. 19, 2001), *available at* https://bit.ly/3dc3mcG ...................................5

45 C.F.R. § 86.1 ..........................................................................................................4

EXECUTIVE MATERIALS:

Exec. Order No. 12212,
  45 Fed. Reg. 29,557 (May 2, 1980) .......................................................................4

President Donald J. Trump, Proclamation on Declaring a National Emergency
  Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13,
  2020), a*vailable at* https://bit.ly/2SFUCUQ ........................................................12

OTHER AUTHORITIES:

Am. Council on Educ., Comment Letter on Proposed Rule Amending Title IX
Regulations (Jan. 30, 2019), *available at* https://bit.ly/35zEOs1 ............................... 9, 10, 11

Am. Council on Educ., Statement by ACE President Ted Mitchell on Final Title
IX Regulations (May 6, 2020), *available at* https://bit.ly/2Bceh8W ...................................... 8

Bd. of Regents of Univ. of Wis. Sys., Chapter UWS 17:  Student Nonacademic
Disciplinary Procedures (eff. Sept. 1, 2009), *available at*
https://bit.ly/2xGV3XU .................................................................................................... 11

Sydney Czyzon, *Title IX investigations transition online, await new federal
guidelines*, Marquette Wire (Apr. 29, 2020), https://bit.ly/2yoVPJw .................................... 14

Entangled Solutions, COVID-19:  Higher Education Resource Center,
https://bit.ly/2zafDAn (last visited July 31, 2020) ................................................................ 12

Isabel L. Isselbacher, *Harvard Title IX Office Operations Continue Remotely
During COVID-19 Crisis*, Harvard Crimson (Mar. 31, 2020),
https://bit.ly/3b9UZxr ....................................................................................................... 14

Letter from Ted Mitchell, President, ACE, to Betsy DeVos, Sec'y of Educ., U.S.
Dep't of Educ. (Mar. 24, 2020), *available at* https://bit.ly/2W7Sdo8 .................................. 15

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter:  Harassment
and Bullying (Oct. 26, 2010), *available at* https://bit.ly/2yPkXct .......................................... 7

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual
Harassment (Jan. 25, 2006), *available at* https://bit.ly/3dhCbxK............................................. 5

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual
Violence (Apr. 4, 2011), *available at* https://bit.ly/3dglR0f, .................................................. 5
*withdrawn* (Sept. 22, 2017), *available at* https://bit.ly/2L4omGY ........................................... 5

Office for Civil Rights, U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct
(Sept. 2017), *available at* https://bit.ly/35Up8jt ....................................................................... 7

Office for Civil Rights, U.S. Dep't of Educ., Questions and Answers on Title IX
and Sexual Violence (Apr. 29, 2014), *available at* https://bit.ly/2YNAYuf............................. 5
*withdrawn* (Sept. 22, 2017), a*vailable at* https://bit.ly/2L4omGY ........................................... 5

Christina Paxson, Opinion, *College Campuses Must Reopen in the Fall.  Here's
How We Do It*., N.Y. Times (Apr. 26, 2020), https://nyti.ms/2WIeVSL ................................ 13

U.S. Dep't of Educ., Background & Summary of the Education Department's
Proposed Title IX Regulation (Nov. 2018), *available at* https://bit.ly/3e8Ul5w...................... 6

U.S. Dep't of Educ., Summary of Major Provisions of the Department of
Education's Title IX Final Rule (May 6, 2020), *available at*
https://bit.ly/2xL9Ws4 ................................................................................................................ 8

U.S. Dep't of Educ., Title IX of the Education Amendments of 1972, Docket ID:
ED-2018-OCR-0064, https://www.regulations.gov (last visited July 31, 2020) ..................... 6

