# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**VICTIM RIGHTS LAW CENTER**
115 Broad Street, 3rd Floor
Boston, MA 02110,

**EQUAL RIGHTS ADVOCATES**
1170 Market Street, Suite 700
San Francisco, CA 94102,

**LEGAL VOICE**
907 Pine Street, Suite 500
Seattle, WA 98101

**CHICAGO ALLIANCE AGAINST SEXUAL
EXPLOITATION**
307 N. Michigan Ave., Suite 1818
Chicago, IL 60601

**JANE DOE**, an individual by and through her
mother and next friend, **MELISSA WHITE**

**ANNE DOE**, an individual

**SOBIA DOE**, an individual

**SUSAN DOE**, an individual

**JILL DOE**, an individual

**NANCY DOE**, an individual

**LISA DOE**, an individual

                          Plaintiffs,

    v.

**ELISABETH D. DEVOS**, in her official
capacity as Secretary of Education,
400 Maryland Avenue SW
Washington, DC 20202,

Case Number: 1:20-cv-11104
(Leave to file granted 8/18/2020)

**KENNETH L. MARCUS**, in his official
Capacity as Assistant Secretary for Civil Rights,
400 Maryland Avenue SW
Washington, DC 20202,

**U.S. DEPARTMENT OF EDUCATION**,
400 Maryland Avenue SW
Washington, DC 20202,

          Defendants.

## AMICUS CURIAE BRIEF OF LAW PROFESSORS

## **<u>TABLE OF CONTENTS</u>**

INTEREST OF AMICI ....................................................................................................... viii

SUMMARY OF ARGUMENT ..............................................................................................1

ARGUMENT .........................................................................................................................2

    I.     THE NEW RULE UNLAWFULLY AND UNREASONABLY TREATS
          SEXUAL HARRASSMENT DIFFERENTLY THAN OTHER FORMS OF
          HARRASSMENT........................................................................................................3

    II.    THE GRIEVANCE PROCESS IS TO THE DETRIMENT OF
          SEXUAL ASSAULT VICTIMS AND ALLOWS SCHOOLS TO
          IGNORE VALID COMPLAINTS .............................................................................10

    III.   THE NEW RULE'S RELIANCE ON *GEBSER* AND *DAVIS* IS
          ARBITRARY AND CAPRICIOUS BECAUSE THOSE CASES
          INVOLVED PRIVATE TITLE IX SUITS SEEKING MONETARY
          DAMAGES, AND THE CONSIDERATIONS OF GOVERNING
          ADMINISTRATIVE ENFORCEMENT BY THE DEPARTMENT
          ARE VERY DIFFERENT ..........................................................................................16

CONCLUSION.....................................................................................................................20

## **TABLE OF AUTHORITIES**

**Cases**

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979)...........................................................................................................17

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999)...................................................................................................... passim

*Department of Homeland Security v. Regents of the University of California*,
  140 S. Ct. 1891 (2020)................................................................................................2, 3, 10, 20

*Dickinson v. Zurko*,
  527 U.S. 150 (1999).............................................................................................................2

*Doe v. Bibb County School District*,
  126 F. Supp. 3d 1366 (M.D. Ga. 2015) ...........................................................................17

*Doe v. Colgate*,
  760 F. App'x 22 (2d Cir. 2019) .......................................................................................16

*Franklin v. Gwinnett County Pub. Schools*,
  503 U.S. 60 (1992)............................................................................................................17

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998)....................................................................................................... passim

*Goss v. Lopez*,
  41 U.S. 565 (1975)............................................................................................................15

*Haidak v. University of Massachusetts-Amherst*,
  933 F.3d 56 (1st Cir. 2019) ..............................................................................................16

*Karasek v. Regents of the University of California*,
  No. 15-CV-03717-WHO, 2015 WL 8527338, (N.D. Cal. Dec. 11, 2015)................................18

*Marsh v. Oregon Natural Resources Council*,
  490 U.S. 360 (1989) ...........................................................................................................2

*Meritor Savings Bank v. Vinson*,
  477 U.S. 57 (1986)..............................................................................................................8

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm*
  *Mutual Automobile Insurance Co.,*
  463 U.S. 29 (1983) ...........................................................................................2, 3, 10

*Roe v. St. Louis University,*
  746 F.3d 874 (8th Cir. 2014) .......................................................................................18

*United States v. Bean,*
  537 U.S. 71 (2002) ...........................................................................................................2

**Statutes and Regulations**

5 U.S.C. § 706(2)(A) ...........................................................................................................2

20 U.S.C. § 1681(a) .........................................................................................................10

20 U.S.C. § 1682 ...............................................................................................10, 17, 20

20 U.S.C. § 1687 ...............................................................................................................6

24 C.F.R. § 100.600(a)(2) ................................................................................................8

29 U.S.C. § 794(a) ...........................................................................................................7

42 U.S.C. § 2000d ...........................................................................................................7

42 U.S.C. § 12132 ...........................................................................................................7

Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance,
  85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) ....................... passim

Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in Education
  Programs or Activities Receiving Federal Financial Assistance,
  83 Fed. Reg. 61,462 (Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) ................................6

**Federal Register**

Office for Civil Rights Sexual Harassment Guidance,
  62 Fed. Reg. 12,034 (Mar. 13, 1997) ...........................................................................4, 6, 10, 11

Revised Sexual Harassment Guidance: Harassment of Students by School
Employees, Other Students, or Third Parties,
66 Fed. Reg. 5512 (Jan. 19, 2001) ........................................................................18

**Other Authorities**

Barbour County Schools Resolution Letter from Melissa M. Corbin, Team Leader, Office of
Civil Rights, U.S. Dep't of Educ., to Jeffrey P. Woofter, Superintendent, Barbour County
Schools, OCR Case No. 03-17-1170 (Oct. 10, 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03171170-a.pdf ..............4

Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., 2014 Dear
Colleague Letter: Responding to Bullying of Students with Disabilities (Oct. 21, 2014),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-bullying-201410.pdf ....................5

Civil Rights Div., U.S. Dep't of Justice, *Title VI Legal Manual, Section V: Defining Title VI* 6
(Sept. 27, 2016),
https://www.masslegalservices.org/system/files/library/title_vi_legal_manual_intro_sections_9
-21-16-pdf_versionbookmarks_2.pdf ........................................................................5

Comments of ACLU, ED-2018-OCR-0064-17939
(filed Jan. 30, 2019) ...................................................................................8, 10

Comments of California Women's Law Center, ED-2018-OCR-0064-10845
(filed Jan. 28, 2019) ........................................................................................15

Comments of Center for American Progress, ED-2018-OCR-0064-31283
(filed Jan. 30, 2019) ........................................................................................12

