**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| VICTIM RIGHTS LAW CENTER *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>ELISABETH D. DEVOS *et al.*,<br><br>    Defendants. |

Case No. 1:20-cv-11104-WGY

**<u>DEFENDANTS' PRE-TRIAL BRIEFING</u>**

The Department of Education (ED), a defendant in this case, has for the first time promulgated a regulation that comprehensively protects individuals from sexual harassment at institutions that receive Title IX funding: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,061 (May 19, 2020) (Rule). Plaintiffs, a group of advocacy organizations and individuals, would prefer that ED promulgate a different regulation that better aligns with their policy preferences. This Court is not the proper venue for policy debates. Under Article III, this Court can resolve only cases and controversies, in which the plaintiff has suffered a concrete injury traceable to the defendant's actions. Here, the only connection between the Rule and Plaintiffs is speculation about how the Rule might affect them or how much advocacy Plaintiffs choose to conduct to oppose the Rule's alleged effects. Such allegations have routinely been rejected as insufficient to establish standing, including the allegations of similar organizations challenging this very Rule. *See Know Your IX v. DeVos*, No. 20-cv-1224-RDB, 2020 WL 6150935 (D. Md. Oct. 20, 2020).

In the weeks before the Rule's effective date, Plaintiffs filed a motion for a preliminary injunction. This Court combined proceedings on the preliminary injunction with a trial on the merits and dismissed several plaintiffs. Tr. of Sept. 2, 2020 Hrg. 7:12-25, ECF No. 136. On October 2, 2020, Plaintiffs moved for leave to file a second amended complaint. Defendants incorporate their preliminary injunction briefing, which addressed many of the pertinent issues, by reference here. Defs.' Opp'n Pls.' Mot. Prelim. Inj. (PI Opp'n) 8-16, ECF No. 96. This brief addresses several issues that arise in the context of the proposed second amended complaint and answers the Court's questions at hearing held on September 2, 2020.

## I.      Supplemental Briefing on Threshold Arguments.

### A.      The Individual Plaintiffs Lack Standing.

Defendants previously noted that the individual plaintiffs had not established standing and

did not present an irreparable injury. PI Opp'n 8-16. Plaintiffs' proposed second amended complaint removes five of the original individual plaintiffs, leaving only Jane Doe and Nancy Doe, and adds a new individual plaintiff, Mary Doe. *See generally* Pls.' Proposed 2d Am. Compl. (2d Am. Compl.), ECF No. 138-1. The two remaining original individual plaintiffs lack standing for the reasons previously explained, including because the Rule imposes no requirements for how schools respond to complaints regarding conduct prior to the effective date, *see infra* Part II.A, because any "uncertainty" concerning the procedures to be applied is not a cognizable injury, and because they have an adequate alternative remedy in the form of a suit against their schools.

Plaintiffs' proposed addition of Mary Doe does not correct these problems. First, because Mary Doe's Title IX complaint is still pending, her fears of injury from the Rule are entirely speculative. Mary Doe appears to be concerned that the Rule will result in "unfairness" in the process, such as the possibility that "statements from parties and witnesses" might be "excluded if they do not appear and submit to cross examination at a live hearing," and the possibility that the "investigation will be unduly delayed" by an ongoing criminal investigation. 2d Am. Compl. ¶¶ 263, 265. Mary Doe is also concerned that her complaint might ultimately be dismissed "when her respondent . . . graduates." 2d Am. Compl. ¶ 266. But these are simply concerns about future injury that may never come to pass, and cannot provide the basis for standing now. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also Cohn v. Brown*, 161 F. App'x 450, 455 (6th Cir. 2005) (holding that an alleged injury from a pending case was speculative). Mary Doe's case has not yet been dismissed, or delayed, and the statements of witnesses have not yet been excluded—it is impossible for Defendants to have caused an injury when none occurred in the first place. A court in this jurisdiction recently held in a similar case that an individual plaintiff lacked standing to challenge ED's guidance, which she argued might unfavorably affect her pending Title IX complaint before OCR, because her injuries were overly speculative given

that the OCR complaint had not yet been adjudicated. *Equal Means Equal v. Dep't of Educ.*, 450 F. Supp. 3d 1, 10 (D. Mass. 2020). So too here.

