**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **VICTIM RIGHTS LAW CENTER,** et al. | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-11104 |
| **ELISABETH D. DEVOS**, et al. | Judge William G. Young |
| Defendants. | |

**PLAINTIFFS' PRETRIAL BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.      **DOE PLAINTIFFS HAVE DEMONSTRATED STANDING** ........................ 2

      A.    Mary Doe ................................................................................................. 2

      B.    Update on Jane Doe and Nancy Doe and Applicable Guidance ................ 4

II.     **IMPACT ON ORGANIZATIONAL PLAINTIFFS** ....................................... 6

III.    **THE FINAL RULE'S EXCLUSIONARY RULE VIOLATES THE APA AND IS INCONSISTENT WITH EVIDENTIARY PRINCIPLES IN OTHER FORUMS** ............................................................ 8

IV.    **THE FAILURE TO CONSIDER DETERRENCE ILLUSTRATES WHY THE FINAL RULE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW** ............................................................................ 10

V.     **THE FINAL RULE VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT** ......................................... 12

CONCLUSION ........................................................................................................................ 15

**TABLE OF AUTHORITIES**

**Cases**

*Ayala-Sepúlveda v. Municipality of San Germán*,

 671 F.3d 24 (1st Cir. 2012) ............................................................................13,15

*Cannon v. Univ. of Chi.*,

 441 U.S. 677 (1979) ....................................................................................1,11,14

*City of Arlington v. FCC*,

 569 U.S. 290 (2013) ............................................................................................12

*Cohen v. Brown Univ.*,

 101 F.3d 155 (1st Cir. 1996) ..............................................................................15

*Doe v. Rensselaer Polytechnic Inst.*,

 1:20-CV-1185, 2020 WL 6118492 (N.D.N.Y. Oct. 16, 2020) ..............................5

*Doe v. Sch. Bd.*,

 604 F.3d 1248 (11th Cir. 2010) ..........................................................................12

*Equal Means Equal v. Dep't of Educ.*,

 450 F.Supp.3d 1(D. Mass. Mar. 18, 2020) ......................................................6, 8

*Gebser v. Lago Vista Indep. Sch. Dist.*,

 524 U.S. 274 (1998) ............................................................................................10

*Havens Realty Corp. v. Coleman*,

 455 U.S. 363 (1982) ..............................................................................................6

*Know Your IX. v. DeVos*,

 No. RDB-20-01244, 2020 WL 6150935 (D. Md. Oct. 20, 2020) ..........................8

*Lipsett v. Univ. of P.R.*,

 864 F.2d 881 (1st Cir. 1988) ..............................................................................13

*Lopera v. Town of Coventry*,

 640 F.3d 388 (1st Cir. 2011) ..............................................................................13

*Lujan v. Defenders of Wildlife,*

    504 U.S. 555 (1992)..................................................................................2

*Moya v. Dep't of Homeland Sec.,*

    975 F.3d 120 (2d Cir. 2020)....................................................................6

*New York v. U.S. Dep't of Homeland Sec.,*

    969 F.3d 42 (2d Cir. 2020)......................................................................6

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*

    797 F.3d 1087 (D.C. Cir. 2015) ..............................................................6

*Renee v. Duncan,*

    623 F.3d 787 (9th Cir. 2010) ..................................................................6

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*

    547 U.S. 47 (2006)...................................................................................2

*Schlesinger v. Ballard,*

    419 U.S. 498 (1975) ...............................................................................15

*Schultzen v. Woodbury Cent. Cmty. Sch. Dist.,*

    187 F. Supp. 2d 1099 (N.D. Iowa 2002)................................................10

*SurvJustice Inc. v. DeVos,*

    No. 18-CV-00535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018)......8

*SurvJustice Inc. v. DeVos,*

    No. 18-CV-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019)...8

**Statutes and Regulations**

20 U.S.C. § 1682...........................................................................................10

34 C.F.R. § 106.30(a)(2)...............................................................................13

34 C.F.R. § 106.44(a)....................................................................................13

83 Fed. Reg. 61,462 (Nov. 29, 2018)...............................................................8

85 Fed. Reg. 30,026 (May 19, 2020) ..............................................1, 3, 8, 9, 10, 11

**Other Authorities**

Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf ........................................................................................................................14

Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct* (Jan. 17, 2020), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/Revised%20Aggregate%20report%20%20and%20appendices%201-7_(01-16-2020_FINAL).pdf ........................................................................................14

Erica L. Green and Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as The Accused Get DeVos's Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html ........................................................................14

