# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**VICTIM RIGHTS LAW CENTER**
115 Broad Street, 3rd Floor
Boston, MA 02110,

**EQUAL RIGHTS ADVOCATES**
1170 Market Street, Suite 700
San Francisco, CA 94102,

**LEGAL VOICE**
907 Pine Street, Suite 500
Seattle, WA 98101

**CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION**
307 N. Michigan Ave., Suite 1818
Chicago, IL 60601

**JANE DOE**, an individual by and through her mother and next friend, **MELISSA WHITE**

**NANCY DOE,** an individual

**MARY DOE,** an individual

Plaintiffs,
vs.

**ELISABETH D. DEVOS**, in her official capacity as Secretary of Education, 400 Maryland Avenue SW Washington, DE 20202;

**KIMBERLY RICHEY**, in her official capacity as Acting Assistant Secretary for Civil Rights, 400 Maryland Avenue SW Washington, DC 20202,

**U.S. DEPARTMENT OF EDUCATION**, 400 Maryland Avenue SW Washington, DC 20202,

Defendants.

Case No.: 1:20-cv-11104

**DECLARATION OF MARY DOE**

1

I, MARY DOE, declare that I am over the age of 18 and competent to testify to the following facts:

**Sexual Assault by Another Student**

1. I am a current undergraduate student at a small four-year college in North Carolina ("the College"). I began attending the College in September 2018.

2. My college has re-opened during the COVID-19 pandemic and I was on campus for the fall 2020 semester.

3. I was raped by another undergraduate student and acquaintance in my on-campus dorm room at or about 1:30am on August 28, 2020.

4. I first met the respondent during my first year of college. He had previously tried to convince me to break up with my then-boyfriend so that I could date him instead. When I did not do what the respondent wanted, he refused to talk to me again until after my relationship eventually ended.

5. On the evening and night of Thursday, August 27, 2020, I had been spending time with a group of friends. During this time, the respondent began texting me and repeatedly asking me to hang out. I told him I was with friends and could not see him.

6. Over the course of an hour, the respondent called me approximately five times. I began to think something was wrong because of the frequency of his calls. When I got back to my dorm room, he was waiting for me at the door.

7. He came into my dorm room and put on a movie. We began kissing and then it escalated—he forced me to perform oral sex and then he raped me. I repeatedly told him to stop and attempted to run away, but he pulled me back. I became numb—it felt like I could not breathe or speak. When he was done, he cleaned up and left.

8. I immediately called my friends to tell them what happened. They came to my dorm and I met them in the lobby where I collapsed in pain. I was shaking and crying uncontrollably. My friends first carried me upstairs to my room. The respondent then tried repeatedly to enter my room, and my friends decided that I should not stay alone in my room. I slept in my friend's room that night.

**Police Report and Medical Exam**

9. On the morning of Friday, August 28, 2020, I called my father to tell him what happened. We agreed that I would go to the hospital to get a rape kit. I went to the local hospital where the city police took my statement. The hospital took pictures of the bruises on my legs, but I was told they did not have the capabilities to perform the rape kit, so I was transferred to another hospital.

10. When I got to the second hospital, they completed the rape kit. This was a painful experience made worse by the fact the respondent texted me several times while I was in the hospital.

11. While I was in the hospital and speaking with a police officer, it is my understanding that the city police collected DNA evidence from my clothing and other sources in my dorm room.

**Obtaining a Restraining Order**

12. My College is small and my respondent lives in the dormitory that is next to mine. I was concerned for my safety and I was afraid I would have to see him again, so I immediately sought a restraining order, even though it would require time and emotional effort.

13. My mother picked me up from the hospital when I was released on Friday evening. Because there was no protective order in place and the respondent was still on campus, my mother got me a hotel room to ensure my safety.

14. The next day, my mother and I went to the Magistrate at the City Court to obtain a Temporary Restraining Order ("TRO"). We were told we would have to wait until Monday to see a judge.

15. On Monday, August 31, 2020, the City Court held a TRO hearing. I attended the hearing in person with my mother and my SAFE advocate. At this point, I was still bleeding from my injuries and it was still difficult for me to walk. I submitted a personal statement to the judge describing the rape and explaining my need for a TRO. I was not permitted to submit any additional evidence. The respondent did not attend this hearing. That same day, the court granted me a TRO effective for 7 days.

16. On September 10, 2020, the court held a second hearing. I attended this hearing in person with my mother, SAFE advocate, and attorney. The respondent attended this hearing with his attorney. As soon as I saw him standing outside the courthouse, I felt as though I was in a state of shock. I could barely move and felt numb. Later, inside the courthouse, when I was speaking with my SAFE advocate and attorney in a closed room, I could hear him standing right outside the door speaking with someone. I immediately started crying. My body began shaking uncontrollably.

17. Once we got inside the courtroom, the respondent sat behind me, right next to the door. When I turned around in my seat to speak with my SAFE advocate, the respondent made eye contact with me. After that, I stopped turning around to talk to my SAFE advocate and instead used a notepad to pass notes to my mother to pass to the SAFE advocate, so that I would not have to look in the respondent's direction. During the entire hearing, I was shaking uncontrollably, and I could not think straight.

