# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

**VICTIM RIGHTS LAW CENTER**
115 Broad Street, 3rd Floor
Boston, MA 02110,

**EQUAL RIGHTS ADVOCATES**
1170 Market Street, Suite 700
San Francisco, CA 94102,

**LEGAL VOICE**
907 Pine Street, Suite 500
Seattle, WA 98101

**CHICAGO ALLIANCE AGAINST SEXUAL
EXPLOITATION**
307 N. Michigan Ave., Suite 1818
Chicago, IL 60601

**JANE DOE**, an individual by and through her
mother and next friend, **MELISSA WHITE**

**NANCY DOE,** an individual

**MARY DOE,** an individual

      Plaintiffs,

  v.

**ELISABETH D. DEVOS**, in her official
capacity as Secretary of Education,
400 Maryland Avenue SW
Washington, DC 20202,

**KIMBERLY RICHEY**, in her official capacity
as Acting Assistant Secretary for Civil Rights,
400 Maryland Avenue SW
Washington, DC 20202,

**U.S. DEPARTMENT OF EDUCATION**,
400 Maryland Avenue SW
Washington, DC 20202,

     Defendants.

Case Number: 1:20-cv-11104

Declaration of Noreen Farrell

## AMENDED DECLARATION OF NOREEN FARRELL (EQUAL RIGHTS ADVOCATES)

I, Noreen Farrell, declare as follows:

1.      I submit this amended declaration in support of the proposed amended complaint filed on behalf of Equal Rights Advocates ("ERA"), Victim Rights Law Center ("VRLC"), Legal Voice, Chicago Alliance Against Sexual Exploitation ("CAASE"), Jane Doe, Nancy Doe, and Mary Doe, plaintiffs in the above-captioned case, which challenges as unlawful the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*. 85 Fed. Reg. 30026 (May 19, 2020) (the "Title IX Rule" or "Final Rule").

2.      I have been employed by ERA since 2004. I joined the organization as a Staff Attorney and later became the Legal Director. Since April 2012, I have served as the Executive Director of the organization. I have compiled the information in the statements set forth below through personal knowledge. I have also familiarized myself with the Final Rule in order to understand its immediate impact on ERA. If I am called as a witness in these proceedings, I could and would testify competently to these facts.

3.      Equal Rights Advocates is a national non-profit civil rights organization based in San Francisco. Founded in 1974, ERA is dedicated to protecting and expanding economic educational access and opportunities for women and girls and people with marginalized gender identities. ERA takes an intersectional approach to tackling gender-based harassment, sexual violence, and other forms of gender discrimination, with a focus on centering the experiences of women of color and other individuals from disadvantaged communities.

4.      Working on behalf of sexual harassment and assault survivors in the academic context is central to ERA's mission, including through enforcement of Title IX of the Education

Amendments of 1972 ("Title IX"). I am familiar with and have participated in the organization's

Title IX work as an attorney, mentor, and supervisor. I have served as lead counsel in a number

of Title IX cases, including *Mansourian v. Regents of the Univ. of California*, U.S.D.C. No. 03-

2591 FCD EFB, which resulted in a published Ninth Circuit opinion interpreting Title IX, 602

F.3d 957 (9th Cir. 2010), and *Brust v. Regents of Univ. of California*, U.S.D.C. No. 2:07-cv-1488

FCD, which resulted in a stipulated judgment designed to ensure equitable opportunities for

female student athletes at University of California, Davis (E.D. Cal. Oct. 19, 2009). I also

represented students facing discrimination in high school and university settings, including

sexual harassment and/or sexual violence. I helped to form a national network of Title IX

advocates during my tenure as Legal Director.

  5.  In my current position as Executive Director, in consultation with our legal

director and other legal staff, I oversee the strategic direction, operations, and development of

ERA's various programs and initiatives across the country, including its Title IX sexual

violence-related work described herein. I directly contributed to the conceptualization and

development of the Initiative to End Sexual Violence in Education ("ESVE") described below. I

also oversee the organization's management team, finances, fundraising and development, media

relations, and human resources. I have personal knowledge about the impact of the Final Rule on

ERA's programs, service delivery, staff, and other resources.

  6.  For the past 46 years, ERA has advocated for gender equity in education across

the country through a unique combination of strategies. In addition to providing free legal

information and assistance to individuals facing discrimination at school through our Advice and

Counseling program, ERA represents victims of sexual harassment and assault in cases brought

pursuant to Title IX and analogous state laws at all stages, from the administrative agency

process through and including the United States Supreme Court. ERA has represented plaintiffs in important precedent-setting cases under Title IX, including *Doe v. Petaluma City School District*, 54 F.3d 1447 (9th Cir. 1995), where the Ninth Circuit held for the first time that a school can be held liable under Title IX when it fails to address a student's claim of serious harassment by another student. ERA also collaborates with students, schools, and community organizations to provide Know-Your-Rights trainings on issues related to gender discrimination and Title IX. We publish reports, fact sheets, and other materials about sexual harassment and gender-based violence in education.[1] ERA also develops and advocates for legislation affirming the right of students to be free from gender-based harassment, violence, and other forms of discrimination at school. Because of this work, ERA knows firsthand the protections needed in the Title IX process to ensure that students who experience sexual harassment and assault feel safe coming forward with their claims and that they will be protected through a fair and equitable process designed to limit any infringement upon their educational opportunities.

7.      The Final Rule irreparably harms ERA.

8.      As detailed further below, the Final Rule makes it more difficult for ERA to obtain timely and fair outcomes for survivors and to protect their access to education; limits the efficacy of available avenues of redress to ERA's clients and others it serves; increases the costs ERA bears in its work on behalf of student victims of sex-based harassment; and otherwise directly conflicts with, impairs, and frustrates ERA's organizational mission and programmatic priorities.

