# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**VICTIM RIGHTS LAW CENTER**
115 Broad Street, 3rd Floor
Boston, MA 02110,

**EQUAL RIGHTS ADVOCATES**
1170 Market Street, Suite 700
San Francisco, CA 94102,

**LEGAL VOICE**
907 Pine Street, Suite 500
Seattle, WA 98101

**CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION**
307 N. Michigan Ave., Suite 1818
Chicago, IL 60601

**JANE DOE**, an individual by and through her mother and next friend, **MELISSA WHITE**

**NANCY DOE,** an individual

**MARY DOE,** an individual

      Plaintiffs,
 v.

**ELISABETH D. DEVOS**, in her official capacity as Secretary of Education,
400 Maryland Avenue SW
Washington, DC 20202,

**KIMBERLY RICHEY**, in her official capacity as Acting Assistant Secretary for Civil Rights,
400 Maryland Avenue SW
Washington, DC 20202,

**U.S. DEPARTMENT OF EDUCATION**,
400 Maryland Avenue SW
Washington, DC 20202,

      Defendants.

Case Number: 1:20-cv-11104
Declaration of Kaethe Morris Hoffer

# AMENDED DECLARATION OF KAETHE MORRIS HOFFER (CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION)

I, KAETHE MORRIS HOFFER, declare as follows:

1. I submit this amended declaration in support of the proposed second amended complaint filed on behalf of Equal Rights Advocates ("ERA"), Victim Rights Law Center ("VRLC"), Legal Voice, Chicago Alliance Against Sexual Exploitation ("CAASE"), Jane Doe, Nancy Doe, and Mary Doe, plaintiffs in the above-captioned case, which challenges as unlawful the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Final Rule"). I have compiled the information in the statements set forth below through personal knowledge. I have also familiarized myself with the Final Rule in order to understand its immediate impact on CAASE. If I am called as a witness in these proceedings, I could and would testify competently to these facts.

2. I have served as Executive Director at CAASE since 2013. In 1997, I began the practice of law in Illinois and was admitted to the state and federal bars. Prior to becoming CAASE's Executive Director, I founded CAASE's Legal Services program in 2009 and served as Legal Director, in which capacity I provided direct legal representation to survivors of sexual violation. Both prior to joining CAASE and during my time as Legal Director, I represented numerous student victims of sexual harassment and assault, asserting their rights under Title IX and other state-based rights with public and private schools in the Chicagoland area, inclusive of most of the major universities in the Chicago region and many of the smaller private and public colleges and high schools. The educational advocacy provided by me and my legal colleagues at CAASE includes

assisting students with making reports and filing sexual misconduct complaints with schools; accompanying students to interviews and meetings with school administrators; assisting with accessing mental health support and academic, housing, and employment accommodations; supporting students throughout the investigation and hearing process, including preparing written materials, providing support and advice at the hearing, and assisting with appeals; and filing discrimination complaints with the Office for Civil Rights if the school mishandles the case.

3. Plaintiff Chicago Alliance Against Sexual Exploitation ("CAASE") is a Chicago-based non-profit, public interest organization dedicated to addressing the culture, institutions, and individuals that perpetrate, profit from, or support sexual exploitation.

4. CAASE furthers its mission by creating and facilitating educational curricula to empower high-school students to end sex-based harassment in the Chicagoland area, as well as Illinois-wide and nation-wide.

5. CAASE advocates for systemic reforms that provide support for and expand options for survivors of sexual harm and that provide for appropriate accountability for offenders – both individual and institutional. CAASE does this via legislative actions, community engagement and education, coalition-building, and strategic criminal legal system convenings.

6. CAASE provides legal representation for survivors of sex-based harassment in civil litigation, as victims' rights representatives in the criminal justice system, and as advocates for public policies that increase the efficacy of criminal and civil laws pertaining to sex-based harms, including sex harassment. CAASE also represents students over the age of 13 who have survived sex-based harm and/or harassment and need support to continue

their education. CAASE assists these students with accessing accommodations under Title IX, navigating the Title IX complaint and disciplinary process, and filing complaints with the Office for Civil Rights if a students' Title IX rights are being violated by their school.

