**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VICTIM RIGHTS LAW CENTER, et al., | |
| *Plaintiffs*, | |
| v. | |
| MIGUEL ANGEL CARDONA, in his official capacity as Secretary of Education, et al., | Case No. 1:20-cv-11104 |
| *Defendants*, | |
| and | |
| STATE OF TEXAS, | |
| *[Proposed] Intervenor-Defendant.* | |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**

The State of Texas ("Texas") respectfully moves to intervene in defense of the Department of Education's ("the Department") Final Rule addressing Title IX obligations, which took effect on August 14, 2020.[1] At the start of this suit, the State's interests were aligned with the Department. Since then, the Department has come under the direction of a new presidential administration that is openly hostile to the Final Rule. More significantly, the new administration has taken early steps towards the Final Rule's repeal, which has affected the Department's litigation decisions in this case and others challenging the Final Rule. In light of these actions, Texas cannot entrust the defense of its protectable interest to the Department.

### BACKGROUND

During the Obama Administration, the Department issued its misguided and controversial

---

[1] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

2011 Dear Colleague Letter[2] and 2014 Questions and Answers on Title IX Sexual Violence ("2014 Question and Answers").[3] Although neither underwent notice and comment rulemaking, both guidance documents put recipients in a no-win situation where either conforming or failing to conform to the guidance documents would expose them to significant risk of litigation.[4] Then-Vice-President Joe Biden played a key role in the development and implementation of the Obama Administration's policies on sexual harassment,[5] including the changes the administration advanced regarding Title IX. The former vice president, in fact, stood as the Obama Administration's spokesperson for the Dear Colleague Letter, announcing its publication to students at the University of New Hampshire in Durham. *See* Press Release, U.S. Dept. of Educ., *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence* (Apr. 4, 2011), https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administration-effort-help-nations-schools-ad.

The Dear Colleague Letter and 2014 Questions and Answers had a detrimental impact on publicly funded education across the country, including in Texas. Not only did the two guidance documents introduce significant confusion regarding academic institutions' obligations under Title

---

[2] Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[3] U.S. Dept. of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 24, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[4] *See, e.g.*, Taylor Mooney, *How Betsy DeVos plans to change the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019) ("Prior to 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year. It is expected there will be over 100 such lawsuits filed in 2019 alone."), https://www.cbsnews.com/news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/.

[5] Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and sexual assault. Likewise, unless otherwise stated, the term, "academic institutions" encompasses all entities covered by the new Final Rule issued by the Department, including schools, colleges, and universities, both primary and secondary.

IX, but they also encouraged academic institutions to violate students' constitutional rights in order to avoid incurring liability. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the letter). Thus, in response to growing criticism, the Department, under the Trump Administration, rescinded both the Dear Colleague Letter and the 2014 Questions and Answers in 2017.[6] It soon became apparent, however, that the withdrawal could not repair the damage caused by the two guidance documents on its own. The Department therefore issued on May 19, 2020 the Final Rule that is the subject of this action. The Final Rule, for the first time, clearly demarcated the outer boundaries of federal fund recipients' obligations under Title IX with respect to sexual harassment. It thereby reduced their risk of liability and resolved the dilemma of how to enforce Title IX without sacrificing the rights of either the victims of sexual harassment or the accused.

At the time this lawsuit commenced, the Department understood and respected the detrimental impact that the Dear Colleague Letter and 2014 Questions and Answers had on common providers of education like Texas. However, on January 20, 2021, the Department came under the direction of a new presidential administration committed to reviving the failed policies of the Obama Administration. *See The Biden Plan To End Violence Against Women*, JOEBIDEN.COM, https://joebiden.com/vawa/. President Biden has not altered his opinion about Title IX policy since his advocacy of the Dear Colleague Letter. He has expressed open hostility to the Final Rule and has promised his supporters that his administration will put "a quick end" to the regulations. *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/. Moreover, the President has not limited his opposition to the Final Rule to mere words.

