**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| VICTIM RIGHTS LAW CENTER, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> MIGUEL ANGEL CARDONA, in his official capacity as Secretary of Education, et al., <br><br> *Defendants*. | Case No. 1:20-cv-11104-WGY |

**BRIEF OF THE STATE OF TEXAS AS *AMICUS CURIAE***
**IN SUPPORT OF DEFENDANTS**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................... ii

Table of Authorities ........................................................................................................... iii

Introduction and Interest of Amicus Curiae .................................................................. 1

Argument ............................................................................................................................ 3

    I.    The Final Rule sets forth reasonable standards for combating gender discrimination in educational programs while safeguarding Free Speech and Due Process. It is fully consistent with federal law. ........................................ 3

        A.    In line with prior judicial precedent, the Final Rule respects the freedom of speech. ...................................................................................................... 4

        B.    The Final Rule protects the due process rights of both the accuser and the accused. ..................................................................................................... 8

        C.    Earlier guidance encouraged public academic institutions to violate their students' constitutional rights, causing severe and irreparable harm, which the Final Rule corrects. .......................................................................... 11

Conclusion ......................................................................................................................... 14

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnes v. Zaccari*,
    669 F.3d 1295 (11th Cir. 2012)................................................................ 16

*Boermeester v. Carry*,
    263 Cal. Rptr. 3d 261 (Cal Ct. App. 2020).................................................. 16

*Booher v. Bd. of Regents, N. Ky. Univ.*,
    No. 96-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 22,
    1998) ...................................................................................................... 14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................................ 11

*Citizens Awareness Network, Inc. v. United States*,
    391 F.3d 338 (1st Cir. 2004) .................................................................... 19

*Dambrot v. Cent. Mich. Univ.*,
    55 F.3d 1177 (6th Cir. 1995)..................................................................... 14

*Daniel v. Univ. of Tex. Sw. Med. Ctr.*,
    960 F.3d 253 (5th Cir. 2020)......................................................................9

*Davila-Bardales v. I.N.S.*,
    27 F.3d 1 (1st Cir. 1994) .......................................................................... 12

*DeJohn v. Temple Univ.*,
    537 F.3d 301 (3d Cir. 2008) ..................................................................... 14

*Doe v. Baum*,
    903 F.3d 575 (5th Cir. 2018)..................................................................... 17

*Doe v. Brandeis Univ.*,
    177 F. Supp. 3d 561 (D. Mass. 2016) ............................................. 16, 17, 21

*Doe v. Purdue Univ.*,
    928 F.3d 652 (7th Cir. 2019)..................................................................... 16

*Doe v. Univ. of Cincinnati,*
    872 F.3d 393 (6th Cir. 2017)..................................................... 16, 17

*Doe v. Univ. of Kentucky,*
    860 F.3d 365 (6th Cir. 2017)..................................................... 17, 19

*Doe v. Univ. of Mich.,*
    721 F. Supp. 852 (E.D. Mich. 1989) ........................................... 14

*Doe v. Univ. of Notre Dame,*
    2017 U.S. Dist. LEXIS 69645 (N.D. Ind. May 8, 2017)............................. 20

*Doe v. Univ. of Scis.,*
    961 F.3d 203 (3d Cir. 2020) ........................................... 16, 18, 19

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274 (1998) ...................................................... 13

*Gorman v. Univ. of R.I.,*
    837 F.2d 7 (1st Cir. 1988) ............................................... 16

*Goss v. Lopez,*
    419 U.S. 565 (1975)..................................................... 15, 16, 20

*Gossett v. Oklahoma ex rel. Bd. of Regents for Langston
    University,*
    245 F.3d 1172 (10th Cir. 2001).................................................... 16

*Guadamuz v. Bowen,*
    859 F.2d 762 (9th Cir. 1988)........................................................ 18

*Healy v. James,*
    408 U.S. 169 (1972)..................................................... 12

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) .............................................. 11, 12

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999)................................................ 10, 13, 14, 15

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)............................................*passim*

