UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
VICTIM RIGHTS LAW CENTER,      )
EQUAL RIGHTS ADVOCATES,        )
LEGAL VOICE,                   )
CHICAGO ALLIANCE AGAINST       )
SEXUAL EXPLOITATION,           )
JANE DOE,                      )
an individual by and through   )
her mother and next friend     )
Melissa White,                 )
NANCY DOE,                     )
MARY DOE,                      )
                              )
          Plaintiffs,          )
                              )
     v.                        )          CIVIL ACTION
                              )          NO. 20-11104-WGY
MIGUEL CARDONA,[1]             )
in his offical capacity as     )
Secretary of Education,        )
SUZANNE GOLDBERG,[2]           )
in her offical capacity as     )
Acting Assistant Secretary for )
Civil Rights,                  )
UNITED STATES DEPARTMENT       )
OF EDUCATION,                  )
                              )
          Defendants.          )
_____)

YOUNG, D.J.                                    July 28, 2021

**FINDINGS OF FACT, RULINGS OF
LAW, AND ORDER FOR JUDGMENT**

---

   [1] The Court substitutes defendant Miguel Cardona for
Elisabeth D. DeVos pursuant to Federal Rule of Civil Procedure
25(d).

   [2] The Court substitutes defendant Suzanne Goldberg for
Kenneth L. Marcus pursuant to Federal Rule of Civil Procedure
25(d).

## I.   INTRODUCTION

On November 29, 2018, the United States Department of
Education (the "Department") proposed to amend regulations
implementing Title IX of the Education Amendments of 1972, 20
U.S.C. § 1681 ("Title IX").  See Nondiscrimination on the Basis
of Sex in Education Programs or Activities Receiving Federal
Financial Assistance ("Proposed Rule"), 83 Fed. Reg. 61,462
(proposed Nov. 29, 2018).  After receiving comments on the
Proposed Rule, the Department published the Final Rule on May
19, 2020.  See Nondiscrimination on the Basis of Sex in
Education Programs or Activities Receiving Federal Financial
Assistance ("Final Rule"), 85 Fed. Reg. 30,026 (May 19, 2020)
(codified at 34 C.F.R pt. 106).  The Final Rule sets new
standards for actionable sexual harassment under Title IX, new
procedures for Title IX investigations, and procedural
safeguards for those accused of sexual harassment.  See
generally id.

Four organizations that advocate on behalf of victims of
sexual violence, Victim Rights Law Center ("Victim Rights"),
Equal Rights Advocates, Legal Voice, and Chicago Alliance
Against Sexual Exploitation ("Chicago Alliance") (collectively,
the "Organizational Plaintiffs"), and three individual
plaintiffs, Jane Doe, Nancy Doe, and Mary Doe (collectively, the

"Individual Plaintiffs"), seek to challenge the Final Rule as violative of the Administrative Procedure Act (the "APA") and the Equal Protection Clause of the Fifth Amendment.  Second Am. Compl. ¶¶ 267-293, ECF No. 138-1.

The Organizational and Individual Plaintiffs (collectively, the "Advocates") challenge the Final Rule and argue that it violates section 706(2)(A) of the APA because thirteen of its provisions depart from established practice and procedure regulating educational institutions "not in accordance with law" ("count I"), and that the same thirteen provisions are the product of arbitrary and capricious decision making ("count II").  Id. ¶¶ 267-276; see Pls.' Pretrial Br. 6-7, ECF No. 145. The Advocates also argue that six provisions violate section 706(2)(C) of the APA because they were promulgated in excess of the Department's statutory authority ("count III"), that five provisions are not logical outgrowths of the Proposed Rule in violation of section 706(2)(D) of the APA ("count IV"), and that thirteen provisions violate the Equal Protection Clause of the Fifth Amendment by discriminating on the basis of sex ("count V").  Second Am. Compl. ¶¶ 277-293.  The Advocates sought a preliminary injunction to halt the implementation of the Final Rule just as soon as it was promulgated.  See Mot. Prelim. Inj., ECF No. 31.

The defendants, Miguel Cardona in his official capacity as
Acting Secretary of Education, the Department, and Suzanne
Goldberg in her official capacity as Acting Assistant Secretary
for Civil Rights (collectively, the "Government") challenge the
Advocates' Article III standing and maintain that the
Department's promulgation was constitutional, within its
statutory authority, and otherwise in compliance with the APA.
Defs.' Pretrial Br. 1-8, 10-15, ECF No. 144.

As is its wont, this Court collapsed hearing on the
preliminary injunction with trial on the merits pursuant to
Federal Rule of Civil Procedure 65(a).  But see Nwaubani v.
Grossman, 806 F.3d 677, 679 (1st Cir. 2015) (Thompson, J.)
(cautioning against overuse of this procedural device).  A full
jury-waived trial was held on November 18, 2020.  Elec. Clerk's
Notes (Nov. 18, 2020), ECF No. 146.

The Court here enters its findings of fact and rulings of
law as required by Federal Rule of Civil Procedure 52.

## II.  TITLE IX GENERALLY

Congress enacted Title IX for two reasons: "to avoid the
use of federal resources to support discriminatory practices"
and "to provide individual citizens effective protection against
those practices."  Cannon v. Univ. of Chi., 441 U.S. 677, 704
(1979).  To those ends, the statute mandates that "[n]o person
in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  The term "program or activity" includes "all of the operations of" all schools, from K-12 to colleges and universities (apart from certain religious institutions), that receive any kind of federal funds ("recipients" or "schools").  Id. § 1687.

Title IX may be enforced judicially, as when a plaintiff sues a school for damages, see Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 76 (1992); however, the Supreme Court has sharply limited liability in such cases.  A plaintiff may recover "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit," and he or she must prove the school's "deliberate indifference to known acts of harassment in its programs or activities."  Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 633 (1999).  This standard is met only if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).  The Final Rule refers to these three standards

-- the strict definition of sexual harassment and the requirements of actual knowledge and deliberate indifference -- as the "Gebser/Davis framework."  85 Fed. Reg. at 30,032.

Title IX may also be enforced administratively by the Department.  See Gebser, 524 U.S. at 292 ("Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U.S.C. § 1682, even if those requirements do not purport to represent a definition of discrimination under the statute.").  All such regulations must "be consistent with achievement of the objectives of" Title IX.  20 U.S.C. § 1682.

In 2001, following the Supreme Court's Gebser and Davis decisions, the Department issued a guidance document -- rather than a binding rule -- that adopted a broader scope of liability for administrative enforcement of Title IX than under the Gebser/Davis framework.  U.S. Dep't of Educ., Off. for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 19, 2001) ("2001 Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.  The guidance document defined sexual harassment as "unwelcome conduct of a sexual nature" that is "severe, persistent, or pervasive."  Id. at vi, 2 (emphasis added) (quoting Off. for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School Employees,

Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,041
(Mar. 13, 1997)).  Actual notice was not needed to trigger
liability.  The school could be liable if a "responsible
employee" reasonably "should have known" of the harassment, and
"responsible employee" was defined broadly to include anyone a
student would reasonably believe had the authority or duty to
take action.  Id. at 13.[3]

The Final Rule repudiates the 2001 Guidance and largely
aligns the standards for administrative enforcement of Title IX
with the Gebser/Davis framework that governs suits for monetary
damages -- though it modifies or "adapts" that framework in
important ways.  85 Fed. Reg. at 30,033.  The Rule also
introduces several due process protections for respondents
accused of sexual harassment and limits the application of Title
IX for off-campus (i.e., non-school related) incidents and
parties no longer affiliated with the school.

---

[3] The Department later issued two other guidance documents.
See U.S. Dep't of Educ., Off. for Civil Rights, Dear Colleague
Letter: Sexual Violence (Apr. 4, 2011) ("2011 Letter"),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-
201104.pdf; U.S. Dep't of Educ., Off. for Civil Rights,
Questions and Answers on Title IX and Sexual Violence (Apr. 29,
2014) ("2014 Q&A"), https://www2.ed.gov/about/offices/list/ocr/
docs/qa-201404-title-ix.pdf.  These documents, however, were
rescinded in 2017.  U.S. Dep't of Educ. & U.S. Dep't of Justice,
Dear Colleague Letter (Feb. 22, 2017), https://www2.ed.gov/
about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

## III.  FINDINGS OF FACT

During the trial, as stipulated by the parties, this Court admitted into evidence the Advocates' declarations and the entire administrative record.  After thorough review of the evidence, this Court makes the following findings.

### A.  Consequences to the Advocates

#### 1.  Mary Doe

Mary Doe is an undergraduate student attending a four-year college in North Carolina.  Pls.' Pretrial Br., Ex. A, Decl. Mary Doe ("Decl. Mary Doe") ¶ 1, ECF No. 145-1.  Mary lived on her college's campus in the fall of 2020,[4] where she experienced a sexual assault by a male classmate (the "Classmate") in her campus dormitory.  Id. ¶¶ 2, 3-8.

She obtained a temporary restraining order, id. ¶ 15, and then met with her school's Title IX director (the "Director"), id. ¶¶ 19-20.  The Director told Mary that if she initiated a Title IX investigation, Mary would be required to attend a live hearing, during which she could not sit in a separate room from the Classmate, and that she could only have one person attend the hearing with her.  Id. ¶ 20.

Mary encountered the Classmate twice on campus, once at the cafeteria and another time while in a common courtyard, and he

_____

[4] Despite the COVID-19 pandemic, Mary's college reopened for on-campus living and classes.  Decl. Mary Doe ¶ 2.

made no effort to remove himself from her presence.  Id. ¶ 23.
Mary's dorm was near the Classmate's, she passed his dorm on her
fastest way to class, and his presence on campus made her
uncomfortable.  See id. ¶¶ 23-26.  Mary spoke to the Director
about removing the Classmate from campus, but the Director said
that if the school made any accommodation for Mary, it would
have to offer the same accommodation to the Classmate as well.
Id. ¶¶ 24-25.  The Director suggested that Mary take the longer
way to her classes to avoid the Classmate but that the school
could not change the Classmate's routes on campus.  Id. ¶ 24.
Mary also interpreted the Director's statements to suggest that
the Classmate would be removed from campus only if he violated
the temporary restraining order.  Id. ¶ 24.  Mary elected to
initiate a Title IX investigation.  Id. ¶ 27.

