## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

VICTIM RIGHTS LAW CENTER, et al.,

*Plaintiffs*,

v.

MIGUEL ANGEL CARDONA, in his official
capacity as Secretary of Education, et al.,

*Defendants*,

and

STATE OF TEXAS,

*[Proposed] Intervenor-Defendant.*

Case No. 1:20-cv-11104

## MEMORANDUM IN SUPPORT OF MOTION TO INTEREVENE
## FOR PURPOSES OF APPEAL

On July 28, 2021, this Court issued an order of judgment, upholding the vast majority of the Final Rule[1] that is subject to this action, but vacating and remanding to the Department of Education ("the Department") Section 106.45(b)(6)(i), which prohibited statements not subject to cross-examination. Following the issuance and later clarification of this order, the State of Texas ("Texas") contacted counsel at the Department of Justice by email to inquire whether the federal government intended to file an appeal. DOJ replied that the federal government does not plan to appeal this Court's decision. In light of this refusal, there are no parties in this case willing to defend the Final Rule in its entirety, including Section 106.45(b)(6)(i). Texas therefore respectfully moves to intervene for purposes of appeal so that it might protect its interests in the Final Rule and the stricken provision in particular.

---

[1] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

## BACKGROUND

Almost everyone agrees that academic institutions should take a hard stance against sexual harassment in education.[2] That commitment, however, should not come at the expense of students' right to a fair hearing. Prior to May 2020, the Department of Education had never issued binding regulations governing how recipients of federal funds should address sexual harassment under Title IX. The Department instead relied on a series of guidance documents that not only imposed duties on recipients that exceeded the text of Title IX, but often raised more questions than they answered, creating much confusion.[3] In addition, the guidance documents bullied recipients into a false choice: either combat sexual harassment or protect the right of accused students to a fair hearing. Regardless of which option recipients picked, the decision left recipients open to a high risk of litigation and liability.[4]

All that changed when the Department, under the Trump Administration, issued the Final Rule that is the subject of this action. The Final Rule, for the first time, clearly demarcated the outer boundaries of recipients' obligations under Title IX with respect to sexual harassment. It clarified the standard under which recipients may be found noncompliant with the statute. And, more relevant here, it rejected the misapprehension created by the Department's earlier guidance that Title IX requires recipients to restrict students' right to a fair hearing to avoid a finding of

---

[2] Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and sexual assault.

[3] The Task Force on Federal Regulation of Higher Education specifically identified the 2011 Dear Colleague Letter and 2014 Question and Answers as guidance documents that were meant to eliminate uncertainty but only led to more confusion. *See Recalibrating Regulation of Colleges and Universities* at 14 (Feb. 12, 2015), *available at* https://www.acenet.edu/Documents/Higher-Education-Regulations-Task-Force-Report.pdf.

[4] *See* Greta Anderson, *More Title IX Lawsuits by Accusers and Accused*, INSIDER HIGHER ED (Oct. 3, 2019), https://www.insidehighered.com/news/2019/10/03/students-look-federal-courts-challenge-title-ix-proceedings (describing "addressing sexual misconduct" as a "lose-lose situation for universities").

noncompliance. The Final Rule set forth a procedural due process standard, required of all recipients, that balances the interests at stake. This standard includes but is not limited to Section 106.45(b)(6)(i), which prohibited recipients from relying on statements not subject to cross-examination.

Plaintiffs dislike the reforms promulgated by the Final Rule and so initiated suit against the Department on June 10, 2020, contending that the Final Rule was in violation of both the Administrative Procedure Act (APA) as well as the Fifth Amendment. ECF 1. Shortly thereafter, Plaintiffs filed a motion for a nationwide preliminary injunction or, in the alternative, a stay of the Final Rule's August 14, 2020, effective date. ECF 31. In response, this Court ordered an expedited briefing schedule, ECF 33, and after securing the parties' agreement, consolidated the preliminary injunction hearing with a full bench trial on the merits since it did not anticipate that additional evidence would be needed or advanced at trial. ECF 130; *see also* ECF 136 at 11. The consolidated trial was conducted on November 18, 2020. ECF 146.

