**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VICTIM RIGHTS LAW CENTER, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:20-cv-11104-WGY |
| MIGUEL CARDONA, *et al.*, | |
| Defendants, | |
| FAMILIES ADVOCATING FOR CAMPUS EQUALITY, JOHN DOE, STEVE DOE, and ZACHARY DOE, | |
| [Proposed] Intervenor-Defendants. | |

**MEMORANDUM IN SUPPORT OF FAMILIES ADVOCATING FOR CAMPUS EQUALITY'S MOTION TO INTERVENE AS DEFENDANT FOR PURPOSES OF APPEAL**

Families Advocating for Campus Equality ("FACE") is a 501(c)(3) nonpartisan, nonprofit organization that advocates for and supplies resources to students and faculty accused of sexual misconduct on college and university campuses, as well as to their families.  Its members include wrongly accused students and faculty subject to disciplinary proceedings governed by the regulations enacted last year by Defendant U.S. Department of Education (hereafter "the Education Department" or "the Department") that regulate post-secondary institutions responses to claims of sexual misconduct ("the Final Rule").  In the wake of this Court's order (hereafter the "July 28 order") vacating the part of that rule that bars reliance on statements not subject to cross-examination, *see* 34 C.F.R. § 106.45(b)(6)(i) (hereafter "the exclusionary rule"), FACE has suffered and will continue to suffer cognizable injury to its mission.  One of its members, furthermore—John Doe, another proposed intervenor-defendant in

this matter—also faces the threat of imminent injury in the wake of this Court's order. That is because the Department, in response to the July 28 order, has announced that "[p]ost-secondary institutions are no longer subject to" the exclusionary rule[1] and has confirmed in writing to counsel for the movants that it will not appeal this Court's order vacating the rule. Schools across the country have now predictably begun to discard it, as John's is likely to do, having only adopted it under government compulsion and employed it for one year. Intervening here is the only practical way for FACE to remedy the harm to its mission and the imminent threat to at least one of its members posed by the July 28 order. Moreover, if the government decides not to oppose any appeal by Plaintiffs relating to any of the 12 *other* parts of the Final Rule that they challenge, participating as a defendant in this matter will also be its only chance, as a practical matter, to remedy further harm to its mission that it will suffer if those other protections afforded to accused students and faculty by the Final Rule are invalidated.[2] FACE therefore respectfully requests an order allowing it to intervene in this matter for purposes of appeal.

## BACKGROUND[3]

### I.  The Final Rule

On November 29, 2018, the Education Department published a Proposed Rule outlining the obligations of post-secondary institutions in responding to claims of sexual harassment and sexual misconduct. *See* 83 Fed. Reg. 61462-01 (Nov. 29, 2018). It proposed, among other

---

[1] *See* https://www2.ed.gov/about/offices/list/ocr/docs/202108-titleix-VRLC.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term= (last visited September 21, 2021).

[2] In response to counsel's inquiry whether the government intends to defend any appeal of the July 28 Order by the plaintiffs, the government responded that it was "not in a position to speculate about what arguments the government would advance in response to hypothetical briefs in an appeal that has not yet been taken." *See* Ex. 1.

[3] Sections I and II of the Background are virtually identical to those same sections in the motion to intervene filed today by John Doe, Steve Doe, and Zachary Doe.

things, that decisionmakers be prohibited from relying on "*any* statement" of a party or witness who "does not submit to cross-examination" at a live hearing.  83 Fed. Reg. 61462, 61475 (emphasis added).  A year and a half later, after an extensive period of notice and comment, the Department then published the Preamble to its Final Rule.  *See* 85 Fed. Reg. 30026-01 (May 19, 2020).  The Preamble devoted 30 pages to the Final Rule's cross-examination provisions, *see id.* at 30311-15, 30331-56, including six directly focused on the exclusionary rule, *see id.* at 30344-30350.  Further discussion of the exclusionary rule was scattered throughout the Preamble.  *See, e.g.*, *id.* at 30215-16.  The Preamble responded to several commenters' criticisms that the exclusionary rule was subject to abuse, including by respondents who might wrongfully procure the absence of witnesses and thereby suppress evidence.  *See, e.g.*, *id.* at 30344 (noting criticism that respondent could "wrongfully procure[] the complainant's absence," thus "requir[ing] exclusion of a complainant's statements").