## STATEMENT OF INTEREST

*Amici* are 25 associations of colleges, universities, educators, trustees, and other representatives of higher education in the United States. *Amici* represent public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions. They have a strong interest in ensuring that their members are given the proper time to analyze, deliberate, and implement the extensive changes mandated by the first set of regulations issued under Title IX since the 1970s, especially in light of the unprecedented demands that responding to the evolving COVID-19 crisis has imposed on higher education institutions.[1]

*Amicus curiae* the American Council on Education ("ACE") represents all higher education sectors. Its more than 1,700 members reflect the extraordinary breadth and contributions of degree-granting colleges and universities in the United States. Founded in 1918, ACE seeks to foster high standards in higher education, believing a strong higher education system to be the cornerstone of a democratic society. As a key part of its mission, ACE is committed to ensuring the continued vitality and workability of the federal civil rights protections enshrined in Title IX, including through the submission of *amicus curiae* briefs in cases of particular national import.

ACE is joined in this amicus brief by the following organizations, whose descriptions are found in the Addendum to this brief:

- The Accreditation Council for Pharmacy Education;
- American Association of Community Colleges;
- American Association of State Colleges and Universities;

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties have consented to the filing of this brief.

- American Association of University Professors;
- American Dental Education Association;
- American Indian Higher Education Consortium;
- Association of American Medical Colleges;
- Association of American Universities;
- Association of Catholic Colleges and Universities;
- Association of Governing Boards of Universities and Colleges;
- Association of Jesuit Colleges and Universities;
- Association of Public and Land-grant Universities;
- College and University Professional Association for Human Resources;
- Council for Advancement and Support of Education;
- Council of Independent Colleges;
- Middle States Commission on Higher Education;
- NASPA - Student Affairs Administrators in Higher Education;
- National Association of College and University Business Officers;
- National Association of Diversity Officers in Higher Education;
- National Association of Independent Colleges and Universities;
- National Collegiate Athletic Association;
- New England Commission of Higher Education;
- University Risk Management and Insurance Association; and
- WASC Senior College and University Commission.

*Amici* are deeply concerned that the U.S. Department of Education ("Department"), in its recently announced regulatory overhaul of Title IX, has set an unreasonable implementation timeframe, requiring the roll-out this semester of revised policies and protocols, renegotiation of collective bargaining and other agreements with constituent groups, and application of hastily arranged and untested procedures.   Moreover, the Department incomprehensibly decided to announce the new requirements in the middle of a pandemic and after administrators and faculty members on every campus in America had been sent home.  As colleges and universities move toward and through the upcoming academic year, they cannot be expected to comprehensively and sensibly implement the new requirements without diverting significant time and resources that are sorely needed to respond to the ongoing global pandemic.  While *amici* have strong and publicly articulated views about many aspects of the regulatory overhaul, that is not the focus of this brief.  *Amici* write to highlight the unique harms that expedited compliance imposes and to

urge this Court to grant preliminary injunctive relief to allow American colleges and universities sufficient time to implement the new regulations.[2]

## SUMMARY OF ARGUMENT

The Department recently issued final regulations under Title IX for the first time in nearly half a century.  *See* U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) (hereinafter, "Final Rule").  The regulations are the result of a year-and-a-half-long rulemaking that culminated in a 600,000 word Federal Register notice.  The new regulations will require colleges and universities nationwide to restructure thousands of institution-specific policies and procedures in order to comply with scores of new administrative mandates.  And yet the Department has set highly abbreviated compliance deadlines for doing so, demanding that new policies and procedures be in place and actively utilized this academic semester.

In the best of times, that timing would be unreasonable.  But in light of the extraordinary burdens that have been placed on American colleges and universities in the wake of the COVID-19 global pandemic, the timing is problematic in the extreme.  Higher education institutions cannot implement their new protocols without diverting significant focus and resources from other mission-critical demands.