Comments of Diane L. Rosenfeld, Director, Gender Violence Program, Harvard Law School,
ED-2018-OCR-0064-12001 (filed Jan. 30, 2019) ....................................................10

Comments of Dr. Judith Herman on behalf of 902 Mental Health Professionals, ED-2018-OCR-
0064-104088 (filed Jan. 30, 2019)........................................................................14

Comments of Girls for Gender Equity (GGE), ED-2018-OCR-0064-14976
(filed Jan. 30, 2019) ........................................................................................11

Comments of Human Rights Campaign, ED-2018-OCR-0064-11375
(filed Jan. 30, 2019) ........................................................................................11

Comments of Jeannie Suk Gersen, Nancy Gertner & Janet Halley, ED-2018-OCR-0064-11950
(filed Jan. 30, 2019) ......................................................................................4, 15

Comments of Margaret B, ED-2018-OCR-0064-104561
(filed Apr. 2, 2019) ...................................................................................................8, 15

Comments of National Women's Law Center, ED-2018-OCR-0064-30297
(filed Jan. 30, 2019) ...................................................................................................14

Comments of Professor Penny Venetis, ED-2018-OCR-0064-18079
(filed Jan. 16, 2019) .....................................................................................................8

Comments of Public Justice, ED-2018-OCR-0064-18382
(filed Jan. 20, 2019) ..............................................................................................10, 14

Comments of State Attorney Generals of the Commonwealths of Pennsylvania and Kentucky,
the States of New Jersey, California, Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland,
Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont,
Washington, and the District of Columbia, ED-2018-OCR-0064-123878
(filed Jan. 30, 2019) .....................................................................................................7

Comments of the City University of N.Y. (CUNY), ED-2018-OCR-0064-11739
(filed Jan. 29, 2019) ...................................................................................................11

Comments of Washington State School Directors Association, ED-2018-OCR-0064-30979
(filed Jan. 30, 2019) ...................................................................................................11

Katharine K. Baker, Deborah L. Brake, Nancy Chi Cantalupo et al., *Title IX & The
Preponderance of the Evidence: A White Paper* (2016),
http://www.feministlawprofessors.com/wp-content/uploads/2016/08/Title-IX-Preponderance-
White-Paper-signed-10.3.16.pdf......................................................................................14, 15

New Fairfield Board of Education Resolution Letter from Meena Morey Chandra, Acting
Regional Director, Office of Civil Rights, U.S. Dep't of Educ., to Dr. Alicia M. Roy,
Superintendent of Schools, New Fairfield Board of Education, OCR Case No. 01-16-1117
(Mar. 5, 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01161117-a.pdf ...............5

Norma V. Cantu, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., 2000 Dear Colleague
Letter: Prohibited Disability Harassment (July 25, 2000),
https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html. ...........................................4

Office for Civil Rights, U.S. Dep't of Educ., *Investigative Guidance on Racial Incidents and
Harassment Against Students* (Mar. 10, 1994),
https://www2.ed.gov/about/offices/list/ocr/docs/race394.html ................................................4, 5

Office of Civil Rights, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ..............................................11, 19

Resolution Agreement, BASIS Scottsdale, OCR Case No. 08-16-1676 (Mar. 20, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/08161676-b.pdf...............7

Resolution Agreement, Duke University, OCR Case No. 11-19-2214 (Dec. 10, 2019), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/11192214-b.pdf...............4

Resolution Agreement, Independent School District No. 1 of Woods City, Oklahoma, OCR Case No. 07-15-1154 (Sept. 28, 2017) https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/07151154-b.pdf...............7

Resolution Agreement, Wallingford Board of Education, OCR Case No. 01-13-1207 (Dec. 23, 2013), http://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01131207-b.pdf ...............7

Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista*  (Aug. 31, 1998), https://www2.ed.gov/offices/OCR/archives/pdf/AppC.pdf.......................................................18

Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999), https://www2.ed.gov/News/Letters/990128.html .......................................................18

Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., 2011 Dear Colleague Letter (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.........13

Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Harassment and Bullying (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html................................5

Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter (Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html........................................19

Tallahassee Community College Resolution Letter from Ebony Calloway-Spencer, Office of Civil Rights, U.S. Dept' of Educ., to Dr. Jim Murdaugh, President, Tallahassee Community College, OCR Case No. 04-16-2248 (Dec. 12, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/04162248-a.pdf...............5

Tennessee State University Resolution Letter from Andrea de Vries, Compliance Team Leader, Office of Civil Rights, U.S. Dep't of Educ., to Dr. Glena Baskin Glover, President, Tennessee State University, OCR Case No. 04-15-2347 (Apr. 2, 2018) https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/04152347-a.pdf ..............4

Valerie Wright, *The Sentencing Project, Deterrence in Criminal Justice*, Sentencing Project, (2010), https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf....................................................................................................................12

Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683 (1998).......................4

## INTEREST OF AMICI

*Amici* are law professors[1] who specialize in administrative and/or antidiscrimination law. *Amici* believe that administrative agencies like the Department of Education's Office for Civil Rights have broad authority to implement statutory mandates like those in Title IX. As *Amici* argue below, however, Defendants exceeded that authority here by failing to comply with basic principles of administrative law. As experts in the enforcement of civil rights law, *Amici* file this brief to demonstrate that Defendants' new Title IX rule will undermine, not advance, the purposes of Title IX, and that the adoption of that rule is arbitrary, capricious, an abuse of discretion, and not in compliance with law.