Second, Mary Doe's alleged injuries, like those of the other individual plaintiffs, are not traceable to the Rule or redressable by relief against ED because her school might implement procedures that she disagreed with, including cross-examination, 2d Am. Compl. ¶ 263, even absent the Rule. Prior to the Rule, ED's previous guidance permitted but did not require cross-examination, and this guidance provided fewer protections for complainants than the Rule provides.[1] Questions and Answers (Q&A) on Title IX and Sexual Violence (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.     Accordingly,     many postsecondary institutions implemented cross-examination even prior to the Rule's effective date. *See, e.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 214-15 (3d Cir. 2020), *remanded*, 2020 WL 5211028 (E.D. Pa. Sept. 1, 2020); *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018), *remanded*, 2019 WL 4809438 (E.D. Mich. Sept. 30, 2019). Indeed, the declarations submitted with Plaintiffs' preliminary injunction briefing argued that *pressure from respondents* might drive schools to implement greater procedural protections for respondents. *See, e.g.*, Susan Doe Decl. ¶ 25, Ex. E, ECF No. 32-5; Jill Doe Decl. ¶ 18, Ex. B, ECF No. 32-2. Such pressure, or even lawsuits by respondents, could occur with or without the Rule and cannot form the basis of Plaintiffs' injury in this case. *See, e.g.*, *Baum*, 903 F.3d at 575; *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), *remanded*, 2019 WL 4118659 (N.D. Ind. Aug. 28, 2019). Courts have expressed particular reluctance "to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413; *see also COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1223 n.11 (10th Cir. 2016) (holding that a challenge to a state

---

[1] For example, the Rule newly requires postsecondary institutions to provide for live hearings to occur via technology with the parties in separate rooms by request. 34 C.F.R. § 106.45(b)(6)(i). And, the Rule permits only *relevant* cross-examination and other questions. *Id.*

Board's educational Standards would not redress plaintiffs' injury because "schools may incorporate the Standards . . . regardless of whether the Board has officially adopted them").

Finally, Mary Doe, like the other individual plaintiffs, has an adequate alternative remedy in the form of a suit against her school to the extent that she challenges discretionary actions not required by the Rule.[2] *See* 5 U.S.C. § 704 (permitting Administrative Procure Act (APA) challenges only for "[a]gency action . . . *for which there is no other adequate remedy in a court*." (emphasis added)); *see also, e.g.*, *Turner v. Sec'y of HUD*, 449 F.3d 536, 539-41 (3d Cir. 2006).

### B. The Organizational Plaintiffs Have Not Corrected Their Standing Deficiencies.

The changes in the second amended complaint only underscore the organizational plaintiffs' lack of standing. As Defendants have previously explained, *see* PI Opp'n 16-20, the organizational plaintiffs lack Article III standing because they have not "'alleged such a personal stake in the outcome of the controversy' as to warrant [their] invocation of federal-court jurisdiction.'" *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (citation omitted).[3] Although Plaintiffs have added further detail about how they *expect* the Rule to affect them, this detail is both speculative and belies a "mere interest in" the Rule. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). To confirm, the Court need look no further than *Know Your IX v. DeVos*, No. 20-cv-1224-RDB, 2020 WL 6150935 (D. Md. Oct. 20, 2020), a case involving a

---

[2] It appears that Mary Doe believes her school is violating Title IX. *See, e.g.*, 2d Am. Compl. ¶ 261 (stating that she has not been offered supportive measures other than the suggestion to walk a new route). If so, then Mary Doe has available administrative remedies, including a complaint before ED's Office for Civil Rights. *See* 34 C.F.R. § 106.81 (adopting and incorporating by reference procedures found at 34 C.F.R. §§ 100.6–100.11); 34 C.F.R. §§ 100.10-100.11; *cf. Equal Means Equal*, 450 F.3d at 10.

[3] The organizational plaintiffs have never claimed to have associational standing and have thus conceded this point. At any rate, each organization alleges that it "brings this action on its own behalf," not on behalf of any members, *see, e.g.*, 2d Am. Compl. ¶ 198, and none allege that they have members, a prerequisite for associational standing.

parallel challenge to the Rule that was dismissed because of the same deficient organizational standing theories that Plaintiffs advance here.