Helene Barthelemy, *How Men's Rights Groups Helped Rewrite Regulations on Campus Rape*, The Nation (Aug. 14, 2020), https://www.thenation.com/article/politics/betsy-devos-title-ix-mens-rights ........................................................................................................................15

John Wagner, *All of the Women Who Have Accused Trump of Sexual Harassment Are Lying, the White House Says*, Wash. Post, Oct. 27, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/10/27/all-of-the-women-who-have-accused-trump-of-sexual-harassment-are-lying-the-white-house-says ........................................................................14

U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html .13, 14

U.S. Dep't of Educ., *Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other students, or Third Parties* (Jan. 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ...................................................4

U.S. Dep't of Educ., Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf ..................................4

U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers for K-12 Public Schools In the Current COVID-19 Environment* (Sept. 28 2020), https://www2.ed.gov/about/offices/list/ocr/docs/qa-covid-20200928.pdf..............................5

U.S. Dep't of Educ., *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement........................................................................................................................14

## **INTRODUCTION**

Congress enacted Title IX to accomplish two complementary objectives: to provide individuals with avenues for complaint and redress against sex discrimination in educational institutions and to ensure that federal funds are not used to support, and indeed are used to deter, such discrimination.[1] Contrary to Title IX's mandate, the Department of Education ("the Department") promulgated a regulation interpreting Title IX's protections against sexual harassment that, by the Department's own admission, reduces the number of harassment investigations that schools will undertake and increases the procedural burden on those who do file harassment complaints, all while failing to deter sexual harassment in this nation's schools and protect equal access to education.[2] Rather than serving Congress's express goals, the Final Rule exacerbates the very harms that Congress sought to eradicate.

Plaintiffs—survivors of sexual harassment and assault currently involved in Title IX processes at their schools and four victims' rights organizations—brought this suit challenging the Final Rule on the grounds that it: (1) violates the Administrative Procedure Act because it is arbitrary, capricious, contrary to law, in excess of the Department's statutory jurisdiction, and was enacted without observance of procedure required by law, and (2) violates the equal protection guarantee of the Fifth Amendment because it singles out complainants of sexual harassment for disparate treatment based on discriminatory sex-based stereotypes.[3]

On September 2, the Court collapsed the preliminary injunction motion into a trial on the merits.[4] Plaintiffs subsequently moved for leave to file a Second Amended Complaint, adding a

---

[1] *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979).
[2] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Final Rule").
[3] ECF No. 13.
[4] ECF No. 130.

new individual Plaintiff, Mary Doe.[5] In accordance with the Court's October 9, 2020 order, Plaintiffs hereby incorporate by reference the arguments in their preliminary injunction briefs and devote this brief to addressing new developments, issues not yet briefed, and matters the Court raised during the prior hearing.

## ARGUMENT

### I.     DOE PLAINTIFFS HAVE DEMONSTRATED STANDING

The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."[6] Doe Plaintiffs have established the elements of Article III standing: each has (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the Defendants and (3) the injury is likely to be redressed by a favorable judicial decision.[7]

#### A.  Mary Doe

The Second Amended Complaint adds allegations from Mary Doe, a college student in North Carolina who was raped by a classmate in her on-campus dorm room on August 28, 2020.[8] The next morning, she went to a local hospital, completed a rape kit, and provided a statement to police from the hospital.[9] The respondent texted her several times while she was still in the hospital.[10] After leaving the hospital, she sought a temporary restraining order ("TRO"), which the court granted and later renewed following an in-person hearing.[11] After a copy of the TRO was served on her assailant, Mary Doe reported the rape to her college's Title IX office.[12]

As both the incident and her report of it occurred after August 14, 2020, the Final Rule

---

[5] ECF No. 138.  As of November 5, 2020, the motion remains pending on the Court's docket.
[6] *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 52 n. 2 (2006).
[7] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).
[8] Exh. A, Decl. of Mary Doe ("Mary Doe").
[9] Mary Doe ¶ 10-11.
[10] Mary Doe ¶ 10.
[11] Mary Doe ¶¶ 14-18.
[12] Mary Doe ¶ 19.

unambiguously governs Mary Doe's Title IX investigation. Mary Doe has experienced significant mental and physical trauma from the rape, including feelings of depression and concern that an underlying eating disorder she has fought to overcome will resurface.[13] Her respondent remains on campus and lives in the dorm next to hers.[14] Despite weekly therapy sessions, she has trouble focusing and missed about sixteen classes during the first month after her rape, causing her grades to suffer.[15] She considered transferring schools to avoid seeing her respondent, but she is attending college on two four-year scholarships and cannot afford to lose her financial aid.[16]