18. That same day, the City Court granted a TRO effective until December 10, 2020.

**Reporting the Assault to the College Title IX Office**

19. On September 1, 2020, after I learned the respondent had been served with a copy of the TRO, I went to the Title IX office to report the rape. My understanding is that the city police had already notified the College of my rape shortly after I reported it to them on August 28, 2020.

20. At this meeting, among other things, the Title IX Director told me that I would have to attend a live hearing if I wanted a Title IX investigation. When I asked whether I could attend the hearing in a room separate from the respondent, she told me that is not how the hearing process worked at the College. She also told me that I could only have one person at the hearing with me.

21. The Title IX Director asked if I wanted the school to conduct a Title IX investigation. At the time, I did not know how the investigation would affect the criminal investigation, so I told her I needed to seek counsel from an attorney before I made a decision.

4

22. The Title IX Director told me that the security office could help enforce the TRO. But, when I went to the security office to show them the TRO, no one was there, and there was a sign on the door that said security was working from home due to COVID, so I did not feel protected.

23. I had a second conversation with the same Title IX officer on September 10, 2020, the day I received the TRO extension. I told her that despite the initial TRO, I had encountered the respondent in the cafeteria and the courtyard of my dorm. On one occasion, when I had walked in the cafeteria, the respondent did not get up and leave. Seeing him again had been shocking and I had not heard anything that the cafeteria worker was saying to me. The respondent and his friends stared at me and made me so uncomfortable that I had to call a friend to come sit with me while I ate. On another occasion, when I was playing football with some friends in the courtyard, the respondent and his friends watched us play from their dorm room and yelled out to my friend group from their window. I felt like he was deliberately trying to antagonize me.

24. During this conversation, the Title IX Director told me to report any similar future incidents and said the school could remove him from campus if he violated the TRO. I then told her that I had to pass by his dorm room to get to one of my classes and that I would feel more comfortable if he was not on campus. She told me that I could take the long route to class, but otherwise there was nothing she could do about his routes on campus. It was my understanding that my College could not do anything to remove the respondent from campus unless he violated the TRO.

25. The respondent's dorm is right next to my dorm. However, the Title IX Director informed me that if they offered me any accommodations, such as moving my dorm room, they would have to offer him the same accommodation. She told me this is required under the new Title IX rule.

26. To date, the school has not provided me any kind of accommodation as a result of the rape.

27. On September 23, 2020, my attorney and I met with the Title IX Director and I chose to file a formal Title IX complaint requesting an investigation.

28. During this meeting, the Title IX director told me that the College would aim to complete an investigation in 60 days. However, the College's student handbook states that the school reserves the right to extend the timeline beyond 60 days.

29. The Title IX Director instructed me to write a list of the people who were present the night of the rape so she could meet with them and get their account of the incident. She said the school would not reach out to the local police to obtain a police report or the results of the rape kit, but that I could bring these items to the hearing on my own if I wanted.

**Effect of this Experience and the Final Rule on my Access to Education and Title IX Complaint**

30. The rape has affected my mental health and my access to education. Since the incident, I have felt depressed and anxious. I do not want to get out of bed in the morning or leave my room, and I cannot sleep at night due to persistent nightmares of the rape, which leave me exhausted during the day and in class. It has been hard for me to focus on classes this semester, and my grades have already started to drop. So far, I have missed about 16 classes since I was raped.

31. I am terrified of coming into contact with the respondent. Because I sometimes work late and there is limited parking on campus, I have to park farther away from my dorm in a parking lot behind the respondent's dorm and across from the athletic complex, where the respondent, a football player, spends a lot of time. I keep my keys in between my fingers while I am walking from my car to my dorm because I am worried about my safety while he is on campus. I feel like I am always looking over my shoulder everywhere I go.

32. In the days immediately following the rape, my mother contacted two of my friends to help rearrange my dorm room to make it look and feel different than the night I was raped. It helped a little, but at the end of the day, it is still the same room and I cannot ignore that.

33. I have been attending therapy every week to help deal with the aftermath of the rape. I am also looking for a service dog to help treat my anxiety and depression.

34. I have an eating disorder from earlier in my life and I had been doing well in my recovery for years, but I am concerned this incident is going to cause me to spiral out of control. I have texted my mother at times telling her I do not want to eat because I am so depressed.

35. I have considered transferring to another school, but I am attending my College on two four-year scholarships. If I were to transfer, I would lose the financial aid and have to pay for college on my own, which I cannot afford. Additionally, one of my scholarships is tied to my grade point average and I am concerned that my grades will eventually slip because I miss too many classes or cannot focus on my classes, and that I will lose my scholarships and have to drop out of college.