9.      In addition, in response to the Final Rule, ERA has diverted and will continue to divert its resources (like increased amount of staff/consultant time and financial resources) to: (a)

---

[1] *See, e.g.*, *Sexual Harassment at School*, Equal Rights Advocates, https://www.equalrights.org/legal-help/know-your-rights/sexual-harassment-at-school/.

meet increasing demand for direct legal assistance and representation of students facing more complex Title IX complaint systems, higher evidentiary burdens, narrower definitions of sexual harassment, indefinite investigatory timelines, and shifting practices at their schools; (b) recruit, train, and provide ongoing support to a growing network of pro bono attorneys; (c) educate the public and engage community members (including parents, students, and other advocates) about the Final Rule; (d) outreach to and advise students most vulnerable to sexual harassment and violence about their rights and help venues; (e) conduct policy advocacy at the state and federal level to restore, defend, and expand the civil rights of student survivors of sexual harassment and violence; (f) bring targeted litigation to defend and expand the civil rights of survivors of sexual harassment and violence; (g) respond to increasing requests for technical assistance from attorneys, students, and school administrators; and (h) fundraise to support this additional work.

10.     The time and resources already spent or diverted by ERA as a direct result of the Final Rule have impaired our ability to engage in multiple other mission-critical activities. Described in great detail below, these include: (a) worker and student organizing and training; (b) workplace justice-related litigation and advocacy; and (c) legislative advocacy and policy reform efforts *not* related to Title IX rights and procedural protections.

11.     The Final Rule forces ERA to expend additional resources and divert significant staff resources to reading, learning, analyzing, and understanding the changes to the Title IX regulations. ERA has begun updating both internal and public-facing resources to reflect the changes from the Final Rule. These resources include training materials, advocacy guides, and know-your-rights guidance.

12.     The Final Rule forces ERA to expend additional resources to support students harmed by sexual violence and harassment. In 2017, ERA launched the Ending Sexual Violence

in Education Initiative ("ESVE") to help students find justice and seek support when sexual assault or harassment disrupts their education. The initiative evolved to respond to the Department's rescission of Obama-era guidance that provided important protections to student survivors of sexual assault and harassment, and to the Department's new guidance requiring a more formalized process to adjudicate sexual misconduct in schools. The new guidance tipped the scales heavily in favor of accused students, who typically have access to attorneys while survivors typically represented themselves. The Department's actions compelled ERA to create, train, and support the nation's first network of pro bono attorneys dedicated to helping college student survivors learn their legal rights, navigate school complaint and investigation policies, advocate for supportive measures and disciplinary findings, and weigh their options in wake of sexual assault or harassment. ERA hired a Pro Bono Program Managing Attorney to manage the development and support of this network.

13.     At the end of 2019, ERA had a network of 30 individual attorneys and two large law firms engaged in the program, and had completed the design and implementation of its Title IX training series.  ERA has since had to expand its Pro Bono Attorney Network to recruit more attorneys to address and mitigate the harms of the Final Rule to victims of sex-based harassment. Rather than train these new attorneys with materials previously prepared by ERA staff, ERA has been forced to overhaul its training program to educate new Pro Bono attorneys and retrain existing attorneys on the impact of the Final Rule.

14.     ERA anticipates that the Final Rule will make it even more difficult to recruit and retain attorneys to represent complainants in campus Title IX proceedings because the Final Rule drastically changes the law and process applicable to these cases and has created significant confusion even among experts about its applicability in many respects. Requirements such as

direct, live cross-examination and the broad exclusion of relevant evidence also mean that it will now take significantly more time for an attorney to prepare for and conduct a hearing or otherwise advocate for their client during a Title IX campus proceeding. ERA staff and pro bono attorneys will be able to take on fewer clients, further frustrating ERA's mission to help survivors of sexual harassment receive timely and equitable outcomes and maintain their access to education.

15.     The Final Rule has forced ERA to divert staff time and resources to respond to inquiries from schools regarding how the Final Rule affects their response to particular reports of sexual harassment. At the expense of other programs, the Final Rule has forced ERA to increase and modify the technical assistance it provides to educational institutions, student organizations, and attorneys. It compels ERA to modify years of work with school districts. For example, ERA is currently engaged in two large-scale, multi-year programmatic collaborations, one with the Sacramento City Unified School District (SCUSD) that serves approximately 43,000 preK-12 students, and another with a post-graduate scientific research institution with locations in two states serving several thousand post-doctoral students and staff. In each collaboration, ERA works with the institution to design and implement improved Title IX policies and trainings, conduct climate surveys to assess prevalence of sexual harassment and efficacy of improvements, provide guidance on particular issues and topics when requested, and evaluate the institution's Title IX program overall. ERA recently added COVID-19 guidance to this portfolio. The goal of this programmatic work is to establish and promote best practices (rather than mere legal compliance) for responding to reports of sex-based harassment, enhance protections for students experiencing such conduct, and help schools achieve genuine culture change.

16.     For one of these initiatives, ERA had completed its intensive policy and training work and was transitioning the implementation to the educators and administrators at the institution with ERA's advisory support. The Final Rule compels ERA to abandon previously developed Title IX policies and training materials and begin anew. Several ERA attorneys must extensively modify work that was near completion to account for the numerous Final Rule changes, setting the programmatic work back by nearly eighteen months

17.     Not only has the Final Rule required ERA to divert resources away from other aspects of its programmatic work with these institutions, it frustrates the mission of these collaborative partnerships. ERA no longer has the capacity to engage in additional aspects of the programmatic collaboration that would directly benefit students, including promoting women in the academic sciences environment, changing reward incentives and disciplinary structures, incorporating student involvement, analyzing results of climate surveys, and advising these institutions on how to respond to individual reports of sex-based harassment.

18.     The Final Rule also prevents ERA from taking on new programmatic projects. For example, ERA planned to replicate the SCUSD agreement to support several neighboring school districts and benefit tens of thousands of other students. The implementation of the Final Rule diverts ERA's resources from these other collaborations to the substantial other revision/education/advocacy work described herein.

19.     The Final Rule diverts ERA staff time away from worker justice litigation and direct services to Title IX services counteracting the effects of the Final Rule. The Final Rule forced ERA to divert staff time from worker helpline intakes to address an increase in student intakes, to advise students who are now less willing to file a formal complaint with their schools because of the Final Rule, and to manage developing Final Rule complexities in student cases.