7. CAASE focuses on communities most impacted by sexual harm. CAASE provides platforms for survivors to share their experiences and expertise, which shapes our work, educates the public, and raises awareness.

8. CAASE has been irreparably harmed by the Title IX Rule.

9. As detailed below, the Final Rule frustrates CAASE's mission by limiting the efficacy of available avenues of redress to CAASE's student clients; directly conflicting with, impairing, and frustrating CAASE's organizational mission and programmatic priorities; and impairing CAASE's ability to advise its clients.

10. In addition, the Final Rule has diverted resources from CAASE's daily operations. Since the issuance of the Final Rule, members of CAASE's Legal Department have had to shift much of their focus away from directly representing clients because they are required to assess the potential impact of the Final Rule on existing and potential future cases. CAASE has had to conduct research and engage in discussions, both within the Legal Department and with outside stakeholders, about the new preemption provision in the Final Rule and how it will affect Illinois state laws, which provide critical protections for complainants but may conflict with the Final Rule and are therefore preempted, such as 110 ILCS 155 Preventing Sexual Violence in Higher Education Act. We have determined that there are two areas of conflict between the Final Rule and the state law: cross-examination and standard of proof. Illinois's state law requires an institution of higher education to use the preponderance of evidence standard and prohibits the use of cross-

examination, whereas the Final Rule allows a school to choose between two standards of proof and requires cross-examination at a hearing. CAASE has also been forced to forgo important projects to devote time to preparing and giving numerous Know Your Rights presentations and drafting collateral materials to spread awareness of these issues. The members of the Legal Department have had to dedicate time to plan for how best to support and represent their clients in response to schools' modifying their policies, and they will need to continue spending significant time conducting research and communicating with schools in order to stay up to date on changes they make in the future.

11. CAASE's Legal, Community Engagement, and Policy departments have had to delay the development of a Restorative Justice program because the necessary resources are currently tied up in these efforts to fully understand and be prepared to provide expert assistance regarding the Title IX regulations. These departments, along with CAASE's Communications Department, have instead restructured to form a Title IX working group that meets regularly to discuss and strategize about the new regulations. This group discusses ways to reach school staff and administrators to ensure that students at their schools are protected and then sets up meetings with those staff members, plans communications strategies regarding the Title IX rule, and brainstorms and creates new resources for students to better understand their rights under Title IX.

12. CAASE's Community Engagement and Policy departments have also been forced to delay the development of a project designed to bring gender justice advocates and criminal justice reform advocates together to discuss shared goals and to build solidarity and community.  Having resources diverted to crisis situations created by the

unreasonable new Title IX rule leaves the Policy Department in particular less able to devote planned time and attention to specific work rooted in its mission—and prioritized by its current strategic plan—such as the very timely work of facilitating collaborations between gender justice advocacy and criminal justice reform work. Necessary delays to this work have unknown consequences, but CAASE's greatest fear is that we will be unable to capitalize on current attention to race inequality and criminal justice reform movements in ways that could significantly advance both those goals and the goals of the gender justice movement that are rooted in a commitment to showing how sexual violence is both symptom and cause of multiple and overlapping forms of inequality, such as those epitomized by white supremacist systems and practices.

13. Since the issuance of the Final Rule, CAASE's Community Engagement Department has had to shift focus away from creating a survivor advisory board and building connections with individuals who have experienced sexual violence on the South side of Chicago to building relationships and connections with student survivors. The members of the Community Engagement Department have had to plan and develop new outreach and collateral as a result of the new regulations, shifting time away from other opportunities and projects. They have had to spend time arranging and attending meetings with school administrators, staff, and students in order to discuss what the new regulations mean, how both students and staff can respond, and how CAASE can support them.