---

[6] *See* Candice Jackson, OCR, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 9, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

As the Department advised this Court, President Biden issued an executive order on March 8, 2021 that ordered the Secretary of Education to review the Final Rule for "consistency" with Biden Administration's stated Title IX policy. ECF 161. The Secretary has instruction "to consider suspending, revising or rescinding" any portion of the Final Rule it deems inconsistent. In response to the executive order, the Department's Office of Civil Rights issued a letter to students, educators, and stakeholders on April 6, 2021, stating that the Department anticipates publishing a notice of proposed rulemaking once it has finished its review of the Final Rule. ECF 162.

Recent events have demonstrated that the Biden Administration is willing to alter, even undermine, the federal government's litigation strategy to advance the President's agenda. For example, on March 9, 2021, one month after ordering a review of the policy,[7] the Biden Administration announced that that the Department of Homeland Security would no longer defend the 2019 public charge rule.[8] *See* Press Release, U.S. Dep't. of Homeland Security, *DHS Secretary Statement on the 2019 Public Charge Rule* (March 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. In accordance with this announcement, the Department of Justice moved to dismiss pending appeals in the Supreme Court, Seventh Circuit, and Fourth Circuit. The press statement issued by the Department of Homeland Security helps explain why. By dismissing the Seventh Circuit appeal, the final judgment from the Northern District of Illinois, which vacated the 2019 public charge rule, would go into effect. *Id.* The Biden

---

[7] Executive Order on Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans (Feb. 02, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-restoring-faith-in-our-legal-immigration-systems-and-strengthening-integration-and-inclusion-efforts-for-new-americans/.

[8] The 2019 public charge rule clarified the factors the government would consider when determining whether someone was likely at any time in the future to become a public charge and was therefore ineligible for admission or adjustment of immigration status.

Administration therefore was able to effectively rescind the regulation without going through notice and comment rulemaking.

In short, it has become apparent that the Department, under the Biden Administration, cannot adequately represent Texas' significant protectable interests. Texas files this motion to intervene in response.

## LEGAL STANDARD

The Federal Rules provide two mechanisms for third-party intervention in a lawsuit: intervention of right under Rule 24(a) and permissive intervention under Rule 24(b). For intervention of right to apply, the movant must demonstrate that: (1) the motion is timely; (2) the movant has a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) the movant's interest is not adequately represented by the existing parties. *See R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009). "[I]n light of 'the great variety of factual circumstances in which intervention motions must be decided,'" courts generally have adopted a "flexible reading" of Rule 24(a). *Int'l Paper Co. v. Inhabitants of Town of Jay, Me.*, 887 F.2d 338, 344 (1st Cir. 1989) (quoting *United States v. Hooker Chemicals & Plastics Corp*., 749 F.2d 968, 983 (2d Cir. 1984)). Accordingly, "intervention of right must be measured by a practical rather than technical yardstick." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996). And courts should "apply [Rule 24(a)] with thoughtful consideration of the objectives it is intended to serve." *Hooker Chemicals*, 749 F.2d at 983.

To qualify for permissive intervention, the movant must file: (1) a timely motion that (2) does not "unduly delay or prejudice" the parties and (3) raises "a claim or defense that shares with the main action a question of law or fact in common." FED. R. CIV. P. 24(B). In addition, "permissive intervention ordinarily must be supported by independent jurisdictional grounds." *The*

*Travelers Indem. Co. v. Bastianelli*, 250 F.R.D. 82, 85 (D. Mass. 2008). As its name would suggest, permissive intervention is an inherently discretionary enterprise provided that the movant meets the abovementioned requirements. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 308 F.R.D. 39, 45 (D. Mass. 2015), aff'd, 807 F.3d 472 (1st Cir. 2015). (noting trial courts enjoy "very broad discretion"). The rationale for granting intervention can have "particular force where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through . . . the framing of issues." *Daggett v. Comm'n on Gov't Ethics*, 172 F.3d 104, 116–17 (1st Cir. 1999) (Lynch, J., concurring).

Texas meets the requirements for both intervention as of right and permissive intervention.