*McCauley v. Univ. of the V.I.*,
618 F.3d 232 (3d Cir. 2010) .......................................................... 14

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*,
545 U.S. 967 (2005) ....................................................................... 11

*Plummer v. Univ. of Houston*,
860 F.3d 767 (5th Cir. 2017) ................................................... 16, 20

*Regents of Univ. of Michigan v. Ewing*,
474 U.S. 214 (1985) ....................................................................... 15

*Roberts v. Haragan*,
346 F. Supp. 2d 853 (N.D. Tex. 2004) .......................................... 14

*Rodriguez v. United States*,
480 U.S. 522 (1987) ....................................................................... 11

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) (Alito, J.) .......................................... 14

*Sweezy v. State of N.H. by Wyman*,
354 U.S. 234 (1957) ....................................................................... 12

*Util. Air Regulatory Group v. E.P.A.*,
573 U.S. 302 (2014) ....................................................................... 11

## Other Authorities

Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009) .................................... 12

CBS NEWS (Nov. 24, 2019) ("Prior to 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year. It is expected there will be over 100 such lawsuits filed in 2019 alone."), https://www.cbsnews.com /news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/ ................................................................................ 21

Council on Postsecondary Education, Sexual Harassment and
    Sexual Violence Policy, https://web.uri.edu/hr/files/CPE-
    Sexual-Harassment-Sexual-Violence-Policy-FINAL-CPE-
    APPROVED-4-1-2015-w-Tech.-Rev.-031218.pdf (last visited
    July 10, 2020) .......................................................................... 14

Eastern Illinois University, Internal Governing Policies, #175 –
    Sexual Harassment, https://castle.eiu.edu/auditing/175.php
    (last visited July 10, 2020) ......................................................... 14

Greta Anderson, *More Title IX Lawsuits by Accusers and
    Accused*, Insider Higher Ed (Oct. 3, 2019),
    https://www.insidehighered.com/news/2019/10/03/students-
    look-federal-courts-chall enge-title-ix-proceedings (describing
    the "high cost of addressing sexual misconduct. . . a lose-lose
    situation for universities" because they faced a high risk of
    litigation and liability regardless of whether they conformed or
    failed to conform to the 2011 Dear Colleague Letter)................................. 10

*Nondiscrimination on the Basis of Sex in Education Programs or
    Activities Receiving Federal Financial Assistance*, 85 Fed. Reg.
    30,026 (May 19, 2020)................................................................8

*"Only Yes Means Yes": An Essay on University Policies Regarding
    Sexual Violence and Sexual Assault, 33 Yale L. & Pol'y Rev.
    387, 394–395 (2015)* ...................................................................... 18

*Recalibrating Regulation of Colleges and Universities* (Feb. 12,
    2015), *available at* https://www.acenet.edu/Documents
    /Higher-Education-Regulations-Task-Force-Report.pd ............................ 18

Spotlight on Due Process 2019–2020, FIRE,
    https://www.thefire.org/resources/spotlight/due-process-
    reports/due-process-report-2019-2020/ ....................................... 15

Spotlight on Speech Codes 2021, FIRE https://d28h
    tnjz2elwuj.cloudfront.net/wp-
    content/uploads/2021/01/04162946/fire-spotlight-on-speech-
    codes-2021.pd ............................................................................ 12

Taylor Mooney, *How Betsy DeVos plans to change the rules for
    handling sexual misconduct on campus* ...................................... 21

Tex. Educ. Agency, *Enrollment in Texas Public Schools 2019-20*
   at 1 (Aug. 12, 2020),
   https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf ..........................9

Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher
   Education Almanac* at 28, 47 (Sept. 28, 2020),
   https://reportcenter.highered.texas.gov/agencypublication/alm
   anac/2020-texas-public-higher-education-almanac/ .....................................9

Title IX Legal Database, available at
   https://www.titleixforall.com/title-ix-legal-database/ ................................ 21

### INTRODUCTION AND INTEREST OF AMICUS CURIAE

No one denies the urgent need to prevent sexual harassment and to punish it when it occurs. Sexual harassment of any sort is unacceptable, including harassment at our nation's public schools and institutions of higher learning. No student pursuing an education should do so in fear that she will be victimized and suffer a lifetime of trauma as a result. For decades, however, educational institutions and the Department of Education ("the Department") have betrayed basic constitutional protections in an effort to purge anything offensive from campus. These constitutional abuses reached a crescendo when President Obama's Department of Education issued its misguided 2011 Dear Colleague Letter, which trampled the rights of students and created a false choice: either combat sexual harassment or protect constitutional liberties. The State of Texas proposes a different option: do both.