Later, Mary and her attorney met with the Director, and
they were informed that the school would aim to complete its
investigation in sixty days, despite the student handbook
reserving the right to extend the investigation beyond sixty
days.  Id. ¶ 28.  Furthermore, the Director stated that the
school would not obtain the police report or results of the rape
kit performed on Mary after the assault, but that she could
bring these materials to the hearing.  Id. ¶ 29.

Mary takes issue with the effects of the Final Rule,
including the "presumption that [her] assault did not happen"

while the investigation is ongoing, id. ¶ 38, that the "school is not permitted to provide [her] with any supportive measures that could be considered punitive to [the Classmate] until the investigation is resolved," id. ¶ 40, that "the Final Rule prohibits [her] school from restricting the [Classmate] from discussing the allegations with anyone," id. ¶ 41, that Mary is "required to participate in a live hearing," id. ¶ 42, that her school will not "rely on the statements of any witness who does not appear and submit to cross-examination at the live hearing," id., that if the Classmate fails to attend the hearing, the school will not consider the text messages he sent to Mary, id. ¶ 43, that she may be cross-examined at the hearing, id. ¶ 44, and that the College "is permitted to dismiss [her] complaint when [the Classmate] graduates," id. ¶ 47.

Given these concerns and impediments, Mary has considered withdrawing her Title IX complaint.  Suppl. Decl. Mary Doe ¶ 7, ECF No. 157-1.

### 2.   Nancy Doe

Nancy Doe is a former undergraduate student at a Connecticut university.  Pls.' Pretrial Br., Ex. B, Decl. Nancy Doe ¶ 1, ECF No. 145-2.  In 2015, while an undergraduate student, Nancy experienced a sexual assault and elected not to bring a Title IX claim.  Id. ¶¶ 2-8.  Approximately three years later, two students filmed Nancy without her consent during a

sexual encounter at an off-campus apartment.  Id. ¶ 9.  The
video was distributed among her classmates.  Id. ¶¶ 10-12.
Students harassed Nancy, and not wanting to involve the police,
she sought relief from her university.  Id. ¶¶ 13-17.  The Title
IX coordinator discouraged her from pursuing a formal
investigation and offered her forms of relief that Nancy found
insufficient.  Id. ¶ 17.  Nancy remained uncertain whether she
wanted to pursue a formal investigation into the sexual
exploitation, and the Title IX coordinator suspended her
investigation.  Id. ¶¶ 18-23.  In 2020, as an alumna, Nancy
reopened her Title IX investigation into the non-consensual
recording against a respondent who was still enrolled at the
University.  Id. ¶¶ 38-39.

No one at the school has discussed with Nancy how the Final
Rule will affect her complaint; however, Nancy is concerned that
the Final Rule will bar her investigation because the incident
occurred off campus and she has since graduated.  Id. ¶¶ 41-43.
Nancy will ask the university to stop her formal investigation
if her complaint is subject to the Final Rule because she is
concerned about being cross-examined, she is concerned that the
Final Rule will prevent the university from investigating her
complaint, and she feels as though the Final Rule strips away
her civil rights.  Id. ¶¶ 44-46, 49-52.

### 3.   Jane Doe

Jane Doe, a ten-year-old fourth-grade student at a community school in Michigan, was sexually harassed and assaulted by a classmate on four occasions between January and February 2020.  Pls.' Pretrial Br., Ex. C, Decl. Jane Doe ¶¶ 1-3, ECF No. 145-3.  Administrators and school board members did little to address the assault and minimized the incident.  Id. ¶¶ 4-13.  To date, Jane and her guardian have not initiated a Title IX investigation.  Id. ¶¶ 16-18.  Doe's guardian is concerned that the harassment Doe suffered is insufficient under the Final Rule to pursue a Title IX complaint, that Jane will not receive the measures she needs because they will be considered "punitive" to her classmate, and that the Final Rule's standard of conduct for schools (deliberate indifference) allows schools to sweep complaints under the rug.  Id. ¶¶ 24-27.

### 4.   The Organizational Plaintiffs

The Organizational Plaintiffs advocate on behalf of victims of sexual assault during the Title IX process.  See Pls.' Pretrial Br., Ex. D, Am. Decl. Noreen Farrell (Equal Rights Advocates) ("Decl. Equal Rights Advocates") ¶¶ 3, 6, 8, 9, ECF No. 145-4; id. Ex. E, Am. Decl. Stacy Malone (Victim Rights Law Center) ("Decl. Victim Rights") ¶¶ 3-8, ECF No. 145-5; id. Ex. F, Am. Decl. Kaethe Morris Hoffer (Chicago Alliance Against Sexual Exploitation) ("Decl. Chicago Alliance") ¶¶ 3-7, ECF No.

145-6; id. Ex. G, Am. Decl. Lisa M. Stone (Legal Voice) ("Decl. Legal Voice") ¶¶ 6-11, ECF No. 145-7.  The Organizational Plaintiffs all claim that the Final Rule frustrates their mission, impairs their ability to advise clients, diverts resources from daily operations, delays programing, forces them to reallocate staff, requires them to update educational material, and requires them to spend time analyzing the Final Rule to continue serving victims in accordance with their missions.  See Decl. Chicago Alliance ¶¶ 9-19; Decl. Victim Rights ¶¶ 8, 10-31; Decl. Equal Rights Advocates ¶¶ 8-26; Decl. Legal Voice ¶¶ 9-20.  Only one of these organizations, Victim Rights, attests that it has actively experienced unwillingness and hesitancy from student victims to continue their Title IX complaints.  Decl. Victim Rights ¶ 9.  Specifically, Victim Rights demonstrates that the cause of this hesitation is the requirement that the complainant be cross-examined at the Title IX hearing.  Id.

   **B.   The Administrative Record**

   The administrative record demonstrates the Department's consideration of each of the challenged provisions.  The Department considered and responded to comments regarding a recipient's response to sexual assault, its procedures, safeguards, deliberate indifference standard of conduct (section 106.44(a)), and appropriate Due Process and First Amendment

safeguards.  Administrative R. at 000061-62, 000102 (appending 34 C.F.R. § 106); see Notice Filing Clerk's Office, ECF No. 149. Similarly, the Department detailed its reasoning for adopting each of its definitions in section 106.30, including its definitions of sexual harassment, formal complaint, and supportive measures.  Administrative R. at 000005-06, 000061-62, 000065, 000068, 000085, 000091, 000094, 000102, 000109; id. at 000031 (explaining the Final Rule's definition of sexual harassment).  The Department also detailed its reliance on and incorporation of the Gebser/Davis framework.  Id. at 000124-31.

The Department explained section 106.45(b)(1)(iv) of the Final Rule's presumption of innocence and forbearance of punishment until the end of the proceedings, id. at 000078, that to do so is a "fundamental tenant of American justice," id. at 000207, and "critical for ensuring a fair proceeding," id. at 000232-33.  It explained that section 106.45(b)(1)(v)'s requirement of "reasonably prompt time frames for conclusion of the grievance process" is limited to temporary delays and extensions for good cause, id. at 000074 n.466, 000062-63, that this would not lead to "endlessly delayed proceedings," id. at 000222, 000243-48, and the potential for concurrent law enforcement action to delay the Title IX action, id. at 000246.

The Department detailed its decision in section 106.45(b)(1)(vii) to allow schools to employ either a

preponderance of the evidence or clear and convincing evidence standard during Title IX hearings.  Id. at 000250, 000348.  The Department explained that it chose to allow schools to use the clear and convincing burden given the "high stakes and potentially life-altering consequences for both parties" and the "competing, plausible narratives about the truth of allegations" often involved in Title IX hearings.  Id. at 000348.

The Department explained section 106.45(b)(3)(i)'s mandatory dismissal provisions as jurisdictional given the Department's lack of authority to force schools to "investigate and adjudicate misconduct that is not covered under Title IX," id. at 000264, but explained that this "does not preclude action under another provision of the recipient's code of conduct," id. at 000416.  Similarly, the Department detailed its decision to revise section 106.45(b)(3)(ii) to make it discretionary rather than mandatory for a recipient to dismiss a formal complaint after a respondent has graduated from the school, given that the recipient will no longer have any disciplinary authority over the respondent.  Id. at 000264.

The Department explained its decision to adopt section 106.45(b)(5)(iii), allowing both the complainant and respondent to discuss the allegations under investigation, so long as the discussion is neither tortious nor retaliatory.  Id. at 000261, 000269, 000270.  Moreover, the Department addressed the concerns

of commenters that the ability freely to discuss the allegations will harm survivors of sexual assault and chill reporting, explaining that the restraints it put on the ability to speak about the allegations balances the interests of gathering evidence for the hearing and First Amendment rights with the need for restricting harmful and retaliatory speech.  Id. at 000270-72.

The Department detailed its reason for adopting the live hearing procedures, including the cross-examination requirement. First, the Department explained that section 106.45(b)(6)(i) bars the decision maker from drawing any inference of guilt "based on a party's failure to appear at the hearing or answer cross-examination or other questions" because the Department sought to respect the parties' Fifth Amendment rights.  Id. at 000242-43.  The administrative record also clarifies that a postsecondary institution has the discretion to hold a live hearing virtually, and where a party refuses to participate, the school may still proceed with the grievance hearing.  Id. at 000245.  The Department explains that cross-examination at the live hearing is limited to "relevant cross-examination questions."  Id. 000269, 000279.  It explained its balance between cross-examination as a "necessary part of a fair, truth-seeking grievance process" with safeguards to minimize the potential for "traumatic effects on the complainants," id. at

000289-92, 000307-08, and described why it elected to bar reliance on statements of a party who did not submit to cross-examination, id. at 000319.

The Department stresses that it is the school which is "responsible for reaching an accurate determination regarding responsibility while maintaining impartial[ity]," acknowledging that Title IX hearings reach "determinations affecting rights of students and employees under federal Civil Rights law," and that hearings are not meant to become courts of law while still resulting in reliable outcomes. Id. at 000308. The Department explained its decision to allow parties not to attend a hearing but still allow the absent party to employ an advisor to cross-examine the present party. Id. at 000314. With the interest of a "fair grievance process leading to reliable outcomes, which is necessary in order to ensure that recipients appropriately remedy sexual harassment occurring in education programs or activities," id. at 000316, in the forefront of the Department's mind and efforts, it stressed the importance of cross-examination to determine the credibility of evidence.