When the parties briefed and tried this case, the Department was under the direction of the Trump Administration and had genuine stake in defending the rule that it proposed and published. On January 20, 2021, however, the Department came under the direction of a new presidential administration committed to reviving the failed policies of old. President Joe Biden repeatedly (and erroneously) characterized the Final Rule as "a green light to ignore sexual violence."[5] He promised to put the Final Rule "quick end," and he ordered the Department to start the process for the Final Rule's repeal immediately after ascending to the Presidency. For this reason, Texas first moved to intervene on April 30, 2021. It argued that the actions of President Biden and his

---

[5] *The Biden Agenda for Women*, JoeBiden.com, https://joebiden.com/womens-agenda/ (last visited Sept. 22, 2021),

Administration constituted an affirmative showing that the Department may not adequately represent Texas' interests. This Court disagreed and denied Texas' motion on May 12, 2021. Texas then filed a notice of interlocutory appeal. That appeal remains pending before the First Circuit.

Following this Court's denial of Texas' motion, the Court entered its Findings of Fact, Rulings of Law, and Order for Judgment on July 28, 2021. ECF 183. The order upheld the majority of the Final Rule. The Court, however, concluded that Section 106.45(b)(6)(i), a key provision governing the evidentiary standards for Title IX hearings, was the product of arbitrary and capricious decision-making. *Id.* at 49–50. The parties then filed a Motion to Clarify whether this Court's order vacated the provision. ECF 185. The Court informed the Parties that it did, ECF 186 at 2, and the Department sent a letter to stakeholders announcing that it would immediately cease enforcement of Section 106.45(b)(6)(i), pursuant to the Court's order.[6]

It is at this point that Texas contacted the Department of Justice by email to inquire whether the federal government intended to appeal the Court's order since it found Section 106.45(b)(6)(i) in violation of the APA. *See* Ex. 1. Initially, DOJ responded that it was in the process of evaluating its litigation options and needed more time to make a final decision. *See* Ex. 2. Texas then asked that as a courtesy, DOJ notify Texas when the federal government determined its course of action. *See* Ex. 3. DOJ did so on September 16, 2021, stating "we don't plan to appeal the July 28 decision in the above-captioned case." Ex. 4. As a consequence of this decision, none of the Parties to this action will continue to defend the Final Rule in its entirety, and Section 106.45(b)(6)(i) in particular. Unless a third-party intervenes, the adverse judgment will remain in effect and deny

---

[6] DOJ informed the D.C. District Court in a joint status report concerning another case challenging the Final Rule that "the Department sent a letter to stakeholders announcing that the Department would immediately cease enforcement of the vacated portion of the rule." Joint Status Report, *Commonwealth of Pennsylvania v. Devos*, 1:20-cv-01468-CJN (D.D.C. Sept. 7, 2021).

Texas of the benefits it and its students derived from the cross-examination requirement. With this in mind, Texas files this motion to intervene for the purposes of appeal.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide two mechanisms for third-party intervention in a lawsuit: intervention of right under Rule 24(a) and permissive intervention under Rule 24(b). For intervention of right to apply, the movant must demonstrate that: (1) the motion is timely; (2) the movant has a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) the movant's interest is not adequately represented by the existing parties. *See R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009). "[I]n light of 'the great variety of factual circumstances in which intervention motions must be decided,'" courts generally have adopted a "flexible reading" of Rule 24(a). *Int'l Paper Co. v. Inhabitants of Town of Jay, Me.*, 887 F.2d 338, 344 (1st Cir. 1989) (quoting *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984)). Accordingly, "intervention of right must be measured by a practical rather than technical yardstick." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996). And courts should "apply [Rule 24(a)] with thoughtful consideration of the objectives it is intended to serve." *Hooker Chems.*, 749 F.2d at 983.

To qualify for permissive intervention, the movant must file: (1) a timely motion that (2) does not "unduly delay or prejudice" the parties and (3) raises "a claim or defense that shares with the main action a question of law or fact in common." FED. R. CIV. P. 24(B). In addition, "permissive intervention ordinarily must be supported by independent jurisdictional grounds." *The Travelers Indem. Co. v. Bastianelli*, 250 F.R.D. 82, 85 (D. Mass. 2008). As its name would suggest, permissive intervention is an inherently discretionary enterprise provided that the movant meets the abovementioned requirements. *Students for Fair Admissions, Inc. v. President & Fellows of*

*Harvard Coll.*, 308 F.R.D. 39, 45 (D. Mass. 2015), *aff'd*, 807 F.3d 472 (1st Cir. 2015). The rationale for granting intervention can have "particular force where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through . . . the framing of issues." *Daggett v. Comm'n on Gov't Ethics*, 172 F.3d 104, 116–17 (1st Cir. 1999) (Lynch, J., concurring).