After considering all of those comments, the Department declined to create exceptions to the exclusionary rule, concluding that a "detailed set of evidentiary rules" was less likely to "result in fair, accurate and legitimate outcomes" than a bright-line rule.  *Id.* at 30337.  It instead responded to commenters' concerns about the exclusionary rule by, among other things, (1) "revis[ing] § 106.45(b)(6)(i) to grant a recipient discretion to hold the entire hearing virtually," and (2) expressly prohibiting retaliation designed to exclude anyone's participation in a grievance process.  *Id.* at 30346.

## II.    The Response to This Court's July 28 Order

On July 28, this Court upheld almost every part of the Final Rule challenged by the plaintiffs but vacated the exclusionary rule as arbitrary and capricious.  ECF No. 183 at 49-50.  It reasoned that if a respondent "elect[ed] not to attend the hearing," succeeded in non-tortiously

"persuad[ing] other witnesses not to attend the hearing," had an advisor who succeeded in "discrediting" the complainant on cross-examination, did so in a way that left the complainant "without hope of evidentiary rehabilitation," and did *all of that* at a school that applied a "clear and convincing evidence" standard of proof (which almost no school does), the hearing would be hollow, and therefore that the Department had failed to consider the effects of the exclusionary provision in conjunction with the rest of the Final Rule. *Id.* at 46-48.

In response to that order, the Department issued both a bulletin[4] and a letter[5] on August 24 stating that "[p]ost-secondary institutions are no longer subject to this portion of the provision" and that decision-makers "may now consider statements made by parties or witnesses that are otherwise permitted under the regulations, even if those parties or witnesses do not participate in cross-examination at the live hearing[.]"[6] Predictably, many schools have responded by announcing they will no longer enforce the exclusionary rule. Ohio University stopped enforcing it on August 27, just three days after the Department issued its guidance, and cited both that guidance and this Court's July 28 Order in explaining why.[7] Penn State, for instance, stopped enforcing it on August 30, just six days after the Department issued its guidance, citing both the guidance and this Court's order in explaining its decision.[8] Dartmouth

---

[4] *See* https://content.govdelivery.com/accounts/USED/bulletins/2ee0a5d (last visited September 21, 2021).

[5] *See supra* n.1.

[6] *Id.* at 1.

[7] *See* Ex. 2 (Letter of Kerri Griffin, Aug. 27, 2021).

[8] *See* https://www.collegian.psu.edu/news/campus/penn-state-enacts-2-changes-to-title-ix-sexual-harassment-policy/article_4f53c3e6-17fd-11ec-aca0-abef77caefe0.html (reporting that Penn State ceased enforcing exclusionary provision on August 30) (last visited Sept. 24, 2021); *see also* https://policy.psu.edu/policies/ad85#FORMAL%20HEARING%20PROCESS (Penn State's current Title IX procedures, containing no exclusionary provision) (last visited Sept. 24, 2021).

College has similarly announced that it "has revised the [Sexual Misconduct Policy] and related procedures consistent with July 28 and August 10, 2021 orders of" this Court "and August 24, 2021 guidance from the Department of Education" by striking the exclusionary rule.[9]  And in the first week of September, proposed intervenor-defendant Zachary Doe's college announced that, in response to the Department's guidance, it, too would be discarding the exclusionary rule, effective immediately.  Its announcement specifically noted that the college had been required by law to make the changes to its policy that it had made the year before.

## III.   Movant's Interests in This Matter[10]

FACE was founded in 2013 by several mothers of sons who had been wrongly accused of, or erroneously found responsible for, sexual misconduct at their respective colleges and universities. Ex. 3 (Declaration of Cynthia P. Garrett) at ¶ 5.  It is organized and operated primarily by women.  *Id.* at ¶ 8.  It has approximately 2,000 members, representing at least 48 states and 18 countries.  *Id.* at ¶ 14.  FACE is the largest and only gender-neutral, non-partisan organization of its type.  *Id.* at ¶ 9.  It does its work with "extremely limited resources.  Save for one part-time employee, FACE is composed entirely of volunteers, which include its Executive officers."  *Id.* at ¶ 47.