The higher education associations submit this brief to explain, independent of the merits challenges to the Final Rule, the imminent and irreparable harms that will befall colleges and universities absent an injunction or stay.  These harms speak solely to the balance of hardships

---

[2] *Amici* have already been granted leave to file a similar version of this brief in *State of New York v. United States Department of Education*, No. 1:20-cv-4260-JGK (S.D.N.Y.), and *Commonwealth of Pennsylvania v. DeVos*, No. 1:20-cv-1468-CJN (D.D.C.).

and public interest factors associated with the standard for preliminary injunctive relief. *Amici* support Plaintiffs' request for a preliminary injunction or stay to permit higher education institutions sufficient time to assess how most effectively to incorporate the new requirements into their policies and procedures. *Amici* also believe it would be prudent to delay implementation of the rule until there is a final resolution of the substantive issues in this lawsuit and reasonable certainty that the Final Rule will, in fact, be a design parameter for policies and procedures on America's campuses.

## ARGUMENT

I.   **The Department's Final Rule Directs A Sea Change For Title IX Administration In Higher Education.**

Title IX is a cornerstone federal civil rights law enacted by Congress as part of the Education Amendments of 1972.  It provides in pertinent part:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The last time full-dress regulations were issued under Title IX was in 1975, nearly half a century ago.  *See* 45 C.F.R. § 86.1 *et seq.*  The agency then tasked with implementing Title IX was the former Department of Health, Education, and Welfare, as those regulations predated the Department of Education itself by five years.  *See* Department of Education Organization Act, Pub. L. No. 96–88, § 201, 93 Stat. 669, 671 (1979); Exec. Order No. 12212, 45 Fed. Reg. 29,557 (May 2, 1980).

In the decades since, various aspects of Title IX's requirements have been further construed and interpreted by the courts, *see, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), as well as in informal guidance and "Dear Colleague" letters from

the Department across administrations, *see, e.g.*, Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997), *revised* (Jan. 19, 2001)[3]; Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006)[4]; Dear Colleague Letter:  Sexual Violence (Apr. 4, 2011),[5] *withdrawn* (Sept. 22, 2017)[6]; Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014),[7] *withdrawn* (Sept. 22, 2017).[8]

The current, once-in-multiple-generations Title IX rulemaking reflects a massive regulatory undertaking.  The Department's Office for Civil Rights released its Notice of Proposed Rulemaking at the end of November 2018.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018).  That proposal sought broad comment on several crucial and highly sensitive and complex issues of Title IX administration, including:

- How to define "sexual harassment" for Title IX purposes;

- What should trigger schools' legal obligations to respond to claims of sexual harassment;

- How schools should respond after receipt of a qualifying complaint;

- What features institutional individual grievance procedures should contain;

- How schools should conduct factual investigations into allegations of misconduct;

---

[3] *Available at* https://bit.ly/3dc3mcG.

[4] *Available at* https://bit.ly/3dhCbxK.

[5] *Available at* https://bit.ly/3dglR0f.

[6] *Available at* https://bit.ly/2L4omGY.

[7] *Available at* https://bit.ly/2YNAYuf.

[8] *Available at* https://bit.ly/2L4omGY.

- What the evidentiary and adjudicative standards for making determinations of responsibility should be;

- How the appeals mechanism for responsibility determinations should work; and

- What record-keeping and disclosure obligations should attach to Title IX coordinators, investigators, and decisionmakers.

*See* 83 Fed. Reg. at 61,495–499; *see also* U.S. Dep't of Educ., Background & Summary of the Education Department's Proposed Title IX Regulation 3–6 (Nov. 2018).[9]  In response to the Proposed Rule, affected stakeholders and members of the public submitted over 120,000 comments.  *See* U.S. Dep't of Educ., Title IX of the Education Amendments of 1972, Docket ID: ED-2018-OCR-0064, https://www.regulations.gov (last visited July 31, 2020).  Those comments included a twenty-eight page letter submitted by sixty-one higher education associations, including virtually all the signatories to this amicus brief.