---

[1] Samuel Bagenstos is the Frank G. Millard Professor of Law at University of Michigan Law School; Nicole Huberfeld is a Professor of Law at Boston University School of Law and a Professor of Health Law and Ethics & Human Rights at Boston University School of Public Health; Naomi Mann is a Clinical Associate Professor of Law at Boston University School of Law; Daniel Hemel is a Professor of Law and Ronald H. Coase Research Scholar at the University of Chicago Law School; Katharine K. Baker is the University Distinguished Professor of Law at the IIT Chicago-Kent College of Law; Jon Michaels is a Professor of Law at UCLA School of Law; Blake Emerson is an Assistant Professor of Law at UCLA School of Law; Deborah Brake is a Professor of Law and John E. Murray Faculty Scholar at the University of Pittsburgh School of Law; Nancy Cantalupo is an Associate Professor of Law at the California Western School of Law; Joanna L. Grossman is the inaugural Ellen K. Solender Endowed Chair in Women and the Law and a Professor of Law at the Southern Methodist University Dedman School of Law; Erin Buzuvis is an Associate Dean and Professor of Law at Western New England University School of Law; David S. Cohen is a Professor of Law at Drexel University Thomas R. Kline School of Law; Ann McGinley is the William S. Boyd Professor of Law at the William S. Boyd School of Law at the University of Nevada, Las Vegas; Ruben Garcia is a Professor of Law at the William S. Boyd School of Law at the University of Nevada, Las Vegas; David Oppenheimer is a Clinical Professor of Law at the University of California, Berkeley School of Law; Jodi Short is the Associate Dean for Research and the Honorable Roger J. Traynor Chair and Professor of Law at the University of California, Hastings College of the Law; Jonathan Weinberg is the Associate Dean for Research & Faculty Development and a Professor of Law at the Wayne State University Law School; David A. Super is the Carmack Waterhouse Professor of Law and Economics at Georgetown University Law Center; Ian Ayres is the Deputy Dean and William K. Townsend Professor of Law at Yale Law School and a Professor at Yale's School of Management; Michael J. Wishnie is a William O. Douglas Clinical Professor of Law and Counselor to the Dean at Yale Law School; Robert S. Chang is a Professor of Law and Executive Director of the Fred T. Korematsu Center for Law and Equality at the Seattle University School of Law; Hannah Brenner Johnson is the Vice Dean for Academic and Student Affairs and an Associate Professor of Law at the California Western School of Law; Michele Dauber is the Frederick I. Richman Professor of Law at Stanford School of Law; Daniel Deacon is a Lecturer at the University of Michigan Law School; Sally Goldfarb is a Professor of Law at Rutgers Law School; Julie Goldscheid is a Professor of Law at the City University of New York School of Law; Victoria F. Nourse is the Ralph Whitworth Professor of Law at Georgetown University Law Center.

## SUMMARY OF ARGUMENT

The Department of Education's new Title IX Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) (the "New Rule"), unlawfully reduces protections for students who are victims of sexual harassment, including sexual assault, and makes it harder for their schools to respond to them.  The New Rule change is premised on a fallacy that false allegations of sexual harassment and assault are widespread.  In fact, they are few and far between.  Sexual harassment and sexual assault in schools impose lasting damage on students, faculty, and the learning environment.  To fulfill Title IX's mandate, schools can and must ensure fair process for the accused without—as this Rule does—imposing hurdles to reporting.  The search for the truth in a Title IX investigation does not require a process like we have in our criminal (or even civil) courtrooms.  The New Rule does not remedy sex-based harassment; it protects it.

The Department of Education's New Rule is unlawful because it is arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act ("APA") and because it is contrary to Title IX's objectives.  The New Rule has many serious flaws, and *Amici* law professors support Plaintiffs' challenge in full.  But we focus on three issues: First, the New Rule arbitrarily creates a double standard by singling out sexual harassment for less favorable treatment than other forms of harassment.  Second, the New Rule's required grievance process will both deter victims from coming forward and insulate schools who fail to protect their students.  Finally, the New Rule's imposition of the heightened standards imposed by *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) and *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629 (1999), which were limited to private Title IX suits seeking monetary damages from schools, is arbitrary and capricious because the Department failed to consider important aspects

of the problem.  The Department did not address the salient differences between enforcement in

court in damages suits against schools by aggrieved individuals and administrative enforcement

by the Department itself.  And it imposed heightened standards for schools to enforce against

students—a context even further removed from the posture of *Gebser* and *Davis*.  The

Department also failed to explain how the standard furthers Title IX's objectives or assesses the

"reliance interests" created by its longstanding contrary policy.

## ARGUMENT

Pursuant to the APA, which sets forth the standard governing judicial review of decisions

made by federal administrative agencies, agency decisions must be set aside where they are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A); *United States v. Bean*, 537 U.S. 71, 77 (2002); *Dickinson v. Zurko*, 527 U.S. 150,

152 (1999).  To determine whether an agency regulation is "arbitrary or capricious," the

reviewing court "must consider whether the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment."  *Marsh v. Oregon Nat.

Res. Council*, 490 U.S. 360, 378 (1989) (internal citation omitted).  To survive judicial scrutiny,

the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation

for its action including a 'rational connection between the facts found and the choice made.'"

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)

(quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Where, as here "an

agency changes course . . . it must be cognizant that longstanding policies may have engendered

serious reliance interests that must be taken into account . . . [and] [i]t would be arbitrary and

capricious to ignore such matters."  *Dep't of Homeland Sec. v. Regents of the Univ. of

California*, 140 S. Ct. 1891, 1913 (2020) (internal citations omitted).

The Department of Education (the "Department") has authority to issue regulations and provide an enforcement scheme for Title IX. *Davis*, 526 U.S. at 638–39 ("Congress authorized an administrative enforcement scheme for Title IX. Federal departments or agencies with the authority to provide financial assistance are entrusted to promulgate rules, regulations, and orders *to enforce the objectives of § 1681*, *see* § 1682.") (emphasis added). But where those regulations or enforcement mechanisms "fail[] to consider an important aspect of the problem," are not the result of reasoned decision-making, or fail to further Title IX's nondiscrimination mandate, they are arbitrary and capricious. *State Farm*, 463 U.S. at 43 ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Dep't of Homeland Sec.*, 140 S. Ct. at 1910, 1913 (arbitrary and capricious for an agency to fail to "consider important aspect[s] of the problem" before the agency and to supply the requisite "reasoned analysis" (citing *State Farm*, 463 U.S. at 57)).

## I.   The New Rule Unlawfully and Unreasonably Treats Sexual Harassment Differently Than Other Forms of Harassment.

Under the guise of enforcing Title IX, the New Rule arbitrarily and capriciously treats allegations of sexual harassment differently and less favorably than allegations of harassment based on race, national origin, and disability. The double standard goes to the central provisions of the New Rule, including the provisions that redefine harassment and impose a less-stringent deliberate indifference standard for responding to complaints. But the Department did not adequately explain *why* sexual harassment should be treated differently. Perhaps that is because there is no reasonable explanation for such disparate treatment.