For one, the organizational plaintiffs continue to disguise their policy preferences as injuries to the organization. As in the previous two complaints, each organization now claims that its mission has been frustrated by the Rule. But crucially, Plaintiffs have not added any allegations that support a true frustration of mission, as opposed to a policy difference with the Rule. In fact, Plaintiffs have doubled down on their argument that advocating for their clients or potentially having fewer clients is somehow a frustration of their mission. *See, e.g.*, 2d Am. Compl. ¶ 207 (alleging that VRLC has increased its technical assistance to campus administrators and attorneys); *id.* ¶ 198 (alleging that VRLC expects fewer students to report sexual harassment). But the organizational plaintiffs cite no true injuries to their missions. The successful advocacy for one's clients is part and parcel of an organization's mission. *See Habeas Corpus Res. Ctr. v. DOJ*, 816 F.3d 1241, 1250 (9th Cir. 2016) ("Assisting and counseling clients in the face of legal uncertainty is the *role* of lawyers, and, notably, [plaintiffs] have not cited any authority suggesting that lawyers suffer a legally cognizable injury.").

The unworkability of Plaintiffs' organizational standing theory proves that it is incompatible with Article III: "Taken to its logical conclusion, this theory of injury would permit attorneys to challenge any governmental action or regulation when doing so would make the scope of their clients' rights clearer and their strategies to vindicate those rights more easily selected." *Id.*; *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 239 (4th Cir. 2020) (holding that "a voluntary budgetary decision, however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to 'manufacture standing by choosing to make expenditures' about its public policy of choice" (quoting *Clapper*, 568 U.S. at 402)).

The *Know Your IX* court rejected this very theory of lawyer standing. There, an organizational plaintiff alleged that the Rule "will demand from the attorney [member] 'increased time and resources' and prohibit her from taking as many cases." 2020 WL 6150935, at *4. The court held that this was not an Article III injury: "Attorneys do not suffer a recognizable injury in fact under Article III whenever the law causes changes to their docket or 'they take measures to protect their clients' rights or alter their litigation strategy amid legal uncertainty.'" *Id.* (citation omitted). This Court should likewise reject Plaintiffs' limitless lawyer standing theory. Furthermore, Plaintiffs continue to conflate purported injuries to their clients with injuries to the organization. For example, Plaintiffs allege that the Rule deters students from reporting sexual harassment. 2d Am. Compl. ¶ 198. Flimsy as this allegation is, Plaintiffs still have not been able "to tie that frustration to particular provisions of the rule," Hr'g Tr. 9:16–17 (Court speaking)— and it at most supports an alleged injury to the *student* who would have reported sexual harassment. But the organizational plaintiffs fail to explain how a student's alleged injury becomes their injury.

The organizational plaintiffs have also doubled down on their resource diversion theory. Although they have provided more detail, the flaw in their theory is the same as before: their expenditures are consistent, not in conflict, with their organizational missions. Each organization alleges that its mission is, at least in some capacity, to fight sexual harassment, including by representing students who have been sexually harassed. *See* 2d Am. Compl. ¶¶ 30-33. But each of the ways that the organizations' resources have allegedly been "diverted" is, in fact, in furtherance of their missions. In no sense is it a "diversion" for VRLC to appeal dismissal of Title IX complaints, *see id.* ¶ 203, for ERA to read the Rule, *see id.* ¶ 211, for Legal Voice to provide technical assistance, *see id.* ¶ 227, or for CAASE to prepare for hearings, *see id.* ¶ 237. Rather, these are activities that one would expect advocacy organizations to undertake in response to a new regulation in which they are interested. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808

F.3d 905, 919-21 (D.C. Cir. 2015) ("[A]n organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." (citations and quotation marks omitted)); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("[Plaintiff's] self-serving observation that it has expended resources to educate its members and others regarding [the challenged provision] does not present an injury in fact" because plaintiffs were not "subject[ed] to operational costs beyond those normally expended to review, challenge, and educate the public about revenue-related legislation"). To conclude otherwise would "eviscerate[]" Article III limitations on standing by permitting organizations to sue "merely by virtue of [their] efforts and expense to advise others how to comport with the law." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014); *CASA de Md., Inc.*, 971 F.3d at 237-39.