Several provisions of the Final Rule injure Mary Doe. The Final Rule prohibits schools from relying on the written or oral statements of any party or witness who does not submit to cross-examination at a live hearing. This means Mary Doe's college cannot even *consider* statements in the police report or findings from the rape kit unless the police officer who took the report and the hospital workers who collected the rape kit are willing and available to testify. This restriction threatens to exclude highly relevant and credible evidence, including evidence that would be admissible in a criminal proceeding. And, if Mary Doe wants her school to consider her own statements, she knows the school must require her to answer *every* relevant question posed by the respondent's advisor during cross-examination or *all* of her statements must be ignored.[17] She explained that this requirement will re-traumatize her, making it harder for her to participate in school, especially after the recent TRO hearing where she had to attend a proceeding with her respondent, and cried and shook uncontrollably when she heard him speak.[18] Because there are no hearsay-rule exceptions, if Mary Doe's respondent does not submit to cross-examination, the Final

---

[13] Mary Doe ¶¶ 33-34.
[14] Mary Doe ¶ 40.
[15] Mary Doe ¶¶ 30, 35.
[16] Mary Doe ¶ 35.
[17] 85 Fed. Reg. 30,349.
[18] Mary Doe ¶ 16-17.

Rule prohibits the school from considering the text messages he wrote to her prior to the rape and while she was at the hospital, even if they constitute an admission of a party-opponent or contain statements against interest.

Despite the fact that she obtained a TRO twice, Mary Doe has been informed by her school that it cannot provide supportive measures that could be considered punitive or burdensome to the respondent due to the Final Rule and therefore it cannot take steps, such as moving his dorm room or changing his routes to class, that would previously have been considered in these circumstances and would provide additional safety and peace of mind for Mary Doe.[19] The Final Rule also prohibits her school from providing her with basic confidentiality protections, thus allowing her respondent to remain to talk about the allegations with other students without restriction.[20]

### B.  Update on Jane Doe and Nancy Doe and Applicable Guidance

Jane Doe and Nancy Doe have not yet received information from their respective schools indicating whether they will implement a "non-Title IX" process to address incidents occurring before the August 14, 2020 effective date of the Final Rule.[21] On August 5, 2020, the Department claimed in an eleventh-hour blog post that the Final Rule does not bind schools in their response to sexual harassment occurring before August 14, 2020. However, just three weeks later, on August 26, 2020, the Department quietly rescinded both the 2001 Guidance and the 2017 Guidance, creating more confusion as to what standards schools should apply in responding to sexual harassment occurring before August 14, 2020.[22] The Department offered no public notice

---

[19] Mary Doe ¶ 40.

[20] The Final Rule also permits Mary Doe's school to delay her Title IX investigation because the assault is the subject of an ongoing criminal investigation. Mary Doe is worried that if the Title IX investigation is delayed for too long, her respondent (a senior) will graduate, and the Final Rule will then allow her school to dismiss her complaint entirely. Mary Doe ¶ 39.

[21] Exh. B, Amend. Decl. of Nancy Doe ("Amend. Nancy Doe") ¶ 55; Exh. C, Amend. Decl. of Jane Doe ("Amend. Jane Doe") ¶ 18.

[22] U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other*

or explanation of these rescissions but did issue a separate COVID guidance in September, instructing K-12 schools to continue using the rescinded Title IX guidances in responding to sexual harassment occurring before August 14, 2020.[23] The Department has issued no such instruction to post-secondary institutions, compounding the confusion surrounding schools' responsibilities. In fact, one federal district court has already preliminarily enjoined a university from declining to apply the Final Rule to pre-August 14, 2020 incidents, stating that the court is not bound to follow the Department's blog post, in part, "because it is not an authoritative statement entitled to *Auer* deference," and thus, the Department's view "need not be the last word on the matter."[24]

The Title IX Coordinator of Michigan, Elizabeth Collins, has expressed serious doubt regarding the ability of Michigan K-12 schools, like Jane Doe's, to use separate approaches to investigate harassment occurring prior to August 14 and after August 14, as it will "inevitably cause confusion for school administrators, students, and parents."[25] She notes that although the Final Rule allows schools to act on incidents outside the limited definition of sexual harassment using a "non-Title IX process," "schools are unlikely to conduct investigations when not required by the Rule," because they are "often strapped for funding" and have "limited resources."[26] As such, the Final Rule jeopardizes Jane Doe's access to a safe educational environment.

Nancy Doe's access to education is similarly at risk. Her institution has offered no instruction on how to proceed using a dual-track system, and given the rescission of the 2001 and

---

*Students, or Third Parties* (Jan. 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf (last visited Oct. 28, 2020); U.S. Dep't of Educ., Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (last visited Oct. 28, 2020).