36. I have thought about quitting my job because it has been so hard to focus and I have felt depressed; however, I need a source of income to save up for a car (to replace the one my parents are temporarily loaning me) to attend my therapy sessions, avoid walking through campus, and get to work. Borrowing my parents' car is not a long-term solution and without a car of my own, I will feel even less safe on campus with the respondent there.

37. I filed a Title IX complaint because I want to have full access to my education at college. However, I am worried about going through a Title IX investigation under the Final Rule. The Final Rule changes the Title IX process such that I am worried it will further traumatize me and affect my access to education when the Title IX process is supposed to help me vindicate my right to my education.

38. My College's sexual misconduct policy states that, during the investigation, there will be a presumption that my assault did not happen, essentially a presumption that I am not telling the truth. It is my understanding that this presumption is required by the Final Rule.

39. Although my College says it is aiming to complete its investigation in 60 days, the College's student handbook states that the school can choose to take more than 60 days. It is my understanding that the Final Rule allows schools to delay Title IX investigations if there

is an ongoing criminal investigation. This worries me, as there is an ongoing criminal investigation in my case.

40. My College's sexual misconduct policy states that my school is not permitted to provide me with any supportive measures that could be considered punitive to my respondent until the investigation is resolved, and resolved in my favor, regardless of the impact on me. It is my understanding that this is also required by the Final Rule. My respondent is still on campus, attending classes, and living in the dorm next to mine. In my meeting with the College's Title IX director, she also told me that I would have to walk the long way to one of my classes to avoid seeing my respondent. She told me that she thought this was unfair but said that there was nothing she could do about this. When I told her that I would feel safer if he was not on campus, she told me the College could not remove him from campus. My understanding is that my school would not take steps to remove him from campus unless he came into my dorm room, stared at me or made eye contact in an intimidating manner again, or if he otherwise violated the TRO.

41. I am afraid of retaliation by my respondent and his friends against me for reporting my rape. My respondent is an athlete for the College, and I have heard that he has told his teammates about "the situation." The College is a small school—many other students appear to have heard some version of what happened, and many have come up to me to ask me questions. However, it is my understanding that the Final Rule prohibits my school from restricting the respondent from discussing the allegations with anyone, and it appears my College has taken the position that my respondent is permitted to talk to anyone about me, and I do not have any recourse.

42. I understand that I am required to participate in a live hearing under the Final Rule. My College's sexual misconduct policy does not allow my school to rely on the statements of any witness who does not appear and submit to cross-examination at the live hearing. It is my understanding that this is required by the Final Rule. I am worried that at such a hearing, my police report, rape kit, and other medical records will not be considered as evidence unless the police officer who wrote the report and the hospital workers who

conducted the rape kit and took photos of my bruises are available to testify at the live hearing. I am deeply concerned I will be at a disadvantage in the hearing because my school cannot compel the police officer, hospital workers, or anyone else to appear at the hearing, and important pieces of evidence in my case could be excluded.

43. I am also worried that the respondent does not even have to show up to the hearing. According to the Final Rule and my College's policy, I cannot submit the text messages the respondent sent me before the rape and when I was at the hospital unless he agrees to submit to cross-examination. This will make it even harder for me to prove that I was raped.

44. I am terrified about being directly cross-examined by an advisor of my respondent's choice under the Final Rule. The respondent has hired a lawyer and I know that seeing him at the hearing would cause me severe emotional distress again. Being cross-examined by his attorney about the rape would make me question my own experience and minimize what I had gone through. Even just telling my mother about the rape made me start feeling as if I should not be upset because things could have been even worse.

45. My College is small, and I will have to recount my traumatic experience to a panel of individuals from the school, whom I could see day after day. It has already been difficult for me to attend a legal studies class taught by a professor who is also my resident director and who knows about the rape. Whenever we read and discuss a legal case about physical injury or sexual assault in that professor's classroom, he stares at me the whole time to watch my reaction. On one of these occasions when he was staring at me, I had a panic attack and started in crying in front of my classmates. I am worried that anyone else involved in the process, such as the people on the hearing panel, will also think differently of me afterward and treat me differently, and this could affect my education on an ongoing basis.

46. At this point, I am considering dropping my Title IX complaint because of the live cross-examination requirement in the Final Rule.

47. Additionally, under the Final Rule, the College is permitted to dismiss my complaint when my rapist graduates. Because he is a year above me, I believe he is on track to

graduate before me, at the end of this academic year, in Spring 2021. Although the College says they intend to finish the investigation within 60 days, I am afraid he and his lawyer could try to extend the Title IX investigation so it is not completed by the time he graduates so he could avoid accountability.

48.    The Final Rule contributes to a culture that doubts sexual assault survivors and tells us that our experiences did not really happen or did not matter, and makes it more difficult for survivors to come forward, and more difficult for schools to hold respondents accountable. I do not feel it is fair that my education has been interrupted and my hopes and dreams put on hold by the rape, and that the Final Rule makes it harder rather than easier for sexual assault survivors to pursue our education goals and feel safe in school.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 30, 2020 in North Carolina.

/s/ Mary Doe
Mary Doe