Given the growing need for worker services due to COVID-19, this diversion of resources has frustrated our mission to serve low-wage workers of color and immigrant workers vulnerable to sex discrimination and most impacted by the pandemic. ERA has also engaged in far less employment enforcement litigation. Where ERA typically takes on several new employment-discrimination cases each year, ERA has not taken on a new employment-discrimination enforcement case at all in 2020 and has no plans to do so for the remainder of the year as we divert staff time to respond to the Final Rule and its consequences.

20.     Additionally, of ERA's five non-policy attorneys, three now do Title IX work exclusively or near-exclusively, a significant increase over the past two years. ERA recently added a law fellow to focus solely on Title IX matters for LGBTQ students, partly in response to the Department's rollback of protections for such students, including provisions contained in the Final Rule.

21.     In the past, ERA has focused its legislative efforts primarily on employment-related bills. The Department's rescission of Obama-era Title IX guidance, 2017 Interim Title IX Guidance, 2018 Proposed Rule, and the 2020 Final Rule forced ERA to redirect resources to state-based legislative advocacy for student survivors of sexual assault. For example, in the 2019 and 2020 legislative sessions, ERA supported the introduction of Senate Bill 493 to impose additional requirements on postsecondary educational institutions in their investigations of sexual misconduct. After issuance of the Final Rule, ERA doubled its efforts modifying bill language and ensuring support of its passage to address some gaps created by the Final Rule for California students. The Final Rule diverted the time of ERA's Senior Policy Counsel and two other staff attorneys from employment-related efforts and direct services to support Senate Bill 493. California Governor Newsom signed Senate Bill 493 on September 30, 2020. Notably, this

bill only applies to California higher education students, does not address all deficiencies of the Final Rule, and remains subject to interpretation by schools and the courts. Because the Final Rule conflicts with some portions of Senate Bill 493, the Rule frustrates ERA's mission of ensuring that the legislation we help draft and pass to protect students from sex discrimination can be fully enforced.

22. The Final Rule forced ERA and our ESVE pro bono attorneys to rush cases and student counseling in process before its effective date to protect those clients from the Final Rule's harmful policies and procedures. The Final Rule also forced ERA to develop and implement on an expedited timeline a series of trainings advising students about how the Final Rule affects their rights and educational experience and how to receive legal help if needed. The timing of the Final Rule has compounded the diversion of ERA's resources and mission, as COVID-19 has made it more difficult for ERA to conduct such outreach and education.

23. Students who experience sexual harassment, including sexual assault, suffer not only physically and emotionally, but also in their ability to participate in and benefit from educational opportunities. The Final Rule worsens the devastating effects of sexual harassment in schools and frustrates ERA's mission to stop it. It prevents and discourages victims from reporting sexual harassment because it narrows the definition of sexual harassment to which schools may respond. It constricts the universe of those school officials whose knowledge of harassment obligates the school to respond. Additionally, in numerous respects, the Final Rule unfairly tilts the grievance processes against students who report sex-based harassment ("complainants") and in favor of those who are reported harassers and assailants ("respondents"), which makes the process more intimidating and traumatizing for victims and puts in place new barriers to accurate fact-finding and adjudication of complaints.

24.     The Final Rule severely hampers ERA's mission to ensure equitable educational opportunities because it chills complaints of harmed students. ERA has been unable to proceed with complaints of students concerned about coverage of off-campus assault, intimidated by the prospect of direct examination by their assailant's advisor, or unwilling to endure a process guided by new definitions and procedures that invalidate their experience. Others are considering terminating an existing process rather than endure a hearing made more traumatizing by the Final Rule.

25.     The August 14, 2020 effective date also forced some students to proceed with complaints before they were emotionally ready. During remote learning, survivors' fears are heightened because they are without the direct support of their victim advocates who typically accompany them physically to all meetings and hearings. Despite this, some students took a "now or never" approach, reporting conduct they would otherwise prefer to delay reporting until in-person learning resumes (and they can benefit from the physical support of their advocate) because they were afraid of how or whether the school would process their complaint after the effective date of the Final Rule.

26.     The following is an explanation of how each of the individual provisions of the Final Rule frustrates ERA's mission and diverts its resources, in addition to the effects described above:

**Mandatory and Permissive Dismissal of Complaints Based on Location, Enrollment Status, or Department's Narrow Definition of Sexual Harassment**

27.     Sections 106.44(a) and 106.45(b)(3)(i) of the Final Rule require schools to dismiss a Title IX complaint if the incident: (i) does not meet the new stringent definition of sexual harassment; (ii) occurs outside of a "program or activity"; or (iii) occurs outside the United States. When dismissal is mandatory under the Final Rule for any of these three reasons,

supportive measures are not required, and schools are not required to provide any "non-Title IX" process.

28.     Under Sections 106.30(a) and 106.45(b)(3)(ii), unaffiliated complainants are barred from filing a Title IX complaint and a respondent's unaffiliated status may be the basis for a permissive dismissal by the school. Schools cannot use a "non-Title IX" process to address incidents that were dismissed because a complainant or respondent was unaffiliated because these complaints are considered "Title IX" incidents under the Final Rule.

29.     These Final Rule provisions (providing for mandatory and permissive dismissal of sexual harassment complaints based on the location of the conduct, the enrollment status of the complainant or respondent, and/or the conduct's purported failure to meet the Department's more narrow and stringent definition of sexual harassment) frustrate ERA's mission. They (1) chill reporting of sexual harassment by students; (2) reduce deterrence of harassment and assault; (3) radically reduce supportive measures for harassed or assaulted students; and (4) prevent ERA from enforcing Title IX rights through a Department administrative complaint for students now excluded by the Department's definitional limitations.

30.     In particular, the Final Rule's narrow definition of what constitutes a recipient's "program or activity" harms ERA's ability to seek redress for most students who have been victims of "off-campus" sexual harassment, impeding their access to educational programs and activities. ERA typically receives daily requests for assistance from victims of harassment who must encounter their harassers or assailants in class, on athletic teams, in on-campus housing, or otherwise on campus. Many of ERA's past and current clients experienced sexual assault or other sexual harassment by a school-affiliated person off-campus (and outside the Final Rule's narrow definition of the recipient's "program or activity"). Such harassment is equally as likely

to create an unsafe and hostile educational environment as harassment that takes place on campus or during a school activity. Yet, under the Final Rule, if a professor harassed or assaulted a student off campus, the student's college might not be obligated to investigate that assault as a Title IX matter – even if the student remains enrolled in the professor's class. Similarly, if a college student was raped at an off-campus party by a fellow student, the Final Rule requires the school to dismiss such a complaint without investigating the allegations as a Title IX violation – even if that student is forced to confront their rapist every day in class, the dining hall, or resident halls. This is true, even if the student's rapist continues to harass or stalk them or even assaults them again, so long as that conduct continues to take place outside a school program or activity as narrowly defined under the Final Rule.