14. CAASE's Policy Department has spent a substantial amount of time analyzing the Final Rule and comparing it to previous guidance, current laws in Illinois, and current bills information in Illinois. The members of this department have dedicated significant time and resources to sorting out potential and confirmed conflicts of law, trying to determine

what schools will do in response to the new regulations, and updating documents and written collateral. They have had to shift focus from passing other bills related to crime victims' rights, rape kit expansion, workplace harassment and violence, and the sex offender registry in order to work on state-specific legislation to ensure the new regulations do not undermine the ability of student victims of sex-based harassment to maintain or achieve access to education. The Policy Department has also pulled back from nearly all workplace advocacy efforts, among other projects, in order to focus on and address this issue. Because these preemption issues were not explained in the Proposed Rule, CAASE has been forced to assess these issues on short notice after the publication of the Final Rule.

15. The members of CAASE's Prevention Department have spent an enormous amount of time reading and analyzing the regulations and associated literature. In order to do that, they have had to divert time from supporting and responding to the abrupt shift towards digital e-learning resulting from the global pandemic. They have also spent time fielding questions from faculty from higher education institutions about the regulations and how to engage with their school administrators to ensure that all staff respond appropriately to sex harassment and harms affecting students. This is work that will continue as schools are learning how to adapt to the Final Rule.  We have already received more questions about the Final Rule than the other issues we work on. We are also noticing that students in postsecondary institutions are now more interested in the Final Rule during workshops, whereas we rarely received questions about Title IX before the Final Rule.

16. CAASE's Communications Department has had to divert time away from its normal operations in order to take meetings with other departments, develop messaging around

this issue, and ensure reporters are educated about the distinctions between the national impact and the local, Illinois-specific impact of these regulations. This includes spending time writing content, keeping media contacts informed about issues and preparing relevant CAASE staff for story-specific interviews, and developing/implementing a social media campaign about the changes focused on target populations. The regulations have also delayed the executions of other planned projects, including the re-launch of CAASE.org.

17. All departments at CAASE will undoubtedly have no choice but to continue to expend substantial resources in order to counteract the effects of the new regulations at the expense of their other projects, activities, and responsibilities.

18. In addition to diverting Plaintiffs' resources and frustrating Plaintiffs' missions, the Department's discriminatory motivation underlying the Final Rule also harms women and girls who are often hindered in bringing their own claims to challenge the Final Rule.

19. The implementation of the Final Rule has impacted our organization's work in several ways. The CAASE attorney who focuses on educational advocacy has had to devote much of her time to providing requested trainings to other organizations, such as rape crisis centers and children's advocacy centers, so that they are prepared to serve their student clients under the Title IX Rule. The preparation for and execution of these presentations have resulted in less time and availability to directly serve clients. She has also taken fewer civil cases of other types to free up space for educational advocacy, as new and existing education cases have become more complex and time-consuming. CAASE has also had to divert time from its normal operations to hold interdepartmental meetings, conduct outreach, and give presentations for student groups and school

administrators so they understand the Final Rule's changes. Additionally, CAASE's Policy Department has diverted time from their regular work to complete an analysis of the Final Rule and draft recommendations of policies for schools, and this work is continuing. All of this has been made more difficult by COVID-19, as CAASE's resources are more limited and schools are dedicating their similarly limited resources to working hard to prepare for the new school year during a global pandemic.

20. Students who experience sexual harassment, including sexual assault, suffer not only physically and emotionally, but also in their ability to participate in and benefit from educational opportunities. The Title IX Rule will worsen the devastating effects of sexual harassment in schools, and will further prevent and discourage victims from reporting sexual harassment because, among other things, it narrows the definition of sexual harassment to which schools may respond; constricts the universe of those school officials whose knowledge of harassment obligates the school to respond; and in numerous respects unfairly tilts the grievance processes against students who report sex-based harassment ("complainants") and in favor of those who are reported harassers and assailants ("respondents"). This makes the process more intimidating and traumatizing for victims and erects new barriers to accurate fact-finding and adjudication of complaints.