**ARGUMENTS**

**I.    The Court should grant intervention as of right.**

**A.    Texas' motion is timely.**

In light of the actions the Biden Administration has taken since its inauguration, Texas moves to intervene in defense of the Final Rule. The motion is timely because it was filed close in time to the change in circumstances requiring intervention: namely, the Biden Administration's decision on March 8, 2021 to issue an executive order instructing the Secretary to review the Final Rule for "consistency" with its stated Title IX policy; and the Biden Administration's decision on March 9, 2021 to terminate its defense of the public charge rule, even though the cases had been fully briefed and tried by the district court. *See Pub. Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 785 (1st Cir. 1988) (judging a motion to intervene timely because it was filed "when the intervenor became aware that its interest in the case would no longer be adequately protected by the parties").

The timeliness of a motion to intervene "is to be determined from all the circumstances." *Id.* (quoting *Nat'l Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973)). Though the "time elapsed since the inception of the suit is relevant, measuring the length of time passed is not in itself the determinative test," *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) (internal citations omitted), particularly where intervention is sought as of right. Rather, the court applies a four-part test articulated in *Culbreath v. Dukakis*, which assesses: (1) the length of time the movant knew of its interest before it petitioned to intervene; (2) any prejudice to the existing parties caused by the movant's delay; (3) the prejudice movant would suffer if it were not allowed to intervene; and (4) the existence of extraordinary circumstances militating for or against intervention. 630 F.2d 15, 20–24 (1st Cir. 1980).

During the Trump Administration, Texas had no reason to intervene. Like Texas, the previous administration supported the Final Rule as an effective means of combating sexual harassment without sacrificing either constitutional liberties or clarity. Accordingly, even if Texas had sought intervention when this action commenced, it likely would have been unable to rebut the presumption that the federal government would act as an adequate representative of Texas' rights. *See T-Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33, 39 (1st Cir. 2020); *see also* ECF 35 (denying proposed intervenors). The Trump Administration, however, has since left office, and its replacement, under the leadership of President Biden, has expressed open hostility to the Final Rule. *E.g. The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/ (last visited Apr. 28, 2021). In fact, the Biden Administration has announced its intention to replace the Final Rule with the much-maligned Dear Colleague Letter and has issued an executive order on March 8, 2021 to initiate that process. ECF 161. The Department has since

acknowledged that it intends to publish "a notice of proposed rulemaking to amend the Department's Title IX regulations" once its review of the Final Rule is complete. ECF 162.

The Biden Administration also has demonstrated its intention to cease defending Trump-era policies even when the issues had been fully briefed and tried before the court. In a departure from historical practice, the Biden Administration announced that it would no longer defend the 2019 public charge rule. Pursuant to this decision, the Department of Justice moved to dismiss multiple pending appeals, allowing an adverse judgment to go into effect. *See* Press Release, U.S. Dep't. of Homeland Security, *DHS Secretary Statement on the 2019 Public Charge Rule* (March 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. It is this circumvention of notice and comment rulemaking (combined with March 8, 2021 executive order and April 6, 2021 letter) that demonstrated to Texas that the defense of the Final Rule would benefit from the Texas' intervention. Prior to the administration's announcement, there was not much Texas could add to the proceedings, as this Court had already conducted a full trial on the merits. However, given recent events, there is strong likelihood that the Biden Administration will seek to use this lawsuit as a means of achieving its policy agenda. Texas needs to intervene to ensure that any adverse judgment is appealed and that any ancillary matter that comes before this Court is briefed in such a way as to advance the Final Rule and therefore Texas' interests.

The timing of Texas's motion does not prejudice any of the existing parties. Courts "do not require timeliness for its own sake." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). The requirement instead "derives meaning from assessment of prejudice in the context of the particular litigation." *Puerto Rico Tel. Co. v. Sistema de Retiro de los Empleados del Gobierno y la Judicatura*, 637 F.3d 10, 15 (1st Cir. 2011). This Court has already conducted a trial on the merits.

The parties have fully presented their arguments and only await a ruling from this Court. Because the trial has concluded, Texas' intervention would not disrupt or delay any of the proceedings. There would be no need to revise the parties' scheduling order, as all the deadlines already have been met. Texas, moreover, has no intention of relitigating any of the issues before this Court. It merely wishes to ensure that its interests remain represented should additional proceedings beyond the trial on the merits occur, such as an appeal. If anything, Texas's addition will avert a potential disruption to the case should the federal government withdraw its support of the Final Rule and refuse to defend it following the issuance of this Court's opinion.