The Department's new Final Rule,[1] which is the subject of this litigation, resolves the dilemma of how to enforce Title IX without sacrificing the rights of either the victims of sexual harassment or the accused. It requires educational institutions to investigate and, where proved, punish allegations of sufficiently severe, pervasive, and objectively offensive sexual harassment.[2] It also provides a needed framework, consistent with long-standing Supreme Court precedent, that protects the foundational constitutional rights of due process and free speech. Far from enabling those who would exploit the vulnerable, the Final Rule affirms a culture of accountability within the contours of constitutional liberty. And nothing could better advance the

---

[1]    *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

[2]    Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and assault. Likewise, unless otherwise stated, the term "academic institutions" encompasses all entities covered by the new Final Rule issued by the Department, including schools, colleges, and universities, both primary and secondary.

cause of eradicating a culture of sexual harassment than ensuring that those who are punished are truly blameworthy.

The State of Texas is a common provider of education that funds, regulates, and oversees the second largest system of K–12 public schools in the nation, serving over 5.4 million students across 1,200 school districts.[3] Texas also funds, supports, and administers a robust network of postsecondary institutions, consisting of 37 universities and 82 two-year colleges and technical schools.[4] Each of these institutions are subject to Title IX, as is Texas directly.[5] Texas therefore has a compelling interest in the Department issuing clear, practical regulatory guidance, which enables Texas and the academic institutions within its borders to effectively combat sexual harassment without sacrificing their commitment to either free speech or due process, nor their receipt of federal funds.

The Final Rule helps Texas attain that balance. The Final Rule builds upon both well-established and emerging law to set forth reasonable standards for combating gender discrimination in educational programs while safeguarding free speech and due process. Moreover, because the Final Rule corresponds with accepted constitutional norms, academic institutions no longer have the added pressure, imposed by the 2011 Dear Colleague Letter, to deny students accused of sexual harassment a genuine chance to defend themselves from life-altering consequences. On the contrary, the Final Rule establishes an additional obligation for

---

[3] Tex. Educ. Agency, *Enrollment in Texas Public Schools 2019-20* at 1 (Aug. 12, 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf.

[4] Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://reportcenter.highered.texas.gov/agencypublication/almanac/2020-texas-public-higher-education-almanac/.

[5] *See Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 257 (5th Cir. 2020) (recognizing public institutions of higher education as "arms" and "instrumentalities" of the State).

academic institutions to design their Title IX adjudication processes in such a way that they pass

constitutional muster in most, if not, all cases. Thus, the Final Rule has not only removed

academic institutions from the no-win situation in which the Department's prior guidance placed

them,[6] but it also has protected students from suffering severe and irreparable harm.

The Department acted reasonably and within its discretion when it promulgated the Final

Rule. Texas therefore urges this Court to deny Plaintiffs' claims and allow the Department to

reaffirm Title IX's commitment to protecting students from harassment while respecting free

speech and due process.