Comparing a Title IX hearing to courts of law, the Department explained that it did not wish to impose complex rules of evidence on a hearing's lay arbiter. Id. at 000320-24. To avoid adopting "complex" rules of evidence, the Department elected to create its own bright-line rules of evidence, wherein

the impartial arbiter must not consider any "statement" whose

declarant does not submit to cross-examination.  Id. at 000322.

As the Department explains:

> The prohibition on reliance on "statements" applies
> not only to statements made during the hearing, but
> also to any statement of the party or witness who does
> not submit to cross-examination. "Statements" has its
> ordinary meaning, but would not include evidence (such
> as videos) that do not constitute a person's intent to
> make factual assertions, or to the extent that such
> evidence does not contain a person's statements.
> Thus, police reports, SANE reports, medical reports,
> and other documents and records may not be relied on
> to the extent that they contain the statements of a
> party or witness who has not submitted to cross-
> examination.

Id. at 000324.  The administrative record further explains that

"[p]robing the credibility and reliability of statements

asserted by witnesses contained in such evidence," even those

documented by first responders in the course of their duties,

"requires the parties to have the opportunity to cross-examine

the witnesses making the statements."  Id.  The Department,

acknowledging that the parties to a Title IX hearing do not have

subpoena power, reasoned, however, that concerns about essential

witnesses missing the hearing -- therefore barring essential

evidence that falls within the broad definition of statement --

could be assuaged by "thoughtfully working with witnesses

regarding scheduling of a hearing and taking advantage of the

discretion to permit witnesses to testify remotely."  Id. at

000322-23.

For these reasons, the Department explained that it decided under section 106.45(b)(6)(ii) to require hearings at postsecondary institutions but to make them discretionary at elementary and secondary schools because having guardians act on behalf of younger complainants and respondents is more reasonable than requiring their cross-examination.  Id. at 000309-10.

The Department further explained its decision in section 106.6(h) to give the Final Rule preemptive effect on state and local laws, explaining that many of the laws that commenters discussed were not in conflict with the Final Rule because of Title IX's narrow scope.  See id. at 000429.  The administrative record also detailed the Department's reasons for distinguishing First Amendment rights and punishment for material false statements made in bad faith from the Final Rule's prohibition on retaliation in sections 106.71(b)(1) and 106.71(b)(2).  Id. at 000512.[5]

---

[5] This Court acknowledges and expresses its appreciation for the briefs amici curiae from the Lawyers' Committee for Civil Rights Under Law, American Association for Affirmative Action by Equal Opportunity Professionals, American Association of University Women, American Federation of Teachers, AFL-CIO, American Humanist Association, Autistic Self Advocacy Network, Education Law Center-PA, GLSEN, Japanese American Citizens League, Lambda Legal Defense and Education Fund, Inc., League of United Latin American Citizens, National Alliance for Partnerships in Equity, National Association of Councils on Developmental Disabilities, National Center for Parent

## IV.   RULINGS OF LAW

### A.   Article III Standing

The Government argues that the Advocates fail to establish
Article III standing.  Defs.' Pretrial Br. 1-9.  The Advocates
argue that all the plaintiffs have suffered direct injury from

---

Leadership, Advocacy and Community Empowerment, National Center
for Special Education in Charter Schools, National Center for
Transgender Equality, National Council of Jewish Women, National
LGBTQ Task Force, Southeast Asia Resource Action Center,
Feminist Majority Foundation, Clearinghouse on Women's Issues,
AASA, The School Superintendents' Association, The Council of
the Great City Schools, National Association of Secondary School
Principals, Law Professors, American Council on Education,
Accreditation Council for Pharmacy Education, American
Association of Community Colleges, American Association of State
Colleges and Universities, American Association of University
Professors, American Dental Education Association, American
Indian Higher Education Consortium, Association of American
Medical Colleges, Association of American Universities,
Association of Catholic Colleges and Universities, Association
of Governing Boards of Universities and Colleges, Association of
Jesuit Colleges and Universities, Association of Public and
Land-grant Universities, College and University Professional
Association for Human Resources, Council for Advancement and
Support of Education, Council of Independent Colleges, Middle
States Commission on Higher Education, NASP - Student Affairs
Administrators in Higher Education, National Association of
College and University and Business Officers, National
Association of Diversity Officers in High Education, National
Association of Independent Colleges and Universities, National
Collegiate Athletic Association, New England Commission of
Higher Education, University Risk Management and Insurance
Association, WASC Senior College and University Commission,
Survivors of Sexual Violence, Promundo, American Men's Studies
Association, CONNECT, Inc., Jana's Campaign, Inc., Men Stopping
Violence, Men's Story Project, Men and Masculinities Knowledge
Community, North American MenEngage Network, Ten Men - Rhode
Island Coalition Against Domestic Violence, Vera House, Inc.,
California Women's Law Center, Members of Congress, Stop Abusive
and Violent Environments, Families Advocating for Campus
Equality, and State of Texas.

the Final Rule and thus satisfy Article III's requirements.
Pls.' Pretrial Br. 2-6.  For the reasons developed below, this
Court finds and rules that only Mary Doe and Victim Rights have
standing to challenge the Final Rule.

"Article III confines the federal judicial power to the
resolution of 'Cases' and 'Controversies.'  For there to be a
case or controversy under Article III, the plaintiff must have a
'personal stake' in the case -- in other words, standing."
TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021).  "[T]o
establish standing, a plaintiff must show (i) that he suffered
an injury in fact that is concrete, particularized, and actual
or imminent; (ii) that the injury was likely caused by the
defendant; and (iii) that the injury would likely be redressed
by judicial relief."  Id. (citing Lujan v. Defs. of Wildlife,
504 U.S. 555, 560-61 (1992)).  Turning first to whether an
alleged injury is concrete, particularized, and actual or
imminent, the plaintiff must show that "he personally has
suffered some actual or threatened injury . . . ."  Valley Forge
Christian Coll. v. Am. United for Separation of Church & State,
454 U.S. 464, 472 (1982) (quotations omitted).  "Requiring a
plaintiff to demonstrate a concrete and particularized injury
caused by the defendant and redressable by the court ensures
that federal courts decide only the rights of individuals," and
that federal courts exercise "their proper function in a limited

and separated government." TransUnion LLC, 141 S. Ct. at 2203
(citations and quotations omitted). "Concreteness and
particularity are two separate requirements." Lyman v. Baker,
954 F.3d 351, 360 (1st Cir. 2020) (citing Spokeo, Inc. v.
Robins, 136 S. Ct. 1540, 1545 (2016)). An injury is "concrete"
when it "actually exist[s]." Id. (quotations omitted). An
injury is "particularized" when it "affect[s] the plaintiff in a
personal and individual way," Lujan, 504 U.S. at 560 n.1, that
goes beyond widely shared "generalized grievances about the
conduct of government," Lyman, 954 F.3d at 361 (citing Becker v.
Fed. Election Comm'n, 230 F.3d 381, 390 (1st Cir. 2000)). An
imminent injury is one where the threatened harm is "certainly
impending," as opposed to mere "allegations of possible future
injury." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)
(brackets and emphases omitted); Lujan, 504 U.S. at 564 n.2.
Allegations of future harm absent any demonstration that said
future harm is "certainly impending" is too speculative to
satisfy Article III. Clapper, 568 U.S. at 401, 409.

Next, to satisfy Article III standing, the injury must be
traceable to the challenged action of the defendant. Lujan, 504
U.S. at 560. This "traceability" element, essentially a
causation element of Article III standing, "requires the
plaintiff to show a sufficiently direct causal connection
between the challenged action and the identified harm."

<u>Dantzler, Inc.</u> v. <u>Empresas Berríos Inventory & Operations, Inc.</u>,
958 F.3d 38, 47 (1st Cir. 2020) (quoting <u>Katz</u> v. <u>Pershing, LLC</u>,
672 F.3d 64, 71 (1st Cir. 2012)).  Although an indirect causal
relationship is not necessarily fatal, an injury is less likely
to satisfy this requirement where the causal chain between the
defendant's action and the alleged harm depends on the actions
of a third party.  <u>See</u> <u>id.</u> at 48 (citing <u>Allen</u> v. <u>Wright</u>, 468
U.S. 737, 757-59 (1984); <u>Simon</u> v. <u>E. Kentucky Welfare Rights
Org.</u>, 426 U.S. 26, 42-45 (1976)).

Finally, the injury must be redressable by a favorable
ruling.  <u>Lujan</u>, 504 U.S. at 561.  A favorable ruling need not
redress the entire injury, but the plaintiff must demonstrate
that a favorable ruling will at least lessen the injury.  <u>See</u>
<u>Antilles Cement Corp.</u> v. <u>Fortuño</u>, 670 F.3d 310, 318 (1st Cir.
2012).

## 1.   The Individual Plaintiffs

Only one of the three individual plaintiffs demonstrates
standing.  Mary Doe has an ongoing Title IX investigation that
occurred after the Final Rule's effective date.  Decl. Mary Doe,
¶ 27.  Mary's university is applying (or attempting to apply)
the Final Rule, and those provisions not yet employed are
certainly impending because the Final Rule prescribes the
university's conduct.  <u>See</u> 34 C.F.R. § 106.11 ("[T]his part 106
applies to every recipient and to the education program or

activity operated by such recipient which receives Federal
financial assistance.").  The Government's argument that the
effect of the Final Rule remains speculative is meritless.  See
Defs.' Pretrial Br. 2-3.  Mary's injury is her treatment thus
far under the Final Rule's regime.  Moreover, the fact that her
hearing has yet to occur after ten months and many delays does
not render her injuries speculative because the delay is an
injury in and of itself and a product of the Final Rule.