Texas meets the requirements for both intervention as of right and permissive intervention. Now that the Department has determined that it will not appeal this Court's adverse ruling, Texas' motion to intervene for purposes of appeal is different in substance than that which it filed earlier in this proceeding. Appellate courts across the country have held that it is appropriate for a would-be intervenor to bring a second motion to intervene for the former purpose, even if a motion for the latter purpose was denied and on appeal. *See, e.g.*, *Brackeen v. Haaland*, 994 F.3d 249, 290 n.10 (5th Cir. 2021) (en banc) (plurality op.); *Ohio St. Conf. of the NAACP v. Husted*, 588 F. App'x 488, 489 (6th Cir. 2014); *United States v. Washington*, 86 F.3d 1499, 1505–06 (9th Cir. 1996). *See generally Edwards v. City of Houston*, 78 F.3d 983, 989 (5th Cir. 1996) (en banc).

**ARGUMENTS**

## I.      Texas is entitled to intervene as of right

Texas satisfies the four-part test stipulated in Rule 24(a)(2). This Court should therefore grant Texas motion to intervene for purposes of appeal.

### A.      Texas' motion is timely.

The measure of timeliness in a post-judgment intervention is "whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment." *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 396 (1977). An intervenor acts promptly, as a rule, if the motion is filed within the time period the parties may take an appeal, *id.* —in this instance, 60 days. FED.

R. APP. P. 4(a)(1)(B). This Court entered its judgment on July 28, 2021. *See* ECF 183. Because the last day of the 60-day period falls on a Sunday, the time to appeal lapses on September 27, 2021. FED. R. APP. P. 26(a)(1)(C). Texas submitted its motion on September 24, 2021. Its motion is therefore timely.

In addition, this is not an occasion where the proposed intervenor had notice that its interests were at risk, but nonetheless sat on its rights to the detriment of the existing parties. *See, e.g., Harvey v. Veneman*, 222 F.R.D. 213, 215 (D. Me. 2004). Texas sent a written inquiry to DOJ on August 16, 2021—well before the appeals period expired—asking whether it intended to appeal the order of judgement. *See* Ex. 1. DOJ answered Texas' inquiry on September 16, 2021, and Texas filed this motion one week later. *See* Ex. 4 Texas, in fact, initially sought intervention back in April, when the Biden Administration first indicated that it opposed the regulations, but its motion was denied. Texas, in short, did not delay filing its motion. It exercised all due diligence and acted as soon as it had reason to suspect that its significant protectable interests were at risk. *See Banco Popular de P.R. v. Greenblatt*, 964 F.2d 1227, 1231 (1st Cir. 1992) (judging timeliness from when applicant knew that its interests were imperiled); *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 786 (1st Cir. 1988) (deeming motion timely because intervenors acted soon after learning its interests would not be adequately represented).

Because Texas acted promptly, none of the existing parties will be prejudiced by Texas' addition to the case. Courts "do not require timeliness for its own sake." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). The requirement instead "derives meaning from assessment of prejudice in the context of the particular litigation," *P.R. Tel. Co. v. Sistema de Retiro de los Empleados del Gobierno y la Judicatura*, 637 F.3d 10, 15 (1st Cir. 2011), and is intended "to prevent last minute disruption of painstaking work by the parties and the court." *Culbreath v.*

*Dukakis*, 630 F.2d 15, 22 (1st Cir. 1980). In the present action, the Federal Rules for Appellate Procedure give the parties until September 27, 2021, to appeal this Court's ruling. Until then, Plaintiffs "can hardly contend that its ability to litigate the issue was unfairly prejudiced simply because an appeal . . . was brought by [Texas], rather than by one of the original named [Defendants]." *United Airlines*, 432 U.S. at 394. Texas is merely stepping in for the federal government. It is not changing or disrupting the rights of the existing parties.