Chief among FACE's purposes is to provide "invaluable encouragement, support and advice" to its members "[i]n the wake of these often traumatic Title IX campus disciplinary processes."   *Id.* at ¶ 8.  It hosts "a Bi-Annual Meet & Greet" which "is among the most important functions that FACE provides for its members."  *Id.* at ¶ 16.  "During a Meet & Greet

---

[9] *See* https://sexual-respect.dartmouth.edu/compliance/dartmouth-sexual-and-gender-based-misconduct-policy-and-procedures (last visited Sept. 21, 2021).

[10] In addition to the interests described here and in the Declaration of Cynthia P. Garrett, FACE adopts the Answer to the Second Amended Complaint filed by the State of Texas (ECF No. 190).

FACE provides an opportunity for its members—mothers, fathers, faculty, and students—to come together, share their often eerily similar stories, and heal with the support of legal and mental health professionals." *Id.* FACE's community members "suffer from severe mental anguish; many of the accused have contemplated suicide, some have attempted it." *Id.* at ¶ 24. "By connecting families going through similar struggles and plugging them into a community where they no longer have to suffer alone, FACE is able to facilitate healing and save lives." *Id.* When new members join FACE, "they receive a welcome email and a FACE Welcome Packet with information geared toward its members," including "a members-only Google Group and an Outreach Committee that assists with emotional support." *Id.* at ¶¶ 18, 21.

FACE "also participates in activities to educate Congress, OCR, FACE members, the media, and the public about issues that accused students and their families face in the context of inequitable Title IX proceedings." *Id.* at ¶ 28. During the Title IX Rulemaking period that preceded enactment of the Final Rule, FACE met with legislators and other government officials to advocate for fairer processes for its members. *Id.* at ¶¶ 34, 38. It also "submitted detailed comments on the Proposed Title IX Rulemaking in January 2019," particularly on the topic of cross-examination. *Id.* at ¶¶ 36, 37. It commented, among other things, that "written statements cannot substitute for cross-examination" and that the Proposed Rules' other "newly-added due process protections . . . will require thoroughness and objectivity on the part of colleges while giving respondents more tools to defend themselves." *Id.* at ¶ 37; *see also id.* at ¶ 46.

Before enactment of the Final Rule, FACE "did not have sufficient staff or money to assist every student or faculty member who approached it for help." *Id.* at ¶ 49 (noting that 75% of accused students are unable to hire advisors and thus require special assistance). During that period, FACE "needed two to four volunteers working 8-hour days managing incoming calls and

emails from new and preexisting desperate community members suffering from inequitable treatment." *Id.* at ¶ 58; *see also id.* at ¶ 59 ("The emotional capacity to listen to and provide support to community members in crisis, some of whom are suicidal, is incredibly draining."). But when the Final Rule was enacted, FACE "saw a corresponding decrease in the number of calls it received from wrongly accused students, faculty, and their families," *id.* at ¶ 57, allowing it to refocus its mission. It "freed up FACE time and resources to support and assist more students and faculty members with their cases." *Id.* at ¶ 50. It also has given FACE "time to begin a serious fundraising effort" to secure its long-term viability. *Id.* at ¶ 51.

The Court's July 28 order has already begun to impair that mission. "In the brief time since the Order, FACE already has experienced some increase in the number of calls, emails, and Google Group postings as a direct result of the Order," impairing its ability to fulfill its mission. *Id.* at ¶ 58. As more and more schools discard the exclusionary rule, FACE will continue having to "explain[] the consequences of the Order to its members, legislators,  the media, and the public." *Id.* at ¶ 53. It reasonably "anticipates that the Order will throw FACE right back into the acute situation it was in before the Final Rules came into effect." *Id.* at ¶ 58.

## ARGUMENT

FACE has interests at stake that warrant intervention, and the government does not intend to defend them. When a movant seeks to intervene for purposes of appeal to seek relief that a party does not, the movant may do so upon satisfying the criteria for both constitutional standing and Rule 24. *Diamond v. Charles*, 476 U.S. 54, 68 (1986). As explained below, FACE has both organizational and associational standing to intervene in this matter, and it also satisfies the criteria for intervention under Rule 24.