The Final Rule was published in the Federal Register on May 19, 2020.  85 Fed. Reg. 30,026.[10]  As finalized, the new regulations mandate that our nation's colleges and universities follow a prescribed template that requires the vast majority of them to make broad-scale and fundamental changes to a wide variety of institution-specific practices and policies attendant to Title IX proceedings.  The Department's new regulations require that every college and university review policies, procedures, and practices in every aspect of their operations and make any necessary changes to assure their policies, procedures, and practices applicable to undergraduate and graduate students, as well as faculty and staff (whether unionized or not), comply with the Final Rule's myriad requirements.  For example:

---

[9] *Available at* https://bit.ly/3e8Ul5w.

[10] Several days earlier, on May 6, the Final Rule was made public informally through a PDF document posted on the Department's website, *available at* https://bit.ly/3hCwzAZ.

- Colleges and universities must adopt or otherwise reconcile in their policies and procedures a new Title IX-specific definition of "sexual harassment," including to mean conduct that is so "severe" *and* "pervasive" *and* "objectively offensive" that it effectively denies a person equal access to the recipient's education program or activity. Notably, this construction runs counter to the Department's prior guidance regarding discriminatory harassment[11] and also is inconsistent with the "severe" *or* "pervasive" offensive conduct standard used in Title VII cases;

- They must meet a new set of mandatory response obligations triggered by a "deliberate indifference" standard, which in turn requires implementation of various newly mandated grievance, investigation, notice, and record-keeping obligations;

- They must adopt new practices for adjudicating Title IX complaints, including the use of "live hearing[s] with cross-examination" under prescribed evidentiary and procedural standards and a written responsibility determination based on either the "preponderance of the evidence" or the "clear and convincing" threshold;

- They must afford both parties to a responsibility determination a specified appeals mechanism to be made available in enumerated circumstances; and

- They must revise informal resolution procedures, such as mediation or restorative justice, to include certain features while prohibiting others, which may both expand and

---

[11] *See, e.g.*, Q&A on Campus Sexual Misconduct 1 (Sept. 2017) ("[W]hen sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond."), *available at* https://bit.ly/35Up8jt; Dear Colleague Letter: Harassment and Bullying 2 (Oct. 26, 2010) ("Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school. When such harassment is based on race, color, national origin, sex, or disability, it violates the civil rights laws that OCR enforces."), *available at* https://bit.ly/2yPkXct.

restrict colleges' and universities' current use of these alternatives.  For example, the
Final Rule disallows an institution to offer an informal resolution process until after a
formal complaint is filed, and in no case may an institution offer or facilitate an informal
resolution process if the respondent is an employee.

*See generally* U.S. Dep't of Educ., Summary of Major Provisions of the Department of
Education's Title IX Final Rule (May 6, 2020).[12]  Taken together, these changes significantly
alter the Title IX compliance landscape to require extensive re-drafting of procedures, policies,
protocols, and handbooks and renegotiation of employee contracts.  In addition, because many of
these changes import highly technical legal standards into institutional disciplinary proceedings
that lay students, administrators, and faculty conduct, colleges and universities also now face
significant re-training burdens in advance of rolling out the new policies and procedures.  In
short, implementing the Final Rule requires that every college and university in America devote
an unprecedented amount of time and attention to assure compliance with "the most complex and
challenging regulations the agency has ever issued."  Am. Council on Educ., Statement by ACE
President Ted Mitchell on Final Title IX Regulations (May 6, 2020).[13]

## II.     The Abbreviated Compliance Deadline Set Forth In The Final Rule Will Be Difficult—If Not Impossible—For Institutions To Meet.

The Final Rule sets an abbreviated compliance deadline, demanding that institutions have
their new protocols and procedures in place during the upcoming academic semester.  Even in
the best of times, that timeframe would be aggressive.

Because colleges and universities employ shared governance structures and have diverse
constituencies, they must be responsive in their development of policies and procedures to

---

[12] *Available at* https://bit.ly/2xL9Ws4.