3

The examples of this double standard are numerous.  For race and disability, the
Department has concluded that harassing conduct that "is sufficiently severe, pervasive *or*
persistent" as to create a hostile environment qualifies as harassment.[2]  From 1997 until the
promulgation of the New Rule, the Department treated sexual harassment the same way.  Office
for Civil Rights Sexual Harassment Guidance, 62 Fed. Reg. 12,034, 12,038 (Mar. 13, 1997)
("1997 Guidance").  The New Rule redefines "sexual harassment," however, which it now limits
to "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and*
objectively offensive that it effectively denies a person equal access to the recipient's education
program or activity."  § 106.30(a)(2) (emphasis added).  The difference between "or" and "and"
is crucial.  As commenters observed, the new definition does not cover misconduct that is
"severe but not pervasive" such as some single assaults, or "conduct that is pervasive but not
independently severe," like persistent statements that subtly undermine the competence of
students of a particular sex.[3]  Under the New Rule, a one-off instance of harassing conduct on
the basis of sex that is both severe and objectively offensive is not sexual harassment—and
therefore a school would be required to dismiss a Title IX complaint, § 106.45(b)(3)—while the
exact conduct, but motivated by race or disability, would qualify as harassment.  This

---

[2] *See, e.g.*, Tennessee State University Resolution Letter from Andrea de Vries, Compliance Team Leader, Office of
Civil Rights, U.S. Dep't of Educ., to Dr. Glena Baskin Glover, President, Tennessee State University, at 3-4, OCR
Case No. 04-15-2347 (Apr. 2, 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/04152347-a.pdf; Barbour County Schools
Resolution Letter from Melissa M. Corbin, Team Leader, Office of Civil Rights, U.S. Dep't of Educ., to Jeffrey P.
Woofter, Superintendent, Barbour County Schools, at 2, OCR Case No. 03-17-1170 (Oct. 10, 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03171170-a.pdf; Resolution Agreement, Duke
University, at 1-2, OCR Case No. 11-19-2214 (Dec. 10, 2019),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/11192214-b.pdf (investigating hostile
environment complaint premised on one anti-Semitic performance); Office for Civil Rights, U.S. Dep't of Educ.,
*Investigative Guidance on Racial Incidents and Harassment Against Students* (Mar. 10, 1994),
https://www2.ed.gov/about/offices/list/ocr/docs/race394.html ("1994 Investigative Guidance"); Norma V. Cantu,
Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., 2000 Dear Colleague Letter: Prohibited Disability Harassment
(July 25, 2000), https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.
[3] Comments of Jeannie Suk Gersen, Nancy Gertner & Janet Halley at 15, ED-2018-OCR-0064-11950 (filed Jan. 30,
2019) ("Comments of Gersen, Gertner & Halley").  *See generally* Vicki Schultz, *Reconceptualizing Sexual
Harassment*, 107 Yale L.J. 1683, 1755-1774 (1998).

underexplained distinction between Title IX complaints and other discrimination complaints is
unreasonable and does not further the aims of Title IX.[4]

The requirements about how institutions must respond to complaints are similarly
premised on an invalid and inexplicable double standard.  The New Rule relieves colleges and
universities of the obligation to address sexual harassment unless they have "actual knowledge"
of sexual harassment.  § 106.44(a).  To meet that standard, a report of sexual harassment must be
made to the school's designated Title IX Coordinator or some other limited number of school
officials.  § 106.30 (defining "actual knowledge").  Conversely, schools must respond to all
harassment on the basis of race, national origin, or disability about which they know or *should
know*.[5]  The New Rule also allows schools to ignore many Title IX reports of sexual assault that
occur off school grounds, including in off-campus housing or during study abroad programs,
regardless of the effect they have on campus and on survivors' educations.  § 106.44(a).  This
broad immunity from liability has never been applied to any other form of harassment.[6]  The
Department redefines "program or activity" just for sexual harassment and not for other forms of

---

[4] Indeed, the explanation offered for this change, which does not serve as a distinction, is that this language is
needed to protect free speech.  New Rule at 30,141-42, 30,151.  That justification further demonstrates the arbitrary
nature of the change, because the Department fails to explain why such reasoning applies only to sexual harassment
and not to harassment on the basis of race, national origin, or disability.

[5] *See, e.g.,* New Fairfield Board of Education Resolution Letter from Meena Morey Chandra, Acting Regional
Director, Office of Civil Rights, U.S. Dep't of Educ., to Dr. Alicia M. Roy, Superintendent of Schools, New
Fairfield Board of Education, at 3, OCR Case No. 01-16-1117 (Mar. 5, 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01161117-a.pdf; Tallahassee Community
College Resolution Letter from Ebony Calloway-Spencer, U.S. Dept' of Educ., Office of Civil Rights, to Dr. Jim
Murdaugh, President, Tallahassee Community College, at 4, OCR Case No. 04-16-2248 (Dec. 12, 2017),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/04162248-a.pdf; Catherine E. Lhamon,
Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., 2014 Dear Colleague Letter: Responding to Bullying of
Students with Disabilities (Oct. 21, 2014), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-bullying-
201410.pdf; Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Harassment
and Bullying (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html; *1994
Investigative Guidance.*

[6] For example, Department of Justice guidance explains that Title VI may apply to some discriminatory conduct that
takes place outside the United States, "depending on how much control the recipient exercises over the overseas
operation and how integral the overseas operation is to the recipient's program in the U.S."  Civil Rights Div., U.S.
Dep't of Justice, *Title VI Legal Manual, Section V: Defining Title VI* 6 (Sept. 27, 2016),
https://www.masslegalservices.org/system/files/library/title_vi_legal_manual_intro_sections_9-21-16-
pdf_versionbookmarks_2.pdf.

discrimination, including other forms of sex discrimination, despite Congress's own broadly

applicable definition of "program or activity" in 20 U.S.C. § 1687, which defines the term

to  include "all the operations of" schools.  It makes particularly little sense to apply this

definition to complaints of sexual harassment, which the Department admitted often occurs off

campus.  *See* Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in

Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462,

64,487 n.27 (Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106).  If anything, the prevalence of

off-campus sexual harassment and assault should drive the Department to be more concerned

about responding to off-campus complaints, not less.

The New Rule also dramatically limits schools' obligations to respond to conduct that

meets the heightened definition of sexual harassment, requiring them to act only in a way that is

not "deliberately indifferent."  § 106.44(a).  This is a significant change from the Department's

previous guidance,[7] and once again it is different from the standard applied to other forms of

harassment.  And the New Rule permits—and effectively requires, in many cases—schools to

apply a heightened clear and convincing evidentiary standard in sexual harassment hearings,

which it has never applied to allegations of other forms of harassment committed by students.  §

106.45(b)(1)(vii).  For allegations of sexual harassment (and only sexual harassment) schools

must apply the same standard for complaints brought against other students and complaints

brought against faculty.  § 106.45(b)(1)(vii).  Because faculty contracts and collective bargaining

agreements often require the use of the clear and convincing evidence standard for faculty

disciplinary proceedings, the New Rule effectively imposes a heightened standard as a

[7] 1997 Guidance at 12,042 ("A school will be in violation of Title IX if the school 'has notice' of a sexually hostile environment and fails to take immediate and appropriate corrective action.").

requirement for student complaints without saying so.[8]  The Department did not explain why the

considerations that drive such collective bargaining agreements should also govern students, who

stand in a very different relationship with their schools than do faculty.  Indeed, elsewhere the

Department recognized the "unique nature and purpose" of educational environments and the

important differences between students and employees in the workplace.  New Rule at 30,037.