Once again, this theory of organizational standing has already been rejected by the only court that has considered it in the context of the Rule. Just as here, the *Know Your IX* organizational plaintiffs alleged that they had to "dedicate a substantial amount of time to analyzing the Rule . . . , assessing existing or needed state or local parallel protections to fill in gaps created by the challenged provisions of the Rule, recreating educational materials, and providing technical assistance to students, families, educators, and journalists." 2020 WL 6150935, at *6. The court held that these allegations did not articulate an Article III injury: their "resource reallocations, although they may be motivated by sincere policy preferences, 'are not cognizable organizational injuries because no action by the defendant has directly impaired the organization's ability to operate and to function.'" *Id.* (quoting *CASA de Md., Inc.*, 971 F.3d at 239).

The revised allegations fail to support organizational standing for one final, independent reason: they are utterly speculative. To establish injury in fact, a plaintiff must demonstrate a threatened injury that is "certainly impending"; "allegations of possible future injury" are

insufficient. *Clapper*, 568 U.S. at 409 (citation and emphasis omitted). The Rule became effective on August 14, 2020, and Plaintiffs strain to explain how they have been injured: Legal Voice "anticipates" that the Rule will chill reporting of sexual harassment, *see* 2d Am. Compl. ¶ 228; CAASE predicts that its clients "will" not be able to file administrative complaints because they do not meet the Rule's definition of sexual harassment, *see id.* ¶ 236; VRLC speculates that the Rule will "make it less likely for" its clients to file complaints, *see id.* ¶ 199; and ERA "expects" to appeal more decisions, *see id.* ¶ 219. As the *Know Your IX* court held in response to nearly identical allegations against the Rule, such speculation does not amount to an Article III case or controversy. *See* 2020 WL 6150935, at *4 (holding that Plaintiffs' standing theory "relies on numerous assumptions, including how many clients will seek her services; what sorts of claims such individuals might have; and how expensive or difficult the cases she gets may be"); *id.* at *8 ("At this point, Know Your Title IX's concerns about an increase in the number of calls and training requests that it will receive in reaction to the Rule are merely speculative.").

Plaintiffs' organizational standing allegations are speculative for another reason: they are not clearly tied to the Rule. Although the second amended complaint contains more citations to the Rule, Plaintiffs' challenge still fails to directly connect any provision of the Rule to an injury to the organization. For example, several organizations claim that they will have to spend more resources preparing for cross-examination, which the Rule requires for hearings at postsecondary institutions. *See, e.g.*, 2d Am. Compl. ¶ 205. But many postsecondary institutions have already chosen or are required to implement cross-examination, absent the Rule. *See, e.g.*, *Doe v. Univ. of Scis.*, 961 F.3d at 214-15; *Doe v. Baum*, 903 F.3d at 578. Plaintiffs do not explain how the Rule in particular injures them, and without doing so they cannot establish standing. In fact, another court in this district dismissed a similar organization's challenge to the Department's guidance on sexual misconduct because it did "not allege that as a result of [that guidance] they have increased on-

campus trainings or developed any new initiatives or devoted staff resources to reaching out to schools regarding complaints." *Equal Means Equal*, 450 F. Supp. 3d at 8.

## II.    Responses to the Court's Questions to the Parties.

The following are Defendants' responses to the Court's five questions at the September 2, 2020 hearing. Tr. of Sept. 2, 2020 Hrg. at 8:17-22, 8:23-9:4, 9:5-10, 9:23-10:13, 10:14-23.

### A.    Has ED Adopted a Position That the Rule Should Be Applied Retroactively, or Communicated Such a Position to Any Recipients?