[23] U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers for K-12 Public Schools In the Current COVID-19 Environment* 7-9 (Sept. 28 2020), https://www2.ed.gov/about/offices/list/ocr/docs/qa-covid-20200928.pdf.

[24] *Doe v. Rensselaer Polytechnic Inst.*, 1:20-CV-1185, 2020 WL 6118492 at *10 (N.D.N.Y. Oct. 16, 2020) ("The absurd—yet necessary—result of an institution following the OCR post's guidance to the letter would be that school's indefinite maintenance of an entire alternative procedure, perhaps behind a pane of glass labelled "Break in Case of Emergency," just in case a claim of sexual assault allegedly occurring before August 14, 2020 should arise.").

[25] ECF Dkt. No. [32], Exhibit O, Declaration of Elizabeth Collins ¶ 22.

[26] *Id.*

2017 Guidances and a recent federal court case preliminarily enjoining a university's dual-track system, it is likely she will be forced to proceed under the Final Rule. Under the Final Rule, her school must dismiss her case because she was harassed in an off-campus location that appears to be outside the school's education program or activity. Such a dismissal would leave Nancy Doe with no recourse under federal civil rights law and at the mercy of her school as to whether, and how seriously, to investigate her claims. Even if the school completely failed to take any steps to respond and protect her, thus compromising her education, this would not violate the Final Rule.

Given this confusion caused by the Final Rule, Jane Doe and Nancy Doe continue to experience particularized and concrete emotional and psychological harm as described in their declarations.[27] This harm is not speculative and is independently sufficient to meet the injury-in-fact requirement.[28] Enjoining the Final Rule would allow the Doe Plaintiffs' claims to continue under their schools' previous Title IX policies, lessening the harm caused by the Final Rule.

## II.    IMPACT ON ORGANIZATIONAL PLAINTIFFS

An organization has standing if its "mission has been 'frustrated' by the challenged conduct and it has expended resources to combat it"[29] or "to counteract[] the effects of the defendants' alleged" unlawful acts.[30] Where a defendant's conduct has "perceptibly impaired" an organization's "ability to provide [services to its clients], there can be no question that the organization has suffered injury in fact."[31]

Organizational plaintiffs have explained in detailed declarations how sections 106.30(a),

---

[27] Amend. Nancy Doe ¶¶ 40-54; Amend. Jane Doe ¶ 19-28.
[28] *See Renee v. Duncan*, 623 F.3d 787, 797 (9th Cir. 2010).
[29] *Equal Means Equal v. Dep't of Educ.*, 450 F.Supp.3d 1, 5 (D. Mass. Mar. 18, 2020) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).
[30] *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1097 (D.C. Cir. 2015).
[31] *Havens*, 455 U.S. at 379; *see Moya v. Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) (citing *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61 (2d Cir. 2020)).

106.44(a), and 106.45(b)(3)(i)-(ii) of the Final Rule will harm their ability to seek redress for students who allege misconduct that does not meet the narrow definition of "sexual harassment," who are sexually harassed outside of a school "program or activity," or whose cases involve an unaffiliated complainant or respondent.[32] By ensuring that sexual harassment will be unaddressed in schools, these dismissal provisions frustrate the organizations' missions of achieving redress for sexually harassed students, increasing reporting of sexual harassment, and deterring sexual harassment.[33] The Final Rule will also require the organizations to divert resources away from mission-critical work as they will spend more time appealing schools' wrongful dismissals of Title IX complaints, navigating multiple "Title IX" and "non-Title IX" processes for the same client, and defending the lawfulness of "non-Title IX" processes in respondent-initiated challenges—all of which reduce the number of clients the organizations can represent.[34]

Organizational plaintiffs have also identified procedural requirements under the Final Rule that will injure their operations. For example, the live cross-examination requirement will deter witnesses from testifying and lead to the exclusion of critical evidence, frustrating organizational plaintiffs' mission of securing fair and accurate resolutions when harassment occurs.[35] The procedural requirements will also divert organizational plaintiffs' resources by requiring them to spend more time preparing for hearings, participate in longer hearings, and secure additional evidence and witnesses to overcome the sweeping exclusionary rule, the presumption of non-responsibility, and the tilted evidentiary standard.[36]

---

[32] Exh. D, Amended Decl. of Noreen Farrell ("Amend. Farrell Decl.") ¶ 30; Exh.E, Amended Decl. of Stacy Malone ("Amend. Malone Decl.") ¶ 13; Exh. F, Amended Decl. of Kaethe Morris Hoffer ("Amend. Hoffer Decl.") ¶ 26.