31.     The Final Rule's requirement that schools dismiss allegations of "off-campus" harassment poses particular risks to students of community colleges and vocational schools. These students do not live on campus. They include students of color, first-generation college students, and/or students that come from lower income families. For example, ERA represented a community college student ("Student A") raped by her fellow student tutor at his off-campus apartment. A professor told this survivor – a former foster youth, Black woman, and first-generation college student – that he would not excuse her from a class when she needed time to process her rape unless she first obtained a rape kit. With ERA's help, Student A was able to seek legal redress against her college (which had not investigated the rape allegations despite the requirement under the Department's prior guidance that it do so). Student A would be without redress under the Final Rule. The Final Rule requires schools to dismiss these allegations merely because the conduct took place outside the school's program or activity, ignoring the obvious impact this conduct has on student victims' access to education and ability to engage safely and

fully with their educational institution. In this way, the Final Rule sends a message to all

community college students – in particular, women, and very often students of color – that their

education is not a priority, and that their school has no responsibility to ensure redress when

harm to them by other school community members disrupts their full access to education. This

frustrates and impedes ERA's mission to obtain equitable student conduct outcomes for victims

of sexual harassment and ensure they maintain equal access to educational programs.

32.     Because the Final Rule's provisions providing for mandatory and permissive

dismissal of Title IX complaints will chill reporting substantially, these provisions frustrate ERA

in its mission of representing sexually harassed/assaulted students. As we communicate the

revised policies to student clients, they understand them as confusing and impossible hurdles

meant to dissuade them from ever reporting harmful harassment, even harassment that falls

within these new definitions. ERA works with students interpreting the new definitions to require

them to endure repeated and escalating abuse before they can seek protection and redress from

their schools. This chill on reporting not only prevents or delays investigation of egregious harm,

it places the student in dangerous situations that often escalate and frustrates ERA's mission to

help them. This will not only chill reporting of harassment that falls outside the Department's

definition, but is likely to chill reporting of all forms of harassment because not all students are

equipped to understand the Final Rule's nuances to assess when it applies and when it does not.

33.     If schools dismiss Title IX complaints because of restrictive definitions of these

new provisions, it chills the reporting of future claims as well. ERA recently represented one

client with friends who are fearful of reporting their own sexual assaults based on their

observations of the handling of her case. In our experience, which is also validated by campus

survivor advocates, the more students fear a school interpretation of requirements will invalidate

their experience, the less likely they are to seek ERA's assistance or report their harassment or assault.

34.     These new provisions similarly frustrate ERA in its mission to deter and prevent student sexual harassment and violence. Under the mandatory and permissive dismissal provisions, many student victims and survivors who request a disciplinary Title IX investigation or a non-disciplinary Title IX process (e.g., mediation, restorative justice) will have their complaints dismissed. This compromises important deterrence against sexual harassment and assault, as these provisions essentially provide perpetrators a "free pass" when their sexual misconduct falls outside the narrow definitions of the Final Rule and fails to deter others who believe they will not be held accountable if they engage in certain types of sexual misconduct. The Final Rule's weakened deterrence will frustrate ERA's mission and contribute to an escalation in the severity and frequency of harassment.

35.     Under these same provisions of the Final Rule, schools are no longer required to provide supportive measures to victims whose harassment falls outside the Department's narrow standards for "Title IX" incidents. This frustrates ERA's mission to expand educational and employment opportunities for students and its mission to enforce students' rights to a discrimination-free educational environment. Supportive measures are a critical part of Title IX's protections, as disciplining the respondent without providing supportive measures to the complainant is not enough to protect the complainant's educational needs. They can include counseling and other mental health services, academic tutoring, excused absences, opportunity to retake a test or redo an assignment, opportunity to withdraw from and retake a class without financial penalty, and a safety plan to avoid sharing class/housing/work assignment with respondent.

36.     In ERA's experience, harassed students denied supportive measures are more likely to drop out of school, have trouble concentrating in class, and otherwise experience a decrease in their academic performances. This was the experience of Student A, described in paragraph 31 above. These outcomes harm future employment opportunities as well.

37.     ERA is also frustrated in its mission of helping student victims enforce their Title IX rights. Under the Final Rule, ERA cannot pursue an administrative remedy with the Department of Education's Office for Civil Rights on behalf of survivors with circumstances not rising to the Final Rule's definitions. The Final Rule also precludes ERA from filing OCR complaints for students with "Title IX" incidents that involve parties not covered by new provisions. This frustrates ERA's mission to support students' access to Department resources and remedies.

38.     The provisions of the Final Rule that mandate or allow dismissal of certain types of sexual harassment and that allow schools to deny supportive measures divert ERA's time and resources away from mission-critical work.  First, ERA will spend more time and resources filing appeals for clients with wrongfully dismissed complaints and for those denied a separate "non-Title IX" process, which prevents ERA from taking as many clients as it would otherwise. ERA also expects to divert resources to address appeals from respondents challenging school decisions to investigate sexual harassment using a parallel track that does not enforce the Final Rule's requirements. (Indeed, the Department has stated it actually expects respondents to file such appeals, *see* 85 Fed. Reg. 30283 n.1129.)  We also expect to spend additional time filing administrative complaints with local agencies or in state courts to enforce our state's requirement that school continue to respond to conduct that falls outside the Department's narrow definitions

of sexual harassment, further reducing the number of clients we can take on and diverting our resources from other important work.