21. Each provision of the Final Rule harms survivors and chills reporting, which results in a frustration of CAASE's mission and a diversion of its organizational resources:

**Non-Title IX" Incidents**

22. Most student survivors that CAASE represents are assaulted outside of a school program or activity. Because schools are now required to dismiss all complaints of sexual

harassment and assault that take place outside of a school program or activity under § 106.45(b)(3)(i) and § 106.44(a), many survivors will have no choice but to continue seeing their assailant each day in class, in the hallways, in campus housing, and in the lunchroom or dining hall. This can be further traumatizing and unsafe for a survivor, and it can also severely hinder their ability to focus and learn.

23. In one specific example, a CAASE client was assaulted by an upperclassman at an apartment during her first week of high school. The school told her that they would not investigate because the assault happened off-campus, and as a result, her assailant received no punishment and the survivor received no protection from him. She continued to see him every day at school, and he made efforts to get her attention daily by calling her name, tapping her shoulder, winking at her, and contacting her on social media. She struggled to concentrate in class, and her grades suffered. She did not feel safe going to school every day, and the school made no effort to assist her or assess the potential threat to other students because the assault happened in the "wrong" place. Under the new rules, we will continue to see this scenario play out in schools, and student survivors will struggle to focus, fulfill their academic and extracurricular responsibilities, and feel safe.

24. Another of CAASE clients' biggest concerns with making a report is that they will not be believed and that their school will not actually do anything to help them. Because schools are now required under § 106.45(b)(3)(i) and § 106.44(a) to dismiss Title IX complaints of sexual harassment unless and until the survivor can show that their access to education has suffered or been denied, students will be forced to endure repeated and escalating levels of abuse before the school is even allowed to investigate. These students will be

left unsupported by their school and unprotected long past the point when the school should have intervened.

25. Before a student survivor has been denied access to their education under the law, they may experience many negative and harmful effects of harassment. In our experience, it is difficult enough for a student survivor of harassment to come forward in the first place, even if the harassment prevents them from learning or even feeling safe. When schools do not actively support and believe a student survivor following a disclosure of sexual violence, they send a clear message to the survivor that they do not deserve that support and that their emotional and physical well-being is not a priority. In addition, once a student has been turned away and told that the school cannot do anything to help them, it is unlikely they will make a second report if the harassment escalates or continues. The Final Rule will cause fewer survivors to come forward initially because they will be concerned that the school will not help them. By requiring survivors to make a second report when the harassment has reached a certain threshold, it will limit how many of them actually come back and are ultimately able to receive support and protection.

26. Taken together, these provisions will frustrate CAASE's mission of representing student survivors of sexual harassment and assault. Fewer students will be able to receive help from their schools, and this will cause their peers and classmates to understand that they should not report their own future harassment and assaults to their school because nothing can or will be done. It is also likely that, at the same time, CAASE's mission of prevention will be frustrated in that students will be more likely to commit harassment or assault because they believe that they will not be held accountable under the new regulations. Furthermore, CAASE will be less capable of helping all student survivors

access the supportive measures they need to continue their education, since many schools will choose not to offer supportive measures for "non-Title IX" incidents like those that happen off-campus or that do not rise to the level of the new sexual harassment definition. Finally, CAASE's mission of helping students to enforce their Title IX rights will be frustrated because the option of filing an administrative complaint with the Department of Education on behalf of student survivors will no longer be available if they do not meet the new regulations' definition of sexual harassment or the location requirements.

27. CAASE also anticipates that it will be forced to continue to divert resources from its normal operations in order to respond to the effects of the new regulations. For example, CAASE will likely have to spend more time and resources filing appeals for students whose complaints are wrongfully dismissed by their schools and are not offered a separate "non-Title IX" process. This will cause CAASE attorneys to be less available to spend time on other types of cases and could require them to take fewer cases overall. CAASE is also spending time and resources strategizing interdepartmentally, writing letters to schools, and preparing to meet with school administrators to strongly encourage them to adopt policies and procedures for "non-Title IX" sexual harassment and assault. Finally, as schools may now have two or even three different processes for adjudicating incidents of sexual harassment, depending on whether they fall under Title IX or not and whether they happened before or after the implementation date, CAASE's attorneys will need to spend more time and resources learning and navigating these different processes in order to effectively represent their clients. This will necessarily limit how much time

they can spend on other types of work and cases, such as protective order cases, policy work unrelated to education, and engagement with the community on other topics.