On the other hand, the failure to grant intervention here could severely harm Texas. As common provider of public education, Texas is subject to Title IX and the Final Rule. Should this Court decide in favor of Plaintiffs and grant injunctive relief, the ruling could significantly alter Texas' legal obligations, as Texas explains later in its motion. *See infra* I.B. Yet, as it stands, none of the existing parties support the Final Rule, much less are in a position to represent Texas' significant protectable interests. *See infra* I.D. For this reason, Texas moved to intervene in two other cases, challenging the Final Rule, in order to ensure that it and other beneficiaries of the Final Rule had a voice in the proceedings.[9] These efforts, however, will prove meaningless if Plaintiffs' claims succeed as a result of the Department's nonfeasance since Texas cannot revitalize the Final Rule or recover the benefits it enjoyed under the Final Rule by securing a favorable ruling in a separate jurisdiction.

All in all, Texas exhibited proper diligence in bringing its motion as soon as it had a "tangible basis to support a claim of purported inadequacy" of representation. *Pub. Serv. Co. of*

---

[9] The court granted Texas' motion in *Commonwealth of Pennsylvania v. Devos*, 1:20-cv-01468-CJN (D.D.C. Feb. 4, 2021).  Texas' other motion remains pending. *See* Mot. to Intervene, *The Women's Student Union v. U.S. Dep't of Educ*, 3:21-cv-01626-EMC (N.D.Cal. April 7, 2021).

*New Hampshire v. Patch*, 136 F.3d 197, 207 (1st Cir. 1998); *see also T-Mobile Ne*, 969 F.3d at 39 (noting that the inadequate representation requirement requires "more than empty conjecture"). Its intervention will cause no prejudicial effect to existing parties, but a denial of its motion could result in Texas being subject to increased costs and liability, all without the benefit of representation. The motion is timely.

>    **B.**    **As a provider of public education, Texas has significant protectable interests directly affected by this litigation.**

Texas administers a system of primary and secondary public education that is funded by both state and federal money. Tex. Educ. Agency, 2020 *Comprehensive Biennial Report on Texas Public Schools* at 297 (Dec. 4, 2020) (reporting that Texas received $5.3 billion dollars for K-12 education), https://tea.texas.gov/sites/default/files/comp_annual_biennial_2020.pdf. The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. Pursuant to this charge, Texas funds, regulates, and oversees the second largest system of K–12 public education in the nation, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2019-20* at 1 (Aug. 12, 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf.

Texas also funds, supports, and administers a robust network of higher education. Texas is home to 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools. *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://reportcenter.highered.texas.gov/agency-publication/almanac/2020-texas-public-higher-education-almanac/. While most states have just one or two public university systems, Texas has six. The largest of these systems—the University of Texas—has 14 separate locations that educate approximately 240,000 students each year. *See*

*About The University of Texas System*, THE UNIVERSITY OF TEXAS SYSTEM, https://www.utsystem
.edu/about (last visited Apr. 28, 2021). All told, the State's entire network of higher education

enrolled just shy of 1.7 million students in 2019. *See* Tex. Higher. Educ. Coordinating Bd., at 13.

Because Texas receives federal funding from the Department for primary and secondary

education, Texas and its public primary and secondary education systems are subject to Title IX

and the regulations effectuating Title IX, such as the Final Rule. Likewise, each of the institutions

in Texas' systems of higher education receives federal funding and, as a result, is subject to the

Final Rule as well. This means that Texas and its academic institutions have an obligation to

investigate and enforce alleged violations of Title IX. *See Daniel v. Univ. of Tex. Sw. Med. Ctr.*,

960 F.3d 253, 257 (5th Cir. 2020) (recognizing public institutions of higher education as "arms"

and "instrumentalities" of the State). Texas is intensely interested in the Final Rule as a result.