**ARGUMENT**

I.   **The Final Rule sets forth reasonable standards for combating gender discrimination in educational programs while safeguarding free speech and due process. It is fully consistent with federal law.**

The Final Rule not only falls within the Department's statutory authority, but it also

complies and is consistent with federal law. Despite Plaintiffs' assertion that the Final Rule marks

a sea change in Title IX regulation, courts and previously-promulgated rules have long

acknowledged and accommodated the free speech and due process rights of those accused of

sexual harassment and gender discrimination under Title IX. The Final Rule merely builds off

that tradition. The Department's adoption of the *Davis* standard for actionable sexual harassment

under Title IX is necessary to ensure that students' speech is limited only when necessary and to

avoid First Amendment concerns. And the Final Rule's due process protections requiring live

hearings, direct cross-examination, and neutral fact-finders reflect a reasonable, straightforward

---

[6] *See* Greta Anderson, *More Title IX Lawsuits by Accusers and Accused*, Insider Higher Ed (Oct. 3, 2019), https://www.insidehighered.com/news/2019/10/03/students-look-federal-courts-challenge-title-ix-proceedings (describing the "high cost of addressing sexual misconduct. . . a lose-lose situation for universities" because they faced a high risk of litigation and liability regardless of whether they conformed or failed to conform to the 2011 Dear Colleague Letter).

3

approach to the resolution of Title IX complaints that protects both complainants' and respondents' due process rights. Indeed, in many instances, Plaintiffs protest disciplinary practices and procedures that the law already compels public academic institutions to provide.

That Plaintiffs would prefer a different policy is not grounds for overriding the Department's reasoned judgment, nor is it grounds for enjoining reasonable regulations. It is axiomatic that the Department has an obligation to issue regulations that are consistent with the Constitution and courts' interpretation of it. Moreover, even if certain aspects of the Final Rule were not compelled by prior precedent, Plaintiffs have cited no authority for the proposition that the Department can go no further than the bare minimum of what prior cases have held that the Constitution requires. The U.S. Supreme Court has emphasized repeatedly that the Department and other federal agencies need not pursue the broad purposes of statutes "at all costs" to "effectuate" legislation. *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (noting that "it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law"). The Department instead has discretion to balance competing factors and objectives and to assess "the wisdom of its policy on a continuing basis." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 838 (1984)). "The question for a reviewing court is whether . . . the agency has acted reasonably," which, in this case, the Department has. *Util. Air Regulatory Group v. E.P.A.,* 573 U.S. 302, 315 (2014).

A.   **In line with prior judicial precedent, the Final Rule respects the freedom of speech.**

"The essentiality of freedom in the community of American universities is almost self-evident." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957)). "Teachers and students must

4

always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* Though America has never lost sight, at least in theory, of this vision of the public university as a "marketplace of ideas," *Healy v. James*, 408 U.S. 169, 180 (1972), many universities—either in an intentional effort to create an ideological monopoly or in a good-faith, but misguided, attempt to protect students from controversial ideas—work to stifle speech on campus.[7] *See* Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009). This includes public universities in Texas.[8]

The Final Rule effectuates the anti-discrimination purposes of Title IX without infringing on the free exchange of ideas. The Final Rule does so by clarifying the types of sexual misconduct to which universities must respond for Title IX purposes. Contrary to the Plaintiffs' assertion, the clarification coincides with longstanding Title IX and First Amendment jurisprudence. *But see Davila-Bardales v. I.N.S.*, 27 F.3d 1, 5 (1st Cir. 1994) (stating that agencies, in any event, have "freedom to refine, reformulate, and even reverse their precedents in the light of new insights and changed circumstances"). And as such, it rejects the notion that public universities can punish

---

[7] The mode of suppression typically assumes one of two forms. First, the university can adopt and enforce overbroad "speech codes" and "harassment" policies. Second, the university can enforce its speech codes and harassment policies arbitrarily based on whether the university, or its stakeholders, find the speech objectionable. Neither tactic is exclusive of the other. And both are constitutionally impermissible.

[8] The Foundation for Individual Rights in Education ("FIRE") publishes a report every year that evaluates the written policies of 478 colleges and universities to determine their compliance with First Amendment standards. *See* Spotlight on Speech Codes 2021, FIRE https://d28h tnjz2elwuj.cloudfront.net/wp-content/uploads/2021/01/04162946/fire-spotlight-on-speech-codes-2021.pdf. In its 2021 report, FIRE identified five public universities in Texas that maintain "at least one policy both clearly and substantially restricting freedom of speech." *Id.* at 4, 28. An additional nine public universities maintain policies "that could be interpreted to suppress protected speech or policies that, while clearly restricting freedom of speech, restrict relatively narrow categories of speech." *Id.* at 4, 29–31.

students for speech—no matter how offensive, disparaging, or unpopular it may be—unless it has been established that the speech prevents another student from participating in or enjoying the benefits of a recipient's education program.