     The Government's alternative arguments that Mary's injury
is neither traceable to the Final Rule nor redressable similarly
fail.  See Defs.' Pretrial Br. 3-4.  This is not an indirect
causation injury.  See Allen, 468 U.S. at 757-59; Simon, 426
U.S. at 42-45.  Mary is challenging whether the Department's
prescribed behavior under the Final Rule ought be applied to her
ongoing Title IX investigation -- not her school's independent
policies and practices.  See Decl. Mary Doe ¶¶ 19-48.  A
favorable ruling that some or all of the challenged regulations
are invalid will, therefore, at least lessen her injury.  See
Antilles Cement Corp., 670 F.3d at 318.

     Nancy Doe and Jane Doe, however, both fail to demonstrate
standing.  Although Nancy Doe has an ongoing Title IX
investigation, the incident under investigation occurred in
2018.  Decl. Nancy Doe ¶¶ 9, 38-39.  The Final Rule states that
"the Department will not enforce these final regulations

retroactively." 85 Fed. Reg. at 30,061; Administrative R. at
000036. Nancy has not demonstrated that her university will
apply the Final Rule to her investigation, Decl. Nancy Doe
¶¶ 42-43, and guidance from the Department explained that the
Final Rule "will not be enforced retroactively, so to the extent
that [documents detailing prior guidance] are helpful to
recipients for appropriately responding to sexual harassment
that allegedly occurred prior to August 14, 2020, they will
remain accessible on the Department's website," U.S. Dep't of
Educ., OCR Letter to Educators and Stakeholders (Aug. 26, 2020)
("August 26 Letter") 2, https://www2.ed.gov/policy/gen/guid/fr-
200826-letter.pdf. Accordingly, Nancy has not suffered a
cognizable injury from the Final Rule and lacks standing.[6] See
Valley Forge Christian Coll., 454 U.S. at 472.

Similarly, Jane Doe has not suffered a cognizable injury.
See id.; Decl. Jane Doe ¶¶ 1-3. Jane's guardian has not

---

[6] This Court does not reach the question whether a school
may apply the Final Rule retroactively. The Advocates argue
that the Final Rule might still be applied because schools are
unlikely or unable to maintain two separate approaches, despite
the language of the Final Rule and the Department's subsequent
guidance. See Pls.' Pretrial Br. 4-6. The Advocates, however,
fail to establish that any school associated with a named
complainant or organization intends to apply the Final Rule to
incidents that occurred prior to August 14, 2020. Therefore,
whether a recipient may apply the Final Rule retroactively and
disregard the Final Rule's language and the Department's August
26 letter is neither ripe nor engendered by the facts before
this Court.

initiated a Title IX investigation.  Decl. Jane Doe ¶¶ 16-18.

Even if Jane's guardian initiated an investigation, the

incidents of assault occurred before the effective date, so the

Final Rule ought not apply, Administrative R. at 000036, and

there is no evidence that Jane's school will apply the Final

Rule.[7]  See id. ¶¶ 2-18.  Accordingly, Jane lacks standing to

challenge the Final Rule.  See Valley Forge Christian Coll., 454

U.S. at 472.

### 2.   No Other Adequate Remedy

The Government alternatively argues that Mary Doe "has an

adequate alternative remedy in the form of a suit against her

school to the extent that she challenges discretionary actions

not required by the [Final] Rule."  Defs.' Pretrial Br. 4.  The

Government's argument, however, misses the mark.

As title 5, section 704 of the U.S. Code provides, "Agency

action made reviewable by statute and final agency action for

---

[7] The Advocates proffered the declaration of Elizabeth
Collins who serves as an Education Consultant, the Civil Rights
Compliance Coordinator, and Methods of Administration and Title
IX Coordinator at the Michigan Department of Education.  Mot.
Prelim. Inj., Ex. O, Decl. Elizabeth Collins ¶ 1, ECF No. 32-15.
Collins expresses doubts about schools' effectiveness in
maintaining two separate approaches for Title IX investigations
before and after the Final Rule's effective date and the
potential for confusion this could cause.  See id. ¶ 22.
Nevertheless, the effectiveness of and potential confusion from
maintaining two approaches does not demonstrate that any school
plans to deviate from the Department's directive and apply the
Final Rule to incidents before the effective date.

which there is no other adequate remedy in a court are subject
to judicial review."  5 U.S.C. § 704.  The Final Rule is a
product of the Department's rulemaking, a final agency action.
See 5 U.S.C. § 551(13); Bennet v. Spear, 520 U.S. 154, 177-78
(1997).  The Government, however, maintains that Mary's injuries
are caused not by the Final Rule, but rather by her school's
incorrect application of the Final Rule to her investigation.
Defs.' Pretrial Br. 2-4.  This is, in part, true.  For example,
Mary's school has incorrectly maintained that she must attend
the hearing and may not sit in a different room from her
assailant during her hearing.  Decl. Mary Doe ¶ 20.  But Mary's
injuries do not arise solely or even predominantly from her
school's misperceptions of the Final Rule.  Mary's injuries
arise chiefly from the Final Rule itself.  As other courts have
held in nearly identical circumstances, "[b]ased on [Mary]'s
alleged injuries and the nature of the relief sought, the
alternative remedy offered by the Department -- suing individual
schools -- offers only 'doubtful and limited relief,' and is
therefore an inadequate remedy under the APA."  SurvJustice Inc.
v. DeVos, Case No. 18-cv-00535-JSC, 2018 WL 4770741 (N.D. Cal.
Oct. 1, 2018), at *6-7 (citing Bowen v. Massachusetts, 487 U.S.
879, 901 (1988) ("[D]oubtful and limited relief . . . is not an
adequate substitute" sufficient to bar review under Section

704)), <u>order amended on reconsideration</u>, Case No. 18-cv-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019).

### 3. The Organizational Plaintiffs

An advocacy organization may demonstrate standing "if its mission has been 'frustrated' by the challenged conduct <u>and</u> it has expended resources to combat it." <u>Equal Means Equal</u> v. <u>Dep't of Educ.</u>, 450 F. Supp. 3d 1, 7 (D. Mass. 2020) (Saris, C.J.) (citing <u>Havens Realty Corp.</u> v. <u>Coleman</u>, 455 U.S. 363 (1982)), <u>appeal dismissed sub nom. Doe</u> v. <u>U.S. Dep't of Educ.</u>, No. 20-1429, 2020 WL 6039917 (1st Cir. June 22, 2020)). "However, the Supreme Court has also held that simply expending resources based on an <u>anticipated</u> harm is not enough to establish standing." <u>See id.</u> (citing <u>Clapper</u>, 568 U.S. at 398). Here, only Victim Rights demonstrates that it has standing to challenge the Final Rule. <u>See id.</u>; Decl. Victim Rights ¶ 9.

To satisfy the first prong, frustration of purpose, the organization must demonstrate an impairment to its mission caused by the Final Rule. <u>See</u> <u>SurvJustice Inc.</u>, 2018 WL 4770741, at *6; <u>Equal Means Equal</u>, 450 F. Supp. 3d at 7; <u>see also</u> <u>Know Your IX</u> v. <u>DeVos</u>, Civil Action No. RDB-20-01224, 2020 WL 6150935, at *5 (D. Md. Oct. 20, 2020) (citing <u>CASA de Md., Inc.</u> v. <u>Trump</u>, 971 F.3d 220, 238-41 (4th Cir. 2020)). The Government correctly argues that diverting resources from daily operations, delaying programing, reallocating staff, updating

educational material, and spending time analyzing the Final Rule to continue serving victims in accordance with their missions do not qualify as frustrating an organization's purpose.  See Defs.' Pretrial Br. 6-9; SurvJustice, 2018 WL 4770741, at *6-7; Equal Means Equal, 450 F. Supp. 3d at 7; Decl. Chicago Alliance ¶¶ 9-19; Decl. Victim Rights ¶¶ 8, 10-31; Decl. Equal Rights ¶¶ 8-26; Decl. Legal Voice ¶¶ 9-20; see also Know Your IX, 2020 WL 6150935, at *5 (quoting CASA de Md., 971 F.3d at 239 ("[R]esource reallocations, although they may be motivated by sincere policy preferences, 'are not cognizable organizational injuries because no action by the defendant has directly impaired the organization's ability to operate and to function.'")).

Victim Rights, however, demonstrates a direct impairment from the Final Rule -- it has experienced unwillingness and hesitancy from student victims to continue their Title IX complaints because of the Final Rule's cross-examination provisions.  See Decl. Victim Rights ¶ 9.  This impairment qualifies as a frustration of purpose because Victim Rights, an organization focused on assisting victims through the Title IX process, has experienced a reduction in requests for its services.  Id. ¶¶ 4-6, 9; compare SurvJustice Inc., 2018 WL 4770741, at *6-7, with Know Your IX, 2020 WL 6150935, at *5, and Equal Means Equal, 450 F. Supp. 3d at 7.  "Such concrete and

demonstrable injury to the organization's activities -- with the consequent drain on the organization's resources -- constitutes far more than simply a setback to the organization's abstract social interests." Havens Realty Corp., 455 U.S. at 379 (citation omitted).  Conversely, Equal Rights Advocates, Legal Voice, and Chicago Alliance fail to demonstrate such an impairment and merely describe their attempts to reallocate resources under the Final Rule.  See SurvJustice, 2018 WL 4770741, at *6-*; Know Your IX, 2020 WL 6150935, at *5; Equal Means Equal, 450 F. Supp. 3d at 7-8 ("Plaintiffs do not allege that there has been an observed decrease in student-filed complaints, nor do they allege that students have expressed unwillingness to file claims because of the [Final Rule].").

Victim Rights also satisfies the second prong -- "a consequent drain on the organization's resources." Havens Realty Corp., 455 U.S. at 379.  Victim Rights demonstrates that it has diverted resources in the form of reassignments, creating new material for clients, and spending more time advising clients.  See Victim Rights Decl. ¶¶ 9-11; see also Havens Realty Corp., 455 U.S. at 379; Equal Means Equal, 450 F. Supp. 3d at 8-9; SurvJustice, 2018 WL 4770741, at *7-8.

Accordingly, Victim Rights is the only Organizational Plaintiff with standing.