   **B.     As a provider of public education, Texas has a concrete, protectable interest in defending the Final Rule.**

   Texas is a common provider of education, directly affected by the Final Rule and this Court's order vacating Section 106.45(b)(6)(i). The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. Pursuant to this charge, Texas funds, regulates, and oversees the second largest system of K–12 public education in the nation, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2019-20* at 1 (Aug. 12, 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf. In addition, Texas funds, supports, and administers a robust network of 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools.[7] *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://reportcenter.highered.texas.gov/agency-publication/almanac/2020-texas-public-higher-education-almanac/. All told, the State's entire network of higher

---

[7] To offer a sense of scale, most states have just one or two public university systems. Texas has six. The largest—the University of Texas—has 14 separate locations that educate approximately 240,000 students each year. *See About The University of Texas System*, The University of Texas System, https://www.utsystem.edu/about (last visited Sept. 21, 2021).

education enrolled just shy of 1.7 million students in 2019. *See* Tex. Higher. Educ. Coordinating Bd., at 13.

Because Texas receives federal funding from the Department for K–12 education,[8] Texas' public primary and secondary education systems are subject to Title IX and the regulations effectuating Title IX, such as the Final Rule. Likewise, each of the institutions in Texas' systems of higher education receives federal funding and is subject to the Final Rule. Under Texas law, public institutions of higher education constitute "arms" and "instrumentalities" of the State. *Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 257 (5th Cir. 2020). Texas therefore has an obligation, through its colleges and universities, to investigate and enforce alleged violations of Title IX. Should Texas, or any of Texas' affiliated academic institutions, deviate from the Department's guidance, that departure would invite either an enforcement action at the risk of significant monetary penalties, up to and including the loss of federal funds. Texas is intensely interested in the Final Rule as a result. Indeed, its interests are the "mirror-image" of Plaintiff's interests. While Plaintiff alleges that it "[is] being injured by the [Final Rule]," Texas "w[ould] be injured by [the Final Rule's] invalidation." *Builders Ass'n of Greater Chi. v. City of Chicago*, 170 F.R.D. 435, 440 (N.D. Ill. 1996).

*First*, the Final Rule clarified the definition of sexual harassment as well as the conditions that must be met before a recipient's obligations under Title IX are activated. Invalidating the Final Rule would create uncertainty, harming the Texas institutions regulated under Title IX. Earlier guidance had caused a great deal of uncertainty regarding recipients' legal responsibilities under

---

[8] *See* Tex. Educ. Agency, 2020 *Comprehensive Biennial Report on Texas Public Schools* at 297 (Dec. 4, 2020) (reporting that Texas received $5.3 billion dollars for K-12 education, which represented 16.4 percent of the total funds Texas spent in FY 2020), https://tea.texas.gov/sites/default/files/comp_annual_biennial_2020.pdf (last visited Sept. 21, 2021).

Title IX. *See supra* at 2. Recipients did not know how to comply with the new mandates or whether failure to do so would incur legal consequences. *See* Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, 33 Yale L. & Pol'y Rev. 387, 394–95 (2015).  In an abundance of caution, many academic institutions, including those funded by Texas, elected to revise their policies to cover a greater range of conduct and make it easier for administrators to arrive at a determination of guilt. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter). But that led to litigation. Hundreds of lawsuits have been filed since the Dear Colleague Letter was issued—a sizeable number of which academic institutions lost or settled.[9]

*Second*, the Final Rule reduced Texas' risk of liability.  While previous guidance had supported an improperly broad view of Title IX liability, the Final Rule confined Title IX liability to proper the limits set by statute. Plaintiffs' Second Amended Complaint in fact objects to the Final Rule precisely because the regulations "narrowed" the definition of "sexual harassment" and "program or activity," which relieved recipients of certain responsibilities. ECF 138-1 ¶¶ 90–95. The changes to Texas' liability did not stop there. The Final Rule clarified the standard under which recipients may be found liable—namely, recipients must be deliberately indifferent to the alleged harassment. § 106.44. And, most relevant here, the Final Rule rejected the misapprehension created by the Department's earlier guidance that Title IX requires recipients to restrict students' constitutional rights to avoid a finding of noncompliance. *Id.*

Earlier guidance, issued by the Department, had put recipients like Texas between a rock and a hard place: academic institutions were advised to treat Title IX compliance as a zero-sum

---

[9] *See* Jonathan Taylor, Milestone: 700+ Title IX/Due Process Lawsuits by Accused Students, Title IX for All (May 11, 2021), https://titleixforall.com/milestone-700-title-ix-due-process-lawsuits-by-accused-students/

calculation, where the rights and interests of some students were sacrificed for the sake of others.[10] Not following the guidance would risk a federal or private enforcement action, also imperiling federal funds, but following the guidance would lead to civil rights lawsuits, litigation expenses, and ultimately monetary settlements. The Final Rule resolved this dilemma by not only reaffirming the primacy of the U.S. Constitution, but also by stipulating standards for recipients to adopt that protect the rights and interests of all parties to a disciplinary proceeding. The provision that this Court vacated, Section 106.45(b)(6)(i), which prohibited recipients from relying on statements not subject to cross-examination, was among the safeguards added to clarify existing standards.