I.      **FACE SATISFIES THE CRITERIA FOR BOTH ORGANIZATIONAL AND ASSOCIATIONAL STANDING.**

FACE has Article III standing to participate in this matter as a party.  As further explained below, it has organizational standing because its mission already has been frustrated by the Court's invalidation of the exclusionary rule, and will continue to be so even more as schools continue to abandon that rule.  *See Victim Rts. L. Ctr. v. Cardona*, No. CV 20-11104-WGY, 2021 WL 3185743, at *9 (D. Mass. July 28, 2021), *order clarified,* No. CIV 20-11104-WGY, 2021 WL 3516475 (D. Mass. Aug. 10, 2021).  And it has associational standing because one of its members, John Doe, is currently subject to a Title IX proceeding at his university and thereby has standing to participate as a party as well.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 104 (D. Mass. 2017), *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020).

A.      **FACE Has Organizational Standing.**

An entity establishes organizational standing by demonstrating that "its mission has been 'frustrated' by the challenged conduct *and* it has expended resources to combat it."  *Victim Rts. L. Ctr.*, 2021 WL 3185743, at *9 (emphasis in original); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Both prongs are satisfied here.

1.      **The July 28 Order Has Impaired FACE's Mission and Threatens to Imminently Do So Even More.**

The July 28 order impairs FACE's mission in at least four concrete ways.

*First*, as noted above, the order has already led to an "increase in the number of calls, emails, and Google Group postings as a direct result of the Order."  Ex. 3 at ¶ 58.  Responding to those inquiries necessarily consumes resources that cannot be spent in furtherance of FACE's

mission and thereby impair it.  The size of the impairment is irrelevant for standing purposes; "an identifiable trifle is enough for standing."  *United States v. Students Challenging Regul. Agency Procs. (SCRAP),* 412 U.S. 669, 690 n. 14 (1973) (quotation omitted); *see also id.* (noting that "a fraction of a vote," "a $5 fine and costs," and "a $1.50 poll tax" have all qualified as injuries-in-fact for standing purposes).  Thus, "[w]here an organization diverts its resources away from its *current* activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing."  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) (emphasis added). That is just as true when the diversion is in response to a recent change in the law that an organization must now explain to others or otherwise expend resources on.  *See, e.g.*, *Hisp. Int. Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1243 (11th Cir. 2012) (noting that in prior case, "an organizational plaintiff suffered cognizable injury when it was forced to 'divert resources from its regular activities to educate and assist [affected individuals] in complying with the [challenged] statute'") (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009)); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (voter outreach organization suffered injury-in-fact from the "additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters" because "addressing the challenged provisions frustrate[d] and complicate[d] its routine community outreach activities"). "Th[e] distinction" between expending resources in connection with "then-existing" law and diverting resources to address "newly" changed law "is not just academic."  *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016).  Only the latter impairs a current mission by diverting resources from "current activities."  *Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 110-11.

*Second*, the abandonment by schools of the exclusionary rule, and the calls that FACE has already received, make it sufficiently likely for standing purposes that this impairment of FACE's mission will increase.  *See Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020), *cert. denied sub nom. Dantzler, Inc. v. S2 Servs. Puerto Rico, LLC*, 2021 WL 1951807, 209 L. Ed. 2d 751 (May 17, 2021) (injury is imminent when there is "a sufficient threat of it occurring"); *see also Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1019 (7th Cir. 2016) (possibility of injury need not "be certain"; rather, "there must be at least a substantial risk that such harm will occur").  That "anticipation" is not subjective or speculative, or concerned with "non-imminent" harm.  *See Clapper v. Amnesty Intern., USA*, 568 U.S. 398, 422 (2013).  It is a "reasonabl[e] anticipat[ion]" based on the inquiries FACE has already received and responded to in the wake of the July 28 order.  *Fla. State Conference of the NAACP v. Browning,* 522 F.3d 1153, 1165-66 (11th Cir. 2008) (organizations satisfied injury prong of standing because they "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and [affected individuals] on compliance" with new statute, based in part on "inquiries received by the organization [that] were prompted by" the challenged law); *see also Ne. Ohio Coal. for the Homeless*, 837 F.3d at 624 (finding organizational standing where plaintiff "*plans* to redirect its focus" in response to new law) (emphasis added).