[13] *Available at* https://bit.ly/2Bceh8W.

multiple stakeholders, including faculty, staff, administrators, and students. Each institution faces context-specific challenges in this respect: Some are public while others are private; some are residential and full time, others serve commuter or part-time students; some are urban, others rural; some are institutions of tens of thousands of people, others a few hundred or fewer; some offer four-year and graduate degrees, others two-year degrees and certificates; and some are guided by a religious mission or identity while others are nondenominational or secular. What's more, of the roughly 4,500 degree-granting colleges and universities throughout the United States, only 1,000 retain a dedicated general counsel. Am. Council on Educ., Comment Letter on Proposed Rule Amending Title IX Regulations 23 & n.16 (Jan. 30, 2019) (hereinafter, "ACE Comment Ltr.").[14] The Final Rule's complexity and adoption of more legalistic approaches make the role of counsel critical to successful implementation. Moreover, institutions will have to reconcile the Final Rule and how to apply it on their campuses with any state statutes and judicial decisions that address similar topics. In many cases, those state statutes and judicial decisions raise complex legal questions about how an institution may satisfy potentially inconsistent legal obligations, such as those related to standards of proof and process. Thus, in order to assess and come into compliance with the new regulatory requirements, the vast majority of colleges and universities will be required to engage additional staff and/or hire outside attorneys and consultants. That alone takes time.

But that is just the beginning of the problem. Implementing the Final Rule's centerpiece reforms to institutional investigatory and adjudicatory procedures is not simply a matter of rewriting policy—which, on many campuses, has a deep-rooted and required cadence to it borne of shared governance traditions and, often, contractual obligation. It instead requires a

---

[14] *Available at* https://bit.ly/35zEOs1.

substantial overhaul of each college and university's disciplinary system for undergraduate students, graduate students, faculty, and staff.  Indeed, the thicket of requirements that colleges and universities now face from the Final Rule, with scores of separately identifiable administrative requirements, will entail extensive and labor-intensive compliance mandates that institutions now must each scramble to meet.  That process necessarily requires diversion of limited time and resources from other efforts, with related costs expected to skyrocket— especially for thinly staffed, less-resourced institutions like community colleges, small private liberal arts colleges, and faith-based institutions.

Colleges and universities face a number of other real-world obstacles in implementing the Final Rule.  The Final Rule applies not only to Title IX proceedings that involve students, but also to those that involve faculty and other staff.  Those employees are often unionized, and their disciplinary processes are often written into existing collective-bargaining and other agreements, which in turn set predetermined time periods during which terms cannot be re-bargained.  *See* ACE Comment Ltr. at 20.  Many institutions have multiple such bargaining units, further compounding challenges with respect to coordination.  In addition to the time and effort required for the re-bargaining itself, any resulting changes are also subject to the National Labor Relations Act and state labor laws, which make the process for modifications to those agreements slow and arduous.

Then there is the need to update faculty handbooks and manuals, which outline how disciplinary proceedings are conducted for both unionized and non-unionized faculty members. In keeping with established principles of shared governance, academic freedom, and tenure, faculty handbooks and manuals are developed through institution-specific, multi-layered governance bodies, often following extensive deliberative proceedings across the whole of the

institution.  As a result, campus administrators are often unable to impose top-down, unilateral change, much less do so swiftly.  *See* ACE Comment Ltr. at 20–21.

Training is also a concern in terms of effective timely implementation of the Final Rule. All participants in the revamped Title IX investigatory and adjudicatory procedures will need to be re-trained, in a manner tailored to their individual roles, on the content and nature of the dozens of new administrative requirements related to complex and highly sensitive subject matters now being federally mandated for the first time.  That, too, requires significant commitments of time and attention from all involved.  The Final Rule not only allows insufficient time to develop well and with appropriate stakeholder involvement the policies and procedures now being mandated, it also allows insufficient time to provide the essential training needed to effectuate those policies and procedures in a manner that best serves campus communities.