Nor did the Department sufficiently explain why those collective bargaining agreements should

control school-student relationships in the Title IX context but not the Title VI or Section 504

context.[9]

These differences do not come from the text of the relevant statutes.  Title VI, which

prohibits discrimination on the basis of race and national origin in federally funded programs,

and Title II and Section 504 of the Rehabilitation Act, which prohibit discrimination on the basis

of disability in public programs, are worded almost identically to Title IX.[10]  Indeed, the

Supreme Court has recognized that "Title IX was modeled after Title VI of the Civil Rights Act

of 1964, which prohibits race discrimination in programs receiving federal funds."  *Gebser*, 524

---

[8] *See, e.g.*, Comments of State Attorney Generals of the Commonwealths of Pennsylvania and Kentucky, the States of New Jersey, California, Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia at 46, ED-2018-OCR-0064-123878 (filed Jan. 30, 2019).

[9] The Department's Office of Civil Rights has required the use of the preponderance of the evidence standard for discrimination on the basis of race and disability.  *See, e.g.*, Resolution Agreement, Wallingford Board of Education, OCR Case No. 01-13-1207 (Dec. 23, 2013), http://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01131207-b.pdf; Resolution Agreement, BASIS Scottsdale, OCR Case No. 08-16-1676 (Mar. 20, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/08161676-b.pdf; Resolution Agreement, Indep. School District No. 1 of Woods City, Oklahoma, OCR Case No. 07-15-1154 (Sept. 28, 2017) https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/07151154-b.pdf.

[10] 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . "); 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

U.S. at 275.  Several comments identified this close relationship between Title VI and Title IX.[11]
The Department provided no legitimate reason for departing from the interpretation of these
related statutes.

 The practical problems imposed by the New Rule's double standard are severe.  The
distinction also serves to reinforce sexist stereotypes that sexual harassment allegations are
uniquely suspect.  Many cases of harassment involve discrimination along more than one axis
(e.g., students targeted for being both Black and female, or for being both female and disabled).
And colleges and universities act not just as educators but also as employers and housing
providers.  Many students also are both employees of the school and residents of its facilities.
As a result, discriminatory harassment of students will frequently violate multiple statutes at the
same time:  not just Title IX, Title VI, and Section 504—but also Title VII and the Fair Housing
Act.  All of these statutes continue to use the disjunctive definition of harassment that the
Department previously applied to Title IX and thus require universities to respond to conduct
that is severe *or* pervasive.[12]  Currently, "[m]any institutions use a single, combined grievance
procedure for persons alleging discrimination based on a protected class."[13]  But the New Rule
will require institutions to provide a different process particularly applicable to sexual
harassment.  That will create needless administrative complexity and confusion for
universities—all of which will translate into additional burdens placed on those who allege
discrimination.

---

[11] *See, e.g.*, Comments of ACLU at 6, ED-2018-OCR-0064-17939 (filed Jan. 30, 2019) ("Comments of ACLU")
("These disparities lack justification, particularly as 'Title IX was patterned after Title VI.'") (quoting *Cannon v.
Univ. of Chi.*, 441 U.S. 677, 694 (1979)); Comments of Professor Penny Venetis at 26, ED-2018-OCR-0064-18079
(filed Jan. 16, 2019) (explaining that Title IX and Title VI are in *pari materia* and should be interpreted
consistently).
[12] *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (holding that sexual harassment is actionable under Title
VII when it is "sufficiently severe or pervasive to alter or the conditions of the victim's employment"); 24 C.F.R. §
100.600(a)(2) (defining harassment to include "unwelcome conduct that is sufficiently severe or pervasive").
[13] Comments of Margaret B., ED-2018-OCR-0064-104561 (filed Apr. 2, 2019) ("Comments of Margaret B.").

These burdens are apparent in the New Rule itself.  When a student files a complaint alleging harassment on the basis of both sex (in violation of Title IX) and race (in violation of Title VI), the New Rule offers the school a choice:  It may apply the new Title IX grievance requirements to the entire complaint, thus overriding the more victim-friendly standards for race- and disability-based harassment.  Or it may engage in separate, duplicative proceedings, thus bearing additional costs and forcing the student who alleges discrimination to go through the process twice.  New Rule at 30,449.  It did not have to be this way.  The Department could have treated sexual harassment like other forms of harassment, instead of imposing unique, unjustified heightened procedural rules.

In fact, the Department agreed that "consistency with respect to administrative enforcement of Title IX and other civil rights laws (such as Title VI and Title VII) is desirable," New Rule at 30,382.  But the New Rule offers little more than conclusory statements in place of honest explanations for its departures.  For instance, the Department said that the APA does not "require" it to devise identical rules to eliminate discrimination on the bases of sex, race, or disability, and that holding otherwise would "wreak havoc on agency behavior" by denying them the ability to make gradual changes to one area at a time or limit rules to a particular subject matter.  New Rule at 30,528–29.  While the APA does not require regulations promulgated under Title IX to be identical to those issued under other discrimination statutes in all instances, it does require that the Department engage in reasoned decision-making, and that the Department must give an adequate explanation for singling out sexual harassment.  That is particularly true when the Department is departing both from longstanding interpretations of Title IX and the interpretation of closely related antidiscrimination statutes.

These disparities are inconsistent with Title IX's purpose of protecting students from sex discrimination and the Department's stated "objective of creating uniformity and consistency."

New Rule at 30,086–87.  The agency has therefore "failed to consider an important aspect of the problem," failed to "articulate a satisfactory explanation," and reached a result that is substantively "implausible."  *State Farm*, 463 U.S. at 43.

## II.     The Grievance Process is to the Detriment of Sexual Assault Victims and Allows Schools to Ignore Valid Complaints.

The Department's grievance process does not "effectuate" Title IX's mandate that "[n]o person" is subjected to sexual harassment in an education program or activity.  20 U.S.C. §§ 1681(a), 1682.  On the contrary, it discourages victims from coming forward and allows schools to disregard valid complaints.[14]  Despite recognizing that the New Rule might have a "chilling effect" on reporting and acknowledging "data showing that reporting rates are lower than prevalence rates with respect to sexual harassment, including sexual violence," the Department dismissed these concerns without justification.  New Rule at 30,067.  And here, where the Department "change[d] course" from prior guidance, it arbitrarily and capriciously ignored "that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Dep't of Homeland Sec.*, 140 S. Ct. at 1913 (quotation omitted).