ED has stated that the Rule will not be applied retroactively and, to the best of its knowledge, has not communicated to any Title IX recipient that the Rule should be applied retroactively. The Rule states, "the Department will not enforce these final regulations retroactively." 85 Fed. Reg. at 30,061. ED's technical assistance and communications to recipients have consistently reiterated this position. *See* Office for Civil Rights (OCR) Blog, *The Title IX Rule Is Effective on August 14, 2020, and Is Not Retroactive* (Aug. 5, 2020), https://www2.ed.gov/ about/offices/ list/ocr/blog/20200805.html; U.S. Dep't of Educ., OCR Letter to Educators and Stakeholders (Aug. 26, 2020), at 2 (August 26 Letter) (explaining that "the Title IX Rule will not be enforced retroactively"), https://www2.ed.gov/policy/gen/guid/fr-200826-letter.pdf; U.S. Dep't of Educ., OCR Blog, *The Department's Title IX Rule Provides Flexibility to Schools with Respect to Decision-Makers* (Sept. 3, 2020) (noting that the Rule "is not retroactive" and that OCR "will not apply the Rule to sexual harassment that allegedly occurred prior to August 14, 2020"), https:// www2.ed.gov/about/offices/list/ocr/blog/20200903.html; U.S. Dep't of Educ., OCR, *Questions and Answers Regarding the Department's Final Title IX Rule*, at 1 (Sept. 4, 2020) ("The Title IX Rule will not be enforced retroactively."), https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-20200904.pdf.

**B.**     **Under What Guidelines Does ED Intend to Enforce Title IX With Respect to Conduct Occurring Prior to August 14, 2020?**

In analyzing and investigating conduct involving sexual harassment that allegedly occurred before August 14, 2020, ED will enforce Title IX under ED regulations in effect prior to that date. Recipients of federal financial assistance also may refer to the following documents: (1) *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512-01 (Jan. 19, 2001) (2001 Guidance); (2) U.S. Dep't of Educ., OCR, Dear Colleague Letter (Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/ sexhar-2006.html; (3) U.S. Dep't of Educ., OCR, *Q&A on Campus Sexual Misconduct* (Sept. 22, 2017),  https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.  *See*  August  26 Letter at 2 (explaining that to the extent that these three documents are helpful to recipients for responding appropriately to sexual harassment allegedly occurring prior to August 14, 2020, they will remain accessible on ED's website, even though they were rescinded after the Rule took effect).

**C.**     **Is ED's 2001 Guidance Still Operative?**

The 2001 Guidance has been rescinded, although it remains accessible on ED's website in the event that recipients of federal financial assistance would like to refer to it. *See supra* I.B.

**D.**     **Did ED Consider Allowing Decision-makers, at Their Discretion, to Rely on Party or Witness Statements Deemed "Reliable" Without Subjecting the Party or Witness to Cross-Examination?**

The Rule provides that "[i]f a party or witness does not submit to cross-examination" during a live hearing conducted by a postsecondary institution, "the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility." 34 C.F.R. § 106.45(b)(6)(i). ED proposed this requirement in its notice of proposed rulemaking. 83 Fed. Reg. 61,462, 61,498 (Nov. 29, 2018). This provision does not exclude all hearsay during a live hearing conducted by a postsecondary institution. The Federal Rules of Evidence define

hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801. By analogy to this definition, in the context of a Title IX grievance process, hearsay includes statements that a declarant does not make while testifying during a live hearing conducted by a postsecondary institution pursuant to 34 C.F.R. § 106.45(b)(6)(i), and that a party uses to prove the truth of the matter asserted.

The Rule does not preclude a decision-maker from relying on hearsay in reaching a determination regarding responsibility. A party or witness may use a statement made outside of the hearing to prove the truth of the matter asserted, as long as that party or witness submits to cross-examination. For example, a party may testify that the party or another witness made a particular statement on the date when the sexual harassment allegedly occurred, and the decision-maker may consider that particular statement so long as the party or witness submits to cross-examination.

However, such a statement nonetheless constitutes hearsay. Accordingly, a party must have the *opportunity* to cross-examine another party or witness regarding the alleged hearsay statement to enable the decision-maker to reliably consider that statement in making a determination of responsibility, though the Rule does not *require* the party or witness to conduct such cross-examination. 34 C.F.R. § 106.45(b)(6)(i). This provision, together with the Rule's prescription to consider only "relevant" evidence, preserves the important function of cross-examination in fostering the accuracy and legitimacy of postsecondary institution Title IX proceedings without over-legalizing an institution's Title IX grievance process. Rule at 30,348, 30,247-248.