[33] Amend. Farrell Decl. ¶¶ 32; Amend. Malone Decl. ¶ 13; Amend. Hoffer Decl. ¶ 21; Exh. G, Amended Decl. of Lisa M. Stone ("Amend. Stone Decl.") ¶ 9.

[34] Amend. Farrell Decl. ¶ 38; Amend. Malone Decl. ¶ 14; Amend. Hoffer Decl. ¶ 27.

[35] Amend. Farrell Decl. ¶ 44; Amend. Malone Decl. ¶ 21; Amend. Hoffer Decl. ¶ 28; Amend. Stone Decl. ¶ 10.

[36] Amend. Farrell Decl. ¶ 45; Exh. E, Amend. Malone Decl. ¶ 22; Exh. F, Amend. Hoffer Decl. ¶ 32; Exh. G, Amend. Stone Decl. ¶ 18.

Organizational plaintiffs have clearly shown frustration of mission and diversion of resources beyond mere speculation. Indeed, a California district court in the *SurvJustice* case previously found *Havens* standing for plaintiffs ERA and VRLC based on similar observed injuries, with the same degree of specificity, and that ruling has been favorably cited by a district court in Massachusetts.[37] A favorable court ruling vacating the Final Rule would redress the organizations' injury by restoring the status quo prior to the Final Rule.

### III.    THE FINAL RULE'S EXCLUSIONARY RULE VIOLATES THE APA AND IS INCONSISTENT WITH EVIDENTIARY PRINCIPLES IN OTHER FORUMS

Section 106.45(b)(6)(i) of the Final Rule prohibits postsecondary schools from relying on the oral or written statements of a party or witness who does not submit to cross-examination in reaching a determination regarding responsibility. At the September 2, 2020 hearing, the Court asked whether the Department had considered making this restrictive rule permissive rather than mandatory.[38] Plaintiffs have seen no indication the Department did.

The exclusionary rule appears for the first time in the Preamble to the Final Rule and was not included in the Proposed Rule, which referred only to "statements" by parties and witnesses.[39] The Final Rule goes much further, creating an absolute prohibition on consideration of "*written statements*" unless the witness submits to cross-examination, and explicitly makes no exceptions for a witness's post-investigation disability or even death.[40] This mandatory provision precludes

---

[37] *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2018 WL 4770741, at *8 (N.D. Cal. Oct. 1, 2018), *order amended on reconsideration*, No. 18-CV-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019) (finding that plaintiffs had satisfied the injury-in-fact prong of standing as to their APA and *ultra vires* claims; *see Equal Means Equal*, 450 F.Supp.3d , at 6 (contrasting organizational plaintiffs' alleged harms with those in *SurvJustice* and allowing one plaintiff to amend the complaint to make allegations to support standing); *see also Know Your IX. v. DeVos,*No. RDB-20-01244, 2020 WL 6150935 (D. Md. Oct. 20, 2020) (contrasting the organizational plaintiffs' allegations as insufficient to find standing as compared to those made by the *SurvJustice* organizational plaintiffs, where standing was found).

[38] Tr. of Prelim. Inj. Hr'g at 10-11.

[39] 83 Fed. Reg. 61,462, 61,475 (Nov. 29, 2018).

[40] 85 Fed. Reg. 30,348 (emphasis added).

decision-makers from considering, or assigning weight to, evidence with indicia of reliability such as medical records or police records, or statements against interest in—for example—social media posts, texts, or blogs posts, unless the person who wrote the statements appears for cross-examination. It imposes this draconian requirement without maintaining exceptions for hearsay available in state and federal court proceedings, even though neither schools nor victims have the authority to compel witnesses to testify.[41] Mary Doe's investigation, as detailed above, exemplifies the arbitrariness and harm to complainants by excluding evidence such as police reports and rape kits if police officers and medical professionals are unable to testify.

The purported rationale for this arbitrary provision is invoked selectively in ways that harm complainants. For example, while the Final Rule attempts to justify its no-exceptions exclusionary rule on the grounds that "Title IX grievance processes are not court proceedings, comprehensive rules of evidence do not, and need not, apply," and schools "should not be converted into *de facto* courtrooms,"[42] the *same provision* also requires the decision-maker—who the Department acknowledges is often a "layperson"—to "make relevance determinations regarding cross-examination [questions] in real time during the hearing."[43] Moreover, the Final Rule *prohibits* schools from excluding evidence or cross-examination questions that are unduly prejudicial, misleading, or assume facts not in evidence.[44] The rule thus arbitrarily requires school decision-makers to apply certain evidentiary rules while also forbidding schools from adopting other well-established rules necessary to make in-school proceedings workable, reliable, and equitable.[45]

---

[41] 85 Fed. Reg. 30,348.