39.     Because of the Final Rule, ERA also expects to spend additional time and resources learning about and navigating multiple processes that can apply to a single case. For example, even if the misconduct in a student's case took place prior to the Final Rule's effective date of August 14, 2020, and the school has decided not to apply the Final Rule, ERA staff must investigate to determine exactly what policy the school applied, and what government guidance was in effect at the time of the misconduct. Moreover, that same student could experience additional harassment by that same perpetrator and/or be subject to retaliation by the assailant or other members of the school community after August 14, 2020. ERA will expend additional time and resources helping students determine which tracks and policies apply to which conduct, supporting their navigation of those tracks/policies, and enforcing their rights.

**Mandatory Live Hearings,[2] Direct Cross-examination, and Exclusion of Reliable and Probative Evidence**

40.     Final Rule provisions requiring a live hearing and prohibiting the consideration of statements unless the declarant appears and subjects themselves to live, direct, cross examination

---

[2] California case law currently requires a live hearing in higher education if the respondent faces a sanction of one year's suspension or more, the complaint involves allegations of sexual assault, and credibility is central to the decision. Specific hearing procedures are not proscribed by law and are determined by each institution's policies. Direct cross-examination is not required and is most often conducted indirectly through a neutral hearing officer. Advisors are typically not permitted to speak during the proceedings, though objections may be noted in writing. Parties or their advisors are usually permitted to propose direct- and cross-examination questions in advance of the hearing and to submit proposed re-direct or re-cross questions in writing during the hearing. The hearing officer usually has wide discretion to exclude questions that are irrelevant, harassing, duplicative, or prejudicial. Senate Bill 493, effective January 1, 2022, (mentioned in paragraph 21) eliminates this hearing requirement and grants discretion to schools to determine when and if a hearing might be necessary. The bill also expressly prohibits direct cross-examination by parties or their advisors, requires the hearing officer to exclude harassing, repetitive, or irrelevant questions, and contains a stronger prohibition on evidence of the complainant's prior sexual conduct than the Final Rule.

frustrate ERA's mission and divert our resources for a multitude of reasons. First, these provisions are likely to have a chilling effect on reporting. The new requirement of a live hearing alone will be too daunting to many students concerned about re-traumatization by the hearing process. They fear having to recount the details of their sexual assault in front of multiple individuals, including their assailant (as opposed to just the investigator). They fear harassing, invasive, victim blaming, and other prejudicial or misleading questions posed by the respondent's attorney or advisor of choice (who could be anyone from an aggressive attorney to the victim's vindictive ex-boyfriend). ERA has heard from students who, not knowing whether or not the Final Rule will be applied to their case, expressed that they were considering either not reporting the misconduct at all, or entering into an early resolution agreement with their assailant to avoid a hearing altogether. Because the Final Rule will hamper ERA's ability to seek redress for our clients ensuring they are safe enough to learn, it frustrates ERA's mission to expand educational opportunities for these students.

41.     The stacking of hearing rules and evidentiary exclusions in favor of respondents will result in fewer findings in favor of complainants with valid claims, frustrating ERA's mission to hold perpetrators accountable, deter future sexual harassment and violence, and protect educational opportunities. While the Final Rule requires complainants to attend the hearing and subject themselves to cross-examination to ensure the admissibility of their statement, the respondent is not required to attend. The rule incentivizes respondents who have made inculpatory statements to avoid hearings and cross-examination contradicting those statements. According to the Final Rule, text messages sent or oral statements made by the respondent to the complainant, the investigator, or any witness are inadmissible if the respondent chooses not to testify at the hearing. The Final Rule further weighs in respondents' favors by

requiring each supporting witness declarant to submit to cross-examination (regardless of the reliability of the statement or applicability of traditional hearsay exceptions). These new provisions will lead to the exclusion of probative evidence supportive of complainants. Because the Final Rule will result in fewer students with valid claims prevailing, the negative impact on deterrence is clear, both of which frustrate ERA's mission.

42.     One of ERA's recent cases exemplifies this problem. ERA represented a student sexually assaulted by another student while she was incapacitated. The attack stopped when interrupted by another student, who physically removed the respondent from the complainant. The complainant reported to the police, who arrested and interviewed the respondent. The respondent made inculpatory statements he later contradicted in his interview with the school's Title IX investigator. At the hearing, the arresting officer was unavailable to testify because she was on parental leave. Under the Final Rule, the arresting officer's police report would have been inadmissible despite its reliability, even if her supervisor could appear in her stead (as was the case here) because the arresting officer herself was unavailable for direct cross-examination. Moreover, even if the arresting officer were available to testify, the respondent's admissions still would not have been admissible under the Final Rule if the respondent refused to testify at the hearing or to subject himself to cross-examination (as was the case).

43.     The Final Rule's additional procedural requirements will result in fewer witnesses being willing to appear at the hearing or participate in the process at all. For all the same reasons that witnesses in civil or criminal cases are hesitant to appear, so are witnesses in campus sexual misconduct cases. Unlike court proceedings, however, where parties have subpoena power, participation by witnesses in the Title IX process is voluntary. ERA has encountered many hesitant witnesses in its Title IX work. First, while witnesses have observed something relevant

to the case, they have not necessarily witnessed the assault itself, so they are unsure as to whether the misconduct took place and therefore hesitant to get involved at all or give the appearance of "taking sides." Second, participation requires a time commitment. Investigators and party advisors interview witnesses, sometimes multiple times, and/or prepare them for the hearing. At the school hearing, witnesses must devote even more hours to the process.  Witnesses are often "on hold" for hours during a school proceeding. Many students are unwilling or unable to provide this time commitment. Third, these credibility inquiries invade their personal lives, violate private communications, subject them to improper questioning, and expose them to threats and intimidation by respondents or their associates. All of these concerns are exacerbated by the Final Rule, where any statements made by such witnesses -- regardless of how reliable they are (such as text messages exchanged by such witnesses with the parties) -- will not be considered if a witness is too scared, too busy, or too disinterested to participate in the hearing. This issue is far more likely to negatively impact complainants, who, in ERA's experience, tend to have more witnesses than the respondent and whose witnesses are more likely to be subjected to or fearful of retaliation by the respondent.