**Live Hearings with Cross-Examination**

28. Under the Final Rule, in higher education, survivors and witnesses in sexual misconduct proceedings are now forced to submit to cross-examination "directly, orally, and in real time" by the respondent's advisor of choice if they want any of their statements to be considered as evidence by the school. The respondent's advisor can be virtually anyone: a fraternity brother, a criminal defense attorney, a parent, etc. The prospect of being directly cross-examined in this way will both prevent students from coming forward to report their own assaults and deter witnesses from agreeing to participate in the process.

29. In CAASE's experience representing student survivors through the disciplinary process, it is already traumatizing for a survivor to have to listen to the respondent answer questions and read a closing statement. In the vast majority of our cases, students have requested to be in a separate room from the respondent while the proceeding is conducted over video call, and they have asked their CAASE attorney to listen to the questioning of the respondent over the phone so they don't have to hear it. Beyond that, they are extremely anxious and worried about the questions the respondent will submit to the hearing committee to be considered and asked.

30. Now that survivors are forced under the Final Rule to answer questions, directly and in real time, from the respondent's advisor, we expect that this will have a chilling effect on survivors considering making a report. It will be too intimidating, overwhelming, and potentially re-traumatizing for some students to choose to endure, and they will forgo filing a complaint with their school. Similarly, we expect that some witnesses will not

13

feel comfortable with being cross-examined and may choose not to give a statement at all, which will result in less relevant information for the investigators to consider.

31. While this will undoubtedly harm survivors, it will also frustrate CAASE's mission of representing clients who have been sexually harassed or assaulted because many student survivors will decide not to come forward at all as a result of the cross-examination requirement. CAASE's mission of obtaining fair and accurate investigations for its clients will be frustrated because many institutions of higher education will be forced to disregard critical evidence because the declarant is not available or does not submit to cross-examination. CAASE's mission of preventing sexual harassment will also likely be frustrated because students in higher education may be more likely to commit sexual harassment and assault when they know that survivors will be less likely to report due to their fear of cross-examination and that, even if an incident is reported, respondents can hide certain evidence by simply refusing to submit to cross-examination. Finally, CAASE's mission of helping student survivors enforce their Title IX rights will be frustrated because we will not be able to seek an administrative remedy from the Department of Education when schools disregard highly relevant and probative evidence, which is now allowed under the Final Rule.

32. CAASE also anticipates a diversion of resources as a result of this change under the new regulations. CAASE expects to spend more time and resources representing clients in higher education because live hearings with cross-examination will require significantly more time to prepare for and to complete. This may involve not only preparing the clients themselves to be cross-examined but also 1) locating and contacting any witness who made a relevant written or oral statement, 2) convincing them to appear at the hearing so

that their statements can be considered as evidence, and/or 3) seeking any other evidence in cases where the respondent or a witness refuses to appear and as a result inculpatory evidence cannot be considered.

**Unaffiliated Complainants and Respondents**

33. Under the new rule, schools are now required to dismiss complaints if the complainant is no longer enrolled in their school, and schools are now allowed to dismiss a complaint if, at any time during the investigation or hearing process, the respondent is no longer enrolled or employed there. At CAASE we have worked with several clients whose perpetrators were set to graduate very soon or had recently graduated. But the Final Rule now allows schools to dismiss these types of complaints and allows such misconduct to go uninvestigated and unpunished.

34. Similarly, CAASE has represented several students who were assaulted by their teachers. Under the Final Rule, if one of these teachers were to retire or resign before the completion of the disciplinary process, the school will no longer have to investigate to determine what exactly happened, if there were other survivors, and whether any other employees knew about what had taken place.