Indeed, its interests are the "mirror-image" of Plaintiff's interests. While Plaintiff alleges that it

"[is] being injured by the [Final Rule]," Texas "w[ould] be injured by [the Final Rule's]

invalidation." *Builders Ass'n of Greater Chi. v. City of Chicago*, 170 F.R.D. 435, 440 (N.D. Ill.

1996).

First, the Final Rule clarified the definition of sexual harassment as well as the conditions

that must be met before a recipient's obligations under Title IX are activated. Invalidating the Final

Rule would create uncertainty, harming the Texas institutions regulated under Title IX. *See infra*

Part I.C. Earlier guidance had caused a great deal of uncertainty regarding recipients' legal

responsibilities under Title IX.[10] Recipients did not know how to comply with the new mandates

---

[10] The Task Force on Federal Regulation of Higher Education specifically identified the Dear
Colleague Letter and 2014 Question and Answers as guidance documents that were meant to
eliminate uncertainty but only led to more confusion. *See Recalibrating Regulation of Colleges
and Universities* at 14 (Feb. 12, 2015), *available at* https://www.acenet.edu/Documents/Higher-
Education-Regulations-Task-Force-Report.pdf.

or whether failure to do so would incur legal consequences. *See* Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, 33 YALE L. & POL'Y REV. 387, 394–395 (2015).

In an abundance of caution, many academic institutions, including those funded by Texas, elected to revise their policies to cover a greater range of conduct and make it easier for administrators to arrive at a determination of guilt. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter). But that led to litigation. Hundreds of lawsuits have been filed since the Dear Colleague Letter was issued—a sizeable number of which academic institutions lost or settled. *See* Jonathan Taylor, Milestone: 600+ Title IX/Due Process Lawsuits in Behalf of Accused Students, Title IX for All (Apr. 1, 2020), https://www.titleixforall.com/milestone-600-title-ix-due-process-lawsuits-in-behalf-of-accused-students.

Second, the Final Rule reduced Texas' risk of liability. While previous guidance had supported an improperly broad view of Title IX liability, the Final Rule fixed those issues. By confining Title IX liability to proper limits set by statute, the Final Rule benefits Texas. If it were invalidated, Texas institutions would be subject to litigation expenses, which, in turn, would lead to higher compliance costs and diversion of resources.

In short, earlier guidance put Texas academic institutions between a rock and a hard place. Not following the guidance would risk federal enforcement actions, but following the guidance would lead to lawsuits, litigation expenses, and ultimately monetary settlements. *Id.*; *see also* Greta Anderson, *More Title IX Lawsuits by Accusers and Accused*, INSIDER HIGHER ED (Oct. 3, 2019), https://www.insidehighered.com/news/2019/10/03/students-look-federal-courts-challenge-title-ix-proceedings (describing the "high cost of addressing sexual misconduct. . . a lose-lose situation

for universities"). The Final Rule, by contrast, resolves the dilemma. It provides clear guidance limiting Texas' liability and reducing expected litigation expenses. These interests support intervention. *See Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 42 (1st Cir. 1992) (stating that interest is qualifies when it is "sufficiently close relationship to the dispute between the original litigants" and is "direct, not contingent").

> ### C.   Disposition of this action may impair or impede Texas's ability to protect its interests.

Texas "would be substantially affected in a practical sense by the determination made" in this action; it therefore should, as a general rule, be entitled to intervene. *Langone v. Flint Ink N. Am. Corp.*, 231 F.R.D. 114, 119 (D. Mass. 2005) (quoting FED. R. CIV. P. 24, Advisory Committee Notes to the 1966 Amendment). As explained above, the Final Rule provides important benefits to Texas, its schools, and its citizens. It both limits the scope of potential Title IX liability and also provides clarity that helps schools follow the law. But Plaintiff asks this Court to deprive Texas of those benefits by vacating and setting aside the Final Rule. *See* ECF 13 at 108. Those practical consequences are more than sufficient to show impairment of Texas' interests. *See Cabot LNG Corp. v. Puerto Rico Elec. Power Auth.*, 162 F.R.D. 427, 430 (D.P.R. 1995) (noting that the potential stare decisis effect from injunctive relief may disadvantage movant). When a movant benefits from a regulation, invalidation of that regulation would necessarily impair the movant's interests. *See, e.g.*, *See Daggett*, 172 F.3d at 110; *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011); *N. Y. Pub. Interest Research Group, Inc. v. Regents of Univ. of State of N. Y.*, 516 F.2d 350, 352 (2d Cir. 1975); *see also Suiza Dairy Inc. v. Rivero Cubano*, 2005 WL 8159035, at *4 (D.P.R. Mar. 23, 2005)