Regulations promulgated by the Department in 1997, for example, readily acknowledged that public schools and universities must take care that Title IX enforcement does not infringe on students' free speech rights. *See* 62 Fed. Reg. 12,045 (1997) ("Title IX is intended to protect students from sex discrimination, not to regulate the content of speech."). Likewise, when the Department updated these regulations in 2001 to reflect intervening Supreme Court precedents in *Gebser v. Lago Vista Independent School District*[9] and *Davis ex rel. LaShonda D. v. Monroe County Board of Education*,[10] the Department incorporated and emphasized the standard that "harassment [must] rise[ ] to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex." 66 Fed. Reg. 5512 (Jan. 19, 2001).

Notably, the 2001 regulations explicitly declined "to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages." 66 Fed. Reg. 5512. In the 2001 regulations, the Department explained:

> [A]lthough the terms used by the Court in *Davis* are in some ways different from the words used to define hostile environment harassment in the 1997 guidance . . . the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept—that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.

*Id*. The Final Rule's reliance on the *Davis* analysis is nothing new.

---

[9] 524 U.S. 274, 290 (1998) (recognizing private cause of action against funding recipient based on deliberate indifference to sexually harassing conduct school employee).

[10] 526 U.S. 629 (1999) (recognizing private cause of action against funding recipient based on deliberate indifference to sexual harassment by fellow students).

The Supreme Court in *Davis,* with its eye on the First Amendment, carefully demarcated the line between constitutionally protected speech and discriminatory conduct prohibited by Title IX. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). Not only does the Final Rule track the language of *Davis*, but it also presents a reasonable response to persistent misinterpretation of Title IX by universities. *See id.* Despite almost uniform precedent instructing otherwise, universities have continued to adopt overbroad policies that chill speech and sanction students, erroneously in the name of Title IX.[11] Although courts routinely strike down such policies,[12] their continued prevalence has a deleterious effect on free speech since the only way for students to obtain relief is through prolonged litigation, which is expensive and burdensome.

The Final Rule puts an end to this constant recycling of discredited, unconstitutional policies. It expressly links the definition of sexual harassment to an objective standard, which, in turn, cabins Title IX to incidents where the speech "undermines and detracts from the victims' educational experience," as Title IX has long provided. *Davis*, 526 U.S. at 651. Administrators

---

[11] *See*, *e.g.*, Eastern Illinois University, Internal Governing Policies, #175 – Sexual Harassment, https://castle.eiu.edu/auditing/175.php (last visited July 10, 2020) (banning students from "a variety of behaviors including . . . offensive or inappropriate language or jokes;" encouraging complaints before "harassment reaches an intolerable level"; and further stating that that "[t]he university can and will address inappropriate behaviors even if those behaviors are not yet severe or pervasive"); *see also* Council on Postsecondary Education, Sexual Harassment and Sexual Violence Policy, https://web.uri.edu/hr/files/CPE-Sexual-Harassment-Sexual-Violence-Policy-FINAL-CPE-APPROVED-4-1-2015-w-Tech.-Rev.-031218.pdf (last visited July 10, 2020) (using a definition of sexual harassment that contemplates discipline arising from a single joke, comment, or innuendo from male colleagues, such as calling a female supervisor "bossy").

[12] *See, e.g., McCauley v. Univ. of the V.I.,* 618 F.3d 232 (3d Cir. 2010)*; DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004); *Booher v. Bd. of Regents, N. Ky. Univ.*, No. 96-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 22, 1998); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989).

will have the incentive to direct their university's policies to behavior that actually interferes with students' equal access to education and not mere expression of ideas—however, controversial or unpopular. Students, meanwhile, will have an avenue of relief that is proactive, not reactive to the hijinks of a single institution determined to continue its unconstitutional and unlawful harassment policy.