**B.    Challenges to the Final Rule**

In count I, the Advocates argue that thirteen provisions of the Final Rule are not in accordance with law because they effectively undermine the purpose of Title IX.[8]  See Second Am. Compl. ¶¶ 267-271.  In count II, the Advocates argue that the same thirteen provisions of the Final Rule are arbitrary or capricious.  See id. ¶¶ 272-276; Pls.' Mem. Supp. Their Mot. Prelim. Inj. or Section 705 Stay ("Pls.' Mem. Supp. Mot. Prelim. Inj.") 8-20, ECF No. 32; Pls.' Pretrial Br. 8-12.  Throughout their briefing, however, the Advocates conflate these distinct standards.  See Pls.' Mem. Supp. Mot. Prelim. Inj. 8-20; Pls.' Reply Supp. Their Mot. Prelim. Inj. or Section 705 Stay 13-20, ECF No. 98.  Whether the Department's actions undermine Title IX necessarily requires interpretation of Title IX, because the Department relies on its interpretation of Title IX to support its actions.  See Holland v. Nat'l Mining Ass'n, 309 F.3d 808, 815 (D.C. Cir. 2002) ("In reviewing an agency's statutory interpretation under the APA's 'not in accordance with law' standard, we adhere to the familiar two-step test of Chevron [USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S.

---

[8] The thirteen challenged provisions are sections 106.30, 106.44(a), 106.45(b)(1)(iv), 106.45(b)(1)(v), 106.45(b)(1)(vii), 106.45(b)(3)(i), 106.45(b)(3)(ii), 106.45(b)(5)(iii), 106.45(b)(6)(i), 106.45(b)(6)(ii), 106.6(h), 106.7(b)(1), and 106.71(b)(2).  Second Am. Compl. ¶ 271.

837 (1984)], provided that the conditions for such review are met.").  Therefore, this Court analyzes count I with count III, under which the Advocates argue that six provisions of the Final Rule exceed the Department's statutory authority.[9]  See Second Am. Compl. ¶¶ 277-283; see also Samma v. U.S. Dep't of Def., 486 F. Supp. 3d 240, 275 n.39 (D.D.C. 2020) (stating that claims under sections 706(2)(A) and 706(2)(C) "are essentially the same").

In count IV, the Advocates argue that five provisions of the Final Rule are not logical outgrowths of the Proposed Rule,[10] Second Am. Compl. ¶¶ 284-288, and in count V, the Advocates argue that the thirteen provisions challenged in counts I and II violate the Equal Protection Clause of the Fifth Amendment because they discriminate against women, id. ¶¶ 289-293.

### 1.   Counts I & III: Not in Accordance with Law and in Violation of Statutory Authority[11]

The Advocates argue that thirteen provisions of the Final Rule are invalid because they are not in accordance with law,

_____

[9] The six challenged provisions are sections 106.30, 106.45(b)(1)(iv), 106.45(b)(3), 106.45(b)(6)(i), 106.71(b)(1), and 106.71(b)(2).  Second Am. Compl. ¶ 283.

[10] The five challenged provisions are 106.30, 106.45(b)(3)(ii), 106.45(b)(6)(i), 106.6(h), and 106.71(b)(1). Second Am. Compl. ¶ 288.

[11] Having ruled below that section 106.45(b)(6)(i) is arbitrary and capricious, see infra Section IV.B.2.b., this

and that six of those thirteen provisions are alternatively
invalid because they exceed the Department's "statutory
jurisdiction, authority, or limitations . . . ."  See Second Am.
Compl. ¶¶ 267-271, 277-283; 5 U.S.C. §§ 706(2)(A), (C).

Section 706(2)(A) of the APA provides that a reviewing
court must "hold unlawful and set aside agency action . . .
found to be . . . arbitrary, capricious, an abuse of discretion,
or otherwise not in accordance with law . . . ."  5 U.S.C. §
706(2)(A).  Section 706(2)(C) of the APA provides that a
reviewing court must "hold unlawful and set aside agency action
. . . found to be . . . in excess of statutory jurisdiction,
authority, or limitations, or short of statutory right."  Id.
§ 706(2)(C).  This is a linguistic distinction without a
practical difference.  As the Supreme Court explained:

> The reality, laid bare, is that there is no
> difference, insofar as the validity of agency action
> is concerned, between an agency's exceeding the scope
> of its authority (its "jurisdiction") and its
> exceeding authorized application of authority that it
> unquestionably has.  "To exceed authorized application
> is to exceed authority.  Virtually any administrative
> action can be characterized as either the one or the
> other, depending on how generally one wishes to
> describe the 'authority.'"

---

Court's decision does not reach whether the Final Rule would be
either in accordance with law or in excess of statutory
authority if the Department were to reinstate section
106.45(b)(6)(i) with the statutorily required reasoning.  If
that should happen, the Advocates are rightfully free to
challenge whether the Department's interpretation of Title IX to
permit such defects satisfies Chevron.

City of Arlington v. F.C.C., 569 U.S. 290, 299, (2013) (quoting

Mississippi Power & Light Co. v. Miss. ex rel. Moore, 487 U.S.

354, 381 (1988) (Scalia, J., concurring)).

    "When an issue 'turns on questions implicating an agency's

construction of the statute which it administers,'" a reviewing

court must "'apply the principles of deference described

in Chevron . . . .'" Massachusetts Dep't of Telecomms. & Cable

v. Fed. Commc'ns Comm'n, 983 F.3d 28, 34 (1st Cir. 2020)

(quoting Garcia v. Sessions, 856 F.3d 27, 35 (1st Cir. 2017)).

Under the Chevron framework, this Court must first "ask whether

'Congress has directly spoken to the precise question at issue.'

If so, courts, as well as the agency, 'must give effect to the

unambiguously expressed intent of Congress.'" Succar v.

Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005) (citation omitted)

(quoting Chevron, 467 U.S. at 842-43). "[I]f the statute is

silent or ambiguous with respect to the specific issue,"

however, this Court must ask "whether the agency's

[interpretation] is based on a permissible construction of the

statute." Chevron, 467 U.S. at 843. An agency's construction

is permissible so long as it is "rational and consistent with

the statute." Sullivan v. Everhart, 494 U.S. 83, 89 (1990)

(quotations omitted). "'[I]f the implementing agency's

construction is reasonable, Chevron requires a federal court to

accept the agency's construction . . . .'" Massachusetts Dep't

of Telecomms. & Cable, 983 F.3d at 34 (quoting Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005)).

> **a.   The Department's Interpretation of the Scope of Title IX is Reasonable and Appropriate.**

Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The Department has the authority administratively to enforce Title IX, so long as the regulations are "consistent with achievement of the objectives of" Title IX. Id.; see Gebser, 524 U.S. at 292 ("Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U.S.C. § 1682, even if those requirements do not purport to represent a definition of discrimination under the statute.").

The Advocates' argument begins with the premise that because sexual harassment is a recognized form of sex discrimination, Title IX requires recipients to ensure that victims are not excluded from participating in education programs or activities because of sexual harassment. See Pls.' Mem. Supp. Mot. Prelim. Inj. 20. The Department does not

dispute this basic premise and acknowledges its obligation to address sexual harassment throughout the record before this Court.  See Final Rule § 106.30(a) (defining sexual harassment).

The Advocates contend, however, that the Department "exceeds Title IX's nondiscrimination mandate by issuing regulations that require schools not to protect students from discrimination and that weaken schools' ability to deter such discrimination."  Pls.' Pretrial Br. 12.  The Advocates maintain that the Department abdicated its duty to enforce Title IX by undermining its charge and leaving victims without redress when it promulgated a rule that narrowed Title IX's scope.  The Department responds that it is empowered to interpret the scope of Title IX, and that such interpretation is afforded substantial deference under Chevron.  See Defs.' Opp'n Pls.' Mot. Prelim. Inj. or Section 705 Stay 21, ECF No. 96.

Under Chevron, this Court first must determine whether Title IX is ambiguous or instead provides clear guidance on the physical and interpersonal scope of Title IX.  Congress has not "directly spoken to the precise question" of Title IX's physical (i.e., where) and interpersonal (i.e., who) scope.  See 20 U.S.C. § 1681; see generally Succar, 394 F.3d at 22 (quoting Chevron, 467 U.S. at 842-43).  The Department interpreted Title IX's language -- "under any education program or activity receiving Federal financial assistance" -- as a limit on Title

IX.  See Final Rule § 106.45(b)(3) ("If the conduct alleged . .
. did not occur in the recipient's education program or activity
. . . then the recipient must dismiss the formal complaint with
regard to that conduct for purposes of sexual harassment under
[T]itle IX . . . ."). Although Congress explained what
qualifies as a "program or activity," it was silent on whether
these enumerated categories were meant to serve as necessary or
sufficient conditions for Title IX to apply.  See 20 U.S.C.
§ 1687 ("Interpretation of 'program or activity'"); 20 U.S.C.
§ 1681.  Therefore, Title IX is "silent or ambiguous with
respect to the specific issue," and this Court's review of the
Department's interpretation is limited to "whether the agency's
[interpretation] is based on a permissible construction of the
statute."  See Chevron, 467 U.S. at 843.  Interpreting the
enumerated categories as a limit to Title IX's jurisdiction is
reasonable and supported by the maxim "expression unius est
exclusion alterius."  See, e.g., In re Smith, 910 F.3d 576, 583
(1st Cir. 2018) ("[T]he expression of one thing is the exclusion
of other things.")  Accordingly, this Court finds this
interpretation of Title IX to be "rational and consistent with
the statute" and affords the Department's interpretation
deference.  See Sullivan, 494 U.S. at 89; Massachusetts Dep't of
Telecomms. & Cable, 983 F.3d at 34 (quoting Brand X Internet
Servs., 545 U.S. at 980 (2005)).

b.   **The Department's Interpretation of Sex Discrimination is Reasonable and Appropriate.**

Similarly, Title IX is silent on what conduct constitutes sex discrimination.  <u>See</u> 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination . . . .").  Therefore, this Court's review of the Department's interpretation of "sex discrimination" to be limited to "sexual harassment" as defined by the Final Rule is restricted to "whether the agency's [interpretation] is based on a permissible construction of the statute."  <u>See</u> <u>Chevron</u>, 467 U.S. at 843.  The Department interpreted Title IX's prohibited sex discrimination to encompass only (1) quid pro quo sexual conduct, (2) "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," and (3) "Sexual assault . . . dating violence . . . domestic violence . . . and stalking," as defined in other provisions of the U.S. Code. Final Rule § 106.30.  As detailed in the administrative record, the Department used the <u>Gebser/Davis</u> framework to formulate components of the Final Rule, including the definition of sexual harassment.  Administrative R. at 000124-31.  The Department reasoned that "the Supreme Court's framework provides the

[38]

appropriate starting point for administrative enforcement of
Title IX, with adaptions of that framework to hold recipients
responsible for more than what the Gebser/Davis framework alone
would require." Id. at 000124. Furthermore, the Department
reasoned that the interests of consistency throughout Title IX
and the differences between complainants and respondents under
Title IX and Title VII warrant the narrower definition of
actionable sexual harassment. Id. at 000124-31. Accordingly,
this Court finds this interpretation of actionable conduct under
Title IX to be "rational and consistent with the statute" and
affords the Department's interpretation deference. See
Sullivan, 494 U.S. at 89; Massachusetts Dep't of Telecomms. &
Cable, 983 F.3d at 34 (quoting Brand X Internet Servs., 545 U.S.
at 980 (2005)).