As Texas explained in the amicus brief it submitted in this case, following the release of the 2011 Dear Colleague Letter, many academic institutions eschewed basic procedural protections. ECF 176 at 12; *see also* Spotlight on Due Process 2019–2020, FIRE, https://www.thefire.org/resources/spotlight/due-process-reports/due-process-report-2019-2020/. The omission led to a wide number of problems, not the least of which is that some form of cross-examination can be important to achieving a fair hearing under circumstances where fault depends on the credibility of competing witnesses. 85 Fed. Reg. 30321 n.1226. It allows the decisionmakers to assess such factors as "specific details, inherent plausibility, internal consistency, [and] corroborative evidence . . . in a way that no other procedural device does." 85 Fed. Reg. 30321. Some courts have found Title IX adjudications legally deficient, at least in part, because recipient institutions denied the accused the opportunity to test the credibility of witnesses in some manner.

---

[10] *See*, *e.g.*, Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011) (conditioning student's right to due process on it not "restrict[ing] or unnecessarily delay[ing] the Title IX protections for the complainant"), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

*See, e.g. Univ. of Scis.*, 961 F.3d at 215; *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018); *see also Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 604–05 (D. Mass. 2016).

With Section 106.45(b)(6)(i) in place, academic institutions knew what was expected of them: to both stand against sexual harassment *and* ensure that accused students received a fair opportunity to demonstrate that no such harassment occurred. Absent the provision, academic institutions may again face pressure to deny accused students an opportunity to test the credibility of their accusers, even in the proverbial he-said/she-said situation. This will not only have serious consequences for accused students for whom a finding of responsibility exacts a high toll— particularly where the accusation might also meet the elements of a crime. *See* ECF 176 at 12–13, It will also recreate the conditions that led to Texas, and academic institutions based in Texas, being overexposed to litigation and liability. In that way, the vacatur will have a significant financial cost on Texas and academic institutions based in Texas. The State has an acute interest in seeing it reversed on appeal.

## C.  The disposition of this action will substantially impair or impede Texas' interests.

Texas "would be substantially affected in a practical sense by the determination made" in this action; it therefore should, as a general rule, be entitled to intervene. *Langone v. Flint Ink N. Am. Corp.*, 231 F.R.D. 114, 119 (D. Mass. 2005) (quoting FED. R. CIV. P. 24, Advisory Committee Notes to the 1966 Amendment). As explained above, the Final Rule provides important benefits to Texas, its schools, and its citizens, in that the Final Rule limits the scope of potential Title IX liability and also provides clarity that helps schools follow the law. The same is true of Section 106.45(b)(6)(i), which ensures Texas academic institutions satisfy both constitutional and statutory minimums in designing their disciplinary proceedings. But Plaintiffs ask this Court to deprive Texas of those benefits by vacating and setting aside the Final Rule. *See* ECF 13 at 108. And the

federal government would assist them by failing to appeal this Court's order for judgement, which found Section 106.45(b)(6)(i) in violation of the APA.

Those practical consequences are more than sufficient to show impairment of Texas' interests. *See Cabot LNG Corp. v. P.R. Elec. Power Auth.*, 162 F.R.D. 427, 430 (D.P.R. 1995) (noting that the potential stare decisis effect from injunctive relief may disadvantage movant). When a movant benefits from a regulation, invalidation of that regulation would necessarily impair the movant's interests. *See, e.g.*, *See Daggett*, 172 F.3d at 110; *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011); *N. Y. Pub. Interest Research Group, Inc. v. Regents of Univ. of State of N. Y.*, 516 F.2d 350, 352 (2d Cir. 1975); *see also Suiza Dairy Inc. v. Rivero Cubano*, 2005 WL 8159035, at *4 (D.P.R. Mar. 23, 2005). The danger is particularly acute here since Plaintiffs are requesting nationwide relief. The Department has already ceased enforcing Section 106.45(b)(6)(i) in Texas. It will do likewise to any provision deemed unlawful on appeal. Hence, any decision made by the appeals court will have a real and perceptible effect on Texas, regardless of whether Texas is successful at defending the regulations in the other cases in which it intervened.