As the Garrett Declaration explains, the decrease in inquiries that followed the enactment of the Final Rule allowed FACE to directly assist more members and even to refocus its mission with a view to establishing its long-term viability.  Ex. 3 at ¶¶ 50-51.  The invalidation of the exclusionary rule, and any other parts of the Final Rule that Plaintiffs might challenge on appeal, will return FACE to a *status quo ante* where it had to dedicate multiple volunteers to fielding

inquires eight hours per day.  *Id.* at ¶ 58; *see also* Memorandum in Support of Individual Movants' Motion to Intervene for Purposes of Appeal at 7-10 (explaining that changes occurring in response to government mandate are likely to revert to *status quo ante* for standing purposes when mandate is removed).  The likelihood that FACE will be able to serve fewer members and may have to abandon its long-term plans both amount to imminent impairments of its mission. *See* ECF No. 183 at 29 (ability to serve fewer clients amounts to organizational impairment); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974 (9th Cir. 2020) (practical need to "overhaul" immigration practice from an affirmative practice to a defensive one amounted to impairment of mission).

Third, the July 28 order has "made it more difficult [for FACE] to obtain beneficial outcomes" for its members.  *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2018 WL 4770741, at *7 (N.D. Cal. Oct. 1, 2018), *order amended on reconsideration*, No. 18-CV-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019).  As the Garrett Declaration explains, the exclusionary rule, and robust cross-examination more generally, helped to ensure fair and reliable outcomes for FACE members.  Ex. 3 at ¶¶ 37, 42-45; ¶ 46 (noting case where nurse not subject to cross-examination in campus proceeding admitted on cross during criminal trial that DNA found during complainant's exam was not respondent's).  Its unavailability threatens harm to its members, including John Doe, who is currently subject to a Title IX proceeding.  This is not a case where "the 'only injury arises from the effect of [a challenged action] on the organizations' lobbying activities, or when the service impaired is pure issue-advocacy.'" *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021) (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015)).

For all of those reasons, the July 28, 2021 Order "has perceptibly impaired' [FACE's] ability to provide services to its members." *SurvJustice Inc.*, 2018 WL 4770741, at *6 (quotation marks omitted).

### 2.     The July 28 Order Has Drained, and Will Soon Further Drain, FACE's Resources.

To satisfy the second prong—diversion of resources—an organization must show "'a consequent drain on the organization's resources.'" *Victim Rts. L. Ctr. v. Cardona*, 2021 WL 3185743, at *10 (citing *Havens Realty Corp.*, 455 U.S. at 379).  As explained above, the July 28 order has already drained, and will continue to drain, FACE's extremely limited resources.  The "increased demand for the services of" an organization and the "accompanying financial operational injuries" establish "a substantial risk of organizational harm."  *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*, No. CV-20-11297-PBS, 2021 WL 3667760, at *8 (D. Mass. Aug. 18, 2021) (finding organizational standing where the "strain on resources and capacity" included going "from getting one to three callers per week to about ten callers per week").  As also explained above, there is a sufficient threat that there will be a further drain on FACE's resources because of the July 28 order.

### B.     FACE Has Associational Standing As Well.

It is well-settled that "[a]n association may assert standing on behalf of its members if: (1) at least one of its members possesses standing to sue in its own right[;] (2) the interests that the suit seeks to vindicate are germane to the organization's objectives; and (3) neither the claim asserted nor the relief demanded necessitates the participation of individual members."  *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998).  FACE satisfies all three criteria.

### 1.   FACE Is a Membership Organization and One of Its Members, John Doe, Has Standing to Sue.

"[F]or the purposes of standing," it is "presumed" that an organization is a membership organization when it (1) "clearly state[s] its mission in its Bylaws and website"; (2) "consistently, and recently, in highly public ways, pursue[s] efforts to [achieve its mission] through litigation"; and (3) "its members voluntarily associate themselves with the organization." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 109 (D. Mass. 2017), *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020).

FACE readily satisfies those criteria. It states its mission on its website, Ex. 3 at ¶ 7; consistently, recently, and publicly, pursues efforts to achieve it mission through litigation, *id.* at ¶¶ 39-40; and its members voluntarily associate themselves with FACE, by proactively reaching out to the organization, *id.* at ¶ 15.

As further explained in the Garrett Declaration, FACE is a membership organization composed of approximately 2,000 members.  *Id.*  at ¶ 14.  Its website has a public-facing "Member Advice" section that contains advice from three categories of members: FACE Students, FACE Parents, and FACE Attorneys.  *Id.* at ¶ 15.  Its website also has a section with the heading "Members" section with the sub-sections, "Our Stories," "News," "Meet & Greet," and "Contact Us."  *Id.*  It hosts activities for its members, including a Bi-Annual Meet & Greet where members are connected with each other and with legal and mental health professionals. *Id.* at ¶ 16.