For some public university systems, the Final Rule triggers an added layer of complexity and implementation steps.  Specifically, the rules and procedures that govern student discipline at some public institutions may be codified in State legislative and regulatory codes.  *See, e.g.*, Bd. of Regents of Univ. of Wis. Sys., Chapter UWS 17:  Student Nonacademic Disciplinary Procedures, UWS §§ 17.01–17.19 (eff. Sept. 1, 2009).[15]  In such case, changes to applicable procedures will require the participation of legislatures and state agencies on top of campus-based constituencies, and those legislatures and agencies may be out of session or operating with reduced staff.

In short, the breadth and depth of the Final Rule presents extreme challenges for institutions to come into compliance even under normal conditions.  But these are not, to

---

[15] *Available at* https://bit.ly/2xGV3XU.

understate the point, ordinary times.  It has now been four-and-a-half months since the President

declared COVID-19 a national emergency, and roughly six months since the Secretary of Health

and Human Services first declared the novel coronavirus SARS-CoV-2 a public-health

emergency.  President Donald J. Trump, Proclamation on Declaring a National Emergency

Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020).[16]  During

that time, the country's colleges and universities have seen their operations upended.  Institutions

have been working tirelessly to determine how best to restructure literally every aspect of their

basic functioning—including how to manage operational risks as a new academic year begins.

And serious challenges remain.

At the time this brief is being filed, more than 4,200 higher education institutions

throughout the United States and over 25 million of their students have been directly impacted

by the global COVID-19 pandemic.  *See* Entangled Solutions, COVID-19:  Higher Education

Resource Center, https://bit.ly/2zafDAn (last visited July 31, 2020).  The response has been

decisive and far-ranging, as colleges and universities have moved to close dorms and lock down

campuses, instructed faculty and staff to work remotely, cancelled sports and extracurricular

activities, and moved classes and graduations online.  Looking to the near future, some 190

institutions have already moved to change their admissions and academic requirements, such as

by extending decision deadlines, waiving deposit fees, moving to test-optional admissions, and

abandoning minimum grade requirements; over 550 have announced hiring and staffing changes

such as freezes, furloughs, and layoffs; and 78 are doing both.  *Id.*  Seventy-two have confirmed

changes such as virtual courses or adjusted payment options for students for Fall 2020 and

beyond, and seven have closed permanently.  *Id.*

---

[16] *Available at* https://bit.ly/2SFUCUQ.

Those changes and others, together with reversals of course, will doubtlessly intensify and multiply in the coming weeks, as many jurisdictions around the country continue on a path to reopening, reassess their plans, press the "pause" or "stop" button, and otherwise make decisions as circumstances change and public-health guidance continue to evolve.  Because additional pressures on colleges and universities to transition safely and effectively to these new realities will only increase going forward, hard choices will get only harder still.  And making sure that higher education institutions will have the bandwidth to return to their full operating capacities as soon as practicable is consequential for the national economy as a whole.  *See, e.g.*, Christina Paxson, Opinion, *College Campuses Must Reopen in the Fall.  Here's How We Do It*., N.Y. Times (Apr. 26, 2020), https://nyti.ms/2WIeVSL.

To require that colleges and universities restructure their existing Title IX policies and procedures while they respond to a continuing global pandemic threatens extraordinary—and needless—hardship and confusion for administrators, faculty, and students.  Even in the best of times, that schedule is unrealistic.  To truly fulfill the hope and promise of Title IX, the staff, faculty, and students on our nation's campuses should be encouraged by the Department to have the long-view in mind as they collectively consider and revise campus policies and procedures.  Compliance with the Final Rule over the ensuing months will almost assuredly negatively affect the quality of the policies and procedures that institutions scramble to craft in order to roll out the new protocols that will also need to be adapted to address public health measures.