Previous Department guidance established that a school could be held responsible for instances of sexual harassment by a teacher, irrespective of actual notice, and schools could be held responsible for student-on-student harassment if a "responsible employee" had constructive notice—i.e., the employee knew or should have known—of the harassment.  1997 Guidance at 12,042.  Schools were affirmatively obligated to "take immediate and appropriate steps to

---

[14] *See e.g.,* Comments of ACLU at 3 ("[T]he ACLU believes the Proposed Rule undermines Title IX by substantially reducing the responsibility of institutions to respond to claims of sexual harassment and assault."); Comments of Public Justice at 5, ED-2018-OCR-0064-18382 (filed Jan. 20, 2019) ("Comments of Public Justice") ("[T]he Department's proposed rules would eliminate, rather than effectuate, many of Title IX's protections, making it harder for students to report sexual harassment, allowing (and often requiring) schools to ignore students' reports of harassment, and unfairly tilting the grievance process in favor of respondents to the detriment of survivors."); Comments of Diane L. Rosenfeld, Director, Gender Violence Program, Harvard Law School, at 25-26, ED-2018-OCR-0064-12001 (filed Jan. 30, 2019) (explaining the New Rule will chill reporting and drastically increase the incidences of "second rape" because schools are disincentivized to fulfill their Title IX duties).

investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." *Id.* The investigation had to be "prompt, thorough, and impartial," but "[t]he specific steps in an investigation w[ould] vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors." Office of Civil Rights, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001) at 15, https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ("2001 Revised Guidance"); *see also* 1997 Guidance at 12,042.

In contrast, the New Rule requires a school have "actual notice," rather than constructive notice, of harassment to trigger its Title IX responsibilities, §§106.30, 106.44(a), and provides that a school's response to allegations of sexual harassment will violate Title IX only if it amounts to "deliberate indifference." § 106.44(a). But requiring that an institution have "actual knowledge" and be "deliberately indifferent" to trigger its obligations under Title IX shields institutions from liability even if they remain intentionally ignorant, and makes campuses more dangerous for victims. The "actual notice" requirement disincentivizes institutions from learning about possible harassment because without "actual knowledge," they can avoid liability for failure to respond.[15] And once a school has "actual knowledge" it must respond in a manner that is only not "deliberately indifferent"—i.e., a "response to sexual harassment [that] is clearly

---

[15] Comments of the City University of N.Y. (CUNY) at 10, ED-2018-OCR-0064-11739 (filed Jan. 29, 2019) ("In order to avoid liability, a 'knew or should have known' standard encourages colleges to acquire knowledge of sexual harassment on their campuses from every institutional actor who 'should have known.' By contrast, an 'actual knowledge' standard discourages colleges from acquiring actual knowledge of sexual harassment on their campuses, in order to avoid liability."); Comments of Girls for Gender Equity (GGE), ED-2018-OCR-0064-14976 (filed Jan. 30, 2019); Comments of Human Rights Campaign, ED-2018-OCR-0064-11375 (filed Jan. 30, 2019); Comments of Washington State School Directors Association, ED-2018-OCR-0064-30979 (filed Jan. 30, 2019).

unreasonable in light of the known circumstances." New Rule at 30,092. Both standards disincentivize schools from investigating complaints.

The Department claimed that requiring "actual knowledge . . . furthers the Department's policy goals of ensuring that elementary and secondary schools respond whenever a school employee knows of sexual harassment or allegations of sexual harassment, while respecting the autonomy of students at postsecondary institutions to decide whether or when to report sexual harassment" and that requiring "deliberate indifference . . . ensures that recipients respond to sexual harassment by offering supportive measures designed to restore or preserve a complainant's equal educational access without treating a respondent as responsible until after a fair grievance process." New Rule at 30,034. But the Department did not explain how it is consistent with Title IX's mandate for these concerns to override the obvious effect of causing schools to do less to respond to sexual harassment.

Further, the Department *admitted* it designed the New Rule to reduce the number of sexual harassment allegations the schools investigate and remedy. *See* New Rule at 30,551, 30,565-68 (New Rule will result in 33% reduction in investigations for post-secondary schools and 50% for K-12 schools as well as reductions in hearings, decisions, and informal resolutions.). There is overwhelming evidence that a reduction in investigations and remedies will result in more harassment.[16] Yet the Department dismissively concluded, contrary to the

---

[16] "The more certain respondents were that the scenario male would be dismissed from school or arrested, the less likely they were to report that they would commit sexual assault under the same set of hypothetical conditions." Comments of Center for American Progress at 5, ED-2018-OCR-0064-31283 (filed Jan. 30, 2019) (citing Ronet Bachman et al., *The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault*, 26 Law & Soc'y Rev. 343-57 (1992)); *see also* New Rule at 30,266 n.1095 (citing David Lisak & Paul Miller, *Repeat and Multiple Offending Among Undetected Rapists*, 17 Violence & Victims 1 (2002) ("undetected rapists" were repeat rapists and undetected repeat rapists committed on average of 5.8 rapes each")); Valerie Wright, *The Sentencing Project, Deterrence in Criminal Justice*, Sentencing Project, 7 (2010), https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf ("offenders are more likely to be deterred from, and thus likely to engage in undesirable behaviors when there is reasonable certainty of some kind of accountability").

evidence, that it is "not apparent that a recipient's response to sexual harassment and assault under these final regulations would be likely to exacerbate the negative effects highlighted by the commenters." New Rule at 30,545, 30,568. The "actual knowledge" and "deliberate indifference" standards constitute an unreasonable departure from previous guidance and undermine Title IX's goal. (As we explain in Part III, those standards are not required by the Supreme Court's *Davis* and *Gebser* cases. The Department's misplaced reliance on those cases is an additional reason for invalidating the New Rule.)

The new cross-examination requirement for post-secondary institutions is yet another stark departure from prior guidance. The 2011 Dear Colleague Letter (April 4, 2011) "strongly discourage[d] schools from allowing the parties personally to question or cross-examine each other during the hearing," recognizing that "[a]llowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment."[17] Under the New Rule, postsecondary schools must now "provide for a live hearing" during which "the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility." § 106.45(b)(6)(i). This cross-examination technique resembles that of a criminal trial. The Department claimed the grievance process "ensure[s] due process protections for both complainants and respondents," New Rule at 30,049, but it favors respondents. For example, the cross-examination procedure excludes statements by parties and statements against interest, including those in writing or on video.[18] New Rule at 30,345-46.

---

[17] Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., 2011 Dear Colleague Letter, at 12 (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ("2011 Dear Colleague Letter").
[18] This means that if a respondent has previously confessed to the harassment—even on video or in writing—she can effectively choose not to let the school consider that evidence. The Department's justification for this is that these evidentiary rulings might be too complicated for a non-attorney decision-maker, New Rule at 30,345, but deciding whether a statement was made by a party or is against interest is no more complicated than making relevance determinations in real-time, which the decision-maker is required to make. New Rule at 30,349.