Some commenters opposed the requirements of § 106.45(b)(6)(i), arguing that the Federal Rules of Evidence "allow out-of-court statements to be admitted in certain circumstances and for limited purposes." Rule at 30,345. At the same time, other commenters supported ED's position

because § 106.45(b)(6)(i) would permit consideration of "only statements that have been tested for credibility, in the 'crucible' of cross-examination," *id*. at 30,344, and because "Title IX sexual misconduct cases often concern accusations of a 'he said/she said' nature where accounts differ between complainant and respondent and corroborating evidence is inconclusive or non-existent," such that a requirement of "cross-examined party statements" would be "critical to reaching a fair determination." *Id*.

ED carefully considered and responded to dissenting commenters, explaining that cross-examination helps ensure the reliability of party and witness statements, allows each party a meaningful opportunity to participate in advancing their own views and interests in the case in front of a neutral decision-maker, and increases the legitimacy of Title IX proceedings. *Id*. at 30,311-342. The real-time, adversarial nature of cross-examination uncovers witness inaccuracy and possible deception by permitting a neutral fact-finder to evaluate a party's or witness's credibility by observing demeanor and judgment consistency and plausibility of the party's or witness's statements. *Id*. For these reasons, ED retained the provision requiring parties to have the opportunity to cross-examine party and witness statements before such statements may be relied upon by the decision-maker, recognizing that allowing recipient officials to judge a statement as "reliable" in a way that bypassed the parties' right to conduct cross-examination would result in losing the benefits of cross-examination in Title IX proceedings. *Id*. at 30,347.

In considering and responding to public comments on this provision, *see id*. at 30,344-50, ED reasoned that while "courts of law operate under comprehensive, complex rules of evidence under the auspices of judges legally trained to apply those rules of evidence," Title IX grievance proceedings are not court proceedings. *Id*. at 30,347. And while judges are competent to apply rules of evidence, the same may not reasonably be expected of recipients whose "primary function is to provide education, not to resolve disputes between students and employees." *Id*. Thus, rather

than "importing comprehensive rules of evidence," ED decided to "apply a bright-line rule." *Id*.

Because ED reasonably determined that in the specific context of analyzing Title IX sexual

harassment allegations, "a rule of non-reliance on untested statements is more likely to lead to

reliable outcomes than a rule of reliance on untested statements," it "decline[d] to import a rule of

evidence that, for example, allows a witness's statement to be relied on where the statement was

made to friends or family without awareness that a crime was under investigation." *Id*.[4] ED

similarly declined "to adopt commenters' suggestion that instead the decision-maker should be

permitted to rely on statements that are not subject to cross-examination, if they are reliable"

because "making such a determination without the benefit of extensive rules of evidence would

likely result in inconsistent and potentially inaccurate assessments of reliability." *Id*. at 30,348.[5]

However, in response to other comments, ED did revise the proposed provision in a number of

ways, including (1) prohibiting decisionmakers from drawing inferences about the determination

regarding responsibility based solely on a party's or witness's absence from a hearing or refusal to

submit to cross-examination, and (2) allowing recipients to hold virtual hearings, to make it as

feasible as possible for parties and witnesses to appear at hearings thereby ensuring that their

statements may be relied upon. *Id*. at 30,349.

---

[4] *See also* Rule at 30,347 ("If statements untested by cross-examination may still be considered and relied on, the benefits of cross-examination as a truth-seeking device will largely be lost in the Title IX grievance process."); *id*. (""Reliance on party and witness statements that have not been tested for credibility via cross-examination undermines party and public confidence in the fairness and accuracy of the determinations reached by postsecondary institutions. This provision need not result in failure to consider relevant evidence because parties and witnesses retain the opportunity to have their own statements considered, by submitting to cross-examination.")

[5] ED also addressed comments noting "that courts have not imposed a blanket rule excluding hearsay evidence from use in administrative proceedings." But ED concluded that "cases cited by commenters do not stand for the proposition that every administrative proceeding *must* be permitted to rely on hearsay evidence, even where the agency lacks subpoena power to compel witnesses to appear." Rule at 30,348 (emphasis in original); *see also id*. at 30,348 n.1336.