[42] 85 Fed. Reg. 30,347-48.

[43] 85 Fed Reg. 30,349; *see also* Def.'s Resp. at 29, ECF 96 (quoting the Final Rule at 30,259) (justifying the Final Rule's presumption of non-responsibility by stating it "operates analogously to the rules governing ordinary civil litigation" and "could be seen as borrowing from criminal procedure").

[44] 85 Fed. Reg. 30,248.

[45] 85 Fed. Reg. 30,248, 30,361.  Moreover, research shows that cross-examination in this context produces less accurate outcomes due to the neurobiological effects of trauma.  *See* ECF Dkt. No. [32], Ex. N, Declaration of Nancy Chi Cantalupo ¶ 27 ("Cantalupo Decl.").

Ultimately, the mandatory evidentiary exclusion bears no relationship to—and in fact directly undermines—the due process and truth-seeking goals that purport to animate it. As the Court itself noted on September 2, 2020, this provision would "swe[e]p aside" "reliable and probative evidence" that is "received in every administrative agency of the federal government and the federal courts" and "passes muster under the Confrontation Clause."[46] By requiring such an inflexible process for sexual harassment complaints specifically, yet at the same time claiming that schools need "flexibility"[47] in responding to sexual harassment, the Department selectively applied its purported principles and acted arbitrarily and capriciously, exceeding its authority.

## IV.   THE FAILURE TO CONSIDER DETERRENCE ILLUSTRATES WHY THE FINAL RULE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW

The Department is "directed to effectuate" Title IX "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of [its] objectives."[48] This includes deterring sex discrimination, including sexual harassment, to ensure each student has access to an education free from the sex discrimination Congress sought to eliminate.[49] Yet the Department shirks this responsibility. The Final Rule eliminates protections that deter sexual harassment, and the Department makes clear that any impact by the Rule on the actual prevalence of harassment was outside the scope of its analysis.[50] This intentional shift in policy makes the Final Rule arbitrary and capricious and in excess of the Department's statutory authority.

---

[46] Tr. of Prelim. Inj. Hr'g at 11.
[47] *E.g.,* 85 Fed. Reg. at 30,248.
[48] 20 U.S.C. § 1682.
[49] *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds"); *Schultzen v. Woodbury Cent. Cmty. Sch. Dist.*, 187 F. Supp. 2d 1099, 1125 (N.D. Iowa 2002) (assessing the appropriateness of punitive remedies due to Title IX's "emphasis on deterring discrimination in educational institutions . . . and given that its primary purpose is eradicating such discriminatory practices"); *see also* Tr. of Prelim. Inj. Hr'g at 10 (describing Title IX's "beneficent goal of deterrence against sexual harassment").
[50] *See* Cantalupo Decl. ¶ 10 ("the Final Rule's requirement that schools use live hearings and direct cross-examination in their sexual harassment investigations, will lead to more, not less, sexual harassment[.]").

The Department expressly ignores deterrence in an attempt to deflect responsibility for the Final Rule's impact on occurrences of sex discrimination. It classifies the obstacles victims face in accessing education in the aftermath of sexual violence—and often also inadequate and harmful responses from schools—as problems that "largely arise from the underlying sexual harassment or assault rather than a recipient's response to that misconduct."[51] The Department glaringly fails to acknowledge the obligations Title IX imposes on schools to minimize these obstacles, as Congress has intended.[52] Further, the Department asserts that Title IX regulations *cannot* deter sexual harassment, confoundingly claiming that it "do[es] not believe that the behavior of perpetrators is driven by Title IX guidelines or regulations."[53] As such, the Department improperly abdicates its fundamental charge under Title IX to prevent and redress sex discrimination.

Indeed, in response to concerns that the Final Rule will increase sexual harassment, the Department says: "we decline to add these costs to our estimates."[54] By the Department's admission, its analysis to justify the Final Rule does not consider deterrence. It assumes the Final Rule will not and cannot deter individuals from committing sexual harassment, and will not reduce the "underlying number of incidents."[55]

The Final Rule contravenes Title IX's deterrence objectives by including numerous provisions requiring or allowing schools to dismiss sexual harassment complaints without

---

[51] 85 Fed. Reg. at 30,545.  This assertion also contradicts the reality of victims who describe their trauma being compounded by intimidating Title IX procedures.  *See* Amend. Nancy Doe ¶¶ 48-49; Mary Doe ¶ 37.