44.     A recent case of ERA's exemplifies this concern. ERA represents a student victim of sexual assault who reported the assault to her university and sought a separate civil restraining order through the court. Though she succeeded in obtaining a 3-year restraining order against the respondent by a clear and convincing evidence standard, the school insisted on conducting its own investigation and hearing into the assault. Unfortunately, after the court hearing for the restraining order, the survivor's witnesses felt bullied by the respondent and his parents. They became too frightened to participate in the Title IX process. They have since ceased responding to contact attempts about the school's Title IX investigation. Understanding that she is unlikely

to prevail without these witnesses, our client felt coerced into a lackluster early resolution

agreement with her assailant. Under the Final Rule, the Respondent's advisor can be anyone,

including the respondent's parents, a friend, or even someone in a position of power over one of

the witnesses. The Final Rule increases the risk of witness intimidation, especially of young

college students. The additional requirement of direct cross-examination by a respondent's

advisor compounds the disadvantage to the complainant. It harms the willingness of witnesses to

testify, making it harder for complainants to prevail, and frustrating ERA's mission to prevent

and address campus sexual harassment.

45.     These additional procedural requirements will not only frustrate ERA's mission as

stated above but will also force ERA to divert significant resources away from other mission-

critical work. First, these hearings will require more time to prepare for and will take longer to

complete. Under the prior guidance and California state law (see footnote 2, above), our

attorneys spent approximately 30 hours preparing for and attending a single Title IX sexual

misconduct hearing. They read the administrative record, interviewed the complainant and

witnesses, prepared proposed direct and cross-examination questions, and attended hearings

where the hearing officer selected and posed questions to the witnesses (based on the

complainant/respondent's proposals). Any evidentiary objections were noted in writing and

made a part of the record but were not argued during the hearing. Under the Final Rule, advisors

will now pose questions directly to the witnesses, and can make and argue over evidentiary

objections during the hearing. Additionally, the Final Rule requires that the hearing officer

consider the relevance of every single question posed, regardless of whether an objection has

been made, and justify on the record their basis for excluding a question. This will collectively

turn what is typically an eight- to ten-hour hearing into a two- to three-day hearing.

46.     Not only will the objections and required justifications mentioned above add significant time; the examinations are also likely to take much longer. In ERA's experience and under prior guidance and state law, hearing officers excluded extraneous, redundant, misleading, or unduly prejudicial questions proposed by the parties in order to get to the heart of the case with their questioning. Under the Final Rule, schools *must allow* cross-examination questions that are unduly prejudicial, misleading, or assume facts not in evidence, that pertain to a complainant's "dating or romantic" history with other people who are not the respondent, or that pertain to a complainant's sexual history with the respondent if it is offered to prove consent. *See* § 106.45(b)(6)(i)-(ii); 85 Fed. Reg. 30248, 30351, 30361. This will significantly prolong the hearing and may lead to the complainant or witnesses needing to take more breaks, causing further delay. Moreover, the additional time preparing for a hearing where the attorney will now be a direct participant and will be responsible for tracking down every declarant, preparing them for the hearing, and convincing them to testify, plus the additional time the hearing itself is likely to take, will turn a 30-hour case into a 60-hour case or more. These new provisions requiring that ERA devote at least twice the resources to a single case will undoubtedly force ERA to represent fewer students. It forces ERA to divert its resources from other mission-critical activities, such as taking on individual pre-litigation employment cases. It prevents ERA's processing of charges with the Equal Employment Opportunity Commission or Department of Fair Employment and Housing regarding sexual harassment, unequal pay, pregnancy discrimination or other forms of sex-based discrimination at work. This frustrates ERA's mission to expand both the educational *and* employment opportunities for women and girls.

**Presumption of Non-Responsibility and Notice of Presumption**

47.     Final Rule provisions requiring schools to presume the respondent is not responsible and to give written notice to both parties of this presumption at the outset of an investigation frustrate ERA's mission to represent students in campus misconduct cases, to prevent sexual harassment in education, and to ensure that students who have been subjected to such harassment are nevertheless able to maintain their access to education. Such provisions will chill reports with schools or withdraw reporting and will accordingly fail to deter sexual harassment. The overwhelming majority of victims already experience blame (from themselves and others) and guilt after an assault and are therefore vulnerable to further victim-blaming. Student victims will be deterred from reporting harassment if they know that the investigator will presume at the outset of the investigation that the victim is lying. Those who do report may be encouraged to withdraw such reports after receiving the notice of the presumption in favor of the respondent. Notably, police officers investigating claims of gender-based violence do not issue such presumption notices (despite the presumption of innocence that applies to criminal proceedings) presumably because they chill victim reporting and willingness to participate in the investigative process. For all of the same reasons and more, such notices given to student victims at the outset of their Title IX investigations will lead to a decrease in reports or completed investigations and embolden perpetrators of sexual harassment and assault not held accountable. This frustrates ERA's mission to prevent sexual harassment and represent student victims in sexual misconduct proceedings.

48.     These provisions will also cause ERA to divert its time and resources away from other mission-critical work to educate Title IX officials that the presumption requirement, while arbitrary and capricious, does not require (and in fact, does not allow) them to assume that all complainants are untruthful. ERA will expend resources to educate Title IX officers that, despite

such provisions implying the contrary, it is not the victim's burden to prove that they were

harassed, but rather the school's obligation to determine, by the applicable standard, whether the

misconduct took place. Because the Final Rule's preamble in the Federal Register is 554 pages

long, many schools do not know about this fine print regarding the presumption requirement.

This diverts our organization's resources from other mission-critical work and forces us to take

on fewer clients.

**Narrowed Definition of Retaliation and Broadened Discipline against Complainants for "False Statements"**

49.     The provisions of the Final Rule that narrow the scope of conduct that can be

considered retaliatory and broaden the circumstances under which a complainant may be

disciplined for purportedly making a false statement frustrate ERA's mission to represent

survivors of campus sexual harassment and to prevent sexual harassment from occurring because

they chill reporting and decrease deterrence. In our experience, fear of retaliation is a primary

reason survivors do not come forward about sexual harassment. Knowing that they will not be

protected from certain forms of retaliation (such as intimidating or harassing speech by

respondent or their associates) coupled with the increased risk that they will be disbelieved and

disciplined for purportedly falsely accusing their harassers, many victims will choose not to

come forward and will be intimidated into dismissing their complaints. Students committing

harassment will be emboldened to retaliate against their victims and/or to commit further

harassment because they believe they are less likely to be held accountable. This will especially

frustrate ERA's mission to assist women and girls of color (particularly Black women and girls),

pregnant and parenting students, LGBTQ students, and students with disabilities, all of whom are

more likely to be disbelieved and blamed due to rape myths and stereotypes that label them as

more promiscuous and aggressive, less credible, more sensitive, and/or less deserving of protection.