35. This change will not only harm survivors but will frustrate CAASE's mission of ensuring that all student survivors have access to support. As a result of the new regulations, fewer survivors who are no longer enrolled at their schools or whose respondents have left their school will report sexual harassment and assault and be able to access support. CAASE's mission of prevention will also be frustrated in that perpetrators will be more likely to commit sexual harassment or assault if they know they will not be held accountable for their actions, as respondents in a pending investigation can escape accountability by

delaying the investigation until they graduate, retire, or otherwise leave the school. In addition, as a result of this provision, CAASE anticipates a diversion of its resources in that it will have to spend time and resources filing appeals for clients who are wrongfully dismissed as an unaffiliated complainant if they are taking a leave of absence but intend to return, if they have graduated but intend to participate in alumni activities, or if they have dropped out but intend to re-enroll if the school addresses their complaint appropriately.

**Notice**

36. The Final Rule allows institutions of higher education to ignore all incidents of sexual harassment unless the Title IX coordinator or a "school official with the authority to institute corrective measures" has actual knowledge of the incident. In CAASE's experience, student survivors often disclose harassment or assault to a school employee that they trust: a residential advisor, a professor, a teaching assistant, or a coach. They should not have to assess whether the person they are confiding in, who is employed by the school, has "the authority to institute corrective measures." They should be able to trust that their disclosure will be taken seriously and properly investigated by the school, and schools should be committed to addressing sexual harm regardless of who the survivor makes their report to.

37. This provision will frustrate CAASE's mission of helping students enforce their Title IX rights because the option of filing an administrative complaint with the Department of Education will no longer be available when schools do not respond adequately to known or suspected sexual harassment and assault. Previously, CAASE could file a complaint with the Department of Education if a) their client in higher education reported sexual

harassment or assault to a university employee but did not receive any help from their school or b) a K-12 or higher education employee had reason to suspect that a student was being sexually harassed, abused, or assaulted but did not do anything about it. Under the new regulations, CAASE can no longer help survivors in this way if they do not meet the new notice requirements.

**Supportive Measures**

38. While the Final Rule does require schools to provide supportive measures to all students who report "Title IX sexual harassment", these supportive measures for complainants are limited, as they must be non-disciplinary, non-punitive, and not reasonably burdensome to the respondent. CAASE's mission is therefore frustrated because it cannot help clients who report a "Title IX" incident obtain a full range of supportive measures. For example, many schools will put the burden on the complainant to change their class, work, and housing assignments because they will believe they can never change a respondent's class, work, or housing assignments. Additionally, many schools will believe they can never issue a one-way no-contact directive against respondents and will instead issue mutual no-contact orders against both the complainant and respondent. This practice allows abusers to manipulate their victims into violating a mutual order, which can result in school discipline for the victim.

39. Furthermore, schools are not required to provide any supportive measures at all to students who report "non-Title IX sexual harassment," thereby frustrating CAASE's mission of ensuring equal educational access for all student survivors. For example, if the reported harassment does not meet the new Title IX definition of sexual harassment,

occurred outside of a school program or activity, or occurred outside of the United States, the school will not be required to provide supportive measures to the complainant.

40. Finally, CAASE's mission of helping students enforce their Title IX rights will be frustrated because the option of filing an administrative complaint with the Department of Education is no longer available when a survivor receives ineffective or harmful supportive measures in response to a "Title IX" incident, or when a survivor does not receive any supportive measures in response to a "non-Title IX" incident.

41. CAASE anticipates that it will need to spend more time helping schools understand that supportive measures are still required in cases of unaffiliated complainants or respondents, requesting supportive measures in those cases, and explaining that the Final Rule does not always prohibit changing a respondent's schedule or issuing a one-way no-contact directive. This will divert CAASE's resources away from other cases and projects.

42. CAASE is very concerned with the negative impact of the Title IX Rule. By chilling reporting, reducing the number of investigations that schools will conduct, allowing schools to respond unreasonably to sexual harassment, and mandating inequitable grievance procedures that are skewed in favor of respondents, there will be less justice for victims and less deterrence of sexual harassment. The increase in demand for CAASE's legal services will stretch beyond the organization's current funding parameters. These drastic changes to Title IX will harm victims of sexual violence across the country.

43. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2020.

*Kaethe Morris Hoffer*

Kaethe Morris Hoffer, CAASE Executive Director