Relegation to the status of amicus curiae would not enable Texas to protect their interests in this case and "is not an adequate substitute for participation as a party." *Nuesse v. Camp*, 385

F.2d 694, 702 (D.C. Cir. 1967); *see also Coal. of Arizona/New Mexico Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 844 (10th Cir. 1996). In such a scenario, Texas would not be able to file motions or appeal if necessary. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. AFL-CIO, Local 283 v. Scofield*, 382 U.S. 205, 215–216 (1965) (discussing the difference between party and amicus status). It would be precluded from commenting on ancillary matters that come before this Court as the parties await a final ruling.[11] And it would lack the ability to introduce an issue or defense not raised by the parties should further briefing be needed. *Swan v. Peterson*, 6 F.3d 1373, 1383 & n. 10 (9th Cir.1993). For the reasons stated below, Texas and the federal government do not share the same interests. *See infra* Part I.D. There is in fact evidence that the Department no longer intends to defend the Final Rule whatsoever going forward. Texas will likely be the sole party then defending the Final Rule in its entirety, making it essential that its arguments concerning future motions be part of the Court's deliberations. "Participation by [Texas] as amicus curiae is not sufficient to protect against these practical impairments." *Feller v. Brock*, 802 F.2d 722, 730 (4th Cir. 1986). Texas should be granted intervenor status.

### D.    None of the parties adequately represent Texas' interests.

The federal government has grown hostile to the Final Rule following the inauguration of President Biden. It is no longer capable of representing Texas' interests or providing an adequate defense of the regulations. It is well established that "an applicant for intervention need only make a minimal showing that the representation afforded by existing parties likely will prove inadequate." *Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 207 (1st Cir. 1998).

---

[11] Ancillary issues continue to come before this Court even as the parties await a final ruling. *E.g.* ECF 154. Their disposition could affect the case's outcome.

Although that burden is heightened "when the movant seeks to intervene as a defendant alongside a government entity," the presumption can be rebutted, as here, by "a strong affirmative showing that the agency (or its members) is not fairly representing the applicants' interests." *Victim Rights Law Ctr. v. Rosenfelt*, 988 F.3d 556, 561 (1st Cir. 2021); *see also Daggett*, 172 F.3d at 111 (stating that a movant may meet its burden by demonstrating "adversity of interest, collusion or nonfeasance"). In addition, as this Court has noted, the required showing of inadequacy "tends to vary depending on the strength of the interest at stake." *Students for Fair* Admissions, 308 F.R.D. at 51 (cleaned up). Thus, while the courts might demand more if the movants interest were "thin and widely shared," the courts require "very little" when, like Texas, the movant's interest is severe, specific, and certain. *Daggett*, 172 F.3d at 113–114; *see supra* Part I.B–C.

On its own, "the change in the Administration raises 'the possibility of divergence of interest' or a 'shift' during litigation," sufficient to satisfy Rule 24(a). *W. Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017). As the Biden Administration's recent actions illustrate, a change in Administration often precedes substantial shifts in federal positions, and these shifts mean the Department's interests are unlikely to overlap with intervenor Texas' interest. *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 (1972) (ruling that requirement "is satisfied if the applicant shows that representation of his interest 'may be' inadequate"); *see also Mosbacher*, 966 F.2d at 44. However, in addition to the general uncertainty surrounding a change of party in the White House, recent events have demonstrated that Biden Administration not only objects to the policies underlying the Final Rule, but it has taken early steps towards the Final Rule's repeal, which has affected the Department's litigation decisions.