### B.  The Final Rule protects the due process rights of both the accuser and the accused.

In addition to protecting students' free speech rights, the Final Rule promulgates a reasonable due process standard that gives students a genuine opportunity to defend themselves from accusations of sexual harassment, all while allowing for the appropriate sanction of guilty students. The Supreme Court has long recognized that students have protected constitutional interests in their pursuit of higher education. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222–23 (1985). Accordingly, the Court has held that students subject to disciplinary proceedings are entitled to due process. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975).  The "specific dictates" of that process vary in accordance with the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). But the Court has clarified that even for a few-day suspension, a student should receive, at minimum, "notice of the charges," and "if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story" at "some kind of hearing." *Goss*, 419 U.S. at 581. The Supreme Court, in other words, has articulated a floor that Plaintiffs and their associated institutions must meet, but it is one that many disciplinary policies fall beneath. *See* Spotlight on Due Process 2019–2020, FIRE, https://www.thefire.org/resources/spotlight/due-process-reports/due-process-report-2019-2020/.

The lower courts provide similar instruction. *See Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (determining that a student's interest "in pursuing an education is included within

the fourteenth amendment's protection of liberty and property"); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (finding reputational harm of being branded a sex offender plus alteration in legal status through suspension and loss of ROTC scholarship created a protected liberty interest); *Plummer v. Univ. of Houston*, 860 F.3d 767, 774 & n.6 (5th Cir. 2017) (students have a protected liberty interest in higher education); *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012) (college students have a state-created property interest in attending Georgia colleges); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001) (students have a state-created property interest in attending Oklahoma public universities).

In the years following the 2011 Dear Colleague Letter, lower courts built upon the fundamentals of *Eldridge* and *Goss*, identifying numerous safeguards vital to fair process and the context in which a student accused of sexual harassment is entitled to receive them. As a consequence, multiple federal jurisdictions already oblige academic institutions to provide students accused of sexual harassment with many of the safeguards contained in the Final Rule, including a live hearing and the opportunity to cross-examine witnesses, their accuser among them. *See Univ. of Scis.*, 961 F.3d at 214; *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400–401 (6th Cir. 2017); *see also Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603–07 (D. Mass. 2016). State courts have not remained silent either. Many have advised academic institutions within their jurisdictions that they cannot refuse students basic procedural protections, such as neutral factfinders and the admission of evidence, while staying true the requirement of fair process. *See*, *e.g.*, *Boermeester v. Carry*, 263 Cal. Rptr. 3d 261, 280 (Cal Ct. App. 2020), as modified (June 4, 2020), reh'g denied (June 18, 2020) ("limited cross-examination . . . prevented [student] from fully presenting his defense, as required by fair procedure").

Plaintiffs nevertheless argue that the procedural safeguards required for due process run

afoul of Title IX because they might expose victims to trauma and deter them from reporting incidents of sexual harassment. *E.g.* ECF 13 ¶¶ 148, 160. Their contention, in effect, is that sexual harassment inflicts unique harms that warrant giving the accused less process than required for other types of misconduct. Plaintiffs' contention, however, has no effect on the legality of the Final Rule. First, the Department considered this exact concern and inserted multiple provisions to mitigate the risk. 34 C.F.R. § 106.45(b). Second, courts have rejected outright the insinuation that academic institutions can target students accused of sexual harassment for reduced procedural protections. *See Doe v. Baum*, 903 F.3d 575, 582 (5th Cir. 2018) (noting that the school provided a hearing with cross-examination in all misconduct cases other than those involving sexual assault); *Brandeis Univ.*, 177 F. Supp. 3d at 607 (noting that virtually all other types of misconduct were decided by a clear and convincing standard).

The adjudication of sexual harassment claims has much in common with criminal proceedings with respect to the conduct charged and the penalties imposed. *See Univ. of Ky.*, 860 F.3d at 370 (finding that a university Title IX hearing was sufficiently "akin to criminal prosecutions" to warrant Younger abstention). Courts therefore have consistently held under *Mathews* that students accused of sexual harassment merit stronger procedural protections, not weaker, when compared to other deprivations. *See, e.g., Univ. of Cincinnati*, 872 F.3d at 400 (characterizing the private interest as "compelling").