### 2. Count II: Arbitrary and Capricious

Under section 706(2)(A) of the APA, this Court must "hold
unlawful and set aside agency action, findings, and conclusions
found to be . . . arbitrary, capricious, an abuse of discretion,
or otherwise not in accordance with law . . . ." 5 U.S.C.
§ 706(2)(A). Actions that are arbitrary and capricious fail
because they are procedurally defective. See Union of Concerned
Scientists v. Wheeler, 954 F.3d 11, 19 (1st Cir. 2020) (citing
Massachusetts v. U.S. Nuclear Regul. Comm'n, 708 F.3d 63, 73
(1st Cir. 2013); H.R. Rep. No. 1980, at 276 (1946) (explaining

that in order to prevail under § 706 a complainant "must show

that the action is contrary to law in either substance or

procedure").  As the First Circuit explains:

> A decision is arbitrary and capricious "if the agency
> has relied on factors which Congress has not intended
> it to consider, entirely failed to consider an
> important aspect of the problem, offered an
> explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that
> it could not be ascribed to a difference in view or
> the product of agency expertise."

Craker v. Drug Enf't Admin., 714 F.3d 17, 26 (1st Cir. 2013)

(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43 (1983)).  Such review is "narrow," "highly

deferential," and a court "may not substitute its judgment for

that of the agency, even if it disagrees with the agency's

conclusions." River St. Donuts, LLC v. Napolitano, 558 F.3d

111, 114 (1st Cir. 2009).  The agency's final determination is

afforded a presumption of validity, id., and the burden falls on

the party challenging the regulation to demonstrate that the

regulation fails to comply with the APA.  M/V Cape Ann v. United

States, 199 F.3d 61, 63 (1st Cir. 1999).

Moreover, "[a]gencies are free to change their existing

policies as long as they provide a reasoned explanation for the

change." Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117,

2125 (2016).  This explanation "need not demonstrate to a

court's satisfaction that the reasons for the new policy

are <u>better</u> than the reasons for the old one." <u>F.C.C.</u> v. <u>Fox
Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009). Yet, the
agency must ordinarily "display awareness that it <u>is</u> changing
position" and "show that there are good reasons for the new
policy." <u>Id.</u>; <u>see also</u> <u>National Labor Relations Bd.</u> v. <u>Lily
Transp. Corp.</u>, 853 F.3d 31, 36 (1st Cir. 2017).

There are at least two situations in which an agency must
provide "a more detailed justification" for a change in policy:
(1) when "its new policy rests upon factual findings that
contradict those which underlay its prior policy;" and (2) "when
its prior policy has engendered serious reliance interests that
must be taken into account." <u>Fox Television Stations, Inc.</u>, 556
U.S. at 515. In the latter case, the agency is required to
assess the reliance interests and weigh them against competing
policy concerns. <u>Dep't of Homeland Sec.</u> v. <u>Regents of the Univ.
of Cal.</u>, 140 S. Ct. 1891, 1915 (2020); <u>see also</u> <u>Encino
Motorcars, LLC</u>, 136 S. Ct. at 2127.

Although significant, <u>Chevron</u> deference does not make this
Court a mere "rubber stamp" for administrative actions. <u>See
Fed. Labor Relations Auth.</u> v. <u>Aberdeen Proving Ground, Dep't of
the Army</u>, 485 U.S. 409, 414 (1988). This Court still must
determine whether the agency action "was consonant with [the
agency's] statutory powers, reasoned, . . . supported by
substantial evidence in the record," <u>Associated Fisheries of</u>

Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997), and
limited to the information available to the agency at the time
it took action, see Valley Citizens for a Safe Env't v.
Aldridge, 969 F.2d 1315, 1319 (1st Cir. 1992).  Accordingly, the
agency must "'articulate a satisfactory explanation for its
action including a rational connection between the facts found
and the choice made.'"  Grosso v. Surface Transp. Bd., 804 F.3d
110, 116 (1st Cir. 2015) (quotations omitted) (quoting State
Farm Mut. Auto. Ins. Co., 463 U.S. at 43).

### a.   Most of the Arbitrary and Capricious Challenges Fail.

The Advocates first argue that the Department failed to
consider their reliance interests because the Final Rule
required schools to implement the new procedures quickly and
because the application of the Final Rule to individual
plaintiffs with ongoing investigations changed their rights.
See Pls.' Mem. Supp. Mot. Prelim. Inj. 20.  This argument is
meritless.  First and foremost, none of the plaintiffs are
schools.  See generally Second Am. Compl.  Therefore, how
quickly and when the Department required schools to implement
the Final Rule is not before this Court.  Victim Rights, the
only organization with standing, does not have rights under a
pending investigation, and Mary Doe's incident and investigation
both occurred after the Final Rule took effect on August 14,

2020, Decl. Mary Doe ¶¶ 2-8, 27, so Mary's rights are not
changed by the Final Rule.

The Advocates also argue that the Department ignored
evidence before it that the Final Rule will "re-traumatize
victims, chill reporting, and undermine Title IX's
antidiscrimination mandate."  See Pls.' Mem. Supp. Mot. Prelim.
Inj. 17-18.  Similarly, this argument is unavailing.  The
Advocates cite to the testimony of their expert on preventing
sexual harassment and gender-based violence.  Id. & n.65.  The
Department, however, disagreed with the expert's assessment of
the Final Rule and explained that it had designed safeguards
adequately to balance the potential negative effects of chilling
reports and retraumatization with the goal of establishing a
reliable fact-finding process through which schools could take
appropriate action.[12]  See Administrative R. at 000289-92,
000307-08, 000316.  In light of the record, "the Court is not
convinced that there is relevant evidence in the record to which
the [Department] has shut its eyes."  See Delta Air Lines, Inc.
v. Exp.-Imp. Bank of U.S., 85 F. Supp. 3d 436, 476 (D.D.C. 2015)
(quotations omitted).  The Department's "refusal to adopt the

---

[12] This is not an easy balancing act, as Negar Katirai
vividly details in her article, Retraumatized in Court, 62 Ariz.
L. Rev. 81, 83-111 (2020), adversarial and formalistic processes
focused predominantly on physical harm can create environments
rife with pitfalls for retraumatization and have a chilling
effect on victims bringing their claims.

approach that [the Advocates] prefer, and which no doubt would be more favorable to [the Advocates'] interests, does not, by itself, make the [Department's] actions arbitrary and capricious." See id. at 477.

The Advocates go on to argue that the narrowed definition of sexual harassment, the provisions prohibiting schools from investigating sexual harassment occurring outside an education program or activity and requiring complainants to be enrolled or attempting to attend the school's programs or activities, the grievance procedures, the presumption of innocence, and the heightened notice requirement are all arbitrary and capricious. Pls.' Reply 14-20. Having considered each of the Advocates' arguments, the administrative record, and the admitted declarations, this Court finds and rules that, with the exception of Section 106.45(b)(6)(i), the Agency adequately considered each of the challenged provisions. See River St. Donuts, LLC, 558 F.3d at 114. Most of the Advocates' arguments boil down to policy debates regarding the best way to protect victims, the balance between vindicating victim rights and protecting respondent rights, and what the scope of Title IX ought be. See Pls.' Reply 14-20. Regardless the vigor with which they are argued, substantive policy arguments are insufficient to overcome the presumption of validity.

Arbitrary and capricious review is a procedural review -- a "hard look" at whether the agency weighed a decision's necessary corollaries -- not whether this Court normatively agrees with the corollaries' ascribed weight.  See Fox Television Stations, 556 U.S. at 515; Union of Concerned Scientists, 954 F.3d at 19; River St. Donuts, LLC, 558 F.3d at 114.  This Court cannot and will not substitute its own judgment, or the Advocates' judgment, for that of the Department.  See River St. Donuts, LLC, 558 F.3d at 114; see also Nikol Oydanich, Note, Chief Justice Roberts's Hard Look Review, 89 Fordham L. Rev. 1635, 1647 (2021) ("[A]rbitrary and capricious review under State Farm requires the Court to be unconcerned with the wisdom of [the agency's action].").

As discussed in Section III.B., supra, the Department considered each of the provisions individually and explained why each rule supported the Department's major aim.  The Department further explained why it formulated each of the provisions in the manner it did, why it rejected many proposed alternatives, and why many of the concerns raised by the commenters were inapt.  See supra Section III.B.

> **b.   Section 106.45(b)(6)(i)'s Prohibition on All Statements Not Subject to Cross-Examination is Arbitrary and Capricious.**

Nevertheless, in the Department's review of the Final Rule's individual provisions, it failed to consider the

[45]

consequences of section 106.45(6)(i)'s prohibition on statements not subject to cross-examination in conjunction with the other challenged provisions.  Neither the Government's briefing nor this Court's thorough review of the record indicates that the Department considered or adequately explained why it intended for section 106.45(6)(i) to compound with a respondent's procedural safeguards quickly to render the most vital and ultimate hallmark of the investigation -- the hearing -- a remarkably hollow gesture.