### D.  The federal government has ceased representing Texas' interests.

The federal government no longer intends to defend Section 106.45(b)(6)(i) of the Final Rule. After this Court issued its order for judgment, Texas contacted DOJ to inquire whether the Department planned to appeal the Court's order, which found the Final Rule's prohibition on statements not subject to cross-examination to be arbitrary and capricious. Ex. 1. DOJ confirmed in writing that it will not appeal the vacatur to the First Circuit. Ex. 4. As a consequence, there are no parties to this action willing and able to represent Texas' interests at all, much less fairly. *Yniguez v. State of Ariz.*, 939 F.2d 727, 737 (9th Cir. 1991) (finding that no representation on

appeal constitutes inadequate representation). In such a scenario, the prospective intervenor has made a strong affirmative showing that the government's representation is inadequate, overcoming the presumption. *See Students for Fair Admissions, Inc.* 308 F.R.D. at 50 (noting if the government refused to appeal a defeat, a would-be intervenor could then seek to intervene). Intervention is appropriate. *See Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 568 (1st Cir. 1999); *Daggett*, 172 F.3d at 112; *cf Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) (explaining that intervenor joined the case to press an appeal that government declined).

Indeed, the Department's decision not to pursue an appeal further supports Texas' assertion that the Department, under the Biden Administration, is hostile to the Final Rule and seeks its repeal through whatever means necessary. As explained above, President Biden (erroneously) considers the Final Rule "a green light to ignore sexual violence." *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/ (last visited Sep. 22, 2021). He promised to put the Final Rule "quick end," *id.*, and immediately upon taking office, ordered the Department to eliminate or revise any provision in the Final Rule that is inconsistent with the President's policies. ECF 161. This encompasses the very reforms that clarified Texas' obligations under Title IX and removed any associated pressure for academic institutions to tread close to the constitutional line. The Department has already announced that it will conduct rulemaking pursuant to the President's executive order, but the process will take years. The Department does not expect to have a proposed rule ready until May 2022, and even then, the Department still has to open the rule up for public comments. An adverse judgment from this Court or the First Circuit would bypass that process (and accompanying delay) entirely, giving the federal government an interest in seeing the Final Rule fail.

As a matter of fact, the Biden Administration already employed this tactic to topple the public charge rule,[11] which, like the Final Rule, the President had promised to "reverse" once in office. *The Biden Plan for Securing Our Values as a Nation of Immigrants*, JOEBIDEN.COM, https://joebiden.com/immigration/ (last visited Sep. 22, 2021). There, the Biden Administration ordered the Department of Homeland Security to stop defending the public charge rule because the Administration determined that the rule was incompatible with its planned immigration policy. *See* Press Release, U.S. Dep't. of Homeland Security, *DHS Secretary Statement on the 2019 Public Charge Rule* (March 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. In accordance with this announcement, DOJ moved to dismiss pending appeals in the Supreme Court, Seventh Circuit, and Fourth Circuit, allowing an adverse judgement from the Northern District of Illinois vacating the public charge rule to go into effect. The announcement came one month after the President ordered a review of the policy, and it effectively enabled him skirt around the notice and comment process. The Department's decision not to appeal this Court's order for judgement borrows from the same playbook.

In sum, Texas easily meets the requirements for intervention as of right.

## II. In the alternative, the Court should permit permissive intervention.

Even if the Court were to conclude that Texas may not intervene as of right, this Court should exercise its "broad discretion" and permit Texas to intervene in this action under Rule 24(b). *Morra v. Casey*, 960 F. Supp. 2d 335, 338 (D. Mass. 2013).

Texas satisfies all the threshold requisites for permissive intervention. *First*, Texas' motion is timely. As explained above, Texas filed its motion to intervene one week after learning that the

---

[11] The 2019 public charge rule clarified the factors the government would consider when determining whether someone was likely at any time in the future to become a public charge and was therefore ineligible for admission or adjustment of immigration status.

federal government intended to abandon its defense of Section 106.45(b)(6)(i) and before the appeals period expired. *See supra* Part I.A; *see also Burney v. City of Pawtucket*, 728 F.2d 547, 549 (1st Cir. 1984). The State acted as soon as it had confirmation that its significant protectable interests were at risk.