FACE has a protocol for new-member intake that is managed by its Intake Committee. *Id.* at ¶ 17.  One of the purposes of the Intake Committee is to ensure that prospective new members and new contacts receive the appropriate attention and guidance within the FACE

organization.  *Id.*  When new members join FACE, they receive a welcome email and a FACE

Welcome Packet with information geared toward its members.  Part of that packet, "Introduction

to FACE," explains that one of the support resources available to members is FACE's online

Discussion Board and a members-only Google Group.  *Id.* at ¶ 18.  The Introduction also states

that it "is through platforms like these that we are able to offer our members the support they

need and allow for an exchange of information."  *Id.* at ¶ 19.  "Introduction to FACE" also

explains that FACE members participate in projects to help advance the goals and objectives of

FACE.  *Id.* at ¶ 20.  Another part of the Welcome Packet, "How to Effectively Utilize Face"

explains that "FACE has many resources and avenues of support to offer all of its members."  *Id.*

at ¶ 21.  Among the resources it highlights is an Outreach Committee that assists with emotional

support.  *Id.*  A third part of the packet, "A Brief History of FACE" recounts how FACE brings

its members together.  *Id.* at ¶ 22.  It lets families know they are not alone in their struggles.  *Id.*

FACE, in short, clearly qualifies as a membership organization; it "adequately represents

the interests of its current members."  *Students for Fair Admissions, Inc.*, 261 F. Supp. 3d at 109.

And one of its members is John Doe, Ex. 3 at ¶ 26, who seeks to intervene here.  As discussed in

the individual movants' own motion to intervene, John Doe has "standing to sue in [his] his own

right."  *Students for Fair Admissions, Inc.*, 261 F. Supp. 3d at 104 (internal citations omitted).

### 2.     The Interests That FACE Seeks to Vindicate Are Germane to Its Objectives.

The second criterion for associational standing is satisfied as well.  As noted, FACE

submitted comments to the Department about the importance of cross-examination and the

inadequacy of written statements not subject to cross while the Proposed Rule was under

consideration.  Ex. 3 at ¶ 36.  Advocating for greater procedural protections has long been part of

its mission.  *See, e.g., id.* at ¶¶ 6-8, 29.  FACE seeks to intervene to further those purposes.

### 3.   FACE's Claims Do Not Require Individual Member Participation.

If allowed to intervene, FACE would seek on appeal an order holding that the exclusionary rule was validly enacted.  That kind of relief does not depend on the participation of any of its members because it "need not be tailored to or require any individualized proof from any particular member."  *Students for Fair Admissions, Inc.*, 261 F. Supp. 3d at 110 (noting that "[a]ctions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation").

## C.   FACE's Injuries Are Traceable to the July 28 Order and Would Be Redressed By Its Reversal.

FACE satisfies the traceability and redressability prong of standing as well.  The July 28 order invalidated the exclusionary rule and led the Department to issue its August 24 guidance, both of which schools have cited when deciding to discard the rule.  Reversal of that order on appeal would reinstate the rule and redress the movants' injuries.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 150 (2010) ("Because that injury is caused by the very remedial order that petitioners challenge on appeal, it would be redressed by a favorable ruling from this Court.").  FACE thus has standing to intervene.

## II.   FACE SATISFIES THE CRITERIA FOR INTERVENTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 24.[11]

### A.   FACE Satisfies the Criteria for Intervention as of Right.

Rule 24(a)(2) states that a court, on "timely motion," "must permit anyone to intervene" who "claims an interest relating to the property or transaction that is the subject of the action" so long as "disposing of the action may as a practical matter impair or impede the movant's ability

---

[11] Except for subsection II.A.2., this section is largely identical to Section II of the individual movants' memorandum in support of their motion to intervene.

to protect its interest" and existing parties do not "adequately represent that interest."  Fed. R.

Civ. P. 24(a)(2).  Although each of those elements must be fulfilled, the "inherent imprecision of

Rule 24(a)(2)'s individual elements dictates that they 'be read not discretely, but together,' and

always in keeping with a commonsense view of the overall litigation." *Pub. Serv. Co. of N.H. v.

Patch,* 136 F.3d 197, 204 (1st Cir. 1998) (citation omitted).

      1.      **The Motion Is Timely.**

The timeliness of a motion to intervene "is to be determined from all the circumstances."