College and university staffs are in a zero sum game in terms of their available bandwidth at this time.  Institutions will not be able to hire additional personnel to accomplish implementation.  So, in a period of catastrophe management, when key players will be socially isolating and, oftentimes, scattered across the country and even around the world, every hour

devoted to restructuring existing procedures and practices to conform with the Final Rule's numerous federal mandates will be an hour that cannot be used for the innumerable risk-management tasks that higher education institutions will face in the days, weeks, and months to come. Even prior to the Final Rule, Title IX coordinators and administrators had seen their work disrupted and capacities slowed as a result of the pandemic. *See, e.g.*, Isabel L. Isselbacher, *Harvard Title IX Office Operations Continue Remotely During COVID-19 Crisis*, Harvard Crimson (Mar. 31, 2020), https://bit.ly/3b9UZxr (discussing delays in training programs); Sydney Czyzon, *Title IX investigations transition online, await new federal guidelines*, Marquette Wire (Apr. 29, 2020), https://bit.ly/2yoVPJw (discussing delays in investigations and problems raised by remote coordination). It is hard to see how rushed implementation of the Final Rule during a time of increased uncertainty and novel operational strategies best serves the Title IX interests of our campus communities.

In addition, to require universities and colleges to implement the Final Rule now, as they adapt protocols and procedures for socially distanced and virtual environments, will ultimately mean that universities and colleges will have to go through a second restructuring effort after life normalizes. In effect, colleges and universities will have to *twice* restructure their Title IX policies to address the Final Rule effectively: Once during the still-uncertain re-opening and transition period we currently face, and once again after students, faculty, and staff are able to return fully and safely to campus.

In issuing the Final Rule with an expedited implementation date, the Department fails to recognize the enormous scope of this diversion of time and resources. The Department asserts that "60 days would be sufficient for recipients to come into compliance" in "the ordinary course" and it concedes that "exigent circumstances exist as a result of the COVID-19 national

emergency" that "require great attention and care on the part of" higher education institutions and others, but the Department nevertheless proceeded to select an effective date mere months away as one that "adequately accommodates the needs of recipients." Yet it did so without any analysis regarding any of the particular hardships discussed above. *See* 85 Fed. Reg. at 30,534 (noting only that "[t]he Department recognizes that the length and scope of the current national emergency relating to COVID-19 is somewhat uncertain."). That is a wholly insufficient allowance during these unprecedented times. And the Department cannot plausibly justify its blanket assertion that this abbreviated timeframe is necessary now when the rulemaking itself lasted more than 1,000 days and the previously prevailing regulatory landscape had been in place for more than four decades. Nor is it any answer for the Department to point to the time elapsed since its Proposed Rule. Regulated entities have no duty to radically overhaul longstanding policies and procedures following the mere announcement of a proposed rulemaking. Moreover, the highly institution-specific nature of individual higher education institutions' Title IX policies and procedures means that any large-scale reform effort requires first knowing the actual details of the Final Rule, which were only recently announced.

That failure to wrestle with our current reality is all the more notable because ACE, joined by numerous other concerned groups, submitted a letter to the Department months ago raising precisely these points, when the toll that COVID-19 would wreak had already been made clear. Letter from Ted Mitchell, President, ACE, to Betsy DeVos, Sec'y of Educ., U.S. Dep't of Educ. (Mar. 24, 2020).[17] As ACE explained, independent from the merits of the particular regulatory proposals contemplated by the Department's Title IX rulemaking, "institutions simply

---

[17] *Available at* https://bit.ly/2W7Sdo8.

do not have the capacity to implement these proposals at this time" given the "challenges campuses face" in "these unprecedented times." *Id.*