The Department also failed to acknowledge the vast differences between schools and courtrooms

or the slew of comments explaining how cross examination severely harms victims of sexual

harassment and sexual assault.[19]

Indeed, schools have different powers and goals than the criminal justice system and

must therefore be treated differently.  "Because violating criminal law often results in

incarceration and is meant to stigmatize the convicted . . . [c]riminal defendants get certain

procedural rights, including higher standards of proof, that are aimed at protecting against abuse

of the state's greater powers in the proceeding."  Katharine K. Baker, Deborah L. Brake, Nancy

Chi Cantalupo et al., *Title IX & The Preponderance of the Evidence: A White Paper* (2016),

http://www.feministlawprofessors.com/wp-content/uploads/2016/08/Title-IX-Preponderance-

White-Paper-signed-10.3.16.pdf.  Schools do not have those same coercive powers.  Rather,

school disciplinary processes are designed not merely to punish, but to foster positive learning

environments.  *See id.*  ("The central goal of student disciplinary systems [i]s helping 'to create

the best environment in which students can live and learn . . . [a]t the cornerstone [of which] is

the obligation of students to treat all other members of the academic community with dignity and

respect—including other students, faculty members, neighbors, and employees.'") (citing

Edward N. Stoner II, *Reviewing Your Student Disciplinary Policy: A Project Worth the*

---

[19] *See, e.g.*, Comments of Dr. Judith Herman on behalf of 902 Mental Health Professionals at 3, ED-2018-OCR-0064-104088 (filed Jan. 30, 2019) (describing cross-examination by the accused student's "advisor of choice" as "being subjected to hostile attacks on their credibility and public shaming at a time, following a traumatic event, when they may feel most vulnerable" and is "almost guaranteed to aggravate their symptoms of post-traumatic stress"); Comments of Public Justice at 30 (describing live cross-examination as "uniquely harmful to survivors of sexual harassment because they are often asked detailed, personal, and humiliating questions rooted in gender stereotypes and rape myths" and explaining it "can also re-victimize a survivor because it forces them to relive the assault"); Comments of National Women's Law Center at 26, ED-2018-OCR-0064-30297 (filed Jan. 30, 2019) ("Being asked detailed, personal, and humiliating questions often rooted in gender stereotypes and rape myths that tend to blame victims for the assault they experienced would understandably discourage many students—parties and witnesses—from participating in a Title IX grievance process, chilling those who have experienced or witnessed harassment from coming forward.").

*Investment* 7 (2000)).  That goal is consistent with Title IX's goal of preventing sex
discrimination in schools.

Additionally, no court has ever equated the consequences of a criminal conviction with
those of a finding of misconduct in a school setting.  The potential loss of liberty is the greatest
form of punishment and our law attempts to ensure the greatest possible protections.  On the
contrary, the greatest possible punishment in the school setting is expulsion.  *See id.* at 6.  The
Supreme Court has cautioned that although a student must be afforded "an opportunity to present
his side of the story" before he is suspended, "further formalizing the suspension process and
escalating its formality and adversary nature may not only make it too costly as a regular
disciplinary tool but also destroy its effectiveness as part of the teaching process."  *Goss v.
Lopez*, 41 U.S. 565, 581, 583 (1975).

Further, the New Rule requires schools to conduct live, quasi-criminal trials with live
cross-examination only in sexual misconduct investigations—and not in investigations of other
types of student or staff misconduct.  This will present a procedural conundrum for schools,
which often use the same disciplinary procedure to address various types of misconduct.[20]  Not
only is the cross-examination requirement contrary to previous guidance and challenging for
schools to administer, but the New Rule rejects less burdensome and less traumatizing truth-
seeking methods that schools already have in place.[21]  And courts have upheld such
"inquisitorial" or "indirect" cross-examination procedures, precisely because "student

---

[20] Comments of Margaret B.

[21] *See, e.g.*, Comments of Gersen, Gertner & Halley at 11 ("There is a suitable alternative that aims at the desired
truth-seeking objective, yet achieves a better balance of the competing interests here. That alternative is used in the
Harvard Law School Procedures for Student/Student Sexual Harassment Cases and is endorsed by the American Bar
Association Criminal Justice Section and by the University of California Post SB 169 Working Group."); Comments
of California Women's Law Center at 11, ED-2018-OCR-0064-10845 (filed Jan. 28, 2019) (in response to the 2011
Dear Colleague Letter, "many universities developed policies still in effect that safely provide a means by which
complainants and respondents may submit questions to be asked of the other party without requiring an in-person
confrontation").

disciplinary proceedings need not mirror common law trials." *See, e.g.*, *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 69-71 (1st Cir. 2019) (finding indirect cross examination allows schools to avoid "displays of acrimony or worse"); *Doe v. Colgate*, 760 F. App'x 22, 33 (2d Cir. 2019). Under the pretense of "due process," the Department improperly equates schools with courtrooms, while ignoring the overarching goals of discipline in the school setting.

The Department arbitrarily and capriciously ignores the reliance interests of schools in light of previous guidance. Instead, the New Rule requires schools to rapidly implement a rigid new process that undermines a very tenet of Title IX—to protect victims of sexual harassment and assault. *See Gebser*, 524 U.S. at 286 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).

### III. The New Rule's Reliance on *Gebser* and *Davis* Is Arbitrary and Capricious Because Those Cases Involved Private Title IX Suits Seeking Monetary Damages, and the Considerations Governing Administrative Enforcement by the Department Are Very Different.

The Department's reliance on *Gebser* and *Davis* is misplaced. In *Gebser* and *Davis*, the Supreme Court set heightened standards for liability in cases brought against schools for failure to address harassing conduct under Title IX's implied private right of action for money damages. *See Gebser*, 524 U.S. at 277; *Davis*, 526 U.S. at 632 (requiring school's actual knowledge of, and deliberate indifference to, harassing conduct for purposes of private claims for money damages). The New Rule seeks to align the Department's own administrative enforcement and the rules dictating when schools can discipline students with the *Gebser* and *Davis* framework. But neither case purported to address the rules that should govern the Department's investigations. And because administrative enforcement of Title IX by the federal government implicates very different considerations than does a private lawsuit for damages, it was arbitrary and capricious for the Department to rely on those cases.

Crucial to the Court's decisions in *Gebser* and *Davis* was the fact that Congress had not expressly created a private right of action to enforce the statute. Rather, it was the Court itself, in *Cannon,* 441 U.S. at 717, that had created such a right. *See also Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75-76 (1992) (private right of action extends to sexual harassment). The statutory text expressly authorizes only one form of enforcement—carefully regulated administrative proceedings brought by the Department to terminate federal funds. 20 U.S.C. § 1682.

When it first crafted the heightened standard of liability in *Gebser*, 524 U.S. at 284, the Court pointed to the lack of an express private right of action as giving it "a measure of latitude" to craft the remedies that would apply when private parties sued under Title IX. In particular, the Court was concerned about imposing a standard that would lead to "unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs." *Id.* at 285.