E.     **Did ED Consider the Goal of Deterrence Against Sexual Harassment With Respect to the "Unaffiliated Complainant Exclusion"?**

To avoid denying potential remedies to sexual harassment victims because of the lapse of time, ED declined to impose an arbitrary time limit for complainants to file a formal complaint. *See* Rule at 30,086-87, 30,127. Yet it also recognized that a Title IX recipient should not automatically be burdened with having to investigate formal complaints filed by individuals who are not associated in any way with the recipient. *Id*. Rather than either imposing a statute of limitations or restricting the filing of a formal complaint only to complainants who are current students or employees of the recipient, ED instead tethered a recipient's obligation to investigate a formal complaint filed by a complainant to whether the complainant is participating (or attempting to participate) in the recipient's education program or activity at the time of filing. *See id*. This condition is consistent with Title IX's application to "any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a), and is reasonably based on the complainant's connection to the recipient. *See* Rule at 30,127, 30,219.

However, the Rule makes clear that the "participation" requirement for filing a formal complaint is to be understood broadly. A complainant may be "attempting to participate" in a recipient's education program in a broad range of circumstances that do not require current enrollment, including *inter alia*, where a complainant (1) has withdrawn from a school due to alleged harassment and expresses a desire to re-enroll if the recipient responds appropriately to the allegations, (2) has graduated but intends to apply to a new program or is inclined to participate in alumni events, (3) is on a leave of absence, or (4) has simply applied for admission. *See id*. at 30,138, 30,219, 30,198 n.869. Furthermore, this "participation" condition does not apply to limit the reporting of sexual harassment, which anyone may do. *See id*. at 30,093, 30,129.

Critically, when a school is on notice of sexual harassment, the Rule requires recipients to offer supportive measures to complainants whether or not a formal complaint is ever filed, and

directs a recipient's Title IX Coordinator to engage in an interactive process with each complainant to discuss supportive measures and explain the process for filing a formal complaint. *See* 34 C.F.R. § 106.44(a), § 106.30(a) (defining "formal complaint"); Rule at 30,210. It also gives each recipient's Title IX Coordinator discretion to sign a formal complaint even if a complainant chooses not to file or is precluded from filing. *See id*. Supportive measures must be offered even if the alleged victim is not a student or employee of the school and even if the alleged victim is not participating in or attempting to participate in the recipient's education program or activity. *See* Rule at 30,198 (definition of "complainant" as any "individual" means that a complainant entitled to supportive measures need not be a student or employee or have any relationship with the recipient). Supportive measures include measures designed to protect a party's safety and/or deter sexual harassment. *See* 34 C.F.R. § 106.30(a) (defining "supportive measures"). Thus, regardless of a complainant's choice or eligibility to file a formal complaint, the Rule requires a recipient to offer individualized services designed to protect the complainant and deter harassment, as appropriate,[6] and requires a Title IX Coordinator to exercise discretion (subject to the deliberate indifference standard) as to whether to sign a formal complaint launching an investigation. These provisions are designed to deter sexual harassment and to avoid deterring or "chilling" reporting of sexual harassment. *See* Rule at 30,128-129. A complainant's right to file a formal complaint is reasonably linked to the complainant's participation or attempted participation in the recipient's education program or activity, but no such restriction applies to the complainant's right to receive supportive measures nor to the discretion of a Title IX Coordinator to sign a formal complaint.[7]

---

[6] Supportive measures may include, but are not limited to, campus escort services, mutual restrictions on contact between the parties, increased security and monitoring of certain areas of the campus. 34 C.F.R. § 106.30(a) (defining "supportive measures" non-exhaustively).

[7] Furthermore, the Rule permits any recipient to choose to allow a complainant who is ineligible to file a formal complaint to instead file a complaint akin to a formal complaint and to offer the process provided for in 34 C.F.R. § 106.45 or a different process. 34 C.F.R § 106.45(b)(3)(i).

Dated: November 5, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Rebecca M. Kopplin*
REBECCA M. KOPPLIN
Trial Attorney (California Bar No. 313970)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 514-3953
E-mail:  rebecca.m.kopplin@usdoj.gov

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the CM/ECF system was served this day on all parties via the Court's electronic case filing system.


*<u>/s/ Rebecca M. Kopplin</u>*
Rebecca M. Kopplin