[52] *See* Brief for Members of Congress as Amici Curiae Supporting Plaintiffs, ECF 116, at 3 ("By enacting Title IX, Congress sought to alleviate this burden [of sex-based discrimination] by establishing a comprehensive remedial structure that protected the rights of victims of sex-based discrimination and encouraged schools to stamp out such discrimination in the educational context."); *see Cannon*, 441 U.S. at 704 (noting that Congress's objectives under Title IX were to "avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices").

[53] 85 Fed. Reg. at 30,546.

[54] 85 Fed. Reg. at 30,545.

[55] 85 Fed. Reg. at 30,539; ECF Dkt. No. [32], Ex. M, Decl. of Michael Madowitz, ¶ 17 ("Given that fewer incidents of sexual harassment will be investigated under the Rule, the likelihood of this harassment being detected and punished will also be reduced, which in turn will reduce the system's general deterrent effect").

11

investigation if: the conduct does not meet the narrow definition of "sexual harassment"; the incident occurred outside of a school "program or activity," even if both parties are students or employees of the school; the victim transferred, dropped out, or graduated before filing a complaint (even if they were pushed out of school because of the harassment they faced); the respondent is no longer a student or employee at the school—even if an investigation is ongoing. Apart from producing absurd results where sexual harassment victims have no recourse under Title IX due to the location of their harassment or a change in their status or their harasser's status, the Final Rule excludes Title IX investigations into misconduct that could threaten others' access to education. Harassers will know that they can avoid accountability by simply targeting victims in certain off-campus locations, transferring, retiring, or targeting victims who will soon leave the institution.

Courts have described how Title IX recipients have a "duty to deter" sex discrimination, including by investigating sexual harassment.[56] The Department therefore exceeds Title IX's nondiscrimination mandate by issuing regulations that require schools *not* to protect students from discrimination and that weaken schools' ability to deter such discrimination. By requiring schools to dismiss many types of complaints of sexual harassment, regardless of the impact of such harassment on victims' equal access to education, the Department has issued a rule that runs counter to both the letter and spirit of Title IX. The Final Rule has "gone beyond what Congress has permitted it to do,"[57] and therefore it must be vacated.

## V.     THE FINAL RULE VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT

The Fifth Amendment to the U.S. Constitution forbids the federal government from denying equal protection of the laws, including by discriminating on the basis of sex. Sex-based

---

[56] *See, e.g., Doe v. Sch. Bd.*, 604 F.3d 1248, 1258 (11th Cir. 2010).
[57] *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).

discrimination violates this guarantee if it "does not serve important governmental objectives and is not substantially related to achievement of those objectives."[58] In evaluating an equal protection claim, the court considers "(1) whether the [plaintiff] was treated differently than others similarly situated, and (2) whether such difference was based on an impermissible consideration."[59]

The Final Rule violates this equal protection guarantee by treating allegations of sexual harassment differently, and less favorably, than allegations of harassment based on race, color, national origin, and disability, based on the discriminatory and baseless gender stereotype that women and girls lack credibility when reporting sexual harassment.[60] For example, the cross-examination and exclusionary rule requirements imposed in sexual harassment investigations apply to no other school investigation of student or faculty misconduct. The Department defines "sexual harassment" as conduct that is sufficiently "severe, pervasive, *and* objectively offensive that it *effectively denies* a person equal access" to education,[61] but, harassment based on disability or race need only be "sufficiently severe, pervasive *or* persistent" so as to "*interfere with or limit*" access to education.[62] The difference between "or" and "and" is crucial—under the Final Rule, a singular instance of severe sexual misconduct (that is not sexual assault), such as a sexually vulgar comment by a school official, is no longer considered "sexual harassment," but a similar type of severe misconduct, such as a racial epithet by the official, remains prohibited. The Final Rule also relieves schools of their obligation to investigate sexual harassment unless they have "actual knowledge" of it,[63] whereas schools must respond to all harassment based on race or disability if

---

[58] *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988) (citation omitted).

[59] *Ayala-Sepúlveda v. Municipality of San Germán*, 671 F.3d 24, 32 (1st Cir. 2012) (quoting *Lopera v. Town of Coventry*, 640 F.3d 388, 402 (1st Cir. 2011)).

[60] *See* Cantalupo Decl. ¶ 30.

[61] 34 C.F.R. § 106.30(a)(2) (emphasis added).