50.     Such provisions also divert ERA's resources because our staff will now spend more time defending clients against allegations that they have made a false statement and/or enforcing anti-retaliation provisions where the conduct involves purportedly protected speech. This additional work diverts ERA resources from other clients and other mission-critical work.

51.     One of ERA's cases exemplifies this concern. ERA represented a student athlete raped by another student at his off-campus apartment. Following her report, several of the respondent's friends harassed her by posting comments about her and her allegations on social media. Because this harassment took place before implementation of the Final Rule and under prior guidance, the school was able to stop the retaliation and protect our client. However, the Final Rule could prevent the school from stopping this harassment if characterized as free speech covered by the First Amendment of the U.S. Constitution. In another case, ERA represented a law student sexually assaulted by another student. The hearing officer stated in her report that she found our client to be uncredible because of an inconsistency in her recollection eight months after the assault occurred of a detail unrelated to the assault.  Fortunately, this student was never disciplined for making a purportedly "false statement." However, under the Final Rule provisions, a school could have concluded that she made a false statement warranting discipline against her.

**Preemption of State or Local Law by Final Rule**

52.     The Final Rule provision stating that it preempts state or local laws in conflict with the Final Rule frustrates ERA's mission to obtain fair and accurate outcomes for survivors and to deter and prevent sexual harassment. This provision prohibits schools from providing

stronger protections against sex discrimination to the extent those protections would conflict with

the Final Rule. It also diverts ERA's resources because we must spend more time and resources

rewriting existing policies that provide for stronger protections to ensure that they do not conflict

and/or conducting research to determine whether a state or local law conflicts with the Final

Rule. This major diversion of resources recently occurred as ERA engaged in policy advocacy

for California Senate Bill 493, noted above. The Final Rule forced ERA to spend considerable

time modifying the bill.

**Actual Knowledge Limitation**

53.     Under the Final Rule, institutions of higher education are not required to address

sexual harassment unless the student makes a report to a Title IX coordinator or an employee

who is an "official with the authority to institute corrective measures"—a narrowly defined yet

unspecified type of employee. There is no indication of what constitutes such an employee and

no requirement that schools provide such information to students. This provision frustrates

ERA's mission to prevent sexual harassment, represent students in sexual misconduct cases, and

enforce students' rights to an investigation, supportive measures, and continued access to their

education because it significantly limits the number of incidents investigated by schools.

54.     The vast majority of ERA's clients do not report directly to a Title IX coordinator,

and it is unclear to students and to their advocates which employees have authority to institute

corrective measures. For example, ERA has represented students who reported their assault to a

coach, a trusted professor, a guidance counselor, and a Resident Advisor charged with ensuring

safety and support for students on their residential floor. These were individuals required by

previous school policies and Department guidance to report the complaint to the school's Title

IX coordinator. However, under the Final Rule, a school could refute that it had actual notice

under the same circumstances if the student did not also report directly to the Title IX

Coordinator or to an official with authority to take corrective action. These same students would

be without recourse under the Final Rule if their school failed to take action, even if existing

school policies required these employees to relay such reports to the Title IX Coordinator and

they failed to do so. See section 106.30(a): "The mere ability or obligation to report sexual

harassment or to inform a student about how to report sexual harassment, or having been trained

to do so, does not qualify an individual as one who has the authority to institute corrective

measures on behalf of the recipient."

55.     The Final Rule provision limiting the circumstances under which schools have

"actual knowledge" of sexual harassment diverts ERA's resources because we must spend more

time and resources educating students and others about this new reporting requirement. We must

research and investigate whether our client has reported to the "correct" person with the authority

to institute corrective action. This diverts ERA's resources from other mission-critical work and

forces ERA to take on fewer clients.

**Supportive Measures**

56.     Additionally, the Final Rule's requirement that schools make supportive measures

"equally" available to both complainants and respondents frustrates ERA's ability to enforce

Title IX and its anti-retaliation mandates. It also harms ERA's ability to achieve safe, necessary

supportive measures for student survivors of sexual violence so critical to their continued access

to education.

57.     Supportive measures provide victims some assurance that their assailant will not

further harass and/or assault them on campus. Without them, our clients have been too fearful of

encounters with their assailant to attend classes. ERA has observed schools interpreting this

"equally" available supportive measures requirement – first applied in the Department's Interim

Guidance in September, 2017 ("2017 Interim Guidance") – as prohibiting one-way no contact

orders and requiring *mutual* no-contact orders, even without any allegation that a complainant

has engaged in threatening behavior or other misconduct. This means that when a victim reports

an assault and requests safety measures – such as an assurance that their assailant cannot contact

them – they can only receive that protection if they also agree to be bound by the no-contact

order. This chills some students from reporting their assault and/or from seeking supportive

measures if they do and frustrates ERA's enforcement of Title IX.

58.     This provision of the Final Rule also frustrates ERA's mission to ensure that Title

IX's anti-retaliation clause is enforced. While survivors generally have no desire to contact their

assailants, ERA has observed how these no-contact orders have been used *against* complainants,

sometimes leading to full investigations of facially spurious, retaliatory counter-claims and

causing delays to the completion and resolution of investigations of actual harassment or assault.

59.     For example, ERA represented a student survivor of drug-facilitated sexual

assault, physical abuse, and sexual exploitation accused by her assailant (a fellow student) of

violating her no-contact order when she appeared in court at a restraining order hearing in

support of another victim of her rapist. She was found by her school to have violated the no-

contact order because she clapped during the hearing. ERA represented another victim of sexual

assault by a fellow student and football player accused of violating her no-contact order when

she joined her boyfriend on the football field after his last game, despite the fact that a court-

issued restraining order explicitly permitted her to do so. ERA has observed that many student

victims who cannot achieve safety during the pendency of their campus proceeding without

avoiding retaliatory and baseless no-contact orders are less likely to engage in the process entirely and may not continue attending classes for fear of encounters with their assailants.