Indeed, almost immediately after taking office, the Department, acting in close concert with plaintiff-states, sought an abeyance in another case challenging the Final Rule "so that

Department leadership [can] review the underlying rule at issue in this case." *See* Mot. to Stay Briefing Schedule, *Commonwealth of Pennsylvania v. Devos*, 1:20-cv-01468-CJN (D.D.C. Feb. 3, 2021). The White House also issued an executive order specifically charging the new Secretary of Education to review the Final Rule for "consistency" with Biden Administration's stated Title IX policy. ECF 161. As the Department advised this Court, the executive order instructs the Secretary "to consider suspending, revising or rescinding" any portion of the Final Rule it deems inconsistent. *Id.* The implication of that suggestive instruction, of course, is that the federal government has changed its position regarding the Final Rule and intends to replace it with alternative regulatory framework. *See also* ECF 162. According to the Biden Administration, that regulatory framework will mirror the Obama Administration's Dear Colleague Letter, which pressured Texas academic institutions to violate constitutional rights lest they incur liability. *See The Biden Plan To End Violence Against Women*, JOEBIDEN.COM, https://joebiden.com/vawa/. In other words, the Biden Administration means to promulgate the very policies that undermined Texas public education, which the Final Rule sought to address.

These actions are evidence of an unavoidable, fundamental divide between Texas and the federal government. Moreover, they raise a strong possibility that the Department, at the direction of the Biden Administration, will either fail to defend the Final Rule in future proceedings or omit from its defense key arguments. *See WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 997 (10th Cir. 2009) (recognizing that government policy is not static and may shift). The fact that this Court conducted a full trial on the merits does not eliminate this risk. Last month, the Department of Homeland Security stopped defending the public charge rule because the Biden Administration determined that the rule was incompatible with its planned immigration policy. *See* Press Release, U.S. Dep't. of Homeland Security, *DHS Secretary Statement on the 2019 Public Charge Rule*

(March 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. Crucially, the announcement came one month after the President ordered a review of the policy. The administration did not limit this decision to lawsuits at the early stages of litigation. The federal government moved to dismiss pending appeals in multiple circuits because doing so would allow an adverse judgment to go into effect. *Id.* Should this Court rule in favor of Plaintiffs, the Biden Administration would have the same incentive here to let the decision stand rather than have the Department pursue procedural remedies, such an appeal. The Administration in fact has an incentive to consent to any development in the case that advances Plaintiffs' claims.

The circumstances surrounding Texas' motion therefore differ greatly from the intervention motion filed by the Foundation for Individual Rights in Education (FIRE), *et al.*, which was submitted well before the current administration assumed office *See* ECF 24. The Department at that time shared the proposed intervenors' "ultimate goal," namely the preservation of the Final Rule. *Moosehead Sanitary Dist. v. S. G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir. 1979). Here, however, the Department has orders to dismantle the Final Rule and reinstate a policy that caused Texas academic institutions to violate their constitutional obligations. Thus, whereas FIRE was concerned that the Department would employ different arguments in defense of the Final Rule, *Victim Rights Law Ctr.*, 988 F.3d at 561–562, Texas has shown that the Department under the Biden Administration has reason to cease defending the Final Rule altogether. To the extent there is a presumption that the Department can adequately represent those who supported the Final Rule, Texas has rebutted it. Texas is therefore entitled to intervene as of right, and this Court should permit intervention here.