Against this backdrop, the due process standard advanced by the Final Rule is eminently reasonable. The standard ensures that Title IX adjudications will pass constitutional muster in most cases. At the same time, the Department took care to institute precautions that effectively eliminate the Plaintiffs' concerns about subjecting vulnerable witnesses to uncomfortable or intimidating situations and abuse of the proceedings. The Final Rule implemented numerous

safeguards with the wellbeing of victims in mind, such as permitting recipients to adopt rules of decorum; allowing for the hearing to take place with the parties in separate rooms; limiting the examination to "relevant" questions; excluding, with exceptions, evidence about the complainant's sexual predisposition and history; and prohibiting a party from personally conducting a cross-examination. *See* 34 C.F.R. § 106.45(b); *see also* ECF 96 at 30. The Department, in short, "balanced all of the interests at issue" and arrived at a compromise that would best advance the purposes of the statute. *Guadamuz v. Bowen*, 859 F.2d 762, 770 (9th Cir. 1988). Plaintiffs disagree with the choices that the Department made, but their objection is political, not rooted in law.

### C. Earlier guidance encouraged public academic institutions to violate their students' constitutional rights, causing severe and irreparable harm, which the Final Rule corrects.

The 2011 Dear Colleague Letter had a detrimental impact on publicly funded education across the country, including in Texas. *See*, *e.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 210, 213–14 (3d Cir. 2020) (describing the pressure universities faced as a result of the letter). Not only did the guidance document introduce significant confusion regarding academic institutions' obligations under Title IX,[13] but it also encouraged academic institutions to violate students' constitutional rights in order to avoid incurring liability and/or drawing federal enforcement. *Id.* That trend did not dissipate when the Department rescinded the guidance document in 2017. As the Department explained in the Final Rule's preamble, "the withdrawal of the 2011 Dear

---

[13] The Task Force on Federal Regulation of Higher Education specifically identified the Dear Colleague Letter and the subsequent 2014 Question and Answers as guidance documents that were meant to eliminate uncertainty but only led to more confusion. *Recalibrating Regulation of Colleges and Universities* at 14 (Feb. 12, 2015), *available at* https://www.acenet.edu/Documents/Higher-Education-Regulations-Task-Force-Report.pdf; *see also "Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault,* 33 Yale L. & Pol'y Rev. 387, 394–395 (2015).

11

Colleague Letter did not require or result in wholesale changes to the set of expectations guiding recipients' responses to sexual harassment." 85 Fed. Reg. 30,029. "Many (if not most) recipients chose not to change their Title IX policies and procedures following the withdrawal," *id.,* with the consequence that academic institutions continued to subject students to disciplinary proceeding that were "akin to criminal prosecutions" but lacked even rudimentary due process protections. *Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017).

The fundamental tenets of due process require Title IX recipients to avoid arbitrary decision-making and reduce the risk of erroneous deprivations of protected rights by balancing the individual's interests with the cost of additional due process measures that would guard against that risk. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Yet, prior to the Final Rule, the absence of meaningful safeguards in disciplinary schemes meant that academic institutions have imposed life-altering consequences on students without ever giving them a real opportunity to defend themselves.

Many academic institutions, in fact, deliberately eschew the procedures and practices associated with due process. It has become commonplace for schools, colleges, and universities to abandon the adversarial model altogether in favor of a so-called "investigative" one—a trend Plaintiffs acknowledge in their Amended Complaint. ECF 13 ¶ 166. The Foundation for Individual Rights in Education reports that only a minority of colleges and universities opt to conduct a live hearing. *See* Spotlight on Due Process 2019–2020, FIRE. The vast majority deny students the right to present evidence or cross-examine witnesses. *Id.* Less than half require that fact-finders be impartial. *Id.*