Under a plain reading of the Final Rule's hearing provisions, a respondent may work with the school to schedule the live hearing, and nothing in the Final Rule or administrative record prevents him or her from doing so to further a disruptive agenda -- e.g., at an inopportune time for third-party witnesses.  The respondent may elect not to attend the hearing to avoid the possibility of self-incrimination, and, so long as he or she does not do so in a tortious or retaliatory manner, the respondent may speak freely to his or her peers about the investigation to collect evidence or even to persuade other witnesses not to attend the hearing.  See id. §§ 106.45(b)(6)(i)-(ii), 106.45(b)(5)(iii).  The respondent could then rest easy knowing that the school could not subpoena other witnesses to appear, Administrative R. at 000322-23, despite the school bearing the "responsibil[ity] for reaching an accurate

[46]

determination regarding responsibility while maintaining impartial[ity]," id. at 000308.

When section 106.45(b)(6)(i)'s statement prohibition is applied (as it must be, pursuant to the Final Rule) alongside these exercised rights, the hearing officer is prohibited from hearing any evidence other than the testimony of the complainant, and the hearing officer cannot draw a negative inference from the absence of the respondent, see 106.45(b)(6)(i); Administrative R. at 000242-43 -- no police reports, no medical history, no admissions by the respondent, no statements by anyone who witnessed the incident and either could not attend or was dissuaded from attending by the respondent. See Administrative R. at 000324.  While the complainant must attend the hearing for his or her evidence to be admitted, he or she can be cross-examined and discredited by the absent respondent's attorney, id. at 000314, with little to no hope of evidentiary rehabilitation.  When the foregoing occurs and the school has elected to apply the clear and convincing evidence standard given the "high stakes and potentially life-altering consequences for both parties," id. at 000348; Final Rule § 106.45(b)(1)(vii), this Court is hard pressed to imagine how a complainant reasonably could overcome the presumption of non-responsibility to attain anything beyond the supportive measures

that he or she is offered when they first file the formal
complaint.  See Final Rule §§ 106.30(a)(3), 106.44(a).

This is not some extreme outlier or fanciful scenario.  No
attorney worth her salt, recognizing that -- were her client
simply not to show up for the hearing -- an ironclad bar would
descend, suppressing any inculpatory statements[13] her client
might have made to the police or third parties, would hesitate
so to advise.  See generally Thomas A. Mauet, Trial Techniques
86-87 (4th ed. 1996) (discussing trial tactics when deciding
whether to volunteer weaknesses in one's testimony and case);
James W. Jeans, Trial Advocacy § 2.10 (1975) (discussing
selective interrogation).  It is not this Court's place, given
the breadth and deference of the Chevron doctrine, to strike
down section 106.45(b)(6)(1) merely because it finds this result
manifestly unreasonable.  It is, however, this Court's
responsibility under section 706(2)(A) of the APA to ensure that
the Department considered this necessary and likely consequence
of section 106.45(b)(6)(1) and require the agency to provide a
reasoned explanation why it nevertheless intended this result.
Nothing in the administrative record demonstrates that the
Department was aware of this result, considered its possibility,
or intended this effect.  Moreover, the construction of the

---

[13] Admissions and confessions are "statements" under the
Final Rule.  See Administrative R. at 000324.

Final Rule suggests that the Department failed even implicitly to recognize this result.

The Department goes to great lengths to solidify the hearing as the hallmark of the Title IX process, essential to the goals of fact finding, weighing credibility, and a "fair grievance process leading to reliable outcomes, which is necessary in order to ensure that recipients appropriately remedy sexual harassment occurring in education programs or activities."  Administrative R. at 000316, 000319.  To so carefully balance and craft the respondent's safeguards, the definitions, the burdens, and the policies in the run-up to the hearing, just to have the prohibition and definition of absentee statements render the hearing a hollow exercise further demonstrates that the Department failed, even implicitly, to consider the consequences from the prohibition and definition of statements.[14]

Therefore, in the absence of evidence that the Department adequately considered section 106.45(b)(6)(i)'s prohibition on

---

[14] Even the Government's counsel seemed to be confused by the effects of section 106.45(b)(6)(i)'s definition of "statements" at the trial and contradicted the plain language of the Federal Register by representing that police reports and rape kits could be admitted depending upon the school's interpretation of "statements" and whether that included documents.  See Administrative R. at 000324 (defining "statements").

statements not subject to cross-examination, this Court finds and rules said prohibition arbitrary and capricious.  See Dep't of Homeland Sec., 140 S. Ct. at 1912-13, Fox Television Stations, 556 U.S. at 515; Union of Concerned Scientists, 954 F.3d at 19; River St. Donuts, LLC, 558 F.3d at 114.

### 3.    Count IV: Logical Outgrowth Under Section 706(2)(D)

The Advocates challenge five provisions of the Final Rule "that were not identified, described, or otherwise included in the Proposed Rule, including provisions that impose sweeping exclusionary rules of relevant evidence, invite retaliation against complainants, and purport to preempt state and local laws . . . ."  Pls.' Mem. Supp. Mot. Prelim. Inj. 22.  Section 706(2)(D), however, does not require that an agency's proposed rule be identical to the final promulgation.  See Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174 (2007).

When agencies undertake informal rulemaking, the APA requires them to publish a "[g]eneral notice of proposed rule making" that contains "the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  An agency may deviate from its proposed rule because "[a]gencies are free -- indeed, they are encouraged -- to modify proposed rules as a result of the comments they receive."  Earthworks v. U.S. Dep't of the Interior, 496 F.

Supp. 3d 472, 498-99 (D.D.C. 2020) (quoting Northeast Md. Waste
Disposal Auth. v. E.P.A., 358 F.3d 936, 951 (D.C. Cir. 2004)
(per curiam)).  "Public input is, after all, one of the purposes
of the APA's notice-and-comment scheme."  Id. at 499.
Therefore, courts have interpreted section 706(2)(D)'s
requirements to mean that an agency's final rule must be a
"logical outgrowth" of the proposed rule.  See Long Island Care
at Home, 551 U.S. at 174 (collecting cases).  Thus, "[a]n agency
can make even substantial changes from the proposed version, as
long as the final changes are 'in character with the original
scheme' and 'a logical outgrowth' of the notice and
comment."  Natural Res. Def. Council, Inc. v. U.S. E.P.A., 824
F.2d 1258, 1283 (1st Cir. 1987) (quoting South Terminal Corp. v.
EPA, 504 F.2d 646, 658 (1st Cir. 1974)); BASF Wyandotte Corp. v.
Costle, 598 F.2d 637, 642 (1st Cir. 1979), cert. denied sub
nom., Eli Lilly & Co. v. Costle, 444 U.S. 1096 (1980).  "The
essential inquiry is whether the commenters have had a fair
opportunity to present their views on the contents of the final
plan," and whether, if "given a new opportunity to comment,
commenters would not have their first occasion to offer new and
different criticisms which the Agency might find convincing."
Natural Res. Def. Council, 824 F.2d at 1283-84 (quoting BASF
Wyandotte, 598 F.2d at 642).  "The object, in short, is one of
fair notice," Long Island Care at Home, 551 U.S. at 174, and

"whether . . . the party, _ex ante,_ should have anticipated that such a requirement might be imposed," _Arizona Pub. Serv. Co._ v. _E.P.A._, 211 F.3d 1280, 1299 (D.C. Cir. 2000) (brackets and quotations omitted); _see also_ _American Med. Ass'n_ v. _United States_, 887 F.2d 760, 768 (7th Cir. 1989) ("The crucial issue, then, is whether parties affected by a final rule were put on notice that their interests were at stake; in other words, the relevant inquiry is whether or not potential commentators would have known that an issue in which they were interested was on the table and was to be addressed by a final rule." (brackets, quotations, and footnote omitted)).

### a. The Final Rule Is a Logical Outgrowth.

The five provisions that the Advocates challenge are (1) the definitions found in section 106.30, (2) the discretion under section 106.45(b)(3)(ii) for schools to "dismiss the formal complaint or allegations therein" if "the respondent is no longer enrolled or employed by the recipient," (3) the hearing procedures in section 106.45(b)(6)(i), including the exclusion of statements not subject to cross-examination, (4) the Final Rule's preemptive effect under section 106.6(h), and (5) the exclusion of First Amendment speech from the Final Rule's prohibition on retaliation under 106.71(b). _See_ Pls.' Mem. Supp. Mot. Prelim. Inj. 21-23; Second Am. Compl. ¶¶ 284-293.

First and foremost, the Department was forthright with what it generally intended to regulate.  See Administrative R. 000642.  Unlike cases where the agency enumerates specific items to be regulated and deviates therefrom by regulating different items, see, e.g., Chocolate Mfrs. Ass'n of the U.S. v. Block, 755 F.2d 1098, 1105 (4th Cir. 1985); American Frozen Food Inst. v. Train, 539 F.2d 107, 135 (D.C. Cir. 1976), the challenged provisions fall within the Department's stated, albeit general, intention to regulate "(1) What constitutes sexual harassment for purposes of rising to the level of a civil rights issue under Title IX; (2) What triggers a school's legal obligation to respond to incidents or allegations of sexual harassment; and (3) How a school must respond."  Administrative R. 000642.  Furthermore, by imposing mandatory dismissal requirements and more restrictive definitions, the Proposed Rule clearly narrows the scope of Title IX procedures compared to the Department's prior guidance.  Compare generally 2001 Guidance, and 2011 Letter, and 2014 Q&A, with Proposed Rule.  The Advocates, therefore, were on notice that their interests were "on the table," and to the extent that sections 106.30 and 106.45(b)(3)(ii) further restrict Title IX's application through their definitions and discretionary authority, the Department made these changes only after commenters persuaded it to do so during the notice and comment process.  Administrative R.

000080-166, 000264-266; see Natural Res. Def. Council, 824 F.2d at 1283-84.

The Advocates' argument contesting section 106.45(b)(6)(i) also fails. See id. Here, the Advocates had notice that section 106.45(b)(6)(i)'s hearing procedures were being considered, including the bar on statements not subject to cross-examination. See Proposed Rule § 106.45 (explicitly barring a hearing officer from considering any statements by witnesses not subject to cross-examination under a different proposed provision, 106.45(b)(3)(vii)); Natural Res. Def. Council, 824 F.2d at 1283-84. Regarding section 106.6(h), some commenters requested that the Department clarify whether the Final Rule preempts state law, while other commenters raised concerns regarding conflicting state laws. Administrative R. 000429-434. Moreover, past executive orders have encouraged agencies to specify "in clear language the preemptive effect" of their regulations. See, e.g., Exec. Order No. 12,988, 61 Fed. Reg. 4,731 (Feb. 5, 1996). The Advocates should have foreseen that the Department would likely clarify the Final Rule's preemptive effect, and the Department's decision to do so is a logical outgrowth of the notice and comment process. See Natural Res. Def. Council, 824 F.2d at 1283-84.