*Second*, Texas entry into the case would not delay, much less prejudice any of the existing parties. *See supra* Part I.A Texas filed its motion to intervene before the appeals period expired. It makes no difference to Plaintiffs' ability to litigate if the appeal was brought by Texas rather than the federal government. *United Airlines*, 432 U.S. at 394.

*Third*, Texas' position in support of the Final Rule involves common questions of law and fact. *See Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 568 (1st Cir. 1999). Both "the main action" and Texas' defense center on whether the Final Rule is consistent with the Administrative Procedures Act and the Fifth Amendment. Fed. R. Civ. P. 24(b)(1)(B). Those common questions of law and fact are sufficient for permissive intervention. *See*, *e.g.*, *Varsity Wireless, LLC v. Town of Boxford*, 2016 WL 11004357, at *7 (D. Mass. Sept. 9, 2016).

*Fourth,* Texas has an independent ground for subject matter jurisdiction, as this action raises a federal question, and Texas would establish federal-question jurisdiction independent of Plaintiff's ability to do so. *Int'l Paper Co.*, 887 F.2d at 347.

*Finally*, the Court should exercise its discretion to permit intervention because Texas seeks to defend interests that will otherwise go unprotected in future proceedings. As courts in this Circuit have recognized, permissive intervention is concerned with securing a "fair, efficient and expeditious resolution of the case." *Charlesgate Nursing Ctr. v. Rhode Island.*, 723 F. Supp. 859, 862 (D.R.I. 1989). In making this determination, the courts may look to additional factors,

including whether the movant's interests are adequately represented. *Commonwealth v. U.S. Dep't of Health & Hum. Servs.*, 289 F. Supp. 3d 259, 265 (D. Mass. 2018). As the federal government has elected not to pursue an appeal of this Court's judgment, there are *no* parties currently representing Texas' interest that the Final Rule be applied in its entirety (or amended through ordinary administrative procedures). By definition, Texas' interests are not being adequately represented by an administration that is demonstrably hostile to a rule that Texas believes will both facilitate enforcement of Title IX and discourage potentially unconstitutional practices. Texas therefore has a stake in the Final Rule (as well as a perspective of its effects) that the parties—who are now aligned on policy—do not share. Thus, even to the extent the federal government participates in future proceeding, Texas' addition to the case will ensure that there is a party to this action willing to pursue all available arguments and procedures in the Final Rule's defense. *See The Travelers Indem. Co. v. Bastianelli*, 250 F.R.D. 82, 86 (D. Mass. 2008) (quoting *N.H. Ins. Co. v. Greaves*, 110 F.R.D. 549 (D.R.I.1986)) (granting intervention because a "just and equitable resolution" involves "the strongest possible arguments by counsel").

Other factors that may play a part in the court's analysis—i.e. the possibility of undue delay and the nature of movant's interest—are addressed earlier in Texas' arguments, *see supra* Part I.A–B, and likewise are clearly weighed in favor of permissive intervention. *Bastianelli*, 250 F.R.D. at 86.

## CONCLUSION

For the foregoing reasons, the State of Texas respectfully requests that the Court grant its motion to intervene as a matter of right under Rule 24(a) or, in the alterative, for permissive intervention under Rule 24(b).

Date: September 24, 2021.                  Respectfully submitted.

KEN PAXTON                                 PATRICK K. SWEETEN
Attorney General of Texas                  Associate Deputy for Special Litigation

BRENT WEBSTER                               */s/ Kathleen T. Hunker*
First Assistant Attorney General           KATHLEEN T. HUNKER
                                           Special Counsel

                                           **OFFICE OF THE ATTORNEY GENERAL**
                                           P.O. Box 12548 (MC-009)
                                           Austin, Texas 78711-2548
                                           Tel.: (512) 936-1414
                                           Fax: (512) 936-0545
                                           patrick.sweeten@oag.texas.gov
                                           kathleen.hunker@oag.texas.gov


                                           */s/    Kenneth B. Walton*
                                           Kenneth B. Walton (BBO No. 562174)
                                           Ken.Walton@lewisbrisbois.com
                                           **LEWIS BRISBOIS BISGAARD & SMITH LLP**
                                           One International Place, 3rd Floor
                                           Boston, MA 02110
                                           T: 857-313-3950
                                           F: 857-313-3951

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth B. Walton, hereby certify that on September 24, 2021, a true and correct copy of the within document was served on all parties via the Electronic Case Filing System.


<u>/s/     Kenneth B. Walton</u>
Kenneth B. Walton