*Nat'l Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973)).  Courts

in this Circuit assess four factors in determining whether a motion to intervene is timely: (1) the

length of time the movant knew of its interest before it petitioned to intervene; (2) any prejudice

to the existing parties caused by the movant's delay; (3) the prejudice movant would suffer if it

were not allowed to intervene; and (4) the existence of extraordinary circumstances militating for

or against intervention.  *Culbreath v. Dukakis*, 630 F.2d 15, 20–24 (1st Cir. 1980).

FACE's motion is timely under those criteria.  FACE seeks intervention less than two

months after this Court issued its July 28 order.  *See Pub. Citizen v. Liggett Group, Inc*., 858

F.2d 775, 785 (1st Cir. 1988) (motion to intervene was timely because it was filed "when the

intervenor became aware that its interest in the case would no longer be adequately protected by

the parties").  The plaintiffs will suffer no prejudice from FACE's failure to file even earlier,

because the window for filing an appeal has yet to run; the only harm the plaintiffs stand to

suffer at all is a slight delay in the briefing on any appeal they may file while this motion is

resolved.  FACE, by contrast, will suffer extraordinary prejudice if it cannot intervene because it

has no other effective way to challenge the Court's decision, which not only struck down the

provision in question but has led the Education Department to forgo any effort to defend that

provision.  Motions to intervene that are filed "within the time period in which the [original parties] could have taken an appeal" generally are "timely filed and should [be] granted," *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395-96 & n.16 (1977), and no "extraordinary circumstances," *Culbreath*, 630 F.2d at 24, suggest otherwise here.

      **2.**      **The Court's Decision Impairs Significant Protectable Interests of FACE.**

FACE satisfies the second and third prongs for intervention as of right as well, for largely the same reasons that they have standing here.  *See Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 110 (1st Cir. 1999) ("Although the two are not identical, the "interest" required under Rule 24(a) has some connection to the interest that may give the party a sufficient stake in the outcome to support standing under Article III.").  Though there "is no precise and authoritative definition of the interest required to sustain a right to intervene," *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 638 (1st Cir. 1989), it generally requires a "sufficiently close relationship" between the intervenor's claims and "the dispute between the original litigants," *Conservation Law Found. v. Mosbacher*, 966 F.2d 39, 42 (1st Cir. 1992). FACE's interests map perfectly onto "the dispute between the original litigants":  It seeks to argue that one of the provisions challenged by the plaintiffs was validly enacted under the Administrative Procedure Act, just as the government argued in this Court.  Its interest is the "mirror image" of the plaintiffs'—just as plaintiffs allege they are "being injured by the [Final Rule]," FACE "w[ould] be injured by [the Final Rule's] invalidation." *Builders Ass'n of Greater Chi. v. City of Chicago*, 170 F.R.D. 435, 440 (N.D. Ill. 1996).

FACE's interests are impaired, "as a practical matter," by invalidation of the exclusionary provision.  Fed. R. Civ. P. 24(a)(2).  As explained above, it has already experienced a drain on its resources in connection with the July 28 order, it is highly likely to experience even more, and its

ability to help secure beneficial outcomes for its members is impaired.  It faces the imminent threat of enduring disciplinary hearings where the decisionmakers in their cases will weigh statements untested by cross-examination.  *See Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) (intervenor-defendant's interests "may, as a practical matter, be impaired" if court invalidated government rule and thereby gave third parties discretion to commit the harms plaintiffs feared).

### 3.   The Government Will Not Adequately Represent FACE's Interests.

FACE also readily satisfies the final criterion for intervention.  It is well established that "an applicant for intervention need only make a minimal showing that the representation afforded by existing parties likely will prove inadequate." *Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 207 (1st Cir. 1998).  Even if that burden is heightened when intervening on the side of the government, it is still met by "a strong affirmative showing that the agency (or its members) is not fairly representing the applicants' interests." *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 561 (1st Cir. 2021).  Here, it is not merely "likely" that the government's representation will prove inadequate—it is *certain*, because the government has stated that it will not be appealing the Court's July 28 order.  *See id.* at 562 (1st Cir. 2021) (noting that the First Circuit has "held that a state agency's representation of movant fishing groups was inadequate when the agency raised no defense to the suit and agreed to a settlement" less favorable to movants than the *status quo ante*).  Defendants could even decide not to defend the *rest* of the Final Rule in any appeal filed by the plaintiffs, or they could choose to defend it only against certain arguments but not others.[12]  Given the politically charged nature of Title IX matters, such a change would not be surprising.  FACE should thus be permitted to intervene not only to

---

[12] *See supra* n.2.

defend the exclusionary rule but also to ensure a full defense against any appeal by the plaintiffs. *Conservation L. Found. of New England, Inc.*, 966 F.2d at 44–45 ("An intervenor need only show that representation *may* be inadequate, not that it is inadequate.") (emphasis added, citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972)).