The Final Rule patently ignores these pleas and the new reality of our COVID-19 world. Instead, the Department mandated full compliance with dozens of new administrative requirements in short order. That timing will prove to be impossible to meet in an effective and well-considered manner for most if not all covered institutions in light of the unprecedented burdens imposed on colleges and universities resulting from the pandemic. Institutions will be forced to cobble together a hastily devised effort to comply that will not serve well the ultimate goals of the Final Rule. A stay is necessary to prevent the immediate and extraordinary harms that otherwise will flow to colleges and universities nationwide if they are forced to reallocate increasingly scarce resources toward this massive new regulatory regime.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for preliminary injunctive relief or a 5 U.S.C. § 705 stay to permit colleges and universities sufficient time to come into compliance with the Final Rule in a manner that ultimately better serves Title IX's goals and the related interests of campus communities

Respectfully submitted,

/s/ *Gregory F. Noonan*
Gregory F. Noonan (BBO# 651035)
HOGAN LOVELLS US LLP
125 High Street, Ste. 2010
Boston, MA 02110
(617) 371-1029
gregory.noonan@hoganlovells.com

Stephanie J. Gold
Susan M. Cook
Kyle M. Druding
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5496
stephanie.gold@hoganlovells.com

*Counsel for Amici Curiae*

Dated:  August 18, 2020

**ADDENDUM**

## ADDENDUM – LIST OF *AMICI CURIAE*

1. American Council on Education (ACE): More information about ACE can be found at: https://www.acenet.edu

2. The Accreditation Council for Pharmacy Education (ACPE): More information about ACPE can be found at: https://www.acpe-accredit.org/

3. American Association of Community Colleges (AACC): More information about AACC can be found at: https://www.aacc.nche.edu/

4. American Association of State Colleges and Universities (AASCU): More information about AASCU can be found at: https://aascu.org/

5. American Association of University Professors (AAUP):  More information about AAUP can be found at: https://www.aaup.org/

6. American Dental Education Association (ADEA): More information about ADEA can be found at: https://www.adea.org/

7. American Indian Higher Education Consortium (AIHEC): More information about AIHEC can be found at: http://www.aihec.org/

8. Association of American Medical Colleges (AAMC): More information about AAMC can be found at: https://www.aamc.org/

9. Association of American Universities (AAU): More information about AAU can be found at: https://www.aau.edu/

10. Association of Catholic Colleges and Universities (ACCU): More information about ACCU can be found at: https://www.accunet.org/

11. Association of Governing Boards of Universities and Colleges (AGB): More information about AGB can be found at: https://agb.org/

12. Association of Jesuit Colleges and Universities (AJCU): More information about AJCU can be found at: https://www.ajcunet.edu/

13. Association of Public and Land-grant Universities (APLU): More information about APLU can be found at: https://www.aplu.org/

14. College and University Professional Association for Human Resources (CUPA-HR): More information about CUPA-HR can be found at: https://www.cupahr.org/

15. Council for Advancement and Support of Education (CASE): More information about CASE can be found at: https://www.case.org/

16. Council of Independent Colleges (CIC): More information about CIC can be found at: https://www.cic.edu/

17. Middle States Commission on Higher Education (MSCHE): More information about MSCHE can be found at: https://www.msche.org/

18. NASPA - Student Affairs Administrators in Higher Education: More information about NASPA can be found at: https://www.naspa.org/

19. National Association of College and University Business Officers (NACUBO): More information about NACUBO can be found at: https://www.nacubo.org/

20. National Association of Diversity Officers in Higher Education (NADOHE): More information about NADOHE can be found at: https://www.nadohe.org/

21. National Association of Independent Colleges and Universities (NAICU): More information about NAICU can be found at: https://www.naicu.edu/

22. National Collegiate Athletic Association (NCAA): More information about NCAA can be found at: http://www.ncaa.org/

23. New England Commission of Higher Education (NECHE): More information about NECHE can be found at: https://www.neche.org/

24. University Risk Management and Insurance Association (URMIA): More information about URMIA can be found at: https://www.urmia.org/home

25. WASC Senior College and University Commission (WSCUC): More information about WSCUC can be found at: https://www.wscuc.org/

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the Court's ECF system on August 18, 2020, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to non-registered participants.

/s/  *Gregory F. Noonan*
Gregory F. Noonan