As *Gebser* itself recognized, the statutory procedure for administrative enforcement by the federal government necessarily supplies the very notice that the Court feared would be absent in a retrospective damages suit brought by a private party. *See Gebser*, 524 U.S. at 288-289. Further, by only holding schools liable if they have "actual knowledge" of sexual harassment, the Department's administrative enforcement, rather than seeking primarily to compensate individual victims, aims to prevent violations before they occur.

Courts across the country have recognized that the Department's administrative enforcement of Title IX serves a different purpose, and thus follows different standards, than private damages litigation under the statute. "What funding recipients' responsibilities are under Title IX and what they can be held liable for in a private cause of action for damages . . . are not one and the same." *Doe v. Bibb Cty. Sch. Dist.*, 126 F. Supp. 3d 1366, 1377 (M.D. Ga. 2015),

17

*aff'd*, 688 F. App'x 791 (11th Cir. 2017); *Karasek v. Regents of the Univ. of California*, No. 15-CV-03717-WHO, 2015 WL 8527338, at *13 (N.D. Cal. Dec. 11, 2015) (similar).  *Cf. Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) ("[T]he Supreme Court has cautioned that 'alleged failure to comply with the [Title IX] regulations' does not establish actual notice and deliberate indifference and it has never held that 'the implied private right of action under Title IX allows recovery in damages for violation of [such] administrative requirements.'") (quoting *Gebser*, 524 U.S. at 291-92).

The Department itself has long taken the same position.  Since *Gebser* and *Davis*, the Department has consistently stated that those cases did not affect the standards that apply in its administrative enforcement proceedings.  *See* Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista*  (Aug. 31, 1998), https://www2.ed.gov/offices/OCR/archives/pdf/AppC.pdf; Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999), https://www2.ed.gov/News/Letters/990128.html.  In particular, the Department explained, *Gebser* did not alter the fundamental obligations of schools to take prompt action to address sexual harassment, because the Court had "expressly distinguished the limits on private recovery of money damages from the Department of Education's enforcement of Title IX."  *Id.*

Successive Department policy documents across multiple presidential administrations unfailingly distinguished the Department's administrative enforcement of Title IX from private claims for money damages against schools.  *See e.g.*, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 66 Fed. Reg. 5512 (Jan. 19, 2001) (the "2001 Policy") ("reaffirm[ing] OCR's standards for administrative enforcement of Title IX" and "re-ground[ing] these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages");

Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter

(Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html ("2006

Letter") (stating that the 2001 Policy "outlines standards applicable to OCR's enforcement of

compliance in cases raising sexual harassment issues" and distinguishing these standards from

those "applicable to private Title IX lawsuits for monetary damages").

The 2001 Revised Guidance, which remains in effect until superseded on August 14,

2020, by the New Rule, clarified that OCR's policies for the administrative enforcement of Title

IX were unaffected by *Gebser* and *Davis* because both cases only addressed the liability

standards for private Title IX sexual harassment lawsuits seeking monetary damages. *See* 2001

Revised Guidance at i-iv (stating that the liability standards used in *Gebser* and *Davis* "are

limited to private actions for monetary damages" and that those cases "did not change a school's

obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate

sexual harassment as a condition of its receipt of Federal funding," a position that was

"uniformly agreed" upon by the institutions and individuals who submitted comments). In 2006,

The Office of Civil Rights ("OCR") issued a guidance document, Dear Colleague Letter: Sexual

Harassment Issues[22] that reiterated schools' "essential" obligation to prevent and remedy sexual

harassment, reaffirming the 2001 Revised Guidance as the operative statement of OCR's

enforcement policies for sexual harassment, and expressly distinguishing OCR's administrative

enforcement standards from those applicable to private Title IX damages lawsuits.

Indeed, in the preamble to the New Rule the Department conceded that neither *Gebser*

nor *Davis* requires it to redefine "sexual harassment" in the more restrictive way it has. New

Rule at 30,033. But the Department utterly could not explain why it was still simply plugging

---

[22] *See* 2006 Letter.

the standards that those cases applied to private damages suits into the very different context of administrative enforcement.  It thus entirely failed to justify its "change[] [of] course" from longstanding policy.  *Dep't of Homeland Sec.*, 140 S. Ct. at 1913.

Just last month, the Supreme Court held that the Department of Homeland Security violated the APA when it treated a prior judicial ruling invalidating the *provision of benefits* to certain unauthorized immigrants as necessarily invalidating the *forbearance from deportation* of those immigrants.  *Dep't of Homeland Sec.*, 140 S. Ct. at 1911.  The Department here committed the same error.  It treated a judicial ruling addressing the scope of an implied private right of action as necessarily dictating the remedies in the very different context of administrative enforcement.  And it did so without justifying why imposing that standard serves Title IX's mandate to eliminate sexual harassment.  That failure renders the New Rule arbitrary and capricious.  See *Dep't of Homeland Sec.*, 140 S. Ct. at 1910, 1913 (arbitrary and capricious for an agency to fail to "consider important aspect[s] of the problem" before the agency and to supply the requisite "reasoned analysis" (citing *State Farm*, 463 U.S. at 57)).  *Cf.* 20 U.S.C. § 1682 (rules must "effectuate" Title IX).

## CONCLUSION

The New Rule is arbitrary and capricious and undermines the goals of Title IX because it arbitrarily creates a double standard by singling out sexual harassment for less favorable treatment than other forms of harassment; outlines a required grievance process that will deter victims from coming forward and protect schools that fail to protect their students; and applies the heightened standards imposed by private Title IX lawsuits seeking monetary damages—*Gebser* and *Davis*—without considering important aspects of that application.  As such, the implementation of the New Rule should be enjoined or stayed.

Dated: August 20, 2020                              Respectfully submitted,


 /s/ Naomi M. Mann                                   /s/ Roy L. Austin
Naomi M. Mann (BBO No. 600944)              Roy L. Austin (admitted *pro hac vice*)
Associate Clinical Professor                       Lauren Snyder (admitted *pro hac vice*)
Boston University Civil Litigation Program     Daniel Tingley (admitted *pro hac vice*)
197 Friend Street                                       Harris, Wiltshire & Grannis LLP
Boston, MA 02114                                      1919 M Street NW, Suite 800
Tel: 617-371-1234                                       Washington, D.C. 20036
nmann@bu.edu                                          Tel: 202-730-1300
                                                            raustin@hwglaw.com
                                                            lsnyder@hwglaw.com
                                                            dtingley@hwglaw.com

                                                            *Counsel for Amici Curiae*

## **CERTIFICATE OF SERVICE**

I, Roy L. Austin, hereby certify that on August 20, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

Respectfully submitted,

/s/ Roy L. Austin
Roy L. Austin