[62] U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* 2 (Oct. 26, 2010) ("2010 Harassment Guidance"), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

[63] 34 C.F.R. § 106.44(a).

they know or *should know* about it.[64] And the Final Rule's exclusion of harassment claims outside a school's "program or activity," has no analog in rules governing other forms of harassment.[65]

The Department has identified no government interests that are furthered by this sex-based distinction.[66] Rather, based on the public statements of Department officials and the administrative record, the only reasonable conclusion is that the Department was motivated by the stereotype that women lie about sexual assault. In a September 2017 speech, Secretary DeVos presented as equally problematic the harm faced by sexual violence survivors and the harm faced by individuals who have been falsely accused, despite evidence that sexual assault is common and false accusations are rare.[67] Candice Jackson, former Acting Assistant Secretary for Civil Rights, went even further, stating that "90 percent" of accusations "fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she just decided that our last sleeping together was not quite right.'"[68] The poisonous view that women frequently fabricate sexual assault allegations filters down from the very top of this Administration—from a president who sought to discredit multiple credible sexual assault allegations against him as claims by "phony accusers" who only wanted "some free fame."[69]

---

[64] *E.g.*, 2010 Harassment Guidance, *supra* note 62, at 2; *see also Cannon*, 441 U.S. 695-704 (explaining that Congress modeled Title IX after Title VI of the Civil Rights Act of 1964 and both were intended to be enforced consistently).
[65] *See* Brief for Law Professors as Amicus Curiae Supporting Plaintiffs, ECF 122, at 9.
[66] Most sexual harassment victims are women and girls. Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*, at xi (Jan. 17, 2020), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/Revised%20Aggregate%20report%20%20and%20appendices%201-7_(01-16-2020_FINAL).pdf (26% of women and 7% of men are sexually assaulted during college); Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* 2 (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf (56% of girls and 40% of boys in grades 7-12 are sexually harassed each year).
[67] *See* U.S. Dep't of Educ., *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.
[68] Erica L. Green and Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as The Accused Get DeVos's Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.
[69] John Wagner, *All of the Women Who Have Accused Trump of Sexual Harassment Are Lying, the White House Says*, Wash. Post, Oct. 27, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/10/27/all-of-the-women-who-have-accused-trump-of-sexual-harassment-are-lying-the-white-house-says.

Emails from the administrative record confirm that groups representing disciplined Title IX respondents and other anti-victim organizations had the ear of Department officials throughout the development of the Final Rule.[70] Ms. Jackson solicited the views of extremist, misogynistic organizations such as the National Coalition for Men, which wrote, "[W]omen might lie about any manner of things sexual and there is no statistical correction for false allegations."[71] Ms. Jackson found "very powerful" an argument that the harms of false accusations were equivalent to the harms of sexual assault.[72] She even shared drafts of Secretary DeVos's speeches for comment and coordinated the placement of opinion editorials by those groups.[73] These interactions reflect a "much deeper collaboration" than is normal between the Department and stakeholders.[74] Indeed, these extremist men's rights groups provided draft language of provisions that ultimately made it into the Final Rule, including the definition of sexual harassment, directly to Ms. Jackson.[75]

The Final Rule, which singles out victims of sexual harassment for uniquely stringent dismissal standards and uniquely burdensome and harmful grievance procedures, is based on an "archaic and overbroad generalization" about women that does not advance any governmental interest[76] and thus violates the equal-protection guarantee of the Fifth Amendment.[77]

## CONCLUSION

Plaintiffs respectfully request that the Court vacate the Final Rule in its entirety.

---

[70] AR_282142; AR_282357.
[71] AR_282124.
[72] AR_282284.
[73] AR_282142; AR_282454.
[74] Helene Barthelemy, *How Men's Rights Groups Helped Rewrite Regulations on Campus Rape*, The Nation (Aug. 14, 2020), https://www.thenation.com/article/politics/betsy-devos-title-ix-mens-rights.
[75] AR_282293.
[76] *Cohen v. Brown Univ.*, 101 F.3d 155, 179 (1st Cir. 1996) (citing *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975)).
[77] *Ayala-Sepúlveda*, 671 F.3d at 32.

Dated:        November 5, 2020              Respectfully submitted,


By: /s/ David Newman

David A. Newman
Natalie A. Fleming Nolen
Julie O'Neill
Vanshika Vij
Caitlin A. Crujido
Robin A. Smith
Evan M. Harris
Morrison & Foerster LLP
2000 Pennsylvania Ave., NW, Suite 6000
Washington, DC 20006-1888
Telephone: 202.887.1500

Emily Martin
Neena Chaudhry
Sunu Chandy
Shiwali G. Patel
Elizabeth Tang
National Women's Law Center
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Telephone: 202.588.5180

Diane L. Rosenfeld
Attorney at Law
Mass. Bar Number 668275
Cambridge, MA 02138

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date:  November 5, 2020

/s/ David A. Newman
David A. Newman
Morrison & Foerster LLP
2000 Pennsylvania Ave. NW, Suite 6000
Washington, DC 20006-1888