60.     The Final Rule's provisions on supportive measures not only frustrate ERA's mission to enforce Title IX's anti-discrimination mandate and protect them from retaliatory "mutual" no-contact orders, they also frustrate ERA's mission of obtaining any supportive measures at all for some clients. The Final Rule does not require schools to provide any supportive measures to students who report incidents that do not constitute "Title IX sexual harassment" (i.e., do not meet the definition, occurred outside a "program or activity", or occurred outside the U.S.).

61.     Additionally, the Final Rule frustrates ERA in our mission of helping students enforce their Title IX rights because we are no longer be able to file administrative complaints with the Department of Education when a survivor receives ineffective or harmful supportive measures in response to a "Title IX" incident, or a survivor does not receive any supportive measures in response to a "non-Title IX" incident.

62.     In addition to frustrating ERA's mission, the supportive measures provisions force ERA to divert its resources. For example, ERA must spend more time explaining to schools that supportive measures are still required even in cases where the complainant and/or respondent is unaffiliated with the school, and the investigation has been dismissed. Similarly, ERA must spend extra resources defending its clients against schools' spurious claims about not being able to provide one-way no-contact orders and advocating in favor of unilateral orders instead.

**Confusing Terms and Unclear Application of Provisions**

63.     Additionally, ERA does not know how to interpret or to comply with many of the provisions of the Final Rule. The confusion surrounding the meaning of particular provisions (for example, what the terms "sexual predisposition" or "prior sexual behavior" mean) or how the new rules will be applied (for example, under what circumstances a complainant's sexual predisposition or prior sexual behavior with respondent would be relevant to prove consent and/or whether evidence of such behavior with someone other than the respondent would even be considered relevant) has already diverted ERA's resources. ERA staff members have spent significant time reading the provisions, digesting the information, discussing the provisions with other Title IX advocates to attempt to gain an understanding as to their meaning or application, and then distilling that information to various audiences, including to our network of approximately 80 pro bono attorneys providing services and representation to survivors of campus sexual assault. This diverted ERA resources from new employment and impact cases.

64.     This confusion also frustrates ERA's important goal (and legal obligation) to provide clear and correct advice and information to students reaching out for help with campus sexual misconduct matters. At present, ERA is unable to give students definitive answers to many of their pressing questions, such as (a) Will my case be investigated at all? (b) If so, will my school adjudicate my case under the Final Rule? (c) Even if my school investigates my case on a separate track from the Title IX track, what will that process look like? (d) If my school fails to investigate or is otherwise deliberately indifferent to my report, how will I enforce that? (e) Can I still file an administrative complaint with the OCR to enforce my Title IX rights if my school adjudicated my case under its separate, non-Title IX track? (f) Can I still file a lawsuit to enforce my Title IX rights if my school adjudicated my case under its separate, non-Title IX track? (g) If my school says they will proceed under the prior policies because the incident

occurred before August 14th, what assurance do I have that the school will not change that decision during the process if they face litigation risk from the respondent to adjudicate it under the Final Rule instead?

65.     In addition to the many ways in which the specific provisions discussed above frustrate our mission and divert our resources, as a whole, the Final Rule will lead to less deterrence and less needed support for survivors because of the combination of (a) chilled reporting (b) dismissals of far more complaints (those involving conduct that falls outside the narrow definition of sexual harassment, took place off campus, or where the complainant/respondent are no longer enrolled), and (c) the additional burdensome, traumatizing, and respondent-favored procedures. This, as a whole, frustrates ERA's mission because it leads to a decrease in deterrence and an increase in incidence of sexual harassment, all of which impedes students' access to their educations and desired occupations after graduation.

66.     I am very concerned with the negative affect of the Final Rule. Based on trends following the imposition of the interim regulations, demand for ERA's advocacy and support will increase and stretch its free legal services for victims beyond current capacity and funding parameters. These drastic changes to Title IX will harm victims of sexual violence across the country.

**University of New Haven Policy Update**

67.     The University of New Haven's website indicates it has a single policy called the "Sexual Harassment & Misconduct Policy," which only covers conduct in the Final Rule and includes the new procedural requirements of the Final Rule.[3] It does not mention any other

---

[3] University of New Haven, *Sexual Misconduct Policy*, https://www.newhaven.edu/student-life/student-affairs/dean-of-students/sexual-misconduct-policy.php (sexual misconduct website); University of New Haven, *Sexual Harassment and*

policy that would cover conduct that falls outside the narrow definitions of the Final Rule. In advance of this filing, ERA reached out to and left messages for University of New Haven's Dean of Students, Ophelie Rowe-Allen, and its Title IX Coordinator, Caroline Koziatek, to determine whether such an alternate policy existed. As of this filing, these calls have been unreturned.

**University of California System Policy Update**

68.     The University of California system's policy states that all conduct that meets the requirements of the Final Rule and occurs on or after August 14, 2020 will be investigated under the university system's "DOE-covered" procedure. All other sexual conduct by students will fall under the "non-DOE-covered" procedure, but there is some ambiguity in the policy regarding whether an investigation is required in such cases, as the school would still have discretion to determine whether the conduct as alleged violates the school's policy before opening an investigation.[4] Furthermore, it is unclear from the policy whether students whose conduct has been determined to not constitute "DOE-covered conduct" can file an administrative complaint with the Office for Civil Rights if the school fails to follow its own procedures when investigating or fails entirely to investigate.

///

///

///

---

*Misconduct Policy for All Faculty, Students, Employees, and Third-Parties*, https://www.newhaven.edu/_resources/documents/student-life/student-affairs/sexual-misconduct-policy.pdf (sexual misconduct policy).

    [4] University of California, *Policy SVSH: Sexual Violence and Sexual Harassment* 13-14, 34 (Aug. 14, 2020), https://policy.ucop.edu/doc/4000385/SVSH (If a dismissal is required under the Final Rule, "[t]he Title IX Officer will decide whether and how to continue resolution of the dismissed allegations.").

69.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 1, 2020.

_____
Noreen Farrell, Executive Director