**II.      In the alternative, the Court should permit permissive intervention.**

As set forth in Section I, *supra*., Texas easily meets the requirements for intervention as of right. But even if it did not, this Court should exercise its "broad discretion" and permit Texas to intervene in this action under Rule 24(b) instead. *Morra v. Casey*, 960 F. Supp. 2d 335, 338 (D. Mass. 2013). Texas satisfies all the threshold requisites for permissive intervention. First, Texas' motion is timely. As explained above, Texas filed its motion within weeks of learning that Biden Administration was willing to withdraw the federal government from defending Trump-era policies even when the issues had been fully briefed and tried before the court. *See supra* Part I.A. Prior to this, Texas had no clear reason to suspect that the defense of the Final Rule would benefit from Texas' intervention since the Department litigated the merits before the Department and Texas' interests diverged. Second, Texas entry into the case would not delay, much less prejudice any of the existing parties. Texas has no interest in relitigating the issues before this Court. It merely wishes to defend the Final Rule should additional proceedings prove necessary, including the possibility of appeal. *Id.* Third, Texas' position in support of the Final Rule involves common questions of law and fact. *See Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 568 (1st Cir. 1999) (defending the validity of a challenged statute meets "the low threshold set by Rule 24(b)"). Both "the main action" and Texas' defense center on whether the Final Rule is consistent with the Administrative Procedures Act and the Fifth Amendment. Fed. R. Civ. P. 24(b)(1)(B). Those common questions of law and fact are sufficient for permissive intervention. *See*, *e.g.*, *Varsity Wireless, LLC v. Town of Boxford*, 2016 WL 11004357, at *7 (D. Mass. Sept. 9, 2016). Fourth, Texas has an independent ground for subject matter jurisdiction, as this action raises a federal question, and Texas would establish federal-question jurisdiction independent of Plaintiff's ability to do so. *Int'l Paper Co. v. Inhabitants of Town of Jay, Me.*, 887

F.2d 338, 347 (1st Cir. 1989) (holding that independent jurisdiction exists when the state seeks to defend the statute against a challenge based on federal law).

Finally, the Court should exercise its discretion to permit intervention because Texas seeks to defend interests that will otherwise go unprotected in future proceedings. As courts in this circuit have recognized, permissive intervention is concerned with securing a "fair, efficient and expeditious resolution of the case." *Charlesgate Nursing Ctr. v. State of Rhode Island.*, 723 F. Supp. 859, 862 (D.R.I. 1989). In making this determination, the courts may look to additional factors, including whether the movant's interests are adequately represented. *Commonwealth v. United States Dep't of Health & Human Services*, 289 F. Supp. 3d 259, 265 (D. Mass. 2018). Texas is a common provider of education, whose schools, universities, and other academic programing are subject to Title IX. But unlike the Biden Administration, Texas believes that the Final Rule will not only facilitate enforcement of Title IX but also discourage unconstitutional practices that have violated the rights of individuals accused of misconduct. Texas therefore has a stake in the Final Rule (as well as a perspective of its effects) that the Biden Administration does not share. The Biden Administration, moreover, has established its willingness to stop defending policies with which it disagrees, even when the issues have been fully briefed and tried before the court. Thus, absent Texas' intervention, there is a significant risk that the Biden Administration will seek to terminate this case by means of a technicality or settlement. *See The Travelers Indem. Co. v. Bastianelli*, 250 F.R.D. 82, 86 (D. Mass. 2008) (quoting *N.H. Ins. Co. v. Greaves*, 110 F.R.D. 549 (D.R.I.1986)) (granting intervention because a "just and equitable resolution" involves "the strongest possible arguments by counsel"). Texas' participation eliminates this danger. It keeps the proceedings adversarial despite the federal government's about-face on the merits, and it

ensures that there is a party to this action willing to pursue all available procedures, such as an appeal, in the Final Rule's defense.

Other factors that may play a part in the court's analysis—i.e. the possibility of undue delay and the nature of movant's interest—are addressed earlier in Texas' arguments, *see supra* Part I.A–B, and likewise are clearly weighed in favor of permissive intervention. *Bastianelli*, 250 F.R.D. at 86.

## CONCLUSION

For the foregoing reasons, the State of Texas respectfully requests that the Court grant its motion to intervene as a matter of right under Rule 24(a) or, in the alterative, for permissive intervention under Rule 24(b).

Date: April 30, 2021

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

PATRICK K. SWEETEN
Associate Deputy for Special Litigation

 */s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel

**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
kathleen.hunker@oag.texas.gov


 */s/   Kenneth B. Walton*
Kenneth B. Walton (BBO No. 562174)
Ken.Walton@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
One International Place, 3rd Floor
Boston, MA 02110
T: 857-313-3950
F: 857-313-3951

## **CERTIFICATE OF SERVICE**

I, Kenneth B. Walton, hereby certify that on April 30, 2021, a true and correct copy of the within document was served on all parties via the Electronic Case Filing System.


/s/    Kenneth B. Walton
Kenneth B. Walton

4838-0310-7559.1