Academic institutions attempt to justify this abandonment of due process by characterizing disciplinary proceedings as an outgrowth of the institution's educational mission

rather than a means of dispensing punishment. Their description, however, is "not credible." *Doe v. Univ. of Notre Dam*e, No. 3:17-cv-298, 2017 U.S. Dist. LEXIS 69645, at *34 (N.D. Ind. May 8, 2017). A finding of guilt can exact severe monetary and reputational costs on students, ranging anywhere from expulsion and academic suspension to loss of tuition, housing, scholarships, and job opportunities. *See Plummer v. Univ. of Houston*, 860 F.3d 767, 779 (5th Cir. 2017), as *revised* (June 26, 2017) (Jones, J., dissenting) (observing that "charges of sexual misconduct [] will affect the students' future lives as surely as criminal convictions"). At the very least, it places a black mark on a student's record. At its most extreme, it can destroy a student's chance for a successful career. In either event, the consequences are "punishment[s] in any reasonable sense of that term." *Id.* And they warrant the protections of due process. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975) (holding that due process forbids arbitrary deprivations, such as "[w]here a person's good name, reputation, honor, or integrity is at stake").

The need for procedural due process only increases in the context of sexual harassment and misconduct. Although not a criminal proceeding outright, the underlying act at issue in a harassment-related disciplinary hearing overlaps with illegal conduct. *See Plummer*, 860 F.3d at 778 (Jones, J., dissenting) (describing the alleged sexual harassment as "quasi-criminal sexual misconduct"). A finding of guilt attaches a special stigma to the accused party that will stay with them well after they exit campus. It is "a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) ("If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision."). For this reason, a growing number of students have filed suit against their academic institutions for

violating their due process rights in the wake of the 2011 Dear Colleague Letter[14]; many of these lawsuits resulted in a monetary judgment against the institution.

To that end, the Final Rule steps in where academic institutions previously have failed. Academic institutions have known for years that many of their disciplinary policies fall short of constitutional minimums. *See supra* at Section I.B. Rather than making adjustments, the institutions have been content to wait for students to force the issue through litigation. *See*, *e.g.*, Title IX Legal Database, available at https://www.titleixforall.com/title-ix-legal-database/ (identifying 715 lawsuits). The Final Rule eliminates the need for students to suffer irreparable injuries before obtaining due process. It establishes a single, publicized standard that conforms to constitutional requirements. More to the point, it incentivizes academic institutions to meet this standard in advance by conditioning the receipt of federal funds on compliance. Had the Department not acted, students would have had no choice but to try their luck in a proceeding stacked against them. They may have then sought redress through the courts, but legal vindication cannot restore missed opportunities, nor can it revive lost dreams or lost reputations. It is a partial remedy at most. The Department acted well within its statutory authority to consider the harm that its prior guidance documents caused and issue a better tailored policy that discourages unconstitutional excess.

## CONCLUSION

For the foregoing reasons, Texas urges the Court to enter judgment that Plaintiffs take

---

[14] *See*, *e.g.*, Taylor Mooney, *How Betsy DeVos plans to change the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019) ("Prior to 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year. It is expected there will be over 100 such lawsuits filed in 2019 alone."), https://www.cbsnews.com/news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/.

14

nothing, dismiss Plaintiffs' suit with prejudice, and award Defendant all other relief the Court deems appropriate. *See Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 351 (1st Cir. 2004) (stating that "an agency may alter its rules in light of its accumulated experience in administering them").

Date: June 1, 2021            Respectfully submitted.

KEN PAXTON                   PATRICK K. SWEETEN
Attorney General of Texas       Deputy Attorney General for Special
                                       Litigation
BRENT WEBSTER
First Assistant Attorney General     */s/ Kathleen T. Hunker*
                                       KATHLEEN T. HUNKER
                                       Special Counsel

**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
kathleen.hunker@oag.texas.gov

*/s/    Kenneth B. Walton*
Kenneth B. Walton (BBO No. 562174)
Ken.Walton@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
One International Place, 3rd Floor
Boston, MA 02110
T: 857-313-3950
F: 857-313-3951