Finally, the Advocates challenge section 106.71(b) but fail to articulate what about section 106.71(b) is not a logical

outgrowth of the notice and comment process.  See Pls.' Mem.
Supp. Mot. Prelim. Inj. 21-22.  The Proposed Rule neither
mentions retaliation nor includes anything similar to section
106.71(b), which prohibits retaliation but not speech protected
by the First Amendment.  Compare Proposed Rule with Final Rule
§ 106.71(b).  After receiving comments that urged the Department
to adopt a prohibition on retaliation, the Department did so,
despite noting that retaliation has already been found to
violate Title IX by the Supreme Court.  Administrative R.
000511, 000520 ("The Department appreciates the commenters'
concerns and suggestions regarding retaliation.  Retaliation
against a person for exercising any right or privilege secured
by Title IX or its implementing regulations is never acceptable,
and the Supreme Court has held that retaliation for complaining
about sex discrimination is, itself, intentional sex
discrimination prohibited by Title IX."); id. 000511 n.1896
("Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 183 (2005)
(holding that "retaliation against individuals because they
complain of sex discrimination is intentional conduct that
violates the clear terms of the statute, and that Title IX
itself therefore supplied sufficient notice that retaliation is
itself sex discrimination prohibited by Title IX" (citation and
quotations omitted))).  To contend that the Advocates had
insufficient notice regarding a provision that substantially

restates an already binding prohibition and for which many commenters explicitly asked illogically puts form over the function of section 706(2)(D)'s notice requirement.  <u>See</u> <u>Jackson</u>, 544 U.S. at 183; Administrative R. 000520, 000511 & n.1896.

Accordingly, the Court finds and rules that sections 106.30, 106.45(b)(3)(ii), 106.45(b)(6)(i), 106.6(h), 106.71(b) are logical outgrowths of the notice and comment process.  <u>See</u> <u>Natural Res. Def. Council</u>, 824 F.2d at 1283-84.

### 4.   Count V: Discrimination on the Basis of Sex in Violation of the Fifth Amendment

Equal protection under the Fifth Amendment, as in the Fourteenth Amendment context, "contemplates that similarly situated persons are to receive substantially similar treatment from their government."  <u>Tapalian</u> v. <u>Tusino</u>, 377 F.3d 1, 5 (1st Cir. 2004); <u>see</u> <u>Buckley</u> v. <u>Valeo</u>, 424 U.S. 1, 93 (1976) (per curiam) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").  To overcome the "threshold requirement" for an equal protection claim, plaintiffs must adduce evidence of disparate treatment showing that the plaintiffs were "treated differently than others similarly situated."  <u>Ayala-Sepúlveda</u> v. <u>Mun. of San Germán</u>, 671 F.3d 24, 32 (1st Cir. 2012).  That is, plaintiffs must "identify and relate <u>specific instances</u> where

persons <u>situated similarly in all relevant aspects</u> were treated differently, instances which have the capacity to demonstrate that plaintiffs were singled out for unlawful oppression." <u>Buchanan</u> v. <u>Maine</u>, 469 F.3d 158, 178 (1st Cir. 2006) (brackets, alterations, and quotations omitted). Plaintiffs must also show that the defendant acted with discriminatory intent. <u>Lipsett</u> v. <u>Univ. of P.R.</u>, 864 F.2d 881, 896 (1st Cir. 1988) (citing <u>Washington</u> v. <u>Davis</u>, 426 U.S. 229, 239-42 (1976)).

If a plaintiff demonstrates these requisites, the Court must apply a heightened form of scrutiny that requires it to deem the law unconstitutional where the government fails to provide an "exceedingly persuasive justification" that the discrimination "'serve[s] important governmental objectives' and is . . . 'substantially related to achievement of those objectives.'" <u>Lipsett</u>, 864 F.2d at 896 (quoting <u>Davis</u> v. <u>Passman</u>, 442 U.S. 228, 234-35 (1979)); <u>Cohen</u> v. <u>Brown Univ.</u>, 101 F.3d 155, 190-91 (1st Cir. 1996) (quoting <u>United States</u> v. <u>Virginia</u>, 518 U.S. 515, 529 (1996)).

> **a.   The Advocates Fail to Demonstrate Unequal Treatment.**

The Advocates argue that thirteen provisions of the Final Rule violate the Equal Protection Clause because they "treat[] allegations of sexual harassment differently, and less favorably, than allegations of harassment based on race, color,

national origin, and disability, based on the discriminatory and baseless gender stereotype that women and girls lack credibility when reporting sexual harassment." Pls.' Pretrial Br. 12-14.

The Advocates' argument does not proceed in the ordinary course. See Pls.' Pretrial Br. 12-14. If the Final Rule were to treat female complainants or respondents differently from male complainants or respondents, then the victim of such disparate treatment on the basis of sex may have an Equal Protection claim. See generally, e.g., Davis, 442 U.S. at 228; Virginia, 518 U.S. at 515; Reed v. Reed, 404 U.S. 71 (1971); Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (citation and footnote omitted)). The Final Rule, however, does not speak in terms of gender, sex, or proxies therefor. It is equally applicable to incidents between the same sex, and the record is devoid of any evidence that female complainants or respondents are treated differently from male complainants or respondents. See Final Rule §§ 106.30, 106.44(a), 106.45(b)(1)(iv), 106.45(b)(1)(v), 106.45(b)(1)(vii), 106.45(b)(3)(i), 106.45(b)(3)(ii), 106.45(b)(5)(iii),

106.45(b)(6)(i), 106.45(b)(6)(ii), 106.6(h), 106.7(b)(1),
106.71(b)(2).

Failing to meet their initial burden, the Advocates attempt
to conjure it up not by "identify[ing] and relat[ing] specific
instances where persons situated similarly in all relevant
aspects were treated differently," see Buchanan, 469 F.3d at
178, but by identifying instances of "similarly situated"
different types of discrimination in suffering individuals, see
Pls.' Pretrial Br. 12-14.  The Advocates go on to argue that
because the Final Rule's treatment of sexual harassment, a form
of sex discrimination, is stricter and less deferential than
other regulations promulgated by different agencies pertaining
to different forms of discrimination, that women suffer a
disparate impact from the Final Rule.  See Pls.' Mem. Supp. Mot.
Prelim. Inj. 23-25.  This argument suffers several shortfalls,
the most prominent of which is the dearth of caselaw in support.
The Fifth Amendment protects against unequal treatment among
classes of individuals, not among classes of discrimination.
See generally Tapalian, 377 F.3d at 5; Buchanan, 469 F.3d at
178.  In lieu of caselaw in support, the Advocates rely on the
bold assertion that the Final Rule is "based on the
discriminatory and baseless gender stereotype that women and
girls lack credibility when reporting sexual harassment."  Pls.'
Pretrial Br. 13.  Such "archaic and overbroad generalizations"

[59]

about women certainly would qualify as sex discrimination if
they were present here.  See Cohen, 101 F.3d at 179 ("[T]he
Supreme Court has repeatedly condemned gender-based
discrimination based upon 'archaic and overbroad
generalizations' about women."). The Advocates, however, fail to
cite even a single sentence in the nearly 300,000-page record
that supports this accusation, see generally Pls.' Pretrial Br.;
Pls.' Mem. Supp. Mot. Prelim. Inj., and instead rely on the
tangentially related statements of the Advocates' expert on
preventing sexual harassment and gender-based violence,[15] see
Pls.' Mem. Supp. Mot. Prelim. Inj. 14 n.89.

---

[15] The cited portion of the expert's declaration reads as
follows:

> The mistaken disbelief of victim testimony and resulting
> fact-finding inaccuracy that traumatic reactions triggered
> by live hearings can cause also feed into stereotypes that
> sexual harassment victims lie about being harassed.  My and
> others' research (most notably research by the President of
> Brooklyn College, Michelle Anderson) has documented how
> ancient legal rules that treated the allegations of
> criminal rape victims with special suspicion have been
> retained in modern culture as gender stereotypes.  That is,
> although these doctrines have been reformed out of the
> black letter law, they continue to affect the enforcement
> of criminal and other laws dealing with sexual harassment
> and/or violence through stereotypes regarding victims' lack
> of credibility.  Under these old doctrines, women who
> reported being raped were viewed as not credible if they
> were "unchaste," married to their assailant, or could not
> provide corroborating evidence of being raped.
> Accordingly, juries were given "cautionary instructions"
> advising them to regard the truthfulness of these women's
> testimony with particular skepticism and suspicion.

Given the legal deficiencies in the Advocates' arguments, their failure to demonstrate a discriminatory purpose in adopting the Final Rule, and their failure to demonstrate that the Final Rule treats women different from men, the Court finds and rules that the Final Rule does not violate the Equal Protection Clause of the Fifth Amendment.  See Ayala-Sepúlveda, 671 F.3d at 32; Buchanan, 469 F.3d at 178; Lipsett, 864 F.2d at 896.

V.   **CONCLUSION**

For these reasons, the Court finds and rules and, thus declares, that with the exception of section 106.45(b)(6)(i)'s prohibition on all statements not subject to cross-examination, the Final Rule does not violate the APA or the Fifth Amendment. The prohibition in section 106.45(b)(6)(i) is REMANDED to the agency for further consideration and explanation for the reasons articulated in Section IV.B.2.b.


**SO ORDERED.**


                                          /s/ William G. Young
                                           WILLIAM G. YOUNG
                                             JUDGE
                                             of the

--------------------

Pls.' Mem. Supp. Mot. Prelim. Inj., Ex. N, Decl. Nancy Chi Cantalupo ¶ 30, ECF No. 32-14 (footnote omitted).

UNITED STATES[16]

_____

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-
1865), would sign official documents.  Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 43 years.