### B.   FACE Satisfies the Criteria for Permissive Intervention As Well.

Alternatively, the Court should use its "very broad discretion" to grant FACE leave to intervene under Rule 24(b).  *The Travelers Indem. Co. v. Bastianelli*, 250 F.R.D. 82, 85 (D. Mass. 2008).  That rule states that a court, on "timely motion," "may permit anyone to intervene" who "has a claim or defense that shares with the main action a common question of law or fact," provided it would not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(2)-(3).

As courts in this Circuit have recognized, permissive intervention is concerned with securing a "fair, efficient and expeditious resolution of the case." *Charlesgate Nursing Ctr. v. State of Rhode Island*, 723 F. Supp. 859, 862 (D.R.I. 1989).  Courts may therefore look to additional factors when weighing permissive intervention, including whether the movant's interests are adequately represented by the parties.  *Commonwealth v. United States Dep't of Health & Hum. Servs.,* 289 F. Supp. 3d 259, 265 (D. Mass. 2018).  That is because the "'just and equitable resolution'" with which the rule is concerned is served by allowing "'the strongest possible arguments by counsel.'"  *Bastianelli,* 250 F.R.D. at 86 (granting intervention and quoting *N.H. Ins. Co. v. Greaves*, 110 F.R.D. 549, 552 (D.R.I. 1986)).

For the reasons explained above, FACE's motion is timely and would only minimally delay any appeal.  *Cf. Steves & Sons, Inc. v. JELD-WEN, Inc*., 323 F.R.D. 553, 561 (E.D. Va. 2018) ("Rule 24(b) mentions only undue delay; normal delay does not require denying

intervention, because adding parties to a case almost always results in some delay.").  FACE's position also shares "a common question of law or fact" with the position taken by Defendants in this Court, in that FACE will similarly argue that the exclusionary provision is consistent with the Administrative Procedure Act.  ECF No. 144 at 11-13 (government's pretrial brief);  *see Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 568 (1st Cir. 1999) (defending the validity of a challenged statute clears "the low threshold set by Rule 24(b)").  Intervention should be granted to ensure that "'the strongest possible arguments'" are advanced before the exclusionary rule, or any other part of the Final Rule, is irreversibly invalidated.

## CONCLUSION

For 18 months, the Education Department received comments on its proposed rule, weighed them, then carefully addressed them before enacting its Final Rule.  The Final Rule gave students like the ones FACE supports important protections in defending against the most serious kind of charge a college student can face.  The government has refused to defend the part of the Rule that this Court invalidated, and it may very well refuse to defend other parts of the Rule on appeal as well.  Intervention in this case, at this time, is thus the only practical way for FACE to secure the Final Rule's protections for its members.  For all of the reasons stated above, it respectfully requests an order allowing it to do so.

Dated:   September 27, 2021

Respectfully submitted,

/s/ Justin Dillon
Justin Dillon (*pro hac vice* pending)
Christopher C. Muha (*pro hac vice* pending)
Sarah R. Fink (*pro hac vice* pending)
KAISERDILLON PLLC
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005
Phone:  (202) 640-2850
Fax:  (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com
sfink@kaiserdillon.com

/s/ Douglas S. Brooks
Douglas S. Brooks
Massachusetts Bar No. 636697
Libbey Hoopes Brooks, P.C.
399 Boylston St.
Boston, MA 02116
Phone: (617) 338-9300
Fax: (617) 338-9911
dbrooks@lhblaw.com

*Counsel for FACE*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of September, 2021, the foregoing Memorandum in Support of Families Advocating for Campus Equality's Memorandum in Support of Motion to Intervene as Defendant for Purposes of Appeal was served upon all parties of record by the Court's CM/ECF system.

<u>/s/ Douglas S. Brooks</u>
Douglas S. Brooks